QUINN EMANUEL URQUHART & SULLIVAN LLP
Rachel Herrick Kassabian (SBN 191060)
rachelkassabian@quinnemanuel.com
Yury Kapgan (SBN 218366)
yurykapgan@quinnemanuel.com
Margret M. Caruso (SBN 243473)
margretcaruso@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Brian Mack (SBN 275086)
brianmack@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6400
Facsimile: (415) 875-6700

*Attorneys for Plaintiff WPEngine, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WPENGINE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AUTOMATTIC INC., a Delaware corporation; and MATTHEW CHARLES MULLENWEG, an individual,<br><br>Defendants. | Case No. 3:24-cv-06917-AMO<br><br>**PLAINTIFF WPENGINE, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge: Honorable Araceli Martínez-Olguín<br>Courtroom: 10<br>Hearing Date:  March 6, 2025<br>Hearing Time: 2:00 p.m. |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

NOTICE OF MOTION AND MOTION ....................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................1

STATEMENT OF ISSUES TO BE DECIDED ........................................................1

INTRODUCTION ....................................................................................................2

FACTUAL BACKGROUND ...................................................................................3

    A.    WordPress ........................................................................................3

    B.    WPEngine, Inc. ................................................................................4

    C.    Defendant Mullenweg, His Entities—and His Resulting Conflicts of Interest..........6

    D.    Defendants' Awareness of WPE's Use of the WordPress Trademark......................7

    E.    Defendants' Coercive Threats To WPE ........................................8

    F.    Defendants Carry Out Their Threats In An Effort to Destroy WPE's Business........9

        1.    Defendants Make False and Disparaging Statements About WPE...............9

        2.    Defendants Block Access to WPE's Plugins .................................10

        3.    Defendants Intentionally Sow Fear in the Marketplace ..............11

        4.    Defendants Manufacture a Sham Security Review of WPE's Plugin..........11

        5.    Mullenweg Modifies wordpress.org's Login Page to Require Loyalty Pledges Disavowing Affiliation with WPE ...................12

        6.    Defendants Wrongfully Expropriate WPE's Most Popular Plugin.............12

        7.    Defendants Threaten More Harm to WPE .................................14

    G.    Defendants Have Caused, and Will Continue to Cause, Irreparable Harm ...........14

LEGAL STANDARD ............................................................................................16

ARGUMENT .........................................................................................................17

I.    WPE IS LIKELY TO SUCCEED ON THE MERITS ................................17

    A.    WPE Is Likely To Succeed On Its CFAA and Extortion Claims.............................17

    B.    WPE Is Likely To Succeed On Its UCL Claim........................................19

    C.    WPE Is Likely To Succeed On Its Interference Claims .........................................20

II.     WPE WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION ..................22

III.    THE EQUITIES TIP SHARPLY IN FAVOR OF RESTORING AND THEN
        PRESERVING THE PRIOR STATUS QUO ..........................................................................24

IV.     THE PUBLIC INTEREST ALSO STRONGLY FAVORS RELIEF....................................25

CONCLUSION ...............................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Accretive Specialty Ins. Sols., LLC v. XPT Partners, LLC,*
    2024 WL 1699509 (C.D. Cal. Mar. 28, 2024) ....................................................... 23

*Alliance for Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ............................................................................. 17

*Altera Corp. v. Clear Logic, Inc.,*
    424 F.3d 1079 (9th Cir. 2005) ............................................................................. 20

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.,*
    534 F. App'x 633 (9th Cir. 2013) ......................................................................... 22

*Boardman v. Pac. Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) ....................................................................... 16, 17

*Campos v. Dyck O'Neal, Inc.,*
    2024 WL 2941656 (E.D. Cal. May 10, 2024) ....................................................... 19

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ........................................................................................ 19

*Cellco P'ship v. Hope,*
    469 Fed. Appx. 575 (9th Cir. 2012) ..................................................................... 21

*Chabner v. United Omaha Life Ins. Co.,*
    225 F.3d 1042 (9th Cir. 2000) ............................................................................. 19

*Chegg, Inc. v. Doe,*
    2023 WL 7392290 (N.D. Cal. Nov. 7, 2023) ................................................... 18, 20

*Comet Techs. United States of Am. Inc. v. Beuerman,*
    2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ...................................................... 25

*Credit Bureau Connection, Inc. v. Pardini,*
    726 F. Supp. 2d 1107 (E.D. Cal. 2010) ................................................................ 21

*Grupo Gigante SA De CV v. Dallo & Co.,*
    391 F.3d 1088 (9th Cir. 2004) ............................................................................. 22

*Henry Schein, Inc. v. Cook,*
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) ................................................................ 22

*hiQ Labs, Inc. v. LinkedIn Corp.,*
    31 F.4th 1180 (9th Cir. 2022) .............................................................................. 20

*Inplant Enviro-Sys. 2000 Atlanta, Inc. v. Lee*,
  2015 WL 12746702 (N.D. Ga. Feb. 10, 2015) ..................................................... 18

*Jorgensen v. Cassiday*,
  320 F.3d 906 (9th Cir. 2003) ............................................................................... 25

*Korea Supply Co. v. Lockheed Martin Corp.*,
  63 P.3d 937 (2003) ................................................................................................ 19

*Moonbug Ent. Ltd. v. HappyKidsTV*,
  2022 WL 18859471 (N.D. Cal. Dec. 15, 2022) ................................................... 23

*Payroll Resource Group v. HealthEquity Inc.*,
  2024 WL 4194795 (N.D. Cal. Sept. 12, 2024) ..................................................... 19

*Quelimane Co. v. Stewart Title Guaranty Co.*,
  19 Cal. 4th 26 (1998) ........................................................................................... 20

*Rent–A–Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ......................................................................... 22, 23

*Russell v. Micheletti*,
  2023 WL 2620896 (N.D. Cal. Mar. 23, 2023) ..................................................... 19

*S & C Elec. Co. v. Contreras*,
  2011 WL 673740 (N.D. Cal. Feb. 17, 2011) ........................................................ 19

*Sewell v. Bernardin*,
  795 F.3d 337 (2d Cir. 2015) ................................................................................. 18

*Simpson Strong-Tie Co. Inc. v. MiTek Inc.*,
  2021 WL 1253803 (N.D. Cal. Apr. 5, 2021) ....................................................... 20

*SkyHop Techs., Inc. v. Narra*,
  58 F.4th 1211 (11th Cir. 2023) ............................................................................ 18

*SolarPark Korea Co. v. Solaria Corp.*,
  2023 WL 4983159 (N.D. Cal. Aug. 2, 2023) .................................................. 22, 23

*Solis v. Specialized Loan Servicing, LLC*,
  2024 WL 4002612, at *3 (C.D. Cal. July 12, 2024) ............................................ 19

*Sony Comput. Ent. Am., Inc. v. Gamemasters*,
  87 F. Supp. 2d 976 (N.D. Cal. 1999) ................................................................... 16

*SuccessFactors, Inc. v. Softscape, Inc.*,
  544 F. Supp. 2d 975, 981 (N.D. Cal. 2008) ......................................................... 18

*Synopsys, Inc. v. InnoGrit, Corp.*,
  2019 WL 2617091 (N.D. Cal. June 26, 2019) ..................................................... 23

-iv-

Case No. 3:24-cv-06917-AMO

*TaiMed Biologics, Inc. v. Numoda Corp.*,
   2011 WL 1630041, at *5 (N.D. Cal. Apr. 29, 2011) ............................................................. 18

*United States v. Soybel*,
   13 F.4th 584 (7th Cir. 2021) ...................................................................................................... 18

*United States v. Sutcliffe*,
   505 F.3d 944 (9th Cir. 2007) ...................................................................................................... 17

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
   32 F.4th 852 (9th Cir. 2022) ...................................................................................................... 17

*Winter v. Natural Resources Defense Council*,
   555 U.S. 7 (2008) ........................................................................................................... 17, 24

## **Rules/Statutes**

Fed. R. Civ. P. 65 ................................................................................................................. 1, 3

