Michael M. Maddigan (Bar No. 163450)
michael.maddigan@hoganlovells.com
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600

Jiaxing (Kyle) Xu (Bar No. 344100)
kyle.xu@hoganlovells.com
**HOGAN LOVELLS US LLP**
4 Embarcadero Center, Suite 3500
San Francisco, CA 94103
Telephone: (415) 374-2300

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Anna Kurian Shaw, *pro hac vice*
anna.shaw@hoganlovells.com
Lauren Cury, *pro hac vice*
lauren.cury@hoganlovells.com
Hadley Dreibelbis, *pro hac vice*
hadley.dreibelbis@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600

*Attorneys for Defendants Automattic Inc. and
Matthew Charles Mullenweg*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| WPENGINE, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> AUTOMATTIC INC., a Delaware corporation; and MATTHEW CHARLES MULLENWEG, an individual, <br><br> Defendants. | Case No. 3:24-cv-06917-AMO <br><br> **DEFENDANTS AUTOMATTIC INC. AND MATTHEW CHARLES MULLENWEG'S OPPOSITION TO WPENGINE, INC.'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. Araceli Martinez-Olguin <br> Courtroom: 3, 3rd Floor, Oakland <br> Hearing Date: November 26, 2024 <br> Hearing Time: 10:30 a.m. |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... iii

I.    INTRODUCTION ................................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................................... 2

III.  ARGUMENT ........................................................................................................................ 7

    A.   LEGAL STANDARD ..................................................................................................... 7

    B.   WP ENGINE HAS NOT AND WILL NOT BE HARMED ABSENT AN
        INJUNCTION, MUCH LESS IRREPARABLY ........................................................... 7

        1.   THE SUPPOSED SOURCES OF WP ENGINE'S ALLEGED
             HARM ARE BELIED BY THE FACTS .................................................... 7

             a.   WP Engine And Its Customers Have At All Times Been
                 Able To Access And Download The WordPress Software
                 And Plugins From Wordpress.Org .................................................... 8

             b.   WP Engine's Access To Wordpress.org Servers Was Only
                 A Matter Of Convenience, Not Access, And WP Engine
                 Fully Restored It Within Days. ....................................................... 8

             c.   WP Engine Has Full Control Of Its Own Repository Of Its
                 Own Plugins ................................................................................... 10

             2.   WP ENGINE IS UNABLE TO TIE ANY PURPORTED HARM
                TO DEFENDANTS' CONDUCT ............................................................ 10

             3.   WP ENGINE'S ALLEGATIONS REGARDING LOST
                CUSTOMERS SHOULD BE VIEWED WITH SKEPTICISM ............... 12

             4.   NONE OF THE HARM WP ENGINE CLAIMS QUALIFIES AS
                 IRREPARABLE ........................................................................................ 13

              a.   WP Engine's Claimed Injuries Are Economic And
                 Measurable ..................................................................................... 13

              b.   WP Engine's Claimed Injuries Are Self-Inflicted ........................ 14

    C.   WP ENGINE IS NOT LIKELY TO SUCCEED ON THE MERITS ................... 15

        1.   WP ENGINE IS NOT LIKELY TO SUCCEED ON THE
             MERITS OF ITS CFAA CLAIM ............................................................ 15

2.   WP ENGINE IS UNLIKELY TO SUCCEED ON THE MERITS
OF ITS ATTEMPTED EXTORTION CLAIM ........................................ 17

3.   WP ENGINE IS NOT LIKELY TO SUCCEED ON THE
MERITS OF ITS INTERFERENCE CLAIMS ....................................... 19

a.   WP Engine's Intentional Interference With Contractual
Relations Claim Is Unlikely To Succeed, Because It Rests On
Actions Defendants Had The Right To Take ..................................... 20

b.   WP Engine's Intentional Interference With Prospective
Economic Relations Claim Is Unlikely To Succeed For Failure
To Establish Independently Unlawful Conduct ................................. 21

4.   WP ENGINE IS NOT LIKELY TO SUCCEED ON THE
MERITS OF ITS UCL CLAIM ............................................................... 21

D.   THE BALANCE OF THE EQUITIES WEIGHS AGAINST ISSUANCE
OF A PRELIMINARY INJUNCTION.................................................... 22

E.   THE PUBLIC INTEREST WEIGHS AGAINST ISSUANCE OF A
PRELIMINARY INJUNCTION.............................................................. 23

F.   IF ANY INJUNCTION ISSUES, IT SHOULD BE LIMITED TO
ACCESS TO WORDPRESS SOFTWARE AND PLUGINS, AND WP
ENGINE SHOULD BE REQUIRED TO POST A BOND ................... 24

IV.   CONCLUSION ...................................................................................................... 25

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**CASES:**

4

5

*Accretive Specialty Ins. Sols., LLC v. XPT Partners, LLC*,
  No. 8:23-CV-01903-JVS (KESx), 2024 WL 1699509 (C.D. Cal. Mar. 28, 2024)................ 14

6

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020)................................................................................................. 15

7

8

*Chegg, Inc. v. Doe*,
  No. 22-cv-07326-CRB, 2023 WL 7392290 (N.D. Cal. Nov. 7, 2023) ................................. 17

9

10

*CoStar Grp., Inc. v. Com. Real Estate Exch. Inc.*,
  619 F. Supp. 3d 983 (C.D. Cal. 2022)................................................................................... 23

11

*CoStar Grp., Inc. v. Com. Real Estate Exch. Inc.*,
  No. 2:20-cv-08819-CBM-AS, 2023 WL 2468742 (C.D. Cal. Feb. 23, 2023)....................... 23

12

13

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
  479 F.3d 1099 (9th Cir. 2007)............................................................................................... 21

14

15

*Diamond v. McLucas*,
  No. CV 03-00016-LGB (VBK), 2003 WL 27367381 (C.D. Cal. Feb. 28, 2003)................. 15

16

*Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*,
  No. CV 19-04993 DSF (JPRx), 2019 WL 8631502 (C.D. Cal. Dec. 16, 2019) ................... 19

17

18

*Edwards v. Leaders in Cmty. Alternatives, Inc.*,
  850 F. App'x 503 (9th Cir. 2021)..................................................................................... 17, 18

19

20

*Env't Democracy Project v. Green Sage Mgmt., LLC*,
  No. 22-CV-03970-JST, 2022 WL 4596616 (N.D. Cal. Aug. 23, 2022) ................................ 15

21

*Evans Hotels, LLC v. Unite Here! Local 30*,
  No. 18-CV-2763 TWR (AHG), 2021 WL 10310815 (S.D. Cal. Aug. 26, 2021) .................. 18

22

23

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) ................................................................................ 14

24

25

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022)................................................................................................ 16

26

*Inplant Enviro-Systems 2000 Atlanta, Inc. v. Lee*,
  No. 1:15-CV-0394-LMM, 2015 WL 12746702 (N.D. Ga. Feb. 10, 2015) ........................... 17

27

28

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

*Jorgensen v. Cassiday*,
   320 F.3d 906 (9th Cir. 2003).................................................................................................25

*Kingston Trio Artists v. Strong*,
   No. CV-19-9163 PSG (SSx), 2021 WL 4692406 (C.D. Cal. Aug. 11, 2021) .......................18

*Levitt v. Yelp! Inc.*,
   765 F.3d 1123 (9th Cir. 2014).........................................................................................18, 19

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980)...................................................................................7, 12, 13

*Moonbug Ent. Ltd. v. HappyKidsTV*,
   No. 22-cv-03203-TLT, 2022 WL 18859471 (N.D. Cal. Dec. 15, 2022) ...............................14

*Munaf v. Geren*,
   553 U.S. 674 (2008) .......................................................................................................7, 22

*Nat'l Soc. of Prof. Eng'rs v. United States*,
   435 U.S. 679 (1978) ...........................................................................................................24

*Neal v. Select Portfolio Servicing, Inc.*,
   No. 5:16-CV-04923-EJD, 2017 WL 4224871 (N.D. Cal. Sept. 22, 2017) ...........................20

*Nexsales Corp. v. Salebuild, Inc.*,
   No. C-11-3915 EMC, 2012 WL 216260 (N.D. Cal. Jan. 24, 2012) .....................................19

*Payroll Resource Group v. HealthEquity, Inc.*,
   No. 23-cv-02794-TSH, 2024 WL 4194795 (N.D. Cal. Sept. 12, 2024) ...............................22

*Putian Authentic Enter. Mgt. Co., Ltd v. Meta Platforms, Inc.*,
   No. 5:22-CV-01901-EJD, 2022 WL 1171034 (N.D. Cal. Apr. 19, 2022) ...........................20

*Ramirez v. Sotelo*,
   No. ED CV 13-02155 SJO (MRWx), 2014 WL 12599799 (C.D. Cal. Feb. 3, 2014) ...........22

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991)...............................................................................................13

*Rockport Admin Servs. v. Integrated Health Sys.*,
   No. 2:23-cv-04920-SPG-AFM, 2023 WL 5667867 (N.D. Cal. June 26, 2023) ...................25

*Sampson v. Murray*,
   415 U.S. 61 (1974) .........................................................................................................7, 14

*Sewell v. Bernardin*,
   795 F.3d 337 (2d Cir. 2015)................................................................................................17

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

1

2

*Shaeffer v. Califia Farms, LLC*,
    258 Cal. Rptr. 3d 270(Cal. Ct. App. 2020) ............................................................. 21

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) ............................................................................. 7

*Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*,
    No. CV 11-01539 MMM (JEMx), 2013 WL 12244286 (C.D. Cal. Feb. 19, 2013) .............. 25

*SkyHop Technologies v. Narra*,
    58 F.4th 1211 (11th Cir. 2023) ............................................................................. 17

*SolarPark Korea Co. v. Solaria Corp.*,
    No. 23-cv-01181-AMO, 2023 WL 4983159 (N.D. Cal. Aug. 2, 2023) ...................... 7, 14, 22

*Steinmeyer v. Am. Ass'n of Blood Banks*,
    No. 23-CV-1160 JLS (BGS), 2023 WL 6370904 (S.D. Cal. Sept. 11, 2023) ................ 17, 21

*SuccessFactors, Inc. v. Softscape, Inc.*,
    544 F. Supp. 2d 975 (N.D. Cal. 2008) ................................................................. 17

*Synopsys, Inc. v. InnoGrit, Corp.*,
    No. 19-CV-02082-LHK, 2019 WL 2617091 (N.D. Cal. June 26, 2019) ............................ 14

*TaiMed Biologics, Inc. v. Numoda Corp.*,
    No. C 10-03260 LB, 2011 WL 1630041 (N.D. Cal. Apr. 29, 2011) ...................................... 18

*Terrier, LLC v. HCAFranchise Corp.*,
    No. 2:22-cv-01325-GMN-EJY, 2022 WL 4280251 (D. Nev. Sept. 15, 2022) ................ 15, 24

*Tran v. Eat Club, Inc.*,
    No. H046773, 2020 WL 4812634 (Cal. Ct. App. Aug. 18, 2020) ......................................... 18

*United States v. Soybel*,
    13 F.4th 584 (7th Cir. 2021) ............................................................................. 17

*Van Buren v. United States*,
    593 U.S. 374 (2021) ............................................................................. 16

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    49 Cal. Rptr. 2d 793 (Cal. Ct. App. 1996) ............................................................. 20

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ............................................................................. 7, 22

**STATUTES:**

18 U.S.C. § 1030
    (a)(7) ............................................................................. 16

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

(a)(7)(A) ................................................................................................................ 15

(a)(7)(C) ................................................................................................................ 15

**OTHER AUTHORITY:**

*Hack*, Black's Law Dictionary (12th ed. 2024) ............................................................. 16

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

## I.   INTRODUCTION

Plaintiff WP Engine's Motion for Preliminary Injunction ("Motion") asks this Court to do something remarkable. It seeks an order compelling Defendants Matthew Charles Mullenweg ("Matt") and Automattic, Inc. ("Automattic") to provide the party that is suing them access to the website that Matt maintains and provides for free—in the absence of any obligation, in law or contract, to do so and without any remuneration from WP Engine. Indeed, WP Engine appears unwilling to even post a bond in the event this Court should grant its Motion. Pl.'s Mot. Prelim. Inj. 25, ECF No. 17 (hereinafter, "Pl.'s Mot."). This remedy is tantamount to requiring specific performance of a contract that does not exist, and to force Defendants to continue to provide services to a private equity-backed company that is unwilling to expend those resources itself.

WP Engine conflates the open source WordPress software with a website located at wordpress.org ("Website") that is provided by Matt. The Website is distinct from the WordPress open source software platform and both are distinct from Automattic and the WordPress Foundation, a nonprofit public benefit corporation that was organized exclusively for charitable, scientific and educational purposes, not commercial endeavors. WP Engine's CEO Heather Brunner feigns ignorance and reliance on a false understanding that an educational foundation was responsible for the Website that provides resources for commercial endeavors. ECF 21 at ¶ 11. But WP Engine's management failings should not be grounds for ordering Defendants to provide free services to WP Engine where they have no obligation to do so.

Further, it is apparent that WP Engine itself is fully capable of providing the services it purports to need from Defendants. WP Engine has never lost the ability to access the WordPress software and plugins on the Website. These are accessible without any login. Indeed, this Court, or anyone else, could readily access such software and plugins by visiting https://wordpress.org/download/ and https://wordpress.org/plugins/. Rather, WP Engine has only been denied access to various developer resources that are provided through the Website, which allow it to manage the back end of the versions of its plugins hosted on the Website. Within days of losing such access, WP Engine was able to recreate much of the functionality it claims it lost and re-establish a connection to its plugins within days by hosting all of its plugins on its own

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

1  website. WP Engine could also maintain the other developer resources available on the Website if

2  it were willing to spend the thousands of hours and other resources that Defendants contribute

3  annually to do so. WP Engine has brought this lawsuit and seeks this injunction because it is

4  unwilling to make that same investment. Instead, it has asked this Court to make Defendants bear

5  that financial burden on its behalf.

6          WP Engine also asks this Court to stifle speech and competition by preventing Matt from

7  criticizing the actions of WP Engine and preventing Automattic from competing in the

8  marketplace in a way that benefits consumers. Specifically, WP Engine seeks to preclude

9  Automattic from calling out its deleterious effects on the WordPress community, and from

10  offering customers commonplace incentives and promotions to switch to hosting through

11  Automattic. The public benefits both from requiring businesses to be managed in a way that puts

12  the onus on companies to ensure reliable infrastructure in their business model so they can provide

13  continuity of service to their customers (without having to rely on free online resources that it has

14  no unfettered right to access) and encourages healthy competition to provide consumers with

15  lower prices and better services. A preliminary injunction would encourage just the opposite.

16          And while WP Engine spends much of its Motion quantifying the damage it supposedly

17  has suffered, including in the form of lost customers, it fails to acknowledge that much of the

18  evidence it submits to support this purported damage demonstrates that those customers left

19  because of WP Engine's own poor service and not because of any action by Defendants. WP

20  Engine is upset by the events that have taken place in the last two months, but that is not sufficient

21  to transform WP Engine's complaints into cognizable legal claims or intangible harms. For these

22  reasons, and as discussed below, WP Engine's Motion should be denied. At most, any injunction

23  should be narrowly granted, as discussed below, *see infra*, § III.F, to allow WP Engine to continue

24  to access the WordPress open source software and plugins, as it is able to today.

25  **II.    STATEMENT OF FACTS**

26          WordPress is an open-source software that allows users to build and manage websites

27  without needing to write software from scratch. Mullenweg Decl. ¶ 3. Matt and his co-founder

28  created WordPress software in early 2003 when Matt was only nineteen years old. *Id*. In order to

1  democratize publishing across the Internet, they made the WordPress software available under an

2  open-source license, so that it was free for anyone to use, copy, and modify. *Id*. Since its initial

3  release, WordPress has been widely adopted across the globe. *Id*. ¶ 4. Today, more than 43% of all

4  websites are powered using WordPress software. *Id*.

5      WordPress software is available through various publicly accessible locations throughout

6  the web, including at least (1) on the Website; and (2) at https://github.com/WordPress/WordPress

7  (on GitHub). Abrahamson Decl. ¶ 5. In particular, approximately 170 repositories of WordPress-

8  related software can be found on GitHub, freely available to users for downloading. *Id*. That

9  software includes the most up-to-date version of WordPress software, which is pushed to GitHub

10  via an automated process from the Website and available on the GitHub Webpage. *Id*.

11      The domain name associated with the Website, namely, WordPress.org, is owned and

12  registered by Matt, and the Website is managed by Matt individually to benefit the WordPress

13  community. Mullenweg Decl. ¶ 5. The Website and its servers host the WordPress software as

14  well as other resources, such as WordPress themes—which define the look and feel of WordPress

15  websites and WordPress plugins. Abrahamson Decl. ¶ 6. A plugin for WordPress is a piece of

16  software that adds specific functionality or features to a WordPress website. *Id*. Plugins can

17  improve the performance and extend the capabilities of WordPress beyond its core features,

18  allowing users to add various tools, functions, or enhancements to their site without needing to

19  revise the core WordPress software. *Id*. WordPress plugins are necessarily based on the same GPL

20  software as WordPress itself and are subject to the same GPL license as WordPress software. *Id*.

21      Most of the Website's subdirectories, including the WordPress software, themes, and

22  plugins, are publicly accessible, allowing visitors to download themes and plugins directly without

23  registering. Abrahamson Decl. ¶¶ 7, 10. The Website also allows web developers to register

24  accounts to publish or support plugins developed by them. *Id*. ¶¶ 10, 15; Mullenweg Decl. ¶ 6. For

25  efficiency, security, and the good of the community, Matt at times deactivates certain accounts and

26  blocks their access to parts of the Website due to issues like spam and potential security risks.

27  Mullenweg Decl. ¶ 7.

28      The Website requires significant resources from Automattic, Matt, and others to manage

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

1   and maintain. *Id.* ¶ 6. With respect to plugins alone, the Website provides a directory

2   (https://wordpress.org/plugins/) (the "Plugin Directory") for users to view and download plugins.

3   Abrahamson Decl. ¶ 7. Currently, there are over 60,000 plugins available in the Plugin Directory,

4   which have been contributed by thousands of developers. *Id.*

5           While developers may elect to submit plugins for publication on the Website's Plugin

6   Directory, this is not the only option for publishing or hosting the plugins they create. *Id.* ¶ 8.

7   Developers can, for example, host their plugins on their own webpages or plugin directories, as

8   well as through community repositories such as GitHub. *Id.* Plugins may and often are hosted in

9   more than one location. *Id.*

10          Plugins are regularly updated to implement improvements or patch discovered security

11  vulnerabilities. *Id.* ¶ 9. With respect to plugins hosted on the Website, WordPress users are able to

12  update the plugins for their WordPress websites either manually or through automated options

13  provided by certain hosting services for their convenience. *Id.*

14          For manual downloading and updating options, plugins, including updates, can be

15  downloaded from the Website Plugin Directory by anyone, at any time. *Id.* ¶10. That Plugin

16  Directory is publicly accessible, and does not require a Website account or login. *Id.* Up-to-date

17  plugins can be downloaded to a WordPress website with a single click, which provides the plugin

18  in the form of a zip file. *Id.* WordPress website users can then extract and upload that file to their

19  individual WordPress websites. *Id.*

20          Alternatively, certain hosting services that assist users in supporting and optimizing their

21  WordPress websites provide dashboards, which allow users to manage and update their websites

22  and plugins from one centralized location. *Id.* ¶11. Rather than manually download and upload

23  each desired plugin to a specific website, they allow users to update their existing plugins with the

24  click of a button. *Id.* This is a matter of convenience for users. *Id.* These third party dashboards

25  can function by linking to up-to-date plugin repositories from which they pull updated plugins. *Id.*

26  ¶12. Those repositories may include the Website's Plugin Directory, or any other repository

27  hosting such plugins. *Id.*

28          WP Engine is a hosting company that provides its users with these dashboards, for their

-4-                                    Case No. 3:24-cv-06917-AMO

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

convenience, to manage their individual WordPress websites. *Id*. ¶13. Prior to September 25, 2024, the dashboards for WordPress websites hosted by WP Engine were linked to the Website's Plugin Directory, for purposes of downloading and updating plugins. *Id*. Matt does not and never has had any contracts, agreements, or obligations to provide WP Engine access to the Website. Mullenweg Decl. ¶ 5. Nor did WP Engine pay any operating costs towards the Website or to access the Website for this convenience. *Id.* ¶ 39.

WP Engine is backed and controlled by private equity company Silver Lake. Xu Decl. ¶¶ 2-6. In recent months, consumers have expressed dissatisfaction with WP Engine's products, services, and customer support, noting recent changes in WP Engine's service that have driven them to leave. Request for Judicial Notice ("**RJN**", Dkt. 37), Exs. 9-11.

On September 25, 2024, due to WP Engine's growing misuse of the WordPress and WooCommerce trademarks and the threat it posed to the community, Matt blocked WP Engine's servers from accessing those of the Website. Mullenweg Decl. ¶¶ 26-27. That block prevented WP Engine's dashboard from continuing to link to updated plugins through the Website's Plugin Directory. Abrahamson Decl. ¶ 14. Despite this, the Website's Plugin Directory remained publicly accessible, at all times allowing WP Engine and its users to download and manually upload plugins to their WordPress sites as needed. *Id*. Such a process does not require using a registered account with the Website. *Id*. ¶10. WP Engine was also blocked from accessing certain developer resources on the Website that would allow it to update the software behind plugins residing on the Website's Plugin Directory. *Id*. ¶15. That block, however, in no way impacted WP Engine's ability to update, modify or deploy those plugins from its own website or from other repositories where those plugins may reside. *Id*. And support comments were made available on the Website to direct users to WP Engine for those updates. Mullenweg Decl. ¶ 42.

Within five days of the September 25 block, WP Engine announced that it had deployed a solution, which fully restored the regular workflow practices of its dashboard by using and linking to its own servers to install and update plugins. Xu Decl. ¶ 7. As of the date of this filing, that solution has been in place, and WP Engine's normal workflow has been fully restored, for over four weeks. *Id.*

Following WP Engine's block from accessing parts of the Website, the WordPress development team assumed responsibility for ensuring the plugins previously uploaded to the Website by WP Engine remained safe and secure for the users who had installed them. Mullenweg Decl. ¶ 42. Support notices were also added to the Website pages for those WP Engine plugins alerting customers that WP Engine could no longer log in to the Website, and that updates to its plugins could be obtained from WP Engine directly. *Id.* One of the WP Engine plugins hosted on the Website was for advanced custom fields ("ACF"). *Id.* ¶ 43. ACF has over two million active installs, so any security vulnerability within ACF would threaten a substantial portion of the WordPress community. *Id.*

To guard against any such threat, the WordPress security team undertook a security review of ACF. *Id.* ¶ 44. That review revealed the existence of a security vulnerability in the ACF software, which the WordPress security team promptly disclosed to WP Engine. *Id.* WP Engine never responded to that disclosure. *Id.* ¶ 45. While WP Engine did update the version of ACF hosted on the WP Engine website to patch the disclosed vulnerability, a review of that patch by the WordPress security team indicated that the patch was incomplete. *Id.* As a result, given the resultant security implications for the broader WordPress community, including over two million community members, the WordPress security team worked to quickly implement a complete patch for the ACF plugin hosted on the Website. *Id.*

In implementing that patch and distinguishing the resultant plugin from ACF—which was still being offered directly through WP Engine—the WordPress security team forked that plugin, and named that fork SCF. *Id.* ¶ 46. Forking—where a developer creates a separate and independently developed version of an existing open-source project—is a common practice in the open-source software community and is how the WordPress software originated. *Id.* ¶ 47.

The forked SCF plugin was deployed as an update to ACF to address the existing associated vulnerability and per the Website Plugin Guidelines. *Id.* ¶ 48. That deployment was announced on the "news" portion of the Website. *Id.* This fork and associated security fix were also published in the changelog for that plugin. *Id.* As such, steps were taken to ensure that the public was notified that the SCF plugin was forked from the ACF plugin and further to inform the

public that if they wished to receive the ACF plugin and updates they should download that directly from WP Engine. *Id.* Notwithstanding this fork, WP Engine retains control of its ACF plugin, which is available directly through WP Engine itself. *Id.* ¶ 49.

## III.   ARGUMENT

### A.  LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy,' " *Munaf v. Geren*, 553 U.S. 674, 689 (2008), "never awarded as of right," *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Such a showing requires that the plaintiff establishes he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20; *see Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009). Alternatively, "[u]nder the Ninth Circuit's sliding scale approach, a court may issue a preliminary injunction if there are serious questions going to the merits," but only "if a hardship balance [also] tips sharply towards the [movant], and so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *SolarPark Korea Co. v. Solaria Corp.*, No. 23-cv-01181-AMO, 2023 WL 4983159, at *3 (N.D. Cal. Aug. 2, 2023) (internal quotations omitted). WP Engine's Motion should be denied under either standard.

### B.  WP ENGINE HAS NOT AND WILL NOT BE HARMED ABSENT AN INJUNCTION, MUCH LESS IRREPARABLY

"The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (citing *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Because WP Engine's inability to show *any* harm attributable to Defendants—let alone irreparable harm—is fatal to WP Engine's Motion, Defendants address this issue upfront.

#### 1.   THE SUPPOSED SOURCES OF WP ENGINE'S ALLEGED HARM ARE BELIED BY THE FACTS

As an initial matter, the supposed activities on which WP Engine bases its claim of harm

either did not take place or are not ongoing. As explained in detail below, and contrary to WP

Engine's Motion, WP Engine can and always has been able to access the WordPress software and

plugins available on the Website, as is anyone. Abrahamson Decl. ¶¶ 6-7, 10. Further, WP Engine

successfully deployed, in a matter of days, a complete solution to any interruption it experienced,

which fully restored its regular workflow practices and has been in place for over four weeks. Xu

Decl. ¶ 7. WP Engine also now maintains its own repository of its own plugins on its own website,

a repository with which Defendants have not and cannot interfere. Abrahamson Decl. ¶ 14.

a.  WP Engine And Its Customers Have At All Times Been Able To Access And Download The WordPress Software And Plugins From WordPress.Org.

As to the source of the losses and damages alleged in its Motion, WP Engine claims that

Defendants are "threaten[ing] WP Engine and its customers with service interruptions" and "trying

to break the functionality of WP Engine-managed websites," among other egregious acts. Pl.'s

Mot. 22, 24. These claims create the impression that WP Engine and its customers are cut-off from

the Website and the plugins hosted on that site, exposed to the whims of Defendants and with no

means available to keep their websites up-and-running absent extraordinary intervention from this

Court. WP Engine even goes so far as to claim that it, as well as its "customers, partners, vendors,

employees, and users" have been prevented by a login-related affiliation question from accessing

"the WordPress code and plugins." Pl.'s Mot. 12. This is false.

At no time have WP Engine and its customers been unable to access and download the

WordPress software and plugins available at the Website. Abrahamson Decl. ¶¶ 10, 14. The

WordPress software and plugins are available on the public-facing, pre-login section of the

Website and are (and always have been) open to all, including WP Engine. *Id*. Access to that

software and plugins has never been blocked, denied, or interrupted by Matt's disabling of server-

to-server connections, the login-related affiliation question, or otherwise. *Id*.; Mullenweg Decl. ¶

41. As such, the harm WP Engine alleges in this regard simply does not exist.

b.  WP Engine's Access To WordPress.Org Servers Was Only A Matter Of Convenience, Not Access, And WP Engine Fully Restored It Within Days.

1    WP Engine also claims harm deriving from a supposed interruption of its users' ability to

2    "access[] wordpress.org resources through [WP Engine's] administrat[ive] panel, which includes

3    downloading WordPress themes and plugins… *from the administrative panel*." Pl.'s Mot. 10-11

4    (emphasis added). As previously explained, at no time was WP Engine or any third party

5    prevented from accessing, updating or downloading any WordPress software, themes or plugins.

6    *See supra*, § III.B.1.a. The only thing that the block impacted was the ability to do so through a

7    WP Engine administrative panel. *See* Abrahamson Decl. ¶ 14; Mullenweg Decl. ¶ 41.

8    Importantly, however, WP Engine's administrative panel is a tool of convenience.

9    Abrahamson Decl. ¶ 11. The functionality of that panel, including the ability to update and install

10   new plugins and themes from the Website all exists elsewhere, including by going directly to the

11   Website and downloading those plugins manually. *Id.* ¶¶ 10-11, 14. And as explained above,

12   access to those resources on the Website has never been denied. *Id.* ¶¶ 10, 14. At no point were

13   WP Engine or any of its customers unable to complete the functions available on the

14   administrative panel; they simply had to do so elsewhere. *See Id.* ¶¶ 10-11, 14.

15   Further, any inconvenience caused by this interruption was short lived—and, by WP

16   Engine's own admission, no longer has any effect on its services. Matt blocked WP Engine's

17   access to the Website's servers on September 25, 2024. Mullenweg Decl. ¶ 27. A mere five days

18   later, on September 30, WP Engine issued the below statement on X, announcing the deployment

19   of a solution that fully restored its regular workflow practices:



24   https://x.com/wpengine/status/1840910240801316924. Xu Decl. ¶ 7.

25   As of the date of this filing, that solution has been in place for over four weeks; there is no

26   known ongoing harm or even inconvenience that WP Engine or its customers are suffering. And

27   the speed with which WP Engine was able to deploy this solution, no longer relying on access to

28   the Website's servers, indicates that it could have done so at any time—including to proactively

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

1    mitigate against any interruption of service and to enhance security, as some other companies have

2    done. Abrahamson Decl. ¶ 12.

3                    c.   WP Engine Has Full Control Of Its Own Repository Of Its Own Plugins.

4            Another source of alleged harm is what WP Engine describes as Defendants' "Block [of]

5    Access to WP Engine plugins." Pl.'s Mot. 10. The only access Matt ever blocked, however, was

6    access by WP Engine and its affiliates to *make updates to plugins available through the Website*.

7    Abrahamson Decl. ¶¶ 14-15. As explained above, the ability to download those plugins, including

8    through the Website, was never disabled. *See supra*, § III.B.1.a. WP Engine has at all times

9    retained its own software for the plugins it offers. Indeed, WP Engine has its own repository of

10   available plugins at https://wpengine.com/solution-center/plugins/. And versions of WP Engine

11   plugins that do reside on the Website contain support comments directing users to WP Engine for

12   associated updates. Mullenweg Decl. ¶ 42.

13                   **2.   WP ENGINE IS UNABLE TO TIE ANY PURPORTED HARM TO**

14                          **DEFENDANTS' CONDUCT**

15           WP Engine does not, because it cannot, show that its claimed injuries were caused by

16   Defendants' actions rather than simply contemporaneous with them. Far from tying any such

17   injuries to Defendants, the evidence WP Engine itself relies on suggests those injuries were at best

18   due to the uncertainty arising out of litigation it initiated. And the vast landscape of consumer

19   complaints against WP Engine indicates its alleged losses are a direct result of its own poor

20   business practices. Neither is grounds for issuing a preliminary injunction against Defendants.

21           In its Motion, WP Engine cites three examples of alleged customer communications from

22   which it claims irreparable harm. Teichman Decl. ¶¶ 32-34 (purporting to quote alleged customer

23   communications but failing to attach the communications themselves, or to provide any

24   information as to who made them, when, or in what context). In the first, an individual explains

25   "I'm not sure I'm comfortable until all this drama on your guys end with WordPress is figured

26   out…. I'm not in the game of getting in the middle of a drawn out legal battle." *Id*. ¶ 32. In the

27   second, an individual notes "with all of the events this week that have transpired between

28   WordPress and WP Engine…. [W]e would really like to see how things shake out here before

1   locking in on any longer term arrangements. *Id.* ¶ 33. And in the third, an individual references

2   "the hostility between the parties" as the reason for its decision to take no further forward steps

3   "[u]ntil such time as the situation is resolved between WP Engine and Matt Mullenweg." *Id.* ¶ 34.

4   These statements point to no actionable conduct by Defendants. Instead, they reflect the common

5   business uncertainty that surrounds litigation—a litigation WP Engine itself initiated. These

6   communications in no way support issuing the injunction WP Engine requests.

7          What's more, the landscape of consumer reviews of WP Engine in the time during and

8   immediately leading up to this dispute reveals that customers are not leaving WP Engine because

9   of any conduct by Defendants, but rather because of WP Engine's own poor business practices.

10  Beginning in July 2024, just weeks before this dispute came to a head, customers began

11  commenting on recent changes to WP Engine's service that led to dissatisfaction with WP Engine:

12         • On July 16, 2024, one customer described what they characterized as a

13             "[c]ompletely horrific experience" with WP Engine, noting "[i]t seems recently

14             something changed with their service, as their software recently became non-

15             functional and support has been a total disaster." RJN Ex. 9.

16         • On July 23, 2024, another customer expressed that WP Engine was "[n]o longer

17             worth the price. As many have said, it has gone downhill." RJN Ex. 11.

18         • And on July 31, 2024, yet another customer explained that "[t]hey used to be good.

19             However I believe they are now using AI to scam their clients by claiming

20             bandwidth overage…. It's ridiculous and anyone using them should beware of their

21             harassing and extortion practices." RJN Ex. 10.

22         Over the weeks that would follow, and concurrent with the present dispute and the actions

23  by Defendants to which WP Engine attempts to attribute its harm, consumer reviews reveal a

24  landscape of consumer anger and upset driving customers to leave WP Engine for reasons entirely

25  unrelated to Defendants, and attributable to WP Engine alone:

26         • One review from September 24 explains "My experience with this company was

27             extremely disappointing. I lasted only five weeks before deciding to leave." They

28             go on to say "[o]nce I left, I felt a sense of relief," citing WP Engine's "ineffective"

1    AI chat feature and "disengaged" staff as the bases of their disappointment. The

2    review concludes by saying "[o]verall, dealing with this company was a

3    nightmare—overpriced and providing poor customer service compared to

4    competitors." *Id.*

5    • Paragraph 106 of WP Engine's own Complaint features a Reddit post from

6    September 26, 2024 that states, "WP Engine and Flywheel have been throttling my

7    client's sites all summer. I've already moved all but 1 ecomm [to] other hosting."

8    Compl. ¶ 106.

9    • Another review, from October 7, 2024, describes a customer's experience as

10   "dreadful," explaining "didn't realize they disable some core wp functions, moved

11   back off to own hosting almost immediately." RJN Ex. 10.

12   • And yet another review from October 21, 2024 describes a prospective customer

13   who contacted WP Engine, and was turned off by WP Engine's nonresponsive

14   automated communications and aggressive marketing tactics, which the customer

15   described as "clearly abusive," "a violation of user consent," and "a clear GDPR

16   violation." That customer explained "I'm obviously not interested in doing any

17   business with a company that behaves like this *with potential customers*. I don't

18   even want to know how they behave with actual customers. I will spend my money

19   elsewhere." *Id.*

20   Further examples of consumer complaints about WP Engine, its products and services are

21   attached. RJN Exs. 9-11. Because WP Engine's outcry of irreparable harm ignores this evidence

22   demonstrating that the losses it is suffering are a direct result of its own reputation for having a

23   high price, low quality, poor customer service and other issues, it has not and cannot show

24   irreparable harm caused by Defendants. *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1202

25   ("The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal

26   remedies.").

27   **3.   WP ENGINE'S ALLEGATIONS REGARDING LOST CUSTOMERS**

28   **SHOULD BE VIEWED WITH SKEPTICISM**

WP Engine sets forth various characterizations of data purporting to quantify the business it has lost. Pl.'s Mot. 22-23. Upon review of the supporting declaration, however, what WP Engine characterizes as "ample evidence" (Pl.'s Mot. 22) ultimately represents isolated data covering a period of 44 days (September 1, 2024 to October 14, 2024)—with no historical comparisons or trend lines included for reference. *See* Teichman Decl. ¶¶ 30-39.

This data should be viewed with skepticism. In just one example, WP Engine attempts to make hay out of the notion that its cancellation requests for the month of September were weighted towards the end of that month, asking this Court to reach what it characterizes as the "common-sense conclusion" that Defendants were responsible for that increase. Pl.'s Mot. 23; Teichman Decl. ¶ 30. But without any historical data, this Court cannot meaningfully evaluate whether this observation was an anomaly, or a regular month-to-month trend relating to WP Engine's monthly renewal terms. Nor can this Court evaluate whether WP Engine was bleeding customers prior to the present dispute. Defendants encourage WP Engine to submit its parallel historical data over at least the past 14 months so an informed evaluation of that data can be made.

### 4. NONE OF THE HARM WP ENGINE CLAIMS QUALIFIES AS IRREPARABLE

WP Engine's claimed irreparable harm consists of 1) "loss of customers and damage to customer relationships;" 2) "loss of market share;" and 3) "damage to reputation and goodwill." Pl.'s Mot. 22-24. Because any such harm is economic in nature, quantifiable by WP Engine's own admissions, and self-inflicted, these claimed harms do not qualify as irreparable.

a.   WP Engine's Claimed Injuries Are Economic And Measurable.

Even accepting WP Engine's claimed injuries as pled, those injuries are economic in nature and thus sufficiently compensated through a monetary award. *See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."); *see also Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1202 ("[M]onetary injury is not normally considered irreparable."). Indeed, after suggesting that its injuries are intangible and unquantifiable, WP Engine then proceeds to quantify those injuries in

1  its Motion, noting "the data show a 14% increase in cancellation requests, 333 fewer new

2  contracts than expected from the 'sales-assisted' channel, and a 29% drop in new customers from

3  the 'self-service' channel." Pl.'s Mot. 22. WP Engine goes on to provide additional data-supported

4  figures regarding cancellation requests and the installation of migration-assisting plugins. *Id.* 23.

5        This information indicates the alleged injuries are cognizable and measurable, contrasting

6  with the intangible harms and ongoing violations required to support a finding of irreparable harm.

7  *Sampson*, 415 U.S. at 90 ("The key word in this consideration is irreparable. Mere injuries,

8  however substantial, in terms of money, time and energy necessarily expended…are not

9  enough."). This distinction—and fatal deficiency—is highlighted by the case law on which WP

10  Engine relies, all of which involve intangible harm arising out of the misappropriation of trade

11  secrets, piracy, or infringement—none of which WP Engine claims. *See SolarPark Korea Co.*,

12  2023 WL 4983159 at *14 ("Once SolarPark's trade secrets are disclosed to companies with no

13  experience with the shingling technology, SolarPark will lose its competitive edge."); *Henry*

14  *Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (involving the misappropriating

15  of trade secrets and other confidential information by a former employee and the use of that

16  misappropriated material to plaintiff's detriment); *Accretive Specialty Ins. Sols., LLC v. XPT*

17  *Partners, LLC*, No. 8:23-CV-01903-JVS (KESx), 2024 WL 1699509, at *12 (C.D. Cal. Mar. 28,

18  2024) (relying on misappropriation of trade secrets to the plaintiff's detriment); *Synopsys, Inc. v.*

19  *InnoGrit, Corp.*, No. 19-CV-02082-LHK, 2019 WL 2617091, at *4 (N.D. Cal. June 26, 2019)

20  (relating to the pirating of proprietary software); *Moonbug Ent. Ltd. v. HappyKidsTV*, No. 22-cv-

21  03203-TLT, 2022 WL 18859471, at *10 (N.D. Cal. Dec. 15, 2022) (involving allegations of

22  trademark and copyright infringement). No such claims or considerations are implicated here. The

23  Court should take WP Engine at its word that its harms are quantifiable, and should decline to

24  issue a preliminary injunction on this ground alone.

25        b.   <u>WP Engine's Claimed Injuries Are Self-Inflicted.</u>

26        WP Engine's claimed economic injuries also are self-inflicted, arising out of its reliance on

27  the Website that it had no contractual right to use. "The Ninth Circuit has held that 'self-inflicted

28  wounds are not irreparable injury.'" *Terrier, LLC v. HCAFranchise Corp.*, No. 2:22-cv-01325-

GMN-EJY, 2022 WL 4280251, at *8 (D. Nev. Sept. 15, 2022) (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020). For this reason, harm that results from a party's own failure to act "severely undermines" its argument for irreparable harm. *Al Otro Lado*, 952 F.3d at 1008.

Here, WP Engine could have avoided the claimed economic injury, and ultimately did mitigate that injury, by expending its own time and resources to create for itself its own repository of the plugins and software which the Website had compiled. To the extent WP Engine experienced a loss of income or capital in that intervening period, these losses are the result of its decision to freeride off the Website and Matt's extensive efforts to support and maintain the Website, all the while knowing it had no contractual agreement entitling it to the continued receipt of those resources. *See Env't Democracy Project v. Green Sage Mgmt., LLC*, No. 22-CV-03970-JST, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022) (explaining how defendant's property management choices led to the losses about which it now complains). WP Engine gambled, for the sake of profit, on Matt's continued maintenance and provision of the Website for free. Having lost that bet, it cannot now come to the Court complaining of the consequences.

### C.  WP ENGINE IS NOT LIKELY TO SUCCEED ON THE MERITS

As a threshold matter, the subset of claims on which WP Engine moves are not likely to survive the pleadings stage, including for the reasons detailed in Defendants' accompanying Motion to Dismiss. *Diamond v. McLucas*, No. CV 03-00016-LGB (VBK), 2003 WL 27367381, at *1 (C.D. Cal. Feb. 28, 2003) (denying motion for preliminary injunction where "Plaintiff's Complaint is subject to dismissal on many grounds" such that "it cannot be said that Plaintiff has demonstrated any likelihood of success on the merits"). To the extent those claims do survive the pleadings, they are unlikely to succeed on the merits for each of the reasons detailed below.

### 1.  WP ENGINE IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CFAA CLAIM.

WP Engine grounds its CFAA claim in § 1030(a)(7)(A) and (C) of the statute. Pl's Mot. 17. But WP Engine is unlikely to establish an actionable "threat," "demand," or "request" involving damage to a "protected computer," or that WP Engine acted with "intent to extort." 18 U.S.C. § 1030(a)(7)(A), (C).

To start, WP Engine's Motion claims that Defendants threatened to and did cause damage to "[the systems] behind WordPress," "WP Engine's systems," and "those of WP Engine's customers." Pl.'s Mot. 17. To the extent WP Engine is seeking to impose liability for Defendants' actions related to its *own* computer systems (*i.e.*, "those behind WordPress," *id.*), that is an astounding claim. The CFAA is a "computer hacking" statute. *hiQ Labs*, *Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022). But as a matter of common sense, making changes to one's own computer systems (or threatening to do so) hardly falls within the ambit of hacking. *See, e.g.*, *Hack*, Black's Law Dictionary (12th ed. 2024) (defining "hack" as "[t]o surreptitiously break into the computer, network, servers, or database *of another person or organization*" (emphasis added)). WP Engine cites no authority for the proposition that a defendant can be liable for making alterations to its own devices and servers. And this Court should decline to accept WP Engine's invitation to adopt such a broad interpretation. Given that the CFAA imposes criminal penalties in addition to civil ones, courts must construe the CFAA's provisions "narrow[ly]." *hiQ Labs*, *Inc.*, 31 F.4th at 1200-01. Yet WP Engine's proposed interpretation risks "turn[ing] a criminal hacking statute into a 'sweeping Internet-policing mandate' "—exactly what the Ninth Circuit has cautioned courts not to do. *Id.*

As for WP Engine's claims concerning damage to WP Engine's systems and those of its customers, WP Engine fails to identify any actionable "threat," "demand," or "request." The communication at issue must involve "damage to" WP Engine's or its customers' computers. § 1030(a)(7). But the comments WP Engine cites either do not discuss technological damage at all, or do not threaten damage to the computers of WP Engine and its customers. Pl.'s Mot. 18. Nor could they. As a factual matter, the blocking implemented on the Website did not inflict technological harm on WP Engine's system or servers at all. *See* Abrahamson Decl. ¶ 14; Mullenweg Decl. ¶¶ 40-41; *see also Van Buren v. United States*, 593 U.S. 374, 392 (2021) (explaining that "damage" under the CFAA "focus[es] on technological harms" that typically flow from "hacking"). And the withdrawal of WP Engine's ability to modify the ACF plugin *on the Website* in no way impacted WP Engine's ability to access, modify, or deploy that plugin from its own website and repository where that plugin now sits. Abrahamson Decl. ¶ 14-15.

1   At any rate, to prove Defendants acted with an "intent to extort," § 1030(a)(7), WP Engine

2   must show that the threats were "wrongful." *Edwards v. Leaders in Cmty. Alternatives, Inc*., 850

3   F. App'x 503, 506 (9th Cir. 2021). But for the reasons mentioned below, *see infra*, § III.C.2, WP

4   Engine is unlikely to make that showing.

5   The cases cited by WP Engine highlight the inapplicability of the CFAA to the facts here.

6   All but two of the cases involve an entirely different provision of the CFAA. *Chegg, Inc. v. Doe*,

7   No. 22-cv-07326-CRB, 2023 WL 7392290, at *7 (N.D. Cal. Nov. 7, 2023); *SuccessFactors, Inc.*

8   *v. Softscape, Inc.,* 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008); *United States v. Soybel,* 13 F.4th

9   584, 595 (7th Cir. 2021); *Sewell v. Bernardin,* 795 F.3d 337, 340 (2d Cir. 2015). And the two that

10   do concern § 1030(a)(7) entail situations where plaintiffs were denied access to their *own*

11   computer systems and servers. *SkyHop Technologies v. Narra*, 58 F.4th 1211, 1227 (11th Cir.

12   2023) (defendant withheld plaintiff's "digital property until it [met defendant's] demands,"

13   thereby impairing plaintiff's "ability to access the programs and data that are housed on

14   [plaintiff's] servers"); *Inplant Enviro-Systems 2000 Atlanta, Inc. v. Lee*, No. 1:15-CV-0394-LMM,

15   2015 WL 12746702, at *2-3 (N.D. Ga. Feb. 10, 2015) (defendants withheld access to plaintiff's

16   website and domains and conditioned return of access on the payment of money plaintiff did not

17   owe). No such scenario happened in this case. Even though WP Engine alleges a "complete

18   takeover of the [ACF] plugin" by Defendants, Pl.'s Mot. 18, it still possesses the software and

19   ACF plugin itself, which it now has published on its own website. *See* Abrahamson Decl. ¶ 14-15.

20   Put simply, what Matt has blocked is only the convenience of publishing and distributing WP

21   Engine's software through the Website. *See id*. ¶¶ 11, 14; Mullenweg Decl. ¶ 41. This is within

22   Matt's right, and does not form the basis of a CFAA claim.

23   ## 2. WP ENGINE IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS

24   ## ATTEMPTED EXTORTION CLAIM.

25   WP Engine makes no effort to even discuss the elements of an attempted extortion claim.

26   Pl.'s Mot. 18-19. That failure is reason alone to reject WP Engine's likelihood-of-success

27   argument for attempted extortion. *See, e.g., Steinmeyer v. Am. Ass'n of Blood Banks*, No. 23-CV-

28   1160 JLS (BGS), 2023 WL 6370904, at *2 (S.D. Cal. Sept. 11, 2023) (denying motion for

preliminary injunction where plaintiff made no effort to discuss elements of claim and thus failed to demonstrate likelihood of success). It is also telling: As recent cases reveal, California law does not recognize the private cause of action for attempted extortion that WP Engine asserts.

WP Engine derives its claim for "common-law attempted extortion" from the crime of attempted extortion under California Penal Code § 524. *See, e.g.*, Pl.'s Mot. 18 (citing *TaiMed Biologics, Inc. v. Numoda Corp.*, No. C 10-03260 LB, 2011 WL 1630041, at *5 (N.D. Cal. Apr. 29, 2011), which explicitly roots attempted civil extortion claim in § 524). WP Engine suggests that courts routinely grant relief based on such a cause of action, relying on two federal district court cases from 2011. Pl.'s Mot. 18-19. But in the wake of those decisions, case after case has rejected arguments that any such private cause of action based on § 524 exists. *See, e.g., Kingston Trio Artists v. Strong*, No. CV-19-9163 PSG (SSx), 2021 WL 4692406, at *5 (C.D. Cal. Aug. 11, 2021) ("[Section] 524 does not authorize a private right of action for attempted extortion as defined by the Penal Code"); *Evans Hotels, LLC v. Unite Here! Local 30*, No. 18-CV-2763 TWR (AHG), 2021 WL 10310815, at *28 (S.D. Cal. Aug. 26, 2021) (same); *Tran v. Eat Club, Inc.*, No. H046773, 2020 WL 4812634, at *16 & n.8 (Cal. Ct. App. Aug. 18, 2020) (unpublished) (dismissing cases, including *TaiMed*, as inconsistent with California law). Nor has any published decision from California's appellate courts or the Ninth Circuit expressly recognized such a cause of action. In light of this recent case law—and apparent lack of any published appellate decision supporting WP Engine's claim—WP Engine can hardly demonstrate likelihood of success.

In any event, WP Engine's claim under § 524 is wholly inadequate. Plaintiffs asserting an attempted economic extortion claim must show that the threats were wrongful because the plaintiff either "had a pre-existing right to be free from the threatened harm," or "the defendant had no right to seek payment for the service offered." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014); *accord Edwards*, 850 F. App'x at 506. In its Motion, WP Engine asserts that Defendants threatened to "smear" WP Engine and ban it from the WordPress community if WP Engine failed to pay for a trademark license. Pl.'s Mot. 8–9. But WP Engine fails to plead—much less attempt to show—that Defendants' expression of critical opinions about WP Engine violated WP Engine's preexisting rights, Pl.'s Mot. 8-10, or that Plaintiff had any entitlement to access the Website, Pl.'s

Mot. 10-11; *see also Levitt*, 765 F.3d at 1133 (rejecting extortion claim where plaintiff "had no pre-existing right to" receive service defendant otherwise made available, as plaintiff failed to identify any contractual obligation or law requiring defendant to provide service). And WP Engine was plainly violating trademark law here, including by using WordPress marks in a product name without a license, Ex. A to Compl. at 22 (advertising "Headless WordPress" product).

For similar reasons, WP Engine's filings belie any contention that Defendants had no right to seek payment for a trademark license. WP Engine simply asserts that the license agreement Defendants proposed "purported to grant [WP Engine] the 'right' to use the WordPress trademark to describe the WordPress open source software." Pl.'s Mot. 8. But language requiring WP Engine to pay for using the marks only descriptively appears nowhere in the proposed agreement. Brunner Decl. Ex. N. And given the flagrant violation of trademark law just mentioned, well beyond the limits of any descriptive fair use, WP Engine cannot persuasively establish that Defendants lacked any legitimate claim to seek payment for WP Engine's use of its trademarks. *See Levitt*, 765 F.3d at 1134. Accordingly, even if attempted extortion based on criminal law were a cognizable claim under California law, WP Engine has not demonstrated a likelihood of success on the merits.

### 3.   WP ENGINE IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS INTERFERENCE CLAIMS.

As an initial matter, WP Engine's interference claims fail on the merits because WP Engine continues to fail to identify 1) *any* contractual relationships allegedly interfered with; 2) *any* contractual terms allegedly breached; or 3) *any* prospective business relationships allegedly disrupted. *Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*, No. CV1904993DSFJPRX, 2019 WL 8631502, at *2 (C.D. Cal. Dec. 16, 2019) (plaintiff must "identify specific contracts that were disrupted, the terms of the contracts, [and] the parties involved."). Because the existence of an enforceable contract or probable future economic relationship is the *sine qua non* of these claims, and because WP Engine fails to identify any, these claims cannot succeed. *Nexsales Corp. v. Salebuild, Inc.*, No. C-11-3915 EMC, 2012 WL 216260, at *4 (N.D. Cal. Jan. 24, 2012) (dismissing where plaintiff "generally allege[d] that a contract existed but fail[ed]," among other things, "to identify any terms of the contract, [or] the parties involved"); *Westside Ctr.*

1  *Assocs. v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793, 803 (Cal. Ct. App. 1996) ("law precludes

2  recovery for overly speculative expectancies by . . . requiring proof the business relationship

3  contained 'the probability of future economic benefit to the plaintiff.'").

a.  <u>WP Engine's Intentional Interference With Contractual Relations Claim Is</u>

<u>Unlikely To Succeed, Because It Rests On Actions Defendants Had The</u>

<u>Right To Take.</u>

7  WP Engine's tortious interference with contractual relations claim is additionally unlikely

8  to succeed because the conduct WP Engine points to in support of its claim was lawful. "[A]n

9  intentional interference claim will not arise if 'the defendant's conduct consists of something

10  which he had an absolute right to do.'" *Putian Authentic Enter. Mgt. Co., Ltd v. Meta Platforms,*

11  *Inc.*, No. 5:22-CV-01901-EJD, 2022 WL 1171034, at *4 (N.D. Cal. Apr. 19, 2022) (quoting *Neal*

12  *v. Select Portfolio Servicing, Inc.*, No. 5:16-CV-04923-EJD, 2017 WL 4224871, at *4 (N.D. Cal.

13  Sept. 22, 2017)). As explained in Defendants' Motion to Dismiss, Matt was under no obligation to

14  continue to provide WP Engine access to some or all of the resources on the Website. Defs.' Mot.

15  to Dismiss at I.A.3 (hereinafter Defs.' Mot.). And he had a right, under the Website's developer

16  guidelines explained *infra*, to fork the ACF plugin as he did, including to address outstanding

17  security issues.

18  This District's denial of a TRO in *Putian Authentic Enterprise. Management Co.*, 2022

19  WL 1171034, at *4, is instructive. There, plaintiffs sought an order enjoining Meta from denying

20  them access to their Facebook Business Manager accounts. *Id.* at *1. In denying the motion, the

21  court relied on Meta's terms, which "ma[d]e clear that fraudulent and misleading conduct [wa]s

22  prohibited… and that repeated violations may result not only in the removal of the fraudulent or

23  misleading ads but also termination of Plaintiffs' accounts." *Id.* at *4. The court held that

24  "[b]ecause Plaintiffs and many of their clients appear to have violated Meta's terms and policies,

25  Meta was within its rights under the parties' agreement to terminate Plaintiffs' accounts." *Id.*

26  The relevant facts of this case mirror those of *Putian*. The Website's Plugin Directory

27  guidelines specify that Matt may "remove developer access to a plugin" as well as "make changes

28  to a plugin, without developer consent, in the interest of public safety." Mullenweg Decl. ¶ 48 (Ex.

DEFENDANTS' OPPOSITION TO WP ENGINE'S MOTION FOR PRELIMINARY INJUNCTION

13). And WP Engine's ACF plugin residing on the Website was not safe, and was subject to vulnerabilities including some that were not fully patched by the update WP Engine imported. Mullenweg ¶¶ 42-45. As a result, Matt acted within his right to disable WP Engine's account access and to make changes to the ACF plugin for the sake of public safety. This Court should decline to enjoin this lawful conduct.

        b. <u>WP Engine's Intentional Interference With Prospective Economic Relations Claim Is Unlikely To Succeed For Failure To Establish Independently Unlawful Conduct.</u>

WP Engine is unlikely to prevail on its tortious interference with prospective economic relations claim for two further reasons as well. First, despite bearing the burden of establishing a likelihood of success on the merits, WP Engine wholly fails to address the elements of this claim. *See* Pl.'s Mot. 20-22; *see also Steinmeyer*, 2023 WL 6370904, at *2. It relies exclusively on the elements for intentional interference with contractual relations, Pl.'s Mot. at 20, which California law treats differently than intentional interference with prospective economic relations, *see, e.g.*, *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007). Second, even if WP Engine had addressed the merits of this claim, it is unlikely to establish a key element: That Defendants' interference was "independently unlawful," in that it was "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1109 (internal quotation marks omitted). In its Complaint, WP Engine purported to ground this claim in its causes of action for attempted extortion and a violation of the UCL. Compl. ¶ 126. But as explained herein, both claims are unlikely to succeed. *See supra*, § III.C.2, and *infra*, § III.C.4.

## 4.  WP ENGINE IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS UCL CLAIM.

WP Engine is not likely to succeed on the merits of its UCL claim, which requires conduct that is either fraudulent, unlawful, or unfair. *Shaeffer v. Califia Farms, LLC*, 258 Cal. Rptr. 3d 270, 276 (Cal. Ct. App. 2020). WP Engine has not alleged fraudulent conduct by Defendants; the supposedly unlawful conduct it cites relies on claims which have not been sufficiently pled and which are otherwise unlikely to succeed themselves, Defs.' Mot. at I.C-D; *supra*, § III.C.1 and §

III.C.2; and WP Engine's argument with respect to allegedly "unfair" conduct has been rejected by Ninth Circuit courts, including under the same circumstances present here. Defs.' Mot. at I.E.

*Payroll Resource Group v. HealthEquity, Inc.*, to which WP Engine cites, highlights the disconnect between WP Engine's alleged, and actual, chances of success. No. 23-cv-02794-TSH, 2024 WL 4194795 (N.D. Cal. Sept. 12, 2024). In that case, the court denied defendant's motion to dismiss a UCL claim under the "unfair" prong when the defendant terminated a twenty-year business relationship pursuant to which the plaintiff accessed the defendant's software. *Id*. at \*5. In denying that motion, the court emphasized the importance of contractual breach in conjunction with anticompetitive conduct, stating, "[t]his situation is materially different from the one addressed in the Court's prior order, in which the Court found that *terminating support for twenty-year-old software is not unfair where there is no contractual obligation to provide that support*." *Id*. (emphasis added). It is that latter situation that is present here, with Matt terminating his provision of support to WP Engine with respect to 20+ year old software, which he has no contractual obligation to provide. In this way, WP Engine's own case law showcases its lack of likelihood of success on this claim.

### D.   THE BALANCE OF THE EQUITIES WEIGHS AGAINST ISSUANCE OF A PRELIMINARY INJUNCTION

To qualify for the "drastic remedy" of a preliminary injunction, the balance of the equities must weigh in WP Engine's favor, if not sharply so. *Munaf*, 553 U.S. at 689; *Winter*, 555 U.S. at 24; *SolarPark Korea Co.*, 2023 WL 4983159 at \*5. "In balancing equities between parties, the Court must weigh the effect of different harms to both parties, at its own discretion." *Ramirez v. Sotelo*, No. ED CV 13-02155 SJO (MRWx), 2014 WL 12599799, at \*5 (C.D. Cal. Feb. 3, 2014). "The Court also examines the degree to which parties have acted in good faith, and particularly whether the moving party's need is self-imposed." *Id*. Finally, the balance of the equities tips in favor of the plaintiff when the injunction merely requires complying with an existing agreement or law. *See SolarPark Korea Co.*, 2023 WL 4983159 at \*9.

As explained above, any need WP Engine claims to have for injunctive relief is self-imposed. WP Engine's claimed economic injuries stem from its unilateral decision to build a

business around the Website, when it had no contractual right to access the Website, and opted not to mitigate any potential changes in access. WP Engine could have created its own mirror version of the Website and repository at any time, and has since created such repository, mooting any going-forward harm.

Meanwhile, to grant WP Engine's demand for a preliminary injunction would be to compel specific performance by Defendants of a contract that does not exist, and to force Defendants to continue to provide free services to a private equity-backed company that would rather not expend the resources itself. That would not be equitable.

Further, the mandated access WP Engine seeks would contradict the accepted legal axiom that "a business generally has the right to refuse to deal with its competitors" and companies are not obligated to assist their competitors. In *CoStar Group, Inc. v. Commercial Real Estate Exchange Inc.*, Commercial Real Estate Exchange Inc. ("CREXi") argued that CoStar anticompetitively blocked CREXi's access to CoStar's website, which contained information CREXi desired for its business. 619 F. Supp. 3d 983, 989-990 (C.D. Cal. 2022). The court determined it was lawful for CoStar to block competitors such as CREXi from its own website, and that the law did not compel CoStar to provide CREXi with assistance "in the form of free access to valuable information solely because CoStar chose to give that information to others for free." *Id*. at 991-992. The court equated "mandating access" with "mandating dealing with a competitor" and noted it raised the same concerns. *Id*. at 991; *see also CoStar Grp., Inc. v. Com. Real Estate Exch. Inc.*, No. 2:20-cv-08819-CBM-AS, 2023 WL 2468742, at *3 (C.D. Cal. Feb. 23, 2023) (finding law did not compel CoStar to provide CREXi access to repository that CoStar hosted). WP Engine is demanding the same access as CREXi for the same reasons and on the same terms—for free to benefit its for-profit business. Its demand should similarly be denied.

### E.  THE PUBLIC INTEREST WEIGHS AGAINST ISSUANCE OF A PRELIMINARY INJUNCTION

After considering the impact of the preliminary injunction on the parties themselves, the *Winter* test lastly requires a court to consider the impact on the public. When an injunction is narrow and limited only to the parties, with little to no impact on non-parties, "the public interest

-23-

will be at most a neutral factor." *Terrier, LLC*, 2022 WL 4280251 at *9. But "when an injunction will impact non-parties and has the potential to impact the public, the public interest is relevant." *Id*. (alteration omitted). The public has an interest in seeing laws upheld and contracts enforced. *Id*. The public also has an interest in robust competition that results in lower prices and better quality products. *Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

WP Engine claims the preliminary injunction is necessary to protect its customers, who are at risk of irreparable harm; to protect developers, who might "have their plug-ins expropriated"; and to protect the WordPress community and ecosystem that constitute over 43% of the world's websites. Pl.'s Mot. 25. But none of this is true. WP Engine's customers never lost access to the Website or its plugins. Abrahamson Decl. ¶ 14; Mullenweg Decl. ¶ 41. WP Engine weeks ago deployed a complete solution for its customers that, in its own words, fully restored its regular workflow practices. *Supra*, § III.B.1.b. And WP Engine is hosting its plugins on its own website, with the Website notifying users of the same. Abrahamson Decl. ¶ 14; Mullenweg Decl. ¶ 42. The public is not, and will not, be subject to any harm in the absence of a preliminary injunction.

To the contrary, the WordPress community and ecosystem has benefited from vigorous, healthy competition since the start of the business dispute between WP Engine and Defendants, with Defendants offering competitive terms to WP Engine's customers, including reimbursing them for any fees owed on their existing contracts—so they are *not* in fact breached—and to provide one year of free hosting. Compl. ¶ 80. Meanwhile, WP Engine has responded by improving its own product, not the least of which involved creating its own repository to support WP Engine's administrative panel, which made WP Engine's offering more reliable. WP Engine's broad request that Defendants be enjoined from "interfering"—or more accurately, competing— would dampen if not extinguish this competition that benefits the public.

### F.  IF ANY INJUNCTION ISSUES, IT SHOULD BE LIMITED TO ACCESS TO WORDPRESS SOFTWARE AND PLUGINS, AND WP ENGINE SHOULD BE REQUIRED TO POST A BOND

To the extent any injunction issues at all, it should be limited to an injunction against restricting WP Engine's ability to download the open source WordPress software and plugins

available on the Website. Such an injunction would ensure WP Engine continues to have access to the updated WordPress software and plugins necessary for it and its customers to run and maintain their WordPress websites.

Additionally, and in the event the Court issues an injunction, WP Engine should be required to post a bond, including to compensate Matt for any services he is ordered to continue to provide to WP Engine, as well as to compensate Automattic for any revenue it is precluded from realizing from competitive business activities.

Rule 65(c) grants the Court discretion to order the amount of bond required. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). "The court should require that the party seeking a preliminary injunction post a bond under Rule 65(c) in the amount of the potential harm that will be caused if the injunction has issued wrongfully." *Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, No. CV 11-01539 MMM (JEMx), 2013 WL 12244286, at *2 (C.D. Cal. Feb. 19, 2013). Here, WP Engine has requested that the Court issue no bond, arguing it should instead uphold the status quo. *See* Pl.'s Mot. 25. But WP Engine's argument misapplies what is considered to be the "status quo" under the law of this jurisdiction. Present circumstances do not qualify as the status quo where one party is indebted to another for services rendered. *See Rockport Admin Servs. v. Integrated Health Sys.*, No. 2:23-cv-04920-SPG-AFM, 2023 WL 5667867, at *6 (N.D. Cal. June 26, 2023). In that case, where a party was past due on its payments, the court required that a bond be put up in the amount of the services provided by defendant, for which it had not been compensated. *See id*.

Here, the continued maintenance and operation of the Website incurs an estimated $800,000.00 in administrative, server and developer costs, per year. Additionally, allowing WP Engine to access the developer resources of the Website permits WP Engine to benefit from the distribution of its products on the Website. Such distribution carries with it a separate value. To the extent Matt is ordered to continue to maintain and provide that website to WP Engine for its benefit, a bond should be posted for at least $1.6M, covering the cost of providing those services for an estimated two year duration of this case.

## IV.   CONCLUSION

For the reasons above, WP Engine's Motion should be denied.

1

Dated: October 30, 2024

2

Respectfully submitted,

3

By:   */s/Michael M. Maddigan*
Michael M. Maddigan

4

5

**HOGAN LOVELLS US LLP**
Michael M. Maddigan (Bar No. 163450)

6

Neal Kumar Katyal, *pro hac vice*
Anna Kurian Shaw, *pro hac vice*

7

Lauren Cury, *pro hac vice*
Jiaxing (Kyle) Xu (Bar No. 344100)

8

Hadley Dreibelbis, *pro hac vice*

9

*Attorneys for Defendants Automattic Inc. and*

10

*Matthew Charles Mullenweg*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28