Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín, Judge

```
WPENGINE, INC., a Delaware      )
corporation,                    )
                                )
            Plaintiff,          )
                                )
  VS.                           )   NO. 3:24-CV-06917 AMO
                                )
AUTOMATTIC INC., a Delaware     )
corporation; and MATTHEW        )
CHARLES MULLENWEG, an           )
individual,                     )
                                )
            Defendants.         )
_____)
```

Oakland, California
Tuesday, November 26, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
        555 Twin Dolphin Drive, Fifth Floor
        Redwood Shores, California 94065
BY: **RACHEL H. KASSABIAN, ATTORNEY AT LAW**
    **SARA E. JENKINS, ATTORNEY AT LAW**

        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
        865 South Figueroa Street, Tenth Floor
        Los Angeles, California 90017
BY: **YURY KAPGAN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED REMOTELY BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                     CSR No. 7445, Official U.S. Reporter

1  **APPEARANCES**:  (CONTINUED)

2  For Plaintiff:

3                          QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                           50 California Street, 22nd Floor
                           San Francisco, California 94111
4                  **BY:  BRIAN E. MACK, ATTORNEY AT LAW**

5

6  For Defendants:

7                          HOGAN LOVELLS US LLP
                           555 Thirteenth Street, N.W.
                           Washington, D.C. 20004
8                  **BY:  ANNA K. SHAW, ATTORNEY AT LAW**
                        **LAUREN B. CURY, ATTORNEY AT LAW**

9

10                         HOGAN LOVELLS US LLP
                           1999 Avenue of the Stars, Suite 1400
11                         Los Angeles, California 90067
                    **BY:  MICHAEL M. MADDIGAN, ATTORNEY AT LAW**

12

13

14  Also Present:          **Jordan Hinkes**
                        **Brooklyn Botello**

15

16

17

18

19

20

21

22

23

24

25

1    <u>**Tuesday - November 26, 2024**</u>                        <u>**10:49 a.m.**</u>

2                        **P R O C E E D I N G S**

3                        **---o0o---**

4        **THE CLERK:**  Calling Civil Matter 24-6917, WPEngine

5    Incorporated v. Automattic Inc.

6        Counsel, please state your appearances for the record,

7    starting with the plaintiff.

8        Pardon me.  The mics should be on now.

9        **MS. KASSABIAN:**  Hello.  Yes, it is.  Thank you.

10    Good morning, Your Honor.  I'm Rachel Herrick Kassabian of

11    Quinn Emanuel, here on behalf of the plaintiff WPEngine.  And

12    with me are several of my colleagues, including my partner

13    Yury Kapgan, my partner Brian Mack, and my colleague Sara

14    Jenkins.

15        We also have Ms. Brooklyn Botello here with us, to help us

16    operate slides, of Fulcrum.

17        **THE COURT:**  Good morning.

18        **MS. SHAW:**  Good morning, Your Honor.  I'm Anna Shaw

19    from Hogan Lovells, and I'm appearing on behalf of defendants,

20    Mr. Matt Mullenweg and Automattic.  I am joined by my

21    colleagues Lauren Cury and Michael Maddigan, as well as the

22    general counsel for Automattic, Jordan Hinkes.

23        **THE COURT:**  Good morning.

24        All right.  Folks, you are welcome to stay at the tables,

25    if you prefer.

1    I have -- I'm going to start with some questions for

2    you-all.  And my first set of questions --

3                        (Interruption.)

4         **THE COURT:**  Hi, Ms. Dub.  Oh, can you hear me?  Go

5    ahead.

6                    (Discussion off the record.)

7         **THE COURT:**  Thank you, Ms. Dub.  I forgot.  The

8    cameras are -- yeah.

9    So, I'm wrong.  Come forward, whoever anticipates taking

10   it up.  So, yeah, come on forward to the lecterns.

11   Thank you, Ms. Dub.

12        **MS. SHAW:**  Your Honor, may I --

13        **THE COURT:**  Please.

14        **MS. SHAW:**  Correct?

15        **THE COURT:**  Yes.

16   So we're here on plaintiff's motion, so let me -- I'll

17   start with my questions for you.

18   It's better there, too, because there's a camera.  Ms. Dub

19   can see you now.

20   Could I ask you to please -- I want you to take a moment

21   and just tell me your best argument on your strongest claim and

22   why you're likely to succeed on the merits.  And please know

23   that -- I'm the one asking to focus you that way.  So please

24   know that you are not conceding that your other claims lack

25   merit.  I'm asking you, I just want to hear your best argument

1    on that particular element of the *Winter* test.

2    **MS. KASSABIAN:**  Thank you, Your Honor.  Rachel

3    Kassabian on behalf of plaintiff, WPEngine.

4    We have an interesting case here because all four of these

5    claims essentially rely on the same or very similar sets of

6    facts that we have demonstrated warrant the issuance of an

7    injunction here.

8    But if I had to pick one, I would probably go with

9    extortion, Your Honor, attempted extortion, which means both

10   the CFAA cyber extortion as well as the common law attempted

11   extortion claim that we have.  Those facts are absolutely just

12   shocking and egregious.

13   **THE COURT:**  So I'm going to stop you.

14   I've got the facts.  Take for granted that I've got the

15   facts.  I want you to talk to me about the law.  I've looked at

16   the stuff.  I've looked at your demonstrative.

17   I was going to leave this as a housekeeping matter, but

18   let me actually say this right now just because it's

19   worthwhile.  Objections are never to be sent to my courtroom

20   deputy.  My courtroom deputy does not resolve objections.

21   You-all do not raise objections to her.  You want to make

22   objections?  You make them to me.  You don't take her time on

23   things like that.

24   You are not alone in having done this.  I just feel the

25   need to now scold every counsel that does it, because

 1    invariably, to the extent that she is an extension of me,

 2    you-all should treat her with more respect.  To the extent that

 3    she is not an extension of me and cannot resolve your disputes

 4    for you, stop.  This wasn't you-all; this was someone else last

 5    week.  But truly, I've seen the email exchanges on which they

 6    either have forgotten she's there or then try to couch it in

 7    better terms because she's there.  The Court da-da-da-da-da.

 8    No.

 9        So --

10        **MS. SHAW:**  My apologies, Your Honor.

11        **THE COURT:**  -- no objections --

12        **MS. SHAW:**  Message received.

13        **THE COURT:**  -- to my courtroom deputy.

14        **MS. SHAW:**  Understood.  Will not happen again.

15        **THE COURT:**  Thank you.

16    All right.  So talk to me about the law, because I've got

17    the facts.  I've gone through the facts.  I even went through

18    the demonstrative with the understanding that of course it's

19    going to be -- it's their demonstrative.  That's the nature of

20    these proceedings.  They are, in fact, adversarial.

21        So, but let me hear from you.  Sorry.  That was a --

22        **MS. SHAW:**  I overheard.

23        **THE COURT:**  Did you catch that?  Yeah.

24        **MS. SHAW:**  I caught that.

25        **THE COURT:**  Okay.  So, coming back down.

```
 1          Sure.  Go ahead --

 2               MS. KASSABIAN:  Your Honor --

 3               THE COURT:  -- Ms. Kassabian.

 4               MS. KASSABIAN:  -- I would be happy to discuss the

 5     legal issues involved in the attempted extortion claim.

 6          I should also add, by the way, that because extortion is a

 7     predicate act for UCL, it sort of knocks all three claims down

 8     together and they all warrant injunctive relief.

 9          But in any event, as you saw in the papers, there is some

10     debate about what the precise elements for an attempted

11     injunction -- attempted extortion claim are.  And the short

12     answer here is it does not matter.  Under any of these

13     formulations, we've demonstrated a likelihood of success.

14          For instance, if you consider the definition taken from

15     the Penal Code, the definition is the obtaining of property or

16     other consideration from another, with his or her consent,

17     induced by a wrongful use of force or fear.  The Hobbs Act, the

18     federal Hobbs Act has a very similar definition.

19          And then we have the Levitt vs. YELP! Ninth Circuit 2014

20     case, which has a slightly different definition.  That

21     definition reads (as read):

22               ". . . a litigant must demonstrate either that

23          he had a pre-existing right to be free from the

24          threatened harm, or that the defendant had no right

25          to seek payment for the service offered."
```

1    And as we've demonstrated in our papers, Your Honor, it

2    really does not matter which test you choose to apply.  They

3    all are satisfied here regarding the attempt to obtain money

4    through use of force or fear.

5        You're familiar with the record, Your Honor, and the facts

6    and the five hours and 21 minutes defendants gave my client to

7    respond to their demand for tens of millions of dollars.

8    That's -- factually, that record is clear.  And the Penal Code,

9    as well as the Hobbs Act, to the extent the Court wants to

10   consider it, that standard is satisfied.

11       As far as the *Levitt vs. YELP!* case, I'll first point out

12   that at the district court level, that case, there's a footnote

13   in that case -- I believe it's Footnote 5 -- that mentions

14   essentially, to the extent that other cases have recognized

15   that there is, in fact, a civil claim for attempted extortion,

16   that you look to the elements of the Penal Code, the definition

17   in the Penal Code.

18       On appeal, the Ninth Circuit enunciated this two-part

19   test.  It's an either/or.  Right?  We don't have to satisfy

20   them both.

21       So regarding the first factor, there's no question that

22   WPEngine has a right to be free from a threat of nuclear war.

23   They have a right to be free from being banned from the very

24   community in which they operate their business.  There's just

25   no question about that.

```
 1          Then there's an "or."  We can satisfy the first prong or
 2   the second.  In the "or" --
 3          THE COURT:  Stay on that first one for just a
 4   moment --
 5          MS. KASSABIAN:  Yes.
 6          THE COURT:  -- because I do have a note to myself to
 7   ask you what right WPEngine has to continued access without
 8   paying any kind of license.
 9          MS. KASSABIAN:  So, Your Honor -- well, do you mean a
10   license to use wordpress.org, or do you mean the purported
11   trademark license that the defendants produced on the morning
12   of September 20th and demanded a signature on?
13          THE COURT:  I imagine that it's harder for you to
14   answer the former, so let's stick with that one.
15          MS. KASSABIAN:  So there's just simply no connection
16   there, Your Honor, whatsoever.  The test is not:  Does WPEngine
17   have a right to be free from a trademark license?  That's
18   not -- that fact is not relevant to that particular prong of
19   the test.
20          I will say that before September 20th -- right? -- the
21   entire WordPress community, including WPEngine, was using
22   wordpress.org.  The operator of that site chose to hold it out
23   as a part of the community hub.  Right?  Doesn't charge anyone
24   anything to use it.  That's how it's been for 15 years.  Right?
25   That's the *status quo* that we're talking about.
```

1      And suddenly, out of the blue, on the morning of

2  September 20th, defendants purport to raise something so urgent

3  that they must demand a five-hour response, in the form of

4  threats to ban WPEngine from the WordPress community and to

5  smear them and to essentially declare war, scorched-earth

6  nuclear war on them.  There's just no question that that is the

7  thing they have a right to be free from.

8      **THE COURT:**  Can I ask you?  I did note that your

9  proposed order rolls things back to September 20th, and it

10  sounds like that's what you're arguing is *status quo*.   I

11  thought WPEngine's access to WordPress wasn't compromised until

12  the 24th.

13      **MS. KASSABIAN:**  So there were various steps taken

14  starting on September 20th, which is why that is the marker

15  that we are using here, Your Honor.

16      You are correct that the actual ban from wordpress.org was

17  not technically implemented until September 25.  A switch was

18  flipped that day without warning.  Our employees, you know,

19  went to interact with that site, as they always do to do their

20  jobs and serve their customers, and they were blocked.

21      But there were other things that happened prior, between

22  September 20th and 25th.  For instance, defendants disparaged

23  and smeared WPEngine via wordpress.org.  Right?  They committed

24  various other wrongs between those dates, which is why we are

25  asking to resume the *status quo ante* of, you know, the moments

1   before this extortion began.

2          THE COURT:  I have a handful more questions for you,

3   but I don't want to get too far away from your having put

4   forward the extortion elements and your elements and your

5   argument about that without giving Ms. Shaw a chance to

6   respond.

7     So, if you would.

8         MS. KASSABIAN:  Your Honor, just to be clear, I have

9   not reached the second element of *Levitt*, but I'm happy --

10        THE COURT:  That's right.

11        MS. KASSABIAN:  -- to wait.

12        THE COURT:  I stopped you there.

13        MS. KASSABIAN:  Would you like me to address the

14   second -- the alternative formulation of the test?

15        THE COURT:  I'm happy to have you go --

16     Well, I'm guessing it's easier to hear all of hers and

17   then hear yours, if that's fine --

18        MS. SHAW:  Certainly, Your Honor.

19        THE COURT:  -- Ms. Shaw.

20     All right.  Let's do that.  Go ahead, Ms. Kassabian.

21        MS. KASSABIAN:  Thank you, Your Honor.

22     So we either have to demonstrate under the *Levitt* test

23   that we have a right to be free from the threat or,

24   alternatively, that defendant had no right to demand payment

25   for the service being offered.  Right?  Either one satisfies

1    the test.

2        And here, charitably put, the service that was being

3    offered by defendants in their extortive demand was a purported

4    trademark license -- right? -- dropped on their desk at

5    10:23 a.m. the morning of the WordPress WordCamp keynote speech

6    at which defendants were threatening to do harm to WPEngine.

7        We know that defendants had no right to offer that,

8    quote/unquote, service because it is a pretext; it is a sham.

9    Right?  You look at the record.  We see that for 15 years

10   WPEngine was making nominative fair use of the WordPress mark,

11   as the entire community did for 15 years without so much as a

12   shoulder tap, excuse me, here's an email, here's a text, here's

13   a cease and desist letter, nothing, nothing whatsoever until

14   the morning of September 20th when we received this one-page

15   bizarre trademark license agreement.

16       That's not how trademark owners operate.  That is not how

17   you protect and enforce your mark.  You don't wait 15 years and

18   then drop a demand for $32 million on the recipient.

19       We also know from the price set.  Right?  This one-page

20   license listed a price of 8 percent of WPEngine's gross

21   revenues, which happens to amount to $32 million, and it set

22   that price for a seven-year period to automatically renew

23   essentially forever.

24       And when asked "How did you set that price?"

25   Mr. Mullenweg, defendant Matthew Mullenweg acknowledged:  "It's

1   what I thought they could pay.  We did an analysis to figure

2   out what the free cash flow was.  That's how we set that

3   number."

4        That's not how you calculate a royalty.  That's how you

5   set a ransom.

6        We also have other evidence in the record, including all

7   of the other WordPress hosts out there who all use the same

8   terminology, make the same nominative fair use of the WordPress

9   trademark.

10       Mr. Mullenweg gave a speech on November 9th in Mexico

11   City, after briefing on this matter had closed, where he

12   claimed:  "Oh, those other, you know, hosting providers,

13   they're not saying 'managed WordPress.'  They're not saying

14   'hosted WordPress.'  Only WPEngine is."

15       And that is false.  You can visit the websites of any of

16   these other --

17            **THE COURT:**  It's also not in front of me because it's

18   after the briefing in this matter closed.  So --

19            **MS. KASSABIAN:**  It is, Your Honor.

20            **THE COURT:**  -- keep it moving.

21            **MS. KASSABIAN:**  But in the record, we have the

22   long-standing use of the mark with absolutely no effort to

23   enforce or even a complaint of any kind; and we have the

24   royalty rate which was clearly set in an extortionate manner,

25   not based upon the value of the purported use, not based upon

1    the value of the purported mark, disconnected from all of those

2    things.

3         I can stop there, Your Honor, just in the interest of

4    time.

5              **THE COURT:**  Thank you, Ms. Kassabian.

6         Go ahead, Ms. Shaw.

7              **MS. SHAW:**  Your Honor, with respect to the extortion

8    claim, we have presented authority showing that courts in

9    California do not recognize a private cause of action for

10   attempted extortion under the California Penal Code.  In reply,

11   plaintiffs rely on *Tran v. Nguyen*, which involves a claim for

12   rescission of consent under duress.

13        At bare minimum, if the plaintiff is now pleading a

14   different claim or a different type of rescission, they should

15   be required to identify what that claim is, plead it with

16   particularity, and present evidence in support of it if

17   this Court is going to grant the extraordinary remedy of a

18   preliminary injunction.

19        But even if they're able to do that, we believe this claim

20   still fails under *Levitt*, the case Ms. Kassabian was citing,

21   because economic extortion, under both California and federal

22   law, requires demonstrating this either preexisting right to be

23   free from the threat and harm or that the defendant had no

24   right to seek payment for the services offered.

25        When you look at this test in the context of the two items

1  that plaintiffs have identified -- namely, the trademark

2  license and the dot-org block -- you will reach the conclusion

3  that they can't meet the standard.

4      So let's first start with the trademark license.  So the

5  threat at issue is the demand that was sent to them for a

6  trademark license.  Plaintiffs keep focusing that trademark

7  license on a payment.  There was a second option in the license

8  as well, which was to satisfy the license through providing,

9  essentially, the equivalent of volunteer hours to dot-org based

10 on WPEngine's own employees.  That obviously has not been

11 highlighted in the argument here.

12     Additionally, I will say WPEngine keeps focusing on this

13 five hours and 21 minutes; but if you actually look at the

14 texts that are included in their own demonstratives, you will

15 see that there is a text from Mr. Mullenweg in which he says --

16 or he makes reference to even negotiating the terms the

17 following week.  They just never responded to

18 Mr. Mullenweg's -- Mr. Mullenweg's response.

19     But coming back to the trademark issues, I think it is

20 notable that on the eve of their filing of the complaint,

21 plaintiffs did a cleanup job on their website to delete

22 numerous references to the WordPress and Blue Commerce

23 trademarks, including references that appeared in product

24 names, which is a violation of the WordPress trademark policy.

25     So for them to sit here today and say that defendants have

1    absolutely no right to bring this claim and they have a right

2    to be free of the threat of the claim is -- it lacks a certain

3    level of credibility.

4        Additionally, if this Court were to adopt that

5    interpretation, essentially any demand letter sent out by any

6    trademark owner could potentially -- the recipient of that

7    letter could potentially argue that it is a claim of extortion

8    if they disagree with the merits of that particular demand.

9        If we then turn to the second element that plaintiffs rely

10   on, which is the block of dot-org, first, just to be clear

11   about the block of dot-org, even today the WordPress software,

12   the plugins, all of that can be accessed by plaintiffs and,

13   basically, anyone.

14       What has been blocked is an enhanced service for plugins

15   that is provided by the dot-org website which would allow

16   plaintiffs to host their plugins, distribute their plugins,

17   manage their plugins.  It allows them to elect -- it allows

18   them to link to dot-org so they themselves don't have to update

19   and upload plugins.  That's the service we're talking about,

20   which is different from the resources on dot-org.

21       But in any event, plaintiffs need to be able to point to

22   some preexisting right to satisfy this *Levitt* test, that they

23   are entitled somehow to be free of this block; and there is

24   no -- there's nothing they can point to to establish that

25   preexisting right.

1       It sounds like in their argument they seem to be arguing

2   kind of a promissory estoppel-type claim because they certainly

3   can't point to any contract or other obligation or agreement to

4   satisfy this prong; but that promissory estoppel claim,

5   Your Honor, is not before the Court at the PI stage.

6           **THE COURT:**  Let me turn your attention to a different

7   one of plaintiff's claims for a moment, Ms. Shaw.

8       Could you tell me why you think they're -- why they are

9   unlikely to succeed on their tortious interference with --

10          **MS. SHAW:**  Certainly.

11          **THE COURT:**  -- contractual relations?

12          **MS. SHAW:**  Certainly, Your Honor.

13      So the tortious interference claim requires that -- and

14  let me first note, plaintiffs seem to have collapsed the

15  analysis of the tortious interference with contractual

16  relationships and the tortious interference with respect to

17  economic advantage into the same analysis.  It is worth noting

18  for this Court, as I'm sure the Court recognizes, there are

19  additional elements and differences between those two claims.

20          With respect to the contractual relations tortious

21  interference claim, plaintiff's main defense seems to be that

22  they're under no obligation to identify the parties to any

23  specific contract; but they should be required to identify what

24  the language of the contract is and, at minimum, what the terms

25  of the contract are that were breached or disrupted.

1    The mere migration of customers from a service provider

2    who may be providing services under an at-will contract -- we

3    don't know if it's an at-will contract because they haven't

4    produced those contracts, despite four separate

5    opportunities -- in their complaint, amended complaint, PI

6    motion, and reply -- to do so, and which would increase --

7    which would impose additional elements of proof on the

8    plaintiffs.  We simply don't know what those terms are that are

9    breached.

10    They rely on *Altera* for the proposition that they do not

11    have to identify that information, but in *Altera*, the actual

12    contracts at dispute which were the subject of the tortious

13    interference claim were available to the Court.  Additionally,

14    the actual terms in that contract that were breached were

15    identified by the parties bringing that claim, and the parties

16    further identified how the defendants had -- the specific

17    actions the defendants had taken to breach those specific

18    terms.

19    We simply do not have that here; and it is just -- it is

20    difficult to even, honestly, evaluate the claim without those

21    basic pleadings.

22    **THE COURT:**  Okay.  While you have the mic, Ms. Shaw,

23    let me ask you a handful more questions.

24    **MS. SHAW:**  Yes, Your Honor.

25    **THE COURT:**  Have defendants required a license

1  agreement of any entity other than WPEngine?

2          **MS. SHAW:**  Yes.  They do have sublicenses in place

3  for their trademarks.

4          **THE COURT:**  And you may have already started to --

5  well, no.  Does WordPress remain free for everyone except

6  WPEngine?

7          **MS. SHAW:**  It depends on what you mean by

8  "WordPress," and so I do want to be specific about what that

9  means.

10      If you're talking about the WordPress software itself,

11  it's free for everyone, including plaintiffs.  If you're

12  talking about access to the -- going to WordPress and

13  downloading plugins, it's free for everybody, including

14  plaintiffs.

15      What plaintiffs cannot do is upload plugins to the

16  WordPress directory.  They cannot link their systems to our

17  servers, which is what they were doing previously, to

18  automatically create updates and uploads of any changes in the

19  plugin directory.

20          **THE COURT:**  So in that vein -- and this may be a

21  little broad.  This question may be too broad, but you --

22          **MS. SHAW:**  Yes.

23          **THE COURT:**  -- narrow it for me.

24          **MS. SHAW:**  Certainly.

25          **THE COURT:**  But what are small business owners or

```
1   others who rely on WPEngine's services supposed to do if one

2   of -- if defendants decide to control some -- like, pull down

3   one of the other plugins and disable some access to them?

4   Doesn't that necessarily disrupt a third party's website?

5              MS. SHAW:  So I'm not -- it's a --

6              THE COURT:  Sorry.

7              MS. SHAW:  -- technical question.

8       I'm not sure that is exactly the facts at issue here.

9       So I can tell you what we understand WPEngine has done,

10  based on their -- based on the statements in the Prabhakar

11  declaration, which was submitted in reply.

12      We understand -- and, of course, it may be different.  My

13  understanding may be incorrect because I'm outside WPEngine's

14  systems.

15      But what we understand that they've done is that they have

16  essentially created a mirror, and that mirror functions to

17  essentially provide those uploads and updates that were

18  previously being provided by dot-org for free and without any

19  contractual obligation to do so.  That has ended.

20      But as noted in a September 30th X post from the WPEngine

21  site, they came up with a technological solution to restore

22  customer functionality.  That same statement also appears in

23  the Prabhakar declaration.

24      The technical issues or technical differences, as stated

25  in the Prabhakar declaration, is that now WPEngine has to
```

1   undertake work to do that instead of relying on that free

2   service being provided by dot-org, and that has created a

3   different workflow for WPEngine and created additional time and

4   resources within the company in order to do that.

5           **THE COURT:**  Let me ask you one thing with respect to

6   the bond.  I did see an argument about WPEngine being in debt

7   to defendants.  I wanted to ask what invoices, if any,

8   defendants sent to WPEngine prior to September 20th.

9           **MS. SHAW:**  There were no invoices, Your Honor.

10          **THE COURT:**  I've run through my list of questions for

11  you, Ms. Shaw; but I want to give you -- would you prefer --

12  plaintiffs haven't been fully heard yet.  I'm either happy to

13  let you keep the mic and let you present further argument that

14  you might have or to hand it back to Ms. Kassabian.  I have

15  further questions for you, but I also want to let you finish

16  other points you might want to make.

17          **MS. SHAW:**  The only point I would make, I was present

18  in your courtroom for your prior hearing --

19          **THE COURT:**  I'm so sorry.

20          **MS. SHAW:**  -- PI hearing -- no -- and there were two

21  statements that you made about preliminary injunctive relief

22  that the defendants strongly agree with you on.

23      The first is that this is an extraordinary and drastic

24  form of relief, and the second is that the touchstone of PI in

25  many instances is likelihood of success on the merits.

1          And I think, as you can see in our briefing, there are

2     serious issues with the claims that have been brought by

3     plaintiffs.  As you know, we did file a motion to dismiss

4     concurrently with the PI -- with our opposition to the PI.

5     That motion to dismiss was mooted by an amended complaint that

6     was filed after the close of briefing in this case.  We do

7     intend to renew that motion to dismiss, and we do believe these

8     claims are susceptible to dismissal at the pleading stage.

9                THE COURT:  Thank you.

10               MS. SHAW:  Thank you, Your Honor.

11               THE COURT:  Ms. Kassabian, here's just a -- I want to

12    run through my questions and then give you a little bit of

13    airtime as well.  But, again, I have gone through everything,

14    and yet I like to confirm these things.

15         Could you just address for me why the harm here -- why the

16    harm alleged is irreparable?  Because it seems to me that

17    WPEngine should do what it needs to furnish promised services

18    to its customers and that it can recover the cost of any

19    work-arounds it's had to implement as a result of the fact --

20    of what's happened and the facts that you've alleged.

21               MS. KASSABIAN:  Sure.

22         So, Your Honor, first, I would like to just address that

23    as a general matter, plaintiff has demonstrated that it is

24    suffering ongoing loss of customers, loss of market share, harm

25    to its reputation, loss of goodwill.  All of those, of course,

1   are recognized as forms of irreparable harm.

2        There has been absolutely no showing to the contrary.

3   That's evidence we've put in the record, and it's unopposed.

4        I think the only response we heard from defendants was

5   something to the effect of "Well, that wasn't caused by us."

6   And of course it was.

7        And I think the evidence is overwhelming on causation.  We

8   know that not just from the evidence that we have put in,

9   Your Honor, but we have a multitude of admissions from the

10  defendants.  Essentially, they went on a speaking tour after

11  committing this wrongful extortion; and we have many, many

12  admissions in the record, Your Honor, about the harm and

13  bragging about the harm that has been caused here that

14  Ninth Circuit law confirms is irreparable.

15       I would love to -- I do have responses to other things

16  that --

17            **THE COURT:**  Go ahead.

18            **MS. KASSABIAN:**  -- we've heard, but I really want to

19  answer your question squarely and succinctly regarding why

20  isn't the work-around good enough; and for that, I would like

21  to turn the microphone over to my colleague Brian Mack, who

22  does have a technical background and would be happy to explain

23  to you why the mirrored repository does not solve the problem

24  in any way, shape, or form here.

25            **THE COURT:**  Sure.

1        **MS. KASSABIAN:**  And without restoration of the

2   *status quo ante*, we absolutely will continue to suffer

3   irreparable harm in a technological manner, having been

4   impaired from being able to service our clients in a way

5   that -- you know, two years is a long time -- right? --

6   Your Honor, before we get to trial in this case.  So I'd like

7   to turn it over to Mr. Mack so he can explain that.

8        **THE COURT:**  Certainly.  Go ahead.

9        **MR. MACK:**  Good morning, Your Honor.  Brian Mack on

10  behalf of plaintiff.

11       I think we heard opposing counsel refer to the block as an

12  enhanced service for plugins and that we cannot link our

13  systems to their servers, but that trivializes what was

14  actually done here.

15       The WordPress core software, the software that defendants

16  make available on their website is intimately linked with

17  wordpress.org.  There's 1500 references in the code.  They're

18  hard coded references that you cannot change.

19       Normally, when you have an application running on your

20  computer, you could go to the settings or the properties; you

21  could change the update server to whatever you would like.

22  That's not the case here.  Defendants know that's not the case

23  here.  It's completely intertwined with the data and the

24  resources on wordpress.org, the actual core software that you

25  download.  Every single WordPress installation relies on

wordpress.org.  It calls back to pull plugins and updates to plugins.

Immediate- -- as soon as our access was blocked, the WordPress websites all gave error messages on the admin panel. And if you're reading the briefing, it might be a little confusing about the admin panel.  They make it seem like that's a panel that we provide, that we developed.  The admin panel is inherent in every WordPress installation.  It comes with the core software.  Every time you download the software, you have an admin panel to administer your sites.  That admin panel needs access to wordpress.org.

So what we did to avoid all these error messages -- it immediately broke our website.  And you can see from Docket 18.7, when they announced that WordPress Engine was banned, Mr. Mullenweg stated on September 25th (as read):

> "Any WP Engine customers having trouble with
> their sites should contact WP Engine support and ask
> them to fix it."

So he knew, when we were banned, it was going to immediately break all of our hosted sites.

What we did was implement a temporary and partial work-around, and that temporary and partial work-around was a mirror.  It's basically trying to download and copy everything from wordpress.org, 60,000 plugins.  We don't know when they're updated.  It's kind of like downloading the entire Apple Store,

1    if you have an iPhone, and trying to mirror that.  And

2    because we don't know when an app or a plugin is updated, we

3    have to redownload everything again.  And they intentionally

4    throttle or rate limit the rate that you can download these

5    things.

6        This is an extremely complicated solution to maintain.

7    It's not built for the long term.  It's just a temporary fix

8    that we had to put in place to satisfy our customers because

9    all of our customers would have left probably.  So now we have

10   a work-around.  And it's explained more fully in the Prabhakar

11   reply declaration, Docket 47, at paragraph 8, why that

12   work-around is just insufficient.

13       In addition, the mirror can't pull everything.  Even

14   though opposing counsel said some of the plugin data is

15   available, manually, yes, you can go and download one by one.

16   We have hundreds of thousands of hosted sites with an average

17   one dozen to two dozen plugins each.  It is impossible to

18   download one by one in the manner that they're discussing.

19   Completely impractical solution.  Technically, it's possible.

20   I think Mr. Prabhakar in his reply declaration says,

21   technically, you can walk from L.A. to San Francisco, but it's

22   just -- it's not practical at all.

23       And there's other limitations with the mirror.  They're

24   all spelled out in Mr. Prabhakar's reply declaration.

25       Some data is not available.  The only data that is

available is the actual code for the plugins and the core code for WordPress.

The user reviews, the user ratings, the number of downloads, all the other types of information that build trust and the reputation of the plugin -- like, you probably wouldn't just go and download an iPhone app that only one person has downloaded and has really bad reviews -- that information, there's no easy way to pull from wordpress.org.

And if you look at one of our demonstratives -- we have two demonstratives that are technical, more technical in nature.  I don't want to get into the weeds, Your Honor, if you're not a technical person.  But if you look at Demonstrative Slide Number 12, if we could put that up on the screen, I think this highlights pretty clearly --

**THE COURT:**  I'm so sorry.  I know that you're calling this technical, but I will tell you, I looked at this yesterday, and -- well, let me let you explain it to me.

**MR. MACK:**  Okay.  Let me actually look at the...

So on the left, you have all the resources that wordpress.org offers.  The core code and the plugin directory, these are the two code repositories, and they are true that that is not technically blocked.  We can manually go and download one by one, which is completely impractical for the hundreds of thousands of hosted customers we have with one to two dozen plugins in each.

1    The api.wordpress.org, that is our servers communicating

2    with wordpress.org servers.  That's that hard coded

3    functionality that I'm talking about.  It's built into the

4    software.  It's an integral part of the software.  You can't --

5    there's no option -- there's no option to, like, go to file

6    settings and change that.  You have to go to api.wordpress.org.

7    What we ended up doing was building a mirror, and we

8    actually did actually go into our hosted customers and we had

9    to change some of those instances to point to our mirror

10   location.  But like I said, the mirror is a temporary and

11   partial fix.

12   **THE COURT:**  Mr. Mack, let me ask you.  And tell me if

13   this is not a question best directed to you.  But why isn't an

14   injunction restoring access to the open-source WordPress

15   software and plugins on the WordPress website, as suggested by

16   defendants, enough?

17   **MR. MACK:**  That's basically what I explained before.

18   The access that they're talking about is the manual one-by-one

19   access.  We would lose the api.wordpress.org access, which is

20   the servers communicating with the servers; the admin panel

21   automatically calls back to --

22   **THE COURT:**  I see.

23   **MR. MACK:**  -- the server to update the plugins and

24   they get notifications coming back.

25   Users wouldn't even know when there's an update available.

 1    You wouldn't know on your iPhone if it didn't tell you there

 2    was an update and automatically -- you probably have it set to

 3    automatically update all of your applications.  You would have

 4    no way of even knowing that an update was available.

 5         So this API is critically important for the basic

 6    functioning of any WordPress installation, the

 7    api.wordpress.org.

 8         The password-protected resources, everything goes through

 9    login.wordpress.org.  That's the login credentials that were

10    revoked by defendants to WordPress -- to the WPE employees.

11    Those are also critically important because that's how -- if

12    you're posting a new plugin or a new application, you would

13    post it to the Apple Store; right?  You would go to -- if you

14    post it somewhere else, no one's going to know it's available;

15    no one's going to trust the reliability of that plugin or

16    software.

17         And defendants themselves explained that all official

18    releases of WordPress software have to come from wordpress.org.

19    They are dissuading people from downloading software from any

20    other service or website or server other than wordpress.org.

21         So we're losing all of this functionality at the bottom,

22    which is the plugin submissions, which is supporting our

23    plugins.  If you had a question, you needed to post a question

24    on a support forum and get a detailed answer from someone that

25    actually developed the plugin, you would go to this location.

1    There's bug tracking that we would lose.

2         And all of these things, there's been a big community

3    built up over 15 years.  Everyone goes to wordpress.org, and

4    that was by design and by intent.  So by banning -- selectively

5    banning just plaintiff from those resources, the only -- the

6    only way that we would be made whole is by getting access back

7    to all of these other resources.

8              **THE COURT:**  And, again, you tell me if you want to

9    hand the mic over to someone else, but let me say this:  Having

10   reviewed everything, I am inclined to grant some sort of

11   injunction.

12        Here's the problem that I have with your proposed

13   injunction, though.  This is a non-starter because it is

14   exceedingly vague.  So to the extent that I conclude that you

15   are likely to succeed on the merits of any of your claims, this

16   isn't particularly narrowly tailored.  It's really broad, and

17   in the grand scheme, I couldn't enforce this.  If you tried to

18   seek enforcement of it, this isn't specific enough for me to do

19   it.

20        So here's my question to both sides:  Is there any

21   interest in you-all trying to narrow this together, or do you

22   just want to see what I produce, understanding that Mr. Mack --

23   I'm assuming on defendants' side as well -- you-all have much

24   better technical expertise than I do?

25             **MR. MACK:**  Your Honor, the problem with the

 1    overbreadthness of that, at least your interpretation that it's

 2    overbroad, is because defendants seem to be pulling a new trick

 3    out of their hat every week.

 4         So there's a new website called wordpressenginetracker.com

 5    that actually tracks -- allegedly tracks all of WPE's customers

 6    that have left and migrated over.  And it actually, if you go

 7    to -- there's a link in there, domains.csv file.  It actually

 8    lists our entire customer list purportedly, which usually

 9    customer lists are considered trade secret information but it's

10    also private internal domain names that opens up a huge

11    security vulnerability for all of our clients.  This is

12    something new that happened after our reply briefing.

13         And just last weekend, there was another finding that they

14    kind of coopted and commandeered the pro features of our

15    plugin, the paid features, and they're releasing those on

16    wordpress.org under a new URL, the Secure Custom Fields URL.

17    So they're trying to give away all of our pro features, that

18    people paid for, for everyone, to the entire WordPress

19    community for free.

20         Every weekend there seems to be something new that

21    defendants do to further escalate the conflict.  So that's why

22    I think we need not only to be restored to the *status quo ante*,

23    but we need kind of ongoing protection from anything new that

24    comes up.

25              THE COURT:  The problem with a PI is that you get

1    *status quo ante.*  So --

2            **MS. KASSABIAN:**  Your Honor, in addition to what

3    Mr. Mack has just explained, I would love to just say a few

4    things.

5        Absolutely, we would be happy to revise and narrow our

6    proposed order and send it to defendants and meet and confer

7    with them to try to come up with an agreed set of language that

8    both meets the strictures of Rule 65 and satisfies Your Honor.

9    We, of course, want it to be enforceable and clear within its

10   four corners.

11       Mr. Mack, though, is also correct that every few days, a

12   new harm is inflicted upon us.  And so we just may have to take

13   that up as it comes and reach back out to Your Honor.

14       But I will also note that, of course, it is perfectly fine

15   for an injunction order to say things like "Don't take steps to

16   cause confusion in the marketplace."  You know, there are --

17   certainly, while the order needs to be narrow enough to be

18   understandable, it can also have terms such as, you know,

19   "Cease your extortion retaliation efforts" that I think should

20   be enforceable.

21       But nevertheless, Your Honor, we hear you loud and clear,

22   and we will just update it.

23            **THE COURT:**  All right.  So, Counsel, let me ask

24   you --

25       Well, we haven't heard from you, Ms. Shaw.  I'm sorry.

```
 1   Please.
 2         MS. SHAW:  Thank you, Your Honor.  I'd like to make
 3   two points.
 4         The first is that we agree that the injunction and the
 5   injunctive relief as drafted is, frankly, difficult to
 6   understand what's even being requested, especially the fourth
 7   relief which is to enjoin all extortion and tortious
 8   interference.  I'm not sure what that means.  And I think that
 9   highlights a concern here that we, as defendants, have.
10         There is a line between an unlawful act and healthy
11   competition.  And plaintiffs seem to be taking the position
12   that anything that results in the migration of customers away
13   from them is somehow an unlawful act, which is simply not the
14   case in this instance.
15         And so, you know, we are happy to meet and confer and try
16   to reach some resolution, but I hope this Court can appreciate
17   the importance of any resolution respecting that line between
18   healthy competition and unlawful activity.
19         THE COURT:  I have a five-week antitrust trial in the
20   New Year.  So, the pretrial conference was yesterday.
21         MS. SHAW:  Yeah.
22         THE COURT:  I've already started on the -- I'm well
23   down the path of anticompetitive -- of cognizing and thinking
24   about anticompetitive conduct --
25         MS. SHAW:  Thank you.
```

1        **THE COURT:**  -- and what is -- we want competitive --

2   I get that.

3        **MS. SHAW:**  Yeah.

4        **THE COURT:**  We want competition.

5        **MS. SHAW:**  And if I --

6        **THE COURT:**  Yes.

7        **MS. SHAW:**  -- could just make a second point.

8        **THE COURT:**  Yes.

9        **MS. SHAW:**  And if you could pull up Slide 12 that you

10  were looking at previously.

11        **THE COURT:**  Yes.

12        **MS. SHAW:**  Is it up on the screen?  Thank you.

13   So you'll see in the right-hand column, they put Xs

14  through everything they claim they don't have.  And I do think

15  it's worth going through this because I think the technical

16  issues are important to Your Honor's consideration of what the

17  appropriate injunctive relief is this in case.

18   So this api.wordpress.org, that is their mirror.  They

19  have essentially created a mirror of that that they have an

20  X through.

21   This login.wordpress.org, the reason they have an

22  X through that is because they no longer have the ability to

23  upload and have our -- have dot-org distribute and disseminate

24  and provide a place where they can update their plugins.

25   The X through "Community-Based Forums," they can still

access and see those forums.  They simply cannot post in those forums.

The "Plugin Submissions," they can no longer submit plugin submissions.  That's kind of the same as the login.wordpress argument that they're making.

It is true that they can no longer participate in the WordPress Slack channel because I think that requires user authentication, but it would be an unusual result if the inability to participate in an online Slack forum would rise to the level of irreparable harm a court looks for when granting a preliminary injunction.

And finally, the "SVN (code contributions)," that really is not allowing them to contribute to the development of the code on wordpress.org.  That's really taking away from their ability to contribute.  It's not taking away from them a right to access something.

And then, finally, they have an X through the "trac.wordpress.org (bug tickets and tracking data)."  They can still see that.  What they can't do is submit bugs and information about their work and get feedback from dot-org on how to fix it.

And I think what Mr. Mack's presentation shows is they do have a way to solve this.  They just don't want to pay for it or spend the time and money to do that; and instead, they want to rely -- be able to rely on dot-org to do that.

1          **THE COURT:**  Go ahead.

2          **MS. KASSABIAN:**  Your Honor, I'll just point out that

3   defendants did not take any issue with our proposed order.

4   Obviously, they did not file objections.  They did not file

5   their own competing proposed order.  So --

6          **THE COURT:**  I do, though.

7          **MS. KASSABIAN:**  I understand.

8      So I'm just hearing this for the first time.

9      But in any event, it won't be hard, Your Honor, to list

10  out the specific wrongdoing that we are talking about here and

11  the specific items that should be restored to *status quo ante*.

12  We'd be happy to work with them to list that out.

13     And then, Your Honor, if we are unsuccessful in reaching

14  final agreement, we will submit competing proposed orders with,

15  perhaps if Your Honor would hear us, maybe a five-page brief

16  explaining the proposed orders if you need it.  If not, we'll

17  just submit the competing proposed orders.

18         **MS. SHAW:**  Your Honor, I think before suggesting what

19  kind of briefing that would be submitted to the Court, taking

20  up its valuable time, I think it might be worthwhile for the

21  parties to meet and confer in the first instance, and then we

22  can advise the Court of the best way forward.

23         **THE COURT:**  Why don't we do this:  Meet and confer.

24  Meet and confer, and if it ends up being -- if you can reach

25  agreement, you-all get me that.  If you cannot reach agreement,

```
 1  give me dueling submissions.  I'll take the dueling
 2  submissions, and in short order, I will let you know if I want
 3  something further.
 4           MS. KASSABIAN:  That works, Your Honor.
 5           THE COURT:  Your five pages is in the right ballpark,
 6  is in the right ballpark.
 7           MS. KASSABIAN:  Thank you.
 8           THE COURT:  Because we are lawyers, I need a timeline
 9  attached to this.  So what say you all?
10           MS. KASSABIAN:  Your Honor, we can work on this today
11  and tomorrow and submit something to you tomorrow.  That's our
12  position, Your Honor.  This is an emergency matter for my
13  client.  We will move with all due haste and submit something
14  to you before the Thanksgiving break.  So tomorrow evening
15  would be our request.
16           MS. SHAW:  Your Honor, the only thing I would say is
17  that I think in order to fashion this order, this proposed
18  order and, frankly, to even have this meet and confer, we do
19  need input from technical team members.  I don't think this is
20  something that just the lawyers can decide.  I think there may
21  be even some agreements that the lawyers would decide that may
22  just not be technologically possible.
23      And given the Thanksgiving holidays, I would ask for a
24  short reprieve until Tuesday of next week to get something to
25  you.
```

1      **THE COURT:**  Can we try this?  Here's what I'm

2  trying -- I'm trying to account for that.  Somewhere in here is

3  the -- I'm trying to think about having -- asking plaintiffs to

4  try and make this more specific, get that to you,

5  counterproposal, bring in the tech folks.  Is that Friday?

6      **MS. KASSABIAN:**  This Friday?

7      **THE COURT:**  It feels crueler than next -- I don't

8  know why that feels worse.  But, I mean, I'll tell you, I think

9  the courthouse is closed on Friday.

10      Are we closed on Friday?  I don't remember.

11      **THE CLERK:**  It's a skeleton crew day.

12      **MS. KASSABIAN:**  It is technically not a federal court

13  holiday, but I'm sure it is a skeleton crew.

14      But Friday works better than Monday for us, Your Honor.

15  This is a very urgent matter, in our view.  Both sides have

16  ample technical personnel who can assist.

17      **MS. SHAW:**  I don't think it's a matter of the ample

18  personnel.  It's their availability.

19      **THE COURT:**  I think that's right.  Why don't we try

20  for Monday.

21      **MS. SHAW:**  Thank you, Your Honor.

22      **THE COURT:**  And get your draft going, send it over,

23  so that what we're doing is you get something done by tomorrow;

24  you get input; and if you -- wherever you are at that point,

25  hopefully, maybe take some time to talk on Monday.  You can

1  submit it late Monday or, if you are far enough apart, just

2  send to me Monday --

3        **MS. SHAW:**  Okay.

4        **THE COURT:**  -- the dueling proposals.

5     If you look at theirs and say no, then just get me yours

6  on Monday as well.

7        **MS. SHAW:**  Thank you.

8        **THE COURT:**  And we'll proceed from there.

9        **MS. KASSABIAN:**  That is fine, Your Honor.

10    And I would just hope and ask that no further acts of

11  wrongdoing occur between now and Monday so that the parties can

12  have this time to put their proposed orders together.

13  Otherwise, our proposed order list is going to grow longer.

14  That would be my sincere hope, that both sides, in particular

15  defendants, will honor the Court's ruling from the Bench and

16  allow the lawyers to sort this out by Monday.

17        **MS. SHAW:**  And, Your Honor, I think I've addressed

18  that point.  I think there's a fundamental difference between

19  the parties as to what is competition and what is unlawful

20  conduct.

21        **THE COURT:**  I get that.  I think the -- so let me ask

22  you, Ms. Shaw, because I think, in part, what I hear -- in

23  part, what I'm hearing from plaintiff's counsel is a request

24  that between now and Monday, we essentially -- I think -- I'm

25  sure this was not exactly what you're saying, Ms. Kassabian,

1    but it seems to -- it strikes me at this moment as the best

2    thing, which is, given the holiday weekend and given that

3    that's why we're extending this some, presumably the idea is

4    that as of today -- it's *status quo* as of today until at least

5    Monday.

6              **MS. KASSABIAN:**  That's correct.

7              **THE COURT:**  So the competition holds off until at

8    least Monday, until we figure out what *status quo* to

9    whatever -- what that looks like come -- is that still

10   November?  December?  That's December already -- December 2nd.

11   So I think the idea is you try and maintain *status quo* from now

12   until Monday.

13             **MS. SHAW:**  Understood, Your Honor.

14             **MS. KASSABIAN:**  That's right.  Thank you, Your Honor.

15   We certainly wouldn't want the extension to be taken advantage

16   of in any way.

17             **THE COURT:**  Understood.

18        All right.  Counsel, I thank you.  I'm sorry you watched

19   the last one, but I appreciate you sharing with me in my clause

20   of "these are adversarial proceedings" and understanding why

21   it's a weird phrase to be frustrated by.

22        One final housekeeping matter.  So I've now lost my notes,

23   but it's this:  I did note that, and I believe that it was

24   flagged again by defense counsel, which is that the complaint

25   was late.  So I just want to -- it was filed three hours late.

1          **MS. KASSABIAN:**  The amended complaint?

2          **THE COURT:**  The amended complaint was filed three

3   hours late.

4       So here's the part I just want to make sure that you

5   understand.  I tend to be a stickler for the rules.  So that's

6   your freebie this time.  Things filed late, things that don't

7   comport with the rules, I won't accept them, and you'll start

8   to see things stricken from the record.

9          **MS. KASSABIAN:**  Your Honor, may I just really quickly

10  respond?

11         **THE COURT:**  By all means.

12         **MS. KASSABIAN:**  The deadline for the amended

13  complaint was actually November 20th.  It's three weeks.  The

14  deadline to oppose the motion to dismiss and the motion to

15  strike was November 13th.  But since we opted to amend rather

16  than respond substantively with an opposition brief, that

17  created two separate deadlines.

18      And there is a Ninth Circuit case -- we checked,

19  Your Honor -- confirming that that is timely, because the

20  filing of the amended complaint moots the motions, and the

21  amended complaint -- we had 21 days under Rule 15 to amend as

22  of right.  So I can get you that citation.

23         **THE COURT:**  Could you?

24         **MS. KASSABIAN:**  Or maybe one of my team members can

25  grab it for us before we walk out of here.

```
1          But, Your Honor, we did -- as a conservative matter, we
2     wanted to file it that same day, but we did technically have an
3     extra week.
4          THE COURT:  No one needs to rush to get it now, but
5     if you could, with whatever comes -- put it as a footnote to
6     your -- no, don't put it as a footnote to the proposed order.
7     That just makes a mess on the docket.
8          MS. KASSABIAN:  We can hand it up on a Post-it if
9     Your Honor would like or --
10          MS. SHAW:  Your Honor --
11          THE COURT:  Go ahead.
12          MS. SHAW:  -- I do appreciate you raising this issue
13     about the rules, and I would like to flag something, just
14     because I think it's important for both parties to be treated
15     the same.
16          We note in your order, you do not allow footnotes in your
17     briefing.  We have taken steps to avoid that.
18          THE COURT:  I have that note as well.  They are
19     supposed -- well, you'll see there's language there about --
20     footnotes are allowed.  They're just not allowed to be used to
21     try and get -- to put in extra argument that just -- right? --
22     to try and get around the page limits.  And as a matter of
23     course, that results in, usually I don't -- I just don't
24     address arguments --
25          MS. SHAW:  Okay.
```

1          **THE COURT:**  -- in footnotes --

2          **MS. SHAW:**  Okay.

3          **THE COURT:**  -- if they get overlong.

4      It's like, you didn't put it in the body and you're at

5  your full length.

6          **MS. SHAW:**  Yeah.

7          **THE COURT:**  So --

8          **MS. SHAW:**  And I would also note that their PI reply

9  was late as well.

10         **MS. KASSABIAN:**  I don't -- that is not correct,

11 Your Honor.  We have a time stamp --

12         **THE COURT:**  No, no.  No, no.  No, no, no.

13         **MS. KASSABIAN:**  Okay.  And I have the citation for

14 you, Your Honor.

15         **THE COURT:**  Please, please.  That, I could use

16 because I don't -- if you're right and I'm wrong, I'd rather

17 get this right.

18         **MS. KASSABIAN:**  It's a fun little quirky rule, that I

19 hadn't ever stumbled across this particular case, but someone

20 has thought of this and made this argument, and the

21 Ninth Circuit has said it's not untimely.

22     It's *Ramirez vs. County of San Bernardino*, 806 F.3d 10002

23 at -- or, sorry -- 1002 at 1008, Ninth Circuit, 2015.  And it's

24 this exact same situation, where the opposition was due in two

25 weeks; Rule 15 gives the plaintiff three weeks to amend as of

1  right.  And the party filed in between the second week and the

2  third week, and the Ninth Circuit said that's just fine.

3            **THE COURT:**  You have to love the rules.

4       Thank you, Counsel.

5            **MS. KASSABIAN:**  Thank you, Your Honor.

6            **MS. SHAW:**  Thank you, Your Honor.

7            **THE COURT:**  Happy Thanksgiving.

8            (Proceedings adjourned at 11:46 a.m.)

9                       ---o0o---

10

11                 <u>**CERTIFICATE OF REPORTER**</u>

12       I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15  DATE:  Wednesday, November 27, 2024

16

17

18

19                    _Ana Dub_

20       _____

21            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

22            CSR No. 7445, Official United States Reporter

23

24

25