UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WPENGINE, INC., | Case No. <u>24-cv-06917-AMO</u> |
| Plaintiff, | |
| v. | **ORDER RE MOTION FOR PRELIMINARY INJUNCTION** |
| AUTOMATTIC INC., et al., | Re: Dkt. No. 17 |
| Defendants. | |

Before the Court is Plaintiff WPEngine, Inc.'s motion for a preliminary injunction. Defendants Automattic Inc. and Matthew Charles Mullenweg oppose the motion. Having considered the papers filed by the parties, the relevant legal authority, and the arguments advanced by counsel at the November 26, 2024 hearing on the matter, the Court **GRANTS** the motion, with modifications, for the reasons set forth below.

## I.    BACKGROUND

### A.    Factual background

#### 1.    <u>WordPress</u>

WordPress is a free and open-source software program that allows users to build and maintain websites without needing to write software from scratch. ECF 19 ("Prabhakar Decl.") ¶ 2; ECF 39 ("Mullenweg Decl.") ¶ 3. Mullenweg and his co-founder Mike Little started developing WordPress in January 2003. Mullenweg Decl. ¶ 3. In May 2003, after spending "hundreds of hours writing code and developing WordPress," they released the first version. *Id.* "To democratize publishing across the Internet, [Mullenweg and Little] made the WordPress software available under an open-source license to be accessible for anyone to use, copy, and modify." *Id.* More than 40% of the websites operating today run on WordPress. *Id.* ¶ 4.

Initially, the wordpress.org website "contained only a download link to the WordPress

software.  Gradually, [Mullenweg] added more resource directories, such as WordPress themes and plugins, with the help of others.  To access specific website directories, a user must register with the Website and log in using their registered credentials."  *Id.* ¶ 6.

Most users of WPEngine's plugins access them from wordpress.org, which "serves as a gateway to the WordPress software and community[.]"  Prabhakar Decl. ¶ 5.  The site "hosts the WordPress software as well as the WordPress plugins created by members of the WordPress community."  *Id.*  WordPress users have the option of downloading plugins directly from the site or they can do so through the administrative panel[1] on their WordPress website.  *Id.*  The plugin directory hosted on the wordpress.org website – https://WordPress.org/plugins/ – "is freely accessible to anyone.  No log-in credentials are required to access the plugin directory or download the plugins hosted on the Website."  Mullenweg Decl. ¶ 8.

Third-party software developers can "create 'plugins' that can interact with a WordPress website."  Prabhakar Decl. ¶ 3.  For example, "if a user wants to add a 'voting' button or a 'sign up form' field to their website, a plugin can be created to offer those features."  *Id.*  These "plugins enhance and add to the functionality of WordPress websites."  *Id.*

"On its website, wordpress.org describes its commitment to open source and its 'four core freedoms . . . .' "  ECF 21 ("Brunner Decl.") ¶ 8.  Those are: " 'The freedom to run the program for any purpose.  The freedom to study how the program works and change it to make it do what you wish.  The freedom to redistribute.  The freedom to distribute copies of your modified versions to others."  *Id.* ¶ 9 & Exs. A, B.  The wordpress.org website states that " '[t]he WordPress community should emphasize that the freedoms in the [General Public License] help provide high quality software.' "  *Id.* ¶ 10.  In addition to the four core freedoms, the wordpress.org website also promises:  "free hosting to anyone who wishes to develop a plugin in our directory."[2]  *Id.* ¶ 11 & Ex. C.

---

[1] "The administrative panel is where many website settings are controlled and where users create their website content."  Prabhakar Decl. ¶ 5.

[2] In his declaration, however, Mullenweg states that he "ha[s] no contracts, agreements, or obligations to provide WPEngine . . . access to [wordpress.org]."  Mullenweg Decl. ¶ 5.

United States District Court
Northern District of California

### 2. **WPEngine**

WPEngine[3] "is a technology company that offers a hosting platform, plugins, themes, support and other tools for websites built using WordPress." Prabhakar Decl. ¶ 1; Brunner Decl. ¶ 3. It "also develops support, training, and advocacy resources for the WordPress community." *Id.* "While some hosting companies offer services for websites built on a variety of other software programs and/or content management systems, such that hosting WordPress websites is just a part of their business, [WPEngine] is dedicated solely to WordPress." ECF 20 ("Teichman Decl.") ¶ 4. All of its "business and proprietary platform caters exclusively to the community of users who have built or will build their websites using WordPress." *Id.* According to Heather Brunner, WPEngine's Chairwoman and CEO, and Jason Teichman, WPEngine's Chief Operating Officer, the company has "invested hundreds of millions of dollars, not only supporting WordPress in the market, but creating a platform without which many customers would not have been able to use WordPress for their sites in a cost-efficient manner, and thus might have never adopted, or left, the WordPress platform were it not for [WPEngine]." *Id.*; *see also* Brunner Decl. ¶ 3. WPEngine "is one of the few organizations with 'at scale' commercial support for users, which means that those users can obtain assistance from [WPEngine] rather than imposing on the community of volunteers who would otherwise need to absorb these questions and issues." Brunner Decl. ¶ 5; Techiman Decl. ¶ 7. WPEngine's "business is built around the WordPress open source platform." Techiman Decl. ¶ 8.

WPEngine develops "several popular plugins that can be used with WordPress websites . . . . Millions of WordPress users have downloaded and currently use these plugins to enhance and operate their websites." Prabhakar Decl. ¶ 4. The company "has invested thousands of engineering hours and millions of dollars into the development of its WordPress plugins and themes, and the vast majority of its users use these at no cost to themselves." *Id.* WPEngine

---

[3] The private equity company Silver Lake is one of WPEngine's investors. *See* Xu Decl. ¶¶ 2-6. In 2018, it invested $250 million dollars in WPEngine. Mullenweg Decl. ¶ 21. Four of WPEngine's board members are Silver Lake employees. *Id.* According to Mullenweg, "private equity firms operate by using investor funding to take over target companies, then driving the company to meet KPIs and derive the maximum profit, often at the expense of more community-oriented goals such as those central to the WordPress mission." *Id.* ¶ 20.

"regularly updates its plugins to create new functionality, to fix bugs, or to address security vulnerabilities, which is common in this industry[,]" and it "publishes updates for its plugins to wordpress.org." *Id.* ¶ 5. Once WPEngine "publishes these updated plugins to wordpress.org, users of [its] plugins get notified of these updates, and then can easily update their plugins." *Id.* "Without access to these updates," websites using WPEngine's plugins "may break, stop functioning, or become insecure." *Id.* According to Ramadass Prabhakar, WPEngine's Senior Vice President and Chief Technology Officer:

> Without access to wordpress.org, most [WPEngine] plugin users will likely not even know there are updates available for [WPEngine] plugins. This is because the standard WordPress [General Public License] core software "hard codes" the wordpress.org update site into every WordPress website, rather than making the update site a configurable option for each user. Furthermore, while there may be other ways for [WPEngine] plugin users to update their plugins without access to wordpress.org from within the administrative panel, a meaningful number of [WPEngine] plugin users do not have the technological skills or knowledge to do this without risking the security and/or stability of their websites. For example, if [WPEngine] identified a security issue on one of the plugins it developed, such as ACF, and [WPEngine] did not have access to wordpress.org, it would no longer be able to post an update to that plugin on wordpress.org to address or fix the issue.

*Id.* ¶ 5.

In addition to developing plugins, WPEngine "also operates a managed hosting service for WordPress websites." *Id.* ¶ 6. This allows WPEngine's customers to "set up their websites using the WordPress software on [WPEngine's] hosting service." *Id.* WPEngine "handles many of the technical details for these users, including ongoing technical management." *Id.* "Essential hosting plans start at $20 per month and increase from there based on the level of services provided." Teichman Decl. ¶ 5. WPEngine is one of the "many hosting and management companies . . . founded to serve the members of this ecosystem by helping users with their WordPress websites for a fee." Brunner Decl. ¶ 6. Its "managed hosting service competes with Automattic's offerings, including wordpress.com, Pressable, and WordPress VIP." Teichman Decl. ¶ 6.

///

///

1    Because WPEngine's "products and services are built to work with websites developed

2    using WordPress open source software and open source WooCommerce[4] plugins, [WPEngine]

3    naturally references 'WordPress' and 'WooCommerce' when referring to the software platform on

4    which its customers' websites are built."  Teichman Decl. ¶ 9.  WPEngine "has consistently used

5    the term 'WordPress' since 2010 in reference to the WordPress program and platform."  *Id.*

6    According to Teichman, "[t]his use has long been widely mirrored by the entire WordPress

7    community.  It is common industry practice to refer to providing managed hosting services on

8    WordPress as 'managed WordPress[,]' " as is reflected in a post Mullenweg made on August 8,

9    2017:



23    Teichman Decl. ¶ 15; ECF 18 ("Jenkins Decl.") ¶ 25 & Ex. 24.  *Id.*  Teichman declares that "prior

24    to the events at issue, Defendants never requested that [WPEngine] make changes to the

25    WordPress references on [its] website."  *Id.*

26

27    ────────────────
[4] "WooCommerce is an open-source ecommerce platform that can be used for websites built using
WordPress."  Teichman Decl. ¶ 17.  "Developers can use WooCommerce to create,
28    customize, and scale an online store on the WordPress ecosystem."  *Id.*  Automattic owns
WooCommerce.  *Id.* ¶ 29.

United States District Court
Northern District of California

### 3. **Automattic & Mullenweg**

Automattic competes with WPEngine as a webhost for WordPress websites. Brunner Decl. ¶ 19. Mullenweg is Automattic's founder, President, and CEO. Mullenweg Decl. ¶ 2. He is also the co-founder of WordPress, the individual owner of the domain name wordpress.org, the manager of the wordpress.org website, and a founding director of the WordPress Foundation. Mullenweg Decl. ¶¶ 2, 5, 36. "[T]he WordPress Foundation [is] a nonprofit public benefit corporation organized exclusively for charitable, scientific, and educational purposes." Mullenweg Decl. ¶ 2. The foundation owns three WordPress trademarks. *Id.* ¶ 36. Automattic assigned the trademarks to the Foundation and "retained a license to use the WordPress trademarks for commercial use[.]" *Id.* ¶ 37. Mullenweg retained "a license to use the WordPress trademarks in connection with the Website." *Id.* ¶ 10. "Until very recently, [Brunner] was under the impression that wordpress.org was associated with and/or owned by the non-profit WordPress Foundation." Brunner Decl. ¶ 8.

### 4. **The licensing agreement**

According to Brunner, in September 2024, "Mullenweg and Automattic's CFO Mark Davies began threatening [her] and one of [WPEngine's] board members[.]" Brunner Decl. ¶ 22. They warned "that if [WPEngine] did not agree to pay Automattic a very large sum of money before Mr. Mullenweg's September 20th keynote address at the WordCamp US Convention ("Keynote Speech"), he was going to embark on a 'scorched earth nuclear approach' toward [WPEngine] within the WordPress community and beyond." *Id.* During calls that occurred on September 17 and 19, "Davies told a [WPEngine] board member that Automattic would 'go to war' if [WPEngine] did not agree to pay Automattic large sums of money, on an ongoing basis." *Id.* ¶ 23. Davies said "he would send over an agreement that he expected [WPEngine] to sign or else the 'war' would commence." *Id.* Hours before Mullenweg's Keynote Speech, Davies sent a one-page document, which was styled as a trademark license agreement and demanded an immediate response. *Id.* ¶¶ 24, 26 & Exs. E, N. Mullenweg also sent harassing texts, outlining his "nuclear option," and made phone calls to Brunner and a WPEngine board member. *Id.* ¶¶ 27-32 & Ex. F. Among other conditions, the trademark license agreement contained the following fee

provision:

> In exchange for the License Grant, WP Engine shall do one of the following:
> (a) Pay Automattic a royalty fee equal to 8% of its Gross Revenue on a monthly basis, within fifteen days of the end of each month. "Gross Revenue" means all revenue generated by WP Engine from the sale of its services, calculated without deductions for taxes, refunds, or other costs. WP Engine will also provide Automattic a detailed monthly report of its Gross Revenue within fifteen days of the close of each calendar month, including a product line breakdown of all revenues generated. Automattic will have full audit rights.
> (b) Commit 8% of its revenue in the form of salaries of WP Engine employees working on WordPress core features and functionality to be directed by WordPress.org. WP Engine will provide Automattic a detailed monthly report demonstrating its fulfillment of this commitment. WordPress.org and Automattic will have full audit rights, including access to employee records and time-tracking.[5]
> (c) Some combination of the above two options.

Brunner Decl. ¶ 24 & Ex. N.

WPEngine "did not agree to Mr. Mullenweg's demands." Brunner Decl. ¶ 33. The events described below followed.

### 5.     **The campaign against WPEngine**

#### a.     *The Keynote Speech*

During his Keynote Speech, Mullenweg said that WPEngine "feed[s] off the host without giving anything back[.]" Brunner Decl. ¶ 36. He encouraged every WPEngine customer to "not renew their contracts with WPEngine." *Id.* He also offered to support WPEngine employees in finding new jobs, suggesting that they could "be fired for speaking up, supporting Mr. Mullenweg, or supporting WordPress . . . ." *Id.* Brunner declares that none of this is true. *Id.*

///

///

---

[5] According to Mullenweg, in 2020, WPEngine had signed-on to the Five for the Future program he launched in 2014, committing to "sponsor individual employees or teams to contribute a dedicated number of hours per week to support and maintain the WordPress code." Mullenweg Decl. ¶¶ 15-16 & Ex. 5. During a session at WordCamp US 2024, Mullenweg reported that WPEngine had 47 hours listed, which had decreased to 40. *Id.* ¶ 17. He reiterated this during a tech-focused livestream on September 26, 2024, stating that WPEngine "built a half-billion dollar business" and has "given nothing back to WordPress, . . . contributing 40 hours per week." *Id.* ¶ 32 & Ex. 11.

United States District Court
Northern District of California

### b.    WPEngine's access to WordPress

Historically, customers using WPEngine's "managed hosting service . . . have . . . been able to install themes and plugins from wordpress.org directly through the administrative panel." Prabhakar Decl. ¶ 6.  On September 24, 2024, WPEngine was no longer able to update the plugins it makes through wordpress.org.  *Id.* ¶ 7.  As a result, WPEngine could no longer publish an update for its plugins on wordpress.org, which "could cause the websites of [WPEngine] plugin users to stop working without any easy way to rectify the issue."  *Id.*  Initially, WPEngine did not know why it lost access to wordpress.org.  *Id.*

On September 25, 2024,[6] Mullenweg banned WPEngine customers "who host their WordPress installations on [WPEngine] servers from accessing wordpress.org resources through the administration panel, which includes downloading WordPress themes and plugins, including themes and plugins developed by WPEngine."  *Id.*; *see also* Mullenweg Decl. ¶¶ 27, 39 & Ex. 9.  As a result, WPEngine "customers and users would no longer be able to install new plugins and themes from wordpress.org[,]" and they "would no longer be able to update their existing plugins (whether [WPEngine] plugins, or any other of the >50,000 plugins hosted at the wordpress.org repository) and themes to address bugs and security vulnerabilities from the administrative panel." Prabhakar Decl. ¶ 7.

On September 27, 2024, Mullenweg announced that he was temporarily restoring WPEngine's access and that he would block access again on October 1, 2024.  Prabhakar

---

[6] In a blogpost made on wordpress.org that same day, Mullenweg wrote, "WP Engine is free to offer their hacked up, bastardized simulacra of WordPress's [General Public License] code to their customers."  Prabhakar Decl. ¶ 10; *see also* Brunner Decl. ¶ 10 (referring to a September 21 post entitled "WP Engine is not WordPress" in which Mullenweg states that what WPEngine provides customers is "something they've chopped up, hacked, [and] butchered to look like WordPress. . . .").  Prabhakar declares that "[t]his statement is false.  [WPEngine] uses the standard WordPress [General Public License] core code."  *Id.*; *see also* Brunner Decl. ¶ 39.  As context for his statement, Mullenweg explains in his declaration that he "was expressing [his] opinion about [WPEngine's] decision to disable revisions by default, contrary to the WordPress platform's core functionality. . . .  [R]evisions are a core function of WordPress, and disabling them by default breaks the core promise of what WordPress does, which is to protect user content."  Mullenweg Decl. ¶ 24.  He adds that "disabling revisions by default would save the host from having to incur those storage costs[,]" which he "believe[s] is an example of the ways in which private equity's profit interests can interfere with WordPress's core promises and functions."  *Id.* ¶ 25.

1    Decl. ¶ 11; ECF 47 ("Prabhakar Reply Decl.") ¶ 3 & Ex. E.  On September 30, 2024, WPEngine

2    posted the following on X:



14   ECF 42 ("Xu Decl.") ¶ 7 & Ex. 6.  On October 1, 2024, Mullenweg again blocked WPEngine's

15   access.  Prabhakar Decl. ¶ 11.

16                  *c.      The Advance Custom Fields ("ACF") plugin*

17           One of WPEngine's plugins is the ACF plugin, which WPEngine acquired in 2022.

18   Prabhakar Decl. ¶ 4.  "There is a free version and a 'PRO' version . . . ."  *Id.*  When installed on a

19   WordPress website, the "plugin extends the functionality of WordPress to allow WordPress to

20   collect and store additional types of information and essentially function as a fully-featured

21   content management system."  *Id.* ¶ 20.  "As of October 12, 2024, the ACF plugin had a 4.5 star

22   rating from over 1,200 reviews and . . . over '2+ million' active installations[,]" making it "one of

23   the most popular plugins in the WordPress ecosystem."  *Id.* ¶¶ 4, 20.  "The ACF plugin was

24   hosted at the website https://wordpress.org/plugins/advanced-custom-fields/," and "[t]his website

25   stated that the plugin was created and developed by 'WP Engine.' "  *Id.* ¶ 20.  It "also showed the

26   history of the plugin (*e.g.*, changes that were made over time), when it first released, the number of

27   'Active Installations,' and reviews of the plugin from members of the WordPress community."  *Id.*

28   ///

1    On October 4, 2024, Automattic sent an email about a security vulnerability[7] affecting the

2    ACF plugin to WPEngine.  *Id.*  Prabhakar Decl. ¶ 14.  Mullenweg and Brunner were copied on the

3    message.  *Id.*  Sending notifications to developers to fix plugins with identified issues are routine,

4    but Automattic had never copied Mullenweg or WPEngine's CEO on this type of security

5    notification.  Prabhakar Decl. ¶ 14.  The notification contained the following language:

6

7        Howdy,

8

9        We are writing today to let you know about a vulnerability we
         discovered in your WordPress plugin, Advanced Custom Fields, found at
10       https://wordpress.org/plugins/advanced-custom-fields/. The
         vulnerability allows administrators to run arbitrary PHP functions,
11       which we consider to be a medium level of risk due to it being
         exploitable in multisite configurations. We have confirmed this issue
12       in the current version available on WordPress.org, 6.3.6, as well as
         the latest version available from advancedcustomfields.com, 6.3.7.  In
13       order to replicate the attack we recommend you follow the proof of
         concept we're sharing: By default, an administrator is allowed to run
14       imports from a JSON file. One can import different post types (acf
         field group, acf post type, and acf taxonomy). The importer uses the
15       key item of each imported item to determine the post type to use. In
         this particular case, if we use the post_type_ prefix, once the post
16       type gets imported it will be mapped to ACF_Post_Type which results in
         custom post types registered in the DB to be loaded in WP-Admin.
17

18

19

20   Brunner Decl. ¶ 56 & Ex. H.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ───────────────────────

28   [7] Prabhakar describes "[t]he supposed vulnerability" as "minor."  Prabhakar Decl. ¶ 15.

10

United States District Court
Northern District of California

On October 5, 2024, Automattic made public disclosures about this security issue. Prabhakar Decl. ¶ 16.  The same day of the security notification, Mullenweg posted the below message on X:



Prabhakar Decl. ¶ 12; Brunner Decl. ¶ 57; Jenkins Decl. ¶ 12 & Ex. 11.

WPEngine released a security update on October 7, 2024.  Prabhakar Decl. ¶ 15.  Because Mullenweg blocked WPEngine's access to wordpress.org, WPEngine could not submit the security patch directly to wordpress.org.  *Id.* ¶ 16.  WPEngine sent the security patch to an Automattic employee, who uploaded to wordpress.org.  *Id.*  WPEngine received no further communications from Automattic or Mullenweg about the security vulnerability.  *Id.*  In his declaration, Mullenweg states that WPEngine never responded to the disclosure, that a review of the patch by the WordPress security team revealed that it was incomplete, and that the team forked the ACF plugin to implement a complete patch.  Mullenweg Decl. ¶¶ 44-46.

According to Prabhakar, on October 12, 2024, Mullenweg "edited the ACF plugin code and listing page in several ways without [WPEngine's] authorization."  Prabhakar Decl.  ¶ 21. "First, he changed the name of the plugin from 'Advanced Custom Fields' to 'Secure Custom Fields' ('SCF').  Second, [he] changed the name of the author of the plugin from 'WP Engine' to 'WordPress.org.' "  *Id.* & Ex. A.  Third, "Mullenweg . . . switched many ACF users to his SCF plugin without the users' consent or knowledge."  *Id.* ¶ 24.  Users of the ACF plugin "began receiving an 'update now' prompt on their WordPress administrative dashboards."  *Id.*  The prompt "listed . . . the author of the plugin 'WP Engine,' which made it appear to users that the

update was coming from 'WP Engine[.]' " *Id.*; Jenkins Decl. ¶ 24 & Ex. 23. Clicking the "update

now" button changes the plugin name to "Secure Custom Fields" and updates the plugin to the

SCF plugin. *Id.* ¶ 25. For WordPress users who have configured their settings to update plugins

automatically, the SCF plugin would have been "installed on their servers without even clicking

any buttons." *Id.* ¶ 26. Fourth, Mullenweg's roll-out of the SCF plugin also removed links,

contained in the ACF plugin, that allowed users to purchase WPEngine's PRO version. *Id.* ¶ 27.

Fifth, when a user searches for "advanced custom fields" on wordpress.org, the following results

appear:



Prabhakar Decl. ¶ 29 & Ex. C. Sixth, as of October 12, 2024, the listing page for the SCF plugin

purports to pass off the statistics relating to the ACF plugin as its own – showing more than 2

million active installations, over 54 million downloads, and reviews going back nearly 12 years,

United States District Court
Northern District of California

1    even though the SCF plugin was less than a day old.  *Id.* ¶¶ 21-23 & Exs. A & B;

2    Brunner Decl. ¶¶ 63-64.  In his declaration, Prabhakar states that:

3           Based on [his] experience in the software industry, "forks" of open
            source software are common.  But in a "fork," a software developer
4           will create a new copy of the code and host that code on a new
            website or URL so there is no confusion between the original
5           software and the new "forked" software.  This is not what happened
            here, where Mr. Mullenweg co-opted the ACF listing page, and its
6           users and reviews, and caused many ACF users to download the
            SCF software without their knowledge or consent.
7

8    Prabhakar Decl. ¶ 27.  Prabhakar adds that Automattic's and Mullenweg's "actions have also

9    undermined the integrity and reliability of the plugin, because the plugin can no longer be

10   maintained by [WPEngine]."  *Id.* ¶ 30.  According to Mullenweg, however, "[WPEngine] retains

11   control of its ACF plugin, which is available directly through [WPEngine] itself."  Mullenweg

12   Decl. ¶ 49.  In addition, "steps were taken to ensure that the public was notified that the SCF

13   plugin was forked from the ACF plugin and further to inform the public that if they wished to

14   receive the ACF plugin and updates they should download that directly from [WPEngine]."  *Id.*

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### d.   The sign-in pledge

On October 8, 2024, Mullenweg modified the wordpress.org login page, requiring users to certify that they are "not affiliated with WP Engine in any way, financially or otherwise[,]" as shown below.  Prabhakar Decl. ¶ 17; Brunner Decl. ¶ 60 & Ex. L.  If a user does not check the box, the user cannot login to wordpress.org.  Brunner Decl. ¶ 60.



Prabhakar Decl. ¶ 17; Brunner Decl. ¶ 60 & Ex. L.

///

///

United States District Court
Northern District of California

In a Slack post made the same day, Mullenweg explained the modification as follows:



Prabhakar Decl. ¶ 18; Brunner Decl. ¶ 61; Jenkins Decl. ¶ 22 & Ex. 21.  In his declaration, Mullenweg states that he "instituted a checkbox on the login portal for the Website, . . . [which was] intended to safeguard the WordPress community against the threat posed by [WPEngine]."  Mullenweg Decl. ¶ 40.  He explains that notwithstanding this requirement and the server block, WPEngine's "developers and their customers could still freely access the plugin directory and download plugins from it."  *Id.* ¶ 41.

According to Prabhakar, adding the checkbox was Mullenweg's attempt "to extend his ban to anyone 'affiliated' with [WPEngine] [,]" as its customers "used to use wordpress.org to access themes and plugins before he blocked [it] from accessing wordpress.org[,]" and "used wordpress.org to communicate with the authors of plugins and themes (not affiliated with Automattic or wordpress.org) to, for example, place and resolve technical support inquiries for the plugin."  Prabhakar Decl. ¶ 19.

///

15

### e.    *Anti-WPEngine advertising*

Mullenweg's company, Pressable, extended deals to existing WPEngine customers.  One advertisement, appearing on the Pressable homepage on September 25, 2024, is reproduced below.



Teichman Decl. ¶ 22 & Ex. 22.  In a different post, Mullenweg encouraged the use of "any other web host in the world," as shown below:



16

1  Techiman Decl. ¶ 23; Jenkins Decl. ¶ 17 & Ex. 16.

2          On October 16, 2024, a WooCommerce employee sent a WPEngine customer the

3  following email:



12  Teichman Decl. ¶ 29 & Ex. P.

13                          ***f.        Other public comments***

14          In addition to the acts described above, Mullenweg made a series of online posts and

15  statements across different platforms.  In an October 1, 2024 article titled, "Mullenweg threatens

16  corporate takeover of WP Engine," he is quoted as saying, "I have a lot to work with[,]" in his

17  fight against WPEngine.  Teichman Decl. ¶ 27; Jenkins Decl. ¶ 10 & Ex. 9 at 1-2.  The article also

18  quotes Mullenweg's description of the current state of any deal with WPEngine:

19              That deal's not on the table anymore.  We're seeking more, not 8%
20              . . . .  I don't want to speculate what the deal might be[.]  In July it
               was less than 8%, it was smaller.  In September it was 8%.  The deal
21              they have to do next could be taking over the company, they have no
               leverage.

22  Brunner Decl. ¶ 53; Jenkins Decl. ¶ & Ex. 9 at 1.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

United States District Court
Northern District of California

United States District Court
Northern District of California

1      On October 2, 2024, Mullenweg posted the below on X:



Teichman Decl. ¶ 24; Jenkins Decl. ¶ 11 & Ex. 10.

///

///

///

1

2  On October 5, 2024, Mullenweg posted:

3

4

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

25  Teichman Decl. ¶ 26; Brunner Decl. ¶ 58 & Ex. I.

26  ///

27  ///

28  ///

1    On October 7, 2024, Mullenweg posted the following on Slack:



**matt**  12:12 PM

This is Monday, we have surprises for you all on Tuesday, Wednesday, Thursday... It's never been more exciting to be in WordPress. 🙂 We're fighting for the future of open source against evil private equity. And this has been happening while I'm on a safari.

📷 **Threads**

**Matt Mullenweg (@photomatt) on Threads**

Did an amazing game drive, I wish I had a real camera with me but the iPhone Pro 16 delivered some incredible shots. (502 kB) ▾

🔴 1   ☺⁺

8 replies   Last reply today at 12:37 PM

Prabhakar Decl. ¶ 13; Brunner Decl. ¶ 59 & Ex. J; Teichman Decl. ¶ 25.

///

///

///

///

On October 12, 2024, Mullenweg posted an article to wordpress.org:

> On behalf of the WordPress security team, I am announcing that we are invoking point 18 of the plugin directory guidelines and are forking Advanced Custom Fields (ACF) into a new plugin, Secure Custom Fields. SCF has been updated to remove commercial upsells and fix a security problem.
>
> On October 3rd, the ACF team announced ACF plugin updates will come directly from their website. This was also communicated via a support notice in the WordPress.org support forum on Oct 5th. Sites that followed the ACF team's instructions on "How to update ACF" will continue to get updates directly from WP Engine. On October 1st, 2024, WP Engine also deployed its own solution for updates and installations for plugins and themes across their customers' sites in place of WordPress.org's update service.
>
> Sites that continue to use WordPress.org's update service and have not chosen to switch to ACF updates from WP Engine can click to update to switch to Secure Custom Fields. Where sites have chosen to have plugin auto-updates from WordPress.org enabled, this update process will auto-switch them from Advanced Custom Fields to Secure Custom Fields.
>
> This update is as minimal as possible to fix the security issue. Going forward, Secure Custom Fields is now a non-commercial plugin, and if any developers want to get involved in maintaining and improving it, please get in touch.
>
> Similar situations have happened before, but not at this scale. This is a rare and unusual situation brought on by WP Engine's legal attacks, we do not anticipate this happening for other plugins.
>
> WP Engine has posted instructions for how to use their version of Advanced Custom Fields that uses their own update server, so you have that option, though the WordPress Security Team does not recommend it until they fix the security issues. You can uninstall Advanced Custom Fields and activate Secure Custom Fields from the plugin directory and be just fine.
>
> There is separate, but not directly related news that Jason Bahl has left WP Engine to work for Automattic and will be making WPGraphQL a canonical community plugin. We expect others will follow as well.

Prabhakar Decl. ¶ 31 & Ex. D.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On October 13, 2024, Mullenweg posted the below on X:



Prabhakar Decl. ¶ 32; Jenkins Decl. ¶ 27 & Ex. 26.

///

///

///

///

///

///

///

///

///

United States District Court
Northern District of California

1

On October 14, 2024, Mullenweg promised "there's more":



Teichman Decl. ¶ 28 & Ex. O.

///

///

///

On October 17, 2024, Mullenweg, using his screen name "photomatt," posted to a thread on the website "Hacker News":



Prabhakar Decl. ¶ 33; Jenkins Decl. ¶ 33 & Ex. 32.

In addition, Brunner describes "personal attacks" by Mullenweg.  Brunner Decl. ¶ 46.  She describes an interview in which Mullenweg gave her "personal cell phone number to the host of the interview, who was a stranger to [her], and encouraged him to contact [her]."  *Id.*  On September 28, 2024, Mullenweg tried to poach Brunner from WPEngine and threatened that he would tell the press and WPEngine's investor that she had interviewed with Automattic if she did not accept his job offer by midnight.  *Id.* ¶ 48 & Ex. G.  Brunner also declares that she "ha[s] heard from multiple sources and understand[s] that Defendants will soon demand that agency partners must choose between doing business with [WPEngine], or doing business with Automattic, and if they cho[o]se [WPEngine], they w[ill] similarly be cut off from the WordPress community by the Defendants."  *Id.* ¶ 62.  She explains that "[i]n the context of [WPEngine's]

business, an agency is an organization that builds websites, stores and publications on behalf of multiple clients, using [WPEngine] tools and products." *Id.* The loss of an agency relationship "would mean that [WPEngine] would lose both the agency partner as well as many customers all at once." *Id.* According to Brunner, since September 20, Mullenweg has repeatedly stated that WPEngine could make all of this stop if it just paid up. *Id.* ¶ 66.

### B.    Procedural background

WPEngine commenced this action against Automattic and Mullenweg on October 2, 2024, asserting claims for (1) intentional interference with contractual relations, (2) intentional interference with prospective economic relations, (3) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, (4) attempted extortion, (5) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, (6) promissory estoppel, (7) declaratory judgment of non-infringement, (8) declaratory judgment of non-dilution, (9) libel, (10) trade libel, and (11) slander. Compl. ¶¶ 113-208.

On October 18, 2024, WPEngine moved for a preliminary injunction. ECF 17 ("Mot."). On that day, WPEngine also moved for an expedited briefing and hearing schedule. ECF 22. Over Automattic's opposition, ECF 33, the Court granted the motion for expedited briefing and hearing. ECF 34. Pursuant to the expedited briefing schedule set by the Court, Automattic filed its opposition to the motion for preliminary injunction on October 30, 2024. ECF 40 ("Opp.").

On that day, Automattic also filed a motion to dismiss and a motion to strike pursuant to California's anti-SLAPP law, Cal. Civ. Proc. Code § 425.16. ECF 36, 38. On November 1, 2024, Automattic moved to expedite the briefing and hearing schedule on those motions. ECF 43. In lieu of opposing the motion to dismiss and the motion to strike, on November 14, 2024, WPEngine filed an amended complaint, adding claims for (12) monopolization in violation of the Sherman Act, 15 U.S.C. § 2, (13) attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2, (14) illegal tying in violation of the Sherman Act, 15 U.S.C. § 1, (15) illegal tying in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, (16) declaratory judgment of trademark misuse, (17) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1), (18) false advertising in violation of the Lanham Act, 15 U.S.C.

§ 1125(a)(1)(B), (19) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5), and (20) unjust enrichment.  ECF 51 ("Am. Compl.") ¶¶ 380-461.  Following the filing of the amended complaint, the Court denied the motion to dismiss, motion to strike, and motion to shorten time as moot.[8]  ECF 52.

On November 4, 2024, WPEngine filed a reply in support of its motion for preliminary injunction.  ECF 44 ("Reply").[9]  WPEngine seeks an order restraining and enjoining "Defendants, and Defendants' officers, agents, servants, employees, and attorneys, and other persons or entities who are in active concert or participation with the foregoing individuals and entities" from:

> (a) interfering with or causing others to interfere with [WPEngine's] and/or its free users', customers', or partners' access to the WordPress community, including wordpress.org and the WordPress Plugin Directory and repository, in any manner that would affect, impede, or restrict access in a way different from how such access existed immediately prior to September 20, 2024;
>
> (b) interfering with or causing others to interfere with [WPEngine's] control over, or access to, plugins or extensions published by [WPEngine]  (or that had been published by [WPEngine] as of September 20, 2024) or the listing or functioning of plugins or extensions published by [WPEngine] (or that had been published by [WPEngine] as of September 20, 2024);
>
> (c) interfering with or causing others to interfere with [WPEngine] and/or its free users', customers', or partners' access to any WordPress plugins, extensions, or WordPress community-related resources, or interfering with or causing others to interfere with the functioning of any WordPress plugins, extensions, or WordPress community-related resources, based on whether the user is believed to be associated or affiliated with [WPEngine] or not, in any way different from how these plugins, extensions, or resources operated immediately prior to September 20, 2024; and
>
> (d) engaging in any extortionate acts or tortious acts of interference with respect to [WPEngine] and its customers, partners, or free users, including with respect to any and all functionality and/or services [WPEngine] provides thereto.

---

[8] The parties agree that the filing of the amended complaint did not moot the motion for preliminary injunction.  *See* ECF 48 at 2-3; ECF 53 at 2.

[9] The briefs from each side violate Paragraph H.3 of the Court's Standing Order for Civil Cases.  WPEngine's opening and reply briefs contain excessive footnotes.  *See, e.g.*, Mot. at 23 n.4; Reply at 7 n.2, 8 n.3, 14 n.5.  The Court has not considered arguments contained in these footnotes.  *See* Standing Order ¶ H.3 ("Use of footnotes in court filings shall be limited to providing brief points of clarification or cross-references.  Argument in footnotes will not be considered by the Court.").  Automattic's opposition brief purports to incorporate by reference arguments made in its motion to dismiss.  *See, e.g.*, Opp. at 22, 27.  The Court declines to consider arguments not expressly advanced in the opposition brief.  Future filings that fail to comply with the Court's Standing Order, the Federal Rules, or this District's Local Rules may be summarily stricken.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    ECF 17-1 at 2-3.  WPEngine requests that the restrictions sought "extend not just to acts aimed at

2    or impacting [WPEngine] itself, but also [WPEngine's] affiliates, partners, employees, users, or

3    customers, and all systems, servers, or computers owned or operated by or for the benefit of the

4    foregoing . . . even if the foregoing person or entity is acting in their personal capacity."  *Id.* at 3.

5    WPEngine also asks that "[i]f there is currently in place any restriction of access, alteration of a

6    plugin, alteration of a plugin directory listing, or alteration of an extension that would have

7    violated the above terms if those acts had been carried out as of the date of this order," Defendants

8    should be ordered to "immediately cause the operations to return to status quo as they existed

9    immediately prior to September 20, 2024, or as agreed to in writing with [WPEngine]" and that

10   "to the extent any plugin, extension, listing, software, or other code has been updated for other

11   reasons since immediately prior to September 20, 2024, restoration to the status quo shall be done

12   in good faith as to not undo the normal and legitimate updates that occurred since that time."  *Id.*

13       On November 21, 2024, Defendants moved for leave to file a surreply in opposition to the

14   motion for preliminary injunctive relief.  ECF 53.  The next day, the Court denied the motion.[10]

15   ECF 55.

16       The Court held a hearing on WPEngine's motion for preliminary injunctive relief on

17   November 26, 2024.  ECF 58.  At the hearing, the Court directed the parties to meet and confer on

18   a stipulated order, with an agreed proposal, if reached, or competing proposals due filed on

19   December 2, 2024.  *Id.*  Having reached no agreement, each side filed their own proposed order on

20   that date.  ECF 62, 63.

21   **II.    LEGAL STANDARD**

22       "A preliminary injunction is an extraordinary remedy never awarded as of right."

23   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  "A plaintiff

24   seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits,

25   [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the

26   _____

27   [10] Although the Court denied Defendants' motion for leave to file a surreply, it has not considered
     the materials WPEngine cites for the first time in reply.  The record is sufficiently developed,
28   without regard to that new content, to support the issuance of preliminary injunctive relief as
     discussed in this Order.

balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Id.* at 20 (citations omitted). The Ninth Circuit "employ[s] a 'sliding scale test,' which allows a strong showing on the balance of hardships to compensate for a lesser showing of likelihood of success." *Where Do We Go Berkeley v. Cal. Dep't of Trans.*, 32 F.4th 852, 859 (9th Cir. 2022) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). Under this approach, "when plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the merits." *Id.* (citing *All. for the Wild Rockies*, 632 F.3d at 1135).

## III.    DISCUSSION

The Court takes up the *Winter* elements in turn.

### A.    Success on the Merits

With respect to the first element of the *Winter* test, the Court focuses on WPEngine's claim for tortious interference with contractual relations, as a showing that WPEngine is likely to succeed on the merits of this claim is sufficient to meet this first prong. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194 (9th Cir. 2022) (declining to reach claim for unfair competition where the plaintiff showed that there were at least serious questions going to the merits of its tortious interference with contract claim).

To prevail on its claim for tortious interference with contractual relations,[11] WP Engine must show "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020) (internal quotations and citations omitted); *see also hiQ Labs, Inc.*, 31 F.4th at 1191.

---

[11] In its briefs, WPEngine refers to its "interference claims" but only addresses the elements of the claim for intentional interference with contractual relations. *See* Mot. at 26-28. For this reason, the Court does not separately analyze whether WPEngine is likely to succeed on its claim for intentional interference with prospective economic relations.

WPEngine has established that it is likely to satisfy each of these elements. First, while Defendants press WPEngine to identify specific contracts, there is no credible argument that contracts do not exist between WPEngine and its customers. At a minimum, by seeking to entice WPEngine customers to move away from the company "by offering competitive terms to WPEngine's customers, including reimbursing them for fees owed on their existing contracts – so they are *not* in fact breached – and to provide one year of free hosting[,]" Opp. at 33, Defendants at least acknowledge that WPEngine has existing contracts with the customers Defendants are targeting.

Second, WPEngine will be able to establish that Defendants were aware of these contractual relationships long before Defendants commenced their campaign against it. In a 2017 post, Mullenweg described WPEngine as "the largest dedicated managed WP host[.]"[12] *See* Teichman Decl. ¶ 15; Jenkins Decl. ¶ 25 & Ex. 24.

Third, Defendants' conduct is designed to induce breach or disruption. That is made explicit in at least the following posts and texts, which state, in part:

- "I know that this is the nuclear option, it sets us down a specific path." Brunner Decl. ¶ 28 & Ex. F.

- "If you're saying 'next week' that's saying 'no,' so I will proceed with the scorched earth nuclear approach to [WPEngine]." *Id.* ¶ 31 & Ex. F.

- "I don't think they're worth a fraction of that now. Customers are leaving in droves. . . . It's a distressed asset." Jenkins Decl. ¶ 11 & Ex. 10.

- "I suspect there are going to be millions of sites moving away from [the ACF Plugin] in the coming weeks." *Id.* ¶ 12 & Ex. 11.

- "Hmm, I guess you'll have to wait and see why people might not trust ACF as much going forward." Brunner Decl. ¶ 58 & Ex. I.

The facts supporting the fourth element of WPEngine's claim for tortious interference with contractual relations – actual breach or disruption of the contractual relationship – and the fifth element – resulting damage – are set forth in Teichman's declaration and discussed in detail in

---

[12] Brunner states in her declaration that Automattic "made a strategic investment in [WPEngine's] . . . Series A investment round" in November 2011. Brunner Decl. ¶ 13 & Ex. D.

United States District Court
Northern District of California

connection with the irreparable harm factor.  *See* Section III.B. *infra.*  Considering the facts set forth in Teichman's declaration, and the others discussed above, the Court finds that WPEngine is likely to succeed on the merits of its intentional interference with contractual relations claim.

Defendants' arguments in opposition do not compel a different conclusion.[13]  They argue that WPEngine has failed to identify any contractual relationships allegedly interfered with and any contractual terms allegedly breached.  Opp. at 40.  But each of the cases Defendants cite in support of their argument are distinguishable.  In *Dongguan Beibei Toys Indus. Co. v. Underground Toys USA, LLC*, No. CV1904993DSFJPRX, 2019 WL 8631502, at *2 (C.D. Cal. Dec. 16, 2019), the court dismissed the plaintiff's claim for tortious interference with contract because, unlike here, underlying allegations were conclusory.  In *Nexsales Corp. v. Salebuild, Inc.*, No. C-11-3915 EMC, 2012 WL 216260, at *1 (N.D. Cal. Jan. 24, 2012), the court granted the defendant's motion to dismiss because, among other failings, the plaintiff, unlike WPEngine here, "failed to allege any specifics tying [d]efendant to the alleged wrongdoing."

Defendants' argument that the interference WPEngine alleges consists of acts they had a right to take fares no better.  They insist that Mullenweg was under no obligation to provide WPEngine access to some or all of the sources on the Website," and that "he had a right, under the Website's developer guidelines . . . to fork the ACF plugin as he did, including to address outstanding issues."  Opp. at 40.  The case Defendants rely on for this argument is inapposite.  In *Putian Authentic Enter. Mgmt. Co., Ltd v. Meta Platforms, Inc.*, No. 5:22-CV-01901-EJD, 2022 WL 1171034, at *4 (N.D. Cal. Apr. 19, 2022), the court concluded that the plaintiffs had not demonstrated a likelihood of success on the merits of its tortious interference with contract claim because they "and many of their clients appear[ed] to have violated Meta's terms and policies," and so, "Meta was within its rights under the parties' agreement to terminate [p]laintiffs' accounts."  Here, Mullenweg's "statement that he had the right to disable WPEngine's account access and to make changes to the ACF plugin for the sake of public safety[,]" *see* Opp. at 27-28,

---

[13] Because the Court does not reach WPEngine's claim for intentional interference with prospective economic relations, it does not address Defendants' arguments as to that cause of action.

1    is belied by the declarations of WPEngine's executives stating that the claimed vulnerability was

2    minor, patched well before the fix-it window set by industry standard, and showing that

3    Defendants tried to pass off the rating and reviews for the ACF plugin as those for their new

4    purportedly forked SCF plugin.

5         Because WPEngine has demonstrated a likelihood of success on the merits of at least one

6    of its claims,[14] the Court proceeds to the next element of the *Winter* test – irreparable harm.

7         **B.    Irreparable Harm**

8         A plaintiff seeking a preliminary injunction must demonstrate "that irreparable injury is

9    likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.  "A plaintiff must do more than

10   merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate

11   immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Caribbean Marine*

12   *Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  "Irreparable harm is traditionally

13   defined as harm for which there is no adequate legal remedy, such as an award of damages."

14   *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

15        WPEngine argues that the requisite irreparable harm is present here because it has suffered

16   loss of existing and potential customers and damage to those customer relationships, loss of

17   market share, and loss of goodwill and reputational harm, in addition to the harm sustained by its

18   customers and the larger WordPress Community.  Mot. at 28-30; Reply at 9-10.

19        WPEngine elaborates on the loss of existing and potential customers as follows.[15]  The

20   company experienced a 14% increase in the average number of daily cancellation requests

21   between September 26 and 30, and an increase of 17% in cancellation requests between October 1

22   and October 14, as compared to September 1 through September 25.  Teichman Decl. ¶¶ 30, 37.

23   63 customers – about 12% of WPEngine's "expected new business for the month – told

24

25   ───────────────────────

     [14] The Court thus does not reach WPEngine's likelihood of success on its remaining claims,
26   including the attempted extortion claim, which WPEngine identified as its strongest claim during
     oral argument.

27   [15] WPEngine contends that "the same facts that show [it] is at an increasing risk of losing
28   customers also show that it is at an increasing risk of losing market share."  Mot. at 29.

1    [WPEngine] that they were declining to upgrade or purchase a new account in September because

2    of the situation vis-à-vis Defendants[,]" expressing concern over the legal battle and hostility

3    between the parties.  *Id.* ¶¶ 31-35; *see also id.* ¶ 38 & Ex. Q (customer opting for a one year

4    contract instead of a three-year deal because of the issues between WPEngine and Wordpress).

5    WPEngine fell short of its forecasted "new sales-assisted business in September[,]" which totaled

6    200 new accounts or upgrades instead of the projected 533 new accounts or upgrades.  *Id.* ¶ 31.

7    Self-service sign-ups (those occurring without the assistance of a salesperson) dropped by 29%,

8    when comparing the period of September 26 – September 30 with September 1 – 25.  *Id.* ¶ 36.  In

9    addition, WPEngine measured a 375% increase in the rate of migration plugin[16] installs between

10   September 26 and September 30, as compared to September 1 through September 25.  *Id.*

11   WPEngine also anticipates a diminished ability to convert free ACF plugin customers into paying

12   customers, as Mullenweg's creation of the SCF plugin eliminated links to the PRO version of

13   WPEngine's plugin.  *Id.* ¶ 40.

14        With respect to loss of goodwill and trust, Teichman asserts that the risk of disruption to

15   their customers' business, Mullenweg's takeover of the ACF plugin, and his threats of continued

16   war undermine WPEngine's ability to offer its customers stability and enterprise readiness.

17   *Id.* ¶¶ 41-45 & Ex. R (WPEngine customer explaining that the ACF plugin takeover caused a day

18   of unexpected work and stating that "[n]ow [his] clients are feeling the results of this mess too, as

19   their websites are directly affected.").  Prabhakar adds that "in order to address Mr. Mullenweg's

20   blocking of [WPEngine's] access to wordpress.org, [WPEngine] was forced to try to find

21   workarounds needed to service [WPEngine's] customers and update its plugins."  Prabhakar Decl.

22   ¶ 34.  While "[t]hose efforts are ongoing[,]" they "cannot fully repair the damage Mr. Mullenweg

23   did to [WPEngine's] systems."  *Id.*

24        As for the harm to WPEngine's customers and the WordPress Community, Teichman cites

25   the possibility of "businesses with a website [that] stand to lose their own revenue and customer

26

27   _____
     [16] In Teichman's experience, "installing these plugins is indicative of a website that is planning to
28   switch hosts."  Teichman Decl. ¶ 39.

United States District Court
Northern District of California

goodwill if their websites stop operating normally – and could lose even more if their website stops functioning at key times," the loss of business by "[WPEngine] agencies – that is, those who help their customers build and manage websites on WordPress and [WPEngine,]" and concern that Mellwenweg will target another hosting service or developer next.  Teichman Decl. ¶¶ 47-49.  WPEngine specifically provides one example, from an identified source, stating that a client backed out of a $40k contract over "Mullenweg's petty war with [WPEngine]."[17]  *Id.* ¶ 48 & Jenkins Decl. ¶ 15 & Ex. 14.

        Defendants counter with four arguments.  None is persuasive.  Defendants' first argument is three-fold: they contend that WPEngine and its customers are not cut-off from WordPress, that WPEngine's access to WordPress through its administrative panel is not a necessity but a mere convenience (for which WPEngine implemented a work-around), and that WPEngine's ability to download plugins was never disabled, as it retains its own repository of available plugins and software.  Opp. at 14-17; *see also* ECF 41 ("Abrahamson Decl.") ¶¶ 6-7, 10, 14-15.

        In his reply declaration, Prabhakar disputes these contentions.  He declares that "Mullenweg and Automattic have blocked [WPEngine's] access to wordpress.org, cutting off its ability to update those plugins in any way, including fixing the description and code."  Prabhakar Reply Decl. ¶ 9.  He explains that "[t]he WordPress software is hardcoded to download plugins from wordpress.org using the administrative panel."  *Id.*  As a result, "the WordPress administrative panel can only download plugins from wordpress.org."  *Id.*  Prabhakar adds that while WPEngine created a partial mirror of the plugin and theme repositories on WordPress, in anticipation that Defendants would once again block access on October 1, the mirror "has only focused on making the latest version of plugins and themes from wordpress.org available to its customers."  *Id.* ¶ 6.  In addition, the use of the partial mirror forces WPEngine "to operate a dramatically irregular workflow in order to provide a limited workaround to Defendants' . . .

---

[17] Because neither WPEngine's customers nor the larger "WordPress Community" are plaintiffs here, the Court address these facts when evaluating whether the public interest supports preliminary injunctive relief.  *See hiQ Labs, Inc.*, 31 F.4th at 1202 (explaining that the effects on non-parties is relevant to analysis of the public interest element).

United States District Court
Northern District of California

1  blocking updates to plugins from the administrative panel." *Id.* ¶ 7.  WPEngine "remains unable

2  to support and maintain its owned plugins and themes hosted at wordpress.org." *Id.*  Its limited

3  workaround is further constrained by multiple factors:

4          ***First***, wordpress.org throttles the rate at which third parties
           can download its content.  As a result, creating and updating a

5          mirror can often take several days.  ***Second***, wordpress.org limits the
           data that it makes available to [WPEngine].  For example, while

6          [WPEngine] is able to download the source code for WordPress
           plugins and themes hosted on wordpress.org, it does not make

7          available to [WPEngine] critical information about plugins, such as
           ratings, reviews, and download and installation counts, which is

8          often important information for WordPress users to assess the trust
           and reliability of a WordPress plugin.  ***Third***, if Mr. Mullenweg

9          decides to make any minor changes to the function or content of
           wordpress.org, it could break [WPEngine's] process in creating and

10         updating its mirror.  Given that Mr. Mullenweg has promised further
           attacks on [WPEngine], it is not out of the question that Defendants

11         may – among other things – make changes to the function or content
           of wordpress.org to intentionally harm [WPEngine].  ***Fourth***,

12         wordpress.org does not notify [WPEngine] when plugins and themes
           on wordpress.org are updated, and thus need to be downloaded to

13         [WPEngine's] mirror.  As a result, it is possible that [WPEngine's]
           mirror could go out of sync with wordpress.org, leaving

14         [WPEngine] customers without critical security patches, or
           otherwise access to updates.  ***Fifth***, wordpress.org explains that

15         "[t]he latest version of WordPress is always available from the main
           WordPress website at https://wordpress.org.  Official releases are

16         not available from other sites – **never** download or install
           WordPress from any website other than https://wordpress.org"

17         (emphasis in original).

18 *Id.* ¶ 8.

19         Defendants next argue that WPEngine cannot tie any of the alleged harm to Defendants'

20 conduct.  Opp. at 17-19.  They offer an alternative explanation: the standard caution that surrounds

21 dealing with a company engaged in litigation and a litany of negative reviews by WPEngine

22 customers from July, September, and October 2024.  *See id.*  Defendants cite no authority

23 permitting the Court to discount the ample evidence of the conduct that immediately preceded the

24 negative effects measured by data WPEngine has proffered here.  Without any such authority, the

25 Court rejects the argument that WPEngine has failed to tie the alleged harm to Defendants'

26 actions.

27         Defendants also argue, again without any supporting authority, that the data WPEngine

28 offers "should be viewed with skepticism."  Opp. at 19-20.  They "encourage WPEngine to submit

United States District Court
Northern District of California

34

1    its parallel historical data over at least the past 14 months so an informed evaluation of the data

2    can be made."  *Id.* at 20.  Absent supporting authority, the Court rejects Defendants' arguments on

3    this point.

4            Finally, Defendants argue that the alleged harm is not irreparable because it is quantifiable

5    and self-inflicted.  Opp. at 20-21.  These arguments fail.  First, "intangible injuries, such as

6    damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."  *Rent-A-Ctr.,*

7    *Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *Regents*

8    *of Univ. of Cal. v. Am. Broadcasting Cos.*, 747 F.2d 511, 519-20 (9th Cir. 1984)).  That WPEngine

9    is able to measure or quantify some of the harm resulting from Defendants' conduct does not

10   undermine a finding that it is irreparable.  *See Regents of Univ. of Cal.*, 747 F.2d at 519 (rejecting

11   the view that "recognition of the obvious – i.e., that monetary losses can indeed attend the

12   infliction of intangible injuries – requires that th[e] court ignore an otherwise unambiguous finding

13   of intangible injury.").  Second, while Defendants characterize WPEngine's harm as self-imposed

14   because it built its business around a website "that it had no contractual right to use[,]" *see* Opp. at

15   21-22, Defendants' role in helping that harm materialize through their recent targeted actions

16   toward WPEngine, and no other competitor, cannot be ignored.  *See hiQ Labs, Inc.*, 31 F.4th at

17   1193-94 (stating that "[i]f companies like LinkedIn, whose servers hold vast amounts of public

18   data, are permitted selectively to ban only potential competitors from accessing and using that

19   otherwise public data, the result – complete exclusion of the original innovator in aggregating and

20   analyzing the public information – may well be considered unfair competition under California

21   law.").

22           In light of the above, the Court finds that WPEngine has shown it will suffer irreparable

23   harm without preliminary injunctive relief.  The Court now turns to the third *Winter* element – the

24   balance of equities.

25           **C.      Balance of Equities**

26           To determine the balance of equities, "[a] court must balance the interests of all parties and

27   weigh the damage to each."  *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832,

28   852 (9th Cir. 2019) (internal quotations and citation omitted).

United States District Court
Northern District of California

1      The conduct described at length above – including the termination of WPEngine's access

2   to WordPress, the interference with the ACF plugin, and the additional burdens imposed on

3   WPEngine's customers, such as the sign-in pledge – demonstrates that WPEngine has a significant

4   interest in obtaining preliminary injunctive relief.

5      Defendants' arguments in opposition do not establish that they will suffer any damage that

6   overrides WPEngine's interest in obtaining relief.  Defendants again argue that any need for

7   injunctive relief is self-imposed, as WPEngine made the unilateral decision to build its business

8   around WordPress, without a "contractual right to access the Website, and opted not to mitigate

9   any potential changes in access."  *Id.* at 30.  Defendants add that "WPEngine could have created

10  its own mirror version of the Website and repository at any time, and has since created such

11  repository, mooting any going forward harm."  *Id.*  Next, Defendants argue that issuing

12  preliminary injunctive relief would be equivalent to "compel[ling] specific performance by

13  Defendants of a contract that does not exist, and to force Defendants to continue to provide free

14  services to a private equity-backed company that would rather not expend the sources itself."  *Id*.

15  Finally, Defendants assert that mandating the access WPEngine demands "would contradict the

16  accepted legal axiom that " ' a business generally has the right to refuse to deal with its

17  competitors.' "  *Id.* (quoting *CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc.*, 619 F.

18  Supp. 3d. 983, 989-990 (C.D. Cal. 2022)).

19     These arguments ignore that Defendants' recent conduct is what WPEngine seeks to

20  remedy by this motion for interim injunctive relief.  It asks to revert to the status quo while the

21  ultimate determination of the merits of the parties' respective positions remains pending.

22  Defendants' reliance on *CoStar Group* is thus misplaced.  That decision resolved a motion to

23  dismiss, not a motion for preliminary injunction.  Moreover, the valuable information at issue in

24  that case was not public.  *See id.* at 992.  Here, however, WordPress has been, until recently,

25  available to WPEngine on the same terms as other users, or at least on the terms that were in place

26  up until September 25, 2024.  Requiring Defendants to restore access on those terms while this

27  action proceeds imposes a minimal burden.  *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072,

28  1077 (N.D. Cal. 2016) (finding balance of hardships tips in favor of plaintiff seeking an injunction

United States District Court
Northern District of California

1   when it would merely require defendant to comply with provisions of an existing agreement).

2   Based on the foregoing, the third *Winter* element – the balance of hardships – thus tips in

3   favor of WPEngine.  The Court now turns to the fourth element – the public interest.

4   **D.   Public Interest**

5   "Whereas the balance of equities focuses on the parties, '[t]he public interest inquiry

6   primarily addresses impact on non-parties rather than parties,' and takes into consideration 'the

7   public consequences in employing the extraordinary remedy of injunction.' "  *hiQ Labs, Inc.*, 31

8   F.4th at 1202 (quoting *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931-32 (9th Cir. 2003)

9   (modification in original)).

10   Here, the public consequences of withholding injunctive relief are significant.  Mullenweg

11   himself acknowledges that "[t]oday, more than 40% of all websites run on WordPress."

12   *See* Mullenweg Decl. ¶ 4.  Over two million websites run the ACF plugin Mullenweg allegedly

13   tampered with, and those users rely on the stability of the plugin, and WordPress more broadly, to

14   operate their websites, run their businesses, and go about their day online.  Maintaining that

15   continuity and preventing arbitrary disruption stemming from a corporate dispute is in the public

16   interest.  *See hiQ Labs, Inc.*, 31 F.4th at 1202 (agreeing with the district court's finding "that

17   giving companies like LinkedIn free rein to decide, on any basis, who can collect and use data –

18   data that the companies do not own, that they otherwise make publicly available to viewers, and

19   that the companies themselves collect and use – risks the possible creation of information

20   monopolies that would disserve the public interest.").

21   Moreover, the availability of WordPress as open-source software has created a sector for

22   companies to operate at a profit.  This includes Mullenweg's own companies like Automattic and

23   Pressable, and as Mullenweg himself acknowledged in 2017, it also includes WPEngine, which at

24   the time, Mullenweg described as "the largest dedicated managed WP host[.]"[18]  *See* Teichman

25   Decl. ¶ 15; Jenkins Decl. ¶ 25 & Ex. 24.  Those who have relied on the WordPress's stability, and

26   the continuity of support from for-fee service providers who have built businesses around

27

28   ───────────────
[18] Automattic even "made a strategic investment in [WPEngine's] . . . Series A investment round" in November 2011.  Brunner Decl. ¶ 13 & Ex. D.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    WordPress, should not have to suffer the uncertainty, losses, and increased costs of doing business

2    attendant to the parties' current dispute.

3           Defendants' arguments in opposition do not persuade otherwise.  They assert that "[t]he

4    public is not, and will not, be subject to any harm in the absence of a preliminary injunction"

5    noting that WPEngine implemented a workaround for Mullenweg's interference with its access to

6    WordPress.  Opp. at 33.  Not so.  In his reply declaration, Prabhakar explains that the temporary

7    solution "is impractical for many reasons."  Prabhakar Reply Decl. ¶ 4.  Without access to

8    wordpress.org, those who use WPEngine's plugins "would not know that their plugins require

9    update[.]"  *Id.*  Many do not know how to update plugins manually.  *Id.*  For those that do, if they

10   manage several websites, and those websites run multiple plugins, the process of performing

11   manual updates would be too onerous and time consuming to be workable.  *Id.*  Moreover, even if

12   WPEngine's workaround did not present the difficulties Prabhakar describes, the costs associated

13   with its implementation, as necessitated by Mullenweg's conduct, supports the issuance of

14   injunctive relief.  *See Cellco P'ship v. Hope*, 469 F. App'x 575, 577 (9th Cir. 2012) (district court

15   did not err in granting Verizon's motion for a preliminary injunction where "Verizon adduced

16   evidence that defendant . . . took actions . . . whose necessary consequence was to burden

17   Verizon's contracts with its wireless subscribers by making it more costly for Verizon to meet its

18   obligation to prevent unauthorized charges on its subscribers' bills.").

19          Defendants' argument that "the WordPress community and ecosystem has benefited from

20   vigorous, healthy competition since the start of the business dispute" between the parties fares no

21   better.  Defendants claim that WPEngine has improved its services as a result of recent events and

22   that Defendants have actually prevented breach of customers' contracts with Defendants "by

23   offering competitive terms to WPEngine's customers, including reimbursing them for fees owed

24   on their existing contracts – so they are *not* in fact breached – and to provide one year of free

25   hosting."  Opp. at 33.  These arguments ignore, however, that Defendants have recently deprived

26   WPEngine of access to WordPress that it has had for years.  Preliminary injunctive relief ensures

27   that such access is restored to WPEngine, but it does not prevent Defendants from otherwise

28   lawfully competing with WPEngine on the terms that have been in place as of September 20,

2024.

Accordingly, the final *Winter* element – the public interest – weighs in favor of granting preliminary injunctive relief. Having found that the remaining *Winter* elements also support granting WPEngine's motion, the Court now turns to whether WPEngine must post a bond.

### E.    Bond

Federal Rule of Civil Procedure 65(c) allows courts to "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

WPEngine argues that no bond is required because requiring Defendants to revert to the status quo imposes no negative effect on them. Mot. at 31. Defendants counter that a bond of $1.6 million is appropriate. Opp. at 32. They assert that "the continued maintenance and operation of the Website incurs an estimated $800,000.00 in administrative, server and developer costs per year[,]" and that allowing WPEngine to access the developer resources of the Website permits WPEngine to benefit from the distribution of its products on the Website[,] which "carries with it a separate value." *Id.* They contend that the requirement of a bond is necessary to "compensate [Mullenweg] for any services he is ordered to continue to provide to WPEngine, as well as to compensate Automattic for any revenue it is precluded from realizing from competitive business activities." Opp. at 32. They also argue that "[p]resent circumstances do not qualify as the status quo where one party is indebted to another for services rendered." *Id.* (citing *Rockport Admin. Servs., LLC v. Integrated Health Sys., LLC*, No. 223CV04920SPGAFM, 2023 WL 5667867, at *5 (C.D. Cal. June 26, 2023)). In reply, WPEngine argues that if the court is inclined to require a bond, "it should be a *de minimus* amount, not wordpress.org's entire budget for two years." Reply at 19. In so asserting, Defendants ignore that "Defendants were operating wordpress.org for free for many years, and are *still* operating it for free for everyone other than [WPEngine]," and that Defendants leave unaddressed "[t]he *marginal* cost of running wordpress.org with [WPEngine's] normal access, and running it with [WPEngine] blocked[,] . . . [which] is likely a tiny fraction of the amount cited by Defendants." *Id.*

WPEngine's arguments are persuasive.  At the hearing, Defendants could point to no invoice that remained outstanding as of September 20, nor quantify WPEngine's alleged debt with any precision.  *Cf. Rockport Admin. Servs., LLC*, 2023 WL 5667867, at *6 (accepting the plaintiff's offer to pay $205,000 for advance services where the defendant's licensing fee was $70,000).  Under these circumstances, the Court finds that any harm to Defendants resulting from the issuance of preliminary injunctive relief is unlikely, as it merely requires them to revert to business as usual as of September 20, 2024.  Accordingly, the Court declines to require WPEngine to post a bond.  *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (stating that "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.").  Having determined that preliminary injunctive relief is appropriate without the posting of a bond, the Court turns to the scope of the appropriate relief.

**F.      Scope of Injunction**

" 'District courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong.' "  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)).  "The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.' "  *Id.* (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)).  "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, . . . [which c]ould lead to absurd situations, in which plaintiffs could never bring suit once [unlawful] conduct had begun," but "instead to 'the last uncontested status which proceeded the pending controversy.' "  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *accord Boardman*, 822 F.3d at 1024 (quoting *GoTo.com*, 202 F.3d at 1210).  Equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).

In keeping with this authority, the Court finds the following preliminary injunctive relief

United States District Court
Northern District of California

1    appropriate given the current record:

2        Defendants, and Defendants' officers, agents, servants, employees, and attorneys, and

3    other persons who are in active concert or participation with them are hereby **RESTRAINED**

4    **AND ENJOINED**, from:

5        (a)     blocking, disabling, or interfering with WPEngine's and/or its employees', users',

6    customers', or partners' (hereinafter "WPEngine and Related Entities") access to wordpress.org;

7        (b)     interfering with WPEngine's control over, or access to, plugins or extensions (and

8    their respective directory listings) hosted on wordpress.org that were developed, published, or

9    maintained by WPEngine, including those that had been published, developed, or maintained by

10    WPEngine as of September 20, 2024; and

11        (c)     interfering with WPEngine's and Related Entities' WordPress installations (i.e.,

12    websites built with WordPress software) by using auto-migrate or auto-update commands to

13    delete, overwrite, disable, or modify any WPEngine plugin without the express request by or

14    consent of WPEngine and/or its users, customers, or partners (as applicable).

15        The above, however, does not preclude wordpress.org's ability to ensure the security and

16    operability of its site consistent with procedures and policies in place as of September 20, 2024.

17        Within 72 hours, Defendants are **ORDERED** to:

18        (a)     remove the purported list of WPEngine customers contained in the "domains.csv"

19    file linked to Defendants' wordpressenginetracker.com website (which was launched on or about

20    November 7, 2024) and stored in the associated GitHub repository located at

21    https://github.com/wordpressenginetracker/wordpressenginetracker.github.io.

22        (b)     restore WPEngine's and Related Entities' access to wordpress.org as it existed as of

23    September 20, 2024, including:

24        (i)     reactivating and restoring all WPEngine employee login credentials to

25    wordpress.org resources (including login credentials to login.wordpress.org) as they existed as of

26    September 20, 2024;

27        (ii)     disabling any technological blocking of WPEngine's and Related Entities'

28    access to wordpress.org that occurred on or around September 25, 2024, including IP address

*United States District Court*
*Northern District of California*

blocking or other blocking mechanisms; and

       (iii)    restoring WPEngine's and Related Entities' access to wordpress.org in the manner that such access existed as of September 20, 2024, including:

           (1)    functionality and development resources (api.wordpress.org, core.svn.wordpress.org, plugins.svn.wordpress.org, themes.svn.wordpress.org, i18n.svn.wordpress.org, downloads.wordpress.org, make.wordpress.org, and translate.wordpress.org);

           (2)    data resources (WordPress Plugin, Theme, and Block Directories, repositories, listings, and other password-protected resources within wordpress.org);

           (3)    security resources (login.wordpress.org); and

           (4)    support resources (trac.wordpress.org and slack.wordpress.org); and

       (iv)    removing the checkbox at login.wordpress.org that Defendants added on or about October 8, 2024 asking users to confirm that they are "not affiliated with WP Engine in any way, financially or otherwise"; and

       (v)    returning and restoring WPEngine's access to and control of its Advanced Custom Fields ("ACF") plugin directory listing at https://wordpress.org/plugins/advanced-custom-fields, as it existed as of September 20, 2024.

This Preliminary Injunction is immediately effective upon its entry and shall remain in full force and effect through the date on which judgment is entered following the trial of this action.

## IV.    CONCLUSION

For the reasons set forth above, WPEngine's motion for a preliminary injunction is **GRANTED**.

      **IT IS SO ORDERED.**

Dated: December 10, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

42