1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Araceli Martinez-Olguin, District Judge

4

5    WPENGINE, INC.,                    )
                                        )
6              Plaintiff,               )
                                        )
7    vs.                                )   Case No. C 24-06917-AMO
                                        )
8    AUTOMATTIC, INC., et al.,          )
                                        )
9              Defendants.              )
     _____)
10
                                    San Francisco, California
11                                  Thursday, August 28, 2025

12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 2:28- 3:13 = 45 MINUTES

14   APPEARANCES:

15   For Plaintiff:

16                            Quinn Emanuel Urquhart &
                                 Sullivan, LLP
17                            555 Twin Dolphin Drive
                              5th Floor
18                            Redwood Shores, California
                                 94065
19                       BY:  RACHEL M. KASSABIAN, ESQ.

20                            Quinn Emanuel Urquhart &
                                 Sullivan, LLP
21                            50 California Street
                              22nd Floor
22                            San Francisco, California
                                 94111
23                       BY:  BRIAN E. MACK, ESQ.

24            (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

```
 1  For Plaintiff:
                                Quinn Emanuel Urquhart Oliver
 2                                & Hedges
                                865 South Figueroa Street
 3                              10th Floor
                                Los Angeles, California 90017
 4                          BY:  MICHAEL E. WILLIAMS, ESQ.
                            BY:  YURY KAPGAN, ESQ.
 5
    For Defendants:
 6
                                Gibson Dunn & Crutcher, LLP
 7                              One Embarcadero Center
                                Suite 2600
 8                              San Francisco, California
                                  94111
 9                          BY:  JOSEPH R. ROSE, ESQ.

10                              Gibson Dunn & Crutcher, LLP
                                333 South Grand Avenue
11                              Los Angeles, California 90071
                            BY:  MICHAEL H. DORE, ESQ.

12  Transcribed by:             Echo Reporting, Inc.
                                Contracted Court Reporter/
13                              Transcriber
                                echoreporting@yahoo.com
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  Thursday, August 28, 2025                                    2:28 p.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4            THE CLERK:  Calling Civil Matter 24-6917,

5  WPEngine, Incorporated v. Automattic, Incorporated, et al.

6      Counsel, please come up to the podiums to state your

7  appearances for the record, starting with the Plaintiff.

8            MS. KASSABIAN (via Zoom):  Good afternoon, your

9  Honor.  I am Rachel Kassabian from Quinn Emanuel, here on

10 behalf of the Plaintiff, WPEngine.  I'll pass the mic.

11           MR. WILLIAMS (via Zoom):  Good afternoon, your

12 Honor.  Michael Williams from Quinn Emanuel on behalf of

13 Plaintiff.

14           MR. TERUYA (via Zoom):  Good afternoon, your

15 Honor.  Kevin Teruya from Quinn Emanuel for Plaintiff as

16 well.

17           MR. MACK (via Zoom):  Afternoon, your Honor.

18 Brian Mack of Quinn Emanuel, also for Plaintiff.

19           THE COURT:  Good afternoon.  One more.

20           MR. KAPGAN (via Zoom):

21           MR. ROSE (via Zoom):  Good afternoon, your Honor.

22 Joseph Rose here on behalf of Defendants.

23           MR. DORE (via Zoom):  Good afternoon, your Honor.

24 Michael Dore on behalf of the Defendants.

25           THE COURT:  Good afternoon to you all.

4

1     All right.  Folks, I have a handful of questions for

2  you all.  Let me -- let me just preview a handful of things

3  for you.  It's -- this is fun.  I have different times.  But

4  going on the clock you can all see, we're just past 2:30.  I

5  intend for us to be done by 3.  So, I'm going to ask you all

6  some questions.  If you want to get time to -- I'm going to

7  ask you all some questions, and I'm going to give you each

8  time to make any presentation that you wish to make about

9  any issue, regardless of whether or not I've asked you a

10  question about it.  The longer you take answering my

11  questions, the less time you have at the end to talk about

12  whatever it is you would like to talk about.

13     So, I think my questions are short and sweet, and you

14  should have plenty of time between you to divide up at the

15  end to -- to make the presentations you wish.  Let me just

16  make abundantly clear I'm not sitting through 200 slides.

17  So, this is just -- just so you have that from the top.

18     All right.  So, I -- I do see from the designations

19  you've given Ms. Salazar-Rodriguez that there -- depending

20  on -- on my questions, it may be different speakers.  So,

21  let me tell you right now that nearly all of my questions

22  are about the antitrust -- the antitrust claims.  So,

23  position yourselves as you need.  I will ask you to go ahead

24  and plan to come to the lecterns for it.

25     I do have one -- I do have one question, well, about

5

1 the UCL -- about one of the UCL claims.  So, just get

2 yourselves ready.  And I'll -- but I'd like to start with

3 the antitrust -- with the antitrust claims.

4      So, sometimes I have questions directed at one party.

5 Sometimes they are a junk bowl.  I'm going to ask the

6 question, and you all let me know what you think because I

7 have a feeling that in the end, the action will be in the --

8 in the interchange between you.

9      So, these -- right, it's Defendants' motion to dismiss.

10 So, let me go ahead and start with Automattic's counsel and

11 just -- and just start with these couple of questions.

12      So, I think I know your answer to this question, but

13 I'm going to ask it anyways.  If I find that WPEngine hasn't

14 adequately pleaded at least one of the Epic Games factors,

15 do I need to reach any of the others?

16           MR. ROSE:  No, your Honor.  As to the

17 aftermarkets, the three alleged aftermarkets, they have to

18 satisfy all the Epic Games factors.  And, so, if you find as

19 to one, that should dispense with the claim.

20           THE COURT:  Mr. Teruya, tell me why you disagree,

21 if you do.  Maybe you don't.

22           MR. TERUYA:  Well, we disagree that the Epic

23 factors should apply for several reasons.  One reason --

24           THE COURT:  That's not my question.  You can --

25 you can make that point during your time.  My question is if

6

1  I find -- if I'm looking at the four Epic -- Epic Game

2  factors and I find that you haven't made out any one of

3  them, do I need to analyze the other three?

4            MR. TERUYA:  No.  If the Court found that the Epic

5  Game factors apply and that we failed to meet one of them,

6  then as to the aftermarkets, I don't think you would need to

7  reach the other elements as to the aftermarkets.

8            THE COURT:  I'm going to -- you are going to get a

9  chance to tell me why you think the Epic Games factors don't

10 apply, but I have one more in the universe where they do.

11    So, here's -- here's -- I have a broader question,

12 which is more that if I -- assume that I conclude that they

13 apply.  And if I find that none of the proposed aftermarkets

14 satisfy the Epic Games factors, what's left of WPEngine's

15 antitrust claims?

16           MR. ROSE:  If that's a question for me, your

17 Honor, there is nothing left of the antitrust claims because

18 the monopolization counts.  Both the actual monopolization

19 and the attempt rely on those aftermarket theories, and then

20 the time claim is also alleged as between two of the

21 aftermarkets.  And, so, without any kind of adequately

22 pleaded antitrust market that meets the requirements for an

23 aftermarket under Epic, there should be no antitrust claims

24 proceeding in this case.

25           THE COURT:  Agree?

7

1    MR. TERUYA:  We -- we don't agree with that.
2 There is a foremarket which is unchallenged, and if we
3 assume for sake of argument the aftermarkets were not well
4 pled, the foremarket is indisputably well pled.  They don't
5 challenge that, and the conduct at issue affects competition
6 in the foremarket, and we've alleged both direct and
7 indirect evidence of power within the foremarket, the Web
8 Content Management System Market.
9    THE COURT:  Let's talk about that because I looked
10 at -- in your complaint, I looked at the allegations about
11 power, and they all seemed to be about power in the
12 aftermarkets.
13    Which paragraphs have power in the foremarket?
14    MR. TERUYA:  Yes, your Honor.  So, with respect to
15 direct evidence -- I'm sorry -- indirect evidence of power
16 in the foremarket that would be FAC first amended complaint,
17 paragraph 204, where we say that more than 64 percent of
18 websites built using a known Web Content Management System
19 are built using WordPress, and we explain why in other
20 allegations that share should be attributed to the
21 Defendants.
22    And with respect to direct evidence, I could direct the
23 Court to slide 14 where we have all of the paragraph
24 citations to where there's direct evidence of power, and
25 that goes to the ability to inflect -- increase prices or

8

1   increase cost or lower quality or exclude competition, and

2   that would be applicable to not only the aftermarkets but

3   also the foremarket.

4       (Pause.)

5           THE COURT:  Say more to me about that because as I

6   -- maybe I'm -- maybe we are not looking at the same

7   paragraphs.  But, as I remember it, those are about in the

8   aftermarkets, not in the foremarket.

9       I hear you -- I hear you saying that because they can

10  affect quality and price and all of these things in the

11  aftermarket, they necessarily can do so in the foremarket,

12  and that doesn't follow -- that tells me that you've made

13  allegations about the aftermarket and not about the

14  foremarket, and I'm not sure why that's a reasonable

15  inference to draw, if that's what you're asking of me.

16          MR. TERUYA:  Well, the -- if there were no

17  aftermarkets, then everyone is participating in the

18  foremarket.  They're all either customers using Web Content

19  Management Systems of different kinds or competitors

20  providing Web Content Management Systems of different kinds

21  or both, you know, using and offering different systems or

22  services in the foremarket.  And, so, anything that would

23  impact the aftermarket would also impact the foremarket.

24          THE COURT:  Do you have any thoughts on this?

25          MR. ROSE:  Yes, your Honor.  So, there are a

9

1  number of issues with counsel's -- WPE's theory here.  The

2  first is just the 64 percent share number, which is just a

3  percentage of websites that use WordPress and, ironically,

4  includes all of WPE's own hosted websites.  So, that is a

5  number that includes both Automattic's customers.  It

6  includes WPE's customers.  It includes every other person in

7  the world that uses WordPress technology, which is, of

8  course, free for anyone to use and is not controlled by

9  anybody.  Anyone can download it.  There's no price

10  associated with it.  And, so, the price for that foremarket

11  participation for WordPress software is zero, and there's no

12  allegation that any Defendant has the ability to raise that

13  price.

14      And, so, market power is share of the Defendant in a

15  relevant product market combined with the ability to raise

16  price above a super competitive level without losing

17  customers to other competitors.  And the 64 percent number

18  that counsel referenced and has alleged in the complaint

19  doesn't match up at all to any of those things.

20          MR. TERUYA:  Your Honor, so, paragraph 204 is the

21  paragraph that talks about in the foremarket direct evidence

22  as well as indirect evidence of power.  And as to why the 64

23  percent should be attributed to the Defendants, the purpose

24  of the inquiry about -- into indirect evidence of power is

25  to ascertain in essence the extent or reach of the

1  Defendants' power.  And, so, typically, that's because those

2  are the sales of the Defendants.  You know, they obviously

3  control the prices of their own products.  But in this case,

4  we've alleged why the reach of Defendants' power is as to

5  the full 64 percent or more, and that's because they have

6  the power through their control of WordPress.org to exclude

7  competition as to anyone within that 64 percent, and we've

8  already seen them do that.  So, the whole point of this

9  exercise, either looking at direct evidence or indirect

10  evidence, is to see is there power, is there the ability to

11  exclude competitors or to increase costs or prices, and

12  we've already seen that, absent the Court's injunction,

13  WPEngine and its customers were barred from access to

14  WordPress.

15          MR. ROSE:  Your --

16          THE COURT:  Go ahead.

17          MR. ROSE:  Your Honor, if I may, there's a lot of

18  fudging going on between WordPress.org and WordPress, and I

19  think it's a really important point for this complaint and

20  for this point that WPE is making.

21      WordPress is software that the complaint acknowledges

22  is open source and free under a general public license.

23  That means that there is no price for WordPress software.

24  Now, counsel talked a few times about wordPress.org, which

25  is a specific website in the WordPress community that is

11

1  owned and controlled by Mr. Mullenweg.

2      Now, there are a lot of allegations in the complaint

3  about access to WordPress.org, but it is not plausibly

4  alleged in this complaint that controlling access to

5  WordPress.org empowers anybody to control a price or

6  distribution of WordPress software.  It is a source of

7  WordPress software.  It is not the only source, and any

8  person in the world could copy it off of WordPress.org or

9  any other website where it is hosted and distribute it

10 freely without anyone being able to stop them from doing

11 that.

12     And, so, it's simply implausible to allege that every

13 WordPress website in the world is controlled by Defendants.

14 In fact, as I mentioned, that 64 percent includes 1.5

15 million websites that WPE itself controls and serves through

16 its customers.

17     And if I might add one additional thought there, your

18 Honor, the -- there's a reason why WPE cannot and does not

19 allege the actual market share of Automattic in this

20 complaint.  You'll notice it doesn't appear anywhere in the

21 complaint, and that's because discovery's going to show

22 this.  WPEngine is actually a -- has a larger share in the

23 WordPress hosting market than Automattic.  This is the

24 ironic instance of a larger company suing a smaller company,

25 alleging that the smaller company engaged in monopolization.

12

1  Now, that's beyond the pleading.  So, I'm not asking the

2  Court to consider that for purposes of the motion to

3  dismiss, but that's why they cannot allege actual market

4  share in this complaint.

5         THE COURT:  All right.  Let me -- let me ask you

6  all a separate question then.

7      So, that may be where I want to leave it with regard to

8  the antitrust pieces.  So, my -- my question for WPEngine's

9  counsel, I just want to ask you all about the specific basis

10  for the UCL claim and ask you all to similarly identify for

11  me relevant paragraphs in the complaint.

12      So, if you need to -- is that still you or do you --

13  does co-counsel --

14         MR. TERUYA:  No.  I'm handling UCL.

15         THE COURT:  Just checking.  All right.

16      So, I'm having trouble lining up the arguments in your

17  opposition with what's alleged in your UCL count.  So, if

18  you could help me just -- I mean, part -- part of what I

19  found difficult to square in the complaint is that you seem

20  to just reincorporate all of the paragraphs and all the

21  claims, which is hard to then know which of the -- which

22  conduct or which pieces you're asserting make up.

23      So, help -- help me by pointing, if you would, please,

24  to the relevant paragraphs in the complaint that specify the

25  basis for your UCL claim.

13

1          MR. TERUYA:  Yes.  So, that would be paragraphs

2    296 through 303.

3          (Pause.)

4          THE COURT:  That, believe it or not, is the extent

5    of my questions for you all.  I do -- actually, I miss --

6    I've misspoken.  There's one question I have for you all,

7    which is I do know that you went to go -- like the parties

8    went to go meet with Judge Beeler at some point, and I know

9    that there's -- I saw on the docket there's an entry about

10   possible follow-up, and I just want to check in with you all

11   about what date, if any, you have next with Judge Beeler.

12         MR. ROSE:  Your Honor, we -- we did have an

13   initial settlement conference with Judge Beeler, and she did

14   invite us to schedule another one.  That has not been

15   calendared yet, and the parties are happy to discuss that.

16   It seems like something you're focused on.  So, we're happy

17   to discuss that and work together to put something on

18   calendar.

19         MS. KASSABIAN:  Just -- just to add to that, Judge

20   Beeler indicated that if she didn't hear sooner, she would

21   follow up with us in November, presumably thinking about the

22   timing of -- of this motion and moving forward with

23   discovery.  But we can certainly follow up with her sooner

24   than that.

25         THE COURT:  Her -- I saw the mention of November

1  or December in her motion (sic), and I took it -- I read the

2  entry to say that it -- to extend an invitation for setting

3  up a particular -- a different -- a different type of

4  meeting, a different type of session with her and that you

5  could do that more quickly and that if not then, to reach

6  out to her to get on her calendar for November or December.

7      I reached out to Judge Beeler yesterday to ask -- to

8  see what dates I might tell you she could do in November or

9  December, and what she shared with me is that she is

10 generally booking in February at this point, but she is also

11 very good about making it work if the parties want to be

12 there.  So, I'm passing that on from her with a little nudge

13 from me, especially since, as you all know, not everything

14 is being -- not everything is subject -- was challenged in

15 the motion to dismiss, right.  Their claims will -- some

16 claims live on.

17     So, having put that -- having put that in your ears,

18 you've got about eight minutes apiece to split at this

19 point.  It's Defendants' motion.  So, Mr. Rose, wherever you

20 care to take me.  It's --

21         MR. ROSE:  Sure.

22         THE COURT:  -- my first --

23         MR. ROSE:  Thank you, your Honor.  I'm going to

24 make just two points about the antitrust claims and then

25 allow my colleague to make a very small handful of points

15

1  about the remaining claims at issue.

2      One is, your Honor, I think market definition is

3  nonnegotiable.  There's a lot of material in WPE's slides

4  saying that they -- they don't have the need to define a

5  relevant product market.  That's just not true, and I think

6  Epic Games, FTC v. Qualcomm, and a whole line of cases

7  confirms that you have to define a relevant product market.

8  Otherwise, you cannot identify any kind of antitrust injury.

9  You can't identify anti-competitive conduct.  You can't

10  identify time.  You can't identify monopolization.

11      One point -- we talked about the market share question

12  and whether market power has been alleged in this case, and

13  my answers to your Honor were focused on that market share

14  issue, which is the indirect evidence.  But I want to say

15  one more point about the direct -- the question of direct

16  evidence.  So, direct evidence is the ability to control

17  price or output of -- in the relevant product market.  And

18  all of the direct evidence alleged in this complaint does

19  not actually match up with any of the markets in which

20  they're supposedly -- those restraints or those -- that

21  conduct supposedly occurred.  The conduct alleged in the

22  complaint are things like a trademark -- a request for a

23  trademark royalty which was never paid.  It was defied by

24  WPEngine when it filed this lawsuit.  That's not a product

25  in any relevant product market.  It's not charged to any

16

1  other customer anywhere, and it just doesn't line up at all

2  to any of the product markets.

3      There also aren't allegations of restricting output

4  that line up with any of the relevant product markets, and

5  that's just another reason why all of the antitrust claims

6  here have to fail.

7          THE COURT:  Can I ask you something about that?

8          MR. ROSE:  Yes, of course.

9          THE COURT:  Because here's just the one point that

10  I do hear them -- that I do hear WPEngine making is that you

11  haven't challenged the market definition of the foremarket,

12  right.  The foremarket is Web Content Management Systems,

13  and at least -- right, there's two components to that, which

14  I'm not sure I actually -- I will tell you I need to go back

15  and look at your papers.  Actually, let me just ask you all.

16  Usually there's a geographical component.  What geography

17  are you all choosing?  Did you choose the United States?

18  And, if so, how does that make sense if it's from the

19  Internet?

20          MR. ROSE:  So, the United States is the alleged

21  geographic market.  I'm not -- I'm not acknowledging that's

22  going to be true, you know, when we go through discovery and

23  actually have proof, but at least as to the motion to

24  dismiss, we're sort of taking that as alleged.  That's not

25  where we're focusing our energy.

17

1     And also in terms of the product market, we're not

2   focusing on our -- our energy on contesting that Web Content

3   Management Systems can be a product market.  Our focus there

4   is on the market power question.

5     So, we're not going to challenge whether that is an

6   alleged antitrust product market.  We are just focusing on

7   the fact that the market share percentages alleged in the

8   complaint have no relationship to the Defendant and don't

9   match up to any of the standards here and also that the so-

10  called direct evidence of market power also doesn't match up

11  because it's not a price -- there's no price for Web Content

12  Management Systems alleged in the complaint and, indeed, the

13  price for WordPress Web Content Management System.  That

14  open source software, the price is zero, and there's no

15  allegation that any Defendant has the ability to raise that

16  price above zero.  In fact, doing so would violate the

17  general public license that WordPress is distributed under

18  in the first place.

19     (Pause.)

20          MR. ROSE:  And I'd like to turn the podium over

21  just for a few brief minutes to my colleague, Mr. Dore.

22          MR. DORE:  Good afternoon, your Honor.

23          THE COURT:  Good afternoon again.

24          MR. DORE:  I'll be quick.  I would like to address

25  very briefly the attempted extortion claim, defamation

18

1  claims and the promissory estoppel claim.  And there are two

2  points I wanted to make to your Honor -- it will take me

3  three minutes to do it -- that I think are crucial for your

4  Honor's consideration of those claims.

5      The first point is that the binding Ninth Circuit and

6  California State Court cases that apply questions of

7  California law here clearly are resolved in the Defendants'

8  favor.  The cases cited by WPEngine in its briefing are all

9  factually distinguishable.  They rely on rationales that

10 have been disapproved by other courts, and oftentimes they

11 don't rely on any rationale at all.

12     The cases that we have cited we believe are dispositive

13 and merit dismissal of the claims.

14     The -- I'll tick through some of those cases that I

15 think are particularly important, and then I'll move to the

16 second point.

17     With respect to the attempted extortion claim, there is

18 no civil attempted extortion claim under California law,

19 period.  That was what was held by <u>Furman</u> (phonetic) and it

20 is what has been endorsed by the <u>Lively v. Wayfarer</u>

21 decision.  Admittedly, that's the Southern District of New

22 York, but it was issued two and a half months ago.  It is

23 going to be published in the Federal Supplement, and it

24 devotes six full pages to an analysis, more than any court

25 in the country ever has addressed this issue.  So, it held

19

1  very clearly that in order to state an attempted extortion

2  claim, the money must be paid.  The demand must be acceded

3  to.  That was not here.  That is not a claim.

4      The other cases that so hold are <u>Francesky v. Baldwin</u>

5  (phonetic), another case cited in our notice of supplemental

6  authorities, and it again makes clear that the <u>Monex</u> case,

7  which is the -- frankly, we would say the wrongly decided

8  tree from which many of the cases cited by the Plaintiffs

9  derive their support.  It walks through in unsparing detail

10 why that case was wrongly decided.  And very quickly, it

11 found -- it relied on damages that were not acceding to the

12 demand, separate damages that could have been brought as

13 other claims.  That's exactly what is the case here.  That

14 is exactly what's reflected in <u>Lively</u> at page 27 of the

15 Court's opinion where Lively and Reynolds said, The gloves

16 are going to come off.  We're going to attack you in the

17 press if you you do not do what we tell you to do.  The

18 demand was not acceded to.  Lively and Reynolds then

19 fulfilled their alleged threat, and the Court said that is

20 not enough.  That is not a claim for attempted extortion.

21 It doesn't exist.

22     Now, with respect to attempted extortion, the second

23 reason why we win is because the claims -- the threats were

24 not wrongful.  They were as evidenced by the <u>Levitt v. Yelp</u>

25 decision, and I would ask the Court to consider the

20

1  <u>Brokerage Concepts</u> decision cited and discussed at length in

2  the <u>Levitt v. Yelp</u> case that's from the Third Circuit.  But

3  it walks through a fact pattern in which there's an HMO

4  network, and the Defendant said, We're not going to let you

5  in unless you pay us and you shift your business from

6  someone over here to us.  And, by the way, the folks that we

7  let into the network, we're freezing them and then auditing

8  them until you pay us.

9       Third Circuit said, That's hard bargaining.  You're

10 allowed to do that.  And the Ninth Circuit endorsed that in

11 ruling in favor of the Defendants in the <u>Levitt v. Yelp</u>

12 case.

13      With respect to defamation, the published Ninth Circuit

14 decisions in <u>Partington v. Bugliosi</u> and in <u>Herring Networks</u>

15 <u>v. Maddow</u> establish definitively that these are -- the

16 claims at issue here reflect hyperbole, rhetorical,

17 inflammatory language that is opinion.  The Ninth Circuit

18 case law demonstrates that these case -- these claims should

19 be dismissed.

20      In further support of that, the <u>Nicosia</u> decision that

21 we cite, as well as the <u>Frolava</u> (phonetic) decision, make

22 clear that in the circumstances where you have a dispute,

23 where there's an adversarial position, the statements being

24 made are more clearly understood as opinion.  So, here, when

25 you look at Mullenweg's allegedly defamatory statements and,

21

1  importantly, the context surrounding them, it is very clear

2  that he is offering his point of view.  He says it's going

3  to be his spiciest word camp presentation ever.  He's

4  talking at the WordCamp presentation about his medical

5  conditions, about "Fern Gully", the movie, about a professor

6  he had.  And, particularly, in the September 25th blog post,

7  he's talking about the threat of litigation from WPEngine,

8  in bold letters.  September 21st blog post, he talks about

9  his mom in the second sentence.  This is very clearly a

10 personal viewpoint being offered.  So, what he does is

11 exactly what <u>Partington</u> said you could do in its published

12 decision by the Ninth Circuit.  He offers the factual basis

13 for his opinion.  He links to and cites to the publicly

14 available websites, and unlike in <u>Flatly</u>, he is not exposing

15 something that no one knows about.  He's not bringing a rape

16 accusation like the Plaintiff did there.  What he's doing is

17 relying on publicly available facts and then offering his

18 opinion.  So, he lays out the facts.  He links to them, and

19 then he offers his hyperbolic rhetorical and figurative

20 opinions thereby.

21      These are not -- when you look at the general context,

22 they're not capable of being understood as true or false.

23 When you look at the specific context, they are clearly

24 rhetorical hyperbole, and they are not capable of being

25 proven true or false.

22

1    The -- and I believe it was the <u>Nicosia</u> (phonetic) case

2 talked about how statements of motivation are not provable

3 as true or false.

4    When you get to the promissory estoppel claim, that

5 one, again, if you focus on the <u>Wozniak</u> case from the

6 California Court of appeal, it cites <u>Murphy v. Twitter</u> as

7 well as the Ninth Circuit's <u>Barnes v. Yahoo</u> decision.

8 Publicly made statements on a website about policy, that's

9 not a promise.  It's got to be a direct one to one promise.

10 That's what it was in <u>Barnes v. Yahoo</u>, and that's what

11 distinguishes the circumstances here from the circumstances

12 in <u>Wozniak</u> -- I'm sorry -- the -- it aligns this with the

13 circumstances in <u>Wozniak</u>, but the Court said that's not a

14 promise.  There is no promissory estoppel claim.

15    Now, the Plaintiffs have cited the <u>Williams</u> case to say

16 that, no, you can have a promise with a caveat and still

17 have promissory estoppel.  That is a vastly different

18 circumstance, your Honor.  If you look at that August

19 decision from 2015 that's cited by the Plaintiff, it implies

20 what is then made abundantly clear in the March 2014

21 decision by the same Court, and if your Honor were so

22 inclined, if you look at Docket 1, Exhibit B, it's got the

23 actual letter.  That letter was sent from the bank to the

24 individual, and it said multiple times this offer.  It

25 defined itself as an offer.  That is wildly different from a

23

1   website that says free access for all, especially when that

2   website --

3           THE COURT:  Mr. Rose (sic), you're over time.  So,

4   wrap it up.

5           MR. DORE:  Sure -- especially when that website

6   includes numerous caveats consistent with what was in the

7   Aviar (phonetic) case, saying, This is not a free for all.

8   We control this, and we can make our subjective decisions

9   about what we allow or don't allow on the platform.  Thank

10  you.

11          THE COURT:  Apologies.  Mr. Dore.

12      Go ahead.

13          MR. TERUYA:  Your Honor, on antitrust, I just

14  wanted to touch back on the share in the foremarket.  You

15  know, we've alleged in paragraph 204 why it is that the

16  share of WordPress in the foremarket is the relevant share.

17  Among other things, we've already seen evidence of exclusion

18  of competitors in that space, the 64 percent.  I mean, I

19  think the Court is presented with actual evidence, factual

20  evidence of that in connection with the preliminary

21  injunction motion papers.

22      Put differently, something happened in that market that

23  is only possible with power, and it happened on our site.

24  So, I heard the argument that within that 64 percent are

25  WPEngine's own sites, but that's -- that's the point is

24

1  those sites were impacted in terms of our ability to

2  continue to compete, WordPressEngine's ability to compete,

3  and that had different kinds of effects.  It's not just

4  limited to price.  Obviously costs went up for WPEngine and

5  its customers, which is the equivalent of an elevation in

6  price.  But there's also disruption in service and a

7  disruption just overall in the market in terms of choices

8  being affected where customers and providers chose to go

9  with WordPress instead of an alternative Web Content

10 Management System in the first instance.  And, so, that's a

11 distortion of the competitive process.  So, there is an

12 effect on competition in the foremarket, which is

13 unchallenged.

14      And I did want to clarify.  I know the Court asked me

15 what paragraphs support the unfair competition law claim,

16 the UCL claim, and I gave the range.  We did incorporate by

17 reference the other counts.  So, I wanted to make clear that

18 we are -- all that's required is the violation of any law or

19 statute.  So, we are relying on the other count as

20 predicates, and I think that was understood because in the

21 briefing, the Defendants alluded to the antitrust claim, for

22 example, which is not specifically called out in the UCL

23 claim as a basis for it.  So, the Lanham Act claims, for

24 example, could provide a basis for the UCL claim.  So,

25 there's multiple independently sufficient bases for that

25

1  claim.

2      And, lastly, with respect to the aftermarkets, I

3  discerned from the Court's questions that the Court had some

4  concerns about the pleading of the aftermarkets, and I was

5  wondering if there were specific questions that the Court

6  had about that.  We thought we had pled all of the factors

7  from Epic, even though we didn't think the Epic factors

8  applied, for multiple reasons.  Nevertheless, we pled

9  switching costs, lack of knowledge of the challenged

10  aftermarket restrictions and inability to -- to accurate

11  life cycle pricing up front as well as, you know, why the

12  different services and products in the relevant aftermarkets

13  are not reasonably interchangeable with each other under

14  traditional principles of market definition, as well as

15  industry recognition of these different aftermarkets.

16      So, I wanted to ask, if I might, whether the Court had

17  some concern about a particular one of those.

18          THE COURT:  So, as I'm sure you've heard judges

19  say to you many times, I ask the questions.  I don't answer

20  them.  So, you'll -- you'll get my order and what I think

21  about what you've submitted so far on that.

22      Yeah, if you have something else, you still have --

23  I'll give you a few more minutes here.

24          MS. KASSABIAN:  Your Honor, we're just responding

25  to Mr. Dore's argument.  He raised attempted extortion and

26

1  defamation.  If we could briefly respond.

2      Regarding attempted extortion, it is -- it is

3  unquestionably a claim.  Let's pull up slide 37, please,

4  sir.  The SDNY's interpretation of California law obviously

5  does not govern here. We've got multiple California cases,

6  including Judge Beeler, who we just spoke about, Judge Alsup

7  in this District both finding unquestionably private rights

8  of action implied.  In Judge Beeler's case, the Timed

9  (phonetic) case, she said it is implied by the restatement

10 of torts as well as California Penal Code 523 and it, of

11 course, furthers the public interest in not having people

12 extort you.

13     We also have two cases, your Honor, the Flatly v.

14 Morrow case, California Supreme Court.  While it was not

15 addressing that specifically, it was ruling on and passing

16 on issues related to an attempted extortion claim

17 specifically in the anti-SLAPP context.  As your Honor noted

18 in the prior case before we were called, judges are not in

19 the habit of issuing advisory opinions.  It's fair to say

20 that Flatly would not have gone to that great length to

21 issue that ruling if, in fact, the underlying attempted

22 extortion claim was not cognizable under California law.

23     We also have the Ninth Circuit in Levitt v. Yelp,

24 again, passing on issues related to a civil claim for

25 attempted extortion and was ruling specifically in that case

27

1    on what constitutes a wrongful threat.  But we can again

2    assume that the Ninth Circuit wasn't wasting its time with

3    an advisory opinion if, in fact, it felt that the underlying

4    attempted extortion claim was not a viable one.

5        I'd also like to pull up slide 42, speaking of the Yelp

6    case, your Honor.  We have on this slide some of the

7    specific extortionate threats.  I think on their face it's

8    obvious that they are wrongful, but we also have the Ninth

9    Circuit telling us that they are.

10       If you look at pages 1133 to 1134 of the Ninth

11   Circuit's decision in Levitt v. Yelp, they apply their two-

12   part test, right.  It's an either/or test.  You can satisfy

13   the first prong or the second prong.

14       As to the first prong, the Court said the Plaintiff

15   there had no preexisting right to have positive reviews

16   appear on the Yelp website.  And, of course, that's correct.

17       In our situation, WPEngine had a preexisting right to

18   be free from someone threatening to destroy their business

19   via nuclear war.

20       The second prong just below that first one, not -- it's

21   not a prong.  to be clear, it's a separate test -- the Court

22   in Yelp said, well, the Plaintiff also doesn't meet the

23   second test.  They don't allege that the advertising that

24   Yelp sold was a valueless sham.  We do allege that.  We

25   allege that the purported trademark license that was the

28

1    excuse for the extortion attempt was, in fact, a sham.  So,

2    we're here on a Rule 12 motion.  We have properly alleged

3    the attempted extortion both as a claim and that the threats

4    at issue were wrongful.

5        With that, I would like to turn it over to my

6    colleague, Mr. Williams, to address Mr. Dore's defamation

7    argument.

8            MR. WILLIAMS:  Good afternoon, your Honor, and I

9    will be brief.  I want to both -- first touch on the anti-

10   SLAPP, which feeds into the defamation claim.  But on the

11   anti-SLAPP, I think the first point is the commercial speech

12   exemption applies here.  You don't even need to reach the

13   rest of the anti-SLAPP analysis.  Defendants do not even

14   meaningfully challenge those elements which we've identified

15   in the complaint that they're met.  They -- and in reply,

16   they barely spend any time at all, and the arguments they

17   make are really unsupported.  They say that it's limited to

18   false advertising cases, but the Norellis (phonetic) from

19   the California Court of Appeal rejects that argument and

20   says it's not limited to false advertising cases, and it

21   applied the commercial speech exemption to statements made

22   on an investor call during a quarterly call.

23       They say that none of the defamatory statements

24   advertised their own services, but that misstates element

25   three of the test, which is whether the statements were made

29

1  for the purpose of promoting their products and services.

2       If you look at the statements -- and we're going to get

3  to that right now, you can see that they were clearly made

4  to promote Defendants' products over those of WPEngine,

5  telling people to switch, move away from WPEngine, and to go

6  to their site where they recommend other products and

7  services, including Pressable and WordPress.com, which are

8  their statements.

9       I want to turn -- they also fail completely to address

10  the public interest element as required by the California

11  supreme Court.  They give two lines in their motion, which

12  it's their burden to establish.  They have not made a prima

13  facie showing that the statements involved a public interest

14  as defined by the California Supreme Court in the <u>Filmon</u>

15  (phonetic) case.

16       Turning specifically to the defamation claims and

17  whether these are fact or opinion, it's important to keep in

18  mind the Ninth Circuit's standard which has said if the

19  statement is capable of two meanings, one defamatory and one

20  not, it has to go to the jury to decide whether it's a fact

21  or an opinion.  And if a reasonable fact finder could

22  disagree whether a statement is an assertion of opinion or

23  fact, it must go to the jury.

24       If you watch the video that Defendants submitted at the

25  U.S. -- the WordCamp U.S. presentation, when he gets -- yes,

30

1 he talked about a lot of things, but when he talks about
2 WordPress, WPEngine not giving back to the community
3 sufficiently, he is stating it in a matter of fact.  He does
4 not say, It's my opinion that they don't do enough.  He goes
5 beyond that, and says they don't give back to the community,
6 and he limits what they say.  He gives objective criteria
7 based on the number of hours that they contribute versus
8 automatic.

9     Had he just said, It's my opinion they don't give back,
10 they might have a -- a closer argument here.  But when you
11 go in and you make assertions of factual matters, indicating
12 that that is all they do, that is false and defamatory.
13 It's not a matter of opinion.  And in our complaint we
14 allege all of the various ways in which WPEngine gives back
15 to the community, and that's described in paragraph 368.

16         THE COURT:  That's -- you're already over.  So,
17 please don't read me a lot of paragraphs now.

18         MR. WILLIAMS:  Okay.  Finally, on the -- the other
19 statements, which are the cheap knockoff, once again, these
20 statements are clearly statements of fact.  As counsel for
21 Defendants admitted, it is the same open source GPL code.
22 Anyone can go download it.  That is exactly what Word --
23 WPEngine provides to its customers.  Yet the title of that
24 document is "WPEngine is not WordPress," and it goes on to
25 say if you use Word -- WPEngine, you're getting a cheap

31

1  knockoff, a hacked-up version.  That is provably false.

2  They try to tie it back to the statement about, Oh, well,

3  it's because they disable revisions, but that's something

4  that Defendants do on their own products, and they've

5  acknowledged that, as we describe in our opposition.  These

6  are statements that can be proven true or false.  And

7  because there's -- if there's any dispute about that, it's

8  an issue that should go to the jury.

9         THE COURT:  Thank you, Mr. Williams.

10         MR. WILLIAMS:  Thank you.

11         THE COURT:  You can have two minutes.

12         MR. DORE:  I swear I'm going to do it.  TiMed is

13  -- relies on the Heziamatsi (phonetic) case, which itself

14  relies on Monex.  It is a decision that inferred a cause of

15  action under 524 that no one else has, and it again springs

16  from Monex.  SNC is a one-page ruling where the Plaintiff --

17  I'm sorry -- the Defendant never appeared.  There was no

18  argument made about whether or not this was a viable claim.

19  So, the one line that Judge Alsup devoted to this issue --

20         THE COURT:  Can you hang on for just one second?

21         MR. DORE:  Sure.

22     (Pause.)

23         THE COURT:  Apologies for the interruption.  We --

24  the computers have decided they like to reboot whenever they

25  like.  So, I just needed to confirm that you're still being

32

1  recorded and so that you all get an accurate and full

2  transcript, and the good news is you're still being

3  recorded.  So, you can -- it's all there.  Pick up wherever

4  you were.  You're ticking through the cases.  Go ahead.

5          MR. DORE:  <u>SNC</u> Defendant never appeared.  <u>Monex</u>,

6  wrongly decided for the reasons established in one of our

7  slides.  The restatement was not adopted with respect to

8  anything but constitutional claims.  That's what the

9  <u>Kurtzman</u> case held.  <u>Monex</u> overlooked that, and <u>TiMed</u>

10 overlooked that when it cited <u>Kurtzman</u>.  <u>Flatly</u>, that was a

11 case exclusively devoted to whether stage one of the anti-

12 SLAPP analysis had been satisfied.  It did not address at

13 all whether, in fact, there was a cognizable claim for

14 attempted extortion.  No cases cited <u>Flatly</u> as the basis for

15 it being a reason to find such a claim.  In fact, cases have

16 made clear that <u>Flatly</u>, as well as <u>Cohen</u>, cited by

17 Plaintiffs, is distinguishable because it simply did not

18 address the issue.

19     <u>Levitt v. Yelp</u>, again, the Court did not address the

20 issue.  None of the cases that do consider and lately have

21 refused to recognize that claim have cited or addressed

22 <u>Levitt v. Yelp</u>.  It did not take this issue on headway, and

23 there's no reason to assume that the Ninth Circuit did,

24 especially when you've got <u>Furman</u>, the California Court of

25 Appeal case that is binding and that held that the money

33

1  needs to go in response to the threat to the Defendant.

2  That didn't happen here, and there is no claim.

3      With respect to slide 42 that counsel presented to your

4  Honor and those text messages, I'd ask the Court to look at

5  those text messages and to consider whether they, in fact,

6  would reflect criminal extortion because that is the

7  argument that is being made here, that there's an implicit

8  right of action consistent with the elements of the criminal

9  extortion statutes.

10     And, so, when Mullenweg is saying, I'm going to present

11  a Q and A, I am going to talk to people, that is not

12  extortion, your Honor.  This is a broadside attack on the

13  First Amendment, purely.  You look at those texts, that is

14  no extortion --

15      (Zoom glitch.)

16          THE COURT:  -- enough hyperbole in all of the

17  pleadings from everyone here.  So, I don't need it right

18  now.

19          MR. DORE:  Well, that's what I was going to say.

20  There are quotations around it.  Nowhere in the complaint is

21  Mullenweg alleged to have said "nuclear war".  Didn't

22  happen.  He refers to nuclear.  He refers to scorched earth.

23  But we have seen over and over again "nuclear war" in

24  quotes.  He didn't say it.  In fact, if your Honor looks at

25  page 24 , lines 14 and 15 of the opposition brief, WPE says

34

1   that it alleges in paragraph 107 that Wu Commerce similarly

2   disables revisions by default.  The complaint doesn't say

3   that.  That allegation is not in the complaint.

4       So, when Mullenweg presented the factual basis, it is

5   not true to say that anyone else disables revisions by

6   default, any hosting provider.  What Mullenweg said is

7   absolutely true.  It has not been alleged to be false, and

8   the allegation that is purportedly quoted in the opposition

9   brief does not exist in the complaint.

10      With respect to defamation, to say that this was not a

11  statement in furtherance of the public interest, your Honor,

12  is not credible.  He made the statement to the WordPress

13  community at the WordCamp.  He was on a YouTube live stream

14  or a Twitch live stream aired on YouTube where you've got

15  machine gun comments from the community behind him

16  responding to what he said.  At the end of his presentation,

17  there's a Q and A.  This was absolutely the public interest.

18  It was absolutely about the broader question of open source.

19  That's what distinguishes all their cases.  LA Cab, that's a

20  phone number.  Med -- Medtronic, there's no general

21  statement about ephedrine and losing weight.  Those are, as

22  reflected in the cases themselves, distinguishable, don't

23  apply here.

24          THE COURT:  All right, Counsel.  I'm going to call

25  time.

35

1          MR. DORE:  Thank you.

2          MR. WILLIAMS:  Thank you, your Honor.

3          THE COURT:  All right, folks.  I'm taking it under

4   submission, and like the folks before you, you will not get

5   a ruling from the bench, but you will get one.

6       Thank you all so much for your time.  Have a good

7   afternoon.

8       (Proceedings adjourned at 3:13 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

1                  CERTIFICATE OF TRANSCRIBER

2

3       I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9       I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14  

15

16          Echo Reporting, Inc., Transcriber

17              Saturday, August 30, 2025

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*