UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WPENGINE, INC.,

        Plaintiff,

    v.

AUTOMATTIC INC., et al.,

        Defendants.

Case No. 24-cv-06917-AMO

**ORDER RE MOTION TO DISMISS**

Re: Dkt. No. 68

    This order assumes familiarity with the facts alleged in the operative complaint, the procedural history of the case, and the arguments advanced in the parties' briefs. Defendants Automattic Inc. and Matthew Charles Mullenweg move to dismiss[1] Counts 1-6, 12-16, and 19-20 and move to partially dismiss Counts 17-18 of Plaintiff WPEngine, Inc.'s amended complaint. They also move to strike, or alternatively dismiss, Counts 9-11 under California's anti-SLAPP statute, California Code of Civil Procedure 425.16. The Court analyzes these claims below, in the sequence the parties address them in the briefing.

**A.     Counts 12-15: Antitrust Claims**

    WPEngine asserts four antitrust claims: Count 12 (monopolization under the Sherman Act, 15 U.S.C. § 2), Count 13 (attempted monopolization under the Sherman Act, 15 U.S.C. § 2),

---

[1] With their opening brief and their reply brief, Defendants submitted a request for judicial notice. Dkt. Nos. 69, 107. WPEngine objected. Dkt. No. 112. Each side filed briefing regarding the requests and the objection. Dkt. Nos. 76, 108, 137. With the exception of Exhibits 5 and 6 to Defendants' supplemental request for judicial notice, the Court **GRANTS** the requests as to the existence of the documents that are the subject of Defendants' requests and to the extent any of those documents provide context for the statements on which Counts 9-11 are based. The requests are otherwise **DENIED**. With respect to Exhibits 5 and 6 Defendants' supplemental request, the Court declines to take judicial notice of these two documents based on WPEngine's representation that the documents do not appear to be authentic copies.

Count 14 (illegal tying under the Sherman Act, 15 U.S.C. § 1), and Count 15 (illegal tying under the California Cartwright Act, Cal. Bus. & Prof. Code § 16700).  First Amended Complaint ("FAC") (Dkt. No. 51) ¶¶ 380-389, ¶¶ 390-399, ¶¶ 400-411, ¶¶ 412-424.  Defendants move to dismiss these claims on the grounds that WPEngine fails to plausibly allege (1) a relevant product market, (2) Defendants' market power, (3) anticompetitive conduct, and (4) unlawful tying.  Motion to Dismiss ("Mot.") (Dkt. No. 68) at 12-19.  The Court first takes up the threshold issue of whether WPEngine has adequately pleaded a relevant market.

> 1. <u>The relevant market</u>

"A threshold step in any antitrust case is to accurately define the relevant market."  *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526, 219 L. Ed. 2d 1204 (2024) (internal quotations and citation omitted).  For purposes of "both Section 1 and Section 2 of the Sherman Act, a relevant market defines 'the field in which meaningful competition is said to exist.' "  *Id.* (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)).  That "definition is essential to any antitrust case because '[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.' "  *Id.* (citing *Ohio v. Am. Express*, 585 U.S. 529, 543 (2018); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (alternations in original)).  In defining a market, " '[t]he principle most fundamental . . . is "cross-elasticity of demand" for certain products or services.' "  *Id.* (citing *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979)).  This concept "refers to the extent to which consumers view two 'products [as] be[ing] reasonably interchangeable' or substitutable for one another."  *Id.* (citing *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).  In the context of an antitrust claim, "[p]roducts or services that are 'reasonably interchangeable' should be considered as being in the same market . . . ."  *Id.* (citing *Kaplan*, 611 F.2d at 291-292; *U.S. v. E.I. Du Pont De Nemours & Co.*, 351 U.S. 377 (1956)).

There are two components to a relevant market: "a geographic component and a product or service component."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023), *cert.*

2

1   *denied*, 144 S. Ct. 681, 217 L. Ed. 2d 382 (2024), and *cert. denied*, 144 S. Ct. 682, 217 L. Ed. 2d

2   382 (2024).  "Courts also consider the 'practical indicia' of a market, including industrial or public

3   recognition of a market as a separate entity or sensitivity to price changes."  *Coronavirus Rep.*, 85

4   F.4th at 955 (citations omitted).  "A relevant market can be an aftermarket in which demand

5   depends entirely upon prior purchases in a foremarket."  *Id.* (citing *Eastman Kodak Co. v. Image

6   *Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d

7   1038, 1048 (9th Cir. 2008)).

8          WPEngine alleges four relevant markets: (1) "a 'foremarket' of multiple brands of web

9   content management systems ('WCMS') (of which WordPress is one), and three derivative

10  aftermarkets (each within the WordPress ecosystem) for market participants who have selected

11  WordPress as their WCMS: (1) web hosting services, (2) custom field plugins, and (3) plugin

12  distribution."  Opposition to Motion to Dismiss ("Opp.") (Dkt. No. 75) at 12 (citing FAC ¶¶ 29-

13  33, ¶¶ 191-252).

14         Defendants argue that WPEngine fails to satisfy the applicable aftermarket pleading

15  requirements.  Mot. at 13-14.  To establish a single-brand aftermarket, WPEngine must show:

16  "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their

17  foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing;

18  (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-

19  definition principles regarding cross-elasticity of demand do not undermine the proposed single-

20  brand market."  *Epic Games*, 67 F.4th at 977 (footnote omitted).  "Where a plaintiff asserts a

21  *Kodak*-style single-brand aftermarket, it bears the burden of 'rebut[ting] the economic

22  presumption that . . . consumers make a knowing choice to restrict their aftermarket options when

23  they decide in the initial (competitive) market to enter a[ ] . . . contract.' "  *Id.* at 978 (quoting

24  *Newcal*, 513 F.3d at 1050) (modifications in original).

25         WPEngine argues that these requirements do not apply because (1) *Epic Games* was a

26  post-trial merits decision that did not address pleading requirements, (2) it has shown "market

27  power by ***direct*** evidence of increased prices, reduced quality, and the like" such that defining a

28  market is not required, and (3) it alleges that "Defendants ***do*** have market power in the

3

foremarket." Opp. at 12 (emphasis in original). WPEngine cites no binding authority permitting it to side-step the *Epic Games* requirements as it suggests, and for this reason, the Court proceeds to apply them here. *See, e.g.*, *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 840 (N.D. Cal. 2024) (finding that *Epic Games* factors did not apply where plaintiffs alleged that Tesla had market power in the electric vehicle market but nonetheless analyzing *Epic Games* factors). Because WPEngine's failure to satisfy any single *Epic Games* factor is fatal,[2] the Court's analysis begins and ends with the first of those factors as discussed below.

The first requirement, that the restrictions in the aftermarket are not generally known, is a "crucial" one. *Epic Games*, 67 F.4th at 979 (quoting *Kodak*, 504 U.S. at 477 n.24). A plaintiff need not "show 'complete ignorance' of a defendant's aftermarket restrictions; it need only show that the restrictions are not 'generally known.' " *Id.* at 979 n.10.

WPEngine argues that "[t]he pertinent unknown restrictions are Defendants reserving the ability to charge fees (particularly extortionate ones) and block access to wordpress.org and, Mullenweg's claimed control of source code and trademarks." Opp. at 13 (citing FAC ¶¶ 28, 248-251). Specifically, WPEngine alleges:

- "When [WPEngine] refused to pay the [licensing] fee, Defendants cut off [WPEngine's] access to many features of WordPress and the WordPress community. Defendants have made clear that if [WPEngine] would just pay the 'licensing fee,' 'all this harm could end.' Defendants are using their purported trademark rights to block [WPEngine] from the WordPress community as a means to extort monopolistic pricing. This conduct demonstrates Defendants' direct use of their trademarks to exclude competition and maintain a monopoly over the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2." FAC ¶ 28 (footnote omitted).

- "Defendants' deception of the market has imposed additional switching costs and entry barriers. For example, Defendants have repeatedly represented that: (1) WordPress is 'for the *free* access for the world'; (2) '*Everyone* is welcome' to WordPress; (3) WordPress 'provides the opportunity for *anyone* to create and share'; (4) WordPress is 'committed to being as *inclusive and accessible as possible*'; and (5) 'wordpress.org offers *free* hosting to *anyone* who wishes to develop a plugin in our directory.' Defendants have also long emphasized the supposedly 'nonprofit' nature of WordPress, including that 'No one' owns

_____

[2] WPEngine, of course, maintains that it need not satisfy any of the *Epic Games* factors here, and that even if they did apply, it meets them. *See* Opp. at 12. Nonetheless, it conceded that if the Court were to find them applicable, the Court need not proceed to address all factors if it found any single factor lacking.

4

associated trademarks, source code, and wordpress.org (the primary means for distributing WordPress plugins), and there is 'no traditional ownership or corporate structure' to manage such items." *Id.* ¶ 248 (emphasis in original).

- "What the market did not and could not know until Mullenweg's recent disclosures and misconduct is that Defendants' representations were materially false and misleading. For example, contrary to Defendants' representations that access to WordPress would be free and open to all forever, Mullenweg has demanded an extortionate 8% purported royalty of [WPEngine] (the opposite of 'free'), commanded similar payments from others, and effectively blocked [WPEngine] and certain of its customers from accessing wordpress.org (the opposite of 'inclusiveness' for 'everyone'). Defendants' representations that WordPress was 'nonprofit' in nature—including that wordpress.org and its associated trademarks and source code were 'fully independent from any company'—were likewise materially false and misleading, as Mullenweg has long controlled WordPress and wordpress.org." *Id.* ¶ 249.

- "By its nature, deception is inherently hidden. The market therefore had no meaningful way to discover Defendants' lies about 'free' and 'open' access or 'nonprofit' control in the face of Defendants' repeated misrepresentations and omissions ***until*** Defendants in September 2024 began—contrary to their earlier representations—publicly demanding extortionate payments and revealed that Mullenweg was the sole owner of wordpress.org. As a result, customers, web hosts, and developers that decided to utilize WordPress prior to September 2024 were not aware, at the time they made those decisions, that Defendants would actually charge for access to WordPress, that Defendants would actually block access from those that Defendants unilaterally deemed threats or otherwise non-compliant, or that Mullenweg did actually control WordPress and wordpress.org. Confirming the reality that the market was deceived and could not uncover Defendants' misrepresentations and omissions, a number of market participants have recently expressed outright surprise at learning the truth, including that Mullenweg ***personally*** owns and controls wordpress.org." *Id.* ¶ 250 (emphasis in original).

- "Defendants' promises of 'free' and 'open' access forever—including to run, change, distribute, and redistribute WordPress software (i.e., WordPress's 'four core freedoms')— enticed customers, web hosts, and developers alike to choose WordPress over competing web content management services. Having then selected WordPress among competing web content management systems, they are all effectively 'locked in' and face substantial switching costs in starting over with a new web content management system. Indeed, the Federal Trade Commission has recognized that such 'open first, closed later' schemes can be anticompetitive and enable 'firms to gain dominance and lock out rivals.' " *Id.* ¶ 251 (footnote omitted).

According to WPEngine, market participants' surprise when these facts came to light bolsters the allegations that the alleged restrictions were unknown. FAC ¶¶ 52-59 (describing alleged deception), ¶¶ 70-82 (alleging lack of knowledge by market participants and detailing online reactions to learning that Mullenweg personally owns and controls wordpress.org).

United States District Court
Northern District of California

Despite WPEngine's contention to the contrary, these allegations do not demonstrate that consumers of WordPress web content management systems lacked awareness that electing to use such a system restricts them to hosting services, plugins, and plugin distribution markets within the WordPress ecosystem.  *See Coronavirus Rep.*, 85 F.4th at 956 (finding prerequisites for a single-product brand market unsatisfied where plaintiffs failed to "demonstrate that iOS end consumers lacked awareness that buying an iPhone constrains which apps would be available to them through the App Store.").  The sole case WPEngine cites in support of its position illustrates this pleading deficiency.  In *Lambrix*, the plaintiffs sufficiently pleaded that consumers were generally unaware that by buying a Tesla, they were "locked-in" to using Tesla-authorized repair shops and service centers.  737 F. Supp. 3d at 835, 842-43.  In that case, the plaintiffs alleged that Tesla led consumers to believe its vehicles require "little to no maintenance, have fewer moving parts, and receive over-the-air software updates[.]"  *Id.* at 843.  Once the actual service needs of the vehicles became known, vehicle owners learned Tesla "restrict[ed] individual shops and car owners from conducting everything but the most minimal repair."  *Id.*  Unlike *Lambrix*, WPEngine's allegations do not establish that consumers choosing WordPress as their web content management system " 'did not knowingly enter a contract' that would lock them into the aftermarkets associated with their foremarket [WordPress product]."  *See id.* at 843 (quoting *Epic Games*, 64 F.4th at 977).  In other words, consumers entering the WordPress ecosystem by electing a WordPress web content management system would know they were locked-in to WordPress aftermarkets.  Mullenweg's purported deception and extortionate acts did not change that fundamental operating principle of the WordPress marketplace.

For these reasons, WPEngine has failed to adequately plead facts satisfying the first requirement for a single-brand aftermarket and has thus failed the threshold step of defining a relevant single-brand aftermarket.  While the failure to adequately plead a relevant market typically ends the analysis, *see Coronavirus Rep.*, 85 F.4th at 957 ("Because the Plaintiffs-Appellants did not define the relevant market, it follows that they could not, and did not, establish that the Defendant-Appellee created an agreement that unreasonably restrained trade, as required for a Section 1 claim.  It also follows that they could not, and did not, establish that the Defendant-

1  Appellee possesses a market share in a relevant market sufficient to constitute monopoly power,

2  nor did they show that there were existing barriers to entry to that market, as required for a Section

3  2 claim."), the Court proceeds to consider whether WPEngine has adequately alleged Defendants'

4  market power in the foremarket, as to which Defendants have raised no pleading challenge.

5          2.        <u>Market power in the foremarket</u>

6       "Monopoly power is the substantial ability to control prices or exclude competition."

7  *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 23-55662, --- F.4th ----, ---- 2025 WL

8  2573045, at *5 (9th Cir. Sept. 5, 2025) (citing *Epic Games*, 67 F.4th at 998; *Grinnell*, 384 U.S.

9  563, 571 (1966)).  Such "power can be shown either directly, through evidence of the exercise of

10  monopoly power, or indirectly, through evidence of a firm's predominant market share."  *Id.*

11  (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Epic Games*, 67

12  F.4th at 998).  WPEngine contends it has adequately pleaded both.  Opp. at 14-15.  The Court

13  addresses each below.

14              ***a.     Direct evidence of market power***

15       "To prove a substantial anticompetitive effect directly, the plaintiff must provide proof of

16  actual detrimental effects [on competition], such as reduced output, increased prices, or decreased

17  quality in the relevant market."  *Epic Games*, 67 F.4th at 983 (internal quotations and citations

18  omitted; modification in original).

19       WPEngine's allegations on this point fall short.  It alleges:

20            There is substantial evidence of Defendants' dominance in the Web
   Content Management Systems Market.  As one example,

21  Defendants have unilaterally sought to increase prices and rivals'
   costs in the form of a demand that [WPEngine] and others pay to

22  license the trademarks that Automattic purports to control.
   Defendants' conduct has hindered [WPEngine's] ability to provide

23  services related to the WordPress web content management system
   (by interfering with [WPEngine's] ability to service its customers)

24  unless [WPEngine] pays the at least 8% purported royalty, which is
   an effective increase in [WPEngine's] costs.  Similarly, Defendants'

25  blocking of [WPEngine] from the wordpress.org portal and servers,
   as well as Defendants' blocking of [WPEngine] customers from

26  accessing wordpress.org resources from their website administrative
   panels, has had, and threatens to have, the effect of excluding

27  [WPEngine] from providing services related to the WordPress
   content management system.  It has caused certain of [WPEngine's]

28  WordPress content management system customers to move (or

threaten to move) to rival providers of services related to the WordPress web content management system. WordPress—which Defendants claim to control—is the largest web content management system: over 43% of all websites on the internet (whether custom-coded, or built using a web content management system) are built using WordPress. And of all websites built using a known web content management system, more than 64% are built using WordPress.

FAC ¶ 204 (footnote omitted).

Allegations of any alleged price increases fail because while Defendants may have demanded a royalty payment that could have resulted in an increase in WPEngine's costs or may have been successful in securing such payment from other competitors, that says nothing about the price for the product in the relevant foremarket. *Cf. CoStar Grp., Inc.,* --- F.4th ----, ----, 2025 WL 2573045, at *7 (finding allegations that defendant raised prices by 300% to 500% sufficient to "create a plausible inference of long-term supracompetitive pricing—an exercise of monopoly power."). Allegations that certain WPEngine customers moved to rival providers are insufficient, as monopoly power is "the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005). Allegations that WPEngine was blocked from accessing WordPress likewise fail, as "[e]ven a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013). And to the extent WPEngine relies on *Kodak* for the proposition that a defendant's ability to drive out competition is direct evidence of market power, in that case, unlike here, Kodak's competitors alleged they "were driven out of business" and that Kodak's conduct resulted in higher service prices and market foreclosure. *See Kodak*, 504 U.S. at 465, 478. Finally, WPEngine's allegations that Defendants' conduct reduced quality are conclusory, and WPEngine does not connect any allegations of reduced quality to the relevant foremarket. *See, e.g.*, FAC ¶¶ 259, 261, 388, 398, 410, 414, 422. WPEngine's current allegations are thus insufficient to plausibly plead monopoly power based on direct evidence. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) ("To prove a substantial anticompetitive effect directly, the plaintiff must provide proof of actual detrimental effects [on competition] such as

1  reduced output, increased prices, or decreased quality in the relevant market.") (internal quotations

2  citation omitted; modification in original).

3                          **b.      *Indirect evidence of market power***

4          "To establish monopoly power through indirect evidence a plaintiff must, with respect to a

5  defined market, show (1) that the defendant owns a dominant share of that market, and (2) that

6  there are significant barriers to entry and . . . that existing competitors lack the capacity to increase

7  their output in the short run." *CoStar Grp., Inc.*, --- F.4th ----, ----, 2025 WL 2573045, at *8

8  (quoting *Rebel Oil*, 51 F.3d at 1434).

9          As to the Web Content Management Systems Market, WPEngine alleges that "64% of

10 websites known to be built using a WCMS used WordPress, and 43% of all websites on the

11 internet use WordPress."  Opp. at 14.  According to WPEngine, because "Defendants claim to

12 control" WordPress, "it is . . . appropriate to attribute those shares to Defendants."  *Id.* (citing FAC

13 ¶ 52, ¶¶ 57-66, ¶ 204).  Even if it were appropriate to do so, these numbers say nothing about

14 Defendants' share of the relevant foremarket.  That is, these alleged percentages are not tethered to

15 those who participate in the proposed Web Content Management Systems Market, which

16 WPEngine defines as "the product market consisting of web content management systems, which

17 are software products that allow for creating, maintaining, controlling, and revising content on a

18 website without prior knowledge of web programming or markup languages.  Examples of web

19 content management systems include Craft CMS, Drupal, Joomla, TYPO3, and WordPress."  FAC

20 ¶ 193.  WPEngine makes no allegations of how much of a market share Defendants maintain vis-

21 à-vis these competitors.  This pleading deficiency is fatal to any theory of market power based on

22 indirect evidence.  *See CoStar Grp., Inc.*, --- F.4th ----, ----, 2025 WL 2573045, at *8 ("To

23 establish monopoly power through indirect evidence a plaintiff must, with respect to a defined

24 market, show . . . that the defendant owns a dominant share of that market . . . .") (internal

25 quotations and citation omitted).

26         For these reasons, the Court **GRANTS** Defendants' motion to dismiss Counts 12-15

27 **WITH LEAVE TO AMEND**.

28

United States District Court
Northern District of California

### B.    Count 16:  Declaratory Judgment of Trademark Misuse

Defendants seek dismissal of WPEngine's sixteenth claim for declaratory judgment of trademark misuse because it is an affirmative defense, not a standalone cause of action.  Mot. at 19.  WPEngine counters that "Defendants cite no authority . . . precluding a standalone declaratory judgment claim for trademark misuse[,]" that "courts permit other trademark defenses to proceed as affirmative declaratory judgment claims[,]" and that "judicial economy favors allowing [the] declaratory claim to proceed."  Opp. at 20-21 (citations omitted).  With no authority from WPEngine that authorizes pleading declaratory judgment of trademark misuse as a standalone cause of action rather than an affirmative defense, the Court **GRANTS** Defendants' motion to dismiss Count 16, without prejudice to WPEngine asserting it as an affirmative defense if appropriate later in this litigation.  *See Loblaw Companies Ltd. v. Azimi*, No. C 00 3591 WHO, 2001 WL 36028016, at *16 (N.D. Cal. Oct. 17, 2001) (dismissing trademark misuse allegations, based on reverse domain name hijacking, because trademark misuse is not an affirmative claim).

### C.    Count 4:  Attempted Extortion

Defendants move to dismiss WPEngine's fourth cause of action for attempted extortion on two grounds.  First, WPEngine cannot state a claim for attempted extortion based on the California Penal Code.  Mot. at 19-22.  Second, WPEngine cannot state a claim for attempted civil extortion based on fraud.  *Id.* at 22-23.  In its opposition, WPEngine indicates that it is not bringing an attempted extortion claim based on fraud.  Opp. at 24.  The Court therefore focuses on whether WPEngine has pleaded a viable attempted extortion claim under the California Penal Code.

California Penal Code Section 524 provides:

> Every person who attempts, by means of any threat, such as is specified in Section 519 of this code, to extort property or other consideration from another is punishable by imprisonment in the county jail not longer than one year or in the state prison or by fine not exceeding ten thousand dollars ($10,000), or by both such fine and imprisonment.

Cal. Penal Code § 524.  Section 519 provides:

> Fear, such as will constitute extortion, may be induced by a threat of any of the following:
> 1. To do an unlawful injury to the person or property of the

1  individual threatened or of a third person.
   2. To accuse the individual threatened, or a relative of his or her, or
2  a member of his or her family, of a crime.
   3. To expose, or to impute to him, her, or them a deformity,
3  disgrace, or crime.
   4. To expose a secret affecting him, her, or them.
4  5. To report his, her, or their immigration status or suspected
   immigration status.

5  Cal. Penal Code § 519.

6        Defendants argue that California Penal Code Section 524 cannot serve as the basis for

7  WPEngine's attempted extortion claim because it does not provide for a private right of action.

8  The Court agrees. *See Franceschi v. Baldwin*, No. B335948, 2025 WL 1528629, at *3 (Cal. Ct.

9  App. May 29, 2025) (rejecting the argument that "the trial court erred by finding no private right

10 of action under Penal Code section 523"); *Tran v. Eat Club, Inc.*, No. H046773, 2020 WL

11 4812634, at *16 (Cal. Ct. App. Aug. 18, 2020) (determining that "lower federal decisions"

12 recognizing "attempted extortion as defined in the Penal Code [a]s a valid civil cause of action in

13 California" "do not accurately reflect this state's law") (citations and footnote omitted); *but see

14 TaiMed Biologics, Inc. v. Numoda Corp.*, No. C 10-03260 LB, 2011 WL 1630041, at *5 (N.D.

15 Cal. Apr. 29, 2011) (finding that "California has long recognized a claim of civil extortion[,]" "at

16 least for purposes of allowing [the plaintiff] to file an amended complaint with the new claim.");

17 *S & C Elec. Co. v. Contreras*, No. C 11-00383 WHA, 2011 WL 673740, at *2 (N.D. Cal. Feb. 17,

18 2011) (granting preliminary injunction in case involving claims for attempted civil extortion and

19 attempted conversion); *see also Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 & n.6 (9th Cir. 2014)

20 (affirming dismissal of claims for civil extortion and attempted civil extortion "without reaching

21 the question of whether California courts recognize a distinct tort of civil extortion"); *Flatley v.

22 Mauro*, 39 Cal. 4th 299, 332-33 & n.16 (2006) (concluding trial court did not err in denying

23 motion to strike where the activity forming the basis of the plaintiff's motion was criminal

24 extortion under Penal Code sections 518, 519, and 523 as a matter of law and, therefore, not

25 constitutionally protected activity for purposes of California's anti-SLAPP statute; "emphasiz[ing]

26 that [the] conclusion that [defendant's] communications constituted criminal extortion as a matter

27 of law are based on the specific and extreme circumstances of th[e] case[,]" which involved threats

28 to publicly accuse the plaintiff of rape and other illegal activity unless he paid the defendant at

United States District Court
Northern District of California

11

1    least $1 million); *Cohen v. Brown*, 173 Cal. App. 4th 302, 318 (2009) (extortion by means of

2    filing a knowingly false State Bar complaint was not protected activity under anti-SLAPP statute).

3         Without binding authority from WPEngine squarely recognizing a civil claim for

4    attempted extortion under California law,[3] the Court **GRANTS** Defendants' motion to dismiss

5    Count 4 **WITHOUT LEAVE TO AMEND**.  *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521

6    F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the

7    complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.")

8    (citation omitted).

9         **D.    Counts 3 and 19:  Computer Fraud and Abuse Act Claims**

10        Defendants seek dismissal of both claims WPEngine asserts under the Computer Fraud and

11   Abuse Act, 18 U.S.C. § 1030 ("CFAA").  "[T]he CFAA was enacted 'primarily to address the

12   growing problem of computer hacking,' such that the en banc Ninth Circuit has favored an

13   interpretation of the statute that 'maintains the CFAA's focus on hacking rather than turning it into

14   a sweeping Internet-policing mandate.' "  *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 129 (N.D.

15   Cal. 2020) (quoting *United States v. Nosal*, 676 F.3d 854, 858 (2012) (en banc)).  The CFAA "is

16   primarily a criminal statute," and should be interpreted "consistently in the criminal and civil

17   contexts."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009) (internal

18   quotations and citations omitted).  Any "ambiguity concerning the ambit of criminal statutes

19   should be resolved in favor of lenity."  *Id.* (internal quotations and citations omitted).

20        WPEngine brings Count 3 under Section 1030(a)(7) and Count 19 under Section

21   1030(a)(5).  FAC ¶¶ 280-282, ¶¶ 450-456.  The Court addresses each claim below.

---

[3] WPEngine contends that "Defendants' narrow focus on Penal Code § 524 ignores common law principles that recognize attempted extortion as an actionable tort, where the victim has suffered harm."  Opp. at 21.  Even so, WPEngine has failed to establish that attempted extortion is an actionable tort as it contends, and to the extent WPEngine faults Defendants for their "narrow focus," that is an unavoidable consequence of WPEngine's failure to specify the legal basis for its claim.  Nonetheless, even if WPEngine had established that it was authorized to bring a claim for attempted extortion, the claim would fail on the merits for the reasons discussed in connection with Count 3.

United States District Court
Northern District of California

1.     <u>Section 1030(a)(7)</u>

Section 1030(a)(7) makes it a crime for anyone to:

> with intent to extort from any person any money or other thing of value, transmit[] in interstate or foreign commerce any communication containing any—
>
> (A) threat to cause damage to a protected computer;
> …
> (C) demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion

18 U.S.C. § 1030(a)(7).

WPEngine alleges Defendants violated "at least" Section 1030(a)(7) "by blocking and interfering with access to wordpress.org's systems[,]" and "threaten[ing] [WPEngine] with 'war' if it did not agree to pay a significant percentage of its gross revenues to Automattic[.]"[4]  FAC ¶¶ 282, 283, 287.  These threats "caused damage to [WPEngine's] computer hosting service and its access to wordpress.org's systems therein." *Id.* ¶ 284.  "Defendants' threats to cause damage to these computer systems, and actual damage thereto, were made with the intent to extort money from [WPEngine], and transmitted in interstate or foreign commerce.  The damage was caused to facilitate the extortion." *Id.* ¶ 285.

As currently pleaded, WPEngine's Section 1030(a)(7) fails.  "[U]nless a person has a preexisting right to be free of the threatened economic harm, threatening economic harm to induce a person to pay for a legitimate service is not extortion." *Levitt*, 765 F.3d at 1130.  WPEngine cannot plausibly allege that it had a preexisting right to access and use Wordpress.org or related trademarks in perpetuity for free.  Indeed, several of its claims in this action seek declaratory relief as to Defendants' trademark rights. *See* FAC ¶¶ 308-316 (seeking declaratory judgment of non-infringement); ¶¶ 317-327 (seeking declaratory judgment of non-dilution), ¶¶ 425-434 (seeking declaratory judgment of trademark misuse).  Because Defendants seek "payment for services that

---

[4] In its opposition, WPEngine appears to rely on the "forcible hijacking of the ACF plugin," though there is no corresponding factual allegation in the paragraphs pertaining to the Section 1030(a)(7) claim. *Compare* Opp. at 24 *with* FAC ¶¶ 280-289.  Accordingly, the Court has not considered the ACF plugin allegations as a basis for Count 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  have some 'objective value,'. . . [they have] a lawful claim to the property obtained" such that

2  their demands for a licensing fee does not constitute extortionate conduct sufficient to support a

3  Section 1030(a)(7) claim. *See Levitt*, 765 F.3d at 1131 (internal quotations and citation omitted).

4  Nor are Defendants' threats of war or suspension of access. *See id.* at 1131-32 (endorsing Seventh

5  Circuit's conclusion that " 'hard bargaining does not amount to extortion' ").[5]

6      Accordingly, Defendants' motion to dismiss Count 3 is **GRANTED WITH LEAVE TO**

7  **AMEND**.

8              2.    Section 1030(a)(5)

9      An individual violates Section 1030(a)(5) when they:

10          (A) knowingly cause[] the transmission of a program, information,
            code, or command, and as a result of such conduct, intentionally

11          causes damage without authorization, to a protected computer;
            (B) intentionally access[] a protected computer without

12          authorization, and as a result of such conduct, recklessly causes
            damage; or

13          (C) intentionally access[] a protected computer without
            authorization, and as a result of such conduct, causes damage and

14          loss.

15  18 U.S.C. § 1030(a)(5).

16      Defendants argue that WPEngine's allegations are insufficient to establish the intent or

17  recklessness requirements of subsections (A)-(B) or the "without authorization" element under

18  subsections (B) and (C).[6]  Mot. at 24-27.  Not so.

19      WPEngine alleges Defendants violated "at least" Section 1030(a)(5) by: "covertly

20  installing their SCF plugin onto the systems of [WPEngine's] customers to replace the ACF plugin

21  . . . without authorization of [WPEngine] and [WPEngine's] customers."  FAC ¶¶ 452, 454.

22  WPEngine also alleges that Defendants intentionally engaged in this conduct: "On September 25,

23  2024, Mullenweg wrote an article on wordpress.org, stating 'WP Engine is banned from

24  _____

25  [5] Whether this conduct amounts to interference for purposes of Counts 1 and 2 is another matter,
    which is not currently before the Court.

26  [6] In reply, Defendants argue for the first time that the Section 1030(a)(5) claim fails for lack of

27  damage.  Reply at 15.  The Court does not consider arguments raised for the first time in reply.
    *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("[A]rguments raised for the first time

28  in a reply brief are waived.") (citation omitted).

14

1   WordPress.org.' " *Id.* ¶ 115.  In that post, "Mullenweg wrote that 'pending their legal claims and

2   litigation against WordPress.org, WP Engine no longer has free access to WordPress.org's

3   resources.' " *Id.*  While "[t]he claim that Mullenweg terminated [WPEngine's] access to

4   wordpress.org because [WPEngine] had filed a lawsuit against wordpress.org was false (there was

5   no lawsuit at that time), . . . the post confirmed to [WPEngine] and the WordPress community that

6   it had been Mullenweg who caused [WPEngine's] inability to update its plugins through his

7   exercise of his self-described control over wordpress.org." *Id.*; *see also id.* ¶ 162 (incorporating

8   post stating, "[i]f WPEngine dropped its lawsuits, apologized, and got in good standing with its

9   trademark use, you are welcome to have access to the plugin directory listing.").

10       In addition, WPEngine alleges Defendants "co-opted the ACF plugin's unique identifier on

11   wordpress.org and published a new plugin to ACF users that they mislabeled as 'a new version of

12   Advanced Custom Fields.' " *Id.* ¶ 159.  Defendants thus "secretly foisted their own plugin under

13   their sole control onto the computers of [WPEngine's] customers, replacing ACF with SCF

14   without the customers' consent or even knowledge as part of an 'update' that misleadingly

15   appeared to originate from [WPEngine], further jeopardizing the security of [WPEngine's]

16   customers and the availability and integrity of [WPEngine's] ACF plugin." *Id.*  These allegations

17   are sufficient to plausibly plead that Defendants acted intentionally for purposes of Section

18   1030(a)(5)(A).  *Cf. Margolis v. Apple Inc.*, 743 F. Supp. 3d 1124, 1134 (N.D. Cal. 2024)

19   (concluding that plaintiffs did not plausibly allege that Apple's purpose in making iOS 15

20   available to iPhone 7 users was to damage their devices where it was equally plausible that Apple

21   considered the benefits to outweigh the risk of any loss of performance).

22       With respect to recklessness, WPEngine alleges that "[t]hrough covertly installing their

23   SCF plugin onto the systems of  [WPEngine's] customers to replace the ACF plugin, Defendants

24   intentionally accessed and continue to access 'protected computers' behind the systems of

25   [WPEngine's] customers, without authorization of [WPEngine] and [WPEngine's] customers, and

26   knowingly caused the transmission of a program, information, code and commands onto such

27   'protected computers,' resulting in and recklessly causing damage to these 'protected computers'

28   and [WPEngine]."  FAC ¶ 452.  While the recklessness allegation is conclusory on its own, when

United States District Court
Northern District of California

viewed in the light most favorable to WPEngine in the context of the other allegations in the amended complaint, the reasonable inference to draw is that Defendants acted with a conscious disregard for the damage that would ensue if they hijacked the ACF plugin in the way WPEngine alleges.  *See Tagged, Inc. v. Does 1 through 10*, No. C 09-01713 WHA, 2010 WL 370331, at *9 (N.D. Cal. Jan. 25, 2010) (finding allegations that "defendant intentionally accessed Tagged's network and computers to create multiple fraudulent accounts without authorization and sent spam emails and recklessly caused damage to Tagged" sufficient to state a claim for reckless unauthorized access under Section 1030(a)(5)(B)).  The Court therefore finds that WPEngine has sufficiently pleaded intent and recklessness for purposes of its Section 1030(a)(5) claim.

Defendants next argue WPEngine has not sufficiently pleaded that Defendants acted without authorization when they covertly installed the SCF plugin to replace the ACF plugin on the computers of third parties.  Mot. at 25-26.  Defendants are wrong.

WPEngine alleges the following facts plausibly establishing that Defendants acted without authorization:

- "Defendants forcibly took control of the [ACF] plugin and updates thereto . . . ." FAC ¶ 153.

- "Defendants confusingly renamed [WPEngine's] ACF plugin to 'Secure Custom Fields' ('SCF'), and tried to portray the plugin as if no coup had occurred. [WPEngine] customers or potential customers visiting the same URL at https://wordpress.org/plugins/advanced-custom-fields as they always had would see virtually the same content ACF used—the same headers, the same number of sentences under them, virtually the same words.  They would see the same number of 'active installations'—'2+ million.'  They would see the same WordPress version (6.0 or higher), the same number of languages available (32), the same number of tags, including the 'acf' tag.  They would see that there were over 1100 five star ACF reviews and would see the content of these reviews, many of which explicitly referenced ACF.   They would see the current version of a plugin that started with 6.3—just as [WPEngine's] ACF had before Defendants' seizure of the ACF webpage." *Id.* ¶ 154.

- "Mullenweg switched many ACF users to his SCF plugin without the users' consent or knowledge.  On October 12, 2024, ACF users began receiving an 'update now' prompt on their WordPress administrative dashboards. . .  [T]he 'update now' prompt was listed below the author of the plugin 'WP Engine,' which made it appear to users that this was an update of the ACF plugin coming from 'WP Engine[.]' " *Id.* ¶ 155.

16

- "Many WordPress users have settings that update plugins automatically. These users would have had Secured Custom Fields installed on their servers without even clicking any buttons." *Id.* ¶ 156.

- "After 'updating,' users can no longer click in the plugin to upgrade to [WPEngine's] premium ACF product. If Defendants had wanted to offer a competing product, they could have done so using a new webpage with a different URL that did not misdirect and mislead customers looking for ACF. They did not do that. Instead, they held their SCF plugin out to the world as just a routine update of the ACF plugin, under a URL that incorporated ACF's well recognized name." *Id.* ¶ 157.

- "[T]he SCF plugin listing (which is located at the ACF URL) confusingly displays all of the download counts and user reviews for the ACF plugin written over a period of 12 years, including ACF's 4.5/5 star rating, falsely suggesting to consumers that SCF had been downloaded more than two million times and that consumers had reviewed SCF, yielding a 4.5 average of review scores[.]" *Id.* ¶ 158.

- "Defendants' actions therefore co-opted the ACF plugin's unique identifier on wordpress.org and published a new plugin to ACF users that they mislabeled as 'a new version of Advanced Custom Fields.' As a result, Defendants secretly foisted their own plugin under their sole control onto the computers of [WPEngine's] customers, replacing ACF with SCF without the customers' consent or even knowledge as part of an 'update' that misleadingly appeared to originate from [WPEngine], further jeopardizing the security of [WPEngine's] customers and the availability and integrity of [WPEngine's] ACF plugin." *Id.* ¶ 159.

These allegations are sufficient to plausibly plead that Defendants acted without authorization within the meaning of Section 1030(a)(5). *Cf. In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 452-53 (N.D. Cal. 2018), *on reconsideration in part*, 386 F. Supp. 3d 1155 (N.D. Cal. 2019) (dismissing Section 1030(a)(5)(C) arising from an Apple iPhone update where "Plaintiffs d[id] not, for example, allege that Apple posed as someone else or blatantly misdescribed the nature of the iOS updates in order to gain access to Plaintiffs' iPhones. Rather, Apple's message stated that the updates 'include[d] bug fixes and improve[d] the security of [the] iPhone' or 'include[d] bug fixes and improvements,' and Plaintiffs allowed the update.") (modifications in original).[7]

---

[7] Defendants also argue that applying the CFAA as WPEngine urges would unduly expand the scope of the CFAA's reach. Mot. at 26. In light of the allegations plausibly establishing a

1    Accordingly, Defendants' motion to dismiss Count 19 is **DENIED**.

2    **E.    Count 5:  UCL**

3    The UCL proscribes any "unlawful, unfair or fraudulent business act or practice." Cal.

4    Bus. & Prof. Code § 17200.  WPEngine brings its UCL claim under the statute's unlawful and

5    unfair prongs.  FAC ¶¶ 301-302.

6    Defendants seek dismissal of the UCL unlawful prong claim on the ground that WPEngine

7    fails to plead a predicate violation.  Mot. at 31.  As discussed in this order, WPEngine has pleaded

8    at least a viable claim under Section 1030(a)(5), and its claims under the Lanham Act, FAC

9    ¶¶ 435-442, ¶¶ 443-449, remain live, as they are not challenged in the pending motion to dismiss.

10    Dismissal is therefore not warranted for lack of a predicate violation.  *See In re iPhone*

11    *Application Litig.*, 844 F. Supp. 2d 1040, 1072 (N.D. Cal. 2012) (denying motion to dismiss UCL

12    claim under unlawful prong where surviving CLRA claim could serve as a predicate violation).

13    Defendants seek dismissal of the UCL unfair prong claim for lack of allegations regarding

14    the impact of Defendants' alleged conduct on competition and because the failure to plead a viable

15    antitrust claim necessarily precludes a claim under the UCL's unfair prong.  Mot. at 27-28.  As

16    discussed above, Plaintiffs have alleged viable claims that supply the necessary predicate

17    violations to support a UCL claim under the unlawful prong.  These allegations "are also sufficient

18    to state a claim under the 'intentionally broad' 'unfair' prong of the UCL."  *See In re Meta Pixel*

19    *Tax Filing Cases*, 724 F. Supp. 3d 987, 1025 (N.D. Cal. 2024) (internal quotations and citations

20    omitted).

21    **F.    Counts 9-11:  Libel, Trade Libel, and Slander**

22    Defendants move to strike, or alternatively, dismiss Counts 9 (libel), 10 (trade libel), and

23    11 (slander) under California's anti-SLAPP statute.  Mot. at 28-34.  The statute permits a

24    defendant to "bring a special motion to strike a cause of action arising from constitutionally

25    protected speech or petitioning activity."  *Barry v. State Bar of Cal.*, 2 Cal. 5th 318, 320 (2017)

26    (citing Cal. Code Civ. Pro. § 425.16(b)(1)).  California courts generally apply a two-step process

27

28    violation of Section 1030(a)(5), that argument is best taken up after development of the factual
     record.

United States District Court
Northern District of California

1    for analyzing an anti-SLAPP motion.  *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir.

2    2010).  "At the first step, the moving defendant bears the burden of identifying all allegations of

3    protected activity, and the claims for relief supported by them."  *Baral v. Schnitt*, 1 Cal. 5th 376,

4    396 (2016).  "Protected activity" is "any act . . . in furtherance of [a] person's right of petition or

5    free speech under the United States Constitution or the California Constitution in connection with

6    a public issue," including "any written or oral statement or writing made in a place open to the

7    public or a public forum in connection with an issue of public interest."  Cal. Code Civ. Proc.

8    § 425.16(b)(1), (e)(3).  Only "[i]f the court determines that relief is sought based on allegations

9    arising from activity protected by the statute" is the second step reached.  *Baral*, 1 Cal. 5th at 381.

10   At the second step, "the burden shifts to the plaintiff to demonstrate the merit of the claim by

11   establishing a probability of success."  *Id.* at 384.

1.    Protected Activity

12         The statements WPEngine challenges in its ninth cause of action for libel and its tenth

13   cause of action for trade libel are:

- "On or about September 21, 2024, Mullenweg, on behalf of Automattic, posted the following statement on the 'News' section of the publicly accessible website wordpress.org: 'What WP Engine gives you is not WordPress, it's something that they've chopped up, hacked, butchered to look like WordPress, but actually they're giving you a cheap knock-off and charging you more for it' (hereinafter 'Defamatory Statement 1'). "  FAC ¶ 329; *see also id.* ¶ 344.

- "On or about September 25, 2024, Mullenweg, on behalf of Automattic, also posted the following statement on the 'News' section of wordpress.org: 'WP Engine is free to offer their hacked up, bastardized simulacra of WordPress's GPL code to their customers, and they can experience WordPress as WP Engine envisions it, with them getting all of the profits and providing all of the services' (hereinafter 'Defamatory Statement 2,' and together with Defamatory Statement 1, the 'Defamatory Statements')."  *Id.* ¶ 330; *see also id.* ¶ 345.

         WPEngine challenges two statements in its eleventh cause of action for slander.  The first

was made during Mullenweg's "keynote address at the WordCamp US Convention to hundreds of

attendees from the WordPress community[,]" which "was simultaneously livestreamed to

countless others in the WordPress community via YouTube."  *Id.* ¶ 361.  As alleged in the

amended complaint:

19

1

2

> In the keynote address, Mullenweg stated that [WPEngine] was one of a number of "parasitic entities" who "just want to feed off" WordPress "without giving anything back" (hereinafter "Slanderous Statement 1"). Mullenweg also stated, with respect to [WPEngine], that it aims to "squeeze every last bit out of the business and for open source communities, it can be fatal."

3

4

5   FAC ¶ 365. The second statement was made during an interview that was livestreamed online.

6   *Id.* ¶¶ 46, 105, 111. WPEngine alleges the following facts about the second statement:

7

> Similarly, in a September 26, 2024 interview titled "Matt Talks About WordPress Situation," Mullenweg, on behalf of Automattic, stated with regard to WPE: "they've built a half a billion dollar business, they've given nothing back to WordPress, they were contributing 40 hours per week. So call that 100 grand per year. They sponsored WordCamp for 75 grand, we allowed them to be a top sponsor, by the way, lots of people want those spots" (hereinafter "Slanderous Statement 2," and together with Slanderous Statement 1, the "Slanderous Statements").

8

9

10

11

12   *Id.* ¶ 366.

13       The above statements constitute protected activity within the meaning of the anti-SLAPP

14   statute. They were made in a place open to the public or a public forum. *See Peak Health Ctr. v.*

15   *Dorfman*, No. 19-CV-04145-VKD, 2020 WL 887935, at *10 (N.D. Cal. Feb. 24, 2020) (finding "a

16   publicly accessible website that purports to provide independent news about the cannabis and

17   hemp industries" to be a public forum); *Muddy Waters, LLC v. Superior Ct.*, 62 Cal. App. 5th 905,

18   917 (2021) ("Internet postings on websites that are open and free to anyone who wants to read the

19   messages and accessible free of charge to any member of the public satisfies the public forum

20   requirement of section 425.16.") (internal quotations and citations omitted). And, given the

21   positions WPEngine has taken in this litigation to date, there is no credible argument that these

22   statements do not pertain to an issue of public interest. *See* Dkt. No. 17 at 31 (arguing that public

23   interest weighed in favor of preliminary injunctive relief because WPEngine customers and

24   services providers in the WordPress community other than WPEngine were at risk of irreparable

25   harm); Dkt. No. at 18 ("[WPEngine's] Motion demonstrates that the public interest also strongly

26   favors granting relief, because Defendants have unleashed chaos in the WordPress community,

27   imposing costs and instilling fears in users and developers alike."); FAC ¶ 303 ("Defendants'

28   unlawful and unfair business practices not only harm [WPEngine] and its employees, but also

United States District Court
Northern District of California

20

1  threaten the entire WordPress community.  [WPEngine] thus brings this [UCL] claim to remedy

2  an important right affecting the public interest and seeks to confer on the public a significant

3  benefit."); ¶ 185 ("Over 43% of websites are built on WordPress."); Prayer for Relief ¶ 15

4  (seeking "a finding that Plaintiff has remedied an important right affecting the public interest and

5  is entitled to attorney fees under Cal. Civ. Proc. Code § 1021.5").  Thus, the Court finds that

6  Defendants have made a threshold showing that Counts 9-11 arise from protected activity within

7  the meaning of the anti-SLAPP statute.

                            2.        Probability of Success

8

9        With step one satisfied, the burden now shifts to WPEngine to demonstrate the merit of its

10  claims.  *See Baral*, 1 Cal. 5th at 384.  Where, as here, "an anti-SLAPP motion to strike challenges

11  only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil

12  Procedure 12(b)(6) standard and consider whether a claim is properly stated."  *Planned*

13  *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*,

14  897 F.3d 1224 (9th Cir. 2018).  "The district court must grant the defendant's motion and dismiss

15  the complaint if the plaintiff presents an insufficient legal basis for the claims or no reasonable

16  jury could find for the plaintiff."  *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir.

17  2021) (internal quotations and citation omitted).

18        With this framework in mind, the Court turns to the elements of Counts 9-11.  Under

19  California law, to state a prima facie case of defamation, WPEngine must show (1) "the

20  intentional publication" of (2) "a statement of fact" that (3) is "false" (4) "unprivileged," and

21  (5) "has a natural tendency to injure or which causes special damage."  *Smith v. Maldonado*, 72

22  Cal. App. 4th 637, 645 (1999).  "A cause of action for trade libel . . . requires (at a minimum):

23  (1) a publication; (2) which induces others not to deal with plaintiff; and (3) special damages."

24  *Elec. Frontier Found. v. Glob. Equity Mgmt. (SA) Pty Ltd.*, 290 F. Supp. 3d 923, 945 (N.D. Cal.

25  2017) (internal quotations and citation omitted).  "Trade libel also requires proof of actual malice."

26  *Id.* (citing *Melaleuca, Inc. v. Clark*, 66 Cal. App. 4th 1344, 1350 (1998)).  Defendants argue that

27  WPEngine has not pleaded an actionable statement of fact nor adequately pleaded the special

28  damages and actual malice elements of its trade libel claim.  Mot. at 29-34.  The Court addresses

United States District Court<br>Northern District of California

each issue in turn.

### *a.    Statement of Fact*

"[T]the threshold question in defamation suits is not whether a statement might be labeled opinion, but rather whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990) (internal quotations, citation, and modifications omitted). "To determine whether a statement implies a factual assertion, [courts] examine the totality of the circumstances in which it was made," taking into consideration (1) "the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work[,]" (2) "the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation[,]" (3) "whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (citations omitted).

Taking WPEngine's allegations as true, a reasonable juror could conclude that the alleged Defamatory and Slanderous Statements are facts or that they are opinions. As such, resolution of that question as a matter of law on a motion to dismiss is improper at this stage. *See Manufactured Home Communities, Inc. v. Cnty. of San Diego*, 544 F.3d 959, 963 (9th Cir. 2008) ("Ordinarily, this context-bound determination is a question of law for the court, but if the challenged statement or statements are reasonably susceptible of an interpretation which implies a provably false assertion of fact, then they may be considered by the jury to determine whether such an interpretation was in fact conveyed.") (internal quotations and citation omitted).

Accordingly, the Defendants' motion to strike or dismiss WPEngine's defamation claims for lack of an actionable statement of fact is **DENIED**.

### *b.    Special Damages and Actual Malice*

"To allege special damages, a plaintiff must identify[ ] customers or transactions lost as a result of disparagement . . . ." *Elec. Frontier Found.*, 290 F. Supp. 3d at 946 (internal quotations and citation omitted; modification in original). "A statement is made with actual malice when the

United States District Court
Northern District of California

1    publisher either knows the statement is false or has some serious subjective doubt about the truth

2    of the statement." *Id.*

3         WPEngine has adequately alleged special damages. WPEngine alleges that Defamatory

4    Statements 1 and 2 "played a material and substantial part in inducing specific existing

5    [WPEngine] customers to stop purchasing [WPEngine's] platform for WordPress websites.

6    Similarly, these statements played a material and substantial part in inducing specific [WPEngine]

7    customers that otherwise would have purchased [WPEngine's] platform not to do so." FAC ¶

8    356; *see also id.* ¶¶ 168-171 (referring to "various" but unnamed WPEngine customers). While

9    these allegations are perhaps thin, and WPEngine offers no case law supporting its position that

10    they are sufficient, Defendants have failed to counter WPEngine's points in reply. Accordingly,

11    the Court finds special damages sufficiently pleaded at this stage. *Cf. Isuzu Motors Ltd. v.*

12    *Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1047 (C.D. Cal. 1998) (finding allegations

13    that plaintiff "suffered and continue[d] to suffer special damages from the loss of revenue from

14    wholesale and retail sales of" its vehicles insufficient to plead special damages).

15         WPEngine has also adequately alleged that Defendants made Statements 1 and 2 knowing

16    they were false:

17           At the time Mullenweg and Automattic made Defamatory
       Statements 1 and 2, they knew these statements were false or at the
18           very least entertained serious doubts as to their truth. Indeed,
       Mullenweg and Automattic knew that (i) [WPEngine's] WordPress
19           installations are identical to the wordpress.org ZIP file which
       defines WordPress and (ii) [WPEngine's] services use the identical
20           WordPress GPL code that everyone else does. Mullenweg and
       Automattic also knew [WPEngine] is not misleading and deceiving
21           its customers and consumers by delivering "something that
       [WPEngine] chopped up, hacked, butchered to look like WordPress"
22           but "is not WordPress." Further, Mullenweg and Automattic knew
       [WPEngine] is not a company that deals in "cheap knock off[s]" or a
23           "bastardized simulacra of WordPress's GPL code."

24    FAC ¶ 339. These non-conclusory allegations are sufficient to plead actual malice. *See Manzari*

25    *v. Associated Newspapers Ltd.*, 830 F.3d 881, 892 (9th Cir. 2016) (defining malice as "knowledge

26    of falsity or reckless disregard for the truth.").

27         Accordingly, Defendants' motion to strike or dismiss WPEngine's trade libel claim for

28

1    lack of allegations of special damages and actual malice is **DENIED**.[8]

2    **G.    Count 6: Promissory Estoppel**

3    Defendants move to dismiss WPEngine's sixth cause of action for promissory estoppel.

4    Mot. at 34-37. The elements of a promissory estoppel claim under California law are "(1) a

5    promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is

6    made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the

7    estoppel must be injured by his reliance." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777,

8    792 (9th Cir. 2012) (citation omitted).

9    In its opposition, WPEngine grounds its promissory estoppel claim on the following:

- "Everyone is welcome" in the WordPress community. *Id.* ¶ 84.

- "Defendants describe their commitment to open source, which has led it to adopt 'four core freedoms' related to its product offerings: (1) 'freedom to run [the software] for any purpose'; (2) freedom to 'change [the software] make it do what you wish'; (3) 'freedom to redistribute' the software; and (4) 'freedom to distribute copies of your modified versions to others.' " *Id.*

- "[W]ordpress.org offers free hosting to anyone who wishes to develop a plugin in our directory." *Id.* ¶ 86.

- "If we find no issues with the security, documentation, or presentation, your plugin will be approved." *Id.* ¶ 87.

- "What's important is that [] longer than I'm alive, longer than Automattic is alive, longer than any of us are alive, there is something that holds the WordPress code and trademark for the free access for the world." *Id.* ¶ 88.

- "WordPress will forever be an open platform that encourages third-party developers to build WordPress plugins and themes to enhance the functionality of WordPress." *Id.* ¶ 306.

23    The representations currently pleaded in paragraphs 86 and 87 support a viable promissory

24    estoppel claim at this stage.[9] *See Sateriale*, 697 F.3d at 792 (finding promise that if consumers

---

[8] Having found that WPEngine has established a probability of success on the merits of Counts 9-11, the Court does not separately address WPEngine's argument that Defendants' anti-SLAPP motion fails due to the commercial speech exemption. *See* Opp. at 29-30.

[9] Insofar as Defendants argue that the conditions accompanying the actionable promises undermines any contention that WPEngine's reliance on those promises was reasonable, *see* Mot.

24

United States District Court
Northern District of California

"saved C-Notes and redeemed them for rewards merchandise in accordance with the catalog, RJR would provide the merchandise" was clear and unambiguous); *Williams v. Chase Bank/JP Morgan, N.A.*, No. 14-cv-02228-JCS, 2015 WL 1843951, at *8 (N.D. Cal. Apr. 8, 2015) (finding letter from Chase regarding a possible short sale of plaintiff's home, though conditioned upon Chase agreeing to certain terms, sufficiently definite to support a promissory estoppel claim); *cf. Wozniak v. YouTube, LLC*, 100 Cal. App. 5th 893, 920 (2024), *as modified on denial of reh'g* (Apr. 2, 2024) (promissory estoppel claim based on general policies or statements, rather than specific promises, did not survive section 230 immunity).

However, the remaining promises, as pleaded in paragraphs 84, 88, and 306, are too "vague, general or of indeterminate application" to support a promissory estoppel claim. *See Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 446 (9th Cir. 1992) (application instructions including "[a]ny training, education, and/or job experience you possess that will benefit the industry" among the list of criteria for consideration did not constitute a promise that previous industry experience would be the determinative factor); *see also Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1017 (9th Cir.), *opinion amended on denial of reh'g*, 352 F.3d 367 (9th Cir. 2003) (finding representations about a forthcoming product, including a commitment to development and new features to be released, not definite enough to be enforceable); *Thanh Nguyen v. PennyMac Loan Servs.*, LLC, No. SACV 12-01574-CJC, 2012 WL 6062742, at *7 (C.D. Cal. Dec. 5, 2012) (finding allegations that Defendants promised to "work with" plaintiff on a home loan modification too vague and general to support a promissory estoppel claim).

Accordingly, Defendants' motion to dismiss WPEngine's Count 6 is **GRANTED IN PART AND DENIED IN PART**.

### H.    Counts 1-2: Intentional Interference with Prospective Economic Relations

Defendants move to dismiss WPEngine's first cause of action for intentional interference

---

at 37, that issue is not suitable for decision at this juncture. *See Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 317-18 (9th Cir. 1996) (affirming grant of summary judgment on promissory estoppel claim where uncontradicted facts established that reliance was unreasonable as a matter of law).

with contractual relations and its second cause of action for intentional interference with prospective economic relations.  Mot. at 37-38.  They argue that WPEngine cannot satisfy the requirement that Defendants' conduct " 'was wrongful by some legal measure other than the fact of interference itself.' "  Mot. at 37-38 (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 751 (Cal. 1995)).  According to Defendants, this is fatal to WPEngine's claim for intentional interference with prospective economic relations, and to the extent based on at-will contracts, it is also fatal to WPEngine's claim for intentional interference with contractual relations.  Mot. at 37-38.  "An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1109 (9th Cir. 2007) (internal quotations, citations, and modification omitted).  WPEngine argues that it "properly alleges multiple viable claims that independently satisfy the wrongful act requirement."  Opp. at 38.  This is enough to preclude dismissal of Counts 1 and 2.  *See id.* at 1110.  Accordingly, Defendants' motion to dismiss these counts is **DENIED**.

### I.    Count 20: Unjust Enrichment

Defendants move to dismiss WPEngine's twentieth cause of action for unjust enrichment.  Mot. at 38-39.  "To allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense."  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) (citation omitted).

WPEngine has alleged sufficient facts to state a plausible claim for relief under the above elements.  Specifically, WPEngine alleges that it "has invested hundreds of millions of dollars to attract and enable users and customers to host their sites using WordPress" and "thousands of engineering hours and millions of dollars into the development of its WordPress plugins and themes, [which] the vast majority of its users use . . . at no cost to themselves."  FAC ¶¶ 34, 38.  According to WPEngine, these "contributions to WordPress have benefited Defendants."  *Id.* ¶ 459.

WPEngine also alleges that Defendants have unjustly retained these benefits.  Specifically, WPEngine alleges these benefits "were induced by clear and unambiguous promises to the

26

1    WordPress plugin developer community that the platform would remain free, open and accessible,

2    and that WordPress will forever be an open platform that encourages third-party developers to

3    build WordPress plugins and themes to enhance the functionality of WordPress[,]" promises on

4    which WPEngine "reasonably relied." *Id.* ¶ 459.  WPEngine also alleges that "Defendants further

5    unjustly retained the value of the benefits [WPEngine] has conferred by wrongfully co-opting

6    software developed and maintained by [WPEngine], falsely conveying to users that it was

7    developed by wordpress.org, banning [WPEngine] from using resources behind wordpress.org,

8    and pressuring [WPEngine's] customers, partners, vendors, employees, and users to cut their ties

9    with [WPEngine]." *Id.* ¶ 460.

10       Taken as true and viewed in the light most favorable to WPEngine, these allegations are

11   sufficient to state a plausible claim for unjust enrichment.  Accordingly, Defendants' motion to

12   dismiss Count 20 is **DENIED**.

13       **J.    Specific Claims Against Automattic**

14       Defendants additionally move to dismiss Counts 3 (violation of CFAA Section

15   1030(a)(7)), 5 (UCL), 9 (libel), 10 (trade libel), 11 (slander), 14 (illegal tying under Section 1 of

16   the Sherman Act), 15 (illegal tying under the California Cartwright Act), 17 (Lanham Act Unfair

17   Competition), 18 (Lanham Act False Advertising), 19 (violation of CFAA Section 1030(a)(5)),

18   and 20 (unjust enrichment) as against Automattic.  Mot at 39-40.

19       With respect to WPEngine's unjust enrichment claim, the Court has already determined

20   that WPEngine has alleged a plausible claim.  Automattic contends WPEngine has not and cannot

21   allege that Automattic knowingly accepted the alleged benefits conferred on the WordPress

22   community.  Mot. at 40.  However, WPEngine's allegations that Mullenweg "solely owns and

23   directs" the WordPress Foundation and wordpress.org "with an iron fist to further his own

24   commercial interests in Automattic and associated commercial businesses, to the detriment of

25   Defendants' competitors" FAC ¶ 6, are sufficient, at the pleading stage, to support a reasonable

26   inference of knowing acceptance by Automattic.

27       With respect to the remaining claims, Automattic seeks dismissal on the basis that the

28   actions giving rise to those claims stem from actions Mullenweg undertook in his individual

United States District Court
Northern District of California

27

capacity as co-founder of WordPress or actions Mullenweg took on WordPress.org, for which Automattic cannot be liable. Mot. at 39-40. But "an employer is vicariously liable for the torts of its employees committed within the scope of the employment." *See Lisa M. v. Henry Mayo Newhall Memorial Hospital*, 12 Cal. 4th 291, 296 (1995) (citation omitted). "This includes willful and malicious torts as well as negligence." *John R. v. Oakland Unified School Dist.*, 48 Cal. 3d 438, 447 (1989). "[A]n employee's willful, malicious and even criminal torts may fall within the scope of his or her employment for purposes of respondeat superior, even though the employer has not authorized the employee to commit crimes or intentional torts." *Lisa M.*, 12 Cal. 4th at 296-97. "The nexus required for respondeat superior liability" is "that the tort be engendered by or arise from the work." *Id.* at 298. For example, "an employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort." *Baptist v. Robinson*, 143 Cal. App. 4th 151, 169-170 (2006) (citations omitted). "Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact." *Lisa M.*, 12 Cal. 4th at 299.

In the amended complaint, WPEngine has alleged sufficient facts to plausibly support a theory respondent superior liability at this stage. WPEngine alleges that "Automattic is liable for Mullenweg's unlawful acts as described [in its amended complaint] because the[] acts were performed while in the employment of Automattic and were within the scope of that employment, within the scope of authority delegated to him, or ratified after the fact by Automattic." FAC ¶ 12. The acts giving rise to WPEngine's claims "were engendered by events or conditions relating to Mullenweg's employment, including his responsibilities as Automattic's CEO," including "promoting WordPress and Automattic's WordPress hosting services; planning and carrying out business strategies for dealing with competing companies, including [WPEngine]; and creating and implementing strategies on how to leverage Automattic's purported rights to intellectual property, including any trademark rights." *Id.* WPEngine specifically alleges:

> The entire extortionate scheme began with Mullenweg demanding, as Automattic's CEO, that [WPEngine] sign a purported trademark license agreement with Automattic. Mullenweg explicitly made Automattic's supposed trademark rights the fulcrum for his extortionate demands, and explicitly tied his willingness to smear

28

1

and disparage [WPEngine]—or to instead stay silent—to [WPEngine's] entry into a trademark license with Automattic. Mullenweg's later activities in punishing [WPEngine] for not entering into that trademark license agreement were all acts of retribution by Defendants, carried out because [WPEngine] had resisted Defendants' extortive demands.

2

3

*Id.* WPEngine additionally alleges that "Mullenweg has used his control over wordpress.org for the benefit of Automattic, and Automattic has sought to capitalize on such events, including by using the events herein to promote and market its services as superior to and more reliable than those of [WPEngine];" that " Automattic has also ratified Mullenweg's conduct[,]" that Automattic's CFO Mark Davies also participated in and helped to carry out the extortionate campaign[,]" and that "Mullenweg also acted as Automattic's agent, and for the benefit of Automattic, in carrying out the wrongdoing alleged in the complaint." *Id.* ¶¶ 13, 14.

4

5

6

7

8

9

10

These facts are sufficient to plausibly allege Automattic's liability for Mullenweg's actions under a theory of respondeat superior. *See Stephens v. United Parcel Serv., Inc.*, No. 3:23-CV-06081-JSC, 2024 WL 4906074, at *3-4 (N.D. Cal. Nov. 27, 2024) (allegations that plaintiff was assaulted because he was preparing a grievance about an employee performing union related tasks at work, that the operations manager notified the employee of the plaintiff's planned grievance and advised the employee of the plaintiff's vehicle before he was attacked, and that the manager took adverse action against the plaintiff after the attack were sufficient to plead negligence under a theory of respondeat superior or ratification); *cf. McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 124 (2007) (finding allegations based on "conclusory averment by a reporter that the source [of alleged defamatory statements] was an 'official' " insufficient to establish that "the speaker was in fact an official authorized to speak on behalf of the University."). Accordingly, Defendants' additional request to dismiss Counts 3, 5, 9-11, 14-15, and 17-20 solely as against Automattic is **DENIED**. Those claims remain live against Automattic to the extent they otherwise survive as discussed earlier in this order.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

///

26

///

27

///

28

///

United States District Court
Northern District of California

United States District Court
Northern District of California

1

**IV.    CONCLUSION**

2
        For the reasons set forth above, Defendants' motion to dismiss is **GRANTED IN PART**

3
**AND DENIED IN PART**.  WPEngine may file a second amended complaint curing the

4
deficiencies discussed in this order within 21 days.  WPEngine may not otherwise add new

5
substantive allegations, name new parties, or include new claims.  Courtesy copies of the second

6
amended complaint and the redline required by the Court's Standing Order for Civil Cases are due

7
to chambers within three days of filing.

8
        **IT IS SO ORDERED.**

9
Dated: September 12, 2025

10

11

12
                                                        _____

13
                                                        **ARACELI MARTÍNEZ-OLGUÍN**
                                                        **United States District Judge**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28