# EXHIBIT A

Redacted Copy of Contract and Statement of Work Signed on or around October 1st

# Statement of Work - REDACTED

| Project Information | |
| --- | --- |
| Client Point of Contact | **REDACTED** |
| Email and Telephone | **REDACTED** |
| Agency Point of Contact | Michael Willman |
| Email and Telephone | michael@websiteredev.com 207-242-4767 |

| Project Summary | |
| --- | --- |
| Start Date | October 14th, 2024 |
| Deadline | January 14th, 2025 |
| Hours Estimate | 145 |
| Project Overview | The purpose of this project is to build a new website for **REDACTED**, a retail store located in Maine. **REDACTED** wants this site to provide basic information on their products available for sale and to help promote their new store. |
| Project Scope | Redev will develop a new website for **REDACTED.** Redev will design and build six page templates (Homepage, Product Archive, About/Contact Us, Single Product template, Blog Archive template, Single Post Template) on the **REDACTED** website. Designs will be provided to **REDACTED** in Figma and Redev will perform up to 2 revisions of each design within the scope of this SOW. Development begins once the pages are approved.<br><br>Redev will implement a contact us form, sending form submissions to the email provided. Redev will configure and integrate the website with **REDACTED**. Redev will configure GA4 and GTM tags on the website to enable basic analytics tracking and tagging.<br><br>Upon launch of the site, Redev will provide **REDACTED** and its employees up to 25 hours of training and website support above and beyond the signed maintenance agreement. |

All work completed as part of this Statement of Work is completed under the terms of the Mighty Doodle Website Maintenance Agreement included for signature with this document.

_____          _____
Provider Signature          Date                    Owner Signature          Date

# Website Maintenance Agreement

This website maintenance agreement is between WEBSITE REDEVELOPMENT CO., a(n) Delaware Corporation (the "**Provider**"), and **REDACTED**, a(n) individual (the "**Owner**").

The Owner is engaged in operating a medical marijuana dispensary in the state of Maine.

The Provider is engaged in the business of building websites, as well as maintaining and updating websites to keep them current and hosting websites so that users can access them over the internet.

The Owner wishes to engage the Provider to provide website development, maintenance, hosting and support services.

The parties therefore agree as follows:

**1. ENGAGEMENT; SERVICES.**

 (a) **Engagement.** The Owner retains the Provider to provide, and the Provider shall provide, the services described below, in connection with the maintenance of the Website (the "**Services**").

 (b) **Services.** The Provider shall:

  (i) develop a new website for The Owner, under the terms and conditions of the signed Statement of Work provided.

  (ii) host the website on a Virtual Private Server, located in the datacenter of a major website hosting provider.

  (iii) monitor the overall performance of the Website for functionality on a monthly basis;

  (iv) procure any equipment, products, or third-party services required to maintain, repair, and update the Website. The Owner shall reimburse the Provider for its actual out-of-pocket cost, without any mark-up, for the purchase of that equipment, products, or third-party services and the Provider will obtain the prior consent of the Owner for any purchase to be made by the Provider of more than $100.00. However, the Owner is not obligated to reimburse the Provider for any portion of services purchased by the Provider that extend beyond the termination of this agreement;

  (v) perform any corrective maintenance services or repairs reasonably necessary to maintain the operation of the Website, with written approval from The Owner;

  (vi) maintain a current back-up copy of the Website in a commercially reasonable manner and archive any files submitted by the Owner in secure locations suitable for those materials;

  (vii) at the request of the Owner, make available at cost any software tools necessary for the Owner to update the Website directly, provided that the Owner will be responsible for all third- party license and storage fees;

  (viii)monitor the overall performance of the Website for functionality, and maintain the Website;

  (ix) provide the following reports on a monthly basis: CMS & plugin update

  (x) provide minor updates to the Website, along with server and hosting support;

  (xi) devote as much productive time, energy, and ability to the performance of its

duties hereunder as may be necessary to provide the required Services in a timely and productive manner;

(xii)    perform the Services in a workmanlike manner and with professional diligence and skill; provide Services that are satisfactory and acceptable to the Owner and take every step to ensure the Website remains functional and operating;

(xiii)    perform scheduled CMS and plugin updates on the website once per quarter;

(xiv)    maintain password secrecy and notify the Owner immediately of any loss or theft of passwords or if the confidentiality of any password has been compromised; and

(xv)    perform additional maintenance work above and beyond the 10 hours per month, using unused (banked) hours from the prior month or on an ad-hoc basis at the agreed upon hourly rate.

(c) **Of the Owner.** The Owner shall:

(i)    cooperate with the Provider to enable the Provider to ensure the Website remains functional and up to date;

(ii)    provide initial information and supply all materials comprising the then-current Website within 30 days of the Effective Date;

(iii)    monitor the content of the Website for items that need to be corrected or updated and provide those updates or corrections to the Provider as detailed in section 6; and

(iv)    maintain password secrecy and notify the Provider immediately of any loss or theft of passwords or if the confidentiality of any password has been compromised.

(d)    **Exclusions.** The Provider is not responsible for the creation, design, development, or hosting of the Website. Accordingly, the following work is expressly excluded from the Services: maintenance of any web servers owned or leased by the Owner.

## 2. COMPENSATION.

(a)    **Flat Fee.** The Owner shall pay $100.00 per hour for the Services (the "**Service Fee**"). The Service Fee will not increase for a period of 1 years from the date of this agreement. In addition, The Owner shall pay $149.00 per month for Hosting Services (the "**Hosting Fee**").

(b)    **Additional Services.** Any revisions, additions, or redesigns requested by the Owner that are not specified in this agreement, or subsequent signed statements of work, will be considered "additional" and require separate agreement and payment. The Provider shall notify the Owner about any requested services that constitute additional services.

(c)    **Schedule.** For any fixed scope service provided under a separate statement of work, The Provider will furnish an invoice at the start of the engagement, and full payment will be required before the project begins. For all other services provided under this agreement, The Provider shall invoice the Owner the Service Fee and Hosting Fee on a monthly basis. The Owner shall pay those invoices within 15 days of receipt. Each invoice will include any Additional Service Fee, as defined in subsection (d) below, if applicable.

(d)    **Additional Service Fees.** Additional maintenance work requested or authorized by the Owner that falls outside the scope of the Services will be billed to the Owner at the Provider's standard rates for that work (the "**Additional Service Fee**").

(e)    **Reimbursement.** The Provider will invoice the Owner for any reimbursements of actual out-of- pocket costs permitted on a monthly basis. Invoices for reimbursement will be paid within 30 days of receipt if receipts for those costs have been received by the Owner. The Owner will own any equipment or products for which the Owner reimburses the Provider.

**3. TERM.**

(a)      **Term.** This agreement will become effective as described in section 20 and continue for an initial term of 1 year(s) (the "**Term**"). Unless either party gives written notice to the other at least 30 days before the end of the Term, this agreement will renew automatically for an additional 1-year term. This automatic extension will continue to apply at the end of each extended period until the agreement is terminated.

(b) **Termination Procedures.** This agreement may be terminated:

- (i) by either party, on provision of 30 days' written notice before the end of a Term;
- (ii)      by either party for a material breach of any provision of this agreement by the other party, if the other party's material breach is not cured within 7 days of receipt of written notice.

(c)      **Effects of Termination.** After the termination of this agreement, all licenses granted under this agreement will terminate unless they are expressly stated as surviving. The Owner shall promptly pay the Provider any outstanding amounts owed to the Provider for services rendered before the effective date of the termination. The Provider shall return to the Owner, at no cost, all materials and information the Owner has provided to the Provider in connection with this agreement, including a complete electronic copy of the then-current Website, upon request and no later than 30 days after the Termination Date.

**4. CONFIDENTIAL INFORMATION.**

(a)      **Definition.** "**Confidential Information**" means this agreement and all nonpublic information of the Owner, in whatever form, pertaining to the business of the Owner, including information relating to the Owner's finances, customer records, and information, and all associated documentation and materials that the designates as being confidential when disclosing it to the Provider or that, under the circumstances of disclosure, ought to be treated as confidential by the Provider. Confidential Information also includes any information relating to the Owner's parent, subsidiaries, and affiliates. Confidential Information does not include information or data that is:

- (i)      known to the Provider before its disclosure by the Owner without an obligation of confidentiality under another agreement;
- (ii) independently developed by the Provider without use of any Confidential Information;
- (iii)      in the public domain when the Provider seeks to disclose or make use of it, other than as a result of disclosure by the Provider; or
- (iv)      received by the Provider from a third party with a legal or contractual right to disclose that information or data.

(b)      **Disclosure.** Neither party shall not use or disclose the Confidential Information of the other party, except in connection with the exercise of its rights or the performance of its obligations under this agreement. Both parties shall not disclose Confidential Information of the other party to any person other than its employees, agents, or independent contractors who have a need to know it in connection with this agreement, and who are under obligations of confidentiality substantially similar to this section. Both parties shall protect the confidentiality of the Confidential Information of the other party in the same manner that it protects the confidentiality of its own proprietary and confidential information, but in any case with reasonable care. All Confidential Information made available under this agreement, including copies, shall be returned or destroyed by the other party, and certified as having been returned or destroyed, promptly after the termination of this agreement.

(c)      **Exceptions.** Neither party will be in violation of this section if it discloses Confidential

Information that is required to be disclosed because of a valid order by a court or other governmental body or by applicable law or by the rules of any nationally recognized stock exchange. However, under these circumstances, said party shall notify the other party in writing of that disclosure to permit the other party to seek confidential treatment of that information.

## 5. MAINTENANCE REQUESTS.

(a)      **Procedure for Request.** The Owner shall submit all requests for maintenance (each, an **"Owner Maintenance Request"**) to the Provider via email or slack message. An Owner Maintenance Request shall:

(i)  provide the Provider with clear and specific instructions;

(ii) be reasonable in nature; and

(iii) be within the scope of the Services.

All materials transferred to the Provider in connection with an Owner Maintenance Request must be in acceptable format, which shall be limited to the following: email to the relevant employee's @websiteredev.com email address, or via slack message in the Provider's slack server.

(b)      **Review and Inspection.** The Provider shall promptly notify the Owner when the work required under an Owner Maintenance Request is complete so that the Owner can review that work to ensure its accuracy. The Owner shall notify the Provider of any errors, omissions, and other issues via email or telephone as soon as practicable following discovery. The Provider shall use its best efforts to resolve any errors, omissions, and issues as quickly as possible.

(c)      **Routine/Corrective Maintenance.** All routine corrective maintenance should be scheduled for a time specified by the Owner and agreed to by the Provider.

(d)      **Timing.** The Provider shall make all updates to the Website within 3 days from the time that Owner Maintenance Request is received. Any Owner Maintenance Request submitted by the Owner after 5 p.m. Eastern time or on Saturday, Sunday, or federal holidays will be deemed received on the next business day. If the work to be performed under any Owner Maintenance Request cannot be performed within the Maintenance Time, the Provider shall notify the Owner immediately.

## 6. WEBSITE PROBLEMS; SECURITY.

(a)      **Minimize Disruption.** The Provider shall use commercially reasonable efforts to minimize disruption of the Website and to schedule Website maintenance in accordance with this agreement.

(b)      **Problems.** If there is a problem with the Website, the Provider shall provide the following levels of support:

**(i)      Urgent Problem.** If the Website suffers from an urgent problem, including the Website becoming unusable, the Provider understands that time is of the essence and will use best efforts to correct the problem as soon as possible. The Provider shall continue to update the Owner of the status of the problem until the problem is resolved, at which time, the Provider will immediately notify the Owner that the problem has been corrected.

**(ii)**      If the Provider becomes aware of an urgent problem before the Owner, the Provider shall immediately notify the Owner of that problem.

**(iii)      Nonurgent Problem.** If the Website suffers from a nonurgent problem, the Provider understands that time is of the essence and will use best efforts to correct the problem as soon

as possible. The Provider will continue to update the Owner of the status of the problem until the problem is resolved, at which time, the Provider will promptly notify the Owner during normal business hours that the problem has been corrected. If the Provider becomes aware of a nonurgent problem before the Owner becomes aware of it, the Provider shall notify the Owner during normal business hours of such problem.

(c)    **Back-up.** The Provider shall back-up the Website as set forth in this agreement.

(d)    **Security.** The Provider must take commercially reasonable steps to prevent unauthorized access to the Website and any of the Owner's Confidential Information, including any data collected on the Website.

## 7. NATURE OF RELATIONSHIP.

The relationship of the parties under this agreement is one of independent contractors, and no joint venture, partnership, agency, employer-employee, or similar relationship is created in or by this agreement. Neither party may assume or create obligations on the other party's behalf, and neither party may take any action that creates the appearance of such authority.

## 8. NO CONFLICT OF INTEREST; OTHER ACTIVITIES

During the Term, the Provider may engage in other website maintenance activities, except that the Provider may not accept work, enter into contracts, or accept obligations inconsistent or incompatible with the Provider's obligations or the scope of Services to be rendered for the Owner under this agreement.

## 9. INDEMNIFICATION.

(a)    **Of Owner by Provider.** At all times after the effective date of this agreement, the Provider shall indemnify the Owner against any award, charge, claim, compensatory damages, cost, damages, exemplary damages, diminution in value, expense, fee, fine, interest, judgment, liability, settlement payment, penalty, or other loss (a "**Loss**") or any attorney's or other professional's fee and disbursement, court filing fee, court cost, arbitration fee, arbitration cost, witness fee, and each other fee and cost of investigating and defending or asserting a claim for indemnification (a "**Litigation Expense**") arising out of:

(i)    the Provider's gross negligence or willful misconduct arising from the Provider's carrying out of its obligations under this agreement; or

(ii) the Provider's breach of any of its obligations or representations under this agreement.

(b)    **Of Provider by Owner.** The Owner shall at all times indemnify the Provider against a Loss or Litigation Expense caused by any breach of any of the representations or agreements made by the Owner under this agreement.

## 10. INTELLECTUAL PROPERTY.

(a)    **No Intellectual Property Infringement by Provider.** The Provider represents that the use and proposed use of any software, programs, or applications to maintain, repair, or update the Website does not and shall not infringe, and the Provider has not received any notice, complaint, threat, or claim alleging infringement of, any trademark, copyright, patent, trade secrets, industrial

design, or other rights of any third party. To the extent the software, programs, or applications used to maintain, repair, or update the Website infringe on the rights of a third party, the Provider shall obtain a license or consent from that party permitting the use of those items.

(b)    **No Intellectual Property Infringement by Owner.** The Owner represents to the Provider and unconditionally guarantees that all text, graphics, photos, designs, trademarks, hyperlinks, or other content on the Website are owned by the Owner, or that the Owner has permission from the rightful owner to use each of these elements, and will indemnify the Provider and its subcontractors against any liability, including any claim or suit, threatened or actual, arising from the use of those elements furnished by the Owner. The Owner further represents to the Provider that its domain names and URL listing do not infringe, dilute, or otherwise violate third-party rights or trademarks.

(c)    **Owner Property Rights.** All text, graphics, photos, designs, trademarks, hyperlinks, or other content on the Website are the property of the Owner and the Provider has no ownership rights or other intellectual property rights to those items.

## 11. GOVERNING LAW.

(a)    **Choice of Law.** The laws of the state of Delaware govern this agreement (without giving effect to its conflicts of law principles).

(b)    **Choice of Forum.** Both parties consent to the personal jurisdiction of the state and federal courts in Sussex County County, Delaware.

## 12. AMENDMENTS.

No amendment to this agreement will be effective unless it is in writing and signed by both parties.

## 13. ASSIGNMENT AND DELEGATION.

(a)    **No Assignment.** Neither party may assign any of its rights under this agreement, except with the prior written consent of the other party. All voluntary assignments of rights are limited by this subsection.

(b)    **No Delegation.** Neither party may delegate any performance under this agreement, except with the prior written consent of the other party.

(c)    **Enforceability of an Assignment or Delegation.** If a purported assignment or purported delegation is made in violation of this section, it is void.

## 14. COUNTERPARTS; ELECTRONIC SIGNATURES.

(a)    **Counterparts.** The parties may execute this agreement in any number of counterparts, each of which is an original but all of which constitute one and the same instrument.

(b)    **Electronic Signatures.** This agreement, agreements ancillary to this agreement, and related documents entered into in connection with this agreement are signed when a party's signature is delivered by facsimile, email, or other electronic medium. These signatures must be treated in all respects as having the same force and effect as original signatures.

## 15. SEVERABILITY.

If any one or more of the provisions contained in this agreement is, for any reason, held to be invalid, illegal, or unenforceable in any respect, that invalidity, illegality, or unenforceability will not affect any other provisions of this agreement, but this agreement will be construed as if those invalid, illegal, or unenforceable provisions had never been contained in it, unless the deletion of those provisions would result in such a material change so as to cause completion of the transactions contemplated by this agreement to be unreasonable.

## 16. NOTICES.

(a)      **Writing; Permitted Delivery Methods.** Each party giving or making any notice, request, demand, or other communication required or permitted by this agreement shall give that notice in writing and use one of the following types of delivery, each of which is a writing for purposes of this agreement: personal delivery, mail (registered or certified mail, postage prepaid, return-receipt requested), nationally recognized overnight courier (fees prepaid), facsimile, or email.

(b)      **Addresses.** A party shall address notices under this section to a party at the following addresses: If to the Provider:

|  |  |
|---|---|
|  | Michael Willman |
|  | 5 Mecca Lane |
|  | Washington, Maine, 04574 |
|  | michael@websiteredev.com |

- If to the Owner:

|  |  |
|---|---|
|  | **REDACTED** |
|  | **REDACTED** |
|  | **REDACTED** |
|  | **REDACTED** |

(c)      **Effectiveness.** A notice is effective only if the party giving notice complies with subsections (a) and (b) and if the recipient receives the notice.

## 17. WAIVER.

No waiver of a breach, failure of any condition, or any right or remedy contained in or granted by the provisions of this agreement will be effective unless it is in writing and signed by the party waiving the breach, failure, right, or remedy. No waiver of any breach, failure, right, or remedy will be deemed a waiver of any other breach, failure, right, or remedy, whether or not similar, and no waiver will constitute a continuing waiver, unless the writing so specifies.

**18. ENTIRE AGREEMENT.**

This agreement constitutes the final agreement of the parties. It is the complete and exclusive expression of the parties' agreement about the subject matter of this agreement. All prior and contemporaneous communications, negotiations, and agreements between the parties relating to the subject matter of this agreement are expressly merged into and superseded by this agreement. The provisions of this agreement may not be explained, supplemented, or qualified by evidence of trade usage or a prior course of dealings. Neither party was induced to enter this agreement by, and neither party is relying on, any statement, representation, warranty, or agreement of the other party except those set forth expressly in this agreement. Except as set forth expressly in this agreement, there are no conditions precedent to this agreement's effectiveness.

**19. HEADINGS.**

The descriptive headings of the sections and subsections of this agreement are for convenience only, and do not affect this agreement's construction or interpretation.

**20. EFFECTIVENESS.**

This agreement will become effective when all parties have signed it. The date this agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) will be deemed the date of this agreement.

**21. NECESSARY ACTS; FURTHER ASSURANCES.**

Each party shall use all reasonable efforts to take, or cause to be taken, all actions necessary or desirable to consummate and make effective the transactions this agreement contemplates or to evidence or carry out the intent and purposes of this agreement.

[SIGNATURE PAGE FOLLOWS]

Each party is signing this agreement on the date stated opposite that party's signature.

|  | Website Redevelopment Co. |
|---|---|
| Date: | By: |
|  | Name: Michael Willman<br>Title: CEO |
|  | **REDACTED** |
| Date: | By: |
|  | Name: **REDACTED** |