1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Donna M. Ryu, Magistrate Judge

4

5  WPENGINE, INC.,                )
                                  )
6           Plaintiff,            )
                                  )
7  vs.                            )   No. C 24-06917-AMO
                                  )
8  AUTOMATTIC, INC., et al.,      )
                                  )
9           Defendants.           )
   _____)
10

11                                San Francisco, California
                                  Thursday, October 9, 2025
12

13   <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 1:23 - 2:19 = 56 MINUTES</u>
14

15   <u>APPEARANCES</u>:

16   For Plaintiff:
                                  Quinn Emanuel Urquhart &
17                                  Sullivan, LLP
                                  865 South Figueroa Street
18                                10th Floor
                                  Los Angeles, California 90017
19                        BY:     MICHAEL E. WILLIAMS, ESQ.

20                                Quinn Emanuel Urquhart &
                                    Sullivan, LLP
21                                555 Twin Dolphin Drive
                                  5th Floor
22                                Redwood Shores, California
                                    94065
23                        BY:     MARGARET M. CARUSO, ESQ.
                          BY:     SARA E. JENKINS, ESQ.
24

25             (APPEARANCES CONTINUED ON THE NEXT PAGE.)

2

```
 1  For Defendants:

 2                               Gibson, Dunn & Crutcher, LLP
                                 333 South Grand Avenue
                                 Los Angeles, California 90071
 3                         BY:   ILISSA S. SAMPLIN, ESQ.
                           BY:   MICHAEL H. DORE, ESQ.
 4

 5  Transcribed by:             Echo Reporting, Inc.
                                Contracted Court Reporter/
 6                              Transcriber
                                echoreporting@yahoo.com
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1 <u>Thursday, October 9, 2025</u>                              <u>1:23 p.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4        THE CLERK:  Calling Civil Case C-24-6997-AMO,

5 WPEngine, Incorporated versus Automattic, Incorporated, et

6 al.

7     Please state your appearances, Counsel, starting with

8 the Plaintiff's attorneys first.  Please approach the

9 podium.

10       MR. WILLIAMS:  Good afternoon, your Honor.

11 Michael Williams on behalf of Plaintiff WPEngine.

12       THE COURT:  Mr. Williams.

13     Anybody who's going to offer argument today will need

14 to offer it from the podium.  We don't have a court

15 reporter.  We're -- we're just making a recording.  So, I

16 want to make sure we have a very clear one by having people

17 up here up at the podium and also by stating your name each

18 time you speak.  As awkward as that sounds, it helps us.

19       MS. CARUSO:  Yes, your Honor.  Margaret Caruso for

20 Plaintiff WPEngine.

21       THE COURT:  Ms. Caruso.

22       MS. JENKINS:  Sara Jenkins for Plaintiff WPEngine.

23       THE COURT:  Ms. Jenkins.

24     And for the Defense?

25       MR. DORE:  Good afternoon, your Honor.  Michael

4

1  Dore on behalf of the Defendants.

2           THE COURT:  Mr. Dore.

3           MS. SAMPLIN:  Good afternoon, your Honor.  Ilissa

4  Samplin on behalf of the Defendants.

5           THE COURT:  Ms. Samplin.

6      Please tell me who will be arguing what.  So, we have

7  three JDLs on today.  Mr. Williams, what's --

8           MR. WILLIAMS:  Your Honor, Michael --

9           THE COURT:  -- going to happen on the Plaintiff's

10 side?

11          MR. WILLIAMS:  So, on the Plaintiff's side, your

12 Honor, I am going to be arguing WPEngine's motion with

13 regard to certain requests as well as opposing Automattic's

14 motion with regard to Requests 6, 13 and 14.

15          THE COURT:  Okay.  So, I think you are going to be

16 up for the first JDL, which is Docket 150 --

17          MR. WILLIAMS:  Correct.

18          THE COURT:  -- and the second one, which is Docket

19 154, right?

20          MR. WILLIAMS:  Correct.  Yes.

21          THE COURT:  All right.

22          MR. WILLIAMS:  And then my partner, Margaret

23 Caruso, is going to argue Docket -- I believe it's Docket

24 1 --

25          MS. CARUSO:  -- 57.

5

1        MR. WILLIAMS:  -- 57.

2        THE COURT:  Okay.  Great.  Thank you.

3    How about on the Defense side?

4        MR. DORE:  Your Honor, Michael Dore for the

5    Defendants.  I will be arguing Docket 150.

6        THE COURT:  Okay.  How about the other two, Ms.

7    Sampling?

8        MS. SAMPLIN:  Yes.

9        THE COURT:  Okay.  Great.

10    So, Counsel, a word on expectations regarding discovery

11    conduct.  So, the Northern District of California

12    Professional Guidelines say -- well, in our standing order

13    for all judges, when you file your Case Management

14    Conference Statements, they require every attorney to attest

15    that you've read our professional conduct guidelines.

16    Section 10 on motion practice says the following:

17            Before filing a motion, a lawyer

18            should engage in a good faith effort to

19            resolve the issue.  In particular, civil

20            discovery motions should be filed

21            sparingly."

22    Court resources are scarce.  We are all working really

23    hard to adjudicate your matters.  We work nights and

24    weekends, and we're also in a shutdown.  So, we -- that

25    professional guidance, as well as the amendments in 2015 to

6

1 the Civil Rules -- Federal Rules of Civil Procedure all make
2 clear that it's incumbent on counsel to really dig in,
3 especially on discovery, and do the level of meet and confer
4 and make reasonable compromises to move the case forward.
5 It only comes to court for adjudication where it's -- it's
6 really necessary, which as we say as a Court, is sparingly.
7         So, I guess that backdrop, so far there have been seven
8 Joint Discovery Letters filed in this case, which is not
9 exactly sparingly.  In light of this record and especially
10 because we're in a shutdown, I want you to know that your
11 trial judge made the suggestion to me that I not allow you
12 to file any more discovery letters without first getting
13 leave of court.  So, even though she's not presiding over
14 discovery matters in your case, at least in the first
15 instance, clearly, she is paying attention to what's going
16 on in the docket and what the parties' conduct has been in
17 discovery.  That's point one.
18         Point two is going forward I am going to limit your
19 ability to file discovery disputes.  So, you first have to
20 obtain my permission.  To do that, you're going to file a
21 very short joint motion seeking leave to file a proposed
22 Joint Discovery Letter that will be attached as an exhibit
23 to that motion.
24         I'll review the Joint Discovery Letter, and I'll decide
25 whether to grant you leave to file it.  Sometimes -- and in

1  the ones that you filed in front of me today -- Joint
2  Discovery Letter might cover a number of disputes.  I want
3  you to know ahead of time if any single dispute in a Joint
4  Discovery Letter that you put in front of me for leave to
5  file is half baked, meaning it's not really fully -- the
6  meet and confer is not done, I'm going to deny the whole
7  letter, and you'll have to go back.  I'm not going to
8  decides which ones to hear and which ones to not.  I want a
9  fully baked Joint Discovery Letter before I'll accept it for
10 filing going forward.
11      So, I am not discussing the four new Joint Discovery
12 Letters.  I have not reviewed them.  And there's, you know,
13 lots of cases and plenty of people who are, unfortunately,
14 you know, needing help and are in line way ahead of you all.
15 So, please, please, you need to -- I know it's not
16 necessarily perhaps your favorite thing to sit down and
17 really have to dig in and work through the discovery issues,
18 but that is what is required.  I'm not just requiring it
19 today.  It's in the Rules.  It's the expectation.
20      So, in light of all this, today, even though I don't
21 usually do this, I'm putting you on the clock.  You get 10
22 minutes a side period for all of -- all three of these
23 because a lot of this is going to be me explaining stuff to
24 you.  But I'll -- and I'll give you a chance briefly to
25 offer argument or clarification.  We have a clock.  So, if

8

1  and when you talk, we'll be running the clock.  When you

2  stop talking -- we'll -- we'll stop the clock if the other

3  side's talking.  And if you run out of your 10 minutes, then

4  you are done unless I give you further permission.

5      Okay.  I'm sorry to start like this, but I really

6  wanted to make it clear, and it was enough to jump out to

7  Judge Martinez-Olguin to say, What is going on?  So, this is

8  not normal, and I'm -- I'm really hoping everybody can

9  change course.

10      But let's go ahead and turn to these three Joint

11  Discovery Letters.  The first one is Docket 150, Defense

12  Requests for Production 6, 13 and 14.

13      I'm going to give you what will be my holdings unless

14  you want to offer some argument, which I will give you a

15  chance to do, but use your time wisely.

16      With respect to Request for Production 6, this calls

17  for customer complaints.  I think these are relevant to two

18  things at least, the tortious interference claim so the

19  Defense can counter the Plaintiff's assertion that they lost

20  business because of Defense actions as opposed to the

21  Plaintiff's actions.

22      The customer complaints are also relevant to the libel

23  claims because there may be complaints about certain aspects

24  that WPE's products or services that are probative of

25  whether Defendants' disparaging statements about WPE were

9

1 actually true and, therefore, not libelous.

2     But a couple of things.  First of all, not all

3 complaints are going to be relevant.  They have to be tied

4 to the claims.  And, so, when -- so, you've got to meet and

5 confer about what kinds of complaints would be relevant.  I

6 think the Defense gave a running start at that, but then

7 also, you know, it was sort of "for example".  So, you --

8 you have to meet and confer and come up with a list of the

9 kinds of complaints that are relevant.

10     So, we also have to look at the time frame.  You both

11 proposed different time frames, and I reject both of them.

12 I'm going to impose a time frame on this one from January 1,

13 2020 to the present.  So, that goes a little more than four

14 years back from Mullenweg's statements in September of 2024.

15 It's a good -- a chunk of -- a good chunk of time to get a

16 picture on what was happening with WPE's business before

17 those statements were made.  So, I find that to be relevant

18 and proportional to the claims.

19     I think what I'm going to do -- well, I think what

20 makes sense is for me to give you my rulings on all three of

21 these RFPs and then offer you if you want to talk me out of

22 it, you can.  Okay.

23     So, here's the next one.  RFP 13, instead of

24 complaints, these are talking about actual losses of

25 business, sales, and customers.  So, for the same reasons,

10

1 business and customer losses are relevant to the tortious

2 interference claims as well as the libel claim in both time

3 and scope.

4     Here's my ruling.  Plaintiffs will have to provide,

5 first of all, some aggregate documents, so, documents

6 sufficient to show the aggregate number of lost customers

7 and lost dollars for each year from January 1, 2020 to the

8 present.  So, we'll have annual numbers and -- for dollars

9 and customers, starting in 2020 and then 2021, et cetera.

10     In addition, Plaintiffs will have to produce documents

11 sufficient to identify the customers who left WPE from

12 January 1, 2022 to the present, including their dates of

13 departure and any reasons given for their departure.

14     So, to give the big picture, we've got some aggregate

15 numbers, five year.  And then starting in January 2022, so,

16 more than two and a half years before the statement,

17 Plaintiff will have to identify the customers who left and

18 also give information about when they left and why they

19 left.  And this one we don't -- I'm not going to require

20 that it be narrowed.  So, it doesn't have to -- unlike RFP

21 6, it doesn't have to be tailored to -- you know, for

22 certain reasons.  Just give them the information.  If you

23 don't have a protective order in place yet, you can do that

24 because some of this is obviously sensitive customer

25 information.

11

1     Then for RFP 14, this is looking for documents

2 concerning Defendants, the website, et cetera.  So, I have a

3 quick question first for Mr. Williams.

4     The Plaintiff's side of the paper discusses a run that

5 Plaintiffs did, but it was aggregate.  It was, you know, all

6 -- for -- for -- I think it meant to cover everything that

7 the Defense was saying they compromised.

8     My question is did the Plaintiffs separately run a

9 search for responsive documents from January 1, 2023 to the

10 present on Mullenweg, so, Mullenweg and MM.  And, if so, how

11 many documents did it turn up?

12     Mr. Williams?

13         MR. WILLIAMS:  Can I have one moment just to

14 confirm?

15         THE COURT:  Sure.

16     (Pause.)

17         MR. WILLIAMS:  Your Honor, I understand we did do

18 that, and it was roughly 225,000 hits or somewhere in that

19 ballpark for Mullenweg.

20         THE COURT:  Just in that time period?

21         MR. WILLIAMS:  Yes.

22         THE COURT:  For him alone.  Okay.  Thank you.

23     So, I -- I am going to deny this request without

24 prejudice because Defense really didn't give me any

25 compromise and didn't offer -- didn't try to -- well, let me

12

1  say this.  It's the Defense requirement for discovery to

2  first explain its relevance, and there was no attempt to do

3  that.  This -- these are very broad.  It's just anything

4  that has to do with any of these topics.  So, it's denied

5  without prejudice to you working with the Plaintiffs to see

6  if you can come up with something that is more tailored or,

7  if it's a dispute you're sure going to have to explain to me

8  what the relevance is more precisely, because this just

9  seems to scoop in anything about everything, and I -- it --

10 it is the job of the -- of the party seeking discovery to

11 establish relevance in the first instance.

12      So, those are my rulings on the first letter.  I will

13 take your argument.  But, remember, the clock will run.

14 This is the Defense motion.  So, Mr. Dore, I'll start with

15 the Defense side.

16          MR. DORE:  Thank you, your Honor.  Michael Dore

17 for the Defendants.

18      One thing I wanted to clarify with the Court, if I may,

19 with respect to the sixth request, we were also seeking

20 communications regarding those customer complaints, and I

21 didn't hear your Honor address that.  I didn't know if that

22 was by design.  But we are seeking internal communications

23 at WPEngine related to those complaints because, as a

24 general matter, the production of internal emails, for

25 example, has been minimal by WPEngine.  We've counted

1  approximately 370 individual internal WPEngine -- WPEngine

2  emails produced in this entire case since its inception, in

3  contrast to the almost 10,000 internal Defendants' emails

4  that have been produced.

5      So, that is a question I would ask your Honor to

6  address.

7          THE COURT:  Yes.  It would include documents and

8  communications about those complaints.

9          MR. DORE:  Okay.

10         THE COURT:  So, if there's a complaint, then it --

11 then it -- that -- you know, that's made that falls within

12 that, that will be produced, and if there's internal

13 communications about that complaint, then that should be

14 turned over.

15         MR. DORE:  Thank you, your Honor.

16         THE COURT:  Okay.

17         MR. DORE:  With respect to RFP 14, I submit, your

18 Honor, that obviously we would love to address it in more

19 detail in the space provided, but Mr. Mullenweg figures in

20 very prominently in the complaint, as we noted, being

21 mentioned 200 times with allegations spanning almost 20

22 years.  And we have not identified -- the Plaintiffs have

23 not identified to us an aspect of what Mr. Mullenweg would

24 have been addressing or with respect to internal

25 communications at WPEngine.  No number has been provided as

14

1  to that.  So, there could be hits on TechCrunch articles

2  that come in the door, but how many hits are there

3  internally at WPEngine talking about Mr. Mullenweg?  We

4  don't know that.  And the complaint addresses 20 years of

5  conduct with respect to taxes, with respect to the

6  community, with respect to a -- a boatload of issues.

7          THE COURT:  Well, what -- what it talks about is a

8  history in which Mullenweg -- Mr. Mullenweg is really

9  supportive of WPE and then everything turns.  So, it's not

10 exactly a history of complaints against him for the entire

11 -- there is another RFP we'll get to or discovery request on

12 the Plaintiff's side that talks about that.  But with

13 respect to allegations against Mr. Mullenweg for things that

14 he did that were tortious or otherwise, you know, caused

15 liability, that's -- I'm not understanding the Defense

16 position on that.

17         MR. DORE:  Your Honor, the allegations in the

18 complaint -- I believe it's paragraphs 62, 70 and 72 -- talk

19 about a scheme perpetrated by Mr. Mullenweg dating back 20

20 years.  So, this is not limited to simply products that he

21 gave to WPEngine around that time.

22         THE COURT:  Okay.

23         MR. DORE:  It is an allegation of a scheme lasting

24 decades.

25         THE COURT:  So, it's denied without prejudice to

1  -- to you, you know.  You can point to things more

2  specifically.  You can get in the -- this is exactly why --

3  part of what I'm trying to illustrate is the meet and confer

4  is, you know, think about you're -- you're getting a sense

5  of hopefully today of how I rule on things.  So -- and what

6  I've taken into account.  So, that will be in your head

7  maybe when you meet and confer.  And I do -- you know, it's

8  what is relevant to the claims and defenses.  That's Rule

9  26, and then what is proportional.  So, we have to first

10 look at what's relevant.

11     Is it's true that the complaint points to a scheme that

12 lasts 20 years that is really unbounded in its subject

13 matter, then maybe Defense ultimately wins on that, and they

14 didn't really make that argument here, which is why, you

15 know -- and please know that you don't necessarily get oral

16 argument.  So, if I ruled on the papers, I'd say there's not

17 enough there.

18     But, Mr. Williams, when you go back and meet and confer

19 with your counterparts on this, if they're pointed to --

20 pointing to things in the complaint that are not clear and

21 that sound very broad, that's the consequence of broad

22 pleading is then, Okay, you've opened the door to discovery.

23 Okay?

24          MR. WILLIAMS:  Understood.

25          THE COURT:  But that is the ruling for today.

16

1  It's denied without prejudice because the argument was not

2  there in the papers to -- to make me understand that that's

3  what was going on.

4      Okay.  Anything further on the --

5          MR. DORE:  Yes, your Honor.

6          THE COURT:  Mr. Dore?:

7          MR. DORE:  How much time is left on the Defense

8  side?

9          THE CLERK:  5:49.

10          THE COURT:  Yeah, about five minutes and 45

11  seconds.

12          THE CLERK:  49.

13          THE COURT:  Yeah.  Some of that was me talking.

14  So --

15          MR. DORE:  I understand.  Michael Dore for

16  Defendants.  Thank you.  I -- I would like to cede the rest

17  of my time, but if there's any left over, if I may make a

18  final point, I'd appreciate it.

19          THE COURT:  Okay.  Mr. Williams?

20          MR. WILLIAMS:  Yes, your Honor, just briefly.  On

21  -- on customer complaints, I understand with regard to

22  tortious interference, and the idea there is alternate

23  causation.  If we say that customer left -- of course, they

24  bragged about how many customers we were losing as a result

25  of it, but it's only relevant to customers who left after

1  September 20th, 2024.

2         THE COURT:  That's not true.  Well, you didn't

3  address in your papers the libel argument other than to say,

4  That's opinion.  But that's not the point.

5         MR. WILLIAMS:  But I -- I guess, just on the

6  interference part, your Honor, because if a customer

7  complained, the question is if we're seeking damages from

8  that date going forward for lost customers -- so, the

9  question is if a customer left after that date, we --

10  understandably, they need to know why.  Was it because of

11  their conduct or something Defendants did or was it

12  something independent?

13     Every customer complaint -- and I know your Honor said

14  we have to talk about subject matter, but even if a customer

15  before that time is saying, I don't like the price increase

16  or I don't like this part of it, if they didn't terminate

17  the relationship, those complaints are not relevant at least

18  to the interference claim.

19     On the libel claim, the issue is whether or not these

20  are statements of fact and, if so, are they false.  And, so,

21  on the question of whether they're statements of fact,

22  that's objective.  It doesn't make a difference if some

23  random customer had a different view or a different opinion.

24  That doesn't change whether or not Mr. Mullenweg's

25  statements were true or false at the time he made them.

18

1          THE COURT:  It's probative.  So, if -- if Mr.

2     Mullenweg said, this is just all in your -- WPE is just a

3     hack job, knockoff, cheap knockoff, right.  So, let's say we

4     look at complaints leading -- from 2024 before he made those

5     remarks, that you all were identified as perhaps relevant to

6     those questions, if you've got customers who are saying,

7     Wow, this is just -- this is -- doesn't have to be exact

8     wording but that's probative of -- of actually showing --

9     people are thinking this is a -- a cheap knockoff.  this is

10    not very good.  This is whatever it might be.  Plus the fact

11    that they left, I think that's also potentially relevant.

12    It's within the scope of discovery.  Whether it's ultimately

13    admissible is another thing.

14          MR. WILLIAMS:  Understood, your Honor.  The last

15    point on the libel is just if -- if it is a matter of

16    opinion, if it was -- if Defendants can show it was a matter

17    of opinion and not fact, then it still doesn't matter.  It's

18    not actionable.  So, it doesn't matter what the customers

19    believe.  So, we just believe that the time frame --

20          THE COURT:  It goes to -- it goes to the question

21    of whether it's truthful.  It's probative of whether -- you

22    know, if there's tons of complaints that back up what Mr.

23    Mullenweg said, then perhaps he can present that as, See, I

24    was just saying what everybody knew.  Okay.

25          MR. WILLIAMS:  Understood, your Honor.  With

19

1  regard to --

2          THE COURT:  Time frame is appropriate because I --

3  I'm not going to -- I don't think it needs to go back to the

4  Silver Lake acquisition.  I think a four-plus-year run up to

5  the comments is plenty of time to figure out what was going

6  on with WPE's business and whether they were losing money

7  and customers and, if so, why.

8          MR. WILLIAMS:  And, your Honor, I just have a

9  point of clarification on Number 13 with your --

10         THE COURT:  Okay.

11         MR. WILLIAMS:  -- Honor's order.  You said

12 aggregate information regarding customers lost and lost

13 dollars or sales.

14         THE COURT:  Yes.

15         MR. WILLIAMS:  And then --

16         THE COURT:  Per year.

17         MR. WILLIAMS:  For January 1, 2020 through the

18 present and then, in addition, documents sufficient to

19 identify customers who left for that time frame and the

20 reasons for --

21         THE COURT:  From January 1, 2022, so a smaller

22 time frame, who were the actual customers.  If they say why

23 they left, then put that in and when did they leave.

24         MR. WILLIAMS:  But -- but not all documents.  It's

25 just a document --

20

1          THE COURT:  Sufficient to show.

2          MR. WILLIAMS:  -- sufficient to show on that?

3          THE COURT:  Correct.

4          MR. WILLIAMS:  Okay.  Thank you, your Honor.

5  That's all on that issue then.

6          THE COURT:  Okay.  Great.  So, those are my

7  rulings.  Let's turn to the next one, Document 154.  So,

8  that's going to be Mr. Williams and Ms. Samplin I believe.

9      These are Plaintiff's Requests for Production.  So,

10 first, on the waiver argument, I -- I don't find that there

11 was waiver.  There was -- I -- when I sent out the discovery

12 referral, I gave new counsel a chance to pick up where the

13 last one was left off and to keep going, and that's --

14 that's -- so, we've gotten past that.  So, I reject the

15 waiver argument.

16     The first set of RFPs have to do with WPE's claim that

17 Defendants were tracking and interfering with their customer

18 relationships.  So, that's RFPs 12 through 15, 19, 98, and

19 100.

20     So, for those, I -- I -- I don't think anybody is

21 arguing that they seek relevant subject matter information.

22 The dispute is about the start and the end time.

23          MR. WILLIAMS:  Your Honor, if I may, we have

24 reached agreement on the start date for some of them that I

25 would like to provide to the Court if -- if that's okay.

21

1          THE COURT:  Okay.  Yeah, that was my first

2 question to you is some you've got different start dates,

3 and some you don't give any dates at all.  So --

4          MR. WILLIAMS:  So, we did reach out.  We have

5 offered to agree to a start date of 1/1/23 for Requests -- I

6 think it was 13 (audio glitch) -- is only limited to January

7 1, '24.

8          MS. SAMPLIN:  Sorry.  I think it's 13, 15 and 98

9 that we agreed to, right?

10          MR. WILLIAMS:  Correct.  Thank you for that.  So,

11 13, 15 and 98 we agreed that the start date would be 1/1/23.

12 And, so, for those, it's really only the end date.

13          THE COURT:  Well, but for some -- okay.  12 is

14 already for January 1, 2023.

15          MR. WILLIAMS:  Correct.

16          THE COURT:  You've agreed to that for 13, and

17 you've agreed to that for 15.  14 is one year later, right?

18          MR. WILLIAMS:  Yeah.

19          THE COURT:  You've agreed to it for 19, which says

20 January 2023 to the present --

21          MR. WILLIAMS:  Correct.

22          THE COURT:  -- correct?  All right.  And for 98.

23 What about 100?

24          MR. WILLIAMS:  100 is more temp -- the request

25 itself is more temporal because it's just talking about the

22

1  data supporting that post.  So, it doesn't really get into

2  the time frame issue.

3           THE COURT:  Okay.  Okay.  Understood.

4           MS. SAMPLIN:  But I think we -- I mean, we didn't

5  understand that.  We understood them as still wanting to go

6  potentially unbounded --

7           THE COURT:  Yes.  But it's the --

8           MS. SAMPLIN:  -- for 100.

9           THE COURT:  -- data -- whatever data your clients

10  were talking about when they said we -- the data shows, our

11  data shows.  So, it's that data.  I don't know the --

12           MS. SAMPLIN:  Subject to --

13           THE COURT:  -- date, and --

14           MS. SAMPLIN:  -- that post.

15           THE COURT:  -- they don't know the date.  So, it's

16  bounded by, well, what was that data.  Okay.

17       So, with respect to RFPs 12, 13, 15, 19 and 98, those

18  will all go from 1/1/2023 till the end date.  For RFP 14,

19  that will go from 1/1/2024 to the end date.  And RFP 100 is

20  whatever the data is that -- that the Defendants were

21  relying on or that were referencing in making this post, and

22  I will say right now that one of the motions by the

23  Plaintiff was to have Defense take out the documents

24  sufficient to show, and I agree with that.  It's whatever

25  Defendants were using, were referring to with respect to

23

1  "our data" should be turned over.

2         MS. SAMPLIN:  I agree with the data.  I think the

3  -- the question was that the request goes to all documents

4  relating to the data potentially, and that's why we had said

5  sufficient to show, but we agree the data should be

6  produced.

7         THE COURT:  Well, what's the difference?  I mean,

8  the -- the data --

9         MS. SAMPLIN:  If people are having a lot of email

10 communications about the data, that's what we were trying to

11 get at.

12        THE COURT:  No.  I think that it -- it calls for

13 documents and communications, and that should be turned

14 over.  I think that's appropriate.

15      Okay.  So, we now have the start dates figured out.

16 Then we go to the end date.  And the Defense proposed a

17 closing date of the day after Judge Martinez-Olquin entered

18 the -- the preliminary injunction, and, no, I think this

19 should be through the present, because, first of all, it's

20 -- it's responsive.  It's relevant.  And Plaintiff doesn't

21 have to take the Defense word -- at their word that they are

22 not violating the preliminary injunction.  If they're not,

23 then it shouldn't be very burdensome to respond.

24      I -- I take the point that it's, you know, inconvenient

25 if there's an extra layer to have to do this iterative

24

search because the present means the present, but there is a
cutoff.  There's a discovery cutoff.  There's a period of,
you know, so, you'll do that.  It will be through that time
plus, you know, supplementation.  So, if you were to provide
the documents before the discovery cutoff, then you've got
to supplement one more time for the discovery cutoff, that's
normal and certainly doable given the -- who these
Defendants are, small business.  So, there's not the kind of
burden where I'd be really concerned about that aspect.

So, that's my ruling on that first set of RFPs on
tracking and interfering with the customer relationships.
I'll just go through the rest of the letter, and I'll give
you a chance to respond.

The next group has to do with market manipulation.
That's RFPs 71 and 103 through 105.  So, these RFPs were
aimed at the antitrust claims that were pleaded at the time
this discovery dispute came up.  They were subsequently
dismissed with leave to amend.  I know that Plaintiff
recently repleaded these with new allegations so that --
that they may affect the parties' positions on these RFPs.

So, I'm denying without prejudice.  Meet and confer in
light of the new allegations, and see if you can come to an
agreement on the discovery for these -- this small group of
RFPs.

The next group is relevant to the knowledge of falsity

25

1  of the public statements made by the Defendants.  So, it's

2  RFPs 50, 88 and 90 through 91.

3     This is -- the parties stated it as mostly a -- a

4  dispute about temporal scope, but I think, you know, that

5  it's also -- it's pretty broad.  But this is my

6  understanding, and this is what my ruling is.

7     The Plaintiffs say that all of these documents should

8  -- should be producible back to the founding of WPE in 2010

9  because this history about what Defendants have said about

10 WPE since its founding is relevant to prove that the

11 Defendants subsequently slandered WPE, presumably because

12 Plaintiff's case is they said all these great things about

13 us, really supportive things about us, and suddenly -- so --

14 so, they know what the truth is, and they slandered us by

15 saying the opposite in -- in September 2024.

16    That -- that is what I think the Plaintiff's position

17 is.  Defense doesn't really dispute general relevance,

18 instead, just makes a compromise of, Well, we'll do this

19 from 2018 when Silver Lake acquired Plaintiff, just trying

20 to sort of split the difference on the timing.

21    So, that's what -- some of it, although there's also

22 some -- I was a little confused.  It looks like the Defense

23 suggested that the Plaintiff limited RFP 90 to 2023 and also

24 that the Defense offered a 2023 start for RFP 50 but the

25 Plaintiff stopped talking.  These are the kinds of things

26

1  that, you know, made it feel a little half baked -- well,

2  actually, very half baked.

3      So, the Defense doesn't really argue relevance, just

4  burden.  But the burden argument is pretty vague.  But, on

5  the other hand, the Plaintiff's requests are very broad.

6  This is -- so, this is one where you've really got to do

7  some engaging.  I don't know that every statement they ever

8  made about these things back to 2010 really is what we're

9  looking for here.  That sounds very burdensome, even for a

10 bigger Defendant.  There must be some way to try to narrow

11 that, and it may be that there's different dates that

12 attach, but I don't know enough because I don't know the

13 relevance arguments, and they weren't really made or the --

14 or the burden arguments.

15     So, I'm going to deny this without prejudice to you all

16 going back to the drawing board on this and digging in a

17 little deeper based on the comments that I'm making here,

18 and hopefully I'm giving you some of the kinds of questions

19 that I -- I asked myself in thinking through what's --

20 what's relevant and proportional with respect to this.

21     Okay.  The -- the last group on this letter has to do

22 with Defendants' attempts to get Plaintiff to pay a

23 trademark licensing fee.  These are RFPs 17, 23, and 114

24 through 115.

25     I think these have to do with the CFAA Section

27

1  1030(a)(7) claim.  This also was subsequently dismissed with

2  leave to amend.  It's been repleaded with new allegations

3  that may affect the parties' positions on these RFPs.  So,

4  just like the antitrust claims, this is denied without

5  prejudice to you going back to meet and confer in light of

6  the new allegations to see if you can reach a compromise on

7  those.

8      Those are my rulings on Docket 154.  I'm ready to take

9  your argument.  This is Plaintiff's motions.  So, Mr.

10  Williams, you're up first.

11          MR. WILLIAMS:  Thank you, your Honor.  Just very

12  briefly.  So, with respect to the -- the antitrust market

13  manipulation, your Honor, just to -- with respect to the --

14  I understand the Court's ruling that we had amended the

15  antitrust claims.  The -- the scope of the claims has not

16  changed.  It's just fleshing out some of the allegations

17  that Judge Martinez-Olguin found were not properly pled.

18  So, we -- we don't know that -- we don't think it changes

19  the true scope of it.  I --

20          THE COURT:  Well, what I hope changes is that

21  you're hearing from me the level of engagement that I'm

22  expecting from the parties which really wasn't done.  And --

23  and, just so you know, I mean, I sometimes hear from people,

24  and I heard Mr. Dore make a little slight reference to,

25  Well, in the pages that we reviewed and -- look, folks, the

28

1  entire District used Joint Discovery Letters.  I get very

2  complex cases where people are really drilling down and able

3  to give me, you know, these are the -- very focused briefing

4  without invective -- so, you know, if we take out the

5  invective in your letters, we've reduced them a little bit

6  already.  Just get down -- do whatever you can to figure it

7  out, but get down to what's really at issue.  Give me the

8  meat to make a decision.  But that wasn't done for a lot of

9  these.  It's okay.  We're -- we're moving past that, but I

10 really am expecting that as we go forward.  Okay?

11         MR. WILLIAMS:  Understood.  And, your Honor, with

12 regard to the knowledge of falsity in the public statements,

13 we did propose to go back to January 1, 2015 and --

14         THE COURT:  Oh.

15         MR. WILLIAMS:  -- address your Honor's -- and --

16 and this was a -- a conversation -- we provided Defendants

17 with some proposals yesterday, and they got back to us.

18 That was one they did not agree with, but in order to help

19 narrow the scope and the burden that your Honor mentioned,

20 we would agree that on Number 50, 88 and 90, instead of

21 going back to 2010, we would agree to January 1, 2015.

22         THE COURT:  Well, that's great for them to know,

23 but you're done with the meet and conferring.  I don't -- I

24 don't know, as I said, when you're -- you all know this, but

25 I'll just say it as an expectation, and it's in our ESI

29

1  checklist and the like.  The search process is iterative.

2  So, you -- you're narrowing it to 2015.  That's great.  That

3  wipes out five years.  That's very helpful.  If we're

4  looking at hits within that time and if you're coming up

5  with search terms that the Defense runs, Defense needs to

6  show those search -- you know, the runs and some sampling to

7  explain -- if you're going to say to them this -- to -- the

8  Defense saying to the Plaintiffs, this is pulling up so much

9  irrelevant stuff, I would expect that you're actually

10 showing them the materials so that you can work together

11 iteratively to narrow it to the good stuff.  Nobody wants to

12 have the non -- the really not very responsive material.

13 So, that's my expectation.  2015 is a good start, but you've

14 got to dig in a little deeper because they might really have

15 a burden argument here if it's turning up lots of -- lots

16 and lots and lots of stuff and a good portion of it is not

17 very responsive.

18      So, I appreciate what you're saying.  That doesn't end

19 the conversation.

20          MR. WILLIAMS:  Okay.  And, finally, your Honor, on

21 the last category, the -- in the title of Extortion Planning

22 Documents, they are also relevant to the declaratory

23 judgment claim for noninfringement and also the unfair

24 competition, the UCL claim, which was not dismissed because

25 the extortion is still a predicate act.

30

1    So, we believe these categories are still relevant

2 given -- even notwithstanding the amended complaint and that

3 there -- the -- the information is still something that we

4 would be entitled to.

5         THE COURT:  Did you make that argument in your

6 papers?

7         MR. WILLIAMS:  We did not because at the time the

8 papers were filed, the amendment had not occurred.  We had

9 not had the --

10        THE COURT:  Okay.  Well, then you need to go back

11 and -- I mean, I didn't have it.  So, I -- it wasn't in

12 front of me.  I couldn't consider it.  I'm not going to

13 consider it on the spot --

14        MR. WILLIAMS:  Okay.

15        THE COURT:  -- without the Defense having had an

16 opportunity to, you know, explain their side to me.  So, but

17 you can certainly raise it with them because this one's one

18 you're going to have to go back to the drawing board on.

19        MR. WILLIAMS:  Okay.  Thank you, your Honor.

20        THE COURT:  Okay.  Great.

21    Let's turn to the Defense.

22        MS. SAMPLIN:  Thank you, your Honor.  I'll be

23 brief because I, you know, heard your instructions to go

24 back and meet and confer on most of these, which we will.

25        THE COURT:  Yes.

31

1          MS. SAMPLIN:  I just wanted to address one item,

2    which is the end date for some of these requests.

3          THE COURT:  Okay.

4          MS. SAMPLIN:  Obviously, I -- I heard and respect

5    your Honor's order.

6          I would just say in looking at the complaint, there are

7    not allegations here of ongoing conduct.  The conduct that's

8    alleged, allegedly deceiving the market into thinking

9    WordPress.org was open to all, extorting allegedly trademark

10   licenses, interfering with facts as to WordPress.org and the

11   ACF plugin, those are all alleged to have occurred in 2024

12   and then ended with the -- the PI order.

13         And, so, I understand if they came with some motion of

14   contempt of the PI order, we might be in a different

15   posture, but we're looking at a complaint that's not

16   alleging ongoing harm.  We're not in a situation -- you

17   know, I have had many cases where we continued the document

18   production if it's an alleged ongoing IP infringement.  But

19   in cases where it's not ongoing conduct, we often have some

20   kind of end date so that the parties are not re-collecting

21   -- if they're agreeing to hundreds of custodians, re-

22   collecting their emails iteratively throughout the whole

23   discovery length of the case.

24         So, part of this is a little bit of a burden argument

25   because there are a lot of people involved in this case, a

1  lot of custodians.  We have collected -- we've imaged

2  devices.  It would require going back and doing all that

3  work all over again, potentially multiple times throughout

4  the fact discovery period of the case.

5      So, I hear you if we're not cutting this off right at,

6  you know, the date of the PI order.  You know, obviously, we

7  put in our papers and believe it should be cut off then,

8  but, you know, we can work on that, but we do feel there

9  should be some date that's not the close of fact discovery.

10          THE COURT:  Well, at first, I mean, which ones

11  exactly do you think should not be -- so, things like

12  talking to customers, that's one that there may be ongoing

13  discovery.  They may not know, versus something like the --

14  the plugin issue, right, because that's either fixed on the

15  website or it's not.

16          MS. SAMPLIN:  Right.

17          THE COURT:  So, if you want to tell me which ones

18  exactly you think should be stopped as of the day that that

19  conduct stopped and is verifiable because it's no longer on

20  the website, then I can try to --

21          MS. SAMPLIN:  Well --

22          THE COURT:  -- rule on that.

23          MS. SAMPLIN:  -- some of them do relate to -- many

24  relate to a request you asked us to go and meet and -- go

25  back and meet and confer on.  So, I don't -- I don't know if

33

1  you want me to raise those to you.  But -- but, in

2  particular, it would be RFPs 103 to 105.  Those relate to

3  allegations related to access of the Wordpress plugin

4  directory and WordPress.org, alleged conduct that I think is

5  done and is not alleged to be continuing.  But your Honor

6  did, you know, ask us to go back and meet and confer on 103.

7          THE COURT:  Yeah, on those -- those were about the

8  market manipulation ones.  So, I haven't ruled on -- maybe

9  my groupings are not perfect, but on that one, for 103 to

10  105, I said go meet and confer and see if you can work it

11  out.

12          MS. SAMPLIN:  Okay.  So, you just want me to raise

13  the ones you -- ones you've ruled on.

14      So, I mean, we would submit that the RFPs related to

15  customers also should end because they're not alleging

16  misconduct related to relationships with customers or

17  continuing harm.  I mean, I guess that -- that's our point

18  in this case.  This is allegations related to a period of

19  time.

20          THE COURT:  I didn't understand that to be the

21  case.

22          MR. WILLIAMS:  That's not correct, your Honor.

23          THE COURT:  If that was ongoing -- well, that that

24  was happening.  Maybe it got stopped somewhat by the PI, but

25  then there's a question of whether it really has been

1  stopped by PI.  So, something like that I would absolutely

2  let that continue.

3      If there's something specific that's verifiable that

4  everybody can see it stopped because, you know -- and I

5  don't know what the -- I don't want to make up an argument

6  -- then maybe you've got a point, but I -- I'm -- but,

7  again, I need to hear the specifics.

8          MS. SAMPLIN:  I guess my point would say even with

9  respect to discovery related to customers, are all the

10  parties going to be re-collecting documents from the

11  custodians through the end of the fact discovery period?  I

12  guess that's kind of the concern I had.  It --

13          THE COURT:  Possibly.

14          MS. SAMPLIN:  -- may not be 2024, but if we're

15  going through 2025, I think we're all going to have to

16  reissue -- reimage devices, re-collect multiple mailboxes,

17  potentially, you know, hundreds of terabytes of data.

18          THE COURT:  That happens, and it happens -- it's

19  going to happen on both sides, right, because the Plaintiffs

20  also are going to be producing customer materials that the

21  Defense asked for that we talked about in the first letter.

22  If you want to come to some kind of agreement, then, of

23  course, you can do that, that -- you can agree to something

24  short of what my order is, but if you don't, then my order

25  is it keeps going for both sides on customer complaints.

35

1          MS. SAMPLIN:  Okay.

2          THE COURT:  Okay.  Anything more on this letter?

3          MS. SAMPLIN:  I think everything else we are

4  meeting and conferring about.  So, I think that's all I

5  wanted to raise.

6          THE COURT:  Okay.

7          MS. SAMPLIN:  Thank you.

8          THE COURT:  Let's go to the third letter, Document

9  157.  So, I'm calling this the <u>Sleekcraft</u> letter.

10      So, Ms. Caruso is up at the podium now for the

11  Plaintiffs, and I do have some basic questions for the

12  Plaintiff -- Plaintiff about this.

13      I -- I'm looking to pin down the Plaintiff on this.

14  So, in the Plaintiff's letter, with respect to the dec

15  relief claim of noninfringement, the Plaintiff says:

16              "We're only arguing nominative fair

17          use and laches."

18      Now, the claim itself is pleaded more broadly and more

19  vaguely than that.  So, if the Plaintiff is going to leave

20  the door open to the possibility of arguing actual

21  noninfringement, then I think that will -- that will

22  absolutely affect the ruling on discovery.  If the Plaintiff

23  is ready to say right here and now that their dec relief

24  claim of noninfringement is only about nominative fair use

25  and laches, then that will affect the ruling as well.

36

1      Ms. Caruso, which one is it?

2           MS. CARUSO:  Your Honor, we are not seeking as

3  part of the dec relief claim anything having to do with non-

4  confusion.  It is just --

5           THE COURT:  That is not answering my question.

6           MS. CARUSO:  It is about --

7           THE COURT:  What exactly --

8           MS. CARUSO:  -- nominative use and laches.

9           THE COURT:  Nominative use and laches, and that's

10  it?

11           MS. CARUSO:  I believe -- I believe we also have

12  acquiescence as part of that pleading as well, but there

13  hasn't been any --

14           THE COURT:  Okay.  This --

15           MS. CARUSO:  -- issue about that.

16           THE COURT:  Well, just for the record and the --

17           MS. CARUSO:  Yes.

18           THE COURT:  -- representation to the Court is your

19  dec relief claim as currently pleaded is limited to -- for

20  -- for noninfringement is limited nominative fair use,

21  laches, and acquiescence.

22           MS. CARUSO:  And the Defendants' standing to bring

23  a trademark infringement claim.

24           THE COURT:  Okay.  Okay.  Fair enough.  And -- and

25  you are specifically telling me nothing more than -- that

37

 1  we're not -- the noninfringement dec relief claim doesn't

 2  cover anything else?

 3              MS. CARUSO:  Correct.

 4              THE COURT:  Okay.  That closes the door on

 5  Sleekcraft for now.  Now, I get it may be that the Defense

 6  decides to file a counterclaim down the road.  There was

 7  some hint of that.  If that happens, then, you know, it's --

 8  then we've got a new claim in the case, but it hasn't

 9  happened, and I'm not going to consider anything that's not

10  currently pleaded as a claim or defense.

11     So, Sleekcraft doesn't apply .  The New Kid factors do

12  apply for the nominative fair use.  And there -- there --

13  the New Kid factors, the three of them, do speak at -- to

14  the risk of confusion, but it's a certain kind of confusion

15  that the speaker is sponsored or endorsed by the trademark

16  holder.  So, now that we know the limits of Plaintiff's

17  claim and we know what law is going to apply, this is

18  another one that needs to go back to the drawing board

19  because some of these do go to -- some of the requests for

20  production by the Defense -- in particular, 19 through 21 go

21  to confusion -- some of those, if they narrow it

22  appropriately, might be -- might be askable under New Kid.

23  I'm not going to sit here and parse that.  That's not my

24  job.  That's your job.  So, you got to go back and meet and

25  confer.  That -- that's really -- I thought of RFPs 19

38

1  through 21 as really being about actual confusion, okay.

2  So, confusion is relevant to the extent it is part of <u>New</u>

3  <u>Kid</u>.  Please meet and confer further.  So, denied without to

4  you doing that, and -- and see if you can reach reasonable

5  compromises that are tailored to the actual noninfringement

6  claim.

7       Then we get to RFPs 22 and 23, which I'm labeling them

8  as confusion and dilution.  So, my understanding of the dec

9  relief claim for non-dilution is that we're -- well, first

10 of all, we're not looking at <u>Sleekcraft</u>, that that's not

11 what non-dilution is about.  Non-dilution is about did WPE's

12 use of its name and actions dilute the WordPress trademark

13 by tarnishment essentially, right?  It goes back kind of to

14 RFP 6 in the first one is that the -- the argument by the

15 Defense that WPE's products were slipping long before

16 Mullenweg made his comments, and by doing that, WPE was

17 diluting the WordPress brand.

18      Is that a fair statement, Ms. Samplin, about the nature

19 of the defense on this or why you're asking for this?

20          MS. SAMPLIN:  I think you're right.  I mean, of

21 course, we had confusion as well because until today, we

22 didn't hear that the debt relief claim related to

23 infringement was narrowed --

24          THE COURT:  Yes.

25          MS. SAMPLIN:  -- and was not as pleaded.  So,

39

1  there -- there was that component in our letter as well.

2          THE COURT:  Okay.  Okay.  So, with -- so, with

3  respect to 22 and 23, you need to go back, meet and confer.

4  It's not going to be about Sleekcraft.  It's going to be

5  about non-dilution.  So, if there are things in those RFPs

6  that are relevant to that concept, then that might be

7  discoverable.  But you need to do some more work on that.

8      On the time frame, though, I -- my -- my tentative

9  would be the time frame will be January 2020 to the present.

10 It's -- it matches the time frame for RFP 6 in the first

11 letter, which is the period of time we're looking at for

12 customer complaints.

13     Okay.  Then the last bunch is RFPs 30 through 33 having

14 to do with customer base.  The only argument Defendant made

15 was Sleekcraft, which doesn't apply.  Now, I don't know.

16 Maybe there's other arguments to make, but that's all I

17 heard.  So, I'm going to deny the request without prejudice

18 to try and -- you know, maybe there's arguments that they're

19 relevant to non -- I don't know -- other things that we now

20 know are relevant to these claims.

21     So, that's my ruling with respect to the last JDL.

22 This one, again, this is Defendants' motion to compel.  So,

23 Ms. Samplin, I'll start with you.

24          MS. SAMPLIN:  Yeah.  I mean, obviously, it's a

25 little bit frustrating to us because we do -- we have had

40

1  multiple meet and confers on this.

2       THE COURT:  Not as frustrating as it is to me.

3       MS. SAMPLIN:  I'll give you that.  But, you know,

4  as you noted, the non -- the dec relief claim for

5  infringement is pleaded as a declaratory relief -- a

6  declaratory judgment of noninfringement.  That's broad.  So,

7  I just want to make sure what we're saying is --

8       THE COURT:  Well, what she said -- what was -- the

9  argument in the letter was this is what this is about.  I

10 just pinned him down on the record.

11      MS. SAMPLIN:  Yes.

12      THE COURT:  So, now we know they can't just rely

13 on the letter.  They've said it to the Court.

14      MS. SAMPLIN:  Yeah.

15      THE COURT:  That the noninfringement dec relief is

16 only nominative fair use, laches, acquiescence and no

17 standing by the Defendants to be able to bring infringement.

18      MS. SAMPLIN:  Okay.  Well, it's helpful.

19 Obviously, we wish we knew that sooner, but it is what it

20 is.  I think --

21      THE COURT:  And it will be -- I'm going to put it

22 in the minute order so we've got it.

23      MS. SAMPLIN:  Okay.

24      THE COURT:  Okay.

25      MS. SAMPLIN:  But I think, you know, on -- and,

41

1  so, I understand your ruling then that Sleekcraft isn't the

2  analysis, but I do think there's overlap, and we'll meet and

3  confer.  On the third New Kids factor, it's that the user

4  must do nothing that would, in conjunction with the mark,

5  suggest sponsorship or endorsement by the trademark holder.

6          THE COURT:  I agree with you.  I mean, I -- I

7  think that there -- as I said, there may be some of these

8  RFPs or documents that are responsive and -- and can map

9  onto New Kid factor.  But I'm not going to sit here and do

10 that analysis today.  That's really your job.  I think you

11 all can work through that.  If there's a real dispute, then

12 you'll try to get it in front of me, but this is not the

13 time to kind of workshop that.  Okay.

14         MS. SAMPLIN:  Well, then I -- I guess we have work

15 to do.

16         THE COURT:  Yes.  Anything more, Ms. Samplin?

17         MS. SAMPLIN:  I think we're kind of set to meet

18 and confer.  So --

19         THE COURT:  Okay.

20         MS. SAMPLIN:  -- I'll just save my time to

21 respond.

22         THE COURT:  Okay.  Ms. Caruso?

23         MS. CARUSO:  Your Honor, we understand that you'd

24 like us to meet and confer and your position on those

25 things, and we certainly have positions as to why what

42

1  they're seeking still is not --

2       (Audio interference.)

3           THE COURT:  -- expecting you all to be talking

4  about.  What I actually look at, if this case to me as a --

5  as a dispute, then I'd see did you tailor it to the actual

6  claims and defenses?  Is it really burdensome?  And for

7  there, I -- I'd want real numbers, I mean, not back of the

8  envelope but, you know, we ran this -- and some of you --

9  you know, you both did some of this -- we ran this.  This is

10 what it's turning up, so that I can really have the grist

11 for the mill, but we don't use discovery hearings to kind of

12 do the meet and confer as it's happening.  Just -- I wish I

13 could offer that.  You can always go out and buy those

14 services, but we -- we, unfortunately, can't do that as part

15 of, you know, a court hearing on these.

16      So, I thank you for your time.  We'll get to the other

17 four in due course.

18      Is there anything further from the Plaintiff?

19           MS. CARUSO:  No, your Honor.  Thank you very much.

20           THE COURT:  From the Defense?

21           MS. SAMPLIN:  No, your Honor.  Thank you.

22           THE COURT:  Okay.  Thank you all.

23      (Proceedings adjourned at 2:19 p.m.)

24

25

43

CERTIFICATE OF TRANSCRIBER

1

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17          Echo Reporting, Inc., Transcriber

18            Saturday, October 11, 2025

19

20

21

22

23

24

25