Michael Willman

5 Mecca Lane Washington, ME 04574

1 (207) 242-4767

michael@websiteredev.com

Pro Se

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

Division: San Francisco

| | |
|---|---|
| WPENGINE, INC., a Delaware corporation,<br><br>  Plaintiff,<br><br>  v.<br><br>AUTOMATTIC INC., a Delaware corporation; and MATTHEW CHARLES MULLENWEG, an individual,<br><br>  Defendants. | Case Number: 3:24-cv-06917-AMO<br><br>**REPLY TO DEFENDANT'S OPPOSITION TO AMENDED MOTION FOR CONTEMPT**<br><br>DATE: November 6, 2025<br><br>TIME: 2PM<br><br>COURTROOM: Courtroom 10 - 19th Floor<br><br>JUDGE: Hon. Araceli Martínez-Olguín |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................................................1

II. BACKGROUND ...................................................................................................................2

III. ARGUMENT .........................................................................................................................3

    A. This Action Meets the Standards for Civil Contempt ………………………………3

        1. Mr. Willman Is a Related Entity of WPEngine ……………………………...4

        2. Defendants Willfully Attempted to Evade the Terms of the Injunction ……7

        3. Defendants Actions Were Not Consistent With Policies and Procedures In Place ..........................................................................................................................8

        4. Mr. Willman's Actions Do Not Violate Community Code of Conduct Guidelines ……………………………………………………………………………..12

    B. Claimed Procedural Issues Do Not Preclude a Criminal Contempt Referral ………13

IV. CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

- *HomeAway.com, Inc. v. City of Santa Monica*,
  918 F.3d 676, 684 (9th Cir. 2019) ……………………………………………………………13

- *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693, 695 (9th Cir. 1993) ......................................................................................................8

- *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 at 954-55 (9th Cir. 2014) ......................................................................................8

- *McComb v. Jacksonville Paper Co.*,
  336 U.S. 187, 191 (1949) ……………………………………………………………………8

- *NetChoice, LLC v. Bonta*,
  692 F.Supp.3d 924, 940 (N.D. Cal. Aug. 16, 2024) …………………………………………..13

- *PruneYard Shopping Ctr. v. Robins, 447 U.S. 74 (1980)*
  447 U.S. 74 (1980) ……………………………………………………………………………13

- *Reno Air Racing Ass'n, Inc. v. McCord*,
  452 F.3d 1126, 1130 (9th Cir. 2006) …..................................................................................8

- *Simon et al v. City and County of San Francisco et al*,
  No. 4:2022cv05541, 2024 WL 4314207, at *5-6 (N.D. Cal. Sept. 26, 2024) …………..8, 15

- *Taggart v. Lorenzen*,
  587 U.S. 554, 561 (2019) ……………………………………………………………………..5

- *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*,
  689 F.2d 885, 892 (9th Cir. 1982) ……………………………………………………………..5

**Rules**

- 18 U.S.C. § 401 ……………………………………………………………………………..15
- Fed. R. Civ. P. 71 …………………………………………………………………………..6, 7

I.  INTRODUCTION

Defendants, in their opposition, continue to advance a fundamentally flawed theory regarding the expectations placed on the named party in a preliminary injunction and the terms of the injunction at question in this matter. If this Court is to accept the Defendants premise, such a decision would fundamentally change the nature of its own order and leave millions of customers of WPEngine unprotected from further retaliation. Defendants contend that the injunction issued by this court, only applies to a handful of individuals employed by WPEngine and named by WPEngine's attorneys in response to an insidious email from the Defendants. Dkt. 102, Ex. A. This is despite the terms of the preliminary injunction order, which explicitly names "WPEngine's and/or its employees', users', customers', or partners'" as protected parties. Dkt. 64, at 41. This interpretation of the conversation between Defendants and Plaintiff is misstated and irrelevant to the terms and scope of the preliminary injunction.

Defendants allege that there was a "good-faith basis to bar Mr. Willman from the wordpress.slack.com workspace" and claimed that his actions were a violation of the Wordpress Code of Conduct, which they state are "evaluated on an individual basis". Dkt. 176, at 8-9. Yet at no point in Defendant's opposition do they demonstrate that their actions in supposedly enforcing the Code of Conduct are "consistent with procedures and policies in place as of September 20, 2024." Dkt. 64, at 41. While the Code establishes extensive procedures to handle violations, none of these were followed by Mr. Mullenweg in banning Mr. Willman. Furthermore, the record clearly shows that other parties accused of the same acts that Mr. Willman has been accused of, have not faced the same consequences for their actions. These parties include an official wordpress.org staff member, employed by Mr. Mullenweg's company Audrey Capital, and even Mr. Mullenweg himself.

When it comes to the nature and details of the conversations on Slack that preceded the contemptuous actions at question in this case, Defendants present a skewed overview of the timeline of events that took place on the Slack server, at times going as far as to make materially false statements to justify their actions.

## II.     BACKGROUND

To provide ongoing support for the WordPress open source project, and to help organize development efforts of the numerous volunteers that support it, wordpress.org operates a Slack server instance to enable real-time communications in a structured manner. Like all wordpress.org spaces, conduct on this Slack server is governed by the WordPress Community Code of Conduct. According to this Code of Conduct, "[i]nstances of abusive, harassing, or otherwise unacceptable behavior may be reported to the WordPress Incident Response Team at reports@wordpress.org. All complaints will be reviewed and investigated promptly and fairly." Dkt. 83, Ex. 7 at 4.

On December 10, 2024, this Court issued a preliminary injunction order against Defendants Matthew Mullenweg and Automattic, Inc. Among other provisions, this order restrained and enjoined Defendants from "blocking, disabling, or interfering with WPEngine's and/or its employees', users', customers', or partners' (hereinafter "WPEngine and Related Entities") access to wordpress.org" and went on to explicitly name slack.wordpress.org as one of the properties that Defendants were ordered to restore access to. Ex. 61, at 41-42. Following this, on December 20, Mr. Mullenweg posted an article to wordpress.org titled "Holiday Break" claiming that he had paused all "[n]ew account registrations on WordPress.org." Mr. Willman would go on to post to a channel titled "#ranting" to point out that it was not just WPEngine that Mr. Mullenweg could be held liable by, but other parties such as himself who had also suffered losses as a result of Defendants actions.

After an increasingly heated argument, Mr. Mullenweg then unilaterally disabled Mr. Willman's Slack account, following Mr. Willman's assertion that Mr. Mullenweg had engaged in conversion when he modified the Advanced Custom Fields plugin installed on Mr. Willman's website into Defendants Secure Custom Fields fork via the wordpress.org automated update system. Mr. Willman would then rejoin the Slack server on a new account and accuse Mr. Mullenweg of violating the court order at issue in this matter, stating his intent to travel to pursue an "emergency injunction" and take Mr. Mullenweg to court. Mr. Mullenweg would respond with a message that reads "saying you're flying to Houston (where I guess you think I am?) feels like a physical threat, which is not okay. Please leave this space." Dkt. 72, at 43.

### III.     ARGUMENT

#### A.  This Action Meets the Standards for Civil Contempt

Despite the claims made by the Defendants in this case, the terms of the preliminary injunction apply to "WPEngine's and/or its employees', users', customers', or partners'", not simply WPEngine itself and four named individuals employed by it. Dkt 64, at 41. As such, Mr. Willman is a Related Entity of WPEngine per the terms of the preliminary injunction order. In his removal of Mr. Willman from the WordPress Slack instance, Mr. Mullenweg failed to follow any relevant guidelines established in the Code of Conduct and in the process documentation for the Incident Response Team. Furthermore, the decision to remove Mr. Willman from the WordPress Slack instance was retaliatory in nature. This action occurred following the assertion of a potential legal claim against Defendants, and was not consistent with procedures and policies in place as of September 20, 2024. While the actions taken by Mr. Mullenweg would have been impermissible regardless of the reasons given for removing Mr. Willman, the allegations that Mr. Willman violated the Code of Conduct are not substantiated by Defendant's arguments.

**1. Mr. Willman Is a Related Entity of WPEngine**

Defendants have repeatedly attempted to claim that Mr. Willman is not a "Related Entity" as defined by the preliminary injunction and that he lacks standing as a result. Dkt 176, at 5. Additionally, they justify their actions in removing Mr. Willman by stating that it was "reasonable for Defendants to conclude that Mr. Willman was no longer an employee, user, customer, or partner of WPEngine and, thus, not a "Related Entity" for purposes of complying with the injunction." Dkt 176, at 8. Such representations are false.

From the initial conversation between Mr. Mullenweg and Mr. Willman on October 10th, it was made clear that Mr. Willman continued to maintain a business relationship with WPEngine. During this conversation, in the very message that Defendants cite to claim that he is not a Related Entity, Mr. Willman stated that he continued to receive revenue from WPEngine's affiliate program that he did not want to give up. Dkt 72, at 27. He goes on to state that he had at least one client of his company Redev that was hosted on WPEngine's managed hosting service. *Id*, at 28. Thus, from the very beginning it has been clear that Mr. Willman was a "Related Entity" of WPEngine. Defendants attempts to conflate a statement made to mollify Mr. Mullenweg do not invalidate the clear statements made by Mr. Willman in that same discussion illustrates the ongoing relationship between him and WPEngine.

In Defendant's opposition, they claim that they "had a good-faith basis for concluding that [Mr. Willman] did not qualify" as a Related Entity. Yet in response to Mr. Willman's initial statement on Slack stating that he had checked the box on the wordpress.org login despite being a member of WPEngine's affiliate program, Mr. Mullenweg implies that Mr. Willman was lying when he checked the box, stating "[i]t's your choice based on your ethics and principles to check the box or not. You chose to despite considering yourself an affiliate? That's fine. People lie all the time." Dkt 72, at 26. In doing so, Mr. Mullenweg demonstrates that it is **his own belief that Mr. Willman lied** when he

checked the box stating he was not an affiliate. Such a statement directly contradicts the arguments made by Defendants in their opposition and show a prior belief by Mr. Mullenweg that Mr. Willman was in fact an affiliate of WPEngine.

Later in the discussion, Mr. Willman goes into more detail regarding this relationship. He explicitly states that one of his ongoing clients was hosted with WPEngine and that they could not switch hosting providers until 2025 at the earliest. Dkt. 72, at 28. He then states that he stands to lose a business relationship valued at over $100,000 if Mr. Mullenweg continued to attempt to compel him to cut ties with Plaintiff. *Id*. Then, in the conversation immediately preceding Mr. Willman's ban, he alleges that "[Secure Custom Fields] was installed on [his] website against [his] will as part of a concerted campaign of extortion." *Id*, at 40-42. Mr. Willman goes on to claim that Mr Mullenweg "accessed [his] computer systems unlawfully" by converting the Advanced Custom Fields plugin to Secure Custom Fields. *Id*.

In the face of this consistent re-iteration of Mr. Willman's status as a Related Entity, the contention that Defendants had made a good faith assumption that Mr. Willman was not a Related Entity is not reasonable. "A party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Taggart v. Lorenzen,* 587 U.S. 554, 561 (2019). Even if we take Defendants claims at face value, if there was any confusion regarding Mr. Willman's status as a Related Entity, the onus was on Defendants to further investigate this question of fact. Taking a single statement by Mr. Willman disclaiming any intent to refer future clients to WPEngine as proof that he is not a "Related Entity", is not a reasonable inference. Far from making "every reasonable effort to comply with the court's order", **Defendants provide no evidence of any effort to verify whether or not Mr. Willman would be considered a Related Entity by the Court.** *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 892 (9th Cir. 1982).

For the purposes of standing under Rule 71, Mr. Willman is clearly an intended beneficiary of the preliminary injunction. The terms of this order identify both "customers" and "users" of WPEngine's products as being "Related Entities". Dkt. 64, at 41. As stated previously, Mr. Willman's company Redev has multiple website development clients hosted on WPEngine to this day, which alone meets the requirements to make him a "user" as the main developer handling these clients accounts. WPEngine themselves recognize this status as a user of their services, stating that Mr. Willman "is a WPE user" in their February 2 letter to Defendants. Dkt. 98, Ex. A. at 2. Furthermore, the Redev website located at websiteredev.com utilizes the paid Advanced Custom Fields Pro plugin, making Redev a "customer" of WPEngine and again making Mr. Willman a "user" of their products. Ex. H. Finally, a private website owned personally by Mr. Willman, which has since been shuttered, was also using the free Advanced Custom Fields plugin at the time of Defendant's contemptuous actions in this case. Dkt 72, at 58.

Regarding the threshold issue that necessitated the initial denial of this motion, this issue has already been resolved in the amended motion. The threshold issue prevents Mr Willman from pursuing claims on behalf of his company as a pro se litigant, and such claims have already been removed in the amended complaint. However, Defendants conflate the threshold issue with the question of standing. In this case, it is clear that the contemptuous actions against Mr. Willman were directed against him *personally* and not Redev. The injunction itself names "users" as a "Related Entity" alongside "customers", demonstrating an intent to protect individual users of their services. Dkt. 64, at 41. At no point do Defendants allege that the Code of Conduct violation was committed by Redev, allegations that they repeatedly make towards Mr. Willman. Thus, the claims advanced by Mr. Willman in this action are personal and he has valid standing under Rule 71 as a user of WPEngine's services. Even if the Court were to accept Defendants arguments that a user relationship with WPEngine through his employment does not grant standing, the use of the Advanced Custom

Fields plugin (which was unlawfully converted to the Secure Custom Fields plugin) on his personally owned website would still convey standing in this matter. Dkt 72, at 58.

### 2. Defendants Willfully Attempted to Evade the Terms of the Injunction

In their opposition, Defendants state that "[w]hen Defendants requested that WPEngine identify all Related Entities for purposes of the injunction, WPEngine did not include Mr. Willman, confirming he was neither an employee, user, customer, or partner of WPEngine." Dkt. 176, at 5. In doing so, they refer to an email exchange between them and Plaintiff where the Defendants demand an exhaustive list of all parties from the Plaintiff. However, Plaintiff's response explicitly states that "we are working to verify which accounts lack access, but based on our current information, below is a list of such accounts." Dkt. 83, Ex. 16. Plaintiff does not purport to have provided an exhaustive list of Related Entities and it is unreasonable to construe Plaintiff's response as an attempt to provide such an exhaustive list. Plaintiff makes this argument themselves, in a February 2 letter sent to Defendants and Mr. Willman. In this letter, Plaintiff states that "Defendants never asked WPE to provide Defendants with a list identifying every individual it considered to be a Related Entity, nor did WPE ever provide such a comprehensive list." Dkt 102, Ex. A. Thus, any argument by Defendants that Plaintiff failed to identify Mr. Willman as a Related Entity is unfounded.

When it comes to Defendants' attempts to paint their interpretation of the preliminary injunction as a "good faith and reasonable interpretation of the court's order", such an argument lacks merit. Civil contempt arises from "a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). In their opposition, Defendants imply that they were in "'[s]ubstantial compliance' with the court order" and that "every reasonable effort has been made to comply" with the terms of the injunction. Dkt 176, at 4. Yet Defendants' argument that the

injunction applies only to four individuals, when it in fact names multiple classes comprising over a million individuals and corporate entities as beneficiaries, comes closer to openly flaunting the terms of the injunction than it does complying with them.

Even if this Court accepts the premise that Defendant's action was an innocent mistake, "[a]n act does not cease to be a violation of the law and of a decree merely because it may have been done innocently." *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949). If there is confusion by the named party in a court order, regarding the scope of that order, there is a responsibility on their part to clarify these details directly with the Court. "[T]o the extent Defendants thought the injunction was unclear, they 'did not seek clarification of their obligations' and instead 'acted at their peril' when they 'undertook to make their own determination of what the [injunction] meant.'" *Simon et al v. City and County of San Francisco et al,* No. 4:2022cv05541, 2024 WL 4314207, at *5-6 (N.D. Cal. Sept. 26, 2024), (quoting *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935 at 954-55 (9th Cir. 2014)). Given this obligation, the actions of Defendants in violating the injunction clearly meet the standards for contempt, regardless of any claim that they acted in good faith.

3. **Defendants Actions Were Not Consistent With Policies and Procedures In Place**

In their opposition, Defendants claim that the steps taken to ban Mr. Willman from the wordpress.slack.org workspace were necessary to ensure the security and operability of wordpress.org. They go on to argue that such actions were consistent with its policies that were in place prior to the preliminary injunction order, policies that they claim Mr. Willman has violated. Defendants then argue that these policies need not be applied evenly, stating that "violations of the Code are evaluated on an individual basis" and that "actions taken on these external websites are not governed by the Code." Dkt 176, at 9. Not only does this contradict their claims, but it contradicts the Community Code of Conduct itself. The Community Code of Conduct states that "[t]his Code of

Conduct applies within all community spaces (virtual and in-person) and applies when an individual officially represents the community in public spaces." In their opposition, Defendants refer to an incident involving a Wordpress.org staff member named Samuel Wood who is also an employee of a company owned by Mr. Mullenweg. This individual was representing themselves as a wordpress.org staff member on the r/Wordpress subreddit that they moderated, and as such it is unclear by what basis Defendants claim that the actions of this individual do not fall under the Code of Conduct.

Equally unclear is how the handling of this issue would not be relevant to the topic at hand. The conduct of this third party involved an actual, unequivocal threat of physical violence, with the individual in question stating that they would "slap someone so hard their head will roll". Given that Defendants have alleged that Mr. Willman's own statements represent a threat of physical violence, there is a direct correlation between these two incidents. Far from Defendants statement regarding the evaluation of violations on an individual basis, the preliminary injunction order explicitly states that it "does not preclude wordpress.org's ability to ensure the security and operability of its site **consistent with procedures and policies in place as of September 20, 2024**". Dkt 64, at 41. This places a responsibility on Defendants to show that their actions to moderate the community are in fact consistent with past handling of incidents and the guidelines established in the Code of Conduct.

This incident involving a staff member of wordpress.org is not the only example of uneven application of the Code of Conduct by Mr. Mullenweg and the Incident Response Team. In a public statement posted to LinkedIn on August 26, 2025, a wordpress.org community member by the name of Sé Reed details her own experiences dealing with Mr. Mullenweg, and her alleged ongoing harassment at his hand. Ex. A. According to her statement of events, she submitted a report in September 2023 to the Incident Response Team (hereafter referred to as the IRT), alleging Code of Conduct violations by Mr. Mullenweg for "harassment, bullying, and public defamation." *Id,* at 8. Upon the culmination of the investigation of this report in January 2024, according to Ms. Reed the

IRT officially ruled that Mr. Mullenweg had engaged in behavior that was "'bullying,' 'unkind,' and 'harassment,' and that his continued actions escalated the harm." *Id.* They allegedly claimed that if his behavior continued, there would be "additional consequences, including the possibility of a ban." *Id.*

Yet, despite this determination, according to Ms. Reed this behavior continued - and now included retaliation. This culminated in Mr. Mullenweg disabling the account of Ms. Reed on January 9, 2025 and naming her in a January 11 post on wordpress.org titled "Joost/Karim Fork" which she claimed made defamatory and false statements against her. Ex. B. Ms. Reed then filed a second Code of Conduct report against Mr. Mullenweg on January 23, 2025; detailing what she claims was "continued bullying, harassment and, additionally, retaliation and defamation." Ex. A. at 8. Less than a week later, she allegedly received a response from the IRT stating that "[b]ased on the experiences and events after your last report, the team feels that the issues you reported are something we don't have ways to enforce or work with." Ex. A. at 9.

These two incidents clearly illustrate Defendants willingness to ignore and avoid the processes and policies that govern wordpress.org. It appears to be their belief that they can simply act as they wish, without complying with these policies in the face of a direct order by this Court. However, the terms of the Preliminary Injunction are clear. Mr. Mullenweg is not given free reign to act with impunity when it comes to enforcing the policies of wordpress.org against Related Entities of WPEngine. The order explicitly requires him to follow the policies and procedures in place as of September 2024. If this Court takes Defendant's claims regarding the evaluation of violations on an individual basis at face value, what is to prevent Defendants from taking unilateral action against other Related Entities without following the proper incident response process and claiming that they somehow violate the Code of Conduct by Defendants subjective interpretation? If Defendants are not held to the standards set by the Code and expected to handle new violations in the same manner that

past violations have been handled, there is nothing that prevents such an occurrence. To grant Defendants the ability to unilaterally declare parties in violation of the wordpress.org policies via executive fiat would invalidate the protections enshrined in the preliminary injunction.

Given these facts, this Court should evaluate the handling of this incident within the guidelines of the Wordpress Community Code of Conduct, and consider whether the actions taken by Mr. Mullenweg are truly consistent with the "procedures and policies in place". According to these guidelines, the section titled "Enforcement" reads "Instances of abusive, harassing, or otherwise unacceptable behavior may be reported to the WordPress Incident Response Team at reports@wordpress.org. All complaints will be reviewed and investigated promptly and fairly." Dkt. 83, Ex. 7 at 4. These guidelines clearly establish that it is the IRT, not Mr. Mullenweg, who are responsible for taking and handling incident reports. A snapshot of the IRT Handbook page on wordpress.org, hosted by the Wayback Machine, shows that the team consisted of 16 members as of September 2024 - none of them Mr. Mullenweg. Ex. C. It also states that "[i]n some circumstances, the IRT will escalate situations to the Executive Director of WordPress." (referring to then Executive Director of Wordpress, Josepha Chomphosy). At no point in any portion of the documentation on make.wordpress.org is there a reference made towards Mr. Mullenweg having a position of enforcing the Code of Conduct or handling incidents reported to the IRT.

Even if we are to accept that Mr. Mullenweg does have such a role, other documentation contradicts his handling of this incident. In the IRT training documentation, a page titled "Conflicts of interest" states that "[a]n IRT member is expected to disclose a conflict of interest, and may be asked to step away from handling an incident report due to conflict of interest. Conflicts of interest include: Involvement in the reported violation, either as the reporter or the reported party." Ex. D. Given that Mr. Mullenweg is clearly one of the two parties involved in the reported violation; his handling of this incident violates this expectation placed on the IRT.

**4. Mr. Willman's Actions Do Not Violate Community Code of Conduct Guidelines**

In their opposition, Defendants outline a number of different claims regarding Mr Willman's conduct in the wordpress.slack.com workspace, which include stating that he engaged in "direct targeting, harassment, and personal attacks of Mr. Mullenweg". Yet, Defendants fail to demonstrate that these justifications were truly the **original** reason for the removal of Mr. Willman from the Slack instance, and not merely a justification made after the fact for his removal. Furthermore, evidence introduced by Defendants directly contradicts this justification. Defendant's claim is that Mr. Willman's violation of the Code of Conduct necessitated the ban. However, the policies of the IRT regulating how Code of Conduct violations are to be handled clearly state that members conducting an investigation are to issue a "Code of Conduct response plan" which reads in part "We are issuing a [correction / warning / temporary ban / permanent ban], as described in the Community Code of Conduct Enforcement Guidelines, and request that you [insert outcome and end date, such as: step away from your organizer role for two months, ending on 14 February, 2024]." Ex. E, at 5.  The policy documentation goes on to state that IRT team members should "include a clear and impartial description of the behavior that led to this response plan." *Id.* Yet, no such communications were exchanged with Mr. Willman during the process of removing him from the community.

Many of the other allegations Defendants make against Mr. Willman are similarly suspect. In their opposition, Defendant's claim that Mr. Willman received multiple written warnings regarding his conduct that supposedly violated the Code of Conduct. Yet Defendants cannot point to a single example of a warning that is given according to the Incident Response process illustrated above, and fail to provide evidence of any such warnings (whether following the Incident Response process or not) in their opposition. Defendants also claim that "a fellow user condemned Mr. Willman for his 'mud-slinging' in his comments about Mr. Mullenweg." Dkt. 176, at 2. Yet, when asked about this comment and whether it was directed at Mr. Willman, the user in question stated that he 'was not

accusing [Mr. Willman], in particular, of mudslinging.' [Defendants] misunderstood the intent and context." Dkt. 99, Ex. B at 3.

Defendants argue that "WordPress.org's content moderation is First Amendment-protected activity", but this argument lacks merit. Dkt 176, at 10. Nothing in the amended motion for contempt or this reply purports to prevent the staff of wordpress.org from performing content moderation that falls within the policies and procedures established as of September, 2024. Nor does the text of the preliminary injunction. It is the conduct of disabling the accounts of Related Entities that is prohibited, not speech. This Court has found that "[a] regulation that restricts conduct without a "significant expressive element" is not subject to any level of First Amendment scrutiny." *NetChoice, LLC v. Bonta,* 692 F.Supp.3d 924, 940 (N.D. Cal. Aug. 16, 2024) (citing *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 684 (9th Cir. 2019)). In this case, the conduct which is prohibited is "blocking, disabling, or interfering with" access to wordpress.org by Related Entities, which lacks a significant expressive element. Dkt 64, at 41. The injunction does not purport to limit the speech of Defendants, as "no specific message is dictated by the State to be displayed on appellants' property, and appellants are free to publicly dissociate themselves from the views of the speakers." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980).

**C. Claimed Procedural Issues Do Not Preclude a Criminal Contempt Referral**

Defendants claim that the amended motion for contempt fails to adhere to the requirements for a finding of criminal contempt, which include "notice of charges, appointment of a prosecutor, assistance of counsel, ability to present a defense, and a jury trial." However, none of the claimed deficiencies prevent a referral to the US Attorney for criminal contempt if Defendants actions are found to represent a *willful* violation of the preliminary injunction. Should this Court make such a referral to the US Attorney or other relevant prosecutor, all of the requirements for criminal contempt would subsequently be met prior to indictment. They do not need to be met now.  Nor do these

claimed deficiencies prevent coercive use of imprisonment to ensure compliance with this Court's orders. "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401.

Defendants go on to claim that Mr. Willman fails to demonstrate that they "willfully violated the injunction." Dkt. 176, at 11. However, the evidence prevented clearly establishes such a pattern. Immediately following the preliminary injunction order by this Court, Defendants proceeded to reach out to Plaintiff with an extraordinary email, requesting an impossible list for the purposes of contracting the scope and scale of the preliminary injunction. Ignoring repeated references to the millions of users of WPEngine's products and services in the order, they 'acted at their peril' when they 'undertook to make their own determination of what the [injunction] meant.'" *Simon,* 2024 WL 4314207, at *5-6.

In many cases, a violation of a preliminary injunction or other court order would warrant primarily coercive monetary sanctions to compel compliance. However, in this case, Mr. Mullenweg has publicly bragged about his "post-economic" status in regard to this case and his ability to withstand the consequences of his actions. Ex. F. Even a particularly onerous financial sanction would equal a small portion of his total net worth. Given this, it is unlikely that monetary sanctions alone will be sufficient to compel compliance by Mr. Mullenweg. This is especially relevant in light of many of the actions that Mr. Mullenweg has taken that flaunt this Court's order.

Mere days after the imposition of the preliminary injunction, Mr. Mullenweg announced the pausing of new account registrations, plugins reviews, and submissions to the plugin, theme and photo directories. As justification for these changes, Mr. Mullenweg states "I'm legally compelled to provide free labor and services to WP Engine thanks to the success of their expensive lawyers, so in order to avoid bothering the court I will say that none of the above applies to WP Engine, so if they need to bypass any of the above please just have your high-priced attorneys talk to my high-priced

attorneys and we'll arrange access, or just reach out directly to me on Slack and I'll fix things for you." Meanwhile, in response to the requirement that he remove the WPEngine affiliation checkbox from the wordpress.org login page, Mr. Mullenweg replaced it with a mandatory checkbox that required users to agree that "Pineapple is delicious on pizza." Ex. G.

When combined with Defendants' attempt to narrow the scope of the injunction to a small handful of employees named by WPEngine, these actions paint a bleak picture. It is clear that Defendants lack a willingness to comply with this Court's orders in any meaningful sense. Instead, they prefer to simply pay lip service to the Court while continuing to engage in the same course of action they had otherwise intended to follow. In the light of this and the limited coercive value that financial sanctions will have in compelling compliance by Defendants, this Court should consider all non-monetary means at its disposal (including, if necessary, coercive imprisonment or the creation of a WordPress Governance Board) to ensure compliance with its orders, as well as consider whether making a criminal contempt referral is justified in this matter.

## IV. CONCLUSION

Based on these details, I humbly request that this Court: grant my motion for contempt, impose compensatory and coercive monetary sanctions, impose coercive non-monetary sanctions to ensure ongoing compliance with this Court's orders, establish a WordPress Governance Board, and make a criminal contempt referral in this case to the US Attorney.

Respectfully submitted,

Date: October 14, 2025

By: /s/ *Michael Willman*

Michael Willman