1  JOSEPH R. ROSE, SBN 27902
     jrose@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   One Embarcadero Center
3  San Francisco, CA 94111-3715
   Telephone: 415.393.8200
4  Facsimile: 415.801.7358

5  MICHAEL H. DORE, SBN 227442
     mdore@gibsondunn.com
6  ILISSA SAMPLIN, SBN 314018
     isamplin@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
8  Los Angeles, CA 90071-3197
   Telephone: 213.229.7000
9  Facsimile: 213.229.6652

JOSH A. KREVITT, SBN 208552
  jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301-1744
Telephone: 650.849.5300
Facsimile: 650.849.5333

ORIN SNYDER (admitted pro hac vice)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.2400
Facsimile: 212.351.6335

10  Attorneys for Defendants Automattic Inc. and
    Matthew Charles Mullenweg

11

12

13

14

15

16

17          IN THE UNITED STATES DISTRICT COURT

18          FOR THE NORTHERN DISTRICT OF CALIFORNIA

19          SAN FRANCISCO DIVISION

20  WPENGINE, INC., a Delaware corporation,

            Plaintiff,

21

22          v.

23  AUTOMATTIC INC., a Delaware corporation;
    and MATTHEW CHARLES MULLENWEG, an
24  individual,

            Defendants.

25

26

27

28

Case No. 3:24-cv-06917-AMO

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CORRECTED SECOND AMENDED COMPLAINT**

**Hearing:**
Date:      January 8, 2026
Time:      2:00 p.m.
Place:     Courtroom 10

Hon. Araceli Martínez-Olguín

Gibson, Dunn &
Crutcher LLP

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on Thursday, January 8, 2026 at 2:00 p.m. Pacific time, or as soon as the matter may be heard, in Courtroom 10, 19th Floor, 450 Golden Gate Avenue, before the Honorable Araceli Martínez-Olguín, Defendants Automattic Inc. and Matthew Charles Mullenweg (collectively, "Defendants"), will and hereby do move this Court to dismiss Counts 3, 11, 12, 13, and 14 of Plaintiff WP Engine, Inc.'s Corrected Second Amended Complaint (ECF 180), without leave to amend. This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities in support thereof, all matters of which the Court may take judicial notice, and such documentary and oral evidence as may be presented at or before the hearing on this motion.

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**

2
Page

3    I.    INTRODUCTION .................................................................................................. 1

4    II.   LEGAL STANDARD ............................................................................................ 2

5    III.  ARGUMENT ......................................................................................................... 3

6          A.    The Court Should Again Dismiss WPE's Antitrust Claims (Counts 11–14) ............... 3

7                1.    WPE's Proposed Aftermarkets Remain Implausible ....................................... 4

8                2.    WPE Still Fails to Allege Market Power ......................................................... 7

9                3.    WPE Fails to Allege Antitrust Injury ............................................................. 11

10               4.    WPE Fails to Allege Any Anticompetitive Conduct ...................................... 12

11               5.    WPE Fails to Allege Any Unlawful Tying ...................................................... 15

12         B.    The Court Should Again Dismiss WPE's Section 1030(a)(7) Claim (Count 3) ......... 16

13               1.    WPE Cannot Establish Extortion or Extortionate Intent on the Basis of
                       Trademark Enforcement ................................................................................. 17
14

15               2.    WPE Cannot Establish a Section 1030(a)(7) Violation Based on Events
                       Occurring *After* the Alleged Extortion Failed .............................................. 19

16               3.    WPE Fails to Allege Any Damage to a Protected Computer ........................ 21

17         C.    The *Noerr-Pennington* Doctrine Bars Plaintiff's Amended Claims .......................... 22

18   IV.   CONCLUSION ..................................................................................................... 25

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016)...................................................................................15

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999)...................................................................................12

*In re Am. Express Anti-Steering Rules*,
    361 F. Supp. 3d. 324 (E.D.N.Y. 2019) .......................................................................4

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*,
    108 F.3d 1147 (9th Cir. 1997).......................................................................12, 13, 15

*In re Apple iPod iTunes Antitrust Litig.*,
    796 F. Supp. 2d 1137 (N.D. Cal. 2011) .....................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................2, 3

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)...................................................................................................11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................2, 3

*Blix Inc. v. Apple, Inc.*,
    2021 WL 2895654 (D. Del. July 9, 2021), *aff'd*, 2022 WL 17421225 (Fed. Cir.
    Dec. 6, 2022)..............................................................................................................11

*Brokerage Concepts v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998)......................................................................................19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...................................................................................................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...................................................................................................11

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008).....................................................................................15

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
    499 U.S. 365 (1991)...................................................................................................25

*Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.*,
    944 F.2d 1525 (9th Cir. 1991)...................................................................................23

*Coronavirus Rep. v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) ....................................................................4, 6, 7, 12

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992) ................................................................................6, 7, 15

*Eclipse Gaming Sys., LLC v. Antonucci*,
2017 WL 3071258 (N.D. Ill. July 18, 2017) ...............................................20

*Empress LLC v. City and County of San Francisco*,
419 F.3d 1052 (9th Cir. 2005) .................................................................24, 25

*Emulex Corp. v. Broadcom Corp.*,
2010 WL 11595718 (C.D. Cal. June 7, 2010) ........................................13, 14

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ...........................................................4, 5, 6, 7, 10

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. July 20, 2010) ..............................................14

*Gamble v. Kaiser Foundation Health Plan*,
348 F. Supp. 3d 1003 (N.D. Cal. 2018) .......................................................24

*Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns and Elecs., Inc.*,
421 F. Supp. 274 (N.D. Cal. 1976) ..............................................................15

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .......................................................................2

*Godecke v. Kinetic Concepts, Inc.*,
937 F.3d 1201 (9th Cir. 2019) .....................................................................17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020) .......................................................14

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .......................................................................7

*Inplant Enviro-Systems 2000 Atlanta, Inc. v. Lee*,
2015 WL 13297963 (N.D. Ga. June 9, 2015) ..............................................20

*Int'l Airport Ctrs., L.L.C. v. Citrin*,
440 F.3d 418 (7th Cir. 2006) ........................................................................21

*Jockey Int'l, Inc. v. Burkard*,
1975 WL 21128 (S.D. Cal. Feb. 21, 1975) ..................................................18

*Klein v. Facebook, Inc.*,
580 F. Supp. 3d 743 (N.D. Cal. 2022) .........................................................13

*Lambrix v. Tesla, Inc.*,
737 F. Supp. 3d 822 (N.D. Cal. 2024) ...........................................................6

*Levitt v. Yelp! Inc.*,
765 F.3d 1123 (9th Cir. 2014) ..........................................................17, 18, 19

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009) ................................................................................16, 21

*MLW Media LLC v. World Wrestling Entm't Inc.*,
   2023 WL 4053802 (N.D. Cal. June 15, 2023) ...............................................................10

*NetApp, Inc. v. Nimble Storage, Inc.*,
   41 F. Supp. 3d 816 (N.D. Cal. 2014) ............................................................................21

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ...........................................................................9, 10, 14

*Nunang-Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
   711 F.3d 1136 (9th Cir. 2013) .......................................................................................22

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) .........................................................................................................4

*Pac. Exp., Inc. v. United Airlines, Inc.*,
   959 F.2d 814 (9th Cir. 1992) .........................................................................................12

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) .........................................................................................................24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ..........................................................................................15

*QuickLogic Corp. v. Konda Techs., Inc.*,
   618 F. Supp. 3d 873 (N.D. Cal. 2022) ..........................................................................25

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .......................................................................................7, 10

*SkyHop Techs., Inc. v. Narra*,
   58 F.4th 1211 (11th Cir. 2023) ......................................................................................21

*SmileDirectClub, LLC v. Berkely*,
   2019 WL 1091339 (C.D. Cal. Jan. 22, 2019) ...............................................................18

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ..............................................................................2, 18, 23

*St Andrews Links Ltd. v. Gilfin International Ltd.*,
   2019 WL 4221725 (N.D. Cal. Sept. 5, 2019) ...............................................................25

*Sullivan v. Tagliabue*,
   828 F. Supp. 114 (D. Mass. 1993), *aff'd*, 25 F.3d 43 (1st Cir. 1994) ............................9

*Tate v. Pac. Gas & Elec. Co.*,
   230 F. Supp. 2d 1072 (N.D. Cal. 2002) ........................................................................13

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ............................................................................................4

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012).................................................................................16

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990)...................................................................................9

*Verizon Commc'ns Inc. v. L. Offs. Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)........................................................................................12, 14

**Statutes**

18 U.S.C. § 1030(a)(7).........................................................................16, 17, 18, 19, 20, 21

18 U.S.C. § 1030(e)(1)....................................................................................................21, 22

18 U.S.C. § 1030(e)(8)............................................................................................................21

18 U.S.C. § 1951(b)(2)............................................................................................................17

**Other Authorities**

*An Analysis of Antitrust Principles and Their Principles*, ¶ 563d (4th and 5th Ed.
    2020) ...........................................................................................................................4, 15

W3Techs, "Market shares of web hosting providers," https://w3techs.com/technologies/
    overview/web_hosting (last accessed on Oct. 17, 2025) .......................................10

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................................................22

Gibson, Dunn &
Crutcher LLP

# I.    INTRODUCTION

Plaintiff WP Engine, Inc.'s ("WPE") Second Amended Complaint ("SAC") fails to resuscitate the defective antitrust and Computer Fraud and Abuse Act ("CFAA") "extortion" claims that the Court already rejected. Last time, the Court dismissed WPE's antitrust claims because WPE did not plausibly allege market power in any cognizable antitrust market, and the Court threw out WPE's CFAA Section 1030(a)(7) claim because WPE failed to identify any extortionate threats by Defendants. WPE repackages those claims with new rhetoric, but they remain irredeemably flawed for the same reasons (and others). This time, the Court should dismiss WPE's repleaded antitrust and CFAA extortion claims with prejudice.

*First*, WPE's antitrust claims continue to suffer from the same defects this Court highlighted in its prior order (as well as many others). WPE still does not plausibly allege any cognizable antitrust markets. Its proposed WordPress-only aftermarkets for hosting, plugins, and plugin distribution have all the same problems that this Court highlighted in its prior opinion—including that consumers were aware of the nature of these markets when first choosing WordPress.

WPE also fails (again) to plausibly allege market power. Though it adds new accusations and soundbites about Defendants' control of WordPress software, WPE never contests that WordPress software is free and available to all. Nor does WPE allege that Defendants have the power to raise the cost of WordPress software without losing market share to other web content management systems ("WCMS")—which are *also* free and open to all. SAC ¶ 227. And WPE's new allegations affirmatively establish a lack of market power in the proposed aftermarkets by showing, for example, not only robust competition among hosting platforms, but also that Defendants have ***less than 1%*** of the hosting segment, while WPE has nearly *twice* Defendants' share. *See* ¶ 281 & n.116.

WPE's repeated failure to satisfy basic antitrust pleading requirements is unsurprising. Open-source software ecosystems are among the most competitive markets around because of the nature of open-source software—it is always available for anyone to use, modify, and distribute at no cost. With minimal barriers to entry, competition is fierce, and maintaining a monopoly is virtually impossible. Plaintiff identifies no case finding a monopoly in an open-source software market. This Court should

Gibson, Dunn &
Crutcher LLP

not be the first to do so.

*Second*, WPE again fails to state a CFAA claim under 18 U.S.C. § 1030(a)(7). That provision bars threats to harm a computer (or acts making good on such threats) to facilitate *extortion—i.e.*, to wrongfully obtain something of value. But WPE again alleges only one kind of payment demand by Defendants: A demand that WPE pay for a license to use Defendants' trademarks. As this Court already held, that claim "fails" because "demands for a licensing fee do[] not constitute extortionate conduct" under the CFAA. Dkt. 169 at 13–14. None of WPE's new allegations cures that fatal flaw. WPE's Section 1030(a)(7) claim also fails because WPE cannot establish that Defendants' alleged "threats" to cut off WPE's access to WordPress.org and fork the ACF plugin were made to extort WPE. To the contrary, WPE alleges that Defendants made those threats *after* WPE rebuffed their trademark license demands. WPE also cannot establish that Defendants threatened or caused damage to a protected computer. Once again, WPE cannot state a claim for relief under Section 1030(a)(7).

*Third*, the First Amendment precludes WPE's antitrust and Section 1030(a)(7) claims. At bottom, these claims seek to impose liability on Defendants for demanding that WPE pay for a trademark license. But the *Noerr-Pennington* doctrine immunizes that request, which was a form of settlement demand. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934–36 (9th Cir. 2006). WPE's attempt to impose antitrust and CFAA liability based on constitutionally protected conduct is contrary to law.

WPE's SAC confirms that its antitrust and Section 1030(a)(7) claims are (and always have been) more than just inadequately pleaded. They are fatally flawed and cannot be revived. The Court should dismiss those claims with prejudice.

## II.    LEGAL STANDARD

A complaint should be dismissed under Rule 12(b)(6) if it lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. The Court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th

Cir. 2008). Nor must a court "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III.    ARGUMENT

### A.    The Court Should Again Dismiss WPE's Antitrust Claims (Counts 11–14)

The Court previously dismissed WPE's antitrust claims on two grounds. First, the Court concluded that WPE had failed to adequately plead its purported three single-brand aftermarkets because WPE failed to "demonstrate that consumers of WordPress web content management systems lacked awareness that electing to use such a system restricts them to hosting services, plugins, and plugin distribution markets within the WordPress ecosystem." Dkt. 169 at 6. Second, the Court held that WPE failed to demonstrate market power in the WCMS foremarket. *Id.* at 7–9. The Court rejected WPE's allegations of direct evidence of market power—Defendants' demands for trademark royalty payments, WPE's bar from WordPress.org, WPE's loss of customers to rivals, and the purported reduction in the quality of WordPress—as either irrelevant or conclusory. *Id.* at 8–9. And the Court dismissed WPE's indirect evidence of market power because WPE's allegations about what percentage of websites ran on WordPress software did not explain "how much of a market share Defendants maintain vis-à-vis the[ir] competitors." *Id.* at 9. These same deficiencies persist in WPE's amended pleadings.

In its SAC, WPE tries to reallege all four of its previously dismissed antitrust claims: two under Section 2 of the Sherman Act for monopolization and attempted monopolization (Counts 11–12), and two for unlawful tying under Section 1 of the Sherman Act and California's Cartwright Act (Counts 13–14). WPE's new allegations add volume but not substance. WPE continues to rely on four separate "markets"—the WCMS foremarket in which WordPress open-source software competes and three separate single-brand aftermarkets that are derivative of WordPress. SAC ¶ 258. And WPE re-alleges purported "anticompetitive" conduct within these markets that boils down to attacks on WPE alone, not on competition as a whole, such as "[d]isparaging WPE in the marketplace" and inducing WPE's customers "to break their contracts with WPE." *Id.* ¶ 196.

The Court should again dismiss WPE's antitrust claims. ***First***, WPE still fails to identify any

single-brand aftermarkets that can form the basis of an antitrust claim. **Second**, WPE fails to allege facts showing that Defendants have market power either in the WCMS foremarket or in any of the ill-pleaded aftermarkets. **Third**, WPE fails to allege antitrust injury because Defendants' purported mis-conduct has not harmed competition, only an alleged competitor. **Fourth**, WPE's alleged anticompet-itive conduct amounts to nothing more than complaints about Defendants' statements and alleged re-fusal to deal with WPE, but the antitrust laws do not police good manners or force companies to deal with competitors. **Fifth**, WPE's "tying" allegations fail because WPE does not allege that any Word-Press.org customers entered into any agreement *not* to use WPE.

### 1. WPE's Proposed Aftermarkets Remain Implausible

As this Court previously explained, "[a] threshold step in any antitrust case is to accurately define the relevant market." Dkt. 169 at 2 (quoting *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023)). "For purposes of 'both Section 1 and Section 2 of the Sherman Act, a relevant market defines 'the field in which meaningful competition is said to exist.'" *Id.* (quoting *Coronavirus Rep.*, 85 F.4th at 955). "Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (cleaned up).

WPE alleges three gerrymandered WordPress-only aftermarkets: (1) WordPress hosting ser-vices; (2) WordPress custom field plugins; and (3) WordPress plugin distribution. SAC ¶ 261. Such "single brand" markets are "presumptively" underinclusive absent allegations that the product at issue has "significant differences in design, quality, use, or other physical features" that make a "multibrand market" infeasible. P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Principles*, ¶ 563d (4th and 5th Ed. 2020) ("Areeda & Hovenkamp"). Accordingly, single-brand aftermarkets are treated with deep "skepticism," *In re Am. Express Anti-Steering Rules*, 361 F. Supp. 3d. 324, 343 (E.D.N.Y. 2019) (collecting cases), and "frequently" dismissed on the pleadings, *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (Sotomayor, J.).

To plead a cognizable single-brand aftermarket, WPE must clear a high bar. It must demonstrate that "demand for" the aftermarket product is "entirely dependent on the prior purchase" in the fore-market, *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 976 (9th Cir. 2023), and, relatedly, that an after-market necessarily requires a "prior purchase[]" in the foremarket. *Coronavirus Rep.*, 85 F.4th at 955

(affirming dismissal of aftermarket on the pleadings). Plaintiff must also plead that "(1) the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic*, 67 F.4th at 977.

Last time around, WPE's allegations foundered on the first factor: the Court held that WPE failed to "demonstrate that consumers of WordPress web content management systems lacked awareness that electing to use such a system restricts them to hosting services, plugins, and plugin distribution markets within the WordPress ecosystem." Dkt. No. 169 at 6. The same fatal defect persists in WPE's amended pleading, and the remaining factors (which the Court did not need to reach last time) independently preclude antitrust liability.

***First***, WPE still fails to allege that the "aftermarket restrictions are not generally known when consumers make their foremarket purchase." *Epic*, 67 F.4th at 977. Rather, WPE's new allegations confirm this Court's prior conclusion that "consumers entering the WordPress ecosystem by electing a WordPress web content management system would know they were locked-in to WordPress aftermarkets" for hosting, custom field plugins, and plugin distribution. Dkt. 169 at 6; SAC ¶¶ 304–06, 317–18. In particular, WPE still compares a consumer's choice of a WCMS to choosing an Apple or Windows operating system and the associated technological lock-in that apps on one may not work on the other. *Id.* ¶¶ 306–08. The Ninth Circuit found the same facts *inadequate* to establish a single-brand aftermarket in *Epic*—rejecting Epic's proposed iOS-only app distribution aftermarket because there was "'no evidence in the record demonstrating that consumers are unaware that the App Store is the sole means of digital distribution on the iOS platform.'" *Epic*, 67 F.4th at 980. Likewise here, consumers are undisputedly aware that their selection of WordPress locks them into WordPress-only plugins and plugin distribution, precluding their single-brand aftermarket claims as a matter of law.

WPE argues that consumers were unaware of Defendants' allegedly "reserv[ing] for themselves" (1) "the abilities to charge exorbitant fees for access to wordpress.org," (2) "the ability to block market participants' access to wordpress.org," and (3) "the ability to assert ownership and control over WordPress software and trademarks." SAC ¶¶ 344–47. But none of these examples is an *aftermarket*

*restriction* in the sense that courts use the term—that is, a mechanism by which WordPress users are "locked in" to WordPress aftermarkets. *See Epic*, 67 F.4th at 977, 980. WPE's own caselaw recognizes this definition of "restriction." In *Coronavirus Reporter*, the "restriction" in question was Apple's ability to choose which apps would be available through the App Store, and the Ninth Circuit concluded that plaintiffs "d[id] not demonstrate that iOS end consumers lacked awareness that buying an iPhone constrains which apps would be available to them through the App Store." 85 F.4th at 953, 956. Similarly, in *Lambrix v. Tesla, Inc.*, plaintiffs alleged that "Tesla owners are 'locked in' to using car parts that were specifically designed to be compatible with Teslas" and that Tesla restricted "individual shops and car owners from conducting everything but the most minimal repair," thereby "forc[ing] Tesla owners to pay supracompetitive prices for parts and services, while enduring extensive wait periods to have their EVs fixed." 737 F. Supp. 3d 822, 835 (N.D. Cal. 2024). Here, by comparison, *none* of the purported restrictions that WPE identifies—the ability to charge "exorbitant fees," to block access to WordPress.org, or to "assert ownership and control over WordPress software and trademarks," SAC ¶¶ 344–47—"locks in" WordPress customers to WordPress-only options after they select WordPress WCMS.

**Second**, WPE fails to allege plausibly that "significant information costs prevent accurate life-cycle pricing," *Epic*, 67 F.4th at 977—that is, "the total cost of the 'package'—equipment, service, and parts—at the time of purchase" of the primary product. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 473 (1992). WPE asserts that Defendants "secretly reserved for themselves the abilities to charge exorbitant fees for access to wordpress.org," and that the market "had no meaningful way to discover Defendants' lies about 'free' and 'open' access or 'nonprofit' control in the face of Defendants' repeated misrepresentations and omissions." SAC ¶¶ 344, 350. But WPE contradicts this theory by also alleging that WordPress.org "enforce[s]" many publicly available policies that establish community standards, *id.* ¶ 70, and that WordPress.org can "ban someone and disable all their plugins" for certain violations—including trademark infringement, RJN Ex. 1 at 4–6, 9, 16–18, 24–27. In short, consumers had notice that WordPress.org could ban them for misconduct, and WPE acknowledges that the purported hidden fees that it faced were linked to Defendants' enforcement of trademark rights (whether WPE agreed with Defendants' position or not), *id.* ¶¶ 208, 212—not to mere access to

WordPress.org or plugins therein, which is all the average consumer seeks.

*Third*, WPE fails to allege that demand for hosting services necessarily requires a "prior purchase[]" in the foremarket. *Coronavirus Rep.*, 85 F.4th at 955. The cost of WordPress software is zero, and although it is a key input into the hosting market, it is not clear from WPE's allegations that "demand for" hosting services is "entirely dependent on the prior purchase" of WordPress software. *Epic*, 67 F.4th at 976. Indeed, the reverse may be the case: consumers purchase hosting services, one input for which happens to be WCMS software, but the hosting is no more derivative of the WCMS market than personal computers are derivative of the chip market. Given that WordPress software's cost is zero, it is all the more strange to consider for-profit hosting services the derivative product.

### 2. WPE Still Fails to Allege Market Power

Like last time, WPE also fails to plausibly allege Defendants' market power in any of the purported relevant markets. Market power can be shown with direct or indirect evidence. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). For direct evidence, the Ninth Circuit requires "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Epic*, 67 F.4th at 983. For indirect evidence, "[c]ourts generally require a 65% market share to establish a prima facie case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997); *see also Kodak*, 504 U.S. at 481 (holding control of 80% to 95% was sufficient market power for monopolization); *Rebel Oil*, 51 F.3d at 1438 (holding 44% may be sufficient for attempted monopolization). WPE fails to plausibly allege direct or indirect evidence of market power—and for good reason: It knows that Automattic's share of the hosting market is less than 1%.

*WCMS Foremarket.* The Court previously held that WPE had failed to allege Defendants' market power in the WCMS foremarket through either indirect or direct evidence. Dkt. 169 at 8. For indirect evidence, the Court held that WPE had failed to allege what percentage "market share [for WCMSs] Defendants maintain vis-à-vis the[ir] competitors." *Id.* at 9. And for direct evidence, the Court concluded that WPE had failed to allege that Defendants had the power to increase the price, decrease the quality, or limit competition in the alleged markets. WPE's amended pleading cures neither deficiency.

As for indirect evidence, WPE alleges that "WordPress" comprises 60% of content management systems and an even higher percentage of *web* content management systems and ascribes all of that "market share" to Defendants. SAC ¶¶ 281–83 & n.116. But that attribution—which includes WPE's own business—is implausible. To make the leap from "WordPress" to Defendants, WPE points to Mullenweg's control of the website, WordPress.org. *See* SAC ¶¶ 282–83. According to WPE, because Mullenweg allegedly touts that "[t]he only authorized way to obtain WordPress (the web content management system) is through WordPress.org," Mullenweg therefore controls all of WordPress's alleged 60% WCMS market share. *Id.* ¶ 285.

This theory ignores the nature of open-source software and the meaning of market share. As the SAC explains, because WordPress is open source "anyone in the world has permission to access, review, copy, modify, distribute, and create derivative works of WordPress without payment to anyone." SAC ¶ 49. Thus, regardless of whether Mullenweg controls WordPress.org or allegedly touts it as the sole "authorized" source for WordPress, he does not (and cannot) control its distribution or use through alternative channels, such as GitHub. WPE does not allege (nor could it) that the WordPress software supporting those websites was downloaded exclusively from WordPress.org.

In terms of direct evidence, WPE still fails to allege that the price of WordPress open-source software has increased beyond zero. To the contrary, WPE concedes that WordPress is open-source software that is available for everyone to use, adapt, and distribute "without payment to anyone." SAC ¶ 49. WPE also admits that competing WCMS software, like Drupal and TYPO3, is likewise free. *Id.* ¶ 227. Thus, if Defendants were to begin charging a non-zero rate for WordPress software, consumers could (and would) pivot to another, free distribution channel for WordPress—or to a different, no-cost WCMS entirely.

WPE alleges that Defendants have created an "effective" price increase by demanding trademark licenses and disrupting the "operation and functionality of millions of websites" (*i.e.*, WPE's own customer accounts). SAC ¶¶ 277–78. The Court already squarely rejected this contention because "while Defendants may have demanded a royalty payment that could have resulted in an increase in WPEngine's costs or may have been successful in securing such payment from other competitors, that says nothing about the price for the product in the relevant foremarket," Dkt. 169 at 8, particularly

given that WPE did not pay for a trademark license. Anyone can build a website using the WordPress software without using any of Defendants' trademarks. *Id.* ¶ 49. And demands for IP licenses are non-actionable in any event, since "a monopolist generally has no duty to share (or continue to share) its intellectual . . . property with a rival." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013). Incidental costs from Defendants' alleged ban of WPE from WordPress.org also does not connect the dots. "[A]n indirect and incidental effect upon competition in the [relevant] market by virtue of" defendant's action towards one participant "cannot be said to be actionable under the antitrust laws." *Sullivan v. Tagliabue*, 828 F. Supp. 114, 118 (D. Mass. 1993), *aff'd*, 25 F.3d 43 (1st Cir. 1994).

WPE also alleges that Defendants have "decreased quality" and caused "cost increases" through "foment[ing] an environment of chaos and uncertainty." *Id.* ¶ 278–79. As the Court concluded previously, however, these "allegations that Defendants' conduct reduced quality are conclusory." Dkt. 169 at 8. Aside from vague references to perceived "stability" (SAC ¶ 279), WPE does not explain how Defendants' alleged conduct decreased the quality of WordPress software itself or led to an associated increase in costs. Nor does WPE explain how these effects, even if properly pleaded, affected competition in the WCMS market overall, as opposed to WPE and its customers specifically. And even assuming that there was an overall decrease in the quality of WordPress open-source software (there wasn't), Defendants would have market power only if they did not correspondingly lose customers. *See United States v. Syufy Enters.*, 903 F.2d 659, 666 (9th Cir. 1990) ("it is not market share that counts, but the ability to *maintain* market share"). But WPE's own allegations show a steady decrease in WordPress's market share in the content management systems market from September 2024 to September 2025. *See* SAC ¶ 281. While this decrease is not necessarily attributable to the alleged price increase or degradation of WordPress open-source software, it confirms that neither Defendants nor anyone else has the power to maintain share in the WCMS market.

**WordPress-Only Aftermarkets.** WPE's allegations of market power in the purported aftermarkets suffer from the same deficiencies the Court identified with respect to the WCMS foremarket. *See* Dkt. 169 at 7–9.

WPE does not plausibly allege indirect evidence of market power in any of the alleged aftermarkets. It does not even attempt to do so for the WordPress hosting aftermarket. *See* SAC ¶¶ 287–99.

Nor could it, because, according to the W3Techs data that WPE incorporates by reference into its SAC, *id.* ¶ 281 & n.116, Automattic has *less than 1%* of the hosting market.[1] For the purported plugin distribution aftermarket, WPE falls back on its theory that Defendants' control of WordPress.org affords them "nearly 100%" market share. SAC ¶ 329. But, as discussed previously, that theory confuses control over WordPress.org with the "power to control prices or exclude competition" (*i.e.*, market power), *MLW Media LLC v. World Wrestling Entm't Inc.*, 2023 WL 4053802, at *4 (N.D. Cal. June 15, 2023), which WPE has not alleged, and implausibly assumes that if the price for WordPress.org were increased above zero, other plugin distribution channels wouldn't immediately enter the market, *see Rebel Oil*, 51 F.3d at 1434 (plaintiff must "show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run"). And, for the custom field plugin market, WPE alleges only the bare number of ACF plugins that have supposedly been replaced with Defendants' forked version (SAC ¶ 309)—not its market share compared to other providers of the more than 60,000 plugins available on WordPress.org alone—which is simply irrelevant. *See Epic*, 67 F.4th at 983 ("Market power is generally inferred from the defendant's possession of a high market share and the existence of 'significant barriers to entry.'").

As for direct evidence, WPE alleges that Defendants "increased prices, increased costs, decreased quality, and excluded competition" in all three purported aftermarkets, SAC ¶¶ 295, 312, 332. But the only "price" identified is again the alleged "royalty" demand for WPE's (and potentially other WordPress hosts') use of *trademarks*, not a price (let alone a supracompetitive price) in the proposed aftermarkets. *Novell*, 731 F.3d at 1074. And as for the other conduct, such as allegedly disrupting access to WordPress.org, WPE admits that it caused customers to switch to many different competitors in the aftermarkets, not just to Automattic. SAC ¶¶ 173–85, 283. Such widespread switching to non-Automattic hosts precludes any suggestion that Defendants were able to restrict overall output in the proposed aftermarkets (and correspondingly increase price) and therefore disposes of WPE's "direct evidence" argument. *See Rebel Oil*, 51 F.3d at 1434. Likewise, although WPE alleges that its customers faced

---

[1] Market shares of web hosting providers, W3Techs, https://w3techs.com/technologies/overview/web_hosting (last accessed on Oct. 10, 2025). *See also* RJN Ex. 2 at 2.

Gibson, Dunn &
Crutcher LLP

service disruptions due to Defendants' actions, SAC ¶ 248, WPE does not explain how Defendants' actions degraded the overall offerings of WordPress hosting, plugins, or plugin distribution. WPE cites snippets of customers' and employees' concern about disruption to the WordPress community, including that non-WPE customers rely on WPE's plugins, *see id.* ¶¶ 241–50, but WPE does not allege how any of the overall offerings in the three alleged aftermarkets were degraded. Nor does it allege that the ACF plugin (although "popular," *id.* ¶ 156) offered unique capabilities that could not be substituted with another offering.

### 3. WPE Fails to Allege Antitrust Injury

WPE's antitrust claims also suffer from additional fatal flaws that the Court did not need to reach in its prior order. First, WPE fails to allege that it suffered antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). It is axiomatic that "[t]he antitrust laws were enacted for the protection of *competition*, not *competitors*." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (cleaned up). Here, WPE alleges *only* harm to itself—not competition—and thus has not pleaded antitrust injury.

At bottom, WPE alleges that Defendants' exercise of their trademark rights and barring of WPE from WordPress.org increased costs for WPE and its customers. SAC ¶¶ 370–77. But this is not the stuff of antitrust injury. The antitrust "laws do not create a federal law of unfair competition." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993); *see also id.* ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws . . . ."). And allegations Defendants limited WPE's ability to compete or made its work harder will not do. *See Blix Inc. v. Apple, Inc.*, 2021 WL 2895654, at *5 (D. Del. July 9, 2021), *aff'd*, 2022 WL 17421225 (Fed. Cir. Dec. 6, 2022) (finding allegations "that [defendant] ha[d] thrown 'sand in the gears'" of a competitor—instead of "the gears of competition"—insufficient (quotation marks omitted)). Nowhere does WPE identify any actual harm to competition, such as reduced output of WordPress-related services or higher prices across the market—they allege only temporary disruptions and movement of some websites away from WPE to other providers (not limited to Automattic). In sum, WPE has not identified any harm to competition and so has not pleaded antitrust injury.

#### 4. WPE Fails to Allege Any Anticompetitive Conduct

Even if WPE could plausibly allege Defendants' monopoly power in a relevant market, the "possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. L. Offs. Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Anticompetitive conduct "harms the competitive process as a whole, rather than the success or failure of individual competitors." *Coronavirus Rep.*, 85 F. 4th at 954–55. WPE's monopolization and attempted monopolization claims fail because none of the conduct alleged in Counts 11 or 12 constitutes anticompetitive harm as a matter of law.

WPE lists three broad categories of allegedly anticompetitive conduct: (1) alleged deception of the market and extortion and disparagement of WPE; (2) alleged interference with WPE's customers and operations; and (3) alleged solicitation of WPE's personnel. SAC ¶ 519. None of these categories constitutes "anticompetitive conduct" under the antitrust laws, or actions which "harm[] the competitive process as a whole, rather than the success or failure of individual competitors." *Coronavirus Rep.*, 85 F.4th at 954–55. "The Sherman Act was 'not designed, and has never been interpreted, to reach all business practices, unfair or otherwise, damaging to individual companies.'" *Pac. Exp., Inc. v. United Airlines, Inc.*, 959 F.2d 814, 818 (9th Cir. 1992) (citation omitted). Plus, WPE does not, and cannot, allege facts showing that the alleged conduct impacts any participant in the only market plausibly alleged in this case (the WCMS foremarket). *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (antitrust plaintiff must have "suffered its injury in the market where competition is being restrained").

***Alleged anticompetitive statements.*** WPE says Defendants "deceived the market" by saying WordPress is open source and then demanding a trademark royalty from WPE; "extorted" WPE by threatening to "go nuclear" absent payment of a royalty; and made "disparaging statements" about WPE. SAC ¶ 519. The Ninth Circuit presumes, however, that public statements cannot be antitrust violations unless WPE can demonstrate that the statements were "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns,*

Gibson, Dunn &
Crutcher LLP

*Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) ("*Harcourt*"); *see also Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 785 (N.D. Cal. 2022) (applying *Harcourt* to Facebook's allegedly false statements about its privacy practices).

WPE pays lip service to the *Harcourt* elements, *see* SAC ¶ 519, but it pleads no factual allegations to support any of them. As to the first three elements, the Court has already ruled that Defendants' statements regarding WordPress "'forever be[ing] an open platform'" and there being "'free access for the world'" were too "'vague'" and "'general'" to be actionable under promissory estoppel. Dkt. 169 at 24–25. Those statements cannot satisfy the first three *Harcourt* elements for the same reason—they are not "capable of objective verification," but are "vague statements of optimism" and "non-actionable puffing." *Klein*, 580 F. Supp. 3d at 794 (quotation marks omitted). WPE also conflates the right to use software as part of the open-source program as a matter of copyright law and the right to use the name "WordPress" to communicate who is offering that software as a matter of trademark law. Open source only confers a right to use the copyright, not the trademark. Nor are the allegedly disparaging statements—such as that WPE "'feed[s] off' of the WordPress ecosystem" or that "customers [who] switch to a different host . . . '*might* get faster performance,'" SAC ¶ 102 (emphasis added)—"capable of objection verification." *Klein*, 580 F. Supp. 3d at 794. Rather, they are the type of "general assertions of 'underperformance' and '[un]satisfactory results' upon which no buyer would reasonably rely." *Emulex Corp. v. Broadcom Corp.*, 2010 WL 11595718, at *3 (C.D. Cal. June 7, 2010).

WPE fares no better on the remaining *Harcourt* elements. As to the fourth, while WPE asserts the disparaging statements were "made to market participants without knowledge of the subject matter," consumers readily can tell whether WPE's products or services are "sub-par." SAC ¶ 519. Allowing WPE to attack Defendants' representations on quality makes it "all too easy for losers in the rough-and-tumble of commerce to accuse competitors of spreading false information." *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1080 (N.D. Cal. 2002). Regarding the fifth element, the purportedly deceptive, extortionate, and disparaging statements at issue (SAC ¶ 519) were made only in late September, hardly a prolonged period. *See In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137, 1146 (N.D. Cal. 2011). And within days of the alleged conduct, WPE set up a "mirror" of the Word-Press Plugin Directory to "mitigate the effects of Defendants' conduct." SAC ¶¶ 237, 322. With respect

1   to the sixth element, the alleged statements concern WPE's quality and conduct and thus are susceptible

2   to neutralization by WPE, a private-equity-backed entity with more than adequate resources to rebut

3   the alleged misrepresentation with its own speech. *Emulex Corp.*, 2010 WL 11595718, at \*3, 7–8.

4       ***Alleged interference with WPE customers and operations.*** WPE also alleges that Defendants

5   "interfered" with WPE's "customers" and "operations" by supposedly blocking WPE from accessing

6   WordPress.org through a portal or WPE's administrative panels. SAC ¶ 519. But those allegations boil

7   down to the complaint that Mullenweg refused WPE access to his own website, WordPress.org, on

8   WPE's preferred terms. As the Court recognized in its prior decision, "even a monopolist generally has

9   no duty to share (or continue to share) its intellectual or physical property with a rival." Dkt. 169 at 8

10  (cleaned up) (quoting *Novell*, 731 F.3d at 1074); *see also Trinko*, 540 U.S. at 408 ("[T]he Sherman Act

11  does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private

12  business, freely to exercise his own independent discretion as to parties with whom he will deal.");

13  *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at \*13 (N.D. Cal. July 20, 2010) (defendant

14  is not "obligated to allow third-party websites unfettered access to its own website").

15      The only "limited exception," *Trinko*, 540 U.S. at 409, to this rule is where a defendant "(1) uni-

16  laterally terminates a voluntary and profitable course of dealing; (2) the only conceivable rationale or

17  purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the

18  exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells

19  in the existing market to other similarly situated customers," *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F.

20  Supp. 3d 1137, 1150 (N.D. Cal. 2020) (dismissing refusal to deal claim). Although WPE and Defend-

21  ants formerly had a more collaborative relationship, WPE doesn't even attempt to meet this standard;

22  for example, it alleges no facts showing that Defendants made money by "dealing" with WPE or lost

23  money by *not* "dealing" with WPE. *Id.* at 1151.

24      ***Alleged solicitation of WPE customers.*** Finally, WPE gets the antitrust laws backwards by

25  claiming that Defendants' "soliciting" of WPE's customers and personnel somehow violates those

26  laws. That conduct is fiercely *competitive*—and commonplace. It is the kind of competitive dynamic

27  the antitrust laws are meant to foster, not stamp out. SAC ¶ 519. The Ninth Circuit thus has held that

28  hiring a competitor's personnel does not violate the antitrust laws unless the "talent is acquired not for

1    purposes of using that talent but for purposes of denying it to a competitor," even if a "second motiva-

2    tion of the hiring[]" is to wound the competitor. *Harcourt Brace*, 108 F.3d at 1153; *Gen. Commc'ns*

3    *Eng'g, Inc. v. Motorola Commc'ns and Elecs., Inc.*, 421 F. Supp. 274, 287 (N.D. Cal. 1976) (dismissing

4    antitrust claim involving "soliciting new customers"). Here, the SAC includes no allegations that De-

5    fendants did not put WPE's former personnel to good use upon hiring them. For all these reasons, none

6    of the facts alleged in Counts 11 or 12 constitute anticompetitive conduct.

7        **5.    WPE Fails to Allege Any Unlawful Tying**

8        Counts 13 and 14 allege that Defendants engaged in a so-called negative tying arrangement by

9    conditioning access to WordPress plugin distribution (the "tying" product) on customers *not* using

10   WordPress web hosting or plugins from WPE. SAC ¶¶ 542–66. This argument fails at the threshold

11   because, as already explained, WPE's alleged "tying" market (plugin distribution) is not a relevant

12   antitrust market and Defendants do not have market power. *See supra* § III(A)(1); *see also Queen City*

13   *Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997) (Section 1 claim "fails because

14   the proposed tying market . . . is not a relevant market for antitrust purposes").

15       The tying claim also fails as a matter of law because WPE alleges no agreement between De-

16   fendants and any WordPress users. Unlike WPE's Section 2 monopolization claims, tying claims are

17   based on "an agreement" between the seller and customers. *Kodak*, 504 U.S. at 461; *see also* Areeda

18   & Hovenkamp ¶ 1752 (2025) ("The antitrust tying provisions require that two products be tied together

19   via a conditioned sale or agreement."). In a positive tie, for example, a seller ties together the sale of

20   two distinct products or services, using economic power in the tying product market to coerce its cus-

21   tomers to purchase the tied product. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178

22   (9th Cir. 2016). The same holds true for negative tying arrangements, which occur "when the customer

23   promises not to take the tied product from the defendant's competitor." *Cascade Health Sols. v. Peace-*

24   *Health*, 515 F.3d 883, 912 n.23 (9th Cir. 2008). But here, WPE alleges no agreement by any Word-

25   Press.org users (*i.e.*, consumers in the WordPress plugin distribution market) not to use WPE for host-

26   ing or plugins. WPE thus has not alleged a cognizable negative tying claim.

27                    *    *    *

28       In sum, WPE's antitrust claims stumble at each step. WPE's new allegations do nothing to

Gibson, Dunn & Crutcher LLP

1    overcome this Court's prior rulings that the purported WordPress-only aftermarkets are legally flawed

2    under Ninth Circuit precedent and that WPE fails to establish Defendants' market power in the WCMS

3    foremarket. WPE asks the Court to tread new ground and find a monopoly in the open-source software

4    market, but alleges no facts establishing that Defendants have the power to increase price or decrease

5    supply or quality—let alone without losing market share. And even if WPE had solved these problems

6    (it didn't), WPE still fails to establish that Defendants harmed competition, not merely a competitor, or

7    that Defendants' actions constitute cognizable anticompetitive conduct.

8    **B.    The Court Should Again Dismiss WPE's Section 1030(a)(7) Claim (Count 3)**

9    The CFAA was enacted "to target hackers who accessed computers to steal information or to

10   disrupt or destroy computer functionality." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th

11   Cir. 2009). The Ninth Circuit thus has interpreted the CFAA to "maintain [its] focus on *hacking*."

12   *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc) (emphasis added). Section

13   1030(a)(7) of the CFAA provides for liability when a person acts "with intent to extort from any person

14   any money or other thing of value" and "transmits in interstate or foreign commerce any communica-

15   tion containing" either a "threat to cause damage to a protected computer" or a "demand or request for

16   money or other thing of value in relation to damage to a protected computer, where such damage was

17   caused to facilitate the extortion."

18   In its First Amended Complaint, WPE alleged that Defendants violated the CFAA, 18 U.S.C.

19   § 1030(a)(7), "'by blocking and interfering with access to wordpress.org's systems[,]' and

20   'threaten[ing] [WPEngine] with 'war' if it did not agree to pay a significant percentage of its gross

21   revenues to Automattic[.]'" Dkt. 169 at 13 (quoting FAC ¶¶ 282, 283, 287). In its prior decision, the

22   Court correctly held that WPE failed to state a CFAA claim under section 1030(a)(7) because "WPEn-

23   gine cannot plausibly allege that it had a preexisting right to access and use Wordpress.org or related

24   trademarks in perpetuity for free," and because none of the alleged conduct by Defendants—including

25   their "demands for a licensing fee," "threats of war" and "suspension of access"—"constitute extor-

26   tionate conduct sufficient to support a Section 1030(a)(7) claim." *Id*. at 13–14.

27   WPE's Second Amended Complaint fails to cure those defects, for three independent reasons.

28   First, WPE cannot establish that Defendants committed extortion or acted with extortionate intent.

Gibson, Dunn &
Crutcher LLP

Second, WPE cannot establish that Defendants' alleged threats were in furtherance of attempted extortion. Third, WPE cannot show that Defendants caused or threatened harm to any "protected computer." The Court should dismiss Count 3, with prejudice.

### 1. WPE Cannot Establish Extortion or Extortionate Intent on the Basis of Trademark Enforcement

WPE fails to plausibly allege that Defendants acted with the "intent to extort" or "facilitated" any "extortion" of WPE by seeking to enforce their trademark rights. 18 U.S.C. § 1030(a)(7), (a)(7)(C). Extortion is "'the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014) (quoting 18 U.S.C. § 1951(b)(2) (emphasis in *Levitt*)). "[U]nless a person has a preexisting right to be free of the threatened economic harm, threatening economic harm to induce a person to pay for a legitimate service is not extortion." *Id*. It "is, at most, hard bargaining." *Id*. at 1134.

WPE alleges that Defendants intended to extort WPE by demanding that WPE pay for a license to use the WordPress and WooCommerce trademarks. SAC ¶ 401. But as this Court correctly held when it dismissed WPE's Section 1030(a)(7) claim, "WPEngine cannot plausibly allege that it had a preexisting right to access and use WordPress.org or related trademarks in perpetuity for free." Dkt. 169 at 13. And because Defendants' alleged demands that WPE pay for a trademark license sought "'payment for services that have some 'objective value'" and to which Defendants had a "'lawful claim,'" Defendants' "demands for a licensing fee d[id] not constitute extortionate conduct sufficient to support a Section 1030(a)(7) claim." *Id*. at 13–14 (quoting *Levitt*, 765 F.3d at 1131). The Court also dismissed WPE's "attempted extortion" claim with prejudice—because there is no cause of action for attempted extortion under California law but also, in the alternative, because "the claim would fail on the merits" for the same reason the Section 1030(a)(7) claim failed. *Id*. at 12 n.3, 13–14.

The SAC changes nothing. WPE argues only that it didn't need a trademark license because it made "nominative fair use" of the WordPress trademark. SAC ¶¶ 406, 413. That is a legal argument, not an allegation, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1205 (9th Cir. 2019). Moreover, the

Gibson, Dunn &
Crutcher LLP

1    Court already rejected the argument that WPE "had a preexisting right to access and use Wordpress.org

2    . . . in perpetuity for free" and that this made Defendants' demands for trademark license payments a

3    form of attempted extortion. Dkt. 169 at 13–14. Nor does the Court need to resolve the nominative fair

4    use question—a separate, disputed legal issue in this case, *id*. at 13—to dismiss WPE's Section

5    1030(a)(7) claim. The mere fact that Defendants asserted trademark enforcement rights against a party

6    using their marks—rightly or wrongly—establishes that they were not *extorting* WPE. As the Ninth

7    Circuit has explained, even "the assertion of weak claims predicated on unsupportable factual allega-

8    tions" is not extortion under federal or California law. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40

9    (9th Cir. 2006) (affirming order granting motion to dismiss); *see also Levitt*, 765 F.3d at 1132–33. And

10   courts dismiss extortion claims premised on the threat of trademark enforcement without resolving the

11   underlying trademark dispute. *See, e.g.*, *SmileDirectClub, LLC v. Berkely*, 2019 WL 1091339, at *5

12   (C.D. Cal. Jan. 22, 2019) (dismissing attempted extortion claim premised on threat of trademark en-

13   forcement); *see also Jockey Int'l, Inc. v. Burkard*, 1975 WL 21128, at *10 (S.D. Cal. Feb. 21, 1975)

14   ("The aggressive assertion of trademark rights does not amount to economic coercion.").

15        WPE also alleges that Mullenweg made "extortionate threats" to restrict WPE's access to

16   WordPress.org and to fork the ACF plugin. *See* SAC ¶¶ 402–04. But these are not independent bases

17   for WPE's Section 1030(a)(7) claim because WPE does not allege that Defendants sought to obtain

18   "any money or other thing of value" from WPE through these purported threats, apart from the alleged

19   demands for trademark licensing payments. *See* 18 U.S.C. § 1030(a)(7). Even if WPE could clear that

20   hurdle, Defendants' alleged threats to block access to WordPress.org or fork the ACF plugin do not

21   establish an "intent to extort" WPE. WPE alleges that WordPress.org is "owned and controlled solely

22   by Mullenweg." SAC ¶ 87. Thus, as this Court has already held, WPE "cannot plausibly allege that it

23   had a preexisting right to access and use Wordpress.org." Dkt. 169 at 13–14 (citing *Levitt*, 765 F.3d at

24   1131). Similarly, Mullenweg's alleged threats to fork the ACF plugin relate solely to conduct that

25   occurred *on Defendants' own website*. *See* SAC ¶ 404 (alleging that Defendants "hijacked WPE's ACF

26   plugin" by "taking over WPE's plugin 'slug' and directory listing ***on wordpress.org***"); *id.*, ¶ 405 (al-

27   leging that Defendants "hijacked WPE's plugin by commandeering the webpage and 'slug' ***on word-***

28   ***press.org*** that hosted it") (emphases added). Nothing in WPE's Second Amended Complaint suggests

that WPE had a "preexisting right to be free of" Defendants' forking of the ACF plugin on *Defendants' own website*. That is particularly true because WPE acknowledges that the ACF plugin had security vulnerabilities, and that Defendants' plugin guidelines clearly stated that Defendants could remove plugins to address security issues. *See* SAC ¶ 150 (the "purported vulnerability was minor and WPE responded quickly by releasing a security patch"); *id*., ¶ 327 (the "Detailed Plugin Guidelines" on WordPress.org advise that security issues "may result in a plugin being removed").

*Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998), which the Ninth Circuit cited and discussed in *Levitt*, is instructive. There, the Court held that an HMO's "'hard-ball' negotiation tactics" against a pharmacy, including conditioning the pharmacy's access to the HMO's network on the pharmacy "discontinu[ing] its contractual relationship with" a specific consultant and "g[iving] its business to one of the HMO's subsidiaries," were not extortionate. *Id*. at 501. "No law prohibited the HMO from conditioning access to its network on such payments, and the pharmacy had no 'right' to access the network." *Levitt*, 765 F.3d at 1131 (citing *Brokerage Concepts*, 140 F.3d at 525–26). Here, similarly, "[n]o law prohibited' Defendants from conditioning access to WordPress.org or plugins hosted on that website on WPE agreeing to pay trademark licensing fees. *Id*. Even if this was a "'hard-ball' negotiation tactic[]," it cannot support WPE's Section 1030(a)(7) "extortion" claim.

### 2. WPE Cannot Establish a Section 1030(a)(7) Violation Based on Events Occurring *After* the Alleged Extortion Failed

WPE's Section 1030(a)(7) claim also fails because WPE cannot show any causal link between Defendants' alleged efforts to "extort" WPE into paying for a trademark license and the "damage" that Defendants allegedly threatened and caused by blocking WPE's access to WordPress.org and forking the ACF plugin.

Section 1030(a)(7) requires a plaintiff to show a causal link between damage to or threats to damage a protected computer and the alleged "extortion." Specifically, under Section 1030(a)(7)(A), qualifying "threat[s]" must be made "*with* [the] intent to extort . . . money or [an]other thing of value." 18 U.S.C. § 1030(a)(7) (emphasis added). Similarly, under Section 1030(a)(7)(C), "damage to a protected computer" must be "caused *to facilitate* the extortion." *Id*. (emphasis added). Both provisions thus require that damage to protected computers be *in furtherance of* the attempted extortion.

Consistent with that statutory language, courts find that plaintiffs have plausibly alleged violations of Section 1030(a)(7) only where the threatened or actual harm is contemporaneous with a demand for payment. *See, e.g.*, *Eclipse Gaming Sys., LLC v. Antonucci*, 2017 WL 3071258, at * (N.D. Ill. July 18, 2017) (plaintiff alleged that defendant "with the intent to extort money from Plaintiff, sent messages . . . threatening to damage [Plaintiff's] gaming machines"); *Inplant Enviro-Systems 2000 Atlanta, Inc. v. Lee*, 2015 WL 13297963 (N.D. Ga. June 9, 2015), at *4 (plaintiff alleged the defendant sent communications which "contained a demand or request for money" and the relevant threats, together).

Here, by contrast, WPE alleges that Defendants made "extortionate" threats and caused damage "*[a]fter WPE refused to accede* to Defendants' attempts to extort money from WPE." SAC ¶ 407 (emphasis added). WPE's theory is that Defendants demanded a trademark license, were rebuffed, and *then* threatened to block WPE from WordPress.org and to fork the ACF plugin (and followed through on those threats) to "punish[] WPE for not entering into that trademark license agreement." *Id*., ¶ 12. WPE calls these "acts of retribution by Defendants, carried out because WPE had resisted Defendants' extortive demands." *Id*. But Section 1030(a)(7) liability is contingent on damage "caused to *facilitate the extortion*" or threats made "*with intent to extort*." 18 U.S.C. § 1030(a)(7) (emphasis added). *Retaliatory* threats or damage occurring *after* a plaintiff "resist[s] [the] extortive demands," SAC ¶ 12, are not actionable under Section 1030(a)(7).

For example, WPE alleges that Mullenweg's public posts on October 5, 2024, regarding the ACF plugin were "ongoing threats to cause damage to WPE's and its users' computers." SAC ¶ 403. WPE fails to plausibly allege that those posts were "threats" within the meaning of the CFAA, given that Mullenweg merely stated that he expected "millions of sites" to "mov[e] away from ACF" and that people "might not trust ACF as much going forward," without stating or implying that he would fork the ACF plugin. *Id*. But even if these were "threats," they were not made with intent to extort or to facilitate extortion. Mullenweg made these statements nearly two weeks *after* Defendants "block[ed] WPE from the WordPress community and all resources on wordpress.org"—an act WPE characterizes as responsive to WPE's *rejection* of the trademark license demands. *See, e.g.*, *id*., ¶ 114 (characterizing "Mullenweg block[ing] WPE from updating the WordPress plugins" "on or about September 24, 2024," as "another act of retaliation for WPE's refusal to hand over tens of millions of dollars to

Automattic"). Notably, WPE does not allege that Defendants made any threats related to forking the ACF plugin before October 5, 2024—by which time WPE had allegedly "resisted" the demand for a trademark license. *Id*., ¶¶ 12, 114, 407. And if, as WPE alleges, it had already "refused to accede" to Defendants' trademark license demands by September 24, 2024, then *subsequent* threats to fork the ACF plugin cannot have been made "with intent to extort" those same trademark license payments. Defendants' alleged threats to fork the ACF plugin cannot give rise to liability under Section 1030(a)(7)(A). Similarly, any damage that Defendants allegedly caused—including by blocking WPE from WordPress.org and forking the ACF plugin—occurred "[a]fter WPE refused to accede" to Defendants' trademark license demands. SAC ¶ 407. As a result, WPE cannot show that such damage "was caused to facilitate the extortion"—*i.e.*, to obtain trademark licensing fees from WPE. Once WPE refused to pay for a license, Defendants' so-called "extortion" was over. Any subsequent "acts of retribution," *id*., ¶ 12, cannot have been "caused to facilitate th[at] extortion," 18 U.S.C. § 1030(a)(7)(C).

### 3.    WPE Fails to Allege Any Damage to a Protected Computer

WPE's Section 1030(a)(7) claim fails for the additional reason that WPE does not (and cannot) plausibly allege that Defendants threatened or caused "damage to a protected computer" within the meaning of the CFAA. *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1227 (11th Cir. 2023) ("'the threat to cause damage' must be to a 'protected computer'"). "As relevant here, the CFAA defines 'computer' as 'an electronic . . . or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.'" *Id*. (quoting 18 U.S.C. § 1030(e)(1)). The statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Thus, "damage" means harm to the data, program, or system at issue, in keeping with the CFAA's design to "target . . . disrupt[ing] or destroy[ing] computer functionality." *LVRC Holdings*, 581 F.3d at 1130; *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 834 (N.D. Cal. 2014) ("'damage' means harm to computers or networks, not economic harm due to the commercial value of the data itself"); *cf. Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 419-20 (7th Cir. 2006) (deleting files impaired the integrity or availability of data programs or information on the computer, and thus constituted "damage").

WPE does not plausibly allege "damage to a protected computer" within the meaning of the CFAA. It alleges Defendants "block[ed] and intefer[ed] with" WPE's "access to wordpress.org's systems," SAC ¶ 400, but WPE's inability to access systems controlled by Defendants does not constitute damage to a "data processing device," 18 U.S.C. § 1030(e)(1), just as a road closure does not constitute damage to a car. WPE alleges that its computers "stopped functioning normally" when it could not access WordPress.org, *see* SAC ¶ 407, but it does not claim, as the CFAA requires, that any reduced functionality flowed from "impairment to the integrity or availability of data, a program, a system" on its own computers or any third-party computer. Nor could it, since restricting access to a *third-party website* controlled by Defendants did not alter WPE's computers, software, or data in any way.

WPE also fails to plausibly allege "damage to a protected computer" based on Defendants' forking of the ACF plugin. WPE alleges that Defendants' actions "hijack[ed] . . . the ACF plugin on WPE's users' computers" and "impaired the utility, availability, and integrity of WPE's ACF plugin," SAC ¶ 419, but does not allege that forking the plugin caused any actual *harm* to computers operated by WPE, its customers, or anyone else. To the contrary, WPE alleges that by forking the plugin, Defendants "replace[d] users' existing ACF plugin code with Defendants' SCF plugin code," *id.*, ¶ 160, without ever alleging that the fork impaired the functionality of users' computers. That is not sufficient to state a claim under Section 1030(a)(7).

## C.    The *Noerr-Pennington* Doctrine Bars Plaintiff's Amended Claims

The Court should also dismiss Plaintiff's amended antitrust and CFAA Section 1030(a)(7) claims with prejudice because they are barred by the *Noerr-Pennington* doctrine. Those claims impermissibly burden Defendants' First Amendment right to petition by seeking to impose liability based on Defendants' pre-litigation demands to settle a legitimate trademark dispute.

The *Noerr-Pennington* doctrine "protects the First Amendment 'right of the people . . . to petition the Government for a redress of grievances.'" *Nunang-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 711 F.3d 1136, 1138–39 (9th Cir. 2013) (citing U.S. Const. amend. I). "Under *Noerr-Pennington*, 'those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.'" *Id.* at 1139 (citation omitted). The Ninth Circuit recognizes that "in the litigation context, not only petitions sent directly to the court in the course of litigation, but also

Gibson, Dunn &
Crutcher LLP

'conduct incidental to the prosecution of the suit' is protected by the *Noerr-Pennington* doctrine.'" *Sosa*, 437 F.3d at 934–35 (quoting *Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525, 1528–29 (9th Cir. 1991)). That includes "communications between private parties," which are "sufficiently within the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to petitioning activity." *Id*. at 935.

In *Sosa*, the Ninth Circuit considered whether a private party's "communication of settlement demands" to another private party, "prior to initiating any actual litigation," was protected petitioning activity within the scope of the *Noerr-Pennington* doctrine. *Sosa*, 437 F.3d at 935. The Court concluded that it was, explaining that "restrictions on presuit demand letters" would "raise substantial Petition Clause issues if, on examination, such restrictions could impair the right of access to the Courts protected by the First Amendment." *Id*. at 936. Because "preceding the formal filing of litigation with an invitation to engage in negotiations to settle legal claims is a common, if not universal, feature of modern litigation," "[r]estricting such prelitigation conduct . . . would render the entire litigation process more onerous, imposing a substantial burden on a party's ability to seek redress from the courts." *Id*.

Counts 3, 11, 12, and 13 of the SAC seek to impose federal statutory liability on Defendants, under the Sherman Act and the CFAA, based on Defendants' pre-suit settlement demands. WPE alleges that in September 2024, Automattic made demands that WPE pay "for a 'license' to use certain trademarks like WordPress." SAC ¶¶ 91–92. WPE identifies several specific communications from Defendants on September 17, 19, and 20, 2024, in which Defendants allegedly demanded WPE "agree to pay . . . Automattic a significant percentage of its gross revenues—tens of million dollars—on an ongoing basis." *Id*., ¶¶ 92–98. WPE's Sherman Act claims rely on the allegation that Defendants' "extortionate threats to WPE . . . to pay for a . . . trademark 'license'" constitute "anticompetitive conduct." *Id*., ¶ 196; *see also id*., ¶¶ 525, 533. WPE also asks the Court to find that Defendants have "market power" based on their trademark license demands, *id*., ¶¶ 275–80. Defendants Section 1030(a)(7) claim is likewise based on Defendants' communications demanding that WPE pay for a trademark license, which WPE characterizes as "extortion." *Id*., ¶¶ 401–07, 412–13.

That demand led directly to this litigation, in which WPE seeks (among other things) a declaratory judgment of non-infringement and Defendants will seek a declaration of infringement. SAC

Gibson, Dunn &
Crutcher LLP

¶¶ 21–28, 441–49. If WPE had acceded to that demand, there would be no trademark dispute before this Court; conversely, because WPE "refused to accede," SAC ¶ 407, the parties are litigating the question of WPE's infringement. Because WPE's Sherman Act claims and Section 1030(a)(7) claim seek to impose liability on Defendants based on Defendants' communication of a settlement demand, they are "claims based upon . . . settlement demands" and "directed at . . . actions incidental to petitioning activity so as to bring them within the scope of *Noerr-Pennington*." *Gamble v. Kaiser Foundation Health Plan*, 348 F. Supp. 3d 1003, 1027 (N.D. Cal. 2018) (allegations based on defendants "demand[ing] certain settlement terms" fell within scope of *Noerr-Pennington* doctrine).

WPE has not plausibly alleged that the "sham" exception to *Noerr-Pennington* applies here. "To establish the sham exception," WPE bears the burden of "show[ing] that [Defendants'] conduct lacked both objective merit and subjective good faith." *Gamble*, 348 F. Supp. 3d at 1027. This is a two-part test: "First the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). Only if the challenged petitioning-related conduct "is objectively meritless may a court examine the litigant's subjective motivation" and consider "whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationship of a competitor,' . . . through the 'use of the governmental process—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *Id*. at 60–61. "[A] plaintiff seeking to establish the sham exception to *Noerr-Pennington*" must "plead around the defense with specificity." *Gamble*, 348 F. Supp. 3d at 1028.

Those criteria are not met here. First, Defendants' demand that WPE pay for the use of Defendants' trademarks is not objectively meritless. Defendants will soon file counterclaims for trademark infringement, which are meritorious—and, at a minimum, not "objectively baseless." *Professional Real Estate Investors*, 508 U.S. at 60. WPE concedes that it regularly uses the WordPress and WooCommerce trademarks—and, as this Court already held, WPE "cannot plausibly allege that it had a . . . right" to use Defendants' "trademarks in perpetuity for free." Dkt. 169 at 13. Second, WPE never alleges that Defendants "used government processes"—*i.e.*, filing litigation—"as a mechanism to injure" WPE. *See Empress LLC v. City and County of San Francisco*, 419 F.3d 1052, 1057 (9th Cir. 2005). In fact, WPE initiated litigation in bringing its claims for declaratory relief as part of an alleged "actual

controversy" on the trademark dispute. *See* SAC ¶ 21 ("With respect to WPE's request for declaratory judgment, a case of actual controversy has arisen between the parties pursuant to 28 U.S.C. § 2201.").

"A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all," rather than "one who genuinely seeks to achieve his governmental result." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991). WPE has not plausibly alleged that Defendants lacked a good-faith intent to enforce their trademarks. In fact, it alleges that in July 2024, just two months before Defendants' alleged trademark license demand, Defendant Automattic filed additional trademark registration applications—thus suggesting that Defendants were taking the trademark enforcement process seriously. *See* SAC ¶ 144. And WPE recently clarified to the Court that its claim for a declaratory judgment of non-infringement is based solely on purported nominative fair use, standing, and equitable defenses (laches, acquiescence)—and "does not have anything to do with non-confusion." (Oct. 9 2025 Hr'g Tr. at 35:8–37:8.) The fact that WPE does not contest that its use of the trademarks was likely to cause confusion further confirms that Defendants' assertion of trademark rights was no sham. *See St Andrews Links Ltd. v. Gilfin International Ltd.*, 2019 WL 4221725, at *3 (N.D. Cal. Sept. 5, 2019) (rejecting "sham" argument where party asserting claim "relie[d] *only* on its defenses to [opposing party's] trademark claims (that [opposing party] sat on its rights and its affirmative claims are time-barred)").

"Thus, based on [WPE's] pleadings, it appears beyond a doubt that [it] can prove no facts demonstrating that [Defendants'] activities fall under the sham exception to the *Noerr-Pennington* doctrine and are therefore not immunized from liability." *Empress*, 419 F.3d at 1057. WPE therefore fails to state a claim on which relief can be granted. *Id.*

## IV.    CONCLUSION

For the reasons set forth above, the Court should dismiss with prejudice Counts 3 and 11–14 of the Second Amended Complaint. WPE has now made multiple unsuccessful attempts to state a claim under these causes of action. Its inability to "replead facts that" state a claim confirms that "leave to amend would be futile" and justifies dismissal with prejudice. *QuickLogic Corp. v. Konda Techs., Inc.*, 618 F. Supp. 3d 873, 887 (N.D. Cal. 2022).

DATED: October 17, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Joseph R. Rose*
        Joseph R. Rose

*Attorney for Defendants Automattic Inc. and Matthew Charles Mullenweg*