QUINN EMANUEL URQUHART & SULLIVAN LLP
Rachel Herrick Kassabian (SBN 191060)
rachelkassabian@quinnemanuel.com
Yury Kapgan (SBN 218366)
yurykapgan@quinnemanuel.com
Margret M. Caruso (SBN 243473)
margretcaruso@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael E. Williams (SBN 181299)
michaelwilliams@quinnemanuel.com
Kevin Y. Teruya (SBN 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Brian Mack (SBN 275086)
brianmack@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6400
Facsimile: (415) 875-6700

*Attorneys for Plaintiff and Counterdefendant WPEngine, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WPENGINE, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>        vs.<br><br>AUTOMATTIC INC., a Delaware corporation; MATTHEW CHARLES MULLENWEG, an individual; and WOOCOMMERCE INC., a Delaware corporation,<br><br>        Defendants.<br><br>AUTOMATTIC INC., a Delaware corporation; MATTHEW CHARLES MULLENWEG, an individual; WORDPRESS FOUNDATION, a California corporation; and | Case No. 3:24-cv-06917-AMO<br><br>**REDACTED VERSION – FILED PUBLICLY**<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>**(1)**   **Intentional Interference with Contractual Relations;**<br>**(2)**   **Intentional Interference with Prospective Economic Relations;**<br>**(3)**   **Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(7);**<br>**(4)**   **Unfair Competition, Cal. Bus. Prof. Code § 17200, *et seq.*;**<br>**(5)**   **Promissory Estoppel;**<br>**(6)**   **Declaratory Judgment of Non-Infringement;**<br>**(7)**   **Declaratory Judgment of Non-Dilution;**<br>**(8)**   **Libel;**<br>**(9)**   **Trade Libel;**<br>**(10)**  **Slander;** |

WOOCOMMERCE INC., a Delaware corporation,

     Counterclaimants,

  vs.

WPENGINE, INC., a Delaware corporation,

     Counterdefendant.

**(11) Monopolization, Sherman Act, 15 U.S.C. § 2;**

**(12) Attempted Monopolization, Sherman Act, 15 U.S.C. § 2;**

**(13) Illegal Tying, Sherman Act, 15 U.S.C. § 1;**

**(14) Illegal Tying, California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*;**

**(15) Lanham Act Unfair Competition, 15 U.S.C. § 1125(a)(1);**

**(16) Lanham Act False Advertising 15 U.S.C. § 1125(a)(1)(B);**

**(17) Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5);**

**(18) Unjust Enrichment.**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................................1

THE PARTIES ....................................................................................................................3

JURISDICTION AND VENUE...........................................................................................5

CASE OF ACTUAL CONTROVERSY FOR DECLARATORY JUDGMENT...................6

GENERAL ALLEGATIONS ...............................................................................................8

I.  The WordPress Community ........................................................................................8

    A.  General Background on the Web Content Management Systems Industry ..............8

    B.  WPE's Services and Other Contributions to the WordPress Community ................9

    C.  WPE's Longstanding Use of the WordPress Mark to Refer to the Open
        Source Software Platform its Customers' Websites are Built On...........................11

II. The WordPress Platform and Matthew Mullenweg's Role in It .........................................18

    A.  Mullenweg Co-Founds Open Source Platform WordPress....................................18

    B.  Defendants Conceal the Truth as to WordPress Trademark Rights........................19

    C.  Defendants Conceal the Truth as to Ownership of wordpress.org..........................22

    D.  Defendants Conceal the Truth Regarding the WordPress Directory ......................27

    E.  Defendants Knew Building a Business on the WordPress Technology Was
        Far Riskier Than They Presented it to Be ...............................................................28

    F.  The Community's Reaction as the Truth Comes to Light ......................................30

III. Defendants' Promises to WPE and the Entire WordPress Community ...............................34

IV. Automattic's and Mullenweg's Coercive Threats and Attempted Extortion of WPE .........37

V.  Automattic and Mullenweg Carry Out Their Threats ........................................................40

    A.  Defendants' False and Disparaging Statements .......................................................42

    B.  Defendants Block Access to WPE's Plugins on wordpress.org..............................46

    C.  Defendants Seek to Capitalize on the Chaos They Created, By Luring WPE's
        Customers Away While Threatening More Harm to WPE......................................49

    D.  Amid Public Backlash, Defendants Attempt Damage Control—Only Digging
        a Deeper Hole For Themselves ...............................................................................60

E.    Undeterred, Defendants Expand Their Extortive Efforts to Threaten WPE's CEO ...........................................................................61

F.    Mullenweg States That Automattic Might Seek To Acquire WPE For a Discount .........................................................................63

G.    Defendants Manufacture a Sham Security Review of WPE's Plugin.....................64

H.    Mullenweg Modifies wordpress.org's Login Page to Require Loyalty Pledges Disavowing Affiliation with WPE .........................................66

I.    Defendants Wrongfully Hijack WPE's Most Popular Plugin .................................67

VI.    Defendants Have Caused, and Will Continue to Cause, Immense and in Some Instances Irreparable Harm to WPE.......................................................73

VII.    The Entire WordPress Community Is Harmed by Defendants' Actions............................80

VIII.    Defendants POSSESS MONOPOLY POWER AND have HARMED BOTH WPE AND COMPETITION, FURTHER AFFECTING INTERSTATE COMMERCE............84

A.    Defendants Have the Requisite Power to Influence Competition...........................86

1.    Direct Evidence Confirms Defendants' Power ............................................86

2.    Additionally, Defendants' Dominance In Multiple Product Markets Is Indirect Evidence of Their Market Power ......................................95

(a)    The Web Content Management Systems Market............................96

(b)    The WordPress Web Hosting Services Market.............................104

(c)    The WordPress Custom Field Plugin Market ..............................107

(d)    The WordPress Plugin Distribution Market..................................111

(e)    Extensive Evidence Establishes the WordPress Aftermarkets.......116

3.    Relevant Geographic Market....................................................121

4.    The Relevant Markets Feature High Entry Barriers....................................121

B.    Defendants' Anticompetitive Conduct Has Harmed Competition and Caused WPE To Suffer Antitrust Injury .........................................124

C.    Interstate Trade and Commerce ........................................................126

FIRST CLAIM FOR RELIEF..............................................................126

SECOND CLAIM FOR RELIEF .......................................................127

THIRD CLAIM FOR RELIEF .........................................................128

FOURTH CLAIM FOR RELIEF........................................................136

FIFTH CLAIM FOR RELIEF.................................................................................137

SIXTH CLAIM FOR RELIEF................................................................................138

SEVENTH CLAIM FOR RELIEF ........................................................................140

EIGHTH CLAIM FOR RELIEF.............................................................................141

NINTH CLAIM FOR RELIEF ..............................................................................145

TENTH CLAIM FOR RELIEF...............................................................................148

ELEVENTH CLAIM FOR RELIEF.......................................................................154

TWELFTH CLAIM FOR RELIEF .........................................................................159

THIRTEENTH CLAIM FOR RELIEF ..................................................................161

FOURTEENTH CLAIM FOR RELIEF .................................................................163

FIFTEENTH CLAIM FOR RELIEF .....................................................................165

SIXTEENTH CLAIM FOR RELIEF .....................................................................166

SEVENTEENTH CLAIM FOR RELIEF ................................................................167

EIGHTEENTH CLAIM FOR RELIEF..................................................................168

PRAYER FOR RELIEF..........................................................................................169

DEMAND FOR JURY TRIAL...............................................................................170

For its Third Amended Complaint, Plaintiff WPEngine, Inc. ("WPE"), by and through its attorneys Quinn Emanuel Urquhart & Sullivan, LLP, avers as follows:

## INTRODUCTION

1.      This is a case about abuse of power, extortion, and greed.  The misconduct at issue here is all the more shocking because it occurred in an unexpected place—the WordPress open source software community built on promises of the freedom to build, run, change, and redistribute without barriers or constraints, for all.  Those promises were not kept, and that community was betrayed, by the wrongful acts of a few—Defendants—to the detriment of the many, including WPE.

2.      WordPress is an open source content management system developed in 2003 that allows people to create and publish their own websites.  WordPress was an early success, and people quickly began using it and building a community around it.  The WordPress source code and trademarks were initially owned and/or controlled by Defendant Matthew Mullenweg's for-profit company, Defendant Automattic Inc. ("Automattic").  In 2010, in response to mounting public concern, Defendants represented that the WordPress source code and trademarks were placed into the nonprofit WordPress Foundation (which Mullenweg created), with Mullenweg and Automattic making sweeping promises of open access for all:  "Automattic has transferred the WordPress trademark to the WordPress Foundation, the nonprofit dedicated to promoting and ensuring access to WordPress and related open source projects in perpetuity.  This means that the most central piece of WordPress's identity, its name, is now fully independent from any company."  Mullenweg and Automattic reiterated this promise later, in even more forceful terms: "What's important is that [] longer than I'm alive, longer than Automattic is alive, longer than any of us are alive, there is something that holds the WordPress code and trademark for the free access for the world."

3.      What Defendants' statements and assurances did not disclose is that while they were publicly touting their purported good deed of moving this intellectual property away from a private company, and into the safe hands of a nonprofit, Defendants in fact had quietly transferred irrevocable, exclusive, royalty-free rights in the WordPress trademarks right back to Automattic that very same day in 2010.  This meant that, far from being "independent of any company" as Defendants had promised, control over the WordPress trademarks effectively never left

Automattic's hands.  And, far from being "free" and open "for the world" forever, Defendants would make extortionate demands for ransom payments and block access to those they deemed competitive threats.

4.     Despite the promises Defendants made to induce companies to build their businesses around WordPress, Defendants are now misusing these trademarks for their own financial gain and to the detriment of the community members.  One such company that relied on Defendants' promises was WPE, founded in 2010.  WPE is a true champion of WordPress, devoting its entire business to WordPress over other similar open source platforms and web content management systems.  In reliance on Defendants' many promises, WPE invested hundreds of millions of dollars and 14 years of hard work building a successful business to serve and expand that community—only to see the petulant whims of Mullenweg inflict harm to its business and the community that has embraced it.

5.     Since September 2024, Defendants have been carrying out a scheme to ban WPE from the WordPress community unless it agreed to pay tens of millions of dollars to Automattic for a purported trademark license that WPE does not even need.  Defendants' plan, which came without warning, gave WPE less than 48 hours to either agree to pay them off or face the consequences of being banned and publicly smeared.  In that short time, Defendants sent ominous messages and photos designed to intimidate WPE into making an extortionate payout.  When WPE did not capitulate, Defendants carried out their threats, unleashing a self-described "nuclear" war against WPE.  That war involved defaming WPE in public presentations, directly sending disparaging and inflammatory messages into WPE customers' software and through the Internet, threatening WPE's CEO and one of its board members, publicly encouraging WPE's customers to take their business to Automattic's competing service providers (for a discounted fee, no less), and ultimately blocking WPE and its customers from accessing the wordpress.org portal and wordpress.org servers.  By blocking access to wordpress.org, Defendants have prevented WPE from accessing a host of functionality typically available to the WordPress community on wordpress.org.

6.     Mullenweg's actions have exposed and highlighted his long history of obfuscating the true facts about his control and manipulation of the WordPress Foundation and wordpress.org—

which he presents as a not-for-profit "dot-org" enterprise, but which in fact he solely owns and directs with an iron fist to further his own commercial interests in Automattic and associated commercial businesses, to the detriment of Defendants' competitors.

7.    Defendants' self-proclaimed war has inflicted harm upon WPE and the entire WordPress community.  Worse, Defendants continued their bad acts even after WPE first filed this case on October 2, 2024.  *See* Dkt. 64.  Since then, Defendants have continued to escalate their war, unleashing a campaign to steal WPE's software, customers, and employees.  Indeed, shortly after commencing their "war," Defendants were unambiguous about their future plans if unchecked:

> [S]ince this started [with WPE] *they've had uh, we estimate tens of thousands of customers leave*. . . . So, um you know, I think *over the next few weeks, they're actually gonna lose far more than 8% of their business* . . . *we're at war with them*.  *We're* . . . *going to go brick by brick and take* . . . *take every single one of their customers* . . . *if they weren't around guess what?* . . . *We'd happily have those customers, and in fact we're getting a lot of them*.[1]

8.    WPE brings this action to stop Defendants from continuing to harm WPE and its customer relationships, and from undermining the entire WordPress ecosystem.  WPE intends to hold Defendants accountable for their broken promises and malfeasance, and to seek damages for the injuries that WPE has suffered—and will continue to suffer—as a result of Defendants' wanton misconduct.

## THE PARTIES

9.    Plaintiff WPE is a Delaware Corporation with its principal place of business in Austin, Texas.  WPE is a technology company that offers a complete Platform as a Service (PaaS) solution (including comprehensive development and deployment tools, support and security, and managed hosting) for WordPress and also develops plugins, themes, and other tools for the WordPress community.  WPE employs more than 1,000 people and is considered one of the most trusted WordPress platforms in the world.

---

[1]  https://www.youtube.com/watch?v=Fn_HzfI_sW0, at 9:17-46, 26:30-36, 29:58-30:07

10.     Defendant Automattic is a Delaware Corporation with its principal place of business in San Francisco, California.  Automattic owns and operates several for-profit businesses that operate within the WordPress ecosystem, including wordpress.com, WordPress VIP, and Pressable.com (all competitors to WPE), as well as Defendant WooCommerce, Inc. (which offers an ecommerce tool).  Defendant WooCommerce Inc. ("WooCommerce") is a Delaware Corporation with its principal place of business in San Francisco, California.  WooCommerce is a wholly-owned subsidiary of Automattic.  Automattic is owned, in part, by private equity firms.

11.     On information and belief, Defendant Matthew Charles Mullenweg ("Mullenweg") lives, among other places, in California, where he beneficially owns residential property.  Mullenweg also controls and serves as the CEO and President of Automattic, a California-based corporation, and as a founding director of the WordPress Foundation, a California nonprofit public benefit corporation recognized by the Internal Revenue Service ("IRS") as a public charity under Section 501(c)(3) of the Internal Revenue Code.  Mullenweg has publicly acknowledged that he owns wordpress.org, which is registered with the Internet Corporation for Assigned Names and Numbers (ICANN) as a California domain.  The wrongful acts described herein, including at least the decisions and conduct to extort, interfere with, and otherwise violate the legal rights of WPE and the libelous and slanderous activity, took place at least in part in California, where Mullenweg and other key Automattic employees and agents work and where the instrumentalities of the company are located.  In addition, on information and belief, at least some of the computers and servers used to carry out the blocking of WPE's access to wordpress.org and to hijack one of WPE's most valuable plugins were located in California.

12.     Automattic is liable for Mullenweg's unlawful acts as described herein because these acts were performed while in the employment of Automattic and were within the scope of that employment, within the scope of authority delegated to him, or ratified after the fact by Automattic.  Those acts were engendered by events or conditions relating to Mullenweg's employment, including his responsibilities as Automattic's CEO.  In particular, and without limitation, those responsibilities included: promoting WordPress and Automattic's WordPress hosting services; planning and carrying out business strategies for dealing with competing companies, including WPE; and creating

and implementing strategies on how to leverage Automattic's purported rights to intellectual property, including any trademark rights. Indeed, the entire extortionate scheme began with Mullenweg demanding, as Automattic's CEO, that WPE sign a purported trademark license agreement with Automattic. Mullenweg explicitly made Automattic's supposed trademark rights the fulcrum for his extortionate demands, and explicitly tied his willingness to smear and disparage WPE—or to instead stay silent—to WPE's entry into a trademark license with Automattic. Mullenweg's later activities in punishing WPE for not entering into that trademark license agreement were all acts of retribution by Defendants, carried out because WPE had resisted Defendants' extortive demands.

13.    Moreover, Mullenweg has used his control over wordpress.org for the benefit of Automattic, and Automattic has sought to capitalize on such events, including by using the events herein to promote and market its services as superior to and more reliable than those of WPE. Automattic has also ratified Mullenweg's conduct, and Automattic's CFO Mark Davies also participated in and helped to carry out the extortionate campaign.

14.    Mullenweg also acted as Automattic's agent, and for the benefit of Automattic, in carrying out the wrongdoing described herein.

15.    At all relevant times, except as otherwise indicated, Defendants Automattic and Mullenweg were jointly engaged in the commission of the following unlawful actions. On information and belief, Automattic and Mullenweg each acted intentionally and their actions caused a single, indivisible injury to WPE. Accordingly, Defendants are jointly and severally liable for all harm inflicted upon WPE, as pleaded herein.

**JURISDICTION AND VENUE**

16.    Jurisdiction is proper in this court because this litigation arises under federal law, namely 15 U.S.C. § 1051 *et seq*. (Lanham Act), 15 U.S.C. § 1 *et seq*. (Sherman Act) and 18 U.S.C. § 1030 *et seq*. (Computer Fraud and Abuse Act). The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) (trademarks), and 28 U.S.C. § 2201 (Declaratory Judgment Act). This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

17.    A case of actual controversy has arisen between the parties pursuant to 28 U.S.C. § 2201 regarding whether WPE infringes any alleged trademark rights of Automattic, as further set forth herein.

18.    This Court has personal jurisdiction over Automattic because Automattic has its principal place of business in the State of California and within this district, regularly conducts business within this district, and advertises and sells its services through the Internet to California residents.  In addition, the claims at issue arise out of or relate in substantial part to Automattic's activities in this District.

19.    This Court has personal jurisdiction over Mullenweg, including due to his substantial and regular contacts with the forum as the CEO of Automattic.  In addition, the claims at issue arise out of or relate in substantial part to Mullenweg's activities in this District.

20.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(c).

## CASE OF ACTUAL CONTROVERSY FOR DECLARATORY JUDGMENT

21.    With respect to WPE's request for declaratory judgment, a case of actual controversy has arisen between the parties pursuant to 28 U.S.C. § 2201.  During the week of September 16, 2024, as further described below, Defendants made various demands that WPE pay tens of millions of dollars per year for a license to use Automattic's and WooCommerce's purported trademarks, including the terms "WordPress," "WooCommerce," and various other similar marks[2] (collectively the "Challenged Terms").

22.    On September 23, 2024, counsel for Automattic and its subsidiary, WooCommerce, Inc., sent a letter to WPE, alleging that WPE's use of the Challenged Terms constitutes trademark infringement and was diluting their rights, tarnishing their reputation, and harming their goodwill. The letter defined Automattic and WooCommerce as a single entity, "Client," and further alleged that WPE's "unauthorized use of our Client's trademarks infringes their rights and dilutes their

---

[2]  WORDPRESS, U.S. Reg. No. 3201424; WORDPRESS, U.S. Reg. No. 4764217; WORDPRESS, U.S. Reg. No. 4865558; WOOCOMMERCE, U.S. Reg. No. 5561427; WOOCOMMERCE, U.S. Reg. No. 5561428; WOO, U.S. Reg. No. 5561425; WOO, U.S. Reg. No. 5561426.

famous and well-known marks," as well as having "enabled [WPE] to unfairly compete with our Client and has led to unjust enrichment."  A copy of that letter is attached as <u>Exhibit A</u>.  The letter also stated that Automattic is "entitled to file civil litigation to obtain an injunction and an award of actual damages, a disgorgement of your profits, and our Client's costs and fees," along with an award of "attorneys' fees."

23.    On the same day, Mullenweg posted a public comment on the Reddit website, again meritlessly accusing WPE of "trademark violations" and claiming that he was going to file "formal legal action" against WPE.[3]

24.    WPE denies Defendants' accusations, including that WPE has violated any trademark rights of Defendants.  Consequently, a specific and immediate dispute exists between WPE and Defendants.  WPE cannot continue to allow Defendants' unsubstantiated threats and demands interfere with WPE's business and relationships with its customers.  WPE needs judicial clarity regarding its non-infringement and non-dilution of the Challenged Terms so that it can continue to serve customers and users of its platform, including the open source community, without further interference from Defendants.

25.    Moreover, Defendants' actions raise a case of actual controversy as to trademark misuse.

26.    Defendants have attempted to use their purported trademarks as a causal instrumentality to violate the antitrust laws.  While Defendants have continually made representations guaranteeing access to the WordPress open source software and community, they are now demanding 8% of WPE's revenues for a purported trademark license to *refer* to "WordPress," a use for which no license is needed.

27.    Defendants' comments belie that they are seeking this trademark license to gain a share of WPE's revenues, and not as payment for trademark use.  At the TechCrunch Disrupt 2024 Conference on October 30, 2024, Mullenweg confirmed that he settled on 8% of WPE's revenues

---

[3]    https://www.reddit.com/r/Wordpress/comments/1fn3mjr/comment/lokzvec/.  Every hyperlink referenced herein was last visited on October 3, 2025.

based on what he thought WPE could afford.  Defendants have threatened to "go nuclear" and "pursue a scorched earth policy" if WPE did not pay their arbitrary licensing fee.

28.    When WPE refused to pay the fee, Defendants cut off WPE's access to many features of WordPress and the WordPress community.  Defendants have made clear that if WPE would just pay the "licensing fee," "all this harm could end."  Defendants are using their purported trademark rights to block WPE from the WordPress community as a means to extort monopolistic pricing. This conduct demonstrates Defendants' direct use of their trademarks to exclude competition and maintain a monopoly, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## GENERAL ALLEGATIONS

## I.    THE WORDPRESS COMMUNITY

### A.    General Background on the Web Content Management Systems Industry

29.    At a high level, the various participants in the web content management system industry include web content management systems providers, web hosting services providers, agencies, developers, and customers.

30.    Web content management systems are software products that allow for the management of digital information on a website, using features that facilitate the creation and maintenance of web content without prior knowledge of web programming or markup languages.[4] WordPress, Craft CMS, Drupal, Joomla, and TYPO3 are all examples of web content management systems.[5]  WordPress—which Defendants effectively control—is by far and away the world's dominant web content management system.

31.    Web hosting services provide customers the server space and other technological facilities they need to make their websites accessible on the internet.  Web hosting services frequently provide web hosting services for websites built using a particular web content management system.  Particular web hosting services may concentrate on WordPress-powered

---

[4]  https://www.techtarget.com/searchcontentmanagement/definition/web-content-management-WCM.

[5]  https://cmscritic.com/cms-or-wcm-which-is-which.

websites, while other web hosting services may offer services with respect to websites powered by other web content management systems, like Drupal.  WPE, for example, provides web hosting services for WordPress-powered websites.

32.     Developers are individuals and entities that build software features, "themes," and other functionalities—often called "plugins"—that can be integrated into a website.  Typically, developers will share their plugins and themes by registering them in a directory, and uploading them to a repository, where customers can search for, download and implement them into a website. The plugins are typically specific to a particular web content management system.  For example, a developer will create a plugin that is meant for WordPress-powered websites, rather than websites powered by Joomla.

33.     Customers are individuals and entities that own or seek to own websites for purposes of their business or other interests.  Given the highly technical knowledge and resources required to create and maintain a website, customers frequently use a web content management system to maintain, manage, host, and operate the customer's website (or contract with someone for that purpose), and a web hosting service to maintain, manage, host and operate the website on the customer's behalf.

**B.     WPE's Services and Other Contributions to the WordPress Community**

34.     WPE was founded in 2010 as a comprehensive platform on which agencies, customers and brands can develop, host, manage, operate and support websites that are built on the open source code known as WordPress, which is a web content management system.  For example, amongst other things, WPE helps companies and agencies of all sizes to manage, host, operate, and optimize their WordPress websites with premium, enterprise-grade tools, services, and support. Over time, WPE began developing, sponsoring, acquiring and offering additional products and services, such as plugins and other tools for the WordPress community.  Today, WPE has more than 1,000 employees, and WPE hosting services are used by more than 1.5 million websites, including by businesses, individuals, charities, schools, and governmental agencies that rely on WPE to keep their websites up and running.  WPE has invested hundreds of millions of dollars to attract and enable users and customers to host their sites using WordPress.

35.     WPE's managed hosting service allows its customers to, among other things, set up their websites using the WordPress software on WPE's platform.  WPE handles many of the technical details for these users, including ongoing technical support of their websites.  WPE's managed hosting service competes with certain of Automattic's core offerings, including wordpress.com, Pressable and WordPress VIP.

36.     WordPress architecture allows software developers, including third party developers, to create "plugins" that can interact with and extend the functionality of WordPress, or a WordPress website.  For instance, plugins have been developed to add a "voting" button or a "sign up form" field to their customer's website.  Agencies, brands, and their website developers can download one or more plugins to further enhance and customize their site.  Developers are strongly encouraged to share their plugins and themes by making them available for download on wordpress.org, the location where open-source WordPress software is hardcoded to download and install plugins from. Plugins are vital to the WordPress ecosystem; virtually all sites on WPE have plugins installed. WPE and the vast majority of WordPress plugin developers, including Automattic, all have historically used wordpress.org to share and make plugins available.  Wordpress.org serves as the sole gateway to the WordPress software and community; it hosts the WordPress software as well as the WordPress plugins, themes and translations created by members of the WordPress community.

37.     WPE is the current developer of a number of popular WordPress plugins, including Advanced Custom Fields ("ACF"), WP Migrate, NitroPack, and many others.   Millions of WordPress users use these plugins to enhance and operate their websites.

38.     For example, the ACF plugin, a powerful tool which allows users to develop WordPress websites with custom fields to use and present structured data, and which WPE acquired in 2022 for a substantial sum, runs on over two million websites.  WPE has invested thousands of engineering hours and millions of dollars into the development of its WordPress plugins and themes, and the vast majority of its users use these at no cost to themselves.

39.     WPE is a proud member of the WordPress community, which consists of users and developers who collaborate to improve the WordPress platform and to make sure that this open source code remains free and accessible to everyone.  As part of the WordPress community, WPE

1   has contributed tens of millions of dollars in ongoing support for the broader community, including

2   through events, sponsorships, and the development of educational resources, including sponsorship

3   of WordCamps worldwide and producing DE{CODE}, a conference for developers who build

4   WordPress websites; hosting, funding and actively maintaining multiple open source projects (*e.g.*,

5   ACF, WPGraphQL, faust.js) within the ecosystem used by millions of websites around the world;

6   and educating and empowering the WordPress community through webinars, podcasts, and

7   tutorials, and content like the WordPress Roundup and WPE's Building WordPress series.

8   **C.    WPE's Longstanding Use of the WordPress Mark to Refer to the Open Source**

9   **Software Platform its Customers' Websites are Built On**

10  40.    Because WPE's products and services are built to work with websites developed

11  using open source WordPress software and open source WooCommerce plugins, WPE naturally

12  references the Challenged Terms when referring to the software platform on which its customers'

13  websites are built.  WooCommerce is an open source WordPress plugin that is managed by

14  Automattic on a for-profit basis.  The WooCommerce plugin adds functionality to WordPress that,

15  among other things, allows users to sell products and services on their website and take payment for

16  those sales.  WPE has consistently used the term "WordPress" since 2010 in reference to the

17  WordPress program and platform, and the term "WooCommerce" in reference to the

18  WooCommerce plugin, since at least 2018.  This type of referential, or nominative, use of the

19  Challenged Terms is not only legal, but it is essential to providing consumers with the information

20  they need.  Further, it has long been condoned by the Defendants, and is widely mirrored by the

21  entire WordPress community.

22  41.    Examples of such WPE uses dating back to 2010 include:

23

24

25

26

27

28

1

**WPE Website (March 30, 2010)[6]**



**WPE Website (December 8, 2010)[7]**



---

[6]   https://web.archive.org/web/20100330012641/http://wpengine.com (formerly viewable at http://wpengine.com).

[7]   https://web.archive.org/web/20101208000154/http://wpengine.com (formerly viewable at http://wpengine.com).

**WPE Website (November 15, 2011)[8]**



**WPE's Website (January 10, 2013)[9]**



---

[8] https://web.archive.org/web/20111115053852/http://wpengine.com/ (formerly viewable at http://wpengine.com).

[9] https://web.archive.org/web/20131114181316/http://wpengine.com/2013/01/10/essential-plugins-and-add-ons-for-wordpress-ecommerce-sites/ (formerly viewable at http://wpengine.com/2013/01/10/essential-plugins-and-add-ons-for-wordpress-ecommerce-sites/ ).

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

1

**WPE's Website (June 16, 2015)[10]**



**WPE Website (Feb. 28, 2018)[11]**

---

[10]    https://web.archive.org/web/20150616200116/http://wpengine.com  (formerly viewable at
http://wpengine.com).

[11]    https://web.archive.org/web/20180228230453/https://wpengine.com/solution-center/ (formerly
viewable at https://wpengine.com/solution-center/).

**WPE Website (October 4, 2018)[12]**



42.     Defendants have known about WPE's use of the Challenged Terms for more than a decade.  Not only is WPE's website publicly available for all to see, but in 2011 Automattic made a substantial investment in WPE and remained an investor until 2018.  Over these years WPE and Automattic maintained regular communications, including about WPE's website.  In addition, WPE has been a long-time sponsor of the WordPress conferences known as WordCamp.  Since at least 2012, WPE has attended these conferences, including having booths with promotional signage and materials at the conferences, with the full knowledge of Defendants.

43.     Mullenweg presumably also had reviewed and approved WPE's use of the Challenged Terms through the "Five for the Future" program, of which WPE is a longstanding member.[13]  Before allowing participation in this program, Mullenweg required that "[a]ny person or business currently misusing or infringing on the WordPress trademark will need to fix any misuse before their pledge will appear on the Five for the Future pledge page."[14]  Mullenweg knowingly published WPE's pledge to this program on wordrpess.org, thereby acknowledging that WPE was not "misusing or infringing on" the WordPress trademark.[15]  In addition, Mullenweg acknowledged that "[a]s a ***longtime contributor*** to WordPress Core, WP Engine has ***played an integral role*** in

---

[12]   http://web.archive.org/web/20181004073656/https://wpengine.com/ (formerly viewable at http://wpengine.com).

[13]   *See* https://wordpress.org/five-for-the-future/.

[14]   https://wordpress.org/five-for-the-future/expectations/.

[15]   *See* https://wordpress.org/five-for-the-future/pledge/wp-engine/ (emphasis added).

supporting the WordPress project for ***more than a decade***."[16]  Indeed, as also acknowledged by Mullenweg, WPE, at the very least, "sponsors **11 contributors** for a total of **45 hours** per week across **5 teams**."[17]

44.    Moreover, on March 21, 2023, with full knowledge of WPE's use of the Challenged Terms, Mullenweg attended and spoke at WPE's developer conference, DE{CODE}, as part of a "fireside chat," which was broadcast widely and is still available to the public.[18]  As part of that interview, in response to a question about what was required from "all of us who stand for a free and open web to keep things thriving for the next 20 years," Mullenweg responded that people should "vote with your wallet.  So when you support companies like WPE, who don't just provide a commercial service, but are also part of a wider open source community, you're saying, hey, I want more of this in the world."  On the day of his fireside chat, praising WPE, WPE's site appeared as follows, clearly using the Challenged Terms in a nearly identical way to how WPE uses the terms today:

### **WPE Website (March 21, 2023)[19]**



---

16  https://wordpress.org/five-for-the-future/pledge/wp-engine/.

17  https://wordpress.org/five-for-the-future/pledge/wp-engine/ (emphasis in original).

18  https://wpengine.com/resources/decode-2023-fireside-chat-mullenweg-ventura/.

19  https://web.archive.org/web/20230321054241/https://wpengine.com/ (formerly viewable at https://wpengine.com).

45.     WPE's website has used the Challenged Terms in substantially the same way for more than a decade so that consumers know that WPE's products and services are made to work with the open source code for WordPress and WooCommerce.[20]

**WPE Website (September 26, 2024)**



46.     Indeed, during a livestream on September 26, 2024 on the X platform, when asked why he had not attempted to enforce Automattic's trademarks against WPE a decade ago, Mullenweg admitted that he'd known about WPE's use of the Challenged Terms for "years," but opted not to take action.[21]

47.     Moreover, WPE's use of "WP" is consistent with the WordPress Foundation's own trademark policy, which makes clear that "WP" is not part of WordPress's trademark and is free for

---

[20]   https://wpengine.com/.

[21]   https://www.youtube.com/watch?v=H6F0PgMcKWM.

anyone to use.[22]  Indeed, years ago Mullenweg publicly stated that WPE's use of "WP" in its company name is entirely proper and serves as an example for other companies:  "We ask you to not use WordPress in your domain name, which we've done for four years now.  So, *use like WP, like there's WPEngine, call it WPEngine instead of WordPressEngine.com or something like that.*"[23]

## II.    THE WORDPRESS PLATFORM AND MATTHEW MULLENWEG'S ROLE IN IT

### A.    Mullenweg Co-Founds Open Source Platform WordPress

48.    In 2003, Mullenweg cofounded WordPress, accessible at wordpress.org, by "forking" (or copying) another earlier open source software program called b2/cafelog.  WordPress is an open source web content management system that is used in over 43% of websites on the Internet as of 2024.  By virtue of Mullenweg's status as cofounder of WordPress, his longstanding involvement in the WordPress community since 2003, and his self-proclaimed status as a WordPress "community leader," Mullenweg is understood by the WordPress community to be highly credentialed, experienced, and knowledgeable about WordPress, including its code and contributions of those in the WordPress community to the WordPress ecosystem.  Many consider him to be an authority on these matters, and his statements to the market are likely to induce reliance.

49.    WordPress operates under the open-source GNU General Public License (GPL).  Under that license, anyone in the world has permission to access, review, copy, modify, distribute, and create derivative works of WordPress without payment to anyone as long as, among other things, derivative works are also contributed back to the open-source community.  This sharing of new code development is the fundamental principal by which open-source communities function and thrive.

50.    In 2005, Mullenweg founded Automattic, a for-profit company.  Upon its founding, Automattic controlled the WordPress trademark.  Automattic also owns, among other sites and

---

[22]  *See* https://wordpressfoundation.org/trademark-policy/.

[23]  https://wordpress.tv/2010/09/19/matt-mullenweg-town-hall-with-matt/ at 36:50-37:18. Defendants now allege the opposite, that "WPEngine" infringes the WordPress mark, *see* Exhibit A.

1    platforms, wordpress.com, Pressable, and WordPress VIP—for-profit hosting providers for

2    WordPress sites which compete with WPE.

3          51.     In 2006, Mullenweg founded the WordPress Foundation as a California nonprofit

4    public benefit corporation.  In 2009, the WordPress Foundation was recognized by the IRS as a tax-

5    exempt public charity under Section 501(c)(3) of the Internal Revenue Code, retroactive to 2006.

6    Mullenweg has served as a director of the WordPress Foundation since its founding.  According to

7    its annual filings with the IRS, the WordPress Foundation's mission is "to ensure free access, in

8    perpetuity, to the software projects we support."  According to its Articles of Incorporation, the

9    purpose of the Foundation is to "preserve and protect the freedom to use, study, copy, modify,

10    redistribute and otherwise make freely available certain open source software," and to "serve the

11    general public by promoting and advancing the development of certain open source software and

12    technologies which can be used by individuals as a personal publishing platform free of charge, and

13    to educate the general public on the availability and use of such software and technologies."

14         **B.**     **Defendants Conceal the Truth as to WordPress Trademark Rights**

15          52.     In 2010, after WordPress Foundation had been publicly recognized by the IRS as a

16    501(c)(3) public charity, Mullenweg caused Automattic to transfer ownership of the WordPress

17    marks to the WordPress Foundation, and publicly announced that transfer.  On September 9, 2010,

18    Mullenweg posted on his blog that "Automattic has transferred the WordPress trademark to the

19    WordPress Foundation, the nonprofit dedicated to promoting and ensuring access to WordPress and

20    related open source projects in perpetuity."[24]  He did that around the same time of public concern

21    over his level of control and potential for abuse, including because those are criteria that are

22    important when selecting a platform to build one's business around.  Mullenweg's public

23    announcement did not mention, however, that he had also caused the nonprofit WordPress

24    

---

25    [24]  https://ma.tt/2010/09/wordpress-trademark/.  *See also* https://wordpress.org/book/2015/11/the-
26    wordpress-foundation/ ("Automattic registered the WordPress trademarks in 2006, but some
     contributors — who had helped build the software or started their own local communities — felt
27    that they had as much right to the trademarks as Automattic.  Some community members believed
     that the community owned the codebase and thus should own the trademarks, not the corporate
28    entity.").

---

Foundation to grant an exclusive, fully-paid, royalty-free, perpetual, irrevocable, worldwide, sublicensable license and related security agreement to the WordPress mark **right back** to Mullenweg's for-profit Automattic.[25]

53.    Mullenweg failed to disclose this exclusive licensing arrangement between his nonprofit (the WordPress Foundation) and his for-profit (Automattic) in the WordPress Foundation's tax filings with the California government, claiming that there were no "contracts . . . **between [WordPress Foundation] and** any officer, director or trustee . . . or with **an entity in which any such officer, director** or trustee **had any financial interest**" (emphasis added).  This statement was false, given that Mullenweg was a director of the WordPress Foundation while also having a financial interest in Automattic, the entity with which the Foundation entered into a trademark license agreement—an apparent self-dealing transaction constituting inurement under federal tax law.  It appears Mullenweg also did not disclose the license agreement in the WordPress Foundation's filings with the IRS, and none of WordPress Foundation's fourteen years of publicly available federal reporting to the IRS indicates that the WordPress Foundation was compensated in any form for granting an exclusive, fully-paid, royalty-free, perpetual, irrevocable, worldwide, sublicensable license for trademarks Defendants now claim are incredibly valuable.  Indeed, while the Foundation has failed to ever disclose to the IRS its ownership of the trademarks or existence of the exclusive royalty-free license to Automattic, for the past seven years Mullenweg himself executed the IRS forms on behalf of the Foundation under penalties of perjury, an apparent false certification to the IRS and public that the Foundation's Forms 990 were true, correct, and complete.

54.    Notably, for the 2010 tax year when the apparent self-dealing transaction with Automattic was executed, the Foundation chose to file the Form 990-N "e-postcard" version of the Form 990 requiring no financial detail except a certification that the organization normally has annual gross receipts of $50,000 or less.  Gross receipts are the total amounts the organization received from all sources during the tax year including non-cash contributions such as valuable trademarks, without subtracting any costs or expenses.  By virtue of having filed this form, the

---

[25]    https://assignments.uspto.gov/assignments/assignment-tm-4233-0698.pdf.

Foundation made a representation to the IRS and to the public that its gross receipts were normally $50,000 or less during the time in which it received rights to the WordPress trademarks, effectively concealing what Defendants claim are valuable trademarks from being reported in the Foundation's returns as assets of the Foundation.  Further, for the subsequent year the Foundation filed a more fulsome 2011 Form 990-EZ which reported that at the start of 2011, the Foundation only had total assets $14,071 consisting solely of cash, savings, and investments.  No trademarks or other valuable IP were reported.  These filings demonstrate that the Foundation made no accounting to the IRS (or the public reviewing IRS forms) concerning the Foundation's receipt and possession of the trademarks at issue.  Assuming the trademarks have any value (much less the tens of millions of dollars annually that Mullenweg has demanded for use of them), each year the Foundation has failed to report the value of the trademarks on its Form 990 balance sheet along with a description of assets in its corresponding Schedule O, although required to do so under federal tax law.

55.     In a number of public statements about the WordPress trademark, Mullenweg also failed to disclose the critical fact that a for-profit entity he controlled held the exclusive WordPress trademark rights.   To the contrary, Mullenweg's comments appeared intent on providing false assurances that the WordPress trademark rights were safely in the hands of the nonprofit Foundation. In 2010, Mullenweg stated that "it's not often you see a for-profit company ***donate one of their most valuable core assets and give up control***."[26]  And as he stated in an interview in 2014, referring to the Foundation: "What's important is that [] longer than I'm alive, longer than Automattic is alive, longer than any of us are alive, ***there is something that holds the WordPress code and trademark for the free access for the world***."[27]   As the Foundation noted: "2010 also saw the WordPress trademark donated by Automattic to the WordPress Foundation.  This was important in helping to draw a clearer definition between the two entities, and to ensure the protection of the trademark in the future, but more immediately it was important because now the trademark is officially tied to

---

[26]  https://ma.tt/2010/09/wordpress-trademark/ (emphasis added).

[27]  https://archive.wordpress.org/interviews/2014_04_17_Mullenweg.html (emphasis added).

the open source project and its goals."[28]  This meant, according to Mullenweg, that "the most central piece of WordPress's identity, its name, is now **fully independent from any company**."[29]

56.    Defendants' assurances were false and intended to mislead the public, and induce their reliance, including WPE and the WordPress community who relied on them.  While they were publicly touting their purported good deed of moving the trademarks away from a private company, and into the safe hands of a nonprofit, Defendants in fact had quietly transferred irrevocable, exclusive, royalty-free rights in the trademarks right back to Automattic that very same day in 2010.  This meant that far from being "independent of any company" as Defendants had promised, control over the WordPress trademarks effectively never left Automattic's hands.

**C.    Defendants Conceal the Truth as to Ownership of wordpress.org**

57.    The WordPress open-source software is hosted by and accessible through the website wordpress.org, which also contains information, tutorials, educational and training resources, and news about WordPress.  As described in further detail herein, wordpress.org also hosts plugins, themes, other add-ons created by software developers in the WordPress community who wish to share their work with the rest of the WordPress community, and hosts other services, such as a support ticket and bug tracking system as well as a community chat and communications system.

58.    Until late 2024, Defendants led the WordPress community to believe that wordpress.org—the directory and repository for WordPress software and plugins—was owned and controlled by the WordPress Foundation.  Defendants nurtured this impression in several ways, including the site's .org domain, which is typically reserved for nonprofits; Mullenweg's statements claiming that the WordPress code was owned by the Foundation to ensure "free access to the world" forever; his role within the Foundation; and his promotion of WordPress as a free, open-source

---

[28]  https://wordpressfoundation.org/news/2011/2010-year-in-review/.

[29]  https://ma.tt/2010/09/wordpress-trademark/ (emphasis added).

software platform accessible to everyone "in perpetuity."  Notably, in October 2024, Automattic's own counsel posted (and then deleted) a statement asserting that wordpress.org is a "non-profit".[30]

59.     In addition to Defendants' repeated assurances that WordPress was free and open "for the world," and would be even beyond Mullenweg's lifetime,[31] statements made on wordpress.org itself represent that "*No one*" owns wordpress.org, "*WordPress.org is not 'owned' in the traditional sense, as it's an open-source project*," "*no one owns WordPress.org for practical purposes*," and "WordPress.org operates as a community-driven platform distributing open-source software, *with no traditional ownership or corporate structure to manage it*."[32]  Simultaneously, Defendants have held wordpress.org out as a community asset and invited—or even insisted that—community members to donate countless hours of free labor to create and improve its content, purportedly for the community's benefit.  At no time did Defendants ever disclose to these volunteers that their labor was serving only to personally enrich Mullenweg, and that they secretly reserved the rights to make extortionate demands for monetary payments, or to leverage their hard work to extort others for continued access, or to ban any or all of these volunteers from wordpress.org if they felt like it.  Statements on wordpress.org represent to the community that "*[t]here's no entity to sign any agreement*" with wordpress.org in the first place.[33]  The above representations were made by multiple individuals, including wordpress.org's own moderators, many of whom are employees of Automattic, or of Audrey Capital, Mullenweg's private investment

---

[30]  *Compare* https://web.archive.org/web/20241002232337/https://automattic.com/2024/10/02/wordpress-trademarks-a-legal-perspective/ (formerly viewable at https://automattic.com/2024/10/02/wordpress-trademarks-a-legal-perspective/) *with* https://automattic.com/2024/10/02/wordpress-trademarks-a-legal-perspective/.

[31]  https://archive.wordpress.org/interviews/2014_04_17_Mullenweg.html; https://wpscan.com/vulnerability-disclosure-policy/.

[32]  https://wordpress.org/support/topic/wordpress-org-administration/; https://wordpress.org/support/topic/who-owns-wordpress-org/.

[33]  https://wordpress.org/support/topic/who-owns-wordpress-org/.

vehicle.[34]  Indeed, in an interview in 2016, Mullenweg stated, "There's wordpress.org, which is our community hub where we develop the WordPress software and have a plugin directory and theme directory and things like that.  That's also sort of an open-community type of thing."[35]  He made this statement immediately after stating, that "no one" owns the WordPress software and "you own it just as much as I do."[36]  The interviewer summarized his interview with Mullenweg by stating, "For the first time I truly understood the difference between WordPress.com and WordPress.org. WordPress.org is the open source software that anyone can contribute to and anyone can benefit from, ***no one owns WordPress.org*** and hence the open source nature" (emphasis added).[37]

60.    These statements were material to WordPress's initial adoption by the open source community as well as its subsequent adoption by ever larger and more commercial entities who rely on this supply chain transparency as a critical part of their decision making process.  Indeed, Defendants made these representations with the goal that market participants would rely on them and decide to build their businesses around WordPress. Confirming Defendants' scheme worked as intended, others in the WordPress community similarly expressed their belief that wordpress.org was either owned by no one or owned by the WordPress Foundation.  For example, in an Axios.com article from 2019, the author wrote, "WordPress is an open-source software platform that's owned by a non-profit group called The WordPress Foundation."[38]

61.    By design, WordPress software and wordpress.org are deeply intertwined.  That is, wordpress.org is *hard-coded* into how WordPress works: the open source WordPress code has over 1,500 references to wordpress.org.  For example, WordPress core code is coded to make internet

---

[34]  https://wordpress.org/support/topic/wordpress-org-administration/; https://wordpress.org/support/topic/who-owns-wordpress-org/.

[35]  https://www.youtube.com/watch?v=8TDobUFDX2U at 1:08:10.

[36]  https://www.youtube.com/watch?v=8TDobUFDX2U at 1:08:00.

[37]  https://www.linkedin.com/pulse/meeting-matt-mullenweg-ceo-automattic-co-founder-wordpress-brill.

[38]  https://www.axios.com/2019/09/19/wordpresscom-owner-automattic-raises-300-million-matt-mullenweg.

connections with, or "callbacks" to, wordpress.org for the purpose of identifying and obtaining updates to plugins, themes, and the WordPress core code, including updates relating to feature improvements and security patches.  Indeed, WordPress updates are *required* to flow through wordpress.org.  WordPress users are warned not to use any versions of WordPress hosted anywhere else.

62.     Shortly before this action was filed, as Defendants commenced their nuclear war, Mullenweg acknowledged that he controls wordpress.org, as in the following message he posted on Slack on September 22, 2024:



63.     Mullenweg also acknowledged that he is the sole owner of wordpress.org, as he stated in a post on X.com on September 30, 2024:

1
2
3
4
5
6
7
8
9
10
11
12
13



14      64.     Mullenweg made similar statements in a message he posted on Slack on January 14,

15  2024 to the effect that wordpress.org (using the abbreviation "W.org," which redirects to

16  wordpress.org) "belongs to me, it's not part of the foundation or any trust":

17



18
19
20
21      65.     In a September 26, 2025 email with a reporter, Mullenweg acknowledged not just

22  ownership, but complete control: "I am in control of everything on WordPress.org."

23      66.     In an interview with the *WordPress Blog & Podcast* on September 27, 2024,

24  Mullenweg also stated that he has "been running wordpress.org for 21 years," which means that he

25  has been running the wordpress.org website since he founded WordPress in 2003, such that

26
27
28

wordpress.org was *never* owned by the nonprofit WordPress Foundation and existed years before there even was a Foundation.[39]

67.     Even after the initial Complaint was filed in this action, Defendants have continued to conflate the Foundation and wordpress.org, suggesting they are one in the same.  For example, under the Foundation's "Updates and new business," the minutes state that "Mary Hubbard will be starting as the new Executive Director of WordPress.org next week," in apparent reference to the nonprofit organization.[40]

### 4. **Updates and new business**

- New Executive Director

    It was noted that Mary Hubbard will be starting as the new Executive Director of WordPress.org next week. She will also oversee educational programs in 2025 with support from teams focused on community, education, and contribution.

### D.     Defendants Conceal the Truth Regarding the WordPress Directory

68.     Defendants have also misled plugin developers into contributing their plugins to the wordpress.org directory and repository.

69.     WordPress plugin developer guidelines were first published on April 9, 2015.  As of the most recent update, the plugin developer guidelines (from wordpress.org, which is operated by Defendants) state that "The goal of the WordPress Plugin Directory is to provide a safe place for all WordPress users – from the non-technical to the developer – to download plugins that are consistent with the goals of the WordPress project"; "We strive to create a level playing field for all developers"; and "Repeat violations may result in all the author's plugins being removed and the developer being banned from hosting plugins on WordPress.org."[41]

---

[39]  https://x.com/TheWPMinute/status/1839774203018662028.

[40]  https://wordpressfoundation.org/news/2024/meeting-minutes/.

[41]  https://developer.wordpress.org/plugins/wordpress-org/detailed-plugin-guidelines/.

70.    Further, the WordPress plugin developer guidelines state that "Our intent is to enforce these guidelines with as much fairness as humanly possible. We do this to ensure overall plugin quality and the safety of their users" and that, although they reserve the right to disable or remove a plugin even for reasons "not explicitly covered by the guidelines, "we promise to use those rights sparingly and with as much respect as possible for both end users and developers."[42]

71.    At no time have Defendants represented that plugins would or could be expropriated at the whim of Mullenweg. Indeed, the very idea that they would ***not be***—*i.e.*, because WordPress would be "free" and "open" forever, and not controlled by any company—was key to the market's adoption of WordPress in the first place.

**E.    Defendants Knew Building a Business on the WordPress Technology Was Far Riskier Than They Presented it to Be**

72.    Defendants knew the foregoing representations and omissions were misleading and were part of a scheme to induce others to invest in the WordPress ecosystem. Defendants indisputably knew that Mullenweg personally owned wordpress.org, and that Automattic had been given an exclusive license and that the transfer to the Foundation was illusory, and that the ownership of wordpress.org and the exclusive license created a conflict of interest. Defendants also knew that contrary to their promises that WordPress would be "free" and "open" "to the world" forever, Defendants could, at any time, begin making extortionate demands for ransom payments and ban anyone they unilaterally deemed to be a competitive threat. Defendants knew that this created a risk to others in contributing to and investing in the WordPress ecosystem, that was different than if all relevant rights were owned and controlled by a properly governed charitable foundation. Defendants knew that WordPress was effectively a trap, illustrated by Defendants themselves:[43]

---

[42]    https://developer.wordpress.org/plugins/wordpress-org/detailed-plugin-guidelines/.

[43]    https://x.com/photomatt/status/1841245789311365213.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19      73.    Mullenweg's October 1, 2024 tweet conveyed that the WordPress ecosystem,

20  including those businesses competing with Automattic, rests on a single block—wordpress.org.

21  Yet, only Defendants knew that this block could be removed at any time at Mullenweg's sole—

22  conflicted—discretion.

23      74.    WPE and other market participants did not know this hidden trap existed and that at

24  any moment, Defendants could begin making extortionate demands for payments or blocking access

25  to WordPress resources.  Rather, like many members of the WordPress community, WPE was lulled

26  into a false sense of security by the foregoing representations and omissions. WPE reasonably

27  believed, to its detriment, that the WordPress ecosystem—including plugins such as ACF—was

28  safely outside of the control of Defendants and subject to the reasonable posted rules and

restrictions.  WPE also reasonably believed, to its detriment, that there would never be a toll charged to developers for using wordpress.org. WPE would have acted differently if it had known the truth about these concealed facts.  It would not have invested in WordPress as it had, or would have done so in a way that did not leave it open to the changing whims of one (conflicted) man.  As seen by the events alleged herein, Defendants' purported ability to control a chokepoint in the WordPress ecosystem was highly material.  It meant that investing in the WordPress ecosystem was far riskier than it appeared to be.

75.    WPE and other market participants did not know that plugins, such as ACF, can also be disabled or removed at the personal whims of Mullenweg or in order to extort exorbitant license payments.  Had WPE known this information, it would have allocated its time and investment into the WordPress ecosystem differently.  Nor did WPE and other market participants know that Mullenweg, rather than the WordPress Foundation, personally controlled wordpress.org. Defendants had actual knowledge of their unchecked and unrestrained power over wordpress.org and plugins, yet they deliberately concealed it, intending to induce WPE and other members of the WordPress community into investing in the WordPress ecosystem, including through plugins such as ACF.

76.    Had WPE known of this ownership structure, it would have acted differently due to the risk presented, since—as this case illustrates—it would not have subjected its business to the caprice of one individual.  The same is true of other market participants, including customers, web hosts, developers and agencies.

**F.    The Community's Reaction as the Truth Comes to Light**

77.    The WordPress community expressed shock to learn that Mullenweg personally owns and controls wordpress.org.  One commenter posted on Reddit on October 22, 2024, "I was

today old when I found out: Wordpress.org is not owned by the WordPress foundation."[44]  Another user wrote, "the vast majority of us thought that wordpress/.org was part of the Foundation . . . ."[45]



78.    On X.com on October 24, 2024, another user quoted from "O'Reilly" — which publishes the "WordPress Bible" — for the proposition that "everything on http://wordpress.org is owned by the community . . . ."

---

[44]  https://www.reddit.com/r/Wordpress/comments/1gab4wq/i_was_today_old_when_i_found_out_wordpressorg_is/.

[45]  https://www.reddit.com/r/Wordpress/comments/1gab4wq/i_was_today_old_when_i_found_out_wordpressorg_is/.

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]



79.    The community was also shocked to learn that when Mullenweg's for-profit company, Automattic, transferred the WordPress trademarks to the WordPress Foundation in 2010, the WordPress Foundation had simultaneously granted Automattic an irrevocable, exclusive, commercial license to the trademarks.

80.    On Reddit.com on September 24, 2024, a user posted, "I thought the WordPress Foundation owned the trademark?" and linked to the WordPress Foundation's own trademark policy.[46]



---

[46] https://www.reddit.com/r/Wordpress/comments/1foiceb/yes_to_use_the_wordpress_trademark_commercially/.

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

81.    On X.com on September 24, 2024, Mullenweg revealed that "[t]he commercial trademark has always belonged to Automattic." One user responded to this post on X.com by asking, "Why doesn't the foundation own it?"



82.    Another user responded to this post on X.com, stating, "I've been working with WordPress since 2012 and NEVER knew this":



83.    The WordPress community was deeply unsettled upon learning that Defendants had demanded payment from WPE for access to, what they believed were open-source resources:



1

2

3

4

5

6

7



8  **III.  DEFENDANTS' PROMISES TO WPE AND THE ENTIRE WORDPRESS COMMUNITY**

9

10      84.     The WordPress community, consistent with the principles of open source, was built

11  upon the values of freedom and openness.  As described above, WordPress's core software is

12  licensed to the world under an open source GPL license.  In addition to its software licensing,

13  WordPress's messaging on wordpress.org and wordpressfoundation.org emphasize these

14  overarching values of freedom and openness.

15      85.     For example, on wordpress.org, Mullenweg claims that the WordPress community

16  is "united by the spirit of open source, and the freedom to build, transform, and share without

17  barriers.  ***Everyone*** is welcome."[47]  The website further states that WordPress "provides the

18  opportunity for ***anyone*** to create and share."[48]  Defendants describe their commitment to open

19  source, which has led it to adopt "four core freedoms" related to its product offerings: (1) "freedom

20  to run [the software] for any purpose"; (2) freedom to "change [the software] make it do what you

21  wish"; (3) "freedom to redistribute" the software; and (4) "freedom to distribute copies of your

22  modified versions to others."[49]  Indeed, these principles are consistent with the philosophical

23  underpinnings of the GPL License.  Defendants explain that they are "committed to being as

24

25  ───────────────

26  [47]  https://wordpress.org/ (emphasis added).

27  [48]  https://wordpress.org/about/ (emphasis added).

28  [49]  https://wordpress.org/about/.

-34-                          Case No. 3:24-cv-06917-AMO
THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

1  *inclusive and accessible as possible*.  We want users, regardless of device or ability, to be able *to*

2  *publish content* and maintain a website or application built with WordPress."[50]

3      86.    Apart from these broad promises of openness, accessibility, and freedom, Defendants

4  make even more specific promises to third party software developers (such as WPE) which it

5  encourages to build on its platform.  WordPress is architected in a way that allows third-party

6  software developers to create "plugins" and "themes" that can seamlessly interact with the

7  WordPress platform.  WordPress plugins enhance and add to the functionality of WordPress, while

8  WordPress themes can change and enhance how WordPress looks when users interact with

9  it.  Defendants strongly encourage software developers to develop and share plugins and themes

10  with other members in its community by uploading them to a repository within the wordpress.org

11  website for all to use.  Websites around the world running WordPress can then download these

12  plugins from wordpress.org repository to their websites.  Defendants operate an authentication

13  system at login.wordpress.org, which controls access to portions of the wordpress.org site, including

14  the ability to submit plugins and themes to the repository.

15      87.    Mullenweg hosts a developer website (developer.wordpress.org) to encourage third-

16  party software developers (such as WPE) to build plugins.  On that developer website, WordPress

17  promises that "wordpress.org offers free hosting to *anyone* who wishes to develop a plugin in our

18  directory."[51]  The wordpress.org website is a control point over distribution for WordPress plugins.

19  Nowhere on the developer website does it say that a developer must pay money to WordPress to

20  host their plugins on wordpress.org, or that access to wordpress.org can be blocked at Mullenweg's

21  whim.  Nor does wordpress.org disclose on the site that it is *not* owned and operated by the nonprofit

22  WordPress Foundation (despite the dot-org top level domain and WordPress Foundation donation

23  page), but is, in fact, owned and controlled solely by Mullenweg.

24

25

26

27  [50]  https://wordpress.org/about/accessibility/ (emphasis added).

28  [51]  https://developer.wordpress.org/plugins/wordpress-org/ (emphasis added).

88.     Wordpress.org's developer website also contains a "Frequently Asked Questions" which provides the process by which plugins are approved to be posted on wordpress.org.[52]  The developer website states that a plugin submitted for publication on wordpress.org "will be queued, and as soon as we get to it, we will manually download and review your code.  ***If we find no issues with the security, documentation, or presentation, your plugin will be approved***.  If we determine there are issues, you will receive a second email with details explaining what needs to be fixed."[53]  Nowhere does the website say that the plugin will be approved only if the developer pays money to WordPress.  The "Frequently Asked Questions" also contains language that describes the conditions under which plugins are not accepted.[54]  Again, nothing states that plugins will not be accepted for failure to pay money to wordpress.org.  The "Frequently Asked Questions" section of the website also states that "[p]lugins are closed for guideline violations, security issues, or by author requests."[55]  Nowhere on the website does WordPress state that plugins can be closed simply because Mullenweg decided so.

89.     In addition to emphasizing the openness of the WordPress Core codebase and wordpress.org, Defendants have also emphasized openness in use of the WordPress trademark.  According to the WordPress Foundation's website, the WordPress Foundation is the rightful owner of the WordPress trademark and oversees its enforcement.[56]  The WordPress Foundation has also represented to the IRS that "THE FOUNDATION WILL BE RESPONSIBLE FOR PROTECTING THE WORDPRESS, WORDCAMP, AND RELATED TRADEMARKS" (capitalization in

---

[52]  https://developer.wordpress.org/plugins/wordpress-org/plugin-developer-faq/.

[53]  https://developer.wordpress.org/plugins/wordpress-org/plugin-developer-faq/ (emphasis added).

[54]  https://developer.wordpress.org/plugins/wordpress-org/plugin-developer-faq/.

[55]  https://developer.wordpress.org/plugins/wordpress-org/plugin-developer-faq/.

[56]  https://wordpressfoundation.org/trademark-policy/.

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

original).[57]  As referenced above, Mullenweg also has stated that the very reason that he created the WordPress Foundation was to ensure that "there is something that holds the WordPress code and trademark for the *free access for the world*."[58]

90.     Consistent with the doctrine of nominative fair use, nearly all third-party developers of WordPress plugins prominently display "WordPress" on their websites when referring to the software and platform on which their plugins are built, as do providers that host WordPress websites, when describing the WordPress software and platform.  As discussed above, WPE has been using the term WordPress in this fashion since the company was formed in 2010 and "WooCommerce" to reference the WooCommerce plugin used by certain of its customers.  Defendants have been aware of this usage for more than a decade without complaint.  This type of referential, or nominative, use of WordPress is not only legal, but it is essential to providing consumers with the information they need.  Further, it has long been condoned by the Defendants and is widely mirrored by the entire WordPress community.

## IV.     AUTOMATTIC'S AND MULLENWEG'S COERCIVE THREATS AND ATTEMPTED EXTORTION OF WPE

91.     In the days leading up to Mullenweg's September 20, 2024 keynote address at the WordCamp US Convention, Automattic suddenly began demanding that WPE pay Automattic large sums of money, and, if it refused, Automattic would wage war against WPE.  This demand was accompanied by allegations about WPE's business that were not only baseless but also bore no rational relation to the payment demand.

92.     During the course of calls on September 17 and 19, 2024, for instance, Automattic CFO Mark Davies told a WPE board member that Automattic would "go to war" if WPE did not agree to pay its competitor Automattic a significant percentage of WPE's gross revenues—tens of millions of dollars—on an ongoing basis.  Automattic's CFO suggested the payment ostensibly would be for a "license" to use certain trademarks like WordPress and WooCommerce, even though,

---

[57]  https://projects.propublica.org/nonprofits/display_990/205498932/2012_12_EO%2F20-5498932_990EZ_201112.

[58]  https://archive.wordpress.org/interviews/2014_04_17_Mullenweg.html (emphasis added).

for example, WPE needs no such license and had no reasonable expectation that Automattic had a right to demand money for use of a trademark owned by the separate nonprofit WordPress Foundation. WPE's nominative uses of those marks to refer to the open-source software platform and plugins used by its clients' websites are fair uses under settled trademark law, and they are consistent with the WordPress Foundation's own guidelines and the practices of nearly all businesses in this space. Nonetheless, Automattic's CFO insisted that WPE provide a response to the demand immediately and later, on the day of the keynote, followed up with an email reiterating a claimed need for WPE to concede to the demands "before Matt [Mullenweg] makes his WCUS keynote at 3:45 p.m. PDT today."

93.     In parallel, and throughout September 19 and 20, Mullenweg embarked on a coercive campaign, sending a series of harassing text messages and making calls to WPE's CEO and a board member. One of Mullenweg's threatening messages to WPE's board member on September 19 read:



> If I'm going to make the case to the WP community about why we're banning WPE I need to do it in my talk tomorrow. Your delaying is just trying to remove that.

94.     Mullenweg also threatened that if WPE did not agree to pay his demands before the start of Mullenweg's livestreamed keynote address at 3:45 pm on September 20, he would go "nuclear" on WPE, including by smearing its name, disparaging its directors and corporate officers, and banning WPE from WordPress, including community events. His threats included the following message:

1

2

3

4

5

6

7

> Just called. Should I run these slides or not?
>
> Is next week a negotiation on the % or it happening at all? I am not going to be able to walk it back
>
> I know that this is the nuclear option, it sets us down a specific path

8    95.    While waiting for a response to his text messages, Mullenweg emailed WPE's CEO

9  and a board member, threatening to use his planned keynote speech to disparage WPE: "We get a

10  few thousand viewers on the livestream, and the videos on YouTube can get millions of views when

11  we promote them."  Mullenweg stated that he had already created slides for his keynote speech,

12  taking aim at WPE and its investor, and would present them to WordCamp attendees—and to

13  millions of others via livestream on YouTube—if his financial demands were not met.

14    96.    Mullenweg continued to send a barrage of texts throughout the evening of September

15  19 and the morning of September 20, attempting to pressure WPE into capitulating to Automattic's

16  financial demands.  For example:

17

18

19

> I have 14 slides so far, working title for the talk: "How Private Equity can Hollow out and Destroy Open Source Communities, a Story in 4 Parts."
>
> I've got quotes from current and former employees, some may even stand up and speak as well.

20

21

22

23    97.    When WPE's board member offered to speak with Mullenweg the next business day

24  in San Francisco to have a business discussion, Mullenweg refused, stating that he "will proceed

25  with the scorched earth nuclear approach to WPE" and that he would "hone" his message

26  accordingly for his keynote address that afternoon:

27

28



98.    In the final minutes leading up to his keynote address, Mullenweg sent one last missive—a photo of the WordCamp audience waiting to hear his speech, with the message that he could shift gears and turn his talk into "just a Q&A about [WordPress]" if WPE agreed to Defendants' payout terms:

V.    **AUTOMATTIC AND MULLENWEG CARRY OUT THEIR THREATS**

99.    When WPE refused to capitulate to Automattic's astronomical and extortionate monetary demands, Mullenweg made good on his threats.  The threat of "war" turned into a multi-front attack, part of an overarching scheme to extract payouts from WPE.  That threat is ongoing.

Defendants have continued to disrupt WPE's business and falsely disparage its products and services.

100.    Defendants' wrongful actions did not stop after WPE filed the initial Complaint, but only escalated.  Defendants proceeded to carry out their threats in multiple ways, launching a full-scale "nuclear war," with Mullenweg himself describing that his goal was to disrupt WPE's customer relationships and to destroy its business.[59]

101.    Mullenweg's actions also reflect a clear abuse of his conflicting roles as (1) a director of the nonprofit WordPress Foundation, (2) with ownership and control of the for-profit wordpress.org website and control over access to the open-source WordPress software (and related community contributed plugins, and themes) that is accessed through his wordpress.org site, and (3) as the CEO of for-profit businesses that compete with WPE and that claim to have an exclusive, royalty free license to the Challenged Terms that are necessarily used by the WordPress community to refer to the open-source WordPress software on which the relevant websites are built. Mullenweg's private demand for tens of millions of dollars from WPE for his for-profit company sharply contrasts with his public proclamations to selflessly safeguard the interests of the WordPress community.  His subsequent actions of terminating WPE's and its customers' ability to freely access portions of the wordpress.org site in order for WPE to service its customers similarly stands in stark

---

[59]  https://x.com/TheWPMinute/status/1839774203018662028; https://x.com/primedryan/status/1838818728961806575.  During the recent hearing before this Court, Defendants represented that "we have seen over and over again 'nuclear war' in quotes," but Mullenweg "didn't say it" and it "[d]idn't happen."  August 28, 2025 Hrg. Tr. at 33.  According to Defendants' counsel, Mullenweg instead only "refers to nuclear," not "nuclear war."  *Id.*  While WPE alleges that both threats are abhorrent and wrongful, reflecting a distinction without a difference, documents recently produced by Defendants confirm that ██████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

All redactions contained within WPE's Second Amended Complaint refer to documents recently produced by Defendants that Defendants have marked as Confidential or Highly Confidential under the governing Protective Order, which prevents WPE from filing Defendants' materials publicly until the Court determines whether to maintain these materials under seal.

contrast to the mission statement of WordPress as an open source community, and to the promises Mullenweg made on which the entire community relied.

A.     **Defendants' False and Disparaging Statements**

102.     During the keynote address at WordCamp US on the afternoon of September 20, Mullenweg, on behalf of Automattic, made a series of false and disparaging statements about WPE and its investor, including:

- Claiming that WPE is a company that just wants to "feed off" of the WordPress ecosystem without giving anything back;

- Suggesting that WPE employees may be fired for speaking up, supporting Mullenweg, or supporting WordPress, and offering to provide support in finding them new jobs if that were to occur;

- Stating that every WPE customer should watch his speech and then not renew their contracts with WPE when those contracts are up for renewal;

- Claiming that if current WPE customers switch to a different host they "might get faster performance";

- Alleging that WPE is "misus[ing] the trademark" including by using "WP" in its name; and

- Claiming that WPE's investor doesn't "give a dang" about Open Source ideals.

103.     These statements during his keynote address at the WordCamp US Convention were demonstrably false.

104.     Contrary to Defendants' statements that WPE does not contribute to the WordPress community, WPE has been deeply dedicated to advancing the use and adoption of WordPress through innovation, investment, and active community involvement.  As Mullenweg acknowledges on wordpress.org, "[i]t takes a lot of time and energy to create and then support Themes and Plugins, keeping them updated as WordPress changes and bugs are found" and "every contribution counts, no matter what it looks like."[60]  WPE has contributed tens of millions of dollars in ongoing support for the broader community through events, sponsorships, and the development of educational resources, including sponsorship of WordCamps worldwide and producing DE{CODE}; educating

---

[60]  https://wordpress.org/documentation/article/become-a-wordpress-contributor/.

1  and empowering the WordPress community through content like the WordPress Roundup and the

2  Building WordPress series; hosting, funding and actively maintaining multiple open source projects

3  (*e.g.*, ACF, Genesis, WPGraphQL, faust.js) within the ecosystem used by millions of websites

4  around the world; providing free developer tools such as Local (with more than 100,000 monthly

5  active users) and sponsoring development of WP-CLI, a command-line interface for WordPress;

6  and producing informative webinars, podcasts, and tutorials.  WPE significantly outpaces multiple

7  other contributors relative to its revenue.

8      105.    Defendants' claim that WPE is misusing the WordPress trademark is false.  For more

9  than a decade, WPE's use of "WP" has been explicitly permitted by WordPress Foundation's

10  trademark policy, which explicitly states: "The abbreviation 'WP' is not covered by the WordPress

11  trademarks and you are free to use it in any way you see fit."[61]  Moreover, WPE's use of the

12  WordPress mark is entirely compliant with governing trademark law.  For more than a decade, WPE

13  has fairly used that term to refer to the open-source WordPress software on which its customers'

14  websites are built, as other members of the WordPress ecosystem do.  For more than a decade,

15  Defendants never complained.

16      106.    Mullenweg's public statements reveal that Automattic is knowingly misusing its

17  asserted trademark rights.  These statements suggest Defendants had no genuine belief that their

18  manufactured trademark infringement accusation against WPE has any merit, as also evidenced by

19  their 14 years of inaction.  Instead, Defendants appear to be attempting to leverage trademark law

20  for anticompetitive purposes.  For example, on September 26, 2024, during a livestream on

21  YouTube, Mullenweg admitted: "Is there a law that says you have to give back?  No, there is a law

22  that says you can't violate the trademark.  ***So that's the law that we're using to try to encourage***

23  ***them to give back***."[62]

24  _____

25  [61]   In response to a cease and desist letter sent by WPE to Defendants, Defendants conspicuously
changed the policy to: "The abbreviation 'WP' is not covered by the WordPress trademarks, but
please don't use it in a way that confuses people."  *See*

26  https://web.archive.org/web/20241117010731/https://wordpressfoundation.org/trademark-policy/

27  (formerly viewable at https://wordpressfoundation.org/trademark-policy/).

28  [62]   https://www.youtube.com/watch?v=H6F0PgMcKWM at 13:12.

107.    Mullenweg's speculation that WPE might retaliate against employees for supporting the WordPress ecosystem is not just false and wholly unsubstantiated—it is also absurd.  WPE's business **depends** on the WordPress ecosystem.  It would be nonsensical for WPE to retaliate against employees who support it; the entire company supports the WordPress ecosystem.

108.    Not satisfied with the harm inflicted at WordCamp, Defendants expanded their smear campaign.   On September 21, 2024, Defendants authored an article that they posted on wordpress.org's "News" section titled "WP Engine is not WordPress."[63]   The article began by falsely stating that WPE is "profiting off of the confusion" and that WPE "needs a trademark license to continue their business."  WPE did not need a trademark license to continue its business.  The article also purported to "offer a specific, technical example of how [WPE] break[s] the trust and sanctity of our software's promise to users to save themselves money so they can extract more profits from you."  In support of this, Defendants alleged that WPE allegedly "disables revisions by default."  However, disabling revisions is a built-in feature of WordPress and has been since before WPE was founded (a Google search returns about 140,000 web pages discussing the practice).  The feature has been officially documented by WordPress and personally approved by Mullenweg, and limiting revisions is also a feature touted by Automattic's own product, JetPack.   Similarly, Defendants' hosting product, wordpress.com, limits revisions by default for many of their hosting plans, and Defendants' WooCommerce product does so as well. The article also separately alleged: "What WP Engine gives you is not WordPress, it's something that they've chopped up, hacked, butchered to look like WordPress, but actually they're giving you a cheap knock-off and charging you more for it."  This statement is provably false and defamatory.  WPE did not chop up, hack or butcher WordPress, or provide a "cheap knock-off."  WPE's WordPress installations are identical to the wordpress.org ZIP file that defines WordPress, and WPE's services use the identical WordPress GPL code that everyone else does.  Defendants' false statement was not based on any facts disclosed by them.  For example, as noted above, the fact that WPE "disables revisions by default" is unremarkable given Defendants approved this feature and their own product does the

---

[63]   https://wordpress.org/news/2024/09/wp-engine/.

same thing, and this fact did not form, and could not have formed, the basis of Defendants' statement and was not understood that way by readers.  Nor was Defendants' false statement based on any other facts disclosed by them.

109.    Mullenweg then caused a post from his personal blog titled "On WP Engine," containing these same false and disparaging statements, to be placed onto the WordPress admin dashboard, a part of every customer's WordPress installation, and displayed to most customers as they go about their daily business in WordPress, regardless of the host that they use, including WPE.

110.    On September 25, 2024, Defendants posted another article on the "News" section of wordpress.org.[64]  The article began by accusing WPE of trademark violations, stating, "WP Engine needs a trademark license, they don't have one."  Then the article stated, "WP Engine is free to offer their hacked up, bastardized simulacra of WordPress's GPL code to their customers."  This statement is provably false and defamatory, given that, as noted above, WPE's WordPress installations are identical to the wordpress.org ZIP file that defines WordPress, and WPE's services use the identical WordPress GPL code that everyone else does.  Nor was Defendants' statement based on any facts disclosed by Defendants (including that WPE "disables revisions by default," as explained above).

111.    Mullenweg has continued to repeat false and defamatory statements about WPE on his X account and to encourage customers to switch away from WPE.  He has even disparaged WPE as a "cancer" to WordPress—despite the countless contributions WPE has made to the WordPress community and the obvious harm such aspersions inflict upon WPE's business reputation.  Mullenweg's "nuclear war" against WPE for daring not to submit to Automattic's extortionate monetary demands has continued through this filing.

112.    Defendants made their false, misleading, and disparaging statements to key members of the WordPress and broader software and technology ecosystem, including WPE employees and customers at WordCamp US, and livestreamed them across the world via YouTube.  Among other things, Defendants' words and actions threaten to intentionally harm WPE's business and reputation

---

[64]  https://wordpress.org/news/2024/09/wp-engine-banned/.

within the WordPress community and beyond, and tortiously interfere with WPE's contractual relationships with its employees and customers.  Some WPE customers and community members have already expressed an intention to stop doing business with WPE due to Defendants' misconduct, as further detailed below.

113.    Based on the foregoing conduct, Defendants acted with actual malice and/or reckless disregard towards WPE.  Indeed, after WPE wrote to Automattic and Mullenweg highlighting their misrepresentations, Mullenweg's attacks continued unabated with blog posts, posts on X.com and Reddit, and appearances on multiple YouTube channels, spreading Defendants' misrepresentations to many hundreds of thousands of people.

**B.    Defendants Block Access to WPE's Plugins on wordpress.org**

114.    In another act of retaliation for WPE's refusal to hand over tens of millions of dollars to Automattic, and following up on his prior threats to ban WPE, on or about September 24, 2024 Mullenweg blocked WPE from updating the WordPress plugins that it publishes through wordpress.org.  By blocking access to wordpress.org, Defendants prevented WPE employees from accessing a host of functionality typically available to the WordPress community on wordpress.org, including, for example, the ability to submit and edit code contributions, participate in support forums designed to notify the community of issues, submit new versions of WPE-managed or WPE-led plugins, participate in WordPress development teams, interact with other WordPress community members through the WordPress Slack channel, and open or comment on support tickets.  This means that if WPE identified that one of the many plugins it created that are in use by millions of websites had a bug or a security issue, it would no longer be able to publish an update for that plugin on wordpress.org.

115.    At the same time, Mullenweg withdrew login credentials for individual employees at WPE, preventing them from logging into their personal accounts to access other wordpress.org resources, including the community Slack channels which are used to coordinate contributions to WordPress Core, the Trac system which allows contributors to propose work to do on WordPress, and the SubVersion system that serves as a repository for and manages open source code contributions.  These actions had the effect of halting the contributions that WPE makes to

WordPress Core, and depriving many WPE employees of access to emerging information on the project—which could include security alerts or other threats to the normal functioning of customers' websites.

116.    On September 25, 2024, Mullenweg wrote an article on wordpress.org, stating "WP Engine is banned from WordPress.org."[65]  In the post, Mullenweg wrote that "pending their legal claims and litigation against WordPress.org, WP Engine no longer has free access to WordPress.org's resources."  The claim that Mullenweg terminated WPE's access to wordpress.org because WPE had filed a lawsuit against wordpress.org was false (there was no lawsuit at that time), but the post confirmed to WPE and the WordPress community that it had been Mullenweg who caused WPE's inability to update its plugins through his exercise of his self-described control over wordpress.org.

117.    As a result of this ban, WPE users were prevented from updating their plugins, accessing wordpress.org themes, and accessing other resources from wordpress.org.

118.    In a further escalation, on or about September 25, 2024, Mullenweg prevented WPE customers who host their WordPress installations on WPE servers from accessing wordpress.org resources through the WordPress administrative panel.  This ban prevented WPE customers from receiving update notifications, updating or installing any of the 50,000+ WordPress themes and plugins from wordpress.org onto their sites.  As a result, WPE's customers were no longer able to install new plugins and themes from wordpress.org or update their existing plugins and themes to address bugs and security vulnerabilities.

119.    On September 28, 2024, during a live streamed interview on YouTube which took place in San Francisco, Mullenweg publicly took credit for carrying out these retaliatory actions against WPE and its customers, and gave various spurious reasons for his actions.  Mullenweg publicly stated that he gave WPE advance warning that he was going to terminate WPE's access to wordpress.org.  That is false.  He gave no notice at all.  WPE discovered Defendants' misconduct when its engineers attempted to log into wordpress.org on the morning of September 24 as usual,

---

[65]    https://wordpress.org/news/2024/09/wp-engine-banned/.

only to discover their accounts had been disabled.  In the same September 28, 2024 interview, Mullenweg was defiant and unremorseful for his wrongful acts, and even asked WPE to "please sue me."  In other posts on the social media platform X, Mullenweg seems to have justified his blocking of WPE from wordpress.org in part because of alleged "Stripe issues" with WPE:[66]



120.    While Mullenweg did not explain what he meant by the "Stripe issues," he appeared to be suggesting that WPE modified the way that a certain WordPress plugin called WooCommerce interacts with Stripe, an online credit card payment processor.  His accusation makes no sense.  The WooCommerce plugin adds functionality to WordPress that, among other things, allows users to sell products and services on their website and take payment for those sales.  WPE offers customers the ability to use alternative payment methods with the WooCommerce plugin, and a small segment of the WPE customer base has opted to use WPE's Stripe connection due to functionality that is not available in the Stripe connection utilized in the default WooCommerce plugin.  In an interview Mullenweg gave on YouTube, he stated that WP Engine earns "tens of millions" of dollars annually

---

[66]  When Mullenweg refers to "Stripe issues", he is referring to a previous allegation that WPE is modifying the way that the WooCommerce WordPress plugin interacts with Stripe, an online credit card payment processor.  By way of background, WooCommerce is a WordPress plugin that is created and managed by Automattic.  The WooCommerce plugin adds functionality to WordPress that, among other things, allows users to sell products and services on their website and take payment for those sales.  Mullenweg's allegation that WPE modifies the way that the WooCommerce plugin interacts with Stripe is false.  While WPE does offer the WooCommerce plugin to its users, it does not at all modify the way in which the plugin interacts with Stripe.

1  from using WPE's Stripe connection.  This is false.  The commissions WPE received from Stripe

2  related to the WooCommerce plugin as of September 2024 were less than $2,000 per month.

3      121.   In a further effort to inflict harm upon WPE and the market, Defendants secretly

4  ████████████████████████████████████████████████.  Shocking documents

5  Defendants recently produced in discovery reveal that in mid-October 2024, just days after WPE

6  brought this lawsuit, Mullenweg ███████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████

9      **C.    Defendants Seek to Capitalize on the Chaos They Created, By Luring WPE's**

10     **Customers Away While Threatening More Harm to WPE**

11     122.   The orchestrated campaign following WPE's refusal to cede to Defendants' demand

12  for tens of millions of dollars was designed to sow fear and doubt in, among others, current and

13  potential future customers of WPE.  To try to directly capitalize on the chaos he caused, Mullenweg

14  has used another company he owns, Pressable, which competes with WPE, to tell clients to breach

15  their contracts with WPE and move to Pressable.

16     123.   Beginning with his September 20, 2024 keynote, Mullenweg urged WPE's

17  customers to reconsider renewing their contracts with WPE, and pushed his own company:  "Well,

18  I hope that we can get every single WP Engine customer to watch this presentation.  And that when

19  their renewal time comes up, they think about that.  And there's some really hungry other hosts.

20  Those things are Blue Host Cloud, Pressable, etc., that would love to get that business."

21     124.   As of September 2024, the Pressable homepage told WPE customers that Pressable

22  will pay for the costs of breaching their current contracts with WPE:

23

24

25

26

27

28

125.    As of September 30, 2024, the wordpress.com homepage (also owned and controlled by Mullenweg) offered WPE customers one year of free hosting on their service:[67]



Host with the World's Largest Contributor to WordPress

Get fully-managed WordPress hosting with unmetered traffic, unmatched speed, and unstoppable security.

Migrate your WP Engine site to WordPress.com and **get one year free of any plan**. We'll even make a 5% donation to the WordPress Foundation.

126.    As another example, Mullenweg urged WPE customers to use "any other web host in the world" besides WPE in a post on X.com dated September 24, 2024:

---

[67]  https://web.archive.org/web/20240930221958/https://wordpress.com/migrate-from-wp-engine/ (formerly viewable at https://wordpress.com/migrate-from-wp-engine/).



127.    Defendants reached out to WPE customers directly, attempting to induce them to terminate their relationship with WPE in favor of contracting with Automattic.  Defendants used fear tactics, pointing out that WPE's ban from wordpress.org—which Defendants themselves imposed—"could impact sites," plugins, or updates, and issuing veiled threats that, while the ban "might not affect your site in the short term," WPE customers should consider switching to Automattic:

From: [redacted] @woocommerce.com>
Date: Wed, Oct 16, 2024, 7:38 PM
Subject: Alert – Your WooCommerce Site Hosting Needs Attention
To: [redacted]

Hello [redacted]

I hope you're doing well. I'm reaching out because your store is currently hosting on WP Engine. As your Customer Success manager, I'm here to help ensure your sto is set up for growth and success.

WP Engine's access to WordPress.org has been restricted, which could impact sites, especially regarding plugin and theme installations or updates that are sourced directly from the WordPress.org repository.

This might not affect your site in the short term, but it would still be a good time to discuss overall hosting options and performance. Plus, Automattic via Pressable is offering a contract buy-out and white-glove migrations because we truly want to ensure your business continuity and performance (see here).

If there's anything else we can discuss or help unblock for your store, we can connect on that as well.

If this is not your area of responsibility, feel free to forward this email or put me in touch with the right contacts.

Thanks, and I am looking forward to hearing from you.
Ken

128.   On October 7, 2024, Mullenweg bragged that he had caused chaos even while he was still on vacation, promising more "surprises for you all on Tuesday, Wednesday, Thursday" in connection with his war against WPE:



129.   An article from October 1, 2024, reported: "Mullenweg said his public attacks would continue, adding, 'I have a lot to work with.'[68]   And, on October 14, Mullenweg promised:  "Oh, there's more":

---

[68]   https://www.therepository.email/mullenweg-threatens-corporate-takeover-of-wp-engine.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22    130.    Mullenweg also ominously warned "Hmm, I guess you'll have to wait and see why

23  people might not trust ACF as much going forward."    ACF is an open source plugin owned,

24  developed and actively maintained by WPE.

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18      131.    Defendants also created a webpage at wordpress.org offering "Promotions &

19  Coupons" to convince WPE customers to stop doing business with WPE and switch over to

20  Automattic's competitor hosting companies like wordpress.com and Pressable; they later added

21  links to other competitors as well.[69]

22      132.    Lest there be any doubt as to Defendants' intention to profit from the chaos they

23  created, on October 30, 2024 at the TechCrunch Disrupt 2024 conference, Mullenweg stated

24  unequivocally that he intends to take all of WPE's customers:

25          [S]ince this started [with WPE] **they've had uh, we estimate tens of thousands of
            customers leave**. ... So, um you know, I think **over the next few weeks, they're**
26          **actually gonna lose far more than 8% of their business** … **we're at war with**
            **them**. We're … **going to go brick by brick and take … take every single one of**
27

28  ⁶⁹  https://wordpress.org/news/2024/10/wp-engine-promotions/

**their customers** … **if they weren't around guess what?** … **We'd happily have those customers, and in fact we're getting a lot of them.**[70]

133.    In September 2024, in an apparent effort to brag about how successful they have been in harming WPE, Defendants created a website—www.wordpressenginetracker.com—that "list[s] . . . every domain hosted by @wpengine, which you can see decline every day. 15,080 sites have left already since September 21st."[71]   September 21 was not selected randomly.  It is the day after Defendants' self-proclaimed nuclear war began – an admission that these customer losses were caused by Defendants' wrongful actions.  In this extraordinary attack on WPE and its customers, Defendants included on their disparaging website a downloadable file of "all [WPE] sites ready for a new home"—that is, WPE's *customer list*, literally inviting others to target and poach WPE's clients while Defendants' attacks on WPE continued.  Images from Defendants' tracker website, as it existed last year (and as it still exists today)—are reflected below.

(**www.wordpressenginetracker.com** November 13, 2024)

[70]   https://www.youtube.com/watch?v=Fn_HzfI_sW0, at 9:17-46, 26:30-36, 29:58-30:07.

[71]   https://x.com/WordPress/status/1854271844309684285.

(**www.wordpressenginetracker.com** September 26, 2025)



Worse, this downloadable file contained private information regarding WPE's customers' domain names, including development, test, and pre-production servers—many of which are not intended to be accessed publicly and contain sensitive or private information.  Many of these servers were intentionally not indexed or otherwise included in public search results because the servers are not safe, secure or production-ready and not intended to be accessed by the general public.  By disclosing this information to the general public, Defendants put these development, test, and pre-production domains at risk for hacking and unauthorized access.[72]

134.    Defendants have since removed the downloadable file from their tracker website.  But it took this Court's preliminary injunction order (Dkt. 64) to compel Defendants to do so.

135.    Defendants' interference with WPE's customer relations was no accident.  Rather, as documents Defendants recently produced in discovery reveal, Defendants had been planning these wrongful actions for months.  For example, in March 2024, Defendants devised a scheme to

---

[72]  As part of its preliminary injunction order, the Court ordered Defendants to remove this purported list of WPE's customers contained in the downloadable file from Defendants' wordpressenginetracker.com website.

1   offer ██████████████████████████████████████████████████████████

2   ████████████████████████████████████████████. Defendants further stated

3   in internal discussions that ███████████████████████████████████████████

4   ███████████████████████████████████████████████████████████████████████

5   ██████████████████████████ Likewise, in July 2024, Automattic's CFO Mark Davies

6   stated that ███████████████████████████████████████████████████████████████

7   ████████████████████████. Defendants' nuclear war against WPE was thus intentional and

8   premeditated.

9       136.   Not content with interfering with WPE's customer relations, Automattic escalated its

10  tactics by actively recruiting hundreds of WPE employees, in an apparent, predatory effort to

11  weaken WPE by sowing doubts about the company's future and enticing WPE's employees to join

12  Automattic (*i.e.*, "the other side"):

13

14  **Exploring with Automattic** ✈

15  ████████ @automattic.com>                                    12:41 (1 hour ago)
    to me ▾
    ████████

16  Given the recent actions between Automattic and WP Engine, I wanted to see if you might be interested in joining "the other side."

17  Why? If you're passionate about Opensource we're definitely the place to be, especially for the WordPress ecosystem. We have a ton of great human-centric benefits (unlimited leave, coaching sessions for everyone, and more), and values that make working here really special. It's also a place where you

18  can "chart your own path" journey where we've seen people switch from WordPress.com to Woo and even other areas of Automattic to truly expand their skills and grow their careers.

19  With your career experiences, we have a few opportunities that could be great for you. However, rather than guessing what might interest you, let's find some time to chat about what you are looking for the most so we can find something that fits your career journey.

20  P.S. As leaders in the WP space, we're not looking for any trade secrets. I promise we'll not ask anything that might make you uncomfortable!

21  Here is my calendly link: https://calendly.com ████████ /30min.

22  Feel free to use whatever time works for you on there and if you need extra flexibility on times just let me know :)

23  ████████

24  Hiring @ Automattic

25  If you don't want to hear from me again, just click here

26

27

28

-57-                                    Case No. 3:24-cv-06917-AMO
THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

137.    Defendants have also specifically targeted WPE employees with recruitment efforts that include disparaging WPE's investors:

**Automattic is hiring. We'd love to talk to you.**

Learn about a new opportunity.

Shaping your future, growing your teams, gathering unicorns 🦄 for a picnic in nature.
Greater Málaga Metropolitan Area

We can say "howdy" because our founder, Matt, is from Houston. As a company, we trust you to live and work wherever you want; we think the future is distributed [https://distributed.blog/].

We know there are a ton of great people at WP Engine; that's why you've built the business you have. We've also heard that your Private Equity (PE) owners have been squeezing every last bit of juice out of the company, as Jason Bahl wrote [https://www.wpgraphql.com/2024/10/07/wpgraphql-becomes-a-canonical-plugin-my-move-to-automattic]:

"While WP Engine has treated me well personally, the focus on open-source contributions from the organization has declined during my time there. My time was also reallocated away from WPGraphQL and community projects as internal initiatives took priority"

Want some examples of how PE hurts all of us? See here [https://www.nytimes.com/2023/04/28/opinion/private-equity.html], here [https://www.theguardian.com/business/2024/oct/10/slash-and-burn-is-private-equity-out-of-control], here [https://www.theatlantic.com/ideas/archive/2023/10/private-equity-publicly-traded-companies/675788/], here [https://www.npr.org/2023/04/26/1172164997/how-private-equity-firms-are-widening-the-income-gap-in-the-u-s], and here [https://www.politico.com/news/magazine/2024/02/18/is-wall-street-to-blame-for-the-collapse-of-newspapers-00141920] too.

There's a reason WP Engine has been so successful. It's you. We think you're likely being undervalued in your current job. We believe you deserve to work in the best place possible, work the hours you choose, and work in a fully distributed [https://distributed.blog/] async workforce.

Our mission is to democratize publishing and commerce so anyone with a story can tell it, and anyone with a product can sell it, regardless of income, gender, politics, language, or where they live in the world.

We believe in Open Source [https://github.com/Automattic], and the vast majority of our work is available under the GPL [https://en.wikipedia.org/wiki/GNU_General_Public_License]. We strive to live by the Automattic Creed [https://automattic.com/creed/]. Newsweek has certified us as a Most Loved Company [https://mostlovedworkplace.com/companies/automattic-inc/] for three years in a row.

We're currently seeking talented individuals across a variety of roles [https://automattic.com/work-with-us/], including engineering, design, marketing, sales, customer support, legal, and operations. Come work with us and enjoy world-class benefits [https://automattic.com/benefits/] (a 3-month sabbatical, 6-month parental leave, professional coaching, and more).

If interested, I'd love to hear from you and set some time to connect. [https://calendly.com[     ]40min?month=2021-10] Or feel free to respond to this email. I will follow up shortly after.

Lead Recruiter at Automattic

View message

138.    Defendants have publicly highlighted at least one new hire from WPE, and stated: "We expect others will follow as well . . . ."[73]

_____

[73] https://wordpress.org/news/2024/10/secure-custom-fields/.

**D.    Amid Public Backlash, Defendants Attempt Damage Control—Only Digging a Deeper Hole For Themselves**

139.    As described in more detail below, Defendants' actions received wide-ranging criticism in the WordPress community.  For instance, WordPress community members published articles with titles such as, "Matt Mullenweg needs to step down from WordPress.org leadership ASAP,"[74] a video titled "This might be the end of WordPress,"[75] and started community discussions about the issue.[76]

140.    On September 27, 2024, in reaction to this public outcry, Mullenweg announced that he was temporarily restoring access—but not permanently.  Instead, he made another threat—that he would be blocking access again on October 1.[77]  He carried out that threat as well, blocking WPE's access to wordpress.org again on October 1.

141.    As members of the WordPress ecosystem continued to criticize Defendants' actions, Defendants went into damage control mode to attempt to characterize WPE as the sole target of their imperious actions.  As one example, Mullenweg participated in an interview livestreamed on X.com on September 27, 2024.  Far from assuaging public concerns, Mullenweg made various damning admissions demonstrating his anticompetitive animus towards WPE, including by stating that "every other web host in the world, we have no beef with, by the way, and [] none of them, all of them can, their servers can access WordPress.org servers, WordPress works just fine on every other web host in the world.  This is very singular to WP Engine."

142.    Around September 29, 2024, Mullenweg gave an interview to the author of the "This might be the end of WordPress" video blog.  Among other statements, Mullenweg acknowledged his retaliatory and vindictive intentions, saying: "They could make this all go away by doing a

---

[74]    https://notes.ghed.in/posts/2024/matt-mullenweg-wp-engine-debacle/.

[75]    https://www.youtube.com/watch?v=XoTToRfM3iA.  In a blog post on September 29, 2024, Mullenweg called this video "very harsh."  *See* https://ma.tt/2024/09/t3/.

[76]    *See, e.g.*,  https://www.reddit.com/r/Wordpress/comments/1fn3mjr/matt_mullenweg_needs_to_step_down_from/.

[77]    https://wordpress.org/news/2024/09/wp-engine-reprieve/.

license.  Interesting question is whether, now … you know, maybe more than 8% is what we would agree to now."[78]  Mullenweg also conceded that no one was currently paying an 8% license fee to Automattic like he attempted to extort from WPE.

143.    Defendants have publicly stated that Automattic had been in discussions with WPE concerning their purported claim that WPE was infringing their trademarks for approximately 18 months leading up to their extortive demands in mid-September 2024.  That is false.  Rather, earlier in 2024, Automattic had proposed that WPE participate in a WooCommerce "Hosting Partner Program," which would have involved WPE collaborating to advance WooCommerce as the leading e-commerce engine for the WordPress ecosystem; Automattic's proposal referenced the inclusion of a trademark license (which WPE did not need under governing trademark law), but made no accusations that WPE was violating any trademarks.  Nor did Defendants ask WPE to make any changes to its references to WordPress or WooCommerce on its website.  Automattic unilaterally shut down those discussions in August 2024 without an agreement, informing WPE that Automattic was "reassessing how we will deal with WP Engine."  Thereafter, WPE received no further communications from Defendants concerning trademarks until the above-referenced extortion demand in mid-September, 2024.

144.    WPE later learned that in July 2024, Automattic had filed new trademark registration applications, seeking registration for the first time of phrases commonly used in the WordPress ecosystem such as "Managed WordPress" and "Hosted WordPress."

**E.    Undeterred, Defendants Expand Their Extortive Efforts to Threaten WPE's CEO**

145.    Defendants' extortion campaign included levying personal attacks against the CEO of WPE for not capitulating to his demands.  For instance, on September 26, 2024, Mullenweg gave an interview on the X platform during which he gave the CEO's personal cell phone number to the interviewer and encouraged him to contact her.  She was in fact contacted by the interviewer.

---

[78]  https://www.youtube.com/watch?v=OUJgahHjAKU/, 47:16-31.

146.    Defendants' attacks against WPE's CEO have also continued in private.  First, on September 28, 2024, Mullenweg attempted to poach her to come and work for Automattic, and falsely suggested that WPE's investor was making her do something she did not want to do:



147.    After WPE's CEO did not immediately respond, Mullenweg threatened her the following day.  Specifically, on September 29, 2024 Mullenweg gave her until midnight that day to "accept" his job "offer" with Automattic.  If she did not accede to his demand, Mullenweg threatened to tell the press, and WPE's investor, that she had interviewed with Automattic:



148.    Mullenweg's premise was false, as WPE's CEO had never interviewed with or negotiated a job offer with Automattic.  To the contrary, back in 2022, Automattic had asked if she would be interested in running wordpress.com, but she politely declined.  WPE's CEO did not respond to Mullenweg's September 29 threat.

**F.     Mullenweg States That Automattic Might Seek To Acquire WPE For a Discount**

149.    In an October 2024 interview, Mullenweg stated that his demand that WPE pay him 8% of its revenue to license the trademarks that Automattic purports to control is "not on the table anymore . . . *[he's] seeking more*."[79]  Mullenweg boasted that he might "*tak[e] over*" WPE, not just seek a licensing fee.  Mullenweg promised in the interview that "his public attacks would continue."  In a social media post on the platform X, he boasted that as a result of his actions, WPE is now a "distressed asset," worth just a "fraction" of what it was before, because "[c]ustomers are

---

[79]  https://www.therepository.email/mullenweg-threatens-corporate-takeover-of-wp-engine
(emphasis added).

leaving in droves" – calling into question whether Defendants' motivations extend beyond mere interference and extortion, and are in fact a thinly disguised attempt to artificially drive down WPE's valuation in hopes of acquiring it on the cheap:



### G.    Defendants Manufacture a Sham Security Review of WPE's Plugin

150.    After WPE filed its initial Complaint, Defendants began sending purported "security alerts" about WPE's "ACF" plugin to WPE's CEO, in another act of harassment.[80]  On October 4, 2024, Automattic sent an email notification about an alleged security vulnerability with the ACF plugin to WPE and copied Mullenweg and WPE's CEO, Heather Brunner.  As a matter of course, prior routine security alerts were not copied to WPE's CEO (let alone WPE's CEO and Automattic's CEO together), yet both were copied on this particular alert. The security notification indicated that "[i]f we don't receive a response from you within the next 5 business days, we may need to reach out to the Marketplace where your extension is published for further assistance in fixing the issues

---

[80]    https://wpengine.com/blog/wp-engine-closes-1-2m-in-series-a-financing/.

1   we have found."  The purported vulnerability was minor and WPE responded quickly by releasing

2   a security patch within 72 hours (well within the arbitrary 5-day deadline).  Despite WPE staff being

3   unable to access wordpress.org due to Defendants' wrongful actions, WPE managed to have the

4   patch provided to the WordPress Security Team for distribution through wordpress.org.  But before

5   WPE could release the patch, in an unprecedented and dangerous move, Defendants publicly

6   announced in a social media post that they discovered a security vulnerability.



15       151.    As commentators noted, publicly announcing a security vulnerability before it could

16   be remedied was unprecedented, inconsistent with good practices across the entire technology

17   industry, and potentially dangerous to WordPress users.  Hackers can take advantage of this

18   information to attempt to hack websites before the patch is released.

19       152.    Following intense public criticism, Mullenweg took the post down.

**H.      Mullenweg Modifies wordpress.org's Login Page to Require Loyalty Pledges Disavowing Affiliation with WPE**

153.    On or about October 8, 2024, Mullenweg changed the login page for wordpress.org to require that all wordpress.org users take a loyalty pledge.  That is, Defendants began requiring all wordpress.org users to check a box agreeing that "I am not affiliated with WP Engine in any way, financially or otherwise"—and blocking login to the site if the box is not checked.[81]  Defendants' original checkbox is reflected below:



154.    Defendants thus pressured WPE's customers, partners, vendors, employees, and users to cut their ties with WPE, or face being banned from using resources that sit behind wordpress.org, including the WordPress code and plugins, which resources are supposed to be open to all.

155.    As part of its preliminary injunction order, the Court ordered Defendants to "remov[e] the checkbox at login.wordpress.org[.]"  *See* Dkt. 64 at 42.  Rather than comply with this Court's order by completely removing the checkbox, Defendants responded by replacing it, simply

---

[81]   https://web.archive.org/web/20241009053305/https://login.wordpress.org/ (formerly viewable at https://login.wordpress.org/).

changing the text about WPE to text about whether "Pineapple is delicious on pizza."  Community

members understood Defendants' modification to be an effort "to poke fun at a court decision" (*i.e.*,

this Court's preliminary injunction decision), to mean "that this is all a big joke to Matt," and that

Mullenweg "is mocking the court, the judge and the entire community."[82]  Defendants' modified

checkbox—which still appears on the login page of wordpress.org today—is reflected below:



### I.      Defendants Wrongfully Hijack WPE's Most Popular Plugin

156.    On October 12, 2024, Defendants initiated a takeover of WPE's most popular

WordPress plugin, Advanced Custom Fields ("ACF").  Before this hijacking, ACF appeared as

follows on the wordpress.org plugin repository at https://wordpress.org/plugins/advanced-custom-

fields/:[83]

---

[82]  https://www.fastcompany.com/91248028/the-latest-twist-in-the-embarrassing-wordpress-saga-involves-pineapple-pizza; https://www.reddit.com/r/Wordpress/comments/1hf98pj/this_is_getting_out_hand/; https://wptavern.com/wordpress-org-login-introduces-mandatory-pineapple-pizza-checkbox.

[83]  https://web.archive.org/web/20241001023207/https://wordpress.org/plugins/advanced-custom-fields/.

157.     Before it was taken over by Defendants, ACF had more than two million downloads and a customer ratings averaging 4.5 out of 5 stars.

158.     Defendants seized control of the plugin and updates thereto, thereby directly interfering with the relationships between WPE and millions of its customers and prospective customers.  Defendants targeted WPE specifically in retaliation for WPE pursuing its legal claims, including in this lawsuit.

159.     Defendants confusingly renamed WPE's ACF plugin to "Secure Custom Fields" ("SCF"), and tried to portray the plugin as if no coup had occurred.  During the hijacking, WPE customers or potential customers visiting the same URL at https://wordpress.org/plugins/advanced-custom-fields as they always had would have seen virtually the same content ACF used—the same headers, the same number of sentences under them, virtually the same words.  They would have seen the same number of "active installations"—"2+ million."  They would have seen the same WordPress version (6.0 or higher), the same number of languages available (32), the same number

of tags, including the "acf" tag.  They would have seen that there were over 1100 five star ACF reviews and the content of these reviews, many of which explicitly referenced ACF.  They would have seen the current version of a plugin that started with 6.3—just as WPE's ACF had before Defendants' seizure of the ACF webpage.  And, understandably, they would have been confused.

160.    Mullenweg utilized his control over the central listings on wordpress.org to forcibly replace users' existing ACF plugin code with Defendants' SCF plugin code, without the users' consent or knowledge.  On October 12, 2024, ACF users began receiving an "update now" prompt on their WordPress administrative dashboards.  As shown below, the "update now" prompt was listed below the author of the plugin "WP Engine," which made it appear to users that this was an update of the ACF plugin coming from "WP Engine":



161.    Many WordPress users have settings that update plugins automatically.  These users would have had Secured Custom Fields installed on their servers and WPE's ACF deleted without even clicking any buttons.

162.    After "updating," users could no longer click in the plugin to upgrade to WPE's premium ACF product.  If Defendants had wanted to offer a competing product, they could have

---

done so using a new webpage with a different URL that did not misdirect and mislead customers looking for ACF. They did not do that. Instead, they held their SCF plugin out to the world as just a routine update of the ACF plugin, under a URL that incorporated ACF's well recognized name. Defendants' passing off thus misappropriates more than a decade of goodwill in ACF—goodwill that historically had attracted new customers to WPE.

163.    As can be seen below, the SCF plugin listing (which was located at the ACF URL) confusingly displayed all of the download counts and user reviews for the ACF plugin written over a period of 12 years, including ACF's 4.5/5 star rating, falsely suggesting to consumers that SCF had been downloaded more than two million times and that consumers had reviewed SCF, yielding a 4.5 average of review scores:[84]

---

[84]    https://web.archive.org/web/20241014020321/https://wordpress.org/plugins/advanced-custom-fields/ (formerly viewable at https://wordpress.org/plugins/advanced-custom-fields/).

164.    Defendants hijacked the ACF plugin's unique identifier on wordpress.org and published a new plugin to ACF users that they mislabeled as "a new version of Advanced Custom Fields."[85]  As a result, Defendants secretly foisted their own plugin, under their sole control, onto the computers of WPE's customers, replacing ACF with SCF without the customers' consent or even knowledge as part of an "update" that misleadingly appeared to originate from WPE, further jeopardizing the security of WPE's customers and the availability and integrity of WPE's ACF plugin.[86]

---

[85]    https://x.com/Brugman/status/1845195750550143424.

[86]    https://x.com/Brugman/status/1845195750550143424.

165.    So complete was Defendants' hijacking of ACF, that when searching on the wordpress.org site for "advanced custom fields," the site's search results returned Defendants' "Secure Custom Fields" directory listing instead.[87]

166.    By portraying user download and rating data about ACF as data about SCF, Defendants engaged in false and misleading advertising.

167.    Defendants' hijacking of ACF was carried out in retaliation against WPE for its refusal to capitulate to Defendants' extortionate demands.  This is evident, for example, from Defendants' post on X indicating that WPE could receive its ACF plugin back "[i]f WP Engine dropped its lawsuits, apologized, and got in good standing with its trademark use" (which WPE already was):[88]



168.    Knowledgeable WordPress community members called Defendants' conduct plugin "theft":

[87]  https://web.archive.org/web/20241114150208/https://wordpress.org/plugins/search/Advanced+Custom+Fields/ (formerly viewable at https://wordpress.org/plugins/search/advanced+custom+fields/).

[88]  https://wordpress.org/news/2024/10/secure-custom-fields/; https://x.com/WordPress/status/1845663751342883195.

They're not your users. YOU stole them. Also, have fun defending the extortion claim in court when these tweets are shown as evidence. You're just making it easier for WPE's lawyers to destroy in court.

6:22 AM · Oct 14, 2024 · **2,232** Views



I'm never using WordPress again, as you're holding the sites of WP Engine customers for ransom and you've literally stolen one of their plugins.

9:45 AM · Oct 14, 2024 · **1,038** Views

1



You literally stole their plugin — years of hard work supported by countless developers.

Open source were not, that's plagiarism.

10:07 PM · Oct 13, 2024 · **685** Views

## VI.    DEFENDANTS HAVE CAUSED, AND WILL CONTINUE TO CAUSE, IMMENSE AND IN SOME INSTANCES IRREPARABLE HARM TO WPE

169.    As a direct and proximate result of Defendants' actions, WPE and its customers have been harmed in multiple ways.

170.    **Lost Access to wordpress.org Functionality**.  Because of Defendants' wrongful blocking of WPE, its employees, and customers from functionality on wordpress.org, including the WordPress Plugin Directory, WPE, its employees, and customers no longer have the ability to perform many formerly routine tasks, such as submit support tickets, service, update, or fix any

WordPress plugins, or publish those updated plugins on wordpress.org.  Given WPE has effectively lost control of its ability to maintain its code on wordpress.org, users and customers of WPE will have outdated and/or potentially vulnerable WPE plugins.  The users of these plugins are subject to increased risk the longer the plugins are not updated or patched to correct for any reported vulnerabilities, causing harm to both WPE's brand and reputation, and its relationships with its customers.  Defendants' actions have also harmed WPE by exposing it to potential legal risk and liability from some of the affected plugins' users and customers for at least the same reasons.  WPE also has had to invest significant efforts and resources in an attempt to mitigate the harmful consequences of Defendants' actions.

171.    WPE customers have posted online about their frustrations with WPE's inability to update its plugins or connect to wordpress.org, harming WPE's reputation as a reliable host of sites built on WordPress.

172.    For example, a September 25, 2024 post from a customer on X.com states: "Not being able to do @WordPress updates because of the @photomatt/@wpengine fight is infuriating. For a small nonprofit, being caught in the middle of this could be costly if we need to migrate our sites to a new host.  That money/time should be used for our mission."



173.    **Lost Existing and Future Customers**.  In addition, as a result of Defendants' actions, various customers have posted on social media or reached out to WPE directly to communicate that they plan to end their relationships with WPE and switch to a different provider.

174. For example, in a post dated September 22, 2024 from X.com, a WPE customer states that due to Mullenweg's article about WPE, he has decided to remove WPE from his company's hosting lists:



175. A post dated September 24, 2024 from X.com shows a WPE customer planning not to renew his contract with WPE:



176. In yet another post on the same date on X.com, a WPE customer proclaims: "Looks like we'll [sic] moving our sites off ASAP!":

177.    In an email from September 25, 2024, a WPE customer tells a WPE account representative, "If we can't get a solid answer or plan we will have to consider moving our business and sites away from WPEngine":



178.    In a private message to WPE's X.com account, a WPE customer stated that due to Mullenweg's act of blocking plugin updates on WPE sites, the customer is "going to move our WPE server to Kinsta," another WPE competitor:



179.    In a series of posts on Reddit from September 25, 2024, users expressed their frustration about having to manually update their site plugins due to Mullenweg's actions:[89]

---

[89]    https://www.reddit.com/r/Wordpress/comments/1fpst5p/wpengine_matt_automattic_wordpressorg_megathread/.

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

1

2

3  Realizing that I have to update core and plugins 50+ sites manually at the end of the month now is very very frustrating. As a smaller agency, we were already experiencing capacity struggles.

4  ⊖  ⇧ 14 ⇩    💬 Reply    🏅 Award    ↗ Share    ⋯

5

6  as someone who works for an agency with 300 sites just on wpengine, I am livid with Matt at the moment.

7  ⊖  ⇧ 9 ⇩    💬 Reply    🏅 Award    ↗ Share    ⋯

8  Oh god my condolences. I run the web team at a much smaller agency, I can only imagine

9  ⇧ 3 ⇩    💬 Reply    🏅 Award    ↗ Share    ⋯

10

11  180.    In another series of posts on Reddit from September 26, 2024, customers stated that

12  they are "[a]lready underway" in leaving WPE:

13  

24  181.    WPE saw account cancellation requests between September 26 and September 30,

25  2024 significantly increase as compared to the average cancellation rate request in September prior

26  to the wordpress.org block.  The cancellation rate during September 26 and September 30 (adjusted

27  for the number of weekends) as against the same period in 2023, as well as against the same period

28

1   in August 2024, also significantly increased.  Cancellations in October 2024 significantly grew as

2   against October 2023, as well as against September 2024 and August 2024.

3           182.   WPE also lost new customers.  The "sales-assisted" new-business channel saw a

4   significant number of potential new purchases or upgrades lost in September, where during

5   negotiations those lost customers expressly cited Defendants' actions as a reason for pulling back.

6   And those are just the lost customers that gave a specific reason.  Overall, the sales-assisted channel

7   secured far fewer new contracts or upgraded contracts during September and October as compared

8   to WPE's prior projections.  Meanwhile, self-service signups dropped significantly between

9   September 25 and September 30, as compared to the prior September average, and the self-service

10  daily average also dropped significantly for October as against the daily average prior to September

11  25.

12          183.   As of September 2024, there were signs that this was just the beginning; for instance,

13  there was a significant increase in customers that installed tools that allow them to migrate to another

14  provider, even if they had not yet announced they were terminating their contracts with WPE.

15          184.   Even where a customer has not personally explained their rationale to WPE, the

16  cause-and-effect can be seen not just in the contemporaneous nature of the drops, but also by

17  statements made publicly by both WPE's customers and Defendants.  Public posts have shown WPE

18  customers saying such things as Defendants' takeover of ACF "gave me a minor heart attack."

19  Mullenweg provided a "forecast" of his own making, claiming that "millions" of customers will

20  lose trust in WPE in the coming weeks, after he unveils future parts of his extortionate and vengeful

21  campaign.[90]

22          185.   Defendants have actively encouraged such defections, including to increase their

23  own market share—offering to pay WPE's customers to breach their contracts while WPE is

24  blocked from wordpress.org, and move to service providers owned by Mullenweg.[91]

25

26  _____

    [90]   https://x.com/photomatt/status/1842500184825090060.

27  [91]   https://web.archive.org/web/20241029015332/https://pressable.com/wpe-contract-buyout/

28  (formerly viewable at https://pressable.com/wpe-contract-buyout/).

186.  **Costly Workarounds**.  As a result of Defendants blocking WPE access to wordpress.org, WPE was forced to expend significant resources to find workarounds needed to service WPE's customers and update its plugins.  WPE sales staff was inundated with queries from their customers and accounts, forcing WPE to divert staff to focus on helping existing customers as opposed to working with new ones, resulting in a loss of new revenue.  And overtime for WPE support professionals increased significantly to deal with the much higher rates of customer inquiries due to Defendants' wrongful actions.

187.  **Loss of ACF Plugin And its Millions of Users**.  By hijacking WPE's ACF plugin and passing it off as their own, Defendants wrongfully usurped the goodwill and brand recognition WPE has developed with millions of ACF users over the past decade.  Defendants' actions undermined the integrity and reliability of the ACF plugin at wordpress.org, resulting in significant reputational harm to WPE.  Defendants' hijacking suspended a channel for generating new customers; 15% of ACF PRO paid subscriptions had come from click-throughs from the standard ACF plugin, which the hijacking rendered unavailable.  Additional takeovers of WPE plugins, which Defendants have threatened, would further interfere with WPE's relationships to its customers.

188.  **Reputational Harm**.  In addition, many of WPE's users and customers have long considered WPE as the most trusted WordPress platform with unmatched performance and support.  Defendants' actions threaten the trust WPE has built with thousands of customers over more than a decade.  WPE has valid and enforceable contracts with its existing customers.  As the foregoing paragraphs demonstrate, Defendants are using their self-proclaimed "war" as an opportunity to interfere with as many of WPE's existing and prospective customer relationships and contracts as they can, including WPE's hosting channel customers and its plugin customers.  Defendants themselves recently estimated that nearly one-hundred thousand websites have left WPE precisely because of Defendants' actions.

189.  **Loss of Goodwill**.  WPE's customers have also been harmed.  Website operators stand to lose *their own* goodwill with *their* customers, if their websites malfunction.  They are being harmed with increased monitoring and planning efforts to ensure websites remain operational no

1    matter what Defendants may do next.  Those customers that instead decide to leave have lost WPE's

2    services, and are needlessly incurring the monetary and personnel costs of switching between

3    managers.  Customers have complained about these hassles publicly, confirming the harm to them

4    and further evidencing loss of WPE's goodwill.[92]

5    **VII.    THE ENTIRE WORDPRESS COMMUNITY IS HARMED BY DEFENDANTS'**
     **ACTIONS**

6

7        190.    Not only have WPE and its customers been harmed by Automattic and Mullenweg's

8    actions, so has the entire WordPress community.  As described above, WordPress has long prided

9    itself in building a community around principles of "freedom" and "openness" with the express

10   promise that anyone in the world is able to contribute to be part of the WordPress ecosystem, for

11   free and forever.  As a result of these promises, tens of millions of users have decided to use

12   WordPress as their preferred web content management tool and publishing platform on the Internet.

13   Over 43% of websites are built on WordPress.

14       191.    Given Defendants' wrongful actions, website operators must devote extra resources

15   and incur costs, while WordPress developers—not just WPE—are seeing cancelled contracts due to

16   concerns over the stability of the WordPress platform.  And while Defendants have tried to claim

17   that WPE is a special case, it is not.  Defendants have threatened at least one other plugin developer

18   that they will "***take over*** your listing and make it a community plugin ***like we did to ACF***."[93]  There

19   is no indication Defendants will stop there.

20       192.    Defendants have shown the power and willingness to unilaterally inflict real damage

21   to any member of the WordPress community, at their whim.  Other developers thus fear becoming

22   Defendants' next target.  Public comments about the situation confirm people are fearful of the

23

24

---

25   [92]  https://x.com/photomatt/status/1841281383307604453; https://www.reddit.com/r/Wordpress/
     comments/1g3rwwm/you_asked_how_were_suffering_as_a_; https://x.com/thehungrybird_/
26   status/1837917667011056075; https://x.com/AkaiEnso/status/1839082080006775170;
     https://x.com/AkaiEnso/status/1839103179826344061.
27

28   [93]  https://www.therepository.email/mullenweg-threatens-to-take-over-paid-memberships-pro.

1  damage Defendants' actions have done, and will continue to do, to the WordPress ecosystem

2  generally.[94]

3      193.    Defendants' retaliatory hijacking of the ACF plugin introduced heightened security

4  issues into the WordPress community, as Defendants tampered with code and products they did not

5  create.

6      194.    Importantly, hundreds of companies (such as WPE) have built their businesses to

7  support the millions of WordPress users.  These companies help WordPress users around the world

8  host their websites, build additional functionality (*e.g.*, plugins, themes), and provide customer

9  support.   These companies also give back to the WordPress community by making their

10  enhancements to WordPress available to all users around the globe via a permissive GPL license.

11  Companies in the WordPress ecosystem have invested billions of dollars and millions of hours

12  making WordPress a better experience for the entire WordPress community.   Moreover, the

13  evangelism and marketing these companies provided has yielded incalculable value, allowing

14  WordPress to establish the recognition, presence, and credibility that have historically been beyond

15  the size of any one business or the reach of individual enthusiasts.

16      195.    This symbiotic relationship between WordPress, its community, and its business

17  ecosystem only works because of the promises of openness and freedom that WordPress has made

18  in the past.  Businesses are willing to commit so much money, time, and resources to developing

19  WordPress in large part because they have the trust that the community will be "open" to them.

20  Without that trust, investment in the ecosystem will certainly decline.  Reasonable businesses may

21  choose to build on platforms that do not have vindictive leaders who are willing to go "nuclear" and

22  destroy their businesses, or worse yet, extort them for money.  In the days following Defendants'

23  actions, businesses have already questioned their choice of WordPress, noting the harm Defendants

24

25

---

[94]  https://www.reddit.com/r/Wordpress/comments/1g3rwwm/you_asked_how_were_suffering_
as_a_result_of/; https://news.ycombinator.com/item?id=41821336.  Recent reports confirm
Mullenweg has threatened other plug-in developers with "tak[ing] over your listing and mak[ing]
it a community plugin like we did to ACF" if they do not toe the line.
https://www.therepository.email/mullenweg-threatens-to-take-over-paid-memberships-pro.

are causing volunteer-driven nonprofits, "local mom and pop" businesses, hobbyists, fire and police stations, and schools:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**WordPress** ✓ @WordPress · Sep 25

Pending their legal claims and litigation against WordPress.org, WP Engine no longer has free access to WordPress.org's resources.
wordpress.org/news/2024/09/w...

#WordPress

wordpress.org
WP Engine is banned from WordPress.org
Pending their legal claims and litigation against WordPress.org, WP Engine no longer has free acces...

💬 302      🔁 593      ♡ 798      📊 817K

Well this just set my next few days of meetings with my stakeholders for our hundreds of WordPress sites (sorry, "sites that use WordPress") and how we move forward. This is an awful move from an optics, user experience, developer experience, and brand-trust perspective.

11:06 PM · Sep 25, 2024 · **379** Views

💬            🔁            ♡ 4            🔖            📤



This is an absolutely disgusting move from @WordPress

So in order to maintain continuity for clients, I need to eat the time sent on manual updates or migrate away from an excellent hosting provider.

Not good enough. I stand with @wpengine

· 16h

I want to share: WordPress.org has blocked @wpengine customers from updating and installing plugins and themes via WP Admin—disrupting essential work for #WordPress users, agencies, freelancers, and plugin developers.
...
Show more

Last edited 1:42 AM · Sep 26, 2024 · **153** Views

· Sep 25

You know who is about to get screwed big time. Small hobbiests, small nonprofits who have absolutely no idea WTF is going on between Automattic and WP Engine.

💬 10        🔁 16        ♡ 132        ᵢᵢᵢ 4.9K        🔖  ⬆️

19h

And they should relax and not worry! The only questions that WP Developers and involved businesses should ask is: Am I making millions from WordPress? No? I am good! Yes, I make millions out of WP? Then I should start to contribute appropriate amount of time :) That simple.

💬 3        🔁        ♡        ᵢᵢᵢ 49        🔖  ⬆️

Not that simple if you can't access something on your website and you're a local mom and pop or volunteer driven non-profit this happened without warning and they don't necessarily know what to do. It takes time to figure it out time is a very valuable and limited commodity

4:29 PM · Sep 26, 2024 · **27** Views

💬        🔁        ♡ 4        🔖        ⬆️

We are in the same boat. We host websites for schools, nonprofits and mostly rural police and fire departments. We have been working with WP engine for seven years and our margins are not big enough to afford to hire in all of the technical services that WP engine provides as part of its hosting package.

7:11 AM · Sep 26, 2024 · **51** Views

💬 1        🔁        ♡        🔖        ⬆️

## VIII. DEFENDANTS POSSESS MONOPOLY POWER AND HAVE HARMED BOTH WPE AND COMPETITION, FURTHER AFFECTING INTERSTATE COMMERCE

196.    Antitrust law precludes a defendant from engaging in conduct that unreasonably restrains competition.  Defendants Automattic and Mullenweg have engaged in numerous acts of anticompetitive conduct, including:

- Deceiving the market that WordPress would be "free" and "open" for "everyone" forever and "fully independent from any company," which induced web hosting service providers, plugin developers, customers, and other market participants to select WordPress over other competing web content management systems such as Drupal and Joomla.

- Disparaging WPE in the marketplace with false statements regarding the quality of WPE's products and services, as well as WPE's contributions to the WordPress community.

- Making extortionate threats to WPE and other market participants to pay for a sham trademark "license," or else ban them from WordPress and, ultimately, force them to face destruction.

- Interfering with WPE's personnel, including by seeking to intimidate WPE's CEO and Board member and soliciting WPE's personnel to leave WPE for "the other side" and join Automattic instead.

- Interfering with WPE's customers, such as by inducing them to break their contracts with WPE, disrupting their services and then using that disruption to force them to leave WPE, and installing a prominent "checkbox" that requires them to attest they are "not affiliated" with WPE in order to log into wordpress.org.

- Interfering with WPE's operations, such as by blocking WPE's access to wordpress.org and therefore WPE's ability to update its own plugins, blocking and terminating WPE employees from accessing their wordpress.org accounts and community resources, hijacking WPE's popular ACF plugin, and threatening WPE's vendors.

- Threatening other market participants that, if they do not acquiesce to Defendants' demands, they too will ████████████████████████████████████████ ████████████████████.

197. In most antitrust cases, a plaintiff must rely on circumstantial evidence—such as defining a relevant market and then calculating the defendant's market share in that market—to draw an inference that the defendant plays a big enough role such that the defendants' conduct *could* affect competition.

198. WPE's case, by contrast, presents the rare situation where such circumstantial evidence and inferences (though present) are not necessary because there is direct evidence that Defendants' conduct *actually did* affect competition.

199. Documents Defendants have recently produced in discovery contain extraordinary evidence of and admissions concerning ████████████████████████████████████████ ███████.

200.    Indeed, in documents recently produced by Defendants, they shockingly acknowledge that they have the power to ███████████████ and would ██████████████ ██████████████████████████████████████.

201.    The anticompetitive effects that Defendants have inflicted upon WPE and others are only possible if Defendants have market power—which Defendants *also* admit in recently produced documents, acknowledging, as they must, that Automattic's CEO "has absolute power in the WP ecosystem."  That Defendants alone actually achieved these anticompetitive effects confirms their power.

202.    Indeed, Defendants' monopoly power is so overwhelming that, while claiming they are interested in encouraging their competitors to "contribute to the *community*," internal documents recently produced by Defendants reveal the truth—that ██████████████████████ ████████████████████████████████████████ Only a monopolist could possibly ██████████████████████████████, as has occurred here.

203.    As detailed further below, Defendants' anticompetitive conduct violates the antitrust laws: Defendants have the requisite power to affect competition, Defendants' misconduct causally harmed both WPE and competition more broadly, and Defendants misconduct has affected interstate trade and commerce.

### A.    Defendants Have the Requisite Power to Influence Competition

204.    Defendants have the power, through their conduct, to unreasonably restrain competition.  Each of the types of proof that courts generally assess to determine whether a defendant has power—direct proof (actual evidence of anticompetitive effects) and indirect proof (circumstantial evidence based on defining a market and calculating the defendant's market share), either of which independently suffice—are present here.

### 1.    Direct Evidence Confirms Defendants' Power

205.    Defendants, by themselves, have the power to actually influence the market, and they have done so here in multiple ways.  In September 2024, Defendants single-handedly: (1) raised prices; (2) increased costs; (3) decreased quality; and (4) excluded rivals.

206.    **Defendants Increased Prices**.  Defendants promised "free" and "open" access to WordPress (the web content management system), wordpress.org, and related resources (including the Plugin Directory).  And for years, the effective price of many of Defendants' services was zero, as Defendants promised.

207.    However, at least as early as 2024, Defendants began exploring a plan to charge for access to critical resources that had long been free.

208.    Contradicting Defendants' current claim that their enforcement of supposed trademarks is legitimate, Defendants conceded internally that ███████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

209.    Defendants proposed offering a ████████████████ plan that would ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████

210.    Defendants' goal is to ███████████████████████████████████████ ████████████████████  Doing so would spare Defendants ████████████████ ███████████  because  they  would ██████████████████████████████████ ████████████████.

211.    Given their market power, Defendants expected to be able to enforce compliance, whether with a ████████ or a ████████

212.    Defendants' threat of enforcement was based on purported trademark rights that they do not even have—*i.e.,* to stop nominative use of the Challenged Terms—which of course require no trademark license.  Yet this was the ████████ Defendants began to use to demand payment for products, services, and wordpress.org access that had always been free, as Defendants had promised.

213.    Defendants' internal documents leave no doubt about their plan to drastically increase  prices: █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████    For example, with ████████, Defendants explained that they wanted ████████

████████████████████████████

214.    Defendants' internal discussions further reveal that if market participants did not acquiesce to the price increases via ██████████████████████████████████████████, then ████████████████████████████████████████████████████████████ ████████████████████. As Defendants' internal correspondence states, ████████████ ████████████████████████

215.    As part of their scheme, Defendants initially ████████████ particular market participants as follows:

- ████████████████████████████████████████████████████████

- ████████████████████████████████████████████████████████

- ████████████████████████████████████████████████████████

216.    These stunning internal comments by Automattic's employees ████████████ ████████████████████████████. For instance, in a September 2024 interview, Mullenweg stated Defendants have "a good relationship with GoDaddy. … So, yes, do they make a lot? Yes. Do they give back more than WP Engine? Yes."[95] Defendants' internal comments ████████████ ████████████████████████████████████████████████████████ Defendants' public statements disparaging WPE as a "parasitic entit[y]" who "just want to feed off" WordPress "without giving anything back" at the September 2024 WCUS keynote.

217.    Defendants proceeded to execute their plan, unilaterally seeking to increase prices and rivals' costs in the form of a demand that WPE and others pay to license the trademarks that Automattic purports to control.  At the TechCrunch Disrupt 2024 conference held on October 30,

---

[95] https://www.youtube.com/watch?v=OUJgahHjAKU at 38:27-38:45.

2024, when asked how he "settled" on the 8% rate for the purported "royalty" to WPE, Mullenweg essentially confirmed that he based it on what he thought WPE could afford to pay—a tacit admission that he reflexively set the price, untethered to any trademark analysis or valuations, or use assessments, whatsoever (*e.g.*, the demanded 8% royalty is not a function of Defendants' actual costs or other relevant input). Further confirming Defendants' unconstrained ability to set prices, Mullenweg has even remarked that the price has gone up: Defendants are now "***seeking more***" than the previously-proposed 8% purported royalty.[96]

218.    Ultimately, WPE was the public example of the ███████ of Defendants' "trademark license" demand. But while WPE decided to stand and fight by refusing Defendants' ransom demand, Defendants' ███████████████████████████████████████ ████████████████████████████

219.    Indeed, based on documents that Defendants have recently produced in discovery, other competitors such as ██████████████████████████████████████ ████████████████████████

220.    Regarding ███████, in internal documents produced by Defendants, ███████ confirmed that ████████████████████████████████████ In return, Mullenweg claimed he ████████████████████████████ ████████████████████ Mullenweg further ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ in an apparent reference to ███████████████████████ Mullenweg responded ███████ Later, on November 26, 2024—the same day this Court held the preliminary injunction hearing— Mullenweg told ███████████████████████████ and ███████

---

[96] https://www.therepository.email/mullenweg-threatens-corporate-takeover-of-wp-engine.

[97] www.earthroamer.com.

1  [redacted]

2  [redacted]

3      221.    In a September 28, 2024 interview with a prominent YouTube streamer named Theo,

4  Mullenweg admitted that there are "other people paying things" to Defendants, further establishing

5  Defendants' imposition of increased prices on market participants.

6      222.    Defendants have thus demanded, and are apparently receiving, purported royalties

7  from others beyond WPE.

8      223.    Documents Defendants recently produced in discovery confirm that, immediately

9  before launching their nuclear war against WPE, Defendants recognized that [redacted]

10  [redacted]

11      224.    As part of that strategy, Defendants planned to seek from their ransom recipients

12  [redacted]

13  [redacted]   specifically noting that

14  doing so would allow [redacted] to [redacted]

15  [redacted]

16      225.    Defendants have apparently deployed their blatantly anticompetitive scheme against

17  various market participants including, for example, WPE, Newfold, [redacted], and the

18  developer of the Paid Memberships Pro plugin.

19      226.    Defendants' purported royalty demand (which at least some others are apparently

20  paying) *is* an effective price increase. The demand is a bounty that recipients must now pay to

21  access WordPress (the web content management system) and related resources (including

22  Defendants' plugin and plugin distribution services), which are products and services that they

23  previously received for free.

24      227.    Defendants' price increase—the difference between the license demand and zero—

25  is a supracompetitive one. That means it is an increase above the level of pricing that could be

26  sustained in a competitive market. Defendants for years promised and offered for free the very

27  products, services, and access they are now effectively charging for. A number of Defendants'

28

competitors—such as non-WordPress web content management services like Drupal and TYPO3—offer their services for free.[98]

228.    **Defendants Increased Costs**.  Defendants' conduct has increased costs for various market participants—not just WPE—in additional, directly measurable ways aside from Defendants' trademark license demand itself.  These costs are themselves tantamount to price increases.

229.    Defendants' conduct has interfered with the operation of market participants' websites, including their use of plugins and themes.

230.    By blocking WPE from accessing the login portions of wordpress.org, WPE's customers were prevented from updating their plugins and accessing other resources, which interfered with the functionality of their websites.

231.    WPE customers recognized this, stating to WPE that Defendants' conduct presents "a serious problem" and means that "[w]e are limited in what we can do for our clients" and "[i]f we have an outage we are screwed."  Another customer responded to the news that Defendants banned WPE from accessing wordpress.org by stating that that meant "I can't fulfill my obligations to my clients now[.]"  And, a WPE customer contacted Defendants to state ██████████ ███████████████████████████████████████████████ such that ████████ ███████████  These are but a few examples.

232.    In soliciting WPE's customers, ***Defendants*** likewise recognized that their nuclear war would have ramifications far beyond just WPE.  Defendants stated, for example, that Defendants' restricting "access to WordPress.org . . . could impact sites," which, in Defendants' view, was reason for those customers to switch.

233.    Defendants' conduct has resulted in downtime for those market participants' websites, requiring them to expend monetary, time, human, and other resources to try to remedy the

---

[98]    https://solutionsreview.com/content-management/the-top-free-and-open-source-content-management-platforms/.

THIRD AMENDED COMPLAINT [UNREDACTED VERSION FILED UNDER SEAL]

issues Defendants have caused in an attempt to move forward.  Website operators, for instance—and not just WPE—are seeing cancelled contracts due to concerns that Defendants have fomented.

234.    Customers have recognized that Defendants' conduct "could be costly" to them because it may require them "to migrate our sites to a new host," which is "money/time" that "should be used for our mission."

235.    Others have similarly stated that Defendants' conduct means that "in order to maintain continuity for clients, I need to eat the time s[p]ent on manual updates or migrate away from an excellent hosting provider" (*i.e.*, WPE).

236.    One market participant put it simply: [i]t takes time to figure it out" and "time is a very valuable and limited commodity[.]"

237.    WPE has been forced to expend significant resources—time, money, and personnel—to address the technical and operational difficulties to its customers that Defendants caused, including developing a "mirror" to try to mitigate the effects of Defendants' conduct.

238.    WPE is not alone in facing increased costs.  Documents that Defendants have recently produced in discovery reflect that ███████, another market participant, was forced to try to ███████████████████████████████  Those resources were apparently wasted, however.  Mullenweg apparently threatened ███████████████████████ ████████████████████████████████

239.    **Defendants Decreased Quality**.  As further direct evidence of their power, Defendants have been able to decrease product and service quality without meaningful competitive discipline.  This decrease is apparent on multiple dimensions of quality.

240.    As one example, stability is a key dimension on which web content management systems, web hosts, plugin developers, plugin distribution providers, and other market participants depend.  People and businesses are willing to commit time, money, and other resources to a given web content management system, web host, plugin developer, or plugin distributor because they expect consistency, *e.g.*, that websites will remain running and that access and resources that were previously given will remain given, and that they and their livelihoods will be not subject to the capricious whims, demands, or extortionate threats of others.

241.    Through their conduct, Defendants have eliminated that stability and created the opposite: chaos.  Various market participants have recognized this.

242.    Plugin developer Fard Johnmar stated online that Defendants' conduct is "unsettling," has created drama, and resulted in "a loss of trust."[99]

243.    Jack Arturo, another plugin developer, stated that "[i]t seems like every week there is another unexpected move from Matt that throws the WordPress community into chaos."[100]

244.    Defendants' own customers have demanded that Defendants explain the instability that Defendants have fomented.  In a plea to Mullenweg directly after the start of Defendants' nuclear war, Defendants' recently produced documents reflect that another market participant stated "tons of people [are] feeling destabilized and confused," "[m]any folks are legitimately fearing that their own reputations and livelihoods are at stake[,]" "every other company / actor in this space" has "worries," and "millions of customers and partners [are] directly or indirectly in the blast radius."

245.    In a direct email to Mullenweg, another market participant stated "You are punishing over a million innocent WordPress users," "harming the reputation of WordPress," "also causing undo stress to us as well," and "I am not now sleeping thinking on how to approach this issue."

246.    Defendants have internally recognized the degradation in quality that their misconduct has created, including on the broader community.  Defendants' own employees expressed concern at ███████████████████ Defendants' conduct, recognizing that it ████████████ and characterizing it as ██████████

247.    Beyond reducing quality by fomenting an environment of instability, Defendants' conduct has reduced quality in other ways.  As discussed *supra*, Defendants' conduct has impaired the operation and functionality of many websites.

248.    Defendants' conduct has reduced quality by creating potential bugs and security vulnerabilities.  For example, WPE funds and creates many popular plugins that are in use by

---

[99]   https://wptavern.com/peepso-leaves-wordpress-plugin-repository.

[100]   https://wpfusion.com/business/regarding-our-cease-and-desist-letter-to-automattic/?srsltid=AfmBOopIrNJG_35CYgtJXgSQpYrdj41KqNrG__q8yZB5cwPEWauatZ7c#how-this-affects-wp-fusion.

millions of websites.  Because of Defendants' conduct, WPE was unable to directly publish an update for those plugins on wordpress.org.  The inability to update plugins means that potential bugs or security vulnerabilities could go unremedied, potentially affecting millions of websites (or more).

249.    As Defendants themselves recognized, the impact of their conduct was so far-reaching that it created these vulnerabilities market-wide, including for Defendants' own customers.

250.    One of Defendants' employees observed: ███████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████

251.    In a competitive environment, Defendants could not foment chaos or create bugs and security vulnerabilities without consequence.  Defendants' ability to do so without meaningfully losing business is direct evidence of Defendants' power.

252.    **Defendants Excluded Market Participants**.  Defendants have the power to exclude rivals ***and*** have already done so.  Defendants excluded WPE (and its customers) from accessing wordpress.org and/or its resources.  Defendants also excluded WPE by hijacking WPE's ACF plugin and users.

253.    At the preliminary injunction stage this Court analyzed—and credited—evidence that Defendants' conduct severely harmed WPE, including with respect to loss of customers, market share, goodwill, and the like.[101]  The Court found this harm to WPE so substantial that the Court determined it "irreparable . . . without preliminary injunctive relief."[102]  Absent this Court's injunction against Defendants, they would have continued to exclude and foreclose WPE from competing, which would inevitably have resulted in higher service prices and market foreclosure.

---

[101]  Dkt. 64 at 31–35.

[102]  *Id.* at 35.

254.    Defendants have excluded other market participants as well.   For example, Mullenweg contacted the developer of the Paid Memberships Pro plugin, threatening to "take over your listing and make it a community plugin like we did to ACF."[103]

255.    Other market participants have felt there is no choice but to leave entirely.   Robert DeVore, for example, "gave 20 years to WordPress," including "[h]undreds of plugins" and "[c]ountless hours," but felt compelled to "walk away for good."[104]

256.    Defendants' scheme was never limited just to their self-proclaimed nuclear war against WPE; their endgame, as ***Mullenweg*** admitted, was to ██████████████████   And they did.  This was not something a defendant that lacks the power to influence the market by itself could do through its own conduct.  It took the extraordinary intervention of this Court—through its preliminary injunction order—to check the reach of Defendants' conduct, given their vast market power.

257.    Each consequence of Defendants' conduct—raised prices, increased costs, decreased quality, and excluded rivals—establishes Defendants' power.  Defendants have sustained their effective price and cost increases above competitive levels, and quality reductions below competitive levels, without losing sufficient customers to deter those increases and reductions.  That confirms Defendants' power.

### 2.   Additionally, Defendants' Dominance In Multiple Product Markets Is Indirect Evidence of Their Market Power

258.    As alleged above, while there is overwhelming direct evidence of Defendants' market power—which is all that is required to establish this element of WPE's antitrust claims—there is also overwhelming ***indirect*** evidence here.  Four product markets are applicable to the indirect evidence inquiry:

(1) web content management systems ("the Web Content Management Systems Market");

(2) WordPress web hosting services ("the WordPress Web Hosting Services Market");

---

[103]   https://www.paidmembershipspro.com/leaving-wordpress-org/.

[104]   https://x.com/deviorobert/status/1931967448393056757.

1    (3) WordPress custom field plugins ("the WordPress Custom Field Plugin Market"); and

2    (4) distribution of WordPress plugins ("the WordPress Plugin Distribution Market").

3    259.    Antitrust law and economics each recognize the concepts of "foremarkets" and

4    "aftermarkets."  The foremarket consists of the relevant market for a given primary good or service,

5    of which there may be multiple brands.  For example, a market for photocopier machines, such as

6    from Xerox, Canon, and HP is known as a foremarket.

7    260.    By contrast, an aftermarket is a derivative relevant market that may be limited to

8    products or services related to a single brand of the primary product or service sold in the foremarket.

9    For example, while the photocopier foremarket may have multiple brands, there may be a derivative

10   relevant market for servicing of only Canon-brand photocopiers—this is known as an aftermarket.

11   261.    The Web Content Management Systems Market is a foremarket: it is comprised of

12   multiple brands of web content management systems, including WordPress, Drupal, Joomla, and

13   others.  Each of the WordPress Web Hosting Services Market, the WordPress Custom Field Plugin

14   Market, and the WordPress Plugin Distribution Market is a separate aftermarket, respectively

15   comprised of web hosting services, plugins, and plugin distribution specific to WordPress.  Each of

16   these relevant markets are further described below.

17                    **(a)    The Web Content Management Systems Market**

18   262.    The Web Content Management Systems Market is the product market consisting of

19   web content management systems, which are software products that allow for creating, maintaining,

20   controlling, and revising content on a website without prior knowledge of web programming or

21   markup languages.  Examples of web content management systems include Craft CMS, Drupal,

22   Joomla, TYPO3, and WordPress.

23   263.    Web content management systems are a distinct type of content management system,

24   although a content management system may offer some but not all of the wide array of functions of

25   a web content management system.  Whereas content management systems are software products

26   that allow for the general creation, editing, and management of content—such as documents,

27

28

records, video, and audio files—web content management systems focus primarily on webpage content and the specific context of creating and maintaining a website.[105]

264.    Web content management systems include features that distinguish them from other types of services.  Examples of these features include:[106]

- Access control: Customers or website administrators can easily control who has access to a page on a website.

- Personalized editing tools: Customers can create and customize content on their websites utilizing user-friendly tools, such as adding text and multimedia and changing fonts and colors.  These tools often are available through a web browser, making access easier than through a native website editing application that must be downloaded to a computer or forcing the user to write code to edit their websites.

- Plugins: Customers can install "plugins," which are modules that can be added to a website to implement a particular feature or functionality.

- Software updates: To ensure functionality, the web content management system is subject to regular software updates, which may be implemented either manually (such as by checking whether an update is available, then downloading it, and then installing it), or automatically.

- Workflow and document management: Customers and other authorized users can review, edit, approve, and/or reject content before it is published through the website, such as through a user-friendly "dashboard."

265.    There are no reasonable substitutes for web content management systems.  For example, custom coding a website is not a reasonable substitute for building a website using a web content management system.  Custom coding a website often requires highly technical or otherwise specialized knowledge like familiarity with and ability to code in a programming language.  By contrast, building a website using a web content management system typically requires much less technical knowledge and can be done using user-friendly, web-accessible tools such as templates, drop down menus, and dashboards.

---

[105]  https://www.techtarget.com/searchcontentmanagement/definition/web-content-management-WCM.

[106]  https://www.techtarget.com/searchcontentmanagement/definition/web-content-management-WCM; *see also* https://cmscritic.com/cms-or-wcm-which-is-which.

266.    Building custom-coded websites often requires more time, money, and other resources than building a website using a web content management system.  Whereas a web content management system can quickly allow for the design and creation of a website using templates and other pre-curated content (such as text blocks, headings, plugins, and the like), custom coding a website requires additional time, human and engineering resources, and money to plan, design, develop, code, and then publish.

267.    Web hosting services are not reasonably interchangeable with web content management systems.  Whereas a web content management system "allows you to create your content," "web hosting is the service that makes it available on the internet"—in this way, a web content management system is "similar to design software" while "[w]eb hosting is more like renting space on the internet."[107]

268.    Other types of content management systems are not reasonably interchangeable with web content management systems.  For example, a component content management system like Paligo focuses on content at a granular level, such as particular phrases, paragraphs, or graphics so that when that content is updated, that change is automatically updated everywhere that content appears.[108]  Web content management systems focus on the creation and maintenance of a ***website***, not a particular piece of content that may appear on multiple websites or in multiple fora.

269.    Document management systems are not reasonably interchangeable with web content management systems.  Document management systems like Box store, manage, and track documents (whether electronic or scanned paper copies).[109]  Unlike web content management systems, document management systems do not meaningfully facilitate the creation and maintenance of websites.

---

[107] https://rockcontent.com/blog/cms-and-hosting; https://codesweetly.com/content-management-system-vs-web-host-vs-world-wide-web/.

[108] https://paligo.net/blog/how-to/a-step-by-step-guide-to-product-knowledge-documentation-in-a-ccms/.

[109] https://www.aiim.org/what-is-document-imaging.

270.    Digital asset management systems are not reasonably interchangeable with web content management systems.  Digital asset management systems provide a centralized repository for organizing, managing, and distributing electronic files.[110]  By contrast, web content management systems enable the creation and maintenance of websites, rather than the distribution of specific electronic files.

271.    Enterprise content management systems are not reasonably interchangeable with web content management systems.  While web content management systems enable the creation and maintenance of websites, enterprise content management systems like Microsoft 365 are "used to create, manage, and publish" other types of content like documents.[111]

272.    There is broad recognition that web content management systems are a distinct type of service.  For example, IBM has explained that a web content management system "builds and manages the content for a brand's website," while a digital asset management system "is just the system to organize and store the brand's digital files" such that those systems "complement one another but are not interchangeable."[112]

273.    Simple [A] (a provider of component content management system services) has recognized that web content management systems are one specific type of "the ***different*** types" of content management systems, the other main ones being component content management systems, document management systems, digital asset management systems, and enterprise content management systems.[113]

274.    Other industry sources have recognized the same distinctions among different types of content management systems:[114]

---

[110]    https://www.ibm.com/topics/digital-asset-management.

[111]    https://learn.microsoft.com/en-us/azure/architecture/example-scenario/apps/scalable-apps-performance-modeling-site-reliability.

[112]    https://www.ibm.com/topics/content-management-system.

[113]    https://web.archive.org/web/20241015154558/https://simplea.com/Articles/what-is-a-cms.

[114]    https://influencermarketinghub.com/content-management-systems/#toc-1.



275.    **Direct evidence confirms Defendants' power in the Web Content Management Systems Market.**  WPE alleges the direct evidence of Defendants' power—increased prices, increased costs, decreased quality, and excluded competition—*supra* in Section VIII(A)(1).  Each of these dynamics are felt in the Web Content Management Systems Market.

276.    Defendants' demand that WPE and others pay to purportedly "license" the trademarks that Automattic claims to control is a price that recipients must now effectively pay in order to access the WordPress web content management system and related software (including plugins and themes).  Defendants admit they control wordpress.org, and wordpress.org is the only authorized site for downloading WordPress in the first place.  Beyond just "core" WordPress (the web content management system software), plugins and themes are essential.  For example, it is estimated that, on average, a website built on WordPress can have twenty to thirty plugins; "feature-rich sites can easily have 50+ plugins[.]"[115]  Those plugins are overwhelmingly distributed through wordpress.org, updating them requires access to wordpress.org, and Defendants control wordpress.org.

277.    The purported license demand is an effective increase in the price for web content management systems because WordPress and many other web content management systems have historically been free; Defendants are now effectively charging for access to WordPress and related

---

[115]    https://duplicator.com/how-many-wordpress-plugins-are-too-many/#:~:text=The%20average%20WordPress%20site%20may,of%20plugins%20to%20your%20site.

1  software, including plugins and themes (despite promising not to do so) and some have paid

2  Defendants' ransom.

3  278.   Even as to market participants within the WordPress web content management

4  system that have not directly paid Defendants' effective price increase, Defendants have nonetheless

5  effectively increased those market participants' costs.  Defendants' conduct interfered with the

6  operation and functionality of millions of websites, causing contract cancellations and resulting in

7  lost revenue streams.  As to those millions of websites, Defendants' conduct likewise caused

8  downtime and service disruptions, which required market participants to expend time, money, and

9  personnel resources to attempt to mitigate those unforeseen costs.

10  279.   Beyond price and cost increases, Defendants' conduct has decreased quality as well.

11  Rather than maintain stability—which is itself a material element of service quality—Defendants

12  have fomented an environment of chaos and uncertainty.  In addition, Defendants' conduct acutely

13  caused potential bugs and security vulnerabilities, and product functionality and security are

14  dimensions of competition.  All these effects were felt in the Web Content Management Systems

15  Market because they were borne by web hosts, plugin developers, and customers affiliated with

16  websites powered by the WordPress web content management system.

17  280.   Defendants' conduct has also excluded rivals and other market participants in the

18  Web Content Management Systems Market.  Defendants effectively control WordPress (the web

19  content management system), and Defendants' conduct has impaired web hosts, plugin developers,

20  customers, and other market participants, so as to effectively exclude them.

21

22

23

24

25

26

27

28

281.  **Indirect evidence confirms Defendants' power in the Web Content Management Systems Market.**  There is also indirect evidence of Defendants' power in the Web Content Management Systems Market.  Construing content management systems broadly (web content management systems are a distinct type of content management system), over 60% of all websites built using a known content management system are built using WordPress specifically:[116]

| | 2024 1 Sep | 2024 1 Oct | 2024 1 Nov | 2024 1 Dec | 2025 1 Jan | 2025 1 Feb | 2025 1 Mar | 2025 1 Apr | 2025 1 May | 2025 1 Jun | 2025 1 Jul | 2025 1 Aug | 2025 1 Sep | 2025 26 Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WordPress | 62.6% | 62.5% | 62.4% | 62.2% | 62.0% | 61.9% | 61.7% | 61.4% | 61.3% | 61.2% | 61.0% | 60.8% | 60.8% | 60.7% |
| Shopify | 6.5% | 6.5% | 6.5% | 6.6% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% | 6.8% |
| Wix | 4.2% | 4.3% | 4.4% | 4.5% | 4.6% | 4.8% | 4.9% | 5.1% | 5.2% | 5.3% | 5.4% | 5.5% | 5.6% | 5.7% |
| Squarespace | 3.1% | 3.1% | 3.1% | 3.1% | 3.2% | 3.2% | 3.2% | 3.2% | 3.3% | 3.3% | 3.3% | 3.3% | 3.4% | 3.4% |
| Joomla | 2.4% | 2.3% | 2.3% | 2.3% | 2.2% | 2.2% | 2.2% | 2.1% | 2.1% | 2.1% | 2.0% | 2.0% | 2.0% | 2.0% |
| Webflow | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| Drupal | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.1% | 1.1% | 1.1% |
| Tilda | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.9% | 0.9% | 0.9% | 0.9% | 1.0% | 1.0% | 1.0% | 1.1% | 1.1% |
| Adobe Systems | 1.3% | 1.3% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.0% | 1.0% |
| Duda | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 1.0% | 1.0% | 1.0% | 1.0% |
| GoDaddy Website Builder | 0.7% | 0.7% | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.9% | 0.9% | 0.9% |
| Google Systems | 1.0% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.8% | 0.8% | 0.8% |

WordPress's market share in the Web Content Management Systems Market therefore exceeds 60%.

282.  WordPress's market share among web content management systems is attributable *to* Defendants.  Mullenweg cofounded WordPress, and Automattic is Mullenweg's for-profit company such that each directly participate in the Web Content Management Systems Market.

283.  Wordpress.org owner Mullenweg has admitted that he "has absolute power in the WP ecosystem," and that he is "in control of everything on WordPress.org."  Similarly, after one of Defendants' supporters made a post on X stating that he "stand[s] by @photomatt [Mullenweg] and Automattic" because "Wordpress is used by more than 40% of the internet" and "***It's their***

---

[116]  WPE includes market share statistics sourced from W3Techs.  *See* https://w3techs.com/technologies/history_overview/content_management.  Indeed, W3Techs is a source that others in the industry, such as other web hosts like Blue Host, use to report market share information.  *See, e.g.*, https://www.bluehost.com/blog/wordpresss-market-share-big-websites-that-use-wordpress/.  Moreover, W3Techs' statistics calculate share among "content management systems."  ***Web*** content management systems are a subset of content management systems, and they are sufficient to themselves constitute a relevant antitrust market.  WordPress's market share among web content management systems, then, is even higher.

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

1  *platform*," Mullenweg responded by publicly resharing the post, indicating Mullenweg's agreement

2  with it.

3      284.    Mullenweg also controls the code for WordPress (the web content management

4  system) itself.  While Defendants tout that WordPress is not controlled by anyone, in fact, it is

5  Mullenweg who decides what goes into the core WordPress software and what does not.  As one

6  market participant has explained: for new releases of WordPress, "[t]here is a Release Lead who is

7  '[t]he community member ultimately responsible for the Release" of that version of WordPress, and

8  "Mullenweg is usually the Release Lead."[117]  For example, Mullenweg included in a prior release

9  of WordPress a feature known as "Gutenberg," despite widespread concerns voiced by the

10  community.[118]

11      285.    Defendants are the gatekeepers of WordPress.  The only authorized way to obtain

12  WordPress (the web content management system) is through Wordpress.org, which WordPress is

13  hardcoded to reference and rely upon, including through over 1,500 references to wordpress.org in

14  the core WordPress code base.

15      286.    Defendants' market share can be calculated by looking to the share of websites

16  powered by WordPress versus other web content management systems.  Just as Microsoft's market

17  share is properly calculated among providers of operating systems by counting the number of

18  personal computers that run Windows as opposed to other operating systems, even though the actual

19  computers are owned by different end-users,[119] it does not matter that Defendants themselves do not

20  ultimately own or control every website built using the WordPress web content management system.

21  Thus, it is the *volume of use* of Defendants' WordPress web content management system

22

23

24  _____

[117]  https://www.reddit.com/r/Wordpress/comments/1g09zzm/matt_mullenweg
25  _automattics_associate_general/.

26  [118]  https://gschoppe.com/wordpress/gutenberg-is-no-gutenberg/.

27  [119]  *See United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 19 (D.D.C. 1999) (Finding of Fact No.
   35, concluding, after bench trial, that Microsoft was a monopolist and looking to Microsoft's
28  market share among operating systems).

(irrespective of by whom) that matters for determining market share in the Web Content Management Systems Market.

**(b)     The WordPress Web Hosting Services Market**

287.    The WordPress Web Hosting Services Market is the product market for web hosting services offered to WordPress-powered websites.  The WordPress Web Hosting Services Market constitutes its own distinct services aftermarket.  The WordPress Web Hosting Services Market consists of WordPress web hosting services, including those provided by WPE, Hostinger, Dreamhost, Kinsta, Bluehost, and Defendants' WordPress web hosting services wordpress.com, Pressable, and WordPress VIP.

288.    Web hosting services are typically specific to web content management systems, meaning a web hosting service will focus on websites powered by a specific web content management system (or a small number of specific web content management systems).  For example, WPE provides web hosting services only to WordPress websites, rather than to websites built using other web content management systems like Joomla.

289.    Web hosting services that operate websites built using other web content management systems are not reasonable substitutes for web hosting services for WordPress websites.  While a customer could, in theory, maintain a WordPress website using a "generic" or non-WordPress web host, doing so would impose a number of costs on the customer that make non-WordPress web hosting services not reasonably interchangeable with WordPress web hosting services from the customer's perspective.  For example, a customer using a non-WordPress web host would "likely need to do everything manually, starting from the initial installation and setup," which requires money, time, and technical expertise, including "an advanced understanding of database and file management if [the customer] require[s] unique customizations."[120]

290.    Similarly, non-WordPress web hosts may lack the WordPress expertise necessary to ensure a WordPress website is running optimally and securely, particularly in the event of a "bug" or other issue.  By contrast, a WordPress web host has that specialized knowledge, allowing the

---

[120]    https://wpengine.com/wordpress-hosting/#guide.

1  WordPress web host to resolve any such problem more quickly, ensuring greater performance and

2  reliability for the maintenance and operation of the customer's WordPress website, and making

3  WordPress web hosts a distinct set of service providers from the customer's perspective.

4      291.    The specialized knowledge required to properly host a WordPress-powered website

5  also makes WordPress web hosts distinct from the perspective of ***web hosts themselves***.  For

6  example, if a customer owns a Rivian electric vehicle and there is a maintenance issue with the

7  vehicle, a maintenance provider that does not specialize in Rivian vehicles may be unable or

8  unwilling to provide repair services because that provider lacks the know-how or relationship with

9  Rivian to diagnose any issue and then fix it.  The same is true of non-WordPress web hosts.  Indeed,

10  wordpress.org specifically encourages customers to engage WordPress web hosts, rather than non-

11  WordPress web hosts.[121]  And WordPress web hosts specifically tout their affiliation with

12  WordPress for this very reason: Defendants' own WordPress web hosting service Pressable, for

13  example, explains that "[c]hoosing the right ***WordPress*** hosting service can boost website

14  performance and improve the user experience."[122]  WPE likewise explains that "anyone who is

15  using" WordPress "should use a WordPress host" because "using a web host that doesn't specialize

16  in WordPress will likely lead to a less-optimized or even subpar website experience," including

17  because "non-WordPress hosts won't be able to cater to WordPress specifically," possibly resulting

18  in performance and security issues for the customer's WordPress website.[123]

19      292.    All of this means that a customer's initial selection of a web content management

20  system for the creation and maintenance of their website effectively determines the universe of

21  alternatives available to them with respect to web hosting services.  Once a customer has built a

22  website using WordPress, the commercial reality is that they are likely to select a WordPress host.

23  While it may, in theory, be possible to migrate a website from a web host that focuses on one web

24

---

25  [121]  https://wordpress.org/hosting/ (recommending WordPress web hosts for "WordPress

26  Hosting").

27  [122]  https://pressable.com/blog/fastest-managed-wordpress-hosting/.

28  [123]  https://wpengine.com/wordpress-hosting/#guide.

content management system to another web host that focuses on a different web content management system, doing so requires time, money, and engineering resources, including to reprogram the website as may be necessary to ensure it continues to operate and does so optimally.

293.    There is industry recognition of the WordPress Web Hosting Services Market. As one example, WPE's website explains that "there's an entire category (and industry) of WordPress hosting services designed explicitly for" the WordPress web content management system.[124] Defendants likewise recognize the WordPress Web Hosting Services Market as a distinct group of services. Defendants' Pressable website expressly refers to the "***WordPress hosting market***."[125]

294.    **Direct evidence confirms Defendants' power in the WordPress Web Hosting Services Market.** As a WordPress aftermarket, the WordPress Web Hosting Services Market is part of the "WP ecosystem" in which Mullenweg agreed he "has absolute power." In addition, WordPress web hosts require access to WordPress and resources through wordpress.org, and Defendants control wordpress.org.

295.    WPE detailed the direct evidence of Defendants' power—increased prices, increased costs, decreased quality, and excluded competition—*supra* in Section VIII(A)(1). Each of these dynamics are felt in the WordPress Web Hosting Services Market.

296.    As to prices, others—including other WordPress web hosts—are apparently paying Defendants for a purported trademark license in order to access WordPress and resources through wordpress.org, which they need in order to provide WordPress web hosting services. That is a price increase as noted above.

297.    Aside from prices, Defendants' conduct has increased costs for WordPress web hosts. WPE, for example, has had to expend tremendous time, money, and personnel resources attempting to address the service and other disruptions to its customers' sites that Defendants caused, as well as to develop, build, operate, and maintain a mirror. Other WordPress web hosts have apparently incurred similar costs in attempting to take protective measures to insulate themselves

---

[124]  https://wpengine.com/wordpress-hosting/#guide.

[125]  https://pressable.com/blog/fastest-managed-wordpress-hosting/.

1    and their customers from Defendants.  For example, ███████████████████████
2    ██████████████████████.  Indeed, these costs are themselves tantamount to price
3    increases.

4        298.    Defendants' conduct has likewise diminished quality in the WordPress Web Hosting
5    Services Market.  Defendants have created an environment of tremendous uncertainty and chaos
6    (the opposite of good "quality").  Defendants' conduct has also created bugs and security
7    vulnerabilities for potentially millions of websites, which affect more than just the websites of
8    WPE's hosting clients, but also the websites of other WordPress web hosts' clients (including those
9    of Defendants' Pressable, wordpress.com, and other hosting services), given the effect of
10   Defendants' conduct on WPE's plugins (and given that other WordPress web hosts and their clients'
11   websites use WPE's plugins).

12       299.    Defendants have the power to exclude participants in the WordPress Web Hosting
13   Services Market, and they have already done so.  WPE offers WordPress web hosting services, and
14   Defendants' blocking of WPE from the wordpress.org portal and servers, as well as Defendants'
15   blocking of WPE customers from accessing wordpress.org resources from their website
16   administrative panels, severely diminished WPE's ability to provide its WordPress web hosting
17   services.  The other aspects of Defendants' nuclear war—including disparaging WPE, making
18   extortionate threats, interfering with WPE's personnel, and interfering with WPE's customers—
19   further impeded WPE's ability to offer WordPress web hosting services.  As Defendants boasted,
20   their anticompetitive conduct caused "***tens of thousands of*** customers" to leave WPE.[126]  It took
21   this Court's extraordinary intervention, through a preliminary injunction, to even begin to restore
22   the status quo *ante*.

(c)    <b>The WordPress Custom Field Plugin Market</b>

24       300.    The WordPress Custom Field Plugin Market is the product market for plugins
25   compatible with WordPress that provide foundational site building features facilitating the
26   administration, presentation, and use of structured data in connection with WordPress websites.

27

---

28   [126]   https://www.youtube.com/watch?v=Fn_HzfI_sW0, at 9:17-46, 26:30-36, 29:58-30:07

301.    The WordPress Developer Resources webpage on wordpress.org describes plugins as "packages of code that extend the core functionality of WordPress."[127]    Defendants' wordpress.com defines plugins as "add-ons that enable you to customize the appearance and functionality of your WordPress site."[128]    In this way, WordPress plugins can be analogized to the "parts" used to repair and improve a particular product.

302.    WordPress custom field plugins are a *specific* type of WordPress plugin that allow for the development of WordPress websites that use "fields" to store custom data, such as text fields, checkboxes, fields for uploading and/or embedding media content, forms for data collection, and the like.

303.    While the WordPress Custom Field Plugin Market is derivative of the Web Content Management Systems Market, it constitutes its own distinct aftermarket that is properly limited to WordPress custom field plugins.    The WordPress Custom Field Plugin Market is primarily comprised of WPE (including its ACF plugin) and Defendants (including their SCF and Easy Custom Fields plugins).

304.    Plugins are typically specific to a particular web content management system. Therefore, there are no reasonable substitutes for WordPress plugins.

305.    Non-plugin types of software are not reasonable substitutes for WordPress plugins. For example, the desktop version of the music streaming app Spotify is not reasonably interchangeable with a WordPress plugin that enables the playing or sharing of music on a WordPress website.    A customer that downloaded the Spotify app onto their computer could not simply then just add the downloaded Spotify app to their WordPress website.    Instead, the customer would have to look for and then implement a WordPress plugin.    The same is generally true of mobile apps downloaded onto a customer's mobile device (such as an iOS app on an Apple device);

---

[127]    https://developer.wordpress.org/plugins/intro/what-is-a-plugin/.

[128]    https://wordpress.com/go/website-building/what-are-wordpress-plugins-and-themes-a-beginners-guide/.

1    such mobile apps are not, by themselves, reasonable substitutes for WordPress plugins and cannot

2    simply be directly added to a WordPress website.

3        306.    Plugins for non-WordPress web content management systems are also not reasonably

4    interchangeable with WordPress plugins.  Just as apps written for the Windows operating system

5    are not reasonably interchangeable with apps written for the Apple operating system, the same is

6    generally true of plugins.  For example, plugins for Joomla are usually coded by developers to work

7    on websites built using Joomla, while plugins for WordPress typically function only with websites

8    built using WordPress.  While it may, in theory, be possible to "migrate" a plugin from one web

9    content management system to another, that would require time, expense, and technical expertise.

10        307.    Other types of WordPress plugins are not reasonably interchangeable with custom

11    field plugins.  For example, a steering wheel and a tail light are both "parts" for an automobile in a

12    general sense.  But even though they are both parts, they perform different functions that make them

13    poor substitutes.  The same is true for WordPress plugins, and WordPress custom field plugins are

14    distinct in the features and functionality that they provide for, *i.e.*, collection and use of structured

15    data through custom "fields."  As one example, WordPress SEO plugins, like Yoast SEO Plugin,

16    allow website designers to generate meta descriptions and titles for website pages, blog posts and

17    social posts that are optimized to allow the site to rank higher in website search engine results, while

18    WordPress custom field plugins, like the ACF Plugin, are used by designers to apply custom fields

19    and incorporate external data sources.

20        308.    The web content management system used to build a customer's website, once

21    selected, therefore significantly defines and limits the universe of plugins from which the customer

22    can choose any alternatives.  In other words, once a customer, developer, or web host has decided

23    to use WordPress, they are effectively locked into WordPress plugins.

24        309.    **Indirect evidence confirms Defendants' power in the WordPress Custom Field**

25    **Plugin Market.**  Before Defendants hijacked WPE's ACF plugin, over 2 million websites with the

26    free version of ACF installed were able to receive updates, enhancements and security fixes directly

27    from the ACF developer team; by comparison, afterwards, there were only 50,000.

28

310. **Direct evidence confirms Defendants' power in the WordPress Custom Field Plugin Market.** Direct evidence likewise confirms Defendants' power in the WordPress Custom Field Plugin Market. As a WordPress aftermarket, the WordPress Custom Field Plugin Market is part of the "WP ecosystem" that Mullenweg agreed he "has absolute power" in.

311. WordPress custom field plugins cannot stand alone from WordPress or wordpress.org because wordpress.org is ***hard-coded*** into WordPress, forcing WordPress to "call back" to wordpress.org for updates and patches, as well as notifications of them, related to custom field plugins. In this way, providers of WordPress custom field plugins effectively require access to WordPress and wordpress.org, which Defendants admit they control exclusively. Defendants' admission of "absolute power," coupled with the hardcoding functionality of the WordPress software hosted on wordpress.org constitutes irrefutable evidence of Defendants' market power.

312. WPE detailed the direct evidence of Defendants' power—increased prices, increased costs, decreased quality, and excluded competition—*supra* in Section VIII(A)(1). Each of these dynamics are felt in the WordPress Custom Field Plugin Market.

313. For example, WPE is a provider of WordPress custom field plugins through its popular ACF plugin. Defendants have unilaterally raised WPE's costs in the provision of WordPress custom field plugins, by imposing an at least 8% purported royalty that is completely untethered to Defendants' actual costs or other relevant input. While WPE did not acquiesce to WPE's random demand, Defendants' conduct nonetheless increased WPE's costs related to WordPress custom field plugins. Defendants hijacked WPE's popular ACF plugin and repurposed it as Defendants' SCF plugin. Beyond that, when Defendants commandeered WPE's ACF plugin, they also seized WPE's positive reviews for ACF on the download page, making it seem as those reviews were for Defendants' SCF plugin, when, in reality, they were for WPE's ACF plugin. In these ways, WPE therefore lost some potential revenue and goodwill associated with ACF.

314. WPE was forced to incur time, monetary, and human resources to address customer inquiries after Defendants hijacked ACF and to attempt to secure its return. Similarly, WPE's ACF customers were forced to incur time, monetary, and human resources navigating the chaotic aftermath that Defendants inflicted when Defendants hijacked WPE's ACF plugin.

315.     Defendants excluded WPE from the WordPress Custom Field Plugin Market.  As anticompetitive as it is for Defendants to have blocked WPE from wordpress.org, Defendants did far more than that.  Defendants literally stole WPE's ACF plugin and positive customer reviews and passed them off as Defendants' SCF plugin and Defendants' reviews.  Defendants also stole WPE's customers by forcing them to utilize Defendants' SCF plugin (rather than WPE's ACF plugin, which is the basis for SCF).  Because Defendants were wholly unrestrained by competition, they were able to engage in property and customer theft.  It took this Court, through its preliminary injunction order, to secure the return of WPE's ACF plugin.  All of this confirms Defendants' market power.

### (d)     The WordPress Plugin Distribution Market

316.     The WordPress Plugin Distribution Market is the product market for the distribution of plugins compatible with WordPress.  The WordPress Plugin Distribution Market includes all the channels by which WordPress-compatible plugins may be uploaded by developers that create them, as well as downloaded by customers, web hosts, and other industry participants that wish to add or otherwise implement them into a website built using WordPress.   The WordPress Plugin Distribution Market primarily includes the WordPress Plugins Directory, which is a repository of plugins on wordpress.org (which Defendants purport to control).

317.     As discussed above, plugins are typically specific to a particular web content management system.  Thus, plugins for one specific web content management system are generally not substitutable with plugins for another web content management system, such that the initial selection of a web content management system largely defines the universe of available plugins.

318.     The distribution of plugins is also severely affected by the customer's initial selection of a web content management system.  For example, each web content management system typically maintains a marketplace dedicated to the distribution of plugins that are compatible *only* with that web content management system.   Joomla, for example, maintains the "Joomla Extensions Directory," which is a repository "where Joomla users can find free and paid extensions *for*

1    *Joomla*."[129]  WordPress, by contrast, maintains the WordPress Plugins Directory on wordpress.org

2    for plugins compatible with WordPress.  Just as an Apple iOS user must typically use the Apple

3    App Store rather than the Google Play Store to download apps that work with the user's iOS device,

4    the same is generally true with respect to plugins for web content management systems.

5        319.    Other types of distribution channels are not reasonably interchangeable with the

6    channels used to distribute WordPress plugins, including most notably the WordPress Plugin

7    Directory.  For example, app stores that distribute mobile apps—like the Apple App Store on iOS

8    devices, and the Google Play Store on Android devices—do not distribute WordPress plugins.  The

9    same is true of other distribution channels, like stores distributing personal computer or gaming

10   console software—like the Microsoft Store (for Windows devices and Xbox game consoles), and

11   the PlayStation Store (for Sony PlayStation game consoles).

12       320.    Nominally only, the direct upload and download of WordPress plugins through other

13   channels are in the WordPress Plugin Distribution Market.  However, these other channels are not

14   meaningful competitors and do not significantly constrain Defendants' ability to raise prices or

15   costs, degrade quality, exclude competitors, or otherwise harm competition.

16       321.    The WordPress Plugin Directory is the primary vehicle by which customers can

17   discover WordPress plugins, which makes other channels of distribution (to the extent even

18   possible) poor substitutes.  Although a customer may be able to download a WordPress plugin from

19   outside the WordPress Plugin Directory, such as from individual developers' webpages, the

20   customer would first need to know to look for the plugin outside the WordPress Plugin Directory

21   and where and how to look for the plugin in order to be able to download it.  Even then, the customer

22   would have to know how to install a plugin that is not available through the WordPress Plugin

23   Directory, such as by manually uploading it to their website using a file transfer protocol or similar

24   software—which requires additional time and technical expertise.

25

26

27   _____
[129]    https://volunteers.joomla.org/teams/extensions-directory-team (emphasis added) (formerly

28   viewable at https://volunteers.joomla.org/teams/extensions-directory-team).

322.    Similarly, creating a "mirror" of the WordPress Plugin Directory from wordpress.org, meaning an alternate partial repository of WordPress plugins that is effectively linked to the WordPress Plugin Directory on wordpress.org, is not a reasonable substitute for distributing WordPress plugins.  Creating and deploying a mirror requires time and substantial financial and engineering resources.  It is also unreliable for a number of reasons.  These include throttling problems (such as limits that Defendants impose on the rates at which third parties can download content from wordpress.org), limits to the data that wordpress.org makes available in the first place (affecting what is available to mirror), the possibility that even minor updates to wordpress.org can break the mirror, and potential security issues.

323.    Mullenweg has confirmed the limits to a mirror that WPE has attempted to set up, stating that "WP Engine hasn't been able to make updates, plugin directory, theme directory, and Openverse work on their sites," and WPE's mirror is "slower than" the WordPress Plugin Directory.[130]

324.    Mullenweg confirmed the inefficacy of a mirror when he ███████████ ████████████████████████████████████████████████████████████ ██████

325.    The effectiveness of a distribution channel is further limited by its penetration and reach.  If an insufficient number of customers might download plugins from that channel, then developers would not use that channel to distribute their plugins.  That, in turn, limits the universe of plugins that are available on a given channel, and thus that channel's efficacy—both to customers (who are looking for a fulsome repository of useful plugins), and to developers (who are looking for a channel that has a substantial audience that may then download the developer's plugin).  The significant extent to which customers can (and must) use the WordPress Plugin Directory on wordpress.org makes other channels poor substitutes to the WordPress Plugin Directory on wordpress.org for the distribution of WordPress plugins.

---

[130]    https://wordpress.org/news/2024/09/wp-engine-reprieve/; https://wordpress.org/news/2024/10/spoon/.

326.    Defendants make the WordPress Plugin Directory the "chokepoint" or "bottleneck" of distribution for WordPress plugins by design.   The "Developer" page on wordpress.org admonishes that "[t]he latest version of WordPress is always available from the main WordPress website at https://wordpress.org.   Official releases are not available from other sites - **never** download or install WordPress from any website other than https://wordpress.org."[131]   That wordpress.org is the only authorized place to obtain WordPress in the first place further entrenches the stickiness of wordpress.org—the same website where the WordPress Plugin Directory is hosted—as the channel for distribution for plugins for WordPress.

327.    The "Detailed Plugin Guidelines" located on the WordPress Developer Resources page of wordpress.org instructs that "A stable version of a plugin must be available from its WordPress Plugin Directory page," and "*[d]istributing code via alternate methods*, while not keeping the code hosted here up to date, *may result in a plugin being removed*."[132]  This makes the WordPress Plugin Directory on wordpress.org a chokepoint for the distribution of WordPress plugins, as WordPress plugins often require updates, and developers do not wish to have to expend time and resources pushing and making available updates on multiple repositories.

328.    As also noted above, WordPress software, including plugins, cannot practically stand alone because wordpress.org is *hard-coded* into the WordPress software, forcing it to "call back" to wordpress.org for updates and patches, as well as notifications of them.

329.    **Indirect evidence confirms Defendants' power in the WordPress Plugin Distribution Market.**  Given the constraints described above, substantially all WordPress plugins are downloaded from (and otherwise distributed through) wordpress.org.   Thus, wordpress.org's market share in the WordPress Plugin Distribution Market is nearly 100%.  As Mullenweg admits, he owns and controls wordpress.org, and Automattic is Mullenweg's for-profit company.  Therefore

---

[131]   https://developer.wordpress.org/advanced-administration/security/hardening/ (emphasis in original) (formerly viewable at https://developer.wordpress.org/advanced-administration/security/hardening/)

[132]   https://developer.wordpress.org/plugins/wordpress-org/detailed-plugin-guidelines/ (emphasis added) (formerly viewable at https://developer.wordpress.org/plugins/wordpress-org/detailed-plugin-guidelines/)

wordpress.org's market share in the WordPress Plugin Distribution Market is properly attributed to Defendants.

330.    **Direct evidence confirms Defendants' power in the WordPress Plugin Distribution Market.**  As a WordPress aftermarket, the WordPress Plugin Distribution Market is part of the "WP ecosystem" that Mullenweg agreed he "has absolute power" in.

331.    Defendants control wordpress.org, and, thus, the "chokepoint" through which substantially all WordPress plugins are uploaded and/or downloaded.

332.    WPE detailed the direct evidence of Defendants' power—increased prices, increased costs, decreased quality, and excluded competition—*supra* in Section VIII(A)(1).  Each of these dynamics are felt in the WordPress Plugin Distribution Market.

333.    As to prices in the WordPress Plugin Distribution Market, WPE is a customer of Defendants.  Likewise, so are other WordPress web hosts who also rely upon Defendants' provision of WordPress plugin distribution services in order to provide their own services to their customers.  Thus, Defendants' imposition of exorbitant fees directly increases the prices WPE and the other web hosts must pay Defendants for services in this market.

334.    others—including WordPress web hosts that also provide plugins as part of their offerings—are apparently paying Defendants for a supposed trademark license in order to access WordPress and resources through wordpress.org, which they need for distribution of their WordPress plugins.  Market participants did not previously need to pay in order to upload or download WordPress plugins through wordpress.org and now they do.

335.    In addition to prices, Defendants have also increased costs related to WordPress plugin distribution.  WPE, for example, is a provider of a number of popular WordPress plugins, including ACF.  Defendants' conduct interfered with the operation and functionality of WPE's plugins, which required WPE to expend tremendous time, money, and personnel resources to attempt to address the service and other disruptions to its customers' sites that Defendants' misconduct caused by interfering with WPE's plugins, as well as to develop, build, operate, and maintain a mirror.  These costs are tantamount to price increases.

336.    Other market participants have apparently incurred similar costs (which are effective price increases) in attempting to take protective measures with respect to WordPress plugin distribution.  For example, ███████ attempted to ████████████████████ ███████ .

337.    In addition, as a result of Defendants' conduct, WPE customers were prevented from updating or installing WordPress plugins through the WordPress administrative panel.

338.    Defendants' conduct has also diminished quality in the WordPress Plugin Distribution Market, including by creating tremendous uncertainty and chaos.   Moreover, Defendants' ban of WPE (and potentially others) from distributing WordPress plugins through wordpress.org created bugs and security vulnerabilities for potentially millions of websites, including both WPE's hosting clients and those of other WordPress hosts.

339.    Defendants also have the power to exclude participants from the WordPress Plugin Distribution Market, and they have already done so.  WPE offers WordPress plugins.  Defendants unilaterally impeded WPE's ability to distribute its plugins by blocking WPE's ability to upload and download plugins from the WordPress Plugin Directory on wordpress.org.   Defendants also unilaterally commandeered WPE's popular ACF plugin, edited it, repurposed it to their self-styled "Secure Custom Fields" plugin, and stole WPE's ACF customers.

340.    WPE is not alone in this regard.  Defendants have threatened others with the same pirate-like conduct; Mullenweg, for example, contacted the developer of another WordPress plugin named Paid Memberships Pro, and threatened to "take over your listing and make it a community plugin like we did to ACF."[133] Ultimately, that developer exited wordpress.org.

**(e)     Extensive Evidence Establishes the WordPress Aftermarkets**

341.    As demonstrated above, overwhelming direct evidence—including Defendants' own admissions—confirms Defendants' power in the foremarket and the three aftermarkets.  *See* Section

---

[133]    https://www.paidmembershipspro.com/leaving-wordpress-org/.

1  VIII(A)(1).   Similarly, overwhelming indirect evidence also confirms Defendants' power in the

2  foremarket.[134]  *See* Section VIII(A)(2).

3      342.    While not required given (i) the direct evidence of Defendants' power alleged above,

4  as well as (ii) the indirect evidence of Defendants' power in the foremarket, extensive evidence also

5  establishes the WordPress aftermarkets.

6      343.    **Lack of Knowledge Regarding Challenged Aftermarket Restrictions**.  There are

7  several aftermarket restrictions in this case that market participants did not know of (and could not

8  anticipate) at the time they selected a web content management system at the foremarket level.

9  These restrictions were outside the general knowledge of most consumers and the market and not

10  subject to reasonable discovery.

11      344.    ***First***, Defendants secretly reserved for themselves the abilities to charge exorbitant

12  fees for access to wordpress.org (which operates as a chokepoint for functional operation of the

13  WordPress software), and related resources, including critical plugin updates and notifications

14  delivered only through wordpress.org.

15      345.    ***Second***, Defendants secretly reserved for themselves the ability to block market

16  participants' access to wordpress.org and related resources as Defendants saw fit (or for no reason

17  at all).  For instance, fledgling website hosting companies deciding which web content management

18  system to use for their business did not know that, at any time, Defendants might cripple their

19  businesses by blocking their access to these WordPress resources that were indispensable to serving

20  their customers.

21      346.    Consumers and other market participants also could not reasonably discover that

22  Defendants would begin charging for and/or blocking access.  Defendants' plan was in their own

23  heads (and not, until relatively recently, communicated publicly).  Defendants had also long

24

25  _____

26  [134]  The Ninth Circuit's *Epic* decision, which articulates the *Epic* factors, flows from the Supreme
   Court's *Kodak* decision.  *Kodak* sets forth the requirements for establishing an aftermarket where
   the defendant lacks market power in the foremarket.  The *Epic* factors necessarily also assess the
27  requirements for establishing an aftermarket where the defendant lacks power in the foremarket.
   Where a defendant ***has*** power in the foremarket, as WPE alleges here (*see* Section VIII(A)(2)(a)),
28  the *Epic* factors are inapplicable.

1    promised such access would be "free" and "open" "forever" (such that discovery would somehow

2    require consumers and other market participants to know, up front, that Defendants were lying).

3        347.    **Third**, Defendants secretly reserved for themselves the ability to assert ownership

4    and control over WordPress software and trademarks, to lie in wait, and then to abuse their control

5    over the software and selectively enforce the trademarks for anticompetitive purposes.  Consumers

6    and other market participants could not reasonably discover that Defendants would claim to be able

7    to enforce trademark and source code rights, including because Defendants previously claimed such

8    rights belonged to the Foundation and the existence and scope of such rights are highly-technical

9    and closely guarded.

10        348.    When market participants selected WordPress at the foremarket level, Defendants

11    provided no contracts or agreements giving market participants notice of any of these restrictions,

12    nor did market participants have any other way for discovering them.

13        349.    Defendants' repeated misrepresentations further obfuscated these aftermarket

14    restrictions.  For instance, Defendants have repeatedly misrepresented that: (1) WordPress

15    (including the "WordPress code and trademark") is "for the free access for the world"; (2)

16    "Everyone is welcome" to WordPress; (3) WordPress "provides the opportunity for anyone to create

17    and share"; (4) WordPress is "committed to being as inclusive and accessible as possible"; (5)

18    "wordpress.org offers free hosting to anyone who wishes to develop a plugin in our directory"; and

19    (6) Automattic "transferred the WordPress trademark to the WordPress Foundation, the non-profit

20    dedicated to promoting and ensuring access to WordPress and related open source projects in

21    perpetuity" such that "the most central piece of WordPress's identity, its name, is now fully

22    independent from any company," which was "a really big deal" because "it's not often you see a

23    for-profit company donate one of their most valuable core assets and give up control."  Defendants

24    have also long emphasized the supposedly "nonprofit" nature of WordPress, including that "No

25    one" owns associated trademarks, source code, or wordpress.org (the primary means for distributing

26    WordPress plugins), and there is "no traditional ownership or corporate structure" to manage such

27    items.

28

350.    By its nature, deception is inherently hidden.  The market therefore had no meaningful way to discover Defendants' lies about "free" and "open" access or "nonprofit" control in the face of Defendants' repeated misrepresentations and omissions, until Defendants in September 2024 began—contrary to their earlier representations—publicly demanding extortionate payments, revealing that Mullenweg was the sole owner of wordpress.org, and the like.

351.    Consumers and market participants have expressed outright surprise at learning the truth, including that Mullenweg **personally** owns and controls wordpress.org.   WordPress community members have stated online, for example, that "I was today old [referring to October 22, 2024] when I found out . . . Wordpress.org is not owned by the WordPress foundation," "the vast majority of us that that wordpress/.org was part of the Foundation," "I thought the WordPress Foundation owned the trademark," "I've been working with WordPress since 2012 and NEVER knew this [referring to Defendants' claimed ownership over WordPress trademarks]," and the like.

352.    All of this surprise confirms the reality that the market and consumers were deceived, could not uncover Defendants' misrepresentations and omissions, and were generally unaware of the challenged aftermarket restrictions up front.[135]  It also confirms that Defendants' prior statements were concrete and definite, such that when Defendants' subsequent conduct and revelations disproved them, consumers and market participants felt misled.

---

[135]   The first *Epic* factor requires that the aftermarket restriction that the plaintiff specifically challenges be unknown.  The first *Epic* factor does not, by contrast, require that the plaintiff show that it be unknown that in selecting a specific brand at the foremarket level, a consumer is then locked into that brand's specific aftermarkets.  This is consistent with the analyses of *Kodak*, *Epic*, *Coronavirus*, *Lambrix*, and the like.  *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023); *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023); *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024).  For instance, in *Kodak*, the relevant inquiry was whether it was generally known that Kodak would sell parts to third parties only if they buy service from Kodak and not others, not whether selecting Kodak as the brand of copier meant the consumer cannot use Canon parts.  Similarly, in *Epic*, the Ninth Circuit assessed whether Apple's "in-app payment processor" policy was generally known, not whether choosing Apple in the foremarket meant consumers could not use Android apps.  Likewise, in *Coronavirus*, the Ninth Circuit evaluated whether it was generally known that Apple could unilaterally reject apps from the App Store, not whether picking Apple meant that Android apps would be unavailable.  And in *Lambrix*, the court considered whether certain repair and service center limitations (*i.e.*, that only **Tesla-Owned** or **Tesla-Authorized** centers could sell parts and repairs) were generally known, not whether picking Tesla at the foremarket level meant that parts for Toyotas would not work.

353. **Significant Information Costs Prevent Accurate Life-Cycle Pricing**.  The information necessary for a customer to even attempt to accurately estimate the cost of a product over its lifetime includes data on price, quality, and availability of products, service and repair costs, including estimates of breakdown frequency, nature of repairs, price of service and parts, length of downtime, and losses incurred from downtime.  Much of this information is difficult—some of it impossible—to acquire at the time of purchase, and, even if it were available, is expensive and not cost efficient to compile.

354. Defendants' conduct has made it difficult, if not impossible, for customers, web hosts, developers, and other market participants to accurately forecast—at the time they select a web content management system at the foremarket level—precisely how much time, money, and resources they would need to spend in connection with WordPress.  Defendants repeatedly promised "free" and "open" access for "everyone" forever.  As such, customers, web hosts, developers, and other market participants could not meaningfully predict that Defendants might begin demanding additional extortionate payments (the opposite of "free"), blocking access to wordpress.org, or raising costs in other ways.  WPE details above much of these unforeseen costs—including lost revenue streams, service disruptions, downtime, and expenditures required to respond to the instability, fear, and chaos that Defendants fomented—which have been borne both by WPE and by other market participants more broadly.

355. **Significant Monetary and Non-Monetary Switching Costs**.  WPE details *infra* in Section VIII(A)(4) the significant switching costs that permeate across the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets.

356. **General Market Definition Principles Do Not Undermine the Aftermarkets**.  General market-definition principles regarding cross-elasticity of demand do not undermine the WordPress aftermarkets.  That can be shown qualitatively through reasonable interchangeability of use or lack thereof between products and services, as well as other practical indicia like industry recognition.

357.    WPE details above what products and services are in each aftermarket, why other products and services are ***not*** interchangeable with those in each aftermarket, and/or how market participants in the aftermarkets recognize all of this (*i.e.*, industry recognition). *See supra*, Section VIII(A)(2)(b) (WordPress Web Hosting Services Market), Section VIII(A)(2)(c) (WordPress Custom Field Plugin Market), Section VIII(A)(2)(d) (WordPress Plugin Distribution Market).

### 3.    Relevant Geographic Market

358.    The geographic scope of the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets is global. The availability of web content management systems, web hosting services, and WordPress plugins (including the distribution for same) is not materially limited by geography. Similarly, there are no material geographic barriers to competition in these Markets.

### 4.    The Relevant Markets Feature High Entry Barriers

359.    Defendants' power in the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets is protected by high barriers to entry. These barriers to entry are further described below.

360.    **Network Effects**. A network effect is the phenomenon by which the value or utility a customer derives from a good or service depends on the number of customers of the same good or service. Network effects can be either direct or indirect. Direct network effects exist where a product or service becomes more valuable to customers (or suppliers) as there is an increase in the number of the same type of customers (or suppliers) of that product or service. By contrast, indirect network effects exist when an increase in the number of customers of a product or service attracts more suppliers, or vice versa. Both types of networks effects are present in the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets.

361.    The more that customers choose to build their websites with WordPress instead of other web content management systems, the more attractive WordPress is to other potential customers, representing significant direct network effects. Indeed, one of Defendants' services—

WordPress VIP—specifically advertises that WordPress is "the world's most popular CMS," presumably to attract additional customers to build *their* websites with WordPress as well.[136]

362.  Similarly, the more developers that build plugins for a given web content management system, the more popular that web content management system is likely to be with other developers (who are attracted by the existence of other developers and plugins, including because that signals and means that web content management system is a more developed, trusted, reliable, and worthwhile platform for which to build plugins).

363.  Indirect network effects similarly exist.  An increase in the number of customers choosing to use WordPress to power their websites attracts additional web hosts and developers that each choose to focus on WordPress specifically.  In addition, the more developers use a given channel, namely the WordPress Plugin Directory—*e.g.*, as more developers use that channel for their plugins or as the number of plugins available on that channel increases—the more popular it becomes with customers, who are attracted by the existence of developers, the plugins and functionalities developers make available for the customers' websites, and the other support that developers provide.

364.  Conversely, if few customers choose to build a website using a particular web content management system, that web content management system will be viewed as niche or exotic, and thus less attractive to customers, web hosts, and developers.

365.  **Switching Costs**.  A switching cost is a cost that a consumer of a good or service, or another market participant, incurs as a result of changing brands, suppliers, or products.  Switching costs can exist on monetary, informational, and other dimensions.  The Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets feature high switching costs that "lock-in" customers, web hosts, and developers into the WordPress ecosystem.

366.  Switching costs are high from the perspective of customers.  Once a customer has chosen to use a particular web content management system for their website, the customer is largely

---

[136]  https://wpvip.com/2022/10/13/wordpress-6-1-hot-takes/.

"locked in" to that web content management system and cannot easily switch.  To illustrate, once a user has purchased, used, and then integrated an iOS device into their business, they cannot easily then switch to an Android or other non-iOS device, as doing so would require money (buying a new device), as well as time and effort (learning how to operate a new device and porting over content to that new device, to the extent that is even possible).  The same is true for a customer that has built their website using a specific web content management system, and, in particular, WordPress.  A customer that has selected WordPress may well have expended money building a WordPress website (such as by paying a web designer, builder, or host), as well as time and effort (such as learning about the various options for building a website, comparing WordPress to other web content management systems, picking a particular web host that focuses on WordPress, and the like). Having done so, the customer will not then be willing to spend additional money, time, and effort to build a new website.

367.    Switching costs are also high from the perspective of web hosting services.  Many web hosting services have spent years substantially investing in WordPress.  Web hosting services like WPE have spent time and resources developing the technical infrastructure and know-how to operate WordPress websites for customers, and they have contributed large sums of money to WordPress, such that switching on a dime to a new web content management system is not viable.

368.    Switching costs for developers are also prohibitively high.  Once developers choose to create plugins for a given web content management system, they are largely "locked in" to that web content management system.  A developer that learns to create apps for the Apple iOS mobile operating system cannot easily switch to programming apps for the desktop version of the Microsoft Windows operating system.  The same is true for WordPress developers, many of whom learn how to create, manage, troubleshoot, and repair plugins specifically *for* WordPress websites, and then how to distribute plugins through the WordPress Plugin Directory (which Defendants by design make the primary vehicle—*i.e.*, the chokepoint—for distributing WordPress plugins).

369.    Defendants' deception has exacerbated these switching costs and other entry barriers.

1     **B.**    **Defendants' Anticompetitive Conduct Has Harmed Competition and Caused**

2            **WPE To Suffer Antitrust Injury**

3     370.    Defendants' anticompetitive conduct has harmed competition. Defendants'

4 anticompetitive conduct has also inflicted antitrust injury upon WPE.

5     371.    Defendants' false promises that WordPress would be "free" and "open" to

6 "everyone" forever acted as a welcome sign, causing customers, web hosts, developers, and other

7 market participants to select WordPress over other web content management systems that would

8 have offered better quality and/or lower costs and prices. Now that WordPress has attracted a critical

9 mass of customers, web hosts, developers, and other participants, and they are locked in (*i.e.*, the

10 door to switch to another system is closed), Defendants have exploited the power that they have

11 deceptively and unlawfully acquired, to the detriment of those competing web content management

12 systems and to other market participants more broadly.

13     372.    Defendants' anticompetitive conduct has also allowed them to raise prices and costs.

14 Indeed, Defendants' dominance has allowed them to make extortionate demands for "royalties" and

15 the like from WPE (and apparently others), with plans to make similar demands of additional market

16 participants. Apparently, Defendants have ***already*** been able to successfully extract these

17 extortionate payments from some market participants who have had no choice but to pay

18 Defendants' ransom.

19     373.    Defendants' anticompetitive conduct has also resulted in increased costs for many.

20 In the case of WPE and certain of its customers who have already suffered disruptions to their

21 respective businesses as a result of Defendants' deception, those added costs have been monetary

22 (such as WPE's and its customers' financial loss associated with their effective blocked access to

23 WordPress, as well as WPE's loss of certain customers altogether). WPE, WPE's customers, and

24 other customers, developers, and web hosts have also incurred costs in the form of time, energy, and

25 other expenses navigating the chaos and "scorched earth" environment that Defendants have

26 deliberately sowed. Given the wide reach of Defendants and WordPress, there are likely additional

27 ripple effects in terms of the increased costs that Defendants' anticompetitive conduct has created.

28 And given that Defendants' anticompetitive conduct is ongoing, all of these costs are only likely to

1   increase even more going forward, further confounding the inability to accurately predict life cycle

2   costs associated with WordPress at the time a customer, developer, or web host chooses WordPress.

3        374.    Defendants' anticompetitive conduct has resulted in reduced product and service

4   quality.  As explained above, stability is a key dimension of quality among web content management

5   systems, web hosts, plugin developers, plugin distribution providers, and other market participants.

6   Defendants—through their conduct—have eliminated that stability and maintained the opposite:

7   chaos.  Defendants have also been able to unilaterally reduce quality by impairing the operation and

8   functionality of many websites.  In addition, Defendants have also reduced quality by creating

9   potential bugs and security vulnerabilities.  But for Defendants' conduct, product and service quality

10   would increase; indeed, Defendants themselves recognized, in the real world, for example, that

11   Defendants' ███████████████████████████████████████

12        375.    Defendants' anticompetitive conduct has also allowed them to effectively block

13   WPE, customers, web hosts, developers, and others for any "reason" Defendants so whimsically

14   claim exists.  Defendants' dominance even allows them to block market participants for ***no reason***

15   ***at all***.  The exclusion of these market participants allows Defendants to fortify their power, by

16   effectively creating a moat that allows them to insulate themselves from competition and discipline.

17        376.    Defendants' anticompetitive conduct has harmed competition and harmed rival web

18   content management systems, as well as customers, web hosts, and developers alike.  But for

19   Defendants' anticompetitive conduct, customers, web hosts, and developers would have had more

20   viable options among web content management systems.  That, in turn, would have spurred

21   additional competition that would have benefited customers, web hosts, developers, and other

22   market participants, including by allowing them to be free from deception, extortionate demands,

23   and arbitrary blocking of access and disruptions to their businesses.

24        377.    In these ways, Defendants' anticompetitive conduct has allowed them to reduce

25   choice, stifle innovation, raise prices and costs, reduce quality, and prevent the free flow of

26   competition on the merits.  All of these harms constitute canonical antitrust injury.

27

28

**C.     Interstate Trade and Commerce**

378.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

379.    Defendants' anticompetitive conduct has taken place in—and negatively affected the continuous flow of interstate trade and commerce in—the United States in that, among other things:

    a.    Defendants have provided web content management systems, WordPress web hosting services, and WordPress plugin services throughout the United States;

    b.    Defendants have used instrumentalities of interstate commerce to provide web content management systems, WordPress web hosting services, WordPress plugins, and WordPress plugin distribution throughout the United States;

    c.    In furtherance of the anticompetitive scheme alleged herein, Defendants and their employees and agents have traveled between states and exchanged communications through interstate wire communications and via the United States mail; and

    d.    The anticompetitive scheme alleged herein has affected billions of dollars of commerce.  Defendants have inflicted antitrust injury by artificially excluding WPE, raising the costs of WPE and other competitors, increasing prices, reducing quality, stifling choice and competition, and causing other antitrust injuries described herein.

380.    Defendants' actions must be stopped, and the harm to WPE must be remedied.

## CLAIMS FOR RELIEF[137]

## FIRST CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations)

### (against all Defendants)

381.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

---

[137]  WPE's prior Amended Complaint asserted claims for attempted extortion (Count 4) and declaratory judgment of trademark misuse (Count 16).  The Court dismissed WPE's attempted extortion claim with prejudice; the Court also dismissed WPE's declaratory judgment of trademark misuse claim as a standalone affirmative claim, without prejudice to WPE "asserting it

382. As herein alleged, Defendants have intentionally interfered with the contracts between WPE and its customers for the provision of WPE's products and services.

383. Defendants have known of these contracts.

384. Defendants have intended to disrupt the performance of those contracts.

385. Defendants' conduct has prevented and will prevent performance, has made and will make performance more expensive or difficult, and has caused customers to terminate their contracts.

386. WPE has been and will be harmed.

387. Defendants' conduct has been and will be a substantial factor in causing WPE's harm.

**SECOND CLAIM FOR RELIEF**

**(Intentional Interference with Prospective Economic Relations)**

**(against all Defendants)**

388. WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

389. As herein alleged, Defendants have intentionally interfered with prospective economic relationships between WPE and its past and current hosting and plugin customers with the option to renew or create new contracts with WPE, as well as future customers. WPE has received numerous messages specifically tying decisions to leave, not renew, or not engage to the problems created by the events described herein.

390. WPE and the customers mentioned in the previous paragraph have had economic relationships that likely would have resulted in an economic benefit to WPE.

---

as an affirmative defense if appropriate later in this litigation." Dkt. 169 at 10–12. To comply with this Court's order (Dkt. 169), WPE has omitted from this Second Amended Complaint WPE's attempted extortion and declaratory judgment of trademark misuse claims and renumbered its remaining claims. However, WPE expressly maintains and preserves its attempted extortion and declaratory judgment of trademark misuse claims for appeal.

391.     Under those relationships, WPE likely would have been entitled to provide its products and services for each potential client.  In exchange, WPE would have been paid the fees it charges for such products and services.

392.     Defendants have known of these relationships and prospective relationships.

393.     Defendants have intended to disrupt those relationships and prospective relationships.

394.     Defendants have engaged in wrongful conduct, including, but not limited to, their violations of Section 17200 of the California Business and Professions code and their wrongful and ongoing attempts to extort WPE.

395.     Defendants' conduct has disrupted and will disrupt those relationships.

396.     WPE has been and will be harmed.

397.     Defendants' wrongful conduct has been and will be a substantial factor in causing WPE's harm.

**THIRD CLAIM FOR RELIEF**

**(Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(7))**

**(against all Defendants)**

398.     WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

399.     As alleged herein, WPE operates a WordPress computer hosting service that accesses wordpress.org systems.   These computers include "protected computers" used in or affecting interstate or foreign commerce or communication, such as through the Internet, and are designed to be accessed, and are accessed, by users around the world.

400.     Through the acts set forth herein, Defendants made threats to cause, and actually caused, "damage" to "protected computers" as those terms are used in 18 U.S.C. § 1030, including through Defendants' acts to interfere with the normal operation of WPE's computers, by blocking and interfering with access to wordpress.org's systems, by impairing the availability of data and information needed for the normal operation of WPE's computers, and by forcibly overwriting millions of instances of the ACF plugin with the SCF plugin.

401.   As alleged herein, Defendants threatened WPE with "war" if it did not agree to pay a significant percentage of its gross revenues to Automattic.  These threats were communicated through text messages, calls, emails, and other communications using the Internet.  For example, on September 19-20, 2024, Mullenweg sent a message to WPE that threatened "banning WPE" from the WP community and sent another message that threatened that Defendants would proceed with "the scorched earth nuclear approach to WPE."  Dkt. 21.  Mullenweg sent these threats just hours before speaking at a WordCamp conference in front of the entire WordPress community; the threats to ban WPE from the community and from the resources on wordpress.org were made through the wrongful use of fear and through an abuse of Mullenweg's authority as the co-founder of WordPress and the CEO of Automattic.

402.   A few days later, Defendants carried out their threats by blocking WPE from the WordPress community and all resources on wordpress.org.  As described above, on September 25, 2024, Mullenweg wrote an article on wordpress.org, stating "WP Engine is banned from WordPress.org."  In the same post, Mullenweg wrote that "pending their legal claims and litigation against WordPress.org, WP Engine no longer has free access to WordPress.org's resources."  The act of banning WPE from wordpress.org was the culmination of Defendants' threats to cause damage to WPE's computers as conveyed in their September messages to WPE.

403.   As alleged above, on October 5, 2024, Mullenweg continued with his extortionate threats by posting publicly and asking the WordPress community "what are the best alternative to Advanced Custom Fields @wp_acf for people who want to switch away?"  He continued, "I suspect there are going to be millions of sites moving away from it in the coming weeks."  When a commenter posted that it was "distasteful and shameless to criticize" ACF and WPE, Mullenweg responded "I guess we'll see how WordPress does without them," and "I guess you'll have to wait to see why people might not trust ACF as much going forward."  Dkt. 21.  These messages constituted continued, ongoing threats to cause damage to WPE's and its users' computers, including damage to the ACF plugins on WPE's and its users' computers, and were made through the wrongful use of fear and through an abuse of Mullenweg's authority as the co-founder of WordPress and the CEO of Automattic.

404.    A few days later, on October 12, 2024, Defendants carried out their threats and hijacked WPE's ACF plugin, taking over WPE's plugin "slug" and directory listing on wordpress.org, causing millions of instances of the plugin on WPE's and its users' computers to be overwritten with SCF.

405.    Defendants transmitted the aforementioned threats to cause damage to WPE's computers with intent to obtain money from WPE induced by Defendants' wrongful use of actual or threatened fear.  As described above, Defendants used the aforementioned threats as well as intimidation and fear to demand exorbitant sums of money (8% royalty on gross revenues) from WPE.  Defendants wrongfully threatened to destroy WPE's business, wrongfully threatened to cause (and wrongfully caused) damages to WPE's and its users' computers, wrongfully blocked WPE from all data and support resources on wordpress.org, and wrongfully hijacked WPE's plugin by commandeering the webpage and "slug" on wordpress.org that hosted it.  Defendants' ongoing threats to ban WPE and damage its ACF plugin and the actual carrying out of these threats were instituted to pressure WPE to consent to Defendants' demand for payment.

406.    Defendants knew when they sent the messages that they were not entitled to the sums of money they were demanding.  The messages were sent in an abuse of Mullenweg's authority as the co-founder of WordPress and the CEO of Automattic.

407.    After WPE refused to accede to Defendants' attempts to extort money from WPE, Defendants caused damage to WPE's computer hosting service and its access to wordpress.org's systems by impairing the integrity and availability of data, programs, systems and information therein.  Defendants knew that the WordPress open source software was specifically designed to be tightly integrated with wordpress.org and includes hundreds of hardcoded callbacks and references to resources on wordpress.org.  Dkt. 47, ¶ 10.  In addition, as described above, Defendants Mullenweg and Automattic actively encouraged and induced WPE to publish its plugins and updates to wordpress.org and actively encouraged and induced WPE and its users to pull plugin updates from wordpress.org.  Access to wordpress.org is therefore "baked into" the WordPress core code and WordPress plugins.  When Defendants wrongfully banned WPE from wordpress.org, WPE's computers running WordPress stopped functioning normally because these hardcoded references,

callbacks, and plugin updates that were intentionally designed to access wordpress.org were broken. Defendant Automattic's employees admitted that the ban was "reckless" and a "mistake."

408.   Defendants intentionally caused damage to WPE's and its users' computers by deleting millions of instances of WPE's ACF plugin and replacing it with Defendants' own SCF plugin.   The act of overwriting the ACF plugin instances was wrongful and impaired the integrity and availability of the plugin on WPE's and its users' computers.

409.   Having spent significant resources and investments to develop, offer, and service their products including the ACF plugin, WPE has a preexisting right to the security and integrity of its computer systems, its plugins, and its user base.   Defendants had no right to interfere with them.   Nor did Defendants have the right to hold WPE's plugin, as well as the data and support resources on wordpress.org, hostage in order to coerce WPE into paying exorbitant sums of money.

410.   WPE had a preexisting right to the continued normal operation of its own computers running the open source WordPress software and a preexisting right to continued access to wordpress.org, preexisting rights WPE had enjoyed since it was founded—almost 15 years prior to the wrongful interference by Defendants.   For example, WordPress is open source software governed by the GNU General Public License (GPL).   This license granted WPE, *inter alia*, "the freedom to run the program for any purpose," "the freedom to redistribute," and "the freedom to distribute copies…to others."   By intentionally banning WPE from the WordPress community and blocking WPE from all resources on wordpress.org, Defendants wrongfully interfered with these preexisting rights granted by both the GPL and by the various promises Defendants made to the WordPress community that access to wordpress.org would be free and open to all who wished to develop plugins or build businesses using the WordPress open source software.

411.   WPE also had a preexisting right to the security and integrity of the software and plugins running on its own computers.   WPE also had a preexisting right to control its own software and plugins without interference from Defendants.

412.   The impairment to the availability and integrity of data, programs, systems and information in WPE's hosting service and its plugins constituted "damage to [] protected computer[s]" under Section 1030(a)(7) of the CFAA.   Defendants' threats were not hard bargaining

or in furtherance of any legitimate business negotiations.  Indeed, Mullenweg admitted that the demand for 8% of WPE's revenue as purported license royalty was based on WPE's income, and completely untethered to value of the WordPress or WooCommerce trademarks or Defendants' actual cost or input.

413.    As described above, the purported trademark license that Defendants demanded WPE sign under threat of a nuclear war was worthless.  As revealed in documents produced by Defendants in this case, Defendants acknowledged internally that ████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████    No license is needed to make nominative fair use of a trademark.  For over a decade, many companies in the WordPress industry have frequently utilized the Challenged Terms, including in conjunction with other words and phrases like "managed" or "hosted," to identify and refer to the class of WordPress-focused products and services they offer and to convey an immediate idea of the quality, characteristics, features, functions, purposes or uses of those services.  Such services encompass a comprehensive suite of WordPress-related offerings that typically include publishing websites, providing automatic updates, maintaining a robust security infrastructure, monitoring and optimizing site performance and site speed, managing website content, offering developer tools, providing expert support, and more.  Below are just a few examples of such uses in the industry:








414.    WPE's nominative fair use of the Challenged Terms is permissible without a license. WPE's WordPress-hosting services cannot be identified without use of the Challenged Terms.  WPE only uses the Challenged Terms as needed for such identification.  WPE does not use the Challenged Terms to imply Defendants sponsor, endorse, or are otherwise connected to WPE.

415.    Independently, no license is needed where laches also bars any viable enforcement claim by Defendants against WPE for its use of the Challenged Terms given WPE's years-long use, with no legal action instituted by Defendants.

416.    Defendants' threats to cause damage to these computer systems, and actual damage thereto, were made with the intent to extort money from WPE, and transmitted in interstate or foreign commerce.  The threats to damage protected computers as well as the actual damage to WPE's and its users' protected computers was caused to facilitate the extortion.

417.    Because of Defendants' actions, WPE was and continues to be irreparably harmed and its damages, incurred over a period of less than one year, exceed $5,000.

418.    WPE was proximately harmed by the impairment of the integrity or availability of data, programs, systems, and information that was caused by Defendants' actions.  As described above, WPE's computers running the WordPress core software stopped operating normally after Defendants banned WPE from wordpress.org.  WPE's computers were no longer able to update any plugins, threatening the stability and security of its computers and causing reputational and actual harm to WPE's software and systems.

419.    Defendants' hijacking of the ACF plugin on WPE's users' computers caused WPE proximate harm because it impaired the utility, availability, and integrity of WPE's ACF plugin, and prevented WPE from making security updates to it.  In documents produced by Defendants in this litigation, Defendants admitted ██████████████████████████████████████ ████████████████████ Defendants further admitted that ████████████████████████ █████████████████ meaning that Defendants' wrongful actions also ██████████████████████████

420.    As described above, WPE further incurred lost revenue as well as costs to respond to Defendants' extortionate threats and the actual damage to WPE's and its customers' computers. Many customers left WPE as a result of the interruption of its service caused by Defendants.

421.    Due to Defendants' hijacking of WPE's ACF plugin, WPE lost millions of ACF users.  Defendants' misconduct also usurped WPE's goodwill and brand recognition in its ACF plugin.

422.    WPE was forced to expend significant resources to investigate the damages done to its and its customer's computers and develop workarounds to service WPE's customers and update its plugins.  Overtime for WPE support professionals increased significantly to help existing customers to address the interruption of normal service and operation of WPE's plugins.

423.    All upgrade paths to the paid version of the ACF plugin were removed from the SCF plugin that Defendants installed onto WPE's users' computers without their knowledge or permission, causing financial harm and degraded the user experience and functionality of the programs running on their computers.  Dkt. 19.

424.    Defendants' SCF plugin was advertised as an update to ACF and took all of ACF's installation counts and user reviews, causing reputational harm to WPE.  Dkt. 19.

425.    WPE further suffered reputational harm and loss of goodwill because of its inability to update the ACF plugin, and to preserve the stability and security that it normally offers its customers and due to the interrupted service of its ACF plugin.

426.    Defendants' actions violate at least 18 U.S.C. § 1030(a)(7).

427.    WPE's remedy at law is not by itself sufficient to compensate WPE for all the irreparable injuries inflicted and threatened by Defendants.  WPE is therefore entitled to a temporary restraining order, a preliminary injunction, and a permanent injunction to prohibit Defendants from continuing their unlawful actions.

428.    In addition to equitable relief, WPE demands monetary damages, fees and costs, as allowed.

**FOURTH CLAIM FOR RELIEF**

**(Unfair Competition, Cal. Bus. Prof. Code § 17200,** *et seq.***)**

**(against all Defendants)**

429.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

430.    California's Unfair Competition Law ("UCL") prohibits any business practice that is "unlawful" or "unfair."  Cal. Bus. & Prof. Code § 17200.

431.    WPE has standing under the UCL as it has been deprived of money and/or property sufficient to qualify as injury in fact, such economic injury being the direct result of Defendants' unfair business practices described herein.

432.    UCL § 17203 provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."

433.    WPE seeks injunctive relief under § 17203 enjoining Defendants from ongoing extortive, anticompetitive and otherwise unlawful and unfair business practices.  Such conduct is an actual and imminent threat to WPE, including, but not limited to, lost business, lost goodwill, and reputational harm.  Unless Defendants are restrained by a preliminary and permanent injunction, WPE will suffer severe, irreparable harm in that it will be forced to terminate or breach contracts with its clients.  WPE is informed and believes, and on that basis alleges, that unless the Court grants injunctive relief, Defendants will continue to restrict WPE's access to the WordPress platform.

434.    Defendants' threats and attempts to extort payment, by threatening and now carrying out threats to ruin WPE's business are plainly illegal under the California Penal Code (including Section 524) and under the Computer Fraud and Abuse Act.  It is well-established that such extortion

1    is a predicate unlawful act under the UCL.  Defendants have been unambiguous regarding their

2    intent to extort WPE, have made good on their threats, and appear intent to try to ruin WPE's

3    business in short order, unless they are enjoined by this Court from doing so.

4         435.    Indeed, Defendants' attempts to exclude WPE are blatantly motivated by

5    anticompetitive animus—an attempt to use their control over the WordPress platform to ruin a

6    competitor—and axiomatically "unfair" under the UCL.  WPE has no adequate remedy at law

7    because monetary damages will not afford adequate relief for the loss of its business relationships,

8    client goodwill, and ability to continue operating.

9         436.    Defendants' unlawful and unfair business practices not only harm WPE and its

10   employees, but also threaten the entire WordPress community.  WPE thus brings this claim to

11   remedy an important right affecting the public interest and seeks to confer on the public a significant

12   benefit.  Pursuant to Code of Civil Procedure section 1021.5, WPE seeks and should be awarded, in

13   addition to all other remedies, prevailing party attorneys' fees.

**FIFTH CLAIM FOR RELIEF**

**(Promissory Estoppel)**

**(against Automattic and Mullenweg)**

17        437.    WPE repeats and realleges each and every allegation of this Complaint as if fully set

18   forth herein.

19        438.    Over the last several decades, Defendants have made clear and unambiguous

20   promises to the WordPress plugin developer community regarding the openness and accessibility

21   of the WordPress platform.  These promises have included promises of open access to both the

22   WordPress GPL code base, but also all of the resources available on wordpress.org, including the

23   plugin and theme directories, forums, message boards, and other resources.

24        439.    Even apart from these broad promises of openness, accessibility, and freedom,

25   Defendants make even more specific promises to software developers who Defendants encourage

26   to develop on the WordPress platform.  Defendants have made promises on the wordpress.org

27   website, at WordPress conferences and in speeches, on message boards and forums and elsewhere

28   that WordPress will forever be an open platform that encourages third-party developers to build

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

1  WordPress plugins and themes to enhance the functionality of WordPress. WPE's reliance on those
2  promises has been both reasonable and foreseeable.

3       440.    In reliance on these clear and unambiguous promises, WPE has built a substantial
4  business over the last decade, including substantial customer relationships, premised on the fact that
5  WordPress was and would always remain open and accessible to all. WPE has committed hundreds
6  of thousands of engineering hours and tens of millions of dollars to develop its software on the
7  WordPress platform and contributing to the WordPress community. As a result of its work, WPE
8  has built a business servicing tens of thousands of individuals and companies. WPE has been injured
9  and continues to be injured in reliance on the promises made by Defendants. WPE has been injured
10 in numerous other ways, including, but not limited to, injury to its goodwill and reputational harm,
11 as the result of Defendants' failure to abide by their promises.

12                              **SIXTH CLAIM FOR RELIEF**

13              **(Declaratory Judgment of Non-Infringement – Trademark Misuse)**

14                       **(against Automattic and WooCommerce)**

15      441.    WPE repeats and realleges each and every allegation of this Complaint as if fully set
16 forth herein.

17      442.    Automattic and WooCommerce have engaged in conduct that gives rise to a real and
18 reasonable apprehension on the part of WPE that it will face an action for injunctive relief and/or
19 damages for trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1),
20 Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and/or common law, if WPE continues its
21 activities, including maintaining its website, its advertising, promotion, and sale of goods and
22 services while making reference to the Challenged Terms. *See* <u>Exhibit A</u> ("Your unauthorized use
23 of our Client's trademarks infringes their rights …."). Indeed, since the filing of WPE's original
24 Complaint, Automattic and WooCommerce have filed trademark-related counterclaims against
25 WPE. *See* Dkt. 195.

26      443.    WPE seeks a declaration of non-infringement with respect to its use of the
27 Challenged Terms so that it can proceed with its business plans without the continuing risk of suit
28 by Automattic and WooCommerce. There is a substantial controversy between WPE (on one hand)

1    and Automattic and WooCommerce (on the other) with respect to WPE's use of its Challenged

2    Terms.  The parties have adverse legal interests of sufficient immediacy and reality to warrant the

3    issuance of a declaratory judgment.

4         444.    WPE's use of the Challenged Terms does not infringe any registered marks, or any

5    other federal, state or common law trademark rights that Automattic and WooCommerce have

6    accused WPE of infringing, including because WPE's uses of the Challenged Terms are nominative

7    uses to refer to the WordPress open source software and/or the open source WooCommerce software

8    which WPE's customers use in connection with their websites.  WPE had no intent to confuse the

9    buying public, as it uses the Challenged Terms in good faith in order to refer to the WordPress open

10   source software and/or the WooCommerce software that its customers' websites use.

11        445.    Automattic and WooCommerce may not enforce any rights in the Challenged Terms

12   on grounds of trademark misuse, as they are attempting to leverage trademark law for

13   anticompetitive purposes.  Automattic's 14 years of knowing acquiescence and inaction, and

14   WooCommerce's knowing acquiescence and inaction for more than four years, further belie that

15   they have any legitimate infringement claim.

16        446.    Automattic is not the registered owner of the marks in question, and lacks standing

17   to enforce the Challenged Terms.  For instance, the WordPress Foundation's website claims it is the

18   rightful owner of the WordPress trademark and oversees its enforcement, has represented to the IRS

19   that it is "responsible for protecting the WORDPRESS, WORDCAMP, and related trademarks,"

20   and Mullenweg has stated that the very reason that he created the WordPress Foundation was to

21   ensure that it would hold the trademarks "for the free access for the world."

22        447.    WPE's use of the Challenged Terms is protected by at least the doctrines of laches,

23   estoppel, unclean hands, implied license, acquiescence and trademark misuse, as well as fair use.

24        448.    Automattic and WooCommerce have no valid, enforceable trademark rights that

25   have been infringed by WPE.

26        449.    To resolve the legal and factual questions and afford relief from the uncertainty and

27   controversy raised by Automattic and WooCommerce's allegations of trademark infringement,

28   WPE is entitled to a declaratory judgment of its rights under 28 U.S.C. §§ 2201-2202, *i.e.*, a

declaration that the Challenged Terms do not infringe any valid trademark rights asserted by Automattic and WooCommerce (to the extent that any exist).

**SEVENTH CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Dilution)**

**(against Automattic and WooCommerce)**

450.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

451.    Automattic and WooCommerce have engaged in conduct that gives rise to a real and reasonable apprehension on the part of WPE that it will face an action for injunctive relief and/or damages for trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), if WPE continues its activities, including maintaining its website, its advertising, promotion, and sale of goods and services while making reference to the Challenged Terms.  *See* Exhibit A ("Your unauthorized use of our Client's trademarks . . . dilutes their famous and well-known marks."). Indeed, since the filing of WPE's original Complaint, Automattic and WooCommerce have filed dilution counterclaims against WPE.  *See* Dkt. 195.

452.    WPE seeks a declaration of non-dilution with respect to its use of the Challenged Terms so that it can proceed with its business plans without the continuing risk of suit by Automattic and WooCommerce.  There is a substantial controversy between WPE (on one hand) and Automattic and WooCommerce (on the other) with respect to WPE's use of the Challenged Terms.  The parties have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

453.    The registered marks, or any other federal, state or common law trademark rights Automattic and WooCommerce accuse WPE of diluting, are not "famous" under 15 U.S.C. § 1125(c)(2), including because they are not widely recognized by the general consuming public of the United States as a designation of source of the goods or services of Defendants.

454.    To the extent that any of the registered marks, or any other federal, state or common law trademark rights Automattic and WooCommerce assert, is famous, WPE's use of such a mark commenced before that mark became famous.

455.    WPE's use of the Challenged Terms is not likely to dilute by blurring or dilute by tarnishment any registered marks, or any other federal, state or common law trademark rights Automattic claims.

456.    Automattic and WooCommerce may not enforce any rights in the Challenged Terms on grounds of trademark misuse, as they are attempting to leverage trademark law for anticompetitive purposes.  Automattic's 14 years of knowing acquiescence and inaction, and WooCommerce's knowing acquiescence and inaction for more than four years, further belie that Automattic or WooCommerce has any legitimate dilution claim.

457.    Automattic lacks standing to enforce the Challenged Terms.  For instance, the WordPress Foundation's website claims it is the rightful owner of the WordPress trademark and oversees its enforcement, has represented to the IRS that it is "responsible for protecting the WORDPRESS, WORDCAMP, and related trademarks," and Mullenweg has stated that the very reason that he created the WordPress Foundation was to ensure that it would hold the trademarks "for the free access for the world."

458.    WPE's use of the Challenged Terms is protected by at least the doctrines of laches, estoppel, unclean hands, implied license, acquiescence and trademark misuse, as well as fair use.

459.    Automattic and WooCommerce have no valid, enforceable trademark rights that have been diluted by WPE.

460.    To resolve the legal and factual questions and afford relief from the uncertainty and controversy raised by Automattic and WooCommerce's allegations of trademark dilution, WPE is entitled to a declaratory judgment of its rights under 28 U.S.C. §§ 2201-2202, *i.e.*, a declaration that the Challenged Terms do not dilute any valid trademark rights asserted by Automattic (to the extent that any exist).

### EIGHTH CLAIM FOR RELIEF

### (Libel)

### (against Automattic and Mullenweg)

461.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

462.    On or about September 21, 2024, Mullenweg, on behalf of Automattic, posted the following statement on the "News" section of the publicly accessible website wordpress.org: "What WP Engine gives you is not WordPress, it's something that they've chopped up, hacked, butchered to look like WordPress, but actually they're giving you a cheap knock-off and charging you more for it" (hereinafter "Defamatory Statement 1").

463.    On or about September 25, 2024, Mullenweg, on behalf of Automattic, also posted the following statement on the "News" section of wordpress.org: "WP Engine is free to offer their hacked up, bastardized simulacra of WordPress's GPL code to their customers, and they can experience WordPress as WP Engine envisions it, with them getting all of the profits and providing all of the services" (hereinafter "Defamatory Statement 2," and together with Defamatory Statement 1, the "Defamatory Statements").

464.    By making these Defamatory Statements, Defendants clearly accused WPE of giving its customers counterfeit versions of WordPress.

465.    These Defamatory Statements were false and defamed WPE itself—not solely disparaging its products.  WPE's WordPress installations are identical to the wordpress.org ZIP file that defines WordPress, and WPE's services use the identical WordPress GPL code that everyone else does.  Thus, WPE is not engaged in misleading and deceiving customers and consumers, as Mullenweg and Automattic asserted, by delivering "something that they've chopped up, hacked, butchered to look like WordPress" but "is not WordPress."  And, contrary to Defendants' statements, WPE is not a company that deals in "cheap knock off[s]" or a "bastardized simulacra of WordPress's GPL code."

466.    Wordpress.org is the central website for the WordPress community.  It is not a blog.  As discussed above, wordpress.org houses the repository for WordPress software and plugins.  Wordpress.org is also designed to promote and secure commercial transactions in WordPress (Defendants' product) and Defendants' hosting services.  For instance, wordpress.org touts and showcases the capabilities of WordPress, offers WordPress to customers for download, and advertises Defendants' WordPress hosting services Pressable and wordpress.com.  As explained

1  above, Defendants have led the public to believe wordpress.org was owned and controlled not by

2  them but by the third-party nonprofit WordPress Foundation.

3      467.   Articles posted on the "News" section of wordpress.org are generally factual posts

4  concerning and promoting WordPress.  For instance, new releases and fixes for WordPress are

5  announced and described in articles posted on the "News" section, and their features are advertised.

6  Articles are also posted announcing and describing new versions of WordPress, new features of the

7  wordpress.org website, and changes to the wordpress.org website.  Additionally, articles are also

8  posted announcing various WordCamps, which are similarly used to promote WordPress and

9  Defendants' hosting services.

10      468.   Mullenweg and Automattic are primarily in the business of selling goods and

11  services: namely WordPress and WordPress hosting services.  And Defendants' September 21 and

12  25 articles, including the Defamatory Statements, were made for the purpose of promoting and

13  securing sales and commercial transactions in Defendants' goods and services.  Indeed, just as with

14  the rest of Defendants' "nuclear war" against WPE, the articles were designed to cause WPE's

15  customers to switch from WPE's hosting services to Defendants' hosting services.

16      469.   For instance, in the September 21 article, in addition to making Defamatory

17  Statement 1, Defendants accused WPE of not substantially giving back to the WordPress ecosystem

18  while simultaneously touting Automattic.  Defendants stated, "[WPE] do[es] about half a billion in

19  revenue on top of WordPress and contribute[s] back 40 hours a week, Automattic is a similar size

20  and contributes back 3,915 hours a week."  Defendants also compared WPE to Defendants' hosting

21  product Pressable: "we tested revisions on *all* of the recommended hosts on wordpress.org [(the

22  foremost of which is Pressable)], and *none* disabled revisions by default.  **Why is WP Engine the**

23  **only one that does?**"  Then, at the end of the article, Defendants stated: "**Remember that you, the**

24  **customer, hold the power; they are nothing without the money you give them.**  And as you vote

25  with your dollars, consider literally any other WordPress host as WP Engine is the only one we've

26  found that completely disables revisions by default."  Additionally, at the top of the webpage where

27  the article was posted, there was a link titled "Hosting," which, when clicked, leads directly to the

28  wordpress.org's page recommending Defendants' hosting products Pressable and wordpress.com.

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

470.    Similarly, in the September 25 article, in addition to making Defamatory Statement 2, Defendants stated: "If you want to experience WordPress, use any other host in the world besides WP Engine."  At the top of this webpage too there was a link titled "Hosting," which, when clicked, leads directly to the wordpress.org page recommending Defendants' hosting products Pressable and wordpress.com.

471.    The audience for Defendants' September 21 and 25 articles consisted mainly of individuals and companies that use or are contemplating using WordPress and that purchase or are contemplating purchasing hosting services for their WordPress websites.  In other words, the audience consisted of actual and potential customers of both (i) WordPress and (ii) Defendants' and WPE's WordPress hosting services.

472.    Mullenweg has publicly stated that others at Automattic review Mullenweg's public statements before he makes them.

473.    At the time Mullenweg and Automattic made Defamatory Statements 1 and 2, they knew these statements were false or at the very least entertained serious doubts as to their truth. Indeed, Mullenweg and Automattic knew that (i) WPE's WordPress installations are identical to the wordpress.org ZIP file which defines WordPress and (ii) WPE's services use the identical WordPress GPL code that everyone else does.  Mullenweg and Automattic also knew WPE is not misleading and deceiving its customers and consumers by delivering "something that [WPE] chopped up, hacked, butchered to look like WordPress" but "is not WordPress."  Further, Mullenweg and Automattic knew WPE is not a company that deals in "cheap knock off[s]" or a "bastardized simulacra of WordPress's GPL code."

474.    WPE's business includes selling a platform specifically for websites that use WordPress; WPE is a business within the WordPress community; WPE advertises itself as "[t]he most trusted platform for WordPress"; and WPE advertises its product as "[b]uilt purely for WordPress."  Thus, Defendants' statements had a tendency to injure WPE in its occupation. Similarly, they exposed WPE to contempt, ridicule, and obloquy in the WordPress community and caused it to be shunned and avoided in the same.  These statements also had natural tendency to cause special damage to WPE and constitute defamation per se.

475.    Indeed, these statements were intended to have such effects, and Defendants' posts indicate as much.  As one of the founders of the WordPress open source project, Mullenweg has a large following and audience.  Defendants understood and were aware of the impact that their statements and actions would have, and have had, on the WordPress community and WPE's customers.  Defendants' statements and actions were deliberate and calculated to have the aforementioned effects.

476.    As a proximate result of these publications, (a) WPE has suffered general damages, including reputational damage, and (b) WPE has incurred various special damages, including, but not limited to, lost customers as well as resources and expenses incurred in efforts to remedy Defendants' false statements and their effects.

## NINTH CLAIM FOR RELIEF

### (Trade Libel)

### (against Automattic and Mullenweg)

477.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

478.    On or about September 21, 2024, Mullenweg, on behalf of Automattic, posted Defamatory Statement 1 on the "News" section of the publicly accessible website wordpress.org.

479.    On or about September 25, 2024, Mullenweg, on behalf of Automattic, also posted Defamatory Statement 2 on the "News" section of wordpress.org.

480.    By making these Defamatory Statements, Defendants clearly accused WPE of giving its customers counterfeit versions of WordPress.

481.    These statements were false.  In truth, WPE's WordPress installations are identical to the wordpress.org ZIP file which defines WordPress, and WPE's services use the identical WordPress GPL code that everyone else does.  WPE's product is not "chopped up, hacked, butchered to look like WordPress."  Nor is WPE's product "a cheap knock off" or a "bastardized simulacra of WordPress's GPL code."

482.    These statements disparaged the quality of WPE's product for hosting WordPress websites and constitute defamation per se.

483.     Wordpress.org is the central website for the wordpress.org community.  It is not a blog.  As discussed, *supra*, wordpress.org houses the repository for WordPress software and plugins.  Wordpress.org is also designed to promote and secure commercial transactions in WordPress (Defendants' product) and Defendants' hosting services.  For instance, wordpress.org touts and showcases the capabilities of WordPress, offers WordPress to customers for download, and advertises Defendants' WordPress hosting services Pressable and wordpress.com.  As explained *supra*, Defendants have led the public to believe wordpress.org was owned and controlled not by them but by the third-party nonprofit WordPress Foundation.

484.     Articles posted on the "News" section of wordpress.org are generally factual posts concerning and promoting WordPress.  For instance, new releases and fixes for WordPress are announced and described in articles posted on the "News" section, and their features are advertised in the same.  Articles are also posted announcing and describing new versions of WordPress, new features of the wordpress.org website, and changes to the wordpress.org website.  Additionally, articles are also posted announcing various WordCamps, which are similarly used to promote WordPress and Defendants' hosting services.

485.     Mullenweg and Automattic are primarily in the business of selling goods and services: namely WordPress tools and WordPress hosting services.  And Defendants' September 21 and 25 articles, including the Defamatory Statements, were made for the purpose of promoting and securing sales and commercial transactions in Defendants' goods and services.  Indeed, just as with the rest of Defendants' "nuclear war" against WPE, the articles were designed to cause WPE's customers to switch from WPE's hosting services to Defendants' hosting services.

486.     For instance, in the September 21 article, in addition to making Defamatory Statement 1, Defendants accused WPE of not substantially giving back to the WordPress ecosystem while simultaneously touting Automattic.  Defendants stated, "[WPE] do[es] about half a billion in revenue on top of WordPress and contribute[s] back 40 hours a week, Automattic is a similar size and contributes back 3,915 hours a week."  Defendants also compared WPE to Defendants' hosting product Pressable: "we tested revisions on *all* of the recommended hosts on wordpress.org [(the foremost of which is Pressable)], and *none* disabled revisions by default.  **Why is WP Engine the**

**only one that does?**"  Then, at the end of the article, Defendants stated: "**Remember that you, the customer, hold the power; they are nothing without the money you give them.**  And as you vote with your dollars, consider literally any other WordPress host as WP Engine is the only one we've found that completely disables revisions by default."  Additionally, at the top of the webpage where the article was posted, there was a link titled "Hosting," which, when clicked, leads directly to wordpress.org's page recommending Defendants' hosting products Pressable and wordpress.com.

487.    Similarly, in the September 25 article, in addition to making Defamatory Statement 2, Defendants stated: "If you want to experience WordPress, use any other host in the world besides WP Engine."  At the top of the webpage where the article was posted, there again was a link titled "Hosting," which, when clicked, leads directly to the wordpress.org page recommending Defendants' hosting products Pressable and wordpress.com.

488.    The audience for Defendants' September 21 and 25 articles consisted mainly of individuals and companies that use or are contemplating using WordPress and that purchase or are contemplating purchasing hosting services for their WordPress websites.  In other words, the audience consisted of actual and potential customers of both (i) WordPress and (ii) Defendants' and WPE's WordPress hosting services.

489.    Mullenweg has publicly stated that others at Automattic review Mullenweg's public statements before he makes them.

490.    At the time Mullenweg and Automattic made Defamatory Statements 1 and 2, they knew these statements were false or at the very least entertained serious doubts as to their truth.  Indeed, Mullenweg and Automattic knew that (i) WPE's WordPress installations are identical to the wordpress.org ZIP file which defines WordPress and (ii) WPE's services use the identical WordPress GPL code that everyone else does.

491.    These statements played a material and substantial part in inducing specific existing WPE customers to stop purchasing WPE's platform for WordPress websites.  Similarly, these statements played a material and substantial part in inducing specific WPE customers that otherwise would have purchased WPE's platform not to do so.

492.     Indeed, these statements were intended to have such effects, and Defendants' posts indicate as much.  In Defendants' September 21, 2024 post, Defendants also stated "as you vote with your dollars, consider literally any other WordPress host…."  And, in Defendants' September 25, 2024 post, Defendants added that "[i]f you want to experience WordPress, use any other host in the world besides WP Engine."

493.     As a proximate result of these publications, and as set forth above, WPE has suffered various special damages, including, but not limited to, lost customers as well as resources and expenses incurred in efforts to remedy these misstatements in the public eye.

**TENTH CLAIM FOR RELIEF**

**(Slander)**

**(against Automattic and Mullenweg)**

494.     WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

495.     Mullenweg and Automattic are primarily in the business of selling goods and services: namely WordPress and WordPress hosting services.

496.     On or about September 20, 2024, Matt Mullenweg, on behalf of Automattic, gave a keynote address at the WordCamp US Convention to hundreds of attendees from the WordPress community.  The keynote address was simultaneously livestreamed to countless others in the WordPress community via YouTube.

497.     As is true with all WordCamps, the WordCamp US Convention was designed to promote WordPress.  Similarly, both Mullenweg and Automattic's presence at WordCamp US Convention was for the purpose of promoting and securing sales and/or commercial transactions in their goods and services, namely (i) WordPress and (ii) WordPress hosting services.  Indeed, Defendants purchased a "Super Admin" sponsorship for the convention for Defendants' product wordpress.com, which provides hosting services that compete with WPE.  "Super Admin" was the highest level of sponsorship, which cost $75,000 and entitled Defendants' product wordpress.com to "a significant presence in the sponsor hall, and [to] be prominently featured on the official WordCamp US website."  This sponsorship also included, among other things:

- A "Prominent, largest logo and link on official WordCamp US website"

- "Acknowledgment and thanks during opening remarks."

- "Largest logo on the 'thank you sponsors' signage in the sponsor hall."

- "Inclusion of the [sponsor's] logo in the largest size on the between-session slide at the event and on the live stream."

- A "Large Booth (approximately 30 ft by 20 ft) with prime placement in the sponsor hall for two days of conversing with attendees, recruiting, and meeting and greeting (September 19-20)."

- "Largest logo on the 'thank you sponsors' signage in the venue."

- A number of tickets, and sponsor badges so that wordpress.com employees could attend the WordCamp conference to promote wordpress.com's goods and services.

498.    Additionally, Defendants purchased an "Editor" sponsorship package for Automattic and additional sponsorship packages for their products WordPress VIP and Pressable, both of which compete with WPE by offering WordPress hosting services.  Defendants paid approximately a combined $55,000 for these sponsorships, which entitled Defendants to additional booths at the conference, signage, display of Defendants' logos on slides posted in between presentations, and substantial numbers of tickets so that Defendants' employees could attend the conference to promote their products and services.

499.    The audience for Mullenweg and Automattic's keynote address at the conference consisted mainly of individuals and companies that use or are contemplating using WordPress and that purchase or are contemplating purchasing hosting services for their WordPress websites.  In other words, the audience consisted of actual and potential customers of both (i) WordPress and (ii) Defendants' and WPE's WordPress Hosting services.

500.    In the keynote address, Mullenweg stated that WPE was one of a number of "parasitic entities" who "just want to feed off" WordPress "without giving anything back" (hereinafter "Slanderous Statement 1").  Mullenweg also stated, with respect to WPE, that it aims to "squeeze every last bit out of the business and for open source communities, it can be fatal."

501.     Similarly, in a September 26, 2024 interview titled "Matt Talks About WordPress Situation," Mullenweg, on behalf of Automattic, stated with regard to WPE: "they've built a half a billion dollar business, they've given nothing back to WordPress, they were contributing 40 hours per week.  So call that 100 grand per year.  They sponsored WordCamp for 75 grand, we allowed them to be a top sponsor, by the way, lots of people want those spots" (hereinafter "Slanderous Statement 2," and together with Slanderous Statement 1, the "Slanderous Statements").

502.     The audience for Defendants' September 26, 2024 interview also consisted mainly of individuals and companies that use or are contemplating using WordPress and that purchase or are contemplating purchasing hosting services for their WordPress websites.

503.     The statement that WPE "feed[s] off" WordPress "without giving anything back" was false.  Similarly, the statement that WPE was only contributing "40 hours per week" and "75 grand" was false.  In reality, WPE's contributions back to WordPress far exceed this: WPE has bet its entire business on WordPress and has been deeply dedicated to advancing the use and adoption of WordPress through innovation, investment, and active community involvement.  WPE has contributed tens of millions of dollars in ongoing support for the broader community through events, sponsorships, and the development of educational resources, including sponsorship of WordCamps worldwide and producing DE{CODE}; educating and empowering the WordPress community through content like the WordPress Roundup and the Building WordPress series; hosting, funding and actively maintaining multiple open source projects (*e.g.*, ACF, Genesis, WPGraphQL, faust.js) within the ecosystem used by millions of websites around the world; providing free developer tools such as Local (with more than 100,000 monthly active users) and sponsoring development of WP-CLI, a command line interface for WordPress; and producing informative webinars, podcasts, and tutorials.  Defendants did not disclose any of these facts to their audiences.

504.     By making the Slanderous Statements—*i.e.,* by stating that WPE has given nothing back to WordPress and describing WPE's contributions only as "40 hours per week" and "75 grand," without mentioning any of WPE's multi-million-dollar contributions—Defendants intended to, and did, falsely describe WPE's contributions back to WordPress.

505.    These Slanderous Statements were made for the purpose of promoting and securing sales and commercial transactions in Defendants' goods and services, namely WordPress and WordPress hosting services.  Indeed, as part of Defendants' self-proclaimed "nuclear war" against WPE, Defendants' keynote presentation, including these statements, were intended to cause WPE's customers to switch from WPE's hosting services to Defendants' hosting services.

506.    For instance, during the keynote presentation, Mullenweg, on behalf of Automattic, repeatedly compared Automattic and WPE, stating that Automattic was giving back to the WordPress ecosystem.  Defendants then told the audience that they should purchase Automattic's goods and services over WPE's by stating, "I want to have the WordPress community to go vote with your wallet.  Who are you giving your money to?  Someone who's going to nourish the ecosystem or someone who's going to frack every bit of value out of it until it withers."  Defendants also stated WPE was "taking the business away from companies" like Automattic and emphasized that "I hope that we can get every single WP Engine customer to watch this presentation.  And that when their renewal time comes up, they think about that.  And there's some really hungry other hosts.  Those things are Bluehost Cloud, Pressable [*i.e.*, Defendants' hosting product], etc., that would love to get that business."  Defendants then added, "migrating has never been easier. . . . So again, it's kind of like, one day of work to switch your site to something else.  And I would highly encourage you to think about that when your contract renewal comes up if you're currently a customer of WP Engine."

507.    Similarly, Defendants' September 26, 2024 interview statements were made for the purpose of promoting and securing sales and commercial transactions in Defendants' goods and services, namely WordPress and WordPress hosting services.  Indeed, the interview as a whole was a calculated part of Defendants' self-proclaimed "nuclear war" against WPE and, as with the rest of their "nuclear war" efforts, the statements in the interview were made for the purpose of causing WPE's customers to switch to Defendants' hosting services.

508.    For instance, in the interview, Defendants accused WPE of not giving back to the WordPress ecosystem, while simultaneously touting Automattic: "If you look at what Automattic's done, even when we've acquired apps like Pocket Cast, we open source it.  We're switching Tumblr

to WordPress. We're very, very, very pro open source. We give tons back. So my money's where my mouth is to the tune of hundreds of millions of dollars of contributions to open source over the years." Additionally, Defendants encouraged customers to leave WPE's hosting products "because again, WordPress will work better and [other hosts] give back to the community much more than WP Engine currently does." Defendants also pointed customers to Defendants' own hosting products, stating that "there's a number of hosts that we recommend on wordpress.org. So there's, you can assume all of those are very good relations." Notably, the first two hosting services recommended on wordpress.org are Defendants' hosting services wordpress.com and Pressable. And, shortly after asserting that WPE is not allowed to use the Challenged Terms, Defendants stated that wordpress.org's recommended hosting services, which include wordpress.com and Pressable, are "allowed just like Automatic is to use WordPress in a more commercial way."

509. Mullenweg has publicly stated that others at Automattic review Mullenweg's public statements before he makes them.

510. At the time Mullenweg and Automattic made the Slanderous Statements, they knew they were false or at the very least entertained serious doubts as to their truth. Mullenweg and Automattic knew about WPE's innovation, investment, and active community involvement described above.

511. Indeed, days after Mullenweg made the Slanderous Statements, Mullenweg effectively admitted they were false and that he knew they were false. On a livestreamed interview posted to YouTube on September 29, 2024, Mullenweg admitted that "everyone who uses WordPress or tells their friend about it is contributing in some ways. If you just have a WordPress site and you tell your friend, hey, I like WordPress, awesome. You just contributed." Mullenweg continued, "I will say that if you want me to give [WPE] credit, sure, I'll give them credit. So they have gotten 1.5 million websites to pay them to host WordPress. Awesome, like kudos." Additionally, Mullenweg admitted that WPE's act of "betting [its] billion dollar business entirely on WordPress" was a form of giving back and thanked WPE multiple times for doing so.

512. Furthermore, according to the "Become a WordPress Contributor" article on Mullenweg's wordpress.org website, contributions to WordPress come in many shapes and sizes

including creating and supporting themes and plugins: "The WordPress Community exists because everyone takes part in some way, by giving their time, energy, and sometimes even money, because they believe in the valuable services WordPress provides. . . . It takes a lot of time and energy to create and then support Themes and Plugins, keeping them updated as WordPress changes and bugs are found . . . . The more the WordPress Community supports the programmers, developers, testers, and challengers, the stronger and better WordPress becomes. . . . Just remember, every contribution counts, no matter what it looks like."  At the time Defendants made the Slanderous Statements, they knew that WPE created and supported themes and plugins.

513.    Mullenweg and Automattic's Slanderous Statements tended directly to injure WPE in respect of its business by (a) imputing to it a general disqualification in those respects which its occupation peculiarly requires and (b) imputing something with reference to WPE's business that has a natural tendency to harm its profits.  These Slanderous Statements constitute defamation per se.

514.    Indeed, WPE's business includes selling a platform specifically for websites that use WordPress, which is open source, and WPE advertises itself as "[t]he most trusted platform for WordPress" and its product as "[b]uilt purely for WordPress."  Defendants' statements that WPE aims to "squeeze every last bit out of the business and for open-source communities, it can be fatal," and "it's not great for consumers often when you do that" illustrate how the Slanderous Statements tended directly to injure WPE: by stating that WPE has given nothing back to WordPress and describing WPE's contributions only as "40 hours per week" and "75 grand," Defendants were telling listeners (a) that WPE is harming WordPress, which its products specifically aim to support, and (b) that WPE is also harming its customers.

515.    As a proximate result of these Slanderous Statements, WPE has suffered general damages in the form of reputational damage and incurred various special damages, including, but not limited to, lost customers as well as resources and expenses incurred in efforts to remedy these misstatements in the public eye.

**ELEVENTH CLAIM FOR RELIEF**

**(Monopolization Under Section 2 of the Sherman Act, 15 U.S.C. § 2)**

**(against Automattic and Mullenweg)**

516.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

517.    Defendants possess monopoly power in the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets.  Defendants have the power to control prices and/or exclude competition in these relevant markets and have done so with respect to WPE, constituting direct evidence of Defendants' monopoly power.  Indeed, Defendants have unilaterally set prices—*e.g.*, a demanded 8% purported royalty that Mullenweg has suggested be even further increased.  They have also excluded WPE, including by: (1) blocking WPE's ability to upload and update WPE-developed plugins to the WordPress Plugin Directory on wordpress.org; (2) blocking WPE customers from accessing wordpress.org resources from their website administrative panels; and (3) unilaterally commandeering WPE's popular ACF plugin and repurposing it as SCF.

518.    Defendants' market shares confirm their monopoly power.  Defendants' market shares are protected by high entry barriers, high switching costs, and strong network effects which make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Defendants.   All of this indirect evidence further confirms Defendants' monopoly power.

519.    Defendants have willfully acquired and maintained monopoly power in the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets by means of predatory, exclusionary, and anticompetitive conduct.  Defendants have threatened to continue such conduct unless WPE pays an at least 8%, arbitrary purported royalty.  Such conduct includes, but is not limited to:

- **Deception of the Market**.  Defendants have deceived the market regarding the very nature of WordPress.  Defendants long promised that WordPress would be "free" and "open" to "everyone" forever, and that WordPress was essentially controlled by

a nonprofit.  In reality, Defendants would begin demanding extortionate sums (contrary to their promise that WordPress would be "free") and blocking access (contrary to their promise that WordPress would be "open" to all).  As a result of Defendants' deception, customers, web hosts, and developers alike are all "locked in" to WordPress.

- **Extortionate threats to WPE and others**.  Defendants have extorted—and continued to extort—WPE.  Defendants have threatened that unless WPE pays an at least arbitrary 8% purported royalty (a price that has apparently only gone up), Defendants would go "nuclear" on WPE, which would only "go away by doing a license."  Defendants have also threatened others—including WPE's vendors—to ***not*** do business with WPE.

- **Disparaging WPE**.  Defendants have smeared WPE through a series of disparaging statements, including that WPE supposedly provides sub-par products and services and is violating Defendants' trademark rights.  Defendants' statements are clearly false and misleading, clearly material, clearly likely to induce reasonable reliance, made to market participants without knowledge of subject matter, continued for prolonged periods, and are not readily susceptible of neutralization or other offset.  Defendants' disparagements were designed to inflict, and have inflicted, harm upon WPE.

- **Interference with WPE's personnel**.  In an effort to further cement their dominance, Defendants have interfered with WPE's personnel.  As one example, Mullenweg has sought to intimidate WPE's CEO by giving her private cell phone number out publicly and threatening her.  Since this litigation began, Defendants have also begun mass soliciting WPE employees to "join[] 'the other side.'"

- **Interference with WPE's actual and potential customers**.  Defendants have also anticompetitively interfered with WPE's actual and potential customers.  For example, Defendants previously blocked certain of WPE's customers from accessing the wordpress.org portal to upload and update WPE-developed plugins and

wordpress.org servers from WPE customer administrative panels. In addition, Defendants have blocked WPE's access to wordpress.org, interfering with WPE's ability to update plugins, among other things. Defendants have also installed a prominent "checkbox," which requires users logging into wordpress.org to affirm "I am not affiliated with WP Engine in any way, financially or otherwise." All of this has caused certain of WPE's actual customers to leave WPE, while dissuading potential new customers from working with WPE. Defendants have also directly interfered with WPE's customers in other ways, such as by encouraging them to break their contracts with WPE and switch to Defendants' services (like Defendants' Pressable and WordPress.com WordPress web hosting services).

- **Interference with WPE's operations**. Defendants have also anticompetitively interfered with WPE's business operations in other ways. For example, Defendants have blocked WPE's access to wordpress.org, interfering with WPE's ability to update the plugins that it has developed and hosted on wordpress.org. In addition, Defendants have blocked or terminated WPE employees' wordpress.org accounts and blocked them from resources including community Slack channels (used to coordinate contributions to the WordPress Core), the Trac system (which allows contributors to propose work to do on WordPress), and the SubVersion system (which manages code contributions). Defendants have likewise expropriated WPE's ACF popular plugin.

520.   As to Defendants' deception of the market, Defendants' statements were materially false and misleading. For example, contrary to Defendants' representations that access to WordPress, wordpress.org, and related resources would be free and open to everyone forever, Mullenweg has demanded an extortionate 8% purported royalty of WPE (the opposite of "free"), commanded similar payments from others (which Defendants are apparently receiving), and effectively blocked WPE and other market participants from accessing wordpress.org and related resources, which is the opposite of "inclusiveness" for "everyone." Defendants' representations that WordPress was "nonprofit" in nature—including that wordpress.org and its associated trademarks

and source code were "fully independent from any company"—were likewise materially false and misleading, as Mullenweg has long controlled WordPress and wordpress.org and has been commercializing them.

521.    Defendants' deception was highly material. Their statements that WordPress and related resources (including access to wordpress.org) would, for example, be free and open for everyone forever influenced customers, web hosts, developers, and other market participants to select WordPress over other web content management systems.

522.    Defendants' deception over these subjects lasted years (from at least 2010 to 2024) and thus continued for prolonged periods of time.

523.    Because neither consumers nor the market knew or could reasonably know these matters up front, Defendants' deception was not reasonably susceptible to neutralization. Market participants could not reasonably come forward, at that time, to respond to Defendants' deception by calling it out, because they did not know (or could not reasonably determine) that Defendants were, in fact, deceiving.

524.    Defendants' false statements induced reasonable reliance from the market, as Defendants specifically intended. As noted above, consumers and other market participants selected WordPress over other web content management systems because of Defendants' representations, confirming their reliance. Many of the deceptive statements were made by Mullenweg, who is deemed an authority on matters in the WordPress community, such that consumers and other market participants would rely on them. Defendants themselves have recognized that market participants have relied on Defendants' past statements: they acknowledged internally, for example, that █████ ████████████████████████████████████████████████████████████████ had come to expect they were ████████████████.

525.    Moreover, the subject of Defendants' deception is complicated, outside the general knowledge of most consumers and the market, and not subject to reasonable discovery. Consumers and other market participants could not reasonably discover that Defendants would claim to be able to enforce trademark and source code rights, including because Defendants previously claimed such rights belonged to the Foundation and the existence and scope of such rights are highly-technical

and closely guarded.  Consumers and other market participants also could not reasonably discover that Defendants would begin charging for and/or blocking access, including because Defendants' plan was secret (and not, until relatively recently, communicated publicly) and Defendants had long promised that such access would be "free" and "open" "forever" (such that discovery would somehow require consumers and other market participants to know, up front, Defendants were lying).

526.    There are no legitimate pro-competitive or business justifications for Defendants' conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

527.    Defendants' acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

528.    Defendants' conduct has had a substantial effect on interstate commerce.

529.    WPE has been, and will continue to be, injured in its property as a result of Defendants' conduct.  For example, Defendants have publicly boasted that their anticompetitive conduct has caused "***tens of thousands of customers***" to leave WPE.[138]  Mullenweg has likewise stated that as a result of Defendants' anticompetitive conduct, WPE is "worth a fraction" of what it was before, such that WPE is a "***distressed asset***."[139]

530.    WPE has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

531.    Due to Defendants' monopolization in violation of Section 2 of the Sherman Act, WPE seeks an award of treble damages or, in the alternative, disgorgement of Defendants' ill-gotten

---

[138]    https://www.youtube.com/watch?v=Fn_HzfI_sW0, at 9:17-46, 26:30-36, 29:58-30:07

[139]    https://www.youtube.com/watch?v=Fn_HzfI_sW0, at 9:17-46, 26:30-36, 29:58-30:07

Case No. 3:24-cv-06917-AMO

THIRD AMENDED COMPLAINT [REDACTED VERSION FILED PUBLICLY]

gains.  WPE also seeks appropriate equitable relief to enjoin Defendants from continuing to engage in anticompetitive behavior and to remedy the harms that Defendants' monopolization has caused.

## TWELFTH CLAIM FOR RELIEF

### (Attempted Monopolization Under Section 2 Of The Sherman Act, 15 U.S.C. § 2)

### (Against Automattic and Mullenweg)

532.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

533.    Defendants have attempted to willfully acquire and maintain monopoly power in the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets by means of predatory, exclusionary, and anticompetitive conduct.  As discussed above, such conduct includes, but is not limited to: (a) deceiving the market that WordPress would be, *e.g.*, "free" and "open" for "everyone" forever and "fully independent from any company"; (b) disparaging WPE with statements that are clearly false and misleading, clearly material, clearly likely to induce reasonable reliance, made to market participants without knowledge of the subject matter, continued for prolonged periods, and are not readily susceptible of neutralization or other offset; (c) making extortionate threats to WPE and others; (d) interfering with WPE's personnel, including by attempting to intimidate its CEO and soliciting WPE's employees to "join[] 'the other side'"; (f) interfering with WPE's actual and potential customers; and (e) interfering with WPE's operations.  Defendants have threatened to continue such conduct unless WPE pays an at least 8%, arbitrary purported royalty.

534.    Defendants have engaged in this conduct with a dangerous probability of monopolizing the Web Content Management Systems, WordPress Web Hosting Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets.  Indeed, Defendants already have the power to control prices and/or exclude competition in these relevant markets and have done so with respect to WPE and others, constituting direct evidence of Defendants' dangerous probability of obtaining monopoly power.  Indeed, Defendants have unilaterally set prices—*e.g.*, a "royalty" that Mullenweg has charged others, demanded from WPE, and suggested be even further increased.  Defendants have also excluded WPE, including by: (1) blocking WPE's ability to upload

1   and update WPE-developed plugins to the WordPress Plugin Directory on wordpress.org;

2   (2) blocking WPE customers from accessing wordpress.org resources from their website

3   administrative panels; and (3) unilaterally commandeering WPE's popular ACF plugin and

4   repurposing it as SCF.  Defendants' market shares confirm Defendants' dangerous probability of

5   obtaining monopoly power.  Defendants' market shares are protected by high entry barriers, high

6   switching costs, and strong network effects which make it unlikely, at any time in the foreseeable

7   future, for a competitor to enter or take away substantial market share from Defendants.  All of this

8   indirect evidence further confirms Defendants' monopoly power.

9        535.    Defendants have engaged in the anticompetitive conduct described herein with the

10  specific intent of monopolizing the Web Content Management Systems, WordPress Web Hosting

11  Services, WordPress Custom Field Plugin, and WordPress Plugin Distribution Markets.  Specific

12  intent to monopolize means a desire to dominate a market by improper means.  There is bountiful

13  evidence of Defendants' specific intent to obtain power through unfair and anticompetitive means:

14  Mullenweg has, for example, in his own words invoked the "nuclear option" and engaged in

15  "scorched earth" conduct intended to "take over."

16       536.    There are no legitimate pro-competitive or business justifications for Defendants'

17  conduct (including because such conduct is not intended to and does not enhance overall efficiency

18  or market efficiency), and even if there were such justifications, the anticompetitive effects of that

19  conduct would far outweigh any possible pro-competitive effects.

20       537.    Defendants' acts and practices have continued to be anticompetitive in nature and

21  tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman

22  Act, 15 U.S.C. § 2.

23       538.    Defendants' conduct has had a substantial effect on interstate commerce.

24       539.    WPE has been, and will continue to be, injured in its property as a result of

25  Defendants' conduct.  For example, Defendants have publicly boasted that their anticompetitive

26  conduct has caused "***tens of thousands of customers***" to leave WPE.  Mullenweg has likewise stated

27  that as a result of Defendants' anticompetitive conduct, WPE is "worth a fraction" of what it was

28  before, such that WPE is a "***distressed asset***."

540.    WPE has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

541.    Due to Defendants' attempted monopolization in violation of Section 2 of the Sherman Act, WPE seeks an award of treble damages or, in the alternative, disgorgement of Defendants' ill-gotten gains.  WPE also seeks appropriate equitable relief to enjoin Defendants from continuing to engage in anticompetitive behavior and to remedy the harms that Defendants' attempted monopolization has caused.

### THIRTEENTH CLAIM FOR RELIEF

### (Illegal Tying Under Section 1 Of The Sherman Act, 15 U.S.C. § 1)

### (Against Automattic and Mullenweg)

542.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

543.    Website hosting services and plugins for WordPress websites and the distribution of WordPress Plugins are each separate products.  For example, separate from their access to WordPress plugins through the WordPress Plugin Directory on wordpress.org, customers can choose to purchase website hosting services for their WordPress websites from various WordPress web hosts (some owned by Defendants, like WordPress.com, Pressable, and WordPress VIP, and others not owned by Defendants, such as WPE), and they can choose to purchase plugins from various WordPress plugin developers.

544.    As alleged in this Complaint, Defendants have induced and/or coerced various customers, web hosts, and developers into entering into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices, degrade quality, exclude competitors, and to otherwise harm competition.  Defendants have threatened to continue such conduct unless WPE pays an at least 8%, arbitrary purported royalty.

545.    For example, Defendants have conditioned access to the distribution of WordPress plugins through the WordPress Plugin Directory—the chokepoint for accessing, uploading and

downloading WordPress plugins in the WordPress Plugin Distribution Market—on customers ***not*** using WPE's WordPress web hosting services or WPE's plugins. Indeed, Defendants have blocked WPE's customers from accessing wordpress.org from the administrative panel of their own WordPress websites if they use WPE as their WordPress web host.

546. As another example, Defendants have also installed a prominent "checkbox" on wordpress.org which requires anyone—including customers, developers, and web hosts—logging into wordpress.org to affirm "I am not affiliated with WP Engine in any way, financially or otherwise." Customers, developers, and web hosts apparently cannot log into wordpress.org ***unless*** they check the box.

547. Defendants possess substantial economic power in the WordPress Plugin Distribution Market, *i.e.*, the "tying" product market. That economic power has allowed Defendants to likewise restrain competition and coerce others in the WordPress Web Hosting Services and WordPress Custom Field Plugin Market, *i.e.*, the "tied" product markets. That some of WPE's customers have already left WPE as a result of Defendants' conduct confirms Defendants' coercive power.

548. Defendants' anticompetitive coercion (*e.g.*, "negative" tying) has had anticompetitive effects.

549. There are no legitimate pro-competitive or business justifications for Defendants' conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

550. Defendants' conduct has had a substantial effect on interstate commerce, including in the tied product markets.

551. WPE has been, and will continue to be, injured in its property as a result of Defendants' conduct.

552. WPE has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation,

increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

553.    Due to Defendants' violation of Section 1 of the Sherman Act, WPE seeks an award of treble damages or, in the alternative, disgorgement of Defendants' ill-gotten gains.  WPE also seeks appropriate equitable relief to enjoin Defendants from continuing to engage in anticompetitive behavior and to remedy the harms that Defendants' attempted monopolization has caused.

**FOURTEENTH CLAIM FOR RELIEF**

**(Illegal Tying Under The California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

**(Against Automattic and Mullenweg)**

554.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

555.    Website hosting services and plugins for WordPress websites and the distribution of WordPress Plugins are each separate products.  For example, separate from their access to WordPress plugins through the WordPress Plugin Directory on wordpress.org, customers can choose to purchase website hosting services for their WordPress websites from various WordPress web hosts (some owned by Defendants, like WordPress.com, Pressable, and WordPress VIP, and others not owned by Defendants, such as WPE), or they can choose to purchase plugins from various WordPress plugin developers.

556.    As alleged in this Complaint, Defendants have induced and/or coerced various customers, web hosts, and developers into entering into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices, degrade quality, exclude competitors, and to otherwise harm competition.  Defendants have threatened to continue such conduct unless WPE pays an at least 8%, arbitrary purported royalty.

557.    For example, Defendants have conditioned access to the distribution of WordPress plugins through the WordPress Plugin Directory—the chokepoint for accessing uploading and downloading WordPress plugins in the WordPress Plugin Distribution Market—on customers not using WPE's WordPress web hosting services or WPE's plugins.  Indeed, Defendants have blocked

WPE's customers from accessing wordpress.org from the administrative panel of their own WordPress websites if they use WPE as their WordPress web host.

558.    As another example, Defendants have also installed a prominent "checkbox" on wordpress.org which requires anyone—including customers, developers, and web hosts—logging into wordpress.org to affirm "I am not affiliated with WP Engine in any way, financially or otherwise." Customers, developers, and web hosts apparently cannot log into wordpress.org *unless* they check the box.

559.    Defendants possess substantial economic power in the WordPress Plugin Distribution Market, *i.e.*, the "tying" product market. That economic power has allowed Defendants to likewise restrain competition and coerce others in the WordPress Web Hosting Services and WordPress Custom Field Plugin Market, *i.e.*, the "tied" product markets. That some of WPE's customers have already left WPE as a result of Defendants' conduct confirms Defendants' coercive power.

560.    Defendants' anticompetitive coercion (*e.g.*, "negative" tying) has had anticompetitive effects.

561.    There are no legitimate pro-competitive or business justifications for Defendants' conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

562.    Defendants' conduct has had a substantial effect on interstate commerce, including in the tied product markets.

563.    WPE has been, and will continue to be, injured in its property as a result of Defendants' conduct, and Defendants' conduct was a substantial factor in causing WPE's injuries.

564.    WPE has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

565.    It is appropriate to bring this action under the Cartwright Act because many affected individuals and entities reside in California, Defendant Automattic maintains its principal place of business in California, Mullenweg lives in California (among other places), and overt acts in furtherance of Defendants' anticompetitive scheme occurred in California.

566.    Due to Defendants' violation of the Cartwright Act, WPE seeks an award of treble damages or, in the alternative, disgorgement of Defendants' ill-gotten gains.  WPE also seeks appropriate equitable relief to enjoin Defendants from continuing to engage in anticompetitive behavior and to remedy the harms that Defendants' attempted monopolization has caused.

### FIFTEENTH CLAIM FOR RELIEF

### (Lanham Act Unfair Competition 15 U.S.C. § 1125(a)(1))

### (against Automattic and Mullenweg)

567.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

568.    WPE is the owner of two trademark applications related to ACF. One is for "ADVANCED CUSTOM FIELDS," and the other is for "ACF."  Both applications were filed on December 19, 2023.

569.    Defendants' hijacking of the ACF (Advanced Custom Fields) wordpress.org/plugins/advanced-custom-fields webpage on which WPE had made available its ACF plugin unlawfully passes off Defendants' SCF plugin as if it were merely an update WPE had made to its ACF plugin or was otherwise endorsed by, or sponsored or affiliated with, WPE's ACF. It is not.

570.    Defendants' adoption of WPE's words about ACF, their appropriation of customers' reviews about ACF, and their occupation of the exact Internet location ACF has existed at for more than a decade—all under a URL web address with WPE's ACF name—are likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of SCF by WPE.

571.    Defendants' actions and false and misleading representations constitute passing off in violation of 15 U.S.C. § 1125(a)(1).

572.    On information and belief, Defendants intentionally took these actions for the purpose of confusing consumers and appropriating WPE's goodwill.  Defendants know the true facts relating to both ACF and SCF, but  nonetheless chose to engage in these unfair and deceptive acts.  By reason of the foregoing, Defendants have intentionally and willfully violated 15 U.S.C. § 1125(a)(1).

573.    As an actual and proximate result of Defendants' willful and intentional acts, WPE has suffered harm.

574.    Defendants' wrongful acts, unless and until enjoined and restrained by order of this Court, will cause irreparable injury to WPE.  WPE has no adequate remedy at law in that monetary damages would be difficult to ascertain, and would be inadequate to compensate WPE for the harm caused by Defendants if Defendants are not enjoined.

### SIXTEENTH CLAIM FOR RELIEF

### (Lanham Act False Advertising, 15 U.S.C. § 1125(a)(1)(B))

### (against Automatic and Mullenweg)

575.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

576.    Defendants are falsely advertising the nature and qualities of their SCF (Secure Custom Fields) software.  To try to make SCF seem as legitimate as WPE's ACF plugin, Defendants misleadingly advertise and promote SCF using content that refers to *ACF*—not SCF.  Defendants display the number of *ACF* downloads (more than two million) and *ACF* customer ratings, including more than 1100 5/5 star reviews, as if they applied to SCF.  They do not.  Defendants' use of these important indicia of the reliability, credibility, and safety of *ACF* to promote *SCF* misrepresents the nature, characteristics, and qualities of SCF, which has neither more than two million downloads, nor more than a 1,100 5 star user reviews, since its deployment on October 12, 2024.

577.    Defendants' representations on the wordpress.org/plugins/advanced-custom-fields domain constitute commercial advertising or promotion in commerce throughout the United States, including in California, and their misleading representations are material to consumers.

578.    Defendants' actions and false and misleading representations constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

579.    Defendants know the true facts relating to both ACF and SCF, but nonetheless chose to engage in these unfair and deceptive acts.    By reason of the foregoing, Defendants have intentionally and willfully violated 15 U.S.C. § 1125(a)(1)(B).

580.    As an actual and proximate result of Defendants' willful and intentional acts, WPE has suffered harm.

581.    Defendants' wrongful acts, unless and until enjoined and restrained by order of this Court, will cause irreparable injury to WPE.    WPE has no adequate remedy at law in that monetary damages would be difficult to ascertain, and would be inadequate to compensate WPE for the harm caused by Defendants if Defendants are not enjoined.

## SEVENTEENTH CLAIM FOR RELIEF

### (Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5))

### (against Automattic and Mullenweg)

582.    WPE repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

583.    As alleged herein, WPE operates a WordPress computer hosting and management service.    The computers behind WPE's service and WPE's customers' systems include "protected computers" used in or affecting interstate or foreign commerce or communication, such as through the Internet, and are designed to be accessed, and are accessed, by users around the world.

584.    Through covertly installing their SCF plugin onto the systems of WPE's customers to replace the ACF plugin, Defendants intentionally accessed and continue to access "protected computers" behind the systems of WPE's customers, without authorization of WPE and WPE's customers, and knowingly caused the transmission of a program, information, code and commands onto such "protected computers," resulting in and recklessly causing damage to these "protected computers" and WPE.

585.    Because of Defendants' actions, WPE was and continues to be irreparably harmed and its damages, incurred over a period of less than one year, exceed $5,000.

586.     Defendants' actions violate at least 18 U.S.C. § 1030(a)(5).

587.     WPE's remedy at law is not by itself sufficient to compensate WPE for all the irreparable injuries inflicted and threatened by Defendants.  WPE is therefore entitled to a temporary restraining order, a preliminary injunction, and a permanent injunction to prohibit Defendants from continuing their unlawful actions.

588.     In addition to equitable relief, WPE demands monetary damages, fees and costs, as allowed.

### EIGHTEENTH CLAIM FOR RELIEF

### (Unjust Enrichment)

### (against Automattic and Mullenweg)

589.     WPE repeats and realleges each and every allegation of this Complaint as though fully set forth herein.

590.     Under California common law, the elements of unjust enrichment are 1) the receipt of a benefit and 2) unjust retention of the benefit at the expense of another.

591.     WPE's contributions to WordPress have benefited Defendants, and Defendants have unjustly retained those benefits because they were induced by clear and unambiguous promises to the WordPress plugin developer community that the platform would remain free, open and accessible, and that WordPress will forever be an open platform that encourages third-party developers to build WordPress plugins and themes to enhance the functionality of WordPress.  WPE reasonably relied on these promises.

592.     Defendants further unjustly retained the value of the benefits WPE has conferred by wrongfully co-opting software developed and maintained by WPE, falsely conveying to users that it was developed by wordpress.org, banning WPE from using resources behind wordpress.org, and pressuring WPE's customers, partners, vendors, employees, and users to cut their ties with WPE.

593.     As a direct and proximate result of Defendants' misconduct, WPE has suffered business, economic, and reputational harm.  No adequate remedy at law exists.  WPE is entitled to restitution, disgorgement, and/or the imposition of a constructive trust, to recover an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, WPE prays for judgment as follows:

1.   A judgment in favor of Plaintiff that Defendants have intentionally interfered with the contractual relations of Plaintiff;

2.   A judgment in favor of Plaintiff that Defendants have intentionally interfered with the prospective economic relations of Plaintiff;

3.   A judgment in favor of Plaintiff that Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*.;

4.   A judgment in favor of Plaintiff that Defendants Automattic and Mullenweg are estopped under the doctrine of promissory estoppel;

5.   A judgment declaring that Plaintiff does not infringe or dilute any enforceable, valid trademark rights owned by Defendants Automattic and WooCommerce;

6.   A judgment declaring that Defendants Automattic and WooCommerce may not enforce any purported trademark rights on grounds of trademark misuse;

7.   A judgment in favor of Plaintiff that Defendants Automattic and Mullenweg have libeled and/or trade libeled Plaintiff;

8.   A judgment in favor of Plaintiff that Defendants Automattic and Mullenweg have slandered Plaintiff;

9.   A judgment in favor of Plaintiff that Defendants Automattic and Mullenweg have been unjustly enriched;

10.  A judgment in favor of Plaintiff that Defendants Automattic and Mullenweg have violated the Sherman Act, 15 U.S.C. §§ 1 & 2;

11.  A judgment in favor of Plaintiff that Defendants Automattic and Mullenweg have violated Cal. Bus. Prof. Code § 16700, *et seq.*;

12.  A judgment in favor of Plaintiff that Defendants Automattic and Mullenweg have violated the Lanham Act, 15 U.S.C. § 1125 *et seq*;

13.  A judgment in favor of Plaintiff that Defendants have violated Cal. Bus. Prof. Code § 17200, *et seq.*;

14.   A finding that Plaintiff has remedied an important right affecting the public interest and is entitled to attorney fees under Cal. Civ. Proc. Code § 1021.5;

15.   A finding that this case is "exceptional" within the meaning of 15 U.S.C. § 1117 and a corresponding award of attorneys' fees in Plaintiff's favor;

16.   Compensatory damages in an amount to be proven at trial (and which are subject to trebling);

17.   Restitution, disgorgement, and/or the imposition of a constructive trust in an amount to be proven at trial;

18.   Exemplary and punitive damages in an amount to be proven at trial;

19.   An award of Plaintiff's fees and costs in this action;

20.   Pre-and post-judgment interest, as available under law;

21.   Injunctive relief; and

22.   Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, WPE hereby demands a jury trial on all issues so triable.

DATED:  December 2, 2025               QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP


By _____
   Rachel Herrick Kassabian
   *Attorneys for Plaintiff and Counterdefendant*
   *WPEngine, Inc.*