18 U.S.C. §1030 *et seq.* .................................................................................................. 17, 18

Cal. Bus. & Prof. Code § 17200 *et seq.* ........................................................................ 19, 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on March 6, 2025, or as soon as the matter may be heard, in the United States District Court for the Northern District of California, San Francisco Division, Plaintiff WPEngine, Inc. ("WPE") will and hereby does move this Court for a preliminary injunction Order against Defendants, pursuant to Fed. R. Civ. P. 65, enjoining Defendants, and all those acting at their direction or in concert with them, from the acts set forth in the accompanying proposed order, namely: (a) interfering with WPE's access to the WordPress community, including wordpress.org  and the WordPress Plugin Directory and repository, in any manner different from how such access existed prior to September 20, 2024; (b) interfering with control over, access to, or the listing or functioning of plugins or extensions published by WPE; (c) interfering with WPE's access to, or the functioning of, WordPress plugins, extensions, or WordPress community-related resources in any way different from as they existed prior to September 20, 2024; and (d) engaging in any other acts of extortion or tortious interference with respect to WPE.  As set forth in the proposed order, (i) such protections should extend to WPE's affiliates, partners, employees, users, and customers, and (ii) if access or operation has already been restricted or altered, then Defendants shall cause such operations to return to the status quo as it existed prior to September 20, 2024.

This motion is made on the grounds that: (1) WPE is likely to succeed on the merits of its claims; (2) absent a preliminary injunction, WPE is likely to suffer irreparable harm; (3) the balance of equities tips sharply in WPE's favor; and (4) the public interest supports an injunction.  This motion is based upon the Complaint in this action; this Notice of Motion; the Memorandum of Points and Authorities; the Proposed Order; the Declarations of Jason Teichman ("Teichman"), Heather Brunner ("Brunner"), Ramadass Prabhakar ("Prabhakar"), and Sara Jenkins ("Jenkins") along with accompanying exhibits; all matters with respect to which this Court may take judicial notice; and such oral and documentary evidence as may be presented to the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF ISSUES TO BE DECIDED**

WPE seeks an order enjoining Defendants from the acts set forth above.

# INTRODUCTION

Plaintiff WPE recently filed this action against Defendants Automattic, Inc. and Matthew Charles Mullenweg, asserting eleven causes of action arising from Defendants' orchestrated campaign of wrongdoing against WPE.  In short, in recent weeks Defendants have engaged in a self-proclaimed "nuclear" war aimed at destroying WPE's business because WPE dared to stand up and speak out against Defendants' extortionate demand for tens of millions of dollars annually for a purported "license" WPE does not even need.  Defendants' scheme, *brazenly memorialized by Mullenweg's own text messages*, gave WPE less than 24 hours to either sign the "license" and pay up, or face a "scorched earth" "nuclear" war.  When WPE refused to pay, the attacks began.

Through these attacks, Defendants have committed multiple wrongful and illegal actions they *admit* were designed to destroy WPE and take its customers away—such as blocking WPE's access to business resources including those used to service its customers, blocking WPE's customers from accessing important security updates, making a litany of false and disparaging statements, and even expropriating one of WPE's most popular software products as its own.  Facing this onslaught of retaliatory actions, WPE had no choice but to file suit to protect its business, its employees, its customers, and the entire community in which it operates.

Ordinarily, a rational actor on the receiving end of a federal complaint asserting multiple serious causes of action such as cyber-extortion, defamation, and intentional interference with contractual relations might pause to consider whether their course of conduct was prudent. Defendants engaged in no such self-reflection here.  They instead doubled down, attacking WPE with escalating frequency and fury since the Complaint's filing on October 2—while also *publicly reaffirming* their extortionate intentions that this can all go away if WPE pays up and drops its suit.

Facing multiple forms of immediate irreparable harm—including loss of customers, market share and goodwill—and with Defendants publicly promising more attacks in coming days, WPE now seeks emergency injunctive relief from this Court.  Despite immense public outcry within the business community in which the parties operate as competitors, it is clear that Defendants' illegal acts against WPE will continue unabated unless stopped by a court of law.  All of the relevant factors strongly weigh in favor of injunctive relief, and a preliminary injunction should issue.

## FACTUAL BACKGROUND

### A.     WordPress

WordPress is an open source software program that allows users to build and maintain their websites.  Prabhakar ¶ 2.  Open source software is free to use by anyone, pursuant to an open source license.  *Id*.  Mullenweg was one of the original developers of WordPress, which was created by "forking" (or copying) another earlier open source software program called b2/cafelog.  Prabhakar ¶ 2; Brunner Ex. A at 1.  WordPress architecture allows third-party software developers to create "plugins" that can interact with a WordPress website.  Prabhakar ¶ 3.  For instance, if a user wants to add a "voting" button or a "sign up form" field to their website, a plugin can be created to offer those features.  *Id*.  Developers are strongly encouraged to share plugins, themes, and other tools by making them available on wordpress.org.  *Id*.  WPE and the vast majority of WordPress plugin developers, including Defendant Automattic, all use wordpress.org to do so.  *Id*.  Wordpress.org serves as a gateway to the WordPress software and community; it hosts the WordPress software as well as the WordPress plugins created by members of the WordPress community.  Prabhakar ¶ 5.

Over the past 21 years since WordPress was released, a diverse ecosystem of users has formed, comprised of individuals, small businesses, larger companies, nonprofits, and the like.  Brunner ¶ 6.  The ecosystem has relied on promises of openness by Mullenweg, such as:

> WordPress is designed for everyone.  We believe great software should work with minimum set up, emphasizing accessibility, performance, security, and ease of use.  The basic WordPress software is simple and predictable, offering powerful features for growth and success.  WordPress is open source software.  Supporting the idea of democratizing publishing and the freedoms that come with open source, is a large community of people collaborating on and contributing to this project.  WordPress is welcoming and inclusive.  Our contributors' passion drives the success of WordPress which, in turn, helps you reach your goals.  WordPress contributors work around the globe, and have dedicated countless hours to build a tool that offers anyone a voice.

Brunner Ex. A at 1-2; Brunner ¶ 7.  Wordpress.org also describes its "four core freedoms" that encourage others to use the open source software.  Brunner ¶ 9; Brunner Ex. A at 2-3.  The four freedoms are:  "The freedom to run the program for any purpose.  The freedom to study how the program works and change it to make it do what you wish.  The freedom to redistribute.  The freedom to distribute copies of your modified versions to others."  Brunner Ex. A at 2-3.

WordPress is licensed to users under the GNU General Public License ("GPL"), which wordpress.org states guarantees these "four core freedoms"—which it calls its "bill of rights." Brunner Exs. A, B; Jenkins Ex. 1.  Wordpress.org explains that GPL licensing requirements include licensing derivative works or things that link core WordPress functions (like themes, plugins, etc.) under the GPL as well, thereby passing on the freedom of use for these works.  Jenkins Ex. 1. Wordpress.org explains that "[t]he WordPress community should emphasize that the freedoms in the GPL help provide high quality software."  Brunner ¶ 10; Brunner Ex. B at 4.

Wordpress.org maintains a separate developer website to encourage third-party software developers (such as WPE) to build plugins on its platform.  Brunner ¶ 11.  On that developer website, wordpress.org states that "Wordpress.org offers free hosting to ***anyone*** who wishes to develop a plugin in our directory."  Brunner ¶ 11; Brunner Ex. C at 1 (emphasis added).  While WordPress as an open source software program is free to use by anyone, various for-profit businesses (including WPE and Automattic) have built their businesses around the WordPress ecosystem, to help users, for a fee, to build, host, and operate their websites using WordPress.  Brunner ¶ 12.

### B.      WPEngine, Inc.

WPE is a technology company that offers a hosting platform, plugins, themes, support, and other tools for websites built using WordPress software.  *Id*. ¶ 3.  It also develops support, training, and advocacy resources for the WordPress community.  *Id*.  WPE was founded in 2010, and is considered one of the most trusted platforms for WordPress sites in the world.  *Id*.  WPE is dedicated solely to WordPress, having built its business on the promise of open source, and all of WPE's business caters exclusively to the community of users who have built their websites using WordPress.  *Id*.  WPE directly competes with Defendant Automattic.  *Id*. ¶ 12.

WPE is the current developer of a number of popular WordPress plugins, including Advanced Custom Fields ("ACF"), WP Migrate, NitroPack, and many others.  Prabhakar ¶ 4. Millions of WordPress users use these plugins to enhance and operate their websites.  *Id*.  For example, the ACF plugin, which WPE acquired in 2022 for a substantial sum of money, runs on over two million websites.  *Id*.  WPE has invested thousands of engineering hours and millions of dollars into the development of its WordPress plugins and themes, and the vast majority of its users

use these at no cost to themselves. *Id.* Most users who use WPE's plugins (or any other WordPress plugins) access those plugins, including feature and security updates for those plugins, from wordpress.org, which is effectively the gateway for access. *Id.* ¶ 5. WordPress users typically either go to wordpress.org to download those plugins directly, or they download those plugins from wordpress.org through the administrative panel on their WordPress websites. *Id.*

As with nearly all plugin developers, WPE regularly updates its plugins to create new functionality, fix bugs, or address security vulnerabilities. *Id.* WPE has been publishing these updates to its plugins to wordpress.org for many years. *Id.* Once WPE publishes them to wordpress.org, users are notified and can easily update their plugins. *Id.* Without access to these updates, users' websites with WPE's plugins may break, stop functioning, or become insecure. *Id.* Without access to wordpress.org, most WPE plugin users likely will not even know there are updates available for WPE plugins. *Id.* Furthermore, while there may be other ways for WPE plugin users to update their plugins without access to wordpress.org from within the administrative panel, a meaningful number of WPE plugin users do not have the technological skills or knowledge to do this without risking the security and/or stability of their websites. *Id.*

In addition to developing plugins, WPE also operates a managed hosting service for websites built using WordPress. *Id.* ¶ 6. Customers of WPE can set up their websites using the WordPress software on WPE's hosting service. *Id.* WPE handles many of the technical details for these users, including ongoing technical management of their websites. *Id.* WPE's customers have historically been able to install themes and plugins onto their WordPress installations from wordpress.org directly through WordPress's administrative panel. *Id.* WPE's managed hosting service competes with Automattic's offerings, including wordpress.com, Pressable and WordPress VIP. *Id.*

Because WPE's products and services are built to work with websites developed using WordPress open source software and WooCommerce plugins, WPE naturally references "WordPress" when referring to the software platform on which its customers' websites are built, and "WooCommerce" to reference the WooCommerce plugin used by certain of its customers— and has done so for many years. Teichman ¶¶ 10-14, 19, 20; Teichman Exs. C – G, K, L. This type of referential, or nominative, use of WordPress is not only legal, but it is essential to providing

consumers with the information they need.  Further, it has long been condoned by the Defendants, and is widely mirrored by the entire WordPress community.  *See* Teichman ¶ 9; Dkt. 1 ¶ 22.

In recent years WPE has grown into a successful and thriving company, employing more than 1,100 people and serving thousands of customers.  Teichman ¶ 2.

### C.  Defendant Mullenweg, His Entities—and His Resulting Conflicts of Interest

Defendant Automattic is a for-profit company that offers WordPress related services. Brunner ¶ 19.  Mullenweg is Automattic's CEO.  *Id.*  Mullenweg founded and is a director of the WordPress Foundation, which claims to be a non-profit entity dedicated to educating the world about WordPress.  *Id.*  In 2010, in response to mounting public concern regarding their private ownership, the WordPress source code and trademarks were reportedly transferred to WordPress Foundation, with Mullenweg and Automattic making sweeping promises of open access for all: "Automattic has transferred the WordPress trademark to the WordPress Foundation, the nonprofit dedicated to promoting and ensuring access to WordPress and related open source projects in perpetuity. This means that the most central piece of WordPress's identity, its name, is now fully independent from any company." *See* Jenkins Ex. 34; *see also* Ex. 35. Mullenweg and Automattic reiterated this promise later: ***"What's important is that [] longer than I'm alive, longer than Automattic is alive, longer than any of us are alive, there is something that holds the WordPress code and trademark for the free access for the world."*** Jenkins Ex. 2 at 22 (emphasis added).

What Defendants' assurances did not disclose is that while they were publicly touting their purported good deed of moving this intellectual property away from a private company, and into the safe hands of a nonprofit, Defendants in fact had quietly transferred irrevocable, exclusive, royalty-free rights in the WordPress trademarks right back to Automattic that very same day in 2010.  *See* Jenkins Ex. 36.  This meant that far from being "independent of any company" as Defendants had promised, control over the WordPress trademarks effectively never left Automattic's hands.

Until recently, Defendants had given the WordPress community the impression that wordpress.org—the repository for the WordPress software and plugins—was owned and controlled by the WordPress Foundation.  Brunner ¶ 8, 21.  The reasons for that belief were numerous, including that the site had a suffix typically reserved for nonprofits; Mullenweg's statements that

the WordPress code was owned by the Foundation for "free access to the world"; his role at the Foundation; and his promotion of WordPress as an open-source software platform that is free and accessible to everyone.  Indeed, Automattic's own counsel recently posted (and then mysteriously deleted) a statement that wordpress.org is a non-profit. *Compare* Jenkins Ex. 3 at 1; *id.* Ex. 4.

So it came as a surprise to most in the WordPress community when Mullenweg revealed recently that he *personally* owns and controls wordpress.org, and pays taxes related to it.  Jenkins Ex. 19 at 2-3.  This disclosure revealed an inherent, troubling conflict between (1) Mullenweg's positions as a director of the nonprofit WordPress Foundation which promises to keep WordPress free and open to the world and owns the WordPress trademark, (2) Mullenweg's role as CEO of Automattic, a for-profit corporation dedicated to profiting from the WordPress community and competing with companies like WPE, and (3) Mullenweg's quiet ownership and control of the for-profit wordpress.org website that hosts WordPress and the community's plugins, acting as a portal to the entire WordPress community that Mullenweg alone wields the power to restrict.

**D.      Defendants' Awareness of WPE's Use of the WordPress Trademark**

Defendants have been aware of WPE's descriptive use of the "WordPress" mark for more than a decade and the WooCommerce trademark for more than five years.  Among other things, Mullenweg, through Automattic, invested in WPE in November 2011 and remained an investor until 2018.  Brunner Ex. D at 1.  The press release for Automattic's investment in WPE described WPE as "the WordPress hosting and security service for bloggers and small businesses."  Brunner ¶ 14; Brunner Ex. D at 1.  At that time, WPE's website used the WordPress mark to accurately describe the WordPress platform.  Brunner ¶ 15; Teichman Ex. G.  Over the years WPE and Automattic maintained regular communications, including about WPE's website.  Brunner ¶ 17.  WPE has also been a longtime sponsor and attendee of the WordPress conferences known as WordCamp, including having booths with promotional signage and materials referencing the WordPress mark, dating back many years.  *Id.*  Never then, nor during the years of their investment in and relationship with WPE, did Defendants request that WPE change any of these references.  Teichman ¶ 9.

### E.   Defendants' Coercive Threats To WPE

Beginning on September 17, 2024, Defendants started making coercive, extortionate threats to WPE.  Specifically, Defendants threatened that, if WPE did not agree to pay Automattic a very large sum of money in a matter of a few days, they would embark on a self-described "scorched earth nuclear approach," starting with a keynote speech Automattic's CEO Mullenweg was going to be making to the WordPress community just days later, on September 20.  Brunner ¶ 22.  During calls on September 17 and 19, Automattic's CFO told a WPE board member that Automattic would "go to war" if WPE did not agree to pay Automattic on an ongoing basis.  *Id*. ¶ 23.  Mr. Davies stated that he would send over an agreement that he expected WPE to sign or else the "war" would commence.  *Id.*  On the morning of September 20, only hours before Mr. Mullenweg's Keynote, Mr. Davies sent WPE a one-page "trademark license agreement" document WPE had never seen before, and which sought to impose an 8% royalty on WPE's gross revenues (which would amount to tens of millions of dollars), along with other onerous terms such as "full audit rights" of WPEs internal records, including "access to employee records and time-tracking."  *Id.* ¶ 24.  In return, the "trademark license agreement" document purported to grant WPE the "right" to use the WordPress trademark to describe the WordPress open source software.  *Id*.  Automattic's CFO insisted that WPE provide its response to this demand immediately.  *Id.* ¶ 26.  After he sent the "trademark license agreement" document on September 20, Mr. Davies followed up with an email to a WPE board member, on which WPE's CEO was copied, reiterating that they needed WPE to agree to their demands immediately, "before Matt makes his WCUS keynote at 3:45 p.m. PDT today."  *Id.*

In parallel, Mullenweg sent various texts and made phone calls to WPE's CEO and a WPE board member, pressuring WPE to pay up or face his wrath.  *Id*. ¶ 17, Ex. F.  He sent a message that he had slides prepared that would smear WPE and its investor, and if WPE failed to capitulate to his financial demands immediately, he would run the slides as part of his keynote speech and start down a "nuclear" path.  *Id*. ¶¶ 18-20, Brunner Ex. F.  Mullenweg threatened that he would reach a wide audience with his keynote speech:  "[T]he videos on YouTube can get millions of views when we promote them."  *Id*. ¶ 29.  He further threatened that he would make a case for "banning" WPE from the WordPress community altogether, if WPE refused to pay up.  *Id*. ¶ 30, Ex. F.  When WPE's

CEO offered to have an actual business discussion with Automattic the following week, Mullenweg declared that he took that as a "no," and would "proceed with the scorched earth nuclear approach to WPE." *Id.* ¶ 31, Ex. F.  Mullenweg sent a photo of the audience gathered for his keynote speech moments before he took the stage, again threatening WPE that he would change his speech to just a "Q&A" if WPE immediately capitulated to his extortionate payment demand.  *Id.* ¶ 32, Ex. F.

## F.   Defendants Carry Out Their Threats In An Effort to Destroy WPE's Business

WPE did not agree to Mullenweg's extortionate demands.  Brunner ¶ 33.  In the days that followed, including after WPE sent Defendants a cease and desist letter[1] and then filed the Complaint (Dkt. 1), Defendants proceeded to carry out their threats in multiple ways, launching a full-scale "nuclear war," with Mullenweg himself describing that his goal was to disrupt WPE's customer relationships and to destroy its business.  *E.g.*, Jenkins Ex. 5 at 1, Ex. 17.

### 1.   Defendants Make False and Disparaging Statements About WPE

Most immediately, Defendants started a defamatory smear campaign against WPE, while simultaneously offering WPE's customers payments if they cancelled or breached their contracts. For instance, Mullenweg made a series of false and disparaging statements about WPE during his September 20 keynote speech, which was broadcasted across the Internet.  Brunner ¶ 36.  He claimed that WPE is a company that "feeds off the host without giving anything back" and that every WPE customer should watch his speech and then not renew their contracts with WPE.  *Id.*  He also falsely suggested that WPE employees may be fired for speaking up, supporting Mullenweg or WordPress, and offered to help them find new jobs if that were to occur.  *Id.*  None of that was true.  *Id.*

After the speech, Mullenweg authored a post on wordpress.org, entitled "WP Engine is not WordPress."  *Id.* ¶ 38; Jenkins Ex. 6.  In that post he alleged that WPE "is a cancer to WordPress" because it is "a cheap knock-off" and "not WordPress."  *Id.*  These statements were, and are, demonstrably false.  Brunner ¶ 39.  Mullenweg also accused WPE of wrongdoing for disabling revisions, but in fact, this is a standard practice that Automattic's wordpress.com does as well, so Mullenweg's suggestion that this somehow jeopardizes the "integrity" of user content

---

[1]   *See* https://wpengine.com/wp-content/uploads/2024/09/Cease-and-Desist-Letter-to-Automattic-and-Request-to-Preserve-Documents-Sent.pdf.

1    or fails to protect that content is also false.  *Id.*

2        In a blog post on wordpress.org that Mullenweg posted on September 25, Mullenweg wrote

3    that "WP Engine is free to offer their hacked up, bastardized simulacra of WordPress's GPL code

4    to their customers."  Prabhakar ¶ 10; Jenkins Ex. 7 at 1.  This statement too is false.  WPE uses the

5    standard WordPress GPL core code.  Prabhakar ¶ 10.

6        Mullenweg has also levied personal attacks against WPE's CEO and one of WPE's board

7    members for failing to capitulate to his demands.  Brunner ¶ 46.  On September 26, Mullenweg sent

8    WPE's CEO another blatantly extortionate text message, "offering" her a job at Automattic, while

9    also threatening her that if she didn't "accept" the "offer" by midnight that night, Mullenweg would

10   tell the press that she had interviewed with Automattic.  *Id.* ¶¶ 47-48; Brunner Ex. G.

11                **2.    Defendants Block Access to WPE's Plugins**

12       On September 24, WPE's employees tried to access their wordpress.org accounts as they do

13   every day, only to learn that their accounts had been disabled.  *See* Prabhakar ¶ 7.  This meant that

14   WPE no longer was able to update the plugins that it makes available through wordpress.org.  *Id.*

15   Stated another way, if WPE identified that one of the plugins it created had a bug or a security issue,

16   it would no longer be able to publish an update for that plugin on wordpress.org.  *Id.*  This could

17   cause the websites of WPE plugin users to stop working without any easy way to rectify the issue.

18   *Id.*  WPE was forced to try to find workarounds needed to service WPE's customers and update its

19   plugins.  *Id.* ¶ 34.  Those efforts are ongoing but cannot fully repair the damage Mr. Mullenweg did

20   to WPE's systems.  *Id.*  Mullenweg publicly took credit for blocking WPE and its employees from

21   wordpress.org in various social media posts, claiming that he did so because WPE had sued

22   wordpress.org.  *Id.* ¶ 9; Jenkins Ex. 7 at 1.  This statement was false.  Jenkins Ex. 8.

23       Nowhere on the developer website for WordPress does it say that a plugin developer must

24   pay Mullenweg's for-profit venture Automattic, to host their plugins on wordpress.org, or that a

25   developer can be excluded from wordpress.org if Mullenweg unilaterally sees fit.  Brunner ¶ 11.

26       On September 25, Mullenweg banned WPE customers who host their WordPress

27   installations on WPE servers from accessing wordpress.org resources through the administration

28   panel, which includes downloading WordPress themes and plugins, including those developed by

WPE.  Prabhakar ¶ 8.  This means that customers no longer would be able to install new plugins and themes from wordpress.org from the administrative panel.  *Id*.  This also means that if WordPress users on WPE wanted to update their existing plugins and themes to address bugs and security issues, they would no longer be able to do so from the administrative panel.  *Id*.  Mullenweg later publicly took credit for carrying out these actions against WPE and its customers.  *Id*. ¶ 9.

### 3.  Defendants Intentionally Sow Fear in the Marketplace

Defendants made clear in numerous public communications that they will continue to search for opportunities to disrupt the normal operation of WPE-powered websites and disrupt the relationships between WPE and its customers, sowing fear and uncertainty in the marketplace in a manner plainly designed to scare WPE's customers into canceling their contracts and devalue WPE.

For instance, in a recent interview Mullenweg claimed that, because of the success of his nuclear war, he is no longer satisfied with 8% of WPE's revenues—"the deal they have to do next could be taking over the company."  Jenkins Ex. 9 at 1.  As to how he could cause WPE's value to sink to the point where it would have to sell itself to Defendants, Mullenweg said he had more cards to play:  "I have a lot to work with."  *Id.* at 2; Brunner ¶ 53.  Elsewhere he bragged he was making WPE a "distressed asset" worth only a "fraction" of its prior value.  Brunner ¶ 54; Jenkins Ex. 10.

As another example, Mullenweg openly invited the WordPress community to brainstorm how to manage a mass migration away from WPE's ACF plugin, predicting "millions of sites moving away from it in the coming weeks."  Brunner ¶ 57; Jenkins Ex. 11.  He also told the WordPress community to use "any other web host in the world" besides WPE.  Jenkins Ex. 16; *see also id*. Ex. 7 at 1.  When someone asked why developers would invest time moving away from WPE, Mullenweg responded ominously:  "Hmm, I guess you'll have to wait and see why people might not trust ACF as much going forward."  Brunner ¶ 58, Brunner Ex. I.

### 4.  Defendants Manufacture a Sham Security Review of WPE's Plugin

After WPE filed its Complaint, Defendants did not so much as even pause their wrongdoing for a moment of self-reflection.  Instead, their attacks against WPE have only increased since that filing, confirming the willfulness of Defendants' misconduct.  Recently, Automattic began sending purported security alerts about WPE's "ACF" plugin to WPE's CEO, in another act of harassment.

Brunner ¶ 43, Ex. D at 1; Prabhakar ¶ 14.  The (supposed) vulnerability was minor and WPE released a security patch within 72 hours, and despite WPE staff being unable to access wordpress.org, WPE managed to have the patch provided to WordPress staff for distribution to all WordPress users through wordpress.org.  Prabhakar ¶ 15.  But before WPE could release the patch, in an unprecedented and dangerous move, Defendants publicly announced in a social media post that they discovered a security vulnerability.  *Id.* ¶ 16.  As commentators noted, such action of publicly announcing a security vulnerability before it could be remedied was unprecedented, inconsistent with good practices across the entire technology industry, and potentially dangerous to WordPress users.  *Id.*  Hackers can take advantage of this information to attempt to hack websites before the patch is released.  *Id.*  Following intense public criticism, Mullenweg took the post down.

### 5.    Mullenweg Modifies wordpress.org's Login Page to Require Loyalty Pledges Disavowing Affiliation with WPE

On or about October 8, 2024, Mullenweg changed the login page for wordpress.org to require that all WordPress users take a loyalty pledge.  That is, Defendants began requiring all WordPress users to check a box agreeing that "I am not affiliated with WP Engine in any way, financially or otherwise"—and blocking login to the site if the box is not checked.  Brunner ¶ 60; Prabhakar ¶ 17; Brunner Ex. L.  So under threat of unspecified legal repercussion, Defendants have pressured WPE's customers, partners, vendors, employees, and users to cut their ties with WPE, or face being banned from using resources that sit behind wordpress.org, including the WordPress code and plugins, which resources are supposed to be open to all.

WPE is informed and believes this "loyalty oath" mindset will soon escalate even further. WPE understands that Defendants will soon demand that agency partners must choose between doing business with WPE, or being similarly cut off from the WordPress community.  Brunner ¶ 62.[2]

### 6.    Defendants Wrongfully Expropriate WPE's Most Popular Plugin

On October 12, 2024, Defendants initiated an unprecedented, hostile takeover of WPE's most popular WordPress plugin, Advanced Custom Fields ("ACF").  Defendants placed themselves

---

[2]    Defendants' draconian loyalty pledge is in line with how they have terminated with severance 159 of their employees for not being supportive of their war against WPE.  Jenkins Ex. 12 at 1.

in control of the plugin and updates thereto, thereby directly interfering with the relationships between WPE and millions of its customers and prospective customers. Brunner ¶¶ 63-65. Defendants admitted doing so to target WPE specifically in retaliation for WPE pursuing justice, including in this lawsuit. Prabhakar ¶ 31; Prabhakar Ex. D at 1 ("This is a rare and unusual situation brought on by WP Engine's legal attacks, we do not anticipate this happening for other plugins."). Defendants forcibly took control of ACF through Mullenweg's ownership of wordpress.org, where ACF is hosted for the WordPress community to download. Prabhakar ¶¶ 20-21. Then they misleadingly rebranded it as "Secure Custom Fields" ("SCF"). Brunner ¶ 63; Prabhakar ¶ 21; Prabhakar Exs. A, B. Defendants justified these actions based on a purported security flaw, but at the time they co-opted the plugin, WPE had already fixed the minor security flaw Defendants identified. Prabhakar ¶ 21. The new page Defendants now control falsely states that SCF was developed by wordpress.org (it was not), and Defendants retained all of the download counts and user reviews for the ACF plugin written over a period of 12 years with a nearly 5 star rating, falsely suggesting to consumers that SCF had obtained those reviews. Brunner ¶¶ 63-64; Prabhakar ¶¶ 20-23; Prabhakar Ex. A.

Just as troubling, Defendants co-opted the ACF plugin's unique identifier on wordpress.org and published a new "update" to the plugin, meaning all active ACF users (more than two million) using wordpress.org to update would be migrated over to the rebranded SCF plugin under wordpress.org and Defendants' unilateral control upon updating **without their consent or even knowledge as the update appeared to have come from WPE**, and further jeopardizing the security of WPE's customers. Prabhakar ¶¶ 24-27; Jenkins Ex. 23. And in yet another act of interference, Defendants removed WPE customers' ability to purchase the paid "PRO" version of ACF from the ACF plugin. Prabhakar ¶ 28. So complete is Defendants' attempt to hijack ACF, that when searching on the wordpress.org site for "advanced custom fields," the site's search result returns Defendants' "Secure Custom Fields" directory listing instead. *Id.* ¶ 29; Prabhakar Ex. C at 1.

Thus, Defendants wrongfully usurped the relationships and goodwill developed between WPE and its millions of loyal users, conveyed the false impression that the plugin was developed by wordpress.org, and violated their own open-source guidelines, promises they had made, and basic

tenets of the open-source community.  Defendants have openly admitted that their expropriation of ACF was to retaliate against WPE.  Prabhakar Ex. D at 1, Jenkins Ex. 26.

### 7.    Defendants Threaten More Harm to WPE

Mullenweg continues to make public statements promising to inflict more harm on WPE with each passing day.  On October 7, Mullenweg bragged that he had caused chaos even while he was still on vacation, promising more "surprises for you all on Tuesday, Wednesday, Thursday" in connection with his war against WPE.  Brunner ¶ 59, Brunner Ex. J at 1.  On October 14, Mullenweg promised: "Oh, there's more."  Teichman ¶ 28.  Further confirming their malicious, anticompetitive intentions in blocking WPE from wordpress.org, Defendants have started contacting WPE customers to induce them to terminate their relationship with WPE and contract with Automattic instead.  Defendants have targeted customers using fear tactics among other things, noting that WPE's ban from wordpress.org (that, notably, Defendants themselves caused) "could impact sites," plugins, or updates.  Teichman ¶ 29.  Defendants added veiled threats that while the ban on WPE "***might*** not affect your site in the ***short term***," *id.* (emphasis added), WPE's customers should consider switching to Defendant Automattic.  WPE also understands from multiple sources that Defendants are plotting more harmful acts against WPE, including, among other things, the forced take-overs of other WPE plugins, and additional bans from other WordPress-related resources.

### G.    Defendants Have Caused, and Will Continue to Cause, Irreparable Harm

WPE saw cancellation requests between September 26 and September 30 increase by 14% as compared to the average cancellation rate request in September prior to the wordpress.org block.  Teichman ¶ 30.  WPE also lost new customers. The "sales-assisted" new-business channel saw 63 potential new purchases or upgrades lost, where during negotiations those lost customers expressly cited Defendants' actions as a reason for pulling back.  *Id.* ¶¶ 31-35 (*e.g.*, "I'm not sure I'm comfortable until all this drama on your guys end with Wordpress [SIC] is figured out . . . I've had a bunch of website issues this week that I'm not used to having and many clients contact me.  It's costing me money.").  And those are just the lost customers that gave a specific reason.  *Id.*  Overall, the sales-assisted channel secured 333 less new contracts or upgraded contracts during the month, as compared to WPE's prior projections.  *Id.*  Meanwhile, self-service signups dropped 29%

between September 25 and September 30, as compared to the prior September average. *Id.* ¶ 36.

And there are signs that this is just the beginning—the data also show a 375% increase in customers that have installed tools that will allow them to migrate to another provider, even if they have not yet announced they are terminating WPE's contract. *Id.* ¶ 39. Even where a customer has not personally explained their rationale to WPE, the cause-and-effect can be seen not just in the contemporaneous nature of the drops, but also by statements made publicly by both WPE's customers and Defendants. *E.g.*, *id.* ¶¶ 35-37, 49. For instance, public posts have shown WPE customers saying such things as Defendants' takeover of ACF "gave me a minor heart attack." Teichman ¶¶ 44-45. For his part, Mullenweg has also provided a "forecast" of his own making, claiming that "millions" of customers will lose trust in WPE in the coming weeks, after he unveils future parts of his extortionate and vengeful campaign. *Id.* ¶ 43; Jenkins Ex. 11.

Defendants have actively encouraged such defections, including to increase their own market share—offering to pay WPE's customers to breach their contracts while WPE is blocked from wordpress.org, and move to service providers owned by Mullenweg. Teichman ¶ 22; Jenkins Ex. 13 at 1.

By forcibly co-opting WPE's ACF plugin and passing it off as their own, Defendants have also wrongfully usurped all of the goodwill and brand recognition WPE has developed with millions of ACF users over the past decade. Prabhakar ¶¶ 20-21. Those actions have also undermined the integrity and reliability of the plugin at wordpress.org, resulting in significant reputational harm to WPE that will only grow over time because the plugin is no longer maintained by WPE. *Id.* ¶ 30. In addition, Defendants' co-opting has eliminated a channel for generating new customers; 15% of ACF PRO paid subscriptions come from (now unavailable) click-throughs from the standard ACF plugin. Teichman ¶ 40. Additional takeovers of WPE plugins, which Defendants have threatened, would further interfere with WPE's relationships to its customers.

WPE's customers have also been harmed. Website operators stand to lose *their own* goodwill with *their* customers, if their website misfunctions. They are being harmed with increased monitoring and planning efforts to ensure websites remain operational no matter what Defendants may do next. *Id.* ¶ 47. Those customers that instead decide to leave have lost WPE's services, and

are needlessly incurring the monetary and personnel costs of switching between managers.  *Id.*  Customers have complained about these hassles publicly, confirming the harm to them and further evidencing loss of WPE's goodwill.  *Id.* ¶¶ 48; Jenkins Exs. 10, 14, 15, 28.

The WordPress community more widely is also being harmed by Defendants' actions. Website operators must devote extra resources and incur costs, while WordPress developers—not just WPE—are seeing cancelled contracts due to concerns over the stability of the WordPress platform.  Teichman ¶¶ 45-48.  And while Defendants have tried to claim that WPE is a special case, it is not and there is no indication they will stop with WPE.  Defendants have shown the power and willingness to unilaterally inflict real damage to any member of the WordPress community, at their whim.  Other developers thus fear becoming Defendants' next target.  *Id.* ¶ 49.  Public comments about the situation confirm people are fearful of the damage Defendants' actions have done, and will continue to do, to the WordPress ecosystem generally.  *Id.* ¶¶ 48-49; Jenkins Ex. 14, 33. Moreover, Defendants' forced and retaliatory takeover of the ACF plugin—and, any similar act with respect to other plugins—have introduced heightened security issues into the WordPress community, as Defendants are rushing to tamper with code and products they did not create.

In response to the public outcry in the WordPress community, Defendants have attempted to justify their malicious and illegal behavior by offering various and sundry excuses, such as that WPE supposedly does not "contribute" enough to the WordPress community in terms of hours or dollars, or WPE is infringing the WordPress trademark in describing the WordPress software its customers used to build their sites, or that WPE is a bad actor because it has a private equity investor. Defendants' excuse *du jour* vacillates seemingly based on the whims of Mullenweg and the audience to whom he is speaking.  But  no matter—the justifications are factually baseless, legally meritless, and ultimately irrelevant, as none would justify Defendants' outrageous actions.

## LEGAL STANDARD

A "preliminary injunction is an equitable remedy."  *Sony Comput. Ent. Am., Inc. v. Gamemasters*, 87 F. Supp. 2d 976, 983 (N.D. Cal. 1999).  "District courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016).  "The purpose of a preliminary injunction is to

preserve the status quo ante litem pending a determination of the action on the merits." *Id.*   A plaintiff seeking a preliminary injunction must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).   A stronger showing on one of these four elements may offset a weaker showing on another.   *Cottrell*, 632 F.3d at 1131, 1134-35.   "Thus, when plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the merits."   *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022) (citation omitted).   Moreover, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."   *See Cottrell*, 632 F.3d at 1132.

## ARGUMENT

## I.   WPE IS LIKELY TO SUCCEED ON THE MERITS

### A.   WPE Is Likely To Succeed On Its CFAA and Extortion Claims

The Computer Fraud and Abuse Act ("CFAA") makes it a violation of federal law to, with an "intent to extort," use a "threat to cause damage to a protected computer" or to "demand . . . money . . . in relation to damage to a protected computer, where such damage was caused to facilitate the extortion."   18 U.S.C. § 1030(a)(7).   The computers at issue here—WPE's systems, those behind WordPress, and those of WPE's customers—involve systems accessed by users via the Internet globally, and therefore qualify as "protected computers."[3]   To "damage" a computer in this context means "***any impairment*** to the ***integrity or availability*** of data, a program, a system, or information."   18 U.S.C. § 1030(e)(8) (emph. added).   The CFAA provides for injunctive relief.   *Id.* § 1030(g) ("Any person who suffers damage or loss by reason of a violation of [Section 1030] may maintain a civil action against the violator to obtain compensatory damages and injunctive relief ...").

---

[3]   *See* 18 U.S.C. § 1030(e)(2)(B) ("protected computer" includes one "which is used in or affecting interstate or foreign commerce or communication"); *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("the Internet is an instrumentality and channel of interstate commerce").

Here, Defendants' actions and words reveal a deliberate, blatant, and ongoing extortion scheme. They demanded tens of millions of dollars under threat of "nuclear" war unless WPE agreed to a sham license within 24 hours. *E.g.*, Brunner ¶¶ 22-34, Brunner Exs. E, F; Jenkins Ex. 21 at 1, Ex. 5 at 1. The use and promise to continue to use technological warfare has made collateral damage of WPE's customers and the WordPress community. Teichman ¶¶ 30-49. Defendants weaponized wordpress.org, and those actions put WPE and its customers at risk of further harm. This is no good-faith trademark dispute. This is extortion. Pay up today, or else.

The extortionate acts were carried out via texts, calls, emails and other communications using the Internet in interstate or foreign commerce. *E.g.*, Brunner ¶¶ 22-34. The CFAA is thus triggered because Defendants' campaign has included threats and actual acts to deprive WPE and its customers of access to the computers and servers behind wordpress.org and to deprive WPE and its customers of the normal functioning of their own websites, including by undermining the security and integrity of WPE's most popular plugin, ACF, as a result of Defendants' complete takeover of the plugin—all because WPE refused to pay Defendants' ransom demands. Prabhakar ¶¶ 7-11, 20-33. This is classic, actionable misconduct under the CFAA. *Chegg, Inc. v. Doe*, 2023 WL 7392290, at *7 (N.D. Cal. Nov. 7, 2023) (granting preliminary injunction under CFAA and UCL); *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008) (same); *Inplant Enviro-Sys. 2000 Atlanta, Inc. v. Lee*, 2015 WL 12746702, at *2-4 (N.D. Ga. Feb. 10, 2015) (granting TRO, finding refusal to give access to a domain likely violated Section 1030(a)(7)).[4]

For the same reasons and based on the same conduct, WPE is also likely to prevail on its common-law attempted extortion claim. *See TaiMed Biologics, Inc. v. Numoda Corp.*, 2011 WL 1630041, at *5 (N.D. Cal. Apr. 29, 2011) (allowing amendment to add claim of attempted extortion

---

[4]    *See also SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1226 (11th Cir. 2023) (defendant's "withholding of the passwords and [plaintiff's] other digital property" unless plaintiff paid up, had "diminished [plaintiff's] ability to use its computer system or the associated data" and constituted "damage[s]" under 1030(a)(7)); *United States v. Soybel*, 13 F.4th 584, 595 (7th Cir. 2021) ("a reasonable jury could find that" by preventing the victim from accessing his computer system, "[the defendant] 'impaired the availability of the system' by temporarily diminishing its readiness for [the victim's] immediate use."); *Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015) (locking victim out of her social media accounts "impaired the integrity" of them).

where defendant threatened to damage plaintiff's business reputation in order to coerce payment of large sum of money);  *S & C Elec. Co. v. Contreras*, 2011 WL 673740, at *2 (N.D. Cal. Feb. 17, 2011) (granting preliminary injunction for attempted extortion).

### B. WPE Is Likely To Succeed On Its UCL Claim

California's Unfair Competition Law ("UCL") is designed "to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."  *Payroll Res. Grp. v. HealthEquity Inc.*, 2024 WL 4194795, at *4 (N.D. Cal. Sept. 12, 2024).  It prohibits any business practice that is "unlawful," "unfair," or "fraudulent," and it provides injunctive relief. Cal. Bus. & Prof. Code § 17200; *see* § 17203 ("Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction").[5]  *Solis v. Specialized Loan Servicing, LLC*, 2024 WL 4002612, at *3 (C.D. Cal. July 12, 2024) (granting TRO on UCL claim); *Campos v. Dyck O'Neal, Inc.*, 2024 WL 2941656, at *3 (E.D. Cal. May 10, 2024) (same).  A business practice is "unlawful" under the UCL if it violates any other law.  *Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000).  Thus, Defendants' violations of the CFAA, as well as attempted extortion (which is a violation of the Penal Code) can serve as the basis for a UCL claim.  *Russell v. Micheletti*, 2023 WL 2620896, at *7 (N.D. Cal. Mar. 23, 2023) ("claims of extortion and fraud . . . could sustain Plaintiff's UCL claim").

But the UCL is broader than the combined effect of other laws.  A business practice is "unfair" when the conduct violates even the "policy or spirit" or is "comparable" to a violation of the antitrust laws, or "otherwise significantly threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  Defendants' scheme is "unfair" for similar reasons as it is extortionate—it has involved, among other things, attempts to block WPE's ability to deliver services to its customers.  And most recently, the scheme involved the takeover of the ACF plugin and unconscionable usurpation of all of WPE's goodwill and

---

[5]  *See also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) ("The UCL covers a wide range of conduct.  It embraces anything that can properly be called a business practice and that at the same time is forbidden by law . . . . Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices"); *id.* at 1152 (the UCL "allows any consumer to combat unfair competition by seeking an injunction").

engineering hours in developing the plugin.  This is also plainly "unfair" and "unlawful" even on its own, as Defendants are giving the false impression that Defendants developed the plugin.  *Chegg*, 2023 WL 7392290, at *7 (granting preliminary injunction under CFAA and UCL); *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, 2021 WL 1253803, at *7 (N.D. Cal. Apr. 5, 2021) (rejecting dismissal of UCL claim based on false advertising).  WPE is thus likely to prevail on its UCL claim as well.

### C.      WPE Is Likely To Succeed On Its Interference Claims

This claim requires: (1) a valid contract; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998).  Injunctive relief is available.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194 (9th Cir. 2022) (affirming preliminary injunction on tortious interference claim where LinkedIn blocked the plaintiff's access to data it had previously made available).  The facts here demonstrate a straightforward example of tortious interference.

This is the rare case where Defendants have brazenly admitted to their intention to interfere with WPE's customer relationships.  The contracts at issue are those between WPE and its customers, as well as its agency partners' customers, which include WordPress website hosting and support contracts. Teichman ¶¶ 4-5.  Defendants' declaration of "nuclear" war on WPE and extortionate acts, coupled with their offer to pay WPE's customers to breach their contracts with WPE and move to service providers owned by Defendants while they were simultaneously blocking WPE from accessing wordpress.org under false pretenses, as well as the hijacking of WPE's popular ACF plugin, demonstrates not just Defendants' knowledge of the existence of WPE's contracts, but also Defendants' desire for WPE customers to breach and/or not renew those contracts.  *E.g.*, Brunner ¶ 23; Teichman ¶ 21-23; Jenkins Ex. 13 at 1, Exs. 15, 17.  Defendants knew they were interfering not just with *a* contractual relationship; they deliberately set out to interfere with *all* of them.  *See Quelimane Co.*, 19 Cal. 4th at 56 (intent met where defendants had purpose to interfere *or* when defendant was "substantially certain" that interference would occur).[6]  Mullenweg changed

---

[6]     *See also Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005) ("When the

the login page for wordpress.org to require all users to pledge loyalty that they are "not affiliated with WP Engine in any way."  Brunner ¶ 60; Brunner Ex. L; Prabhakar ¶ 17.

Plainly, WPE's performance on those contracts is being disrupted at least by adding burdens and expenses to WPE's and its customers' performance.  *See Cellco P'ship v. Hope*, 469 Fed. Appx. 575, 577 (9th Cir. 2012) (affirming preliminary injunction based on interference with contractual relationships where the "necessary consequence" of defendant's interference "was to burden [plaintiff's] contracts with its [] subscribers by making it more costly for [plaintiff] to meet its obligation"); *Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1120-22 (E.D. Cal. 2010) (granting preliminary injunction because defendants "impermissib[ly] revo[ked]" an implied license for a software program and "restricted [plaintiff's] access to the software and ability to service existing and new clients," where plaintiff had "marketed the software under its name and has enjoyed unlimited use of, and access to, the software" for years prior to revocation).  That WPE will be able to show harm is further confirmed by the loss of customers, which will increase if Defendants are allowed to continue a rolling set of cyber-attacks.  Teichman ¶¶ 30-40.  Again, Defendants have stated that their belief is that customers have already left in "droves," and that "millions" more will leave in the coming "weeks"—presumably after more of Defendants' "surprises" are unveiled.  *See* Brunner ¶¶ 54, 57, 59; Jenkins Exs. 10, 11.  Defendants have also intentionally interfered with WPE's relations with its ACF users because Defendants have taken over the plugin, removing WPE's ability to provide users with an upgrade path to the more advanced and paid version of the plugin, ACF PRO, and impairing the goodwill WPE has built over many years.  Brunner ¶¶ 42-44; Prabhakar ¶¶ 20-28; Teichman ¶ 21.  All the elements of this tort are met.

Defendants may argue that they had a right or privilege to act as they did.  This fails.  Defendants have tried to justify their behavior with multiple ever-shifting excuses, including allegations that WPE infringed WordPress trademarks.  Defendants' sham trademark argument is meritless.  WPE's use is unquestionably fair, and Automattic's 14-year delay in enforcing the WordPress mark—if it even has standing to do so in the first place given that the WordPress

---

defendant performs the act that causes the interference, the defendant need not know exactly who is a party to the contract, so long as he knows he is interfering with a contractual relationship.").

1   Foundation owns it—dooms their specious effort under the doctrine of laches.  *See, e.g.*, *Grupo*

2   *Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1102–03 (9th Cir. 2004) (plaintiff "cannot simply

3   wait . . . and then ask for an injunction to take away good will developed by defendant in the

4   interim.").  The same is true for the WooCommerce marks.  Nor could Defendants' extortion

5   campaign and other wrongful actions, designed to inflict devastating harm upon a competitor and

6   threaten the operation and security of millions of websites, be justified by a supposed trademark

7   disagreement.  WPE is likely to prevail on its interference claims.

8   **II.      WPE WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION**

9          Irreparable harm "is traditionally defined as harm for which there is no adequate legal

10   remedy."  *SolarPark Korea Co. v. Solaria Corp.,* 2023 WL 4983159 at *8 (N.D. Cal. Aug. 2, 2023)

11   (Martínez-Olguín, J.).  Courts recognize that intangible and unquantifiable injuries often lack an

12   adequate legal remedy and, therefore, constitute irreparable harm.  *See Rent-A-Center, Inc. v.*

13   *Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries,

14   such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm").  As

15   explained in the concurrently filed declarations, Defendants' actions—and Defendants' clear intent

16   to continue their misdeeds—have caused and will continue to cause irreparable harm to WPE.

17          ***Loss of customers and damage to customer relationships***.  The threat of losing customers

18   supports a finding of irreparable harm.  *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 Fed. Appx.

19   633, 636 (9th Cir. 2013) (affirming finding of irreparable harm where plaintiff provided "evidence

20   of threatened loss of [] customers").  Even where a specific customer has not yet left, the Ninth

21   Circuit recognizes that interfering with a company's relationship with its customers can constitute

22   irreparable harm.  *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (finding

23   irreparable harm based on likelihood of losing established customer relationships).

24          As discussed above, there is ample evidence showing that WPE has lost, and will continue

25   to lose, customers if Defendants are able to continually threaten WPE and its customers with service

26   interruptions.  Even though Defendants' "war" is just weeks old, the data show a 14% increase in

27   cancellation requests, 333 fewer new contracts than expected from the "sales-assisted" channel, and

28   a 29% drop in new customers from the "self-service" channel.  Teichman ¶¶ 30-36.  October has

seen a 17% increase in cancellation requests.  *Id.* ¶ 37.  And WPE has seen a 375% spike in the installation of migration-assisting plugins, indicating more is still coming.  *Id.* ¶ 39.  The common-sense conclusion that these events are the direct result of Defendants' efforts to interrupt only WordPress sites managed by WPE is confirmed by the words of WPE's customers, as well as those of Defendants themselves.  *Id.* ¶¶ 22-49 & Ex. N; Brunner ¶¶ 36-59; *e.g.*, Jenkins Exs. 10, 11, 13 at 1.  Defendants' takeover of the ACF plugin has also impacted WPE's ability to provide an upgrade path to the advanced, paid version of ACF—ACF PRO—and has irreparably harmed WPE's relationships with its customers and prospective customers of the ACF PRO plugin.  Prabhakar ¶ 28; Teichman ¶ 39.  These facts amply demonstrate irreparable harm.  *See Accretive Specialty Ins. Sols., LLC v. XPT Partners, LLC*, 2024 WL 1699509, at *12-13 (C.D. Cal. Mar. 28, 2024) (granting TRO on CFAA claim; "continued loss of . . . clients" demonstrates irreparable harm).

**Loss of market share.**  Relatedly, "[a]mple case law supports [the] arguments that loss of market share and lost profits constitute irreparable harm."  *Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 2617091, at *4 (N.D. Cal. June 26, 2019); *see also SolarPark Korea Co.* 2023 WL 4983159, at *8 ("there is a likelihood of irreparable harm because absent a preliminary injunction, [plaintiff] will likely suffer a loss of market position, loss of current and prospective customers . . .").

Here, the same facts that show WPE is at an increasing risk of losing customers also show it is at an increasing risk of losing market share.  *See supra.*  Mullenweg told the WordPress community to leave WPE and use other web hosts.  Jenkins Ex. 7 at 1, Ex. 16.  Conveniently, his examples included Automattic companies.  Jenkins Ex. 29 at 10-11.  Defendants even offered to pay WPE customers to breach their contracts with WPE.  Teichman ¶ 22; Jenkins Ex. 13 at 1.

**Damage to reputation and goodwill**.  Harming a company's reputation or goodwill can constitute irreparable harm.  *Rent-A-Center*, 944 F.2d at 603 ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"); *Moonbug Entm't Ltd. v. HappyKidsTV*, 2022 WL 18859471, at *10 (N.D. Cal. Dec. 15, 2022) (damage to "business, reputation, and goodwill . . . are intangible quantities sufficient to establish an irreparable harm").

The Court has an ample record to conclude that WPE has suffered and will suffer these categories of harm, too.  WPE is one of the organizations that can provide assistance "at scale," and

WPE focuses on customers that put a premium on stability and enterprise readiness.  Teichman ¶¶ 7, 41.  WPE's customer base is thus particularly sensitive to even the perceived possibility of service interruptions.  *Id.* ¶ 41.  By, among other things, trying to break the functionality of WPE-managed websites, cutting off WPE-managed websites from automatic security updates, barring WPE customers from wordpress.org resources, ginning up "security" concerns about WPE's plugins, and hijacking WPE's most popular plugin, Defendants are influencing WPE customers to doubt the *future* reliability of WPE's offerings.  Customers are leaving or threatening to leave, explaining that they cannot justify paying a premium for WPE when they "have these problems."  *See* Teichman ¶¶ 32-34, 44-49; Jenkins Exs. 14, 15, 17.  This has and will continue to erode WPE's goodwill and reputation as a reliable service provider, built up over a decade of service.  Teichman ¶¶ 41-49.

Again, the Court can find evidence of this existing and future harm in Mullenweg's own words.  Mullenweg recently openly invited the WordPress community to brainstorm how to manage a mass migration away from WPE's ACF plugin, predicting "millions of sites moving away from it in the coming weeks."  Brunner ¶ 57; Jenkins Ex. 11.  When someone asked why developers would invest time moving away from WPE, Mullenweg responded ominously:  "Hmm, I guess you'll have to wait and see why people might not trust ACF as much going forward."  Brunner Ex. I.

Given Defendants have declared an intent to unveil "surprises" that will break the "trust" people have for WPE, leading to "millions" of customers leaving in a matter of "weeks," this Court should not countenance any defense argument that WPE has not been put under an imminent and continuous threat of irreparable harm.  Brunner ¶ 59, Brunner Exs. I, J; Jenkins Ex. 11.

## III.     THE EQUITIES TIP SHARPLY IN FAVOR OF RESTORING AND THEN PRESERVING THE PRIOR STATUS QUO

Courts "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  Absent judicial relief, Defendants will continue to inflict death by a thousand cuts upon WPE, as Defendants try to break the functionality of WPE websites, cause the marketplace to lose trust in WPE, and otherwise drive away WPE's customers.  By sharp contrast, Defendants face no burden here.  The requested relief amounts merely to returning to the status quo prior to Defendants'

extortive and unprovoked declaration of war.  WPE's products were plugged into wordpress.org for many years without incident.  Prabhakar ¶ 4.  The balance of equities strongly favor granting relief.

## IV.   THE PUBLIC INTEREST ALSO STRONGLY FAVORS RELIEF

The public interest in this dispute also strongly favors quickly restoring and then preserving the status quo as it existed just a few weeks ago.  WPE's customers are themselves at risk of irreparable harm, as a result of the impairment of functionality in their websites, exerting time and resources in an attempt to preempt such occurrence, or switching service providers just to avoid these risks.  Teichman ¶¶ 44-48; Jenkins Exs. 14, 28, 33.  Moreover, service providers in the WordPress community other than WPE are also losing business because website operators are concerned about the stability of the WordPress platform, and developers are anxious and want assurance they will not be next to receive another extortionate demand from Mullenweg, become his next target of nuclear war, or next to have their plug-ins expropriated.  Teichman ¶¶ 44-49.  And Defendants' ham-fisted takeover attempts are increasing the security risk for everyone in the WordPress community.  An order here will make clear that everyone's data and systems will be respected while WPE and Defendants litigate their dispute.  It will also help stabilize the entire WordPress ecosystem, and keep the system that powers over 40% of websites running.

## CONCLUSION

WPE respectfully requests that the Court issue a preliminary injunction restoring and preserving the status quo as it existed prior to Defendants' wrongful actions described above.  The preliminary injunction requires no security because returning the situation to the status quo will have no negative effect on Defendants.  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."); *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018) (bond not required for injunctive relief that "simply enjoin[s] Defendant from doing something Defendant never had a right to do in the first place").

Dated: October 18, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By

Rachel Herrick Kassabian
*Attorneys for Plaintiff WPEngine, Inc.*

PLAINTIFF WPENGINE, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES