QUINN EMANUEL URQUHART & SULLIVAN LLP
Rachel Herrick Kassabian (SBN 191060)
  rachelkassabian@quinnemanuel.com
Yury Kapgan (SBN 218366)
  yurykapgan@quinnemanuel.com
Margret M. Caruso (SBN 243473)
  margretcaruso@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael E. Williams (SBN 181299)
  michaelwilliams@quinnemanuel.com
Kevin Y. Teruya (SBN 235916)
  kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Brian Mack (SBN 275086)
  brianmack@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6400
Facsimile: (415) 875-6700

*Attorneys for Plaintiff WPEngine, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| WPENGINE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>AUTOMATTIC INC., a Delaware corporation; and MATTHEW CHARLES MULLENWEG, an individual,<br><br>Defendants.<br>_____<br>AUTOMATTIC INC., a Delaware corporation; MATTHEW CHARLES MULLENWEG, an individual; WORDPRESS FOUNDATION, a California corporation; and WOOCOMMERCE INC., a Delaware corporation,<br><br>Counterclaimants,<br><br>v.<br><br>WPENGINE, INC., a Delaware corporation,<br><br>Counterdefendant. | Case No. 3:24-cv-06917-AMO<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CORRECTED SECOND AMENDED COMPLAINT**<br><br>Hon. Araceli Martínez-Olguín<br><br>Hearing Date:    March 5, 2026<br>Hearing Time:    2:00 p.m.<br>Courtroom:    Courtroom 10<br><br>**REDACTED VERSION FILED PUBLICLY** |

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................................1

II.   ARGUMENT ........................................................................................................1

      A.    WPE States Valid Antitrust Claims (Counts 11–14) ...................................1

            1.    WPE Plausibly Alleges Cognizable Aftermarkets .........................1

            2.    WPE Plausibly Alleges Defendants' Power In Each Market......................6

            3.    WPE Plausibly Alleges Antitrust Injury ....................................10

            4.    WPE Plausibly Alleges Defendants' Anticompetitive Conduct ................12

            5.    WPE Plausibly Alleges Defendants Committed Unlawful, Negative Tying ................................................................................17

      B.    WPE States A Valid CFAA Claim Under Section 1030(a)(7) (Count 3) ...............18

            1.    Defendants Acted With Intent To Extort And Facilitated Extortion...........18

                  (a)    WPE Alleges A Pre-Existing Right To Be Free ............................18

                  (b)    WPE Alleges Defendants Had No Right To Seek Payment For The Purported Trademark License ....................................19

            2.    WPE Plausibly Alleges The Causal Link Between Defendants' Extortion And The Damage They Threatened To Cause and Actually Caused ....................................................................................20

            3.    WPE Plausibly Alleges Damage To A Protected Computer.......................21

      C.    Defendants' *Noerr-Pennington* Defense Is Baseless ..............................22

III.  CONCLUSION ...................................................................................................25

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Ad Mgmt., Inc. v. Gen. Tel. Co. of California,*
190 F.3d 1051 (9th Cir. 1999) ........................................................................ 12

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
836 F.3d 1171 (9th Cir. 2016) ........................................................................ 17

*Alcazar v. Corp. of Cath. Archbishop of Seattle,*
598 F.3d 668 (9th Cir. 2010) ...................................................................... 19, 20

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro.*
*Publications, Inc.,*
108 F.3d 1147 (9th Cir. 1997) ............................................ 12, 13, 14, 15, 16

*Apple Inc. v. Samsung Elecs. Co.,*
2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ................................................ 11

*Arista Networks, Inc. v. Cisco Sys. Inc.,*
2018 WL 11230167 (N.D. Cal. May 21, 2018) .............................................. 13

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ........................................................................................ 11

*Bernegger v. Banks,*
2008 WL 3539777 (E.D. Wis. Aug. 12, 2008) .............................................. 20

*Bhan v. NME Hosps., Inc.,*
929 F.2d 1404 (9th Cir. 1991) .......................................................................... 2

*Blix Inc. v. Apple, Inc.,*
2021 WL 2895654 (D. Del. July 9, 2021) ...................................................... 11

*Broadcom Corp. v. Qualcomm Inc.,*
501 F.3d 297 (3d Cir. 2007) ............................................................................. 2

*Brokerage Concepts v. U.S. Healthcare, Inc.,*
140 F.3d 494 (3d Cir. 1998) ........................................................................... 18

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ........................................................................................ 11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) ........................................................................................ 11

*Cal. Spine & Neurosurgery Inst. v. Oxford Health Ins. Inc.*,
2019 WL 6171040 (N.D. Cal. Nov. 20, 2019) ................................................................... 18

*Caldera, Inc. v. Microsoft Corp.*,
87 F. Supp. 2d 1244 (D. Utah 1999) ................................................................................. 13

*Cascades Comput. Innovation LLC v. RPX Corp.*,
2013 WL 6247594 (N.D. Cal. Dec. 3, 2013) ..................................................................... 23

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ............................................................................................. 11

*Coronavirus Rep. v. Apple, Inc.*,
85 F.4th 948 ................................................................................................................. 2, 5, 6

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) .......................................................................... 7, 11, 13, 16

*Dooley v. Crab Boat Owners Ass'n*,
2004 WL 902361 (N.D. Cal. Apr. 26, 2004) ..................................................................... 16

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ............................................................................................ 12

*E.W. French & Sons, Inc. v. Gen. Portland Inc.*,
885 F.2d 1392 (9th Cir. 1989) ........................................................................................... 11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ............................................................................................... 3, 4, 5, 8

*Empress LLC v. City & Cnty. of San Francisco*,
419 F.3d 1052 (9th Cir. 2005) ........................................................................................... 24

*Emulex Corp. v. Broadcom Corp.*,
2010 WL 11595718 (C.D. Cal. June 7, 2010) ............................................................. 14, 15

*Entri, LLC v. GoDaddy.com, LLC*,
2024 WL 4468488 (E.D. Va. Oct. 10, 2024) ................................................................. 6, 17

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................................................. 2, 3, 4, 5, 6

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) ............................................................................................................. 2

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................................................... 15

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................................................ 12

*FTC v. Deere & Co.*,
    2025 WL 1638474 (N.D. Ill. June 9, 2025) ................................................... 3, 7, 8

*FTC v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020) ................................................................................ 2

*Gamble v. Kaiser Foundation Health Plan*,
    348 F. Supp. 3d 1003 (N.D. Cal. 2018) ............................................................. 23

*GCM Partners, LLC v. Hipaaline Ltd.*,
    2020 WL 6867207 (N.D. Ill. Nov. 23, 2020) ..................................................... 21

*Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*,
    421 F. Supp. 274 (N.D. Cal. 1976) .................................................................... 16

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ....................................................... 16, 25

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) ........................................................ 13, 25

*Innovative Health, LLC v. Biosense Webster, Inc.*,
    2024 WL 62948 (9th Cir. Jan. 5, 2024) ............................................................... 4

*Inplant Enviro-Sys. 2000 Atlanta*,
    2015 WL 12746702 ............................................................................................ 21

*In re Abbott Lab'ys Norvir Anti-Tr. Litig.*,
    2008 WL 8202771 (N.D. Cal. Aug. 19, 2008) ..................................................... 9

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
    703 F. Supp. 3d 862 (N.D. Ill. 2023) ................................................................... 3

*In re Ductile Iron Pipe Fittings Antitrust Litig.*,
    2013 WL 812143 (D.N.J. Mar. 5, 2013) ............................................................... 8

*Jiaxing Super Lighting Elec. Appliance Co. v. Bruggeman*,
    2022 WL 2068220 (N.D. Cal. June 8, 2022) ..................................................... 20

*Jockey Int'l, Inc. v. Burkard*,
    1975 WL 21128 (S.D. Cal. Feb. 21, 1975) ........................................................ 20

*Kickflip, Inc. v. Facebook, Inc.*,
    999 F. Supp. 2d 677 (D. Del. 2013) ................................................................... 15

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022). ......................................................... 13, 14

*Lambrix v. Tesla, Inc.*,
    737 F. Supp. 3d 822 (N.D. Cal. 2024) ......................................................... 3, 5, 6

*Levitt v. Yelp! Inc.*,
 765 F.3d 1123 (9th Cir. 2014) ............................................................. 18, 19, 20

*MLW Media LLC v. World Wrestling Ent., Inc.*,
 2023 WL 4053802 (N.D. Cal. June 15, 2023) ......................................... 9

*Novell, Inc. v. Microsoft Corp.*,
 731 F.3d 1064 (10th Cir. 2013) .......................................................... 7, 15

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
 838 F.2d 360 (9th Cir. 1988) ............................................................... 8

*Orwell Nat. Gas Co. v. Dominion Res., Inc.*,
 2009 WL 112566 (N.D. Ohio Jan. 16, 2009) ......................................... 16

*Perez v. DirecTV Group Holdings LLC*,
 2019 WL 6362471 (C.D. Cal. July 23, 2019) ......................................... 23

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
 508 U.S. 49 (1993) ........................................................................ 23

*Rebel Oil Co. v. Atl. Richfield Co.*,
 51 F.3d 1421 (9th Cir. 1995) ............................................................. 6, 9

*St Andrews Links Ltd. v. Gilfin Int'l Ltd.*,
 2019 WL 4221725 (N.D. Cal. Sept. 5, 2019) ......................................... 25

*SC Innovations, Inc. v. Uber Techs., Inc.*,
 2020 WL 2097611 (N.D. Cal. May 1, 2020) ......................................... 16

*Sewell v. Bernardin*,
 795 F.3d 337 (2d Cir. 2015) ............................................................... 22

*Shields v. World Aquatics*,
 2024 WL 4211477 (9th Cir. Sept. 17, 2024) ......................................... 2

*SkyHop Techs., Inc. v. Narra*,
 58 F.4th 1211 (11th Cir. 2023) ....................................................... 20, 21

*SmileDirectClub, LLC v. Berkely*,
 2019 WL 1091339 (C.D. Cal. Jan. 22, 2019) ......................................... 20

*Sonus Networks, Inc. v. Inventergy, Inc.*,
 2015 WL 4539814 (N.D. Cal. July 27, 2015) ......................................... 23

*Sosa v. DIRECTV, Inc.*,
 437 F.3d 923 (9th Cir. 2006) .......................................................... 20, 22

*Sullivan v. Tagliabue*,
 828 F. Supp. 114 (D. Mass. 1993) ....................................................... 7, 8

*Tate v. Pac. Gas & Elec. Co.*,
   230 F. Supp. 2d 1072 (N.D. Cal. 2002) ................................................................. 14

*Tekion Corp. v. CDK Glob., LLC*,
   2025 WL 1939870 (N.D. Cal. July 15, 2025) ...................................................... 16

*United Bhd. of Carpenters & Joiners of Am. v. Shapiro*,
   2022 WL 3597443 (W.D. Wash. Aug. 23, 2022) ................................................ 22

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................................... 13

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) .................................................................................. 8

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ............................................................................................. 15

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ................................................................................... 17

*Washington Alder LLC v. Weyerhaeuser Co.*,
   2004 WL 1068791 (D. Or. May 7, ) ..................................................................... 15

*Wit Walchi Innovation Techs., GMBH v. Westrick*,
   2012 WL 33164 (S.D. Fla. Jan. 6, 2012) ............................................................. 21

## **Rules/Statutes**

18 U.S.C. § 1030(a)(7) ............................................................................. 1, 20, 21, 22

18 U.S.C. § 1030(e)(8) ......................................................................................... 21

## **Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1752 ................................ 17

## I.    PRELIMINARY STATEMENT

While Plaintiff WPE need only *allege* its antitrust and CFAA claims to survive the instant motion, discovery has already revealed damning admissions and compelling evidence *supporting* them.  Based on Defendants' own evidence, WPE's Second Amended Complaint (Dkt. 181-2, "SAC") alleges in detail their anticompetitive and extortionate scheme and its wide-reaching effects.

In the face of these damning allegations, nothing in Defendants' latest motion (Dkt. 209, "Mot.") requires dismissal of WPE's antitrust or Section 1030(a)(7) claims.  Indeed, this same evidence, and more to come, will feature prominently in WPE's summary judgment motion and/or at trial.  As to the antitrust claims, WPE plausibly defines four markets (one of which Defendants concede is well-pled), demonstrates Defendants' power in those markets, shows harm to competition, and chronicles Defendants' anticompetitive conduct.  WPE also plausibly alleges the elements of its Section 1030(a)(7) claim, including a pre-existing right to be free from both Defendants' extortion and their theft of WPE's ACF plugin (either of which suffices), a temporal and causal link between Defendants' extortion and the harm WPE suffered, as well as damage to protected computers (from Defendants' blocking of WPE's access to wordpress.org, and their overwriting of the ACF plugin code).  Defendants' arguments regarding supposed *Noerr-Pennington* immunity are baseless because Defendants' pre-litigation, informal threats for a ransom payment are not constitutionally-protected government petitioning conduct, and even if they were, are still actionable since they fall within *Noerr-Pennington*'s sham exception and also are part of Defendants' larger anticompetitive scheme.

Defendants' Motion is a poorly-disguised effort to distract from the SAC's inculpatory evidence that Defendants have market influence and wielded it anticompetitively and extortionately. Defendants pretend this proof does not exist, dispute it, or hide behind misstatements of law that do not actually support their arguments.  All fail, and Defendants' Motion should be denied in full.

## II.    ARGUMENT

### A.    WPE States Valid Antitrust Claims (Counts 11–14)

#### 1.    WPE Plausibly Alleges Cognizable Aftermarkets

Defendants concede the WCMS foremarket is "plausibly alleged," and they only challenge the definition of the three aftermarkets.  Mot. at 3–7, 12.  Defendants' critiques are misguided.

1      **First**, Defendants' focus on market definition wrongly presupposes it is an end in itself.  But

2      the goal of antitrust analysis is to determine whether the challenged practice "is likely to be of

3      significant magnitude."  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).  One way

4      to do so is **indirectly**: "delineat[ing] a relevant market and show[ing] that the defendant plays enough

5      of a role in that market to impair competition significantly."  *Id.*  But where there is **direct evidence**

6      the defendant "ha[s] already" "influence[d] the market," market definition is unnecessary.  *Id.* at 1413

7      n.10; *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007).  This is because

8      defining a market and calculating the defendant's share in it (indirect proof) is "but a surrogate for

9      detrimental effects," so where there is direct proof of "detrimental effects, "detailed market analysis"

10     (a proxy) is not required.[1]  *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

11     Here, WPE alleged (and discovery confirms) Defendants recognized they could ████████

12     ████████  and planned to and did ████████  coercing ████████

13     ████  and ████████, raising prices and costs, decreasing quality, and

14     excluding market participants, so much so they knew ████████████

15     ████████  SAC ¶¶ 196–257.  Defendants could only engage in this conduct and

16     achieve these effects **if** they had power.  Direct evidence confirms they do, making indirect evidence

17     unnecessary.  *Shields v. World Aquatics*, 2024 WL 4211477, at *3 (9th Cir. Sept. 17, 2024) ("without

18     a viable market definition, . . . [p]laintiffs . . . raised a triable dispute . . . through direct evidence").

19     **Second**, Defendants assume WPE must meet the *Epic* factors.  Mot. at 4–5.  But *Epic* and other

20     decisions make clear that is not so where, as here, the defendant has power in the foremarket.  SAC ¶

21     341 n.134.  *Epic* explained that in *Kodak*, "the Supreme Court considered . . . whether a lack of market

22     power in the foremarket . . . categorically precludes a finding of market power in the aftermarket[.]"

23     *Epic*, 67 F.4th at 976.  The answer was no: even if the multi-brand foremarket is competitive (the

24     defendant lacks power there), that foremarket competition may not discipline the defendant in its own

25     aftermarkets, since consumers, having already selected that brand at the foremarket level, are "locked

---

[1]  *Epic Games, Inc. v. Apple, Inc.*, confirms market definition is not required in all rule-of-reason cases.  67 F.4th 946, 974 (9th Cir. 2023).  It describes language that market definition is a "threshold step in any antitrust case" from *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)—the basis for the language Defendants cite from *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948—as dicta.  *See Epic*, 67 F.4th at 974 n.6.

1   in" to the defendant's brand and cannot easily or costlessly switch to other brands.  67 F.4th at 976–

2   78; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 454–76 (1992).  *Epic* also confirms

3   the factors originate **from Kodak**: it states a "<u>Kodak</u> single-brand aftermarket requires 'high switching

4   costs,' 'high information costs,' and [a] 'substantial' ability to 'exploit' ignorant consumers," and the

5   "knowledge-based" requirement "flow[s] directly from" *Kodak*.  *Epic*, 67 F.4th at 977.

6       Requiring a *Kodak*-like analysis (*i.e.*, the *Epic* factors) where there is **no** power in the

7   foremarket—but **not** requiring such analysis where there **is** power in the foremarket—is consistent

8   with the caselaw.  In each of *Kodak* and *Epic*, for example, the foremarkets were competitive, so the

9   courts applied the factors.  *Kodak*, 504 U.S. at 465 n.10; *Epic*, 67 F.4th at 975, 977–81, 999.  But,

10  where, as here, the defendant has power in the foremarket, courts have found the *Kodak/Epic*

11  framework unnecessary.  *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 839–41 (N.D. Cal. 2024);[2] *In*

12  *re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 896–900 (N.D. Ill. 2023); *FTC v.*

13  *Deere & Co.*, 2025 WL 1638474, at *3 (N.D. Ill. June 9, 2025).  This makes sense: *Kodak* and *Epic*

14  **expand** antitrust liability, because they create exposure for defendants who act anticompetitively in

15  their own aftermarkets, even if they lack power in the foremarket.  They do not **contract** liability by

16  making it more difficult for a plaintiff to establish a claim where the defendant has power in the

17  foremarket to start with.  That would make little sense, because where a company **has** power in the

18  foremarket, consumers—"regardless of information costs, switching costs, and general awareness of

19  restrictions"—**already** lack the ability to use their selection of a brand in the foremarket to discipline

20  that company's conduct in an aftermarket, since the foremarket is necessarily **not** competitive (since

21  the company has power in it).  *Lambrix*, 737 F. Supp. 3d at 839–841.

22       **Third**, even assuming the *Epic* factors apply, WPE pleads facts that meet them.  SAC ¶¶ 341–

23  57.  By not challenging the third and fourth factors (switching costs and general market definition

24  principles), Defendants concede them.  Mot. at 5–7.  As to the other two factors, their arguments fail.

25       **<u>Lack of Knowledge</u>.**  WPE challenges three aftermarket restrictions based on Defendants'

26  reserving for themselves the abilities to: (1) charge exorbitant fees for access to wordpress.org; (2)

27

---

28  [2]   The *Lambrix* court proceeded to address the *Epic* factors "[a]rguendo."  737 F. Supp. 3d at 841.
    That does not detract from its holding the *Epic* factors "do not apply" in the first place.  *Id.* at 840.

1    capriciously block access to wordpress.org and related resources; and (3) assert ownership and control

2    over WordPress software and trademarks.  SAC ¶¶ 343–47.  Defendants argue none of these "is an

3    aftermarket restriction," which they claim must be "a mechanism by which WordPress users are

4    'locked in' to WordPress aftermarkets," *i.e.*, a "technological lock-in."  Mot. at 5–6.  They are wrong.

5          For starters, Defendants' argument confuses the mechanism of lock-in—information and

6    switching costs—with the challenged aftermarket restrictions.  In *Kodak*, for example, the challenged

7    aftermarket restriction (parts for service), is not, itself, what locked in consumers to the aftermarket;

8    rather, it was their lack of knowledge about the restriction and the costs of switching to a different

9    brand once discovered.  504 U.S. at 472–76.  WPE alleges that here. Defendants' promises of free

10   and open access were ***why*** market participants selected WordPress over other WCMS at the

11   foremarket level.  SAC ¶¶ 60, 71, 74–75.  Having picked WordPress over other WCMS and invested,

12   they are "locked in" to WordPress aftermarkets, since it is costly to now switch to a different WCMS.

13   SAC ¶¶ 365–68. Defendants may factually dispute these allegations, but that cannot sustain dismissal.

14        Defendants also assert that what must be unknown is a restriction of a "technological"

15   nature—*i.e.*, users must be unaware picking a WCMS means being limited to that WCMS's hosting

16   services, plugins, and plugin distribution services as other WCMS's "may not work."  Mot. at 3, 5–

17   6.  Not so.  *Epic* is clear the first factor requires "the ***challenged*** aftermarket restrictions" be unknown.

18   67 F.4th at 977.  If Defendants' interpretation were correct (it is not), then the first factor would not

19   be articulated in terms of the restriction that the plaintiff specifically ***challenges***.

20        Cases confirm what must be unknown is the restriction the plaintiff is challenging, not that

21   picking a brand at the foremarket level necessarily means being locked into that brand's aftermarkets.

22   In *Kodak*, it was known "Kodak parts are not compatible with other manufacturers' equipment, and

23   vice versa"—what was ***not*** "generally known" and gave rise to liability was Kodak's "restrictive parts

24   policy" of conditioning supply of parts on buyers using Kodak (not others) for service.  504 U.S. at

25   457–58, 463 n.8, 477 n.24.  In *Innovative Health, LLC v. Biosense Webster, Inc*., the factor was met

26   where a manufacturer had a "tying policy" of only providing clinical support to hospitals that also

27   bought its catheters, as that ***policy*** was unknown.  2024 WL 62948, at *1–*4 (9th Cir. Jan. 5, 2024).

28        *Epic*, *Coronavirus*, and *Lambrix* support WPE, not Defendants.  Mot. at 5–6.  In *Epic*, the

plaintiff challenged Apple's **policies** restricting iOS app distribution to Apple's App Store and requiring in-app purchases to use Apple's processor with a commission. 67 F.4th at 966.   The aftermarket failed at trial, as there was no proof the "***app-distribution and IAP restrictions***" (policies) were unknown. *Id.* at 979–80.  In *Coronavirus*, the plaintiffs tried to distribute an app in Apple's App Store, Apple "rejected" the app, and they challenged Apple's "curation and censorship of apps"; the aftermarket failed since it was known Apple has "sole discretion" to reject apps. 85 F.4th at 953, 956 (cleaned up).  In *Lambrix*, the factor was met as Tesla's *"repair restrictions"* requiring Tesla vehicles to be serviced via "Tesla-Owned" or "Tesla-Approved" centers (not self-repair or independent providers) were unknown.  737 F. Supp. 3d at 835, 842–43.  The throughline is that when selecting a brand in the foremarket, what must be unknown is the challenged practice, ***not*** that selecting that brand means lock-in to its aftermarkets for lack of interoperability with other brands (*e.g.*, Apple's services vs. Android's in *Epic/Coronavirus*, Tesla's parts vs. Rivian's in *Lambrix*).  SAC ¶ 352 n.135.

**Information Costs and Life-Cycle Pricing.**  WPE meets the second factor.  SAC ¶¶ 353–54.  Defendants argue the "hidden fees" associated with the license demand are not borne by others for "mere access" to wordpress.org or its resources (Mot. at 6–7), but that improperly disputes WPE's well-pled allegations the demand ***is*** a price increase that recipients of the demand must pay to access wordpress.org, and which others ***are*** paying.  *Id.* ¶¶ 206–227, 296, 313, 333–34.  Fee demand aside, WPE also alleges Defendants increased others' costs through loss of functionality, downtime, and instability. *Id.* ¶¶ 228–51, 297, 314, 335–36.  *Kodak*, Defendants' citation, confirms all of this is part of life-cycle pricing.  504 U.S. at 473.

Defendants' argument there are no information costs that impede estimating prices since "consumers had notice" of Defendants' "policies" fail.  Mot. at 6.  They cannot obtain dismissal by injecting ***their*** view of what was known, from one policy outside the pleadings, from one moment in time. Even their characterization states, at most, somebody can generally "ban someone and disable all their plugins" "for ***certain violations*** … including trademark infringement." That does not establish it was known Defendants were reserving the abilities to: (1) charge exorbitant fees; (2) block market participants' access to wordpress.org and related resources *in toto* (not just for plugins) at their whim, including pretextually and anticompetitively (not just for "violations"); and (3) assert ownership and

control over WordPress software and trademarks; to the contrary, market participants were shocked after learning the truth. SAC ¶¶ 77, 79, 343–354; *Lambrix*, 2024 WL 3403777, at 842–44 (factor met; practices "unexpected" and defendant's "public misstatements distort the lifecycle costs").

**Finally**, Defendants' argument that WPE "fails to allege" that demand for web hosting requires a foremarket (WCMS) purchase is misguided. Mot. at 7. That is about **web hosting** and thus does not apply to the custom field and plugin distribution aftermarkets. Defendants' own citations also state a "market **can be** an aftermarket in which demand depends entirely upon prior purchases in a foremarket." *Coronavirus*, 85 F.4th at 955; *Epic*, 67 F.4th at 976. Defendants cannot make a permissive statement into a mandatory requirement. In any event, picking a WCMS is the initial decision that then dictates available hosts, *i.e.*, demand for WordPress hosting flows from picking WordPress as a WCMS. SAC ¶¶ 260–61, 287–88, 291–92. Their argument that the "cost of WordPress software is zero" is a disputed issue (given their effective price increases and quality degradations), and also wordplay (a "free" product is still "purchased," *i.e.*, selected, over others).

### 2.    WPE Plausibly Alleges Defendants' Power In Each Market

The SAC alleges Defendants' power in each market. Defendants do not establish otherwise.[3]

**WCMS Market.**  As to indirect evidence, WordPress's market share of all websites built using a known CMS exceeds 60% and is even higher considering **W**CMS. SAC ¶ 281 & n.116. WordPress' share **is** Defendants': (1) Mullenweg co-founded WordPress, and Automattic is his company involved in its operation; (2) Mullenweg agreed he had "absolute power in the WP ecosystem" and WordPress's share was his and Automattic's; and (3) Mullenweg controls WordPress (the software) and wordpress.org (access to which is key for WordPress to function). *Id.* ¶¶ 282–85.

Defendants' attacks are baseless. Mot. at 8. Defendants' reference to open-source terms is misplaced since they **violated** those terms. SAC ¶ 410. Their conjuring of bootleg WordPress distributed "through alternative channels" is unsupported, goes beyond the pleadings, and misses the point: given Defendants' control of **WordPress software**, any site using WordPress counts towards

---

[3]  Defendants misstate the market shares required for WPE's claims via indirect evidence. Mot. at 7. For monopolization and attempted monopolization, respectively, **less than** 50% and 30% are "insufficient," such that shares **above** those thresholds can suffice. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). For tying, 30% or more in the tying product market can suffice. *Entri, LLC v. GoDaddy.com, LLC*, 2024 WL 4468488, at *7 (E.D. Va. Oct. 10, 2024).

Defendants' share, regardless of how WordPress was obtained or who ultimately hosts the site, just as any computer running Windows counts towards Microsoft's share among operating systems regardless of who owns the computer. *Id.* ¶ 286; *Deere*, 2025 WL 1638474, at *4–*5 (proper to attribute dealers' share to manufacturer as dealers performed repairs using manufacturer's software, which it controlled). At bottom, Defendants claim WPE overstates their market share, but a dispute about share "overestimation" is "fact-intensive" and "cannot be resolved on a motion to dismiss." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1070–71 (9th Cir. 2025).

WPE separately establishes Defendants' power in the WCMS Market through direct evidence. SAC ¶¶ 206–257, 275–80. Defendants' argument (Mot. at 8) that WPE alleges WordPress is available "without payment to anyone" again takes WPE's allegations out of context—WPE alleges open-source terms require that, but Defendants ***breached*** those terms. SAC ¶¶ 259, 410. Similarly, Defendants' assertion that consumers, faced with a price increase, "would" obtain WordPress elsewhere or switch to a different WCMS is unsupported speculation and disputes WPE's allegations WordPress (*i.e.*, Defendants) have not appreciably lost customers despite the conduct. SAC ¶ 256.

Next, Defendants challenge WPE's allegations that Defendants' license demand was a price increase. Mot. at 8–9. The SAC explains ***how*** the demand was a supracompetitive increase for recipients in the price of the relevant product (WordPress, the dominant WCMS). Defendants used the demand to extract payment for continued access to wordpress.org and related resources (which the WordPress software requires), Defendants recognized that was a price increase, and it is a big one given Defendants' and other WCMS' prior prices (zero). SAC ¶¶ 208, 217–22, 226–27, 276–77. Defendants' additional argument that "demands for IP licenses are non-actionable" is also wrong. Their citation, *Novell, Inc. v. Microsoft Corp.*, is a post-trial decision about whether refusing to provide software is anticompetitive conduct, ***not market power***, and it explains that even as to conduct, the legal right to refuse to deal is not absolute. 731 F.3d 1064, 1071, 1074 (10th Cir. 2013).

As to costs, Defendants' assertion "WPE does not explain how" Defendants' conduct "led to an associated increase" is false. Mot. at 9. The SAC details with ***proof*** how beyond WPE, Defendants caused service disruptions (and thus lost financial opportunities) and expenditures for others to try to mitigate what Defendants did. SAC ¶¶ 228–38, 244, 250, 278. Their reliance on *Sullivan v. Tagliabue*

is unavailing: that summary judgment decision holds there was no **antitrust injury** where only the plaintiff was hurt.  828 F. Supp. 114, 118 (D. Mass. 1993).  It says nothing about **market power** (the pertinent element), and is inapt given Defendants impacted millions, including their own customers.

Regarding quality, the SAC's allegations are **not** "conclusory."  Mot. at 9.  It details how: (1) stability, functionality, and security are key quality dimensions; (2) Defendants eroded stability by creating chaos, fear, and uncertainty; (3) Defendants impaired many websites' functionality; (4) Defendants caused bugs and security liabilities; and (5) how these quality reductions affect WordPress software (it is hardcoded to call back to wordpress.org) and are felt in the WCMS Market (they were borne by market participants using WordPress, the dominant WCMS).  SAC ¶¶ 61, 239–251, 279, 285.  Defendants' claim WPE only alleges impact to its customers and itself is false: **Defendants** stated their conduct was so far reaching it reduced quality for **their own customers**.  *Id.* ¶¶ 249–50.

Finally, Defendants argue they lack power because their market share declined over one year.[4] Mot. at 9.  A "declining market share . . . does not foreclose" power.  *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988).  Their only citation, *United States v. Syufy Enters.*, **rejects** their efforts "to focus narrowly on [] market share at a particular time," and found, after trial, share decreasing double digits over years disproved power.  903 F.2d 659, 665–66 (9th Cir. 1990). Defendants' share decreased by 2%. SAC ¶ 281. *In re Ductile Iron Pipe Fittings Antitrust Litig.*, 2013 WL 812143, at *17 (D.N.J. Mar. 5, 2013) (10% decline did not preclude power at pleading stage).

**WordPress Aftermarkets.**  Defendants first dispute indirect evidence of their power in the aftermarkets.  Mot. at 9–10.  As to hosting, based on a source that they do not even attach, Defendants fixate on Automattic's supposedly low market share, but that ignores the overwhelming indirect evidence WPE has alleged of Defendants' power, including that Defendants' goal was to force ███ ███████████████████ *i.e.*, take ████████ in its ██████████ so as to have them do the work for Automattic's profit (such that their shares should count towards Defendants').  SAC ¶¶ 202, 213–15, 218–20, 224; *Deere*, 2025 WL 1638474, at *5 (defendant had power though it "le[ft] repair

---

4  Market power can also be shown with proof of "**power** to . . . drive out competition[.]"  *Kodak*, 504 U.S. at 477.  So while a competitor actually going out of business can suffice, it is not necessary. WPE alleges Defendants had the **power** to drive out competition, damaging WPE so as to require an injunction.  SAC ¶¶ 252–53, 280, 299, 315, 339–40.  Suing before it was too late is no bar.  And by not challenging these allegations as to any of WPE's four asserted markets, Defendants concede them.

services and parts sales" to others since it "reaps massive profits" from them). As to both hosting and custom field plugins, Defendants' focus on market share ignores that direct proof makes such indirect proof unnecessary, and WPE has alleged direct proof here as to both markets. *Infra* at 9–10.

As to plugin distribution, Defendants' share is "nearly 100%," as substantially all WordPress plugins are distributed through wordpress.org (which Mullenweg owns). SAC ¶ 329. Defendants' argument WPE "confuses control over WordPress.org with the power to control prices or exclude competition" is wrong, as it addresses direct proof, but WPE alleges indirect proof (*i.e.*, near-100% share). Their citation, *MLW Media LLC v. World Wrestling Ent., Inc*., confirms either suffices and *denied* dismissal as the defendant had sufficient share (as here). 2023 WL 4053802, at *4–*5 (N.D. Cal. June 15, 2023). Their claim WPE must establish that if Defendants increased prices "other plugin distribution channels wouldn't immediately enter" is wrong. Their citation, *Rebel Oil*, is a summary judgment decision and does not require disproving hypotheticals about non-existent competitors; it states for a defendant's power to be durable, "competitors [must] lack the capacity to increase their output in the short run." 51 F.3d at 1434. That is clear here from the non-emergence of independent WordPress plugin distribution channels (which mirrors are not, as they call back to wordpress.org), particularly given the high entry barriers that WPE alleges. SAC ¶¶ 322–24, 328–29, 359–69.

Defendants' direct evidence arguments fail. Mot. at 10–11. WPE explains how Defendants' demand *is* a price increase recipients felt in each aftermarket, as through it, they charged for what *was* free: the ability to providing hosting and plugins. SAC ¶¶ 296, 311–13, 333–34. Their citation, *Novell*, is inapt, as it addresses neither market power nor what is a price increase. As to their cost increases (SAC ¶¶ 228–38, 278, 297, 312, 314, 335–36), their only response is customers switched to other hosts, "not just Automattic." That is misleading and irrelevant: (1) that customers switched to other hosts in the hosting aftermarket says nothing about custom field plugin or plugin distribution providers in the other aftermarkets; (2) as to hosting, that others besides Automattic gained share does not mean the conduct was untenable, since its upside to Automattic could be more than the downside from competitors' gains, which is demonstrated by Defendants' continued engaging in the conduct; and (3) that Defendants acted recklessly such that others incidentally benefited does not foreclose power. *In re Abbott Lab'ys Norvir Anti-Tr. Litig*., 2008 WL 8202771, at *2 (N.D. Cal. Aug. 19, 2008)

1   (abrogated on other grounds) (defendant's power "not precluded as a matter of law . . . even though

2   some existing competitors have increased [] their market share" following its "price increase").

3        Defendants' "quality" arguments also falter.  Mot. at 11.  WPE explains how Defendants

4   created chaos, bugs, and security vulnerabilities, and how these are felt in each aftermarket: (1) in all

5   markets, Defendants fomented fear and uncertainty among "millions of customers and partners" in

6   the "blast radius"; (2) in hosting, other hosts' customers use WPE's plugins so Defendants' conduct

7   vis-à-vis WPE caused those customers' sites to not function and/or be vulnerable; (3) in custom field

8   plugins, Defendants stole WPE's ACF plugin, restricted choice (forcing use of SCF, not ACF), and

9   lied; and (4) in plugin distribution, Defendants limited the universe of plugins (given their blocking

10   of WPE) and constrained providers' associations through the checkbox.  SAC ¶¶ 61, 153, 239–251,

11   298, 312, 315, 332, 338.  Contrary to Defendants' claims, all of this "degraded" the "overall offerings"

12   in each aftermarket: it cast a shadow on the WordPress community and is poor (not good) quality.

13             **3.**      **WPE Plausibly Alleges Antitrust Injury**

14        Defendants' antitrust injury arguments fail.  Mot. at 11.  They assert "WPE alleges only harm

15   to itself—not competition," pretending their conduct was only directed at and harmed WPE.  Mot. at

16   11.  Defendants ignore the SAC pleads conduct injuring others beyond WPE: (1) "other web content

17   management systems such as Drupal and Joomla" were harmed since market participants would have

18   selected them over WordPress absent Defendants' conduct (SAC ¶¶ 196, 371, 376); (2) through

19   shakedowns, Defendants targeted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (not just WPE)

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* ¶¶ 135, 202, 213–15, 218–225); (3) Defendants threatened

21   other plugin developers, who exited wordpress.org (*id.* ¶¶ 254–55, 340; (4) Defendants killed a ▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.* ¶ 238); and (5) Defendants caused "millions of

23   customers and partners," ***including their own***, to suffer cost increases, service disruptions, and quality

24   degradations by being "in the blast radius" (*id.* ¶¶ 117–18, 170–85, 189–95, 228–250).

25        Defendants boasted that their sights extended far beyond WPE to ▮▮▮▮▮▮▮▮▮▮

26   and ▮▮▮▮▮▮▮▮▮▮▮▮▮and they recognized their scheme had ramifications beyond WPE as it

27   ▮▮▮▮▮▮ the WordPress community and was a ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 200, 246, 256.  All

28   this is the opposite of Defendants' citations, where competitors or consumers stood to benefit (not

1    suffer) from the conduct.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–89 (1977)

2    (post-trial decision; no antitrust injury to plaintiff from competitor's acquisition because it "preserved

3    competition" and plaintiff's "lost income" came from increased, not decreased, competition); *Atl.*

4    *Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337–38 (1990) (summary judgment; no antitrust

5    injury from competitors' "cutting prices," because price-cutting pro-, not, anti-, competitive).

6        Next, Defendants argue there is no antitrust injury from their "exercise of their trademark

7    rights and barring of WPE from WordPress.org" since "[t]he antitrust laws do not create a federal law

8    of unfair competition," and malice by one "competitor against another" does not suffice.  Mot. at 11.

9    WPE disputes Defendants' so-called "trademark rights," and their own documents confirm their

10   purported enforcement scheme's speciousness.  SAC ¶ 208.  Their focus on the license demand and

11   blocking also ignore their other conduct: deception, disparagement, and interference.  *Id.* ¶ 196.  Even

12   as to the demand and blocking, that they are also actionable in tort does not bar an antitrust claim on

13   them.  *Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768, 783–84 (6th Cir. 2002); *CoStar*, 150

14   F.4th at 1074–75 (creating "technological barriers" impeding competitors anticompetitive); *Brooke*

15   *Grp. Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 224–25 (1993) (Defendants' citation;

16   post-trial decision, price-cutting not anticompetitive absent "below-cost pricing").

17       Defendants' argument they merely "limited WPE's ability to compete or made its work

18   harder" is a non-sequitur.  Their conduct was directed at and harmed more than just WPE, which is a

19   far cry from *Blix Inc. v. Apple, Inc.*, where the claim failed since there was no allegation beyond the

20   defendant's mucking up "a single competitor."  2021 WL 2895654, at *5 (D. Del. July 9, 2021).  Even

21   were it true WPE alleges only harm to itself (it is not), where the competitor is significant enough,

22   harm to the competitor **can** harm competition, by weakening the competitor to where the defendant

23   can act without real constraint.  *E.W. French & Sons, Inc. v. Gen. Portland Inc*., 885 F.2d 1392, 1401

24   (9th Cir. 1989) ("elimination of a single competitor may violate section 1 if it harms competition").

25       Finally, Defendants' claim WPE does not plead "reduced output" or "higher prices across the

26   market" is wrong.  Mot. at 11.  WPE details how Defendants increased prices, decreased quality, and

27   reduced choice for many.  *Supra* at 7–10. Defendants' dispute fails. *Apple Inc. v. Samsung Elecs. Co*.,

28   2011 WL 4948567, at *6 (N.D. Cal. Oct. 18, 2011) (similar harm to competition allegations sufficed).

### 4. WPE Plausibly Alleges Defendants' Anticompetitive Conduct

Defendants' anticompetitive conduct arguments each miss the mark. Mot. at 12–15.

**First**, Defendants improperly dismember their course of conduct into pieces and then argue because no piece is supposedly anticompetitive on its own, WPE's claims fail. Mot. at 11. But "it is not proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect[.]" *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012). Moreover, where the plaintiff challenges a "course of conduct," courts reject attempts to place each piece in "manufactured subcategories" and subject each to "rigid" tests. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353–56 (4th Cir. 2024).

**Second**, Defendants claim WPE does not allege Defendants' conduct "impacts any participant" in the WCMS Market (the "only" adequately-pled market), which they say is problematic because *Ad Mgmt., Inc. v. Gen. Tel. Co. of California* requires a plaintiff to have "suffered its injury in the market where competition is being restrained." Mot. at 12. But the very sentence Defendants selectively cite from *Ad Mgmt.* confirms they conflate **antitrust injury** (a different element) with **anticompetitive conduct**. 190 F.3d 1051, 1057 (9th Cir. 1999). Contrary to Defendants' argument, WPE also plausibly alleges the three WordPress aftermarkets, not just the WCMS foremarket. Section II.A.1. Moreover, as to the foremarket, the SAC alleges and explains how Defendants' deception in that market impacted hosts, developers, customers, and competing WCMS by causing hosts, developers, customers, and others to make a different choice (WordPress over other WCMS), and how Defendants' additional conduct (disparagement, random demands, blocking, and interference) caused effects that are felt in the foremarket too.[5] *E.g.*, SAC ¶¶ 275–80, 371, 519, 524.

**Finally**, even separately construed, WPE's conduct theories are each adequately pled.

**Anticompetitive statements.** Defendants lump together WPE's theories based on Defendants' deception of the market and disparaging WPE. Mot. at 12–14. They wrongly claim a six-part test, from cases like *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997), governs both theories. But courts routinely

---

[5] Defendants assert there are no WordPress aftermarkets. Mot. at 3. If that were true (it is not), then there would be no aftermarkets, just the WCMS Market (which Defendants do not contest); the conduct and its effects do not disappear, they are simply felt in the broader WCMS Market.

have **not** applied that test to a defendant's deception of the market, versus its disparaging a rival.[6] *United States v. Microsoft Corp.*, 253 F.3d 34, 76–77 (D.C. Cir. 2001) (deception of developers); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007) (deception of standard setting organization); *Arista Networks, Inc. v. Cisco Sys. Inc.*, 2018 WL 11230167, at *12–*13 (N.D. Cal. May 21, 2018) (test applied to disparagement, not "open early, closed late" scheme). Courts have also declined to apply the test to disparagement where, as here, it is one piece of a larger scheme. *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1249 (D. Utah 1999).

Even if the six-part test applied to both deception and disparagement, WPE meets it. The test's first three elements require misstatements that are: (1) clearly false; (2) clearly material; and (3) clearly likely to induce reliance. *Harcourt*, 108 F.3d at 1152. Regarding deception, Defendants made statements that were: (1) clearly false—Defendants misrepresented their control over wordpress.org and that WordPress would be free and open for everyone forever, SAC ¶¶ 2–4, 52–56, 59, 68–70, 343–49, 519–20, 533; (2) clearly material—the misstatements were key to market participants selecting WordPress over other WCMS, *id.* ¶¶ 60, 71, 74, 76, 521; and (3) clearly likely to induce reliance—Defendants intended market participants to rely on the misstatements and many did so and picked WordPress **because of** them, *id.* ¶¶ 4, 48, 56, 60, 72, 75, 439–440, 524, 533.

Regarding these deception allegations, Defendants raise (Mot. at 13) the Court's prior ruling, which found, for **promissory estoppel**, certain misstatements were definite and others were "too vague." Dkt. 169 at 24–25. But whether a statement is "clear and unambiguous" so as to infer a contract that can then be enforced through estoppel imposes a higher bar than antitrust, as Defendants' citation indicates: *Klein* confirms a false statement suffices for these antitrust elements if it is "capable of objective verification," not a "vague statement[] of optimism" or "puffing." 580 F. Supp. 3d at 794. Whether Defendants offered services that were free, open, for everyone, forever is objectively verifiable: they either did or did not. That market participants commonly interpreted these misstatements, relied on them (as Defendants conceded in their internal documents), and understood

---

6  Defendants cite (Mot. at 13) *Klein v. Facebook, Inc.*, which applied (over the plaintiffs' objection) the six-part test to a defendant's deception over its own product. 580 F. Supp. 3d 743, 785 (N.D. Cal. 2022). *Klein* pre-dates the binding *CoStar*, which cited *Microsoft* and found deception anticompetitive without reference to *Harcourt Brace* or the six-part test. *CoStar*, 150 F.4th at 1075.

1  Defendants' later revelations to contradict them show this—otherwise there would be nothing to be

2  surprised about.  SAC ¶¶ 77–83, 208, 351–52, 413, 524.  Defendants' other argument about conflating

3  rights and copyright and trademark law (Mot. at 13) is unsupported attorney say-so that, at best,

4  presents a fact dispute about how the misstatements should be construed.

5  As to disparagement, Defendants' sole argument regarding the first three elements is that

6  statements WPE "feeds off the WordPress ecosystem" and "customers who switch to a different host

7  might get faster performance" are not objective.  Mot. at 13 (cleaned up).  The "faster performance"

8  statement is but one of the disparaging statements, and the "feeds off" reference is a partial quote of

9  a misstatement WPE is "parasitic" that, along with others, the Court already found were sufficiently

10  factual to raise a dispute ***for trial*** for WPE's defamation claims.  Dkt. 169 at 19–22 (denying motion

11  to dismiss based on statements regarding "cheap knock-off," "bastardized simulacra," "parasitic

12  entities", and WPE "giv[ing] nothing back").  Defendants' citations, which address the challenged

13  statements in other cases, not the ones this Court already found well-pled, are not to the contrary.

14  *Klein*, 580 F. Supp. 3d at 795 (aspiration to "keep[] the global community safe" not objectively

15  verifiable but finding statements about specific practices were); *Emulex Corp. v. Broadcom Corp.*,

16  2010 WL 11595718, at *3–*4 (C.D. Cal. June 7, 2010) (similar; statement about "underperformance"

17  and "inability to deliver satisfactory results" not verifiable, but others actionable).

18  As to the fourth element—buyers' lack of knowledge—Defendants only challenge

19  disparagement, not deception.  Mot. at 13.  Their argument consumers can tell whether WPE's

20  products are "sub-par" falls flat, as it only addresses disparagement of WPE's ***quality***, not

21  disparagement regarding WPE's community contributions and use of trademarks.  SAC ¶¶ 102–06.

22  Even as to quality, many customers are ***not*** technical and hire WPE for that reason (*id.* ¶¶ 33–35,

23  525), and it would take time, knowhow, and money for them to try other services and then compare

24  them to WPE's to determine whether the disparagement was false.  That is the opposite of Defendants'

25  citation, *Tate v. Pac. Gas & Elec. Co.*, where the plaintiffs did not allege buyers lacked knowledge

26  regarding the subject matter, and any such allegations would be implausible as the customers were

27  "sophisticated" buyers of technology.  230 F. Supp. 2d 1072, 1075–76, 1080 (N.D. Cal. 2002).

28  The fifth element requires the deception be "continued for prolonged periods[.]"  *Harcourt*,

108 F.3d at 1152. Defendants contend WPE's theories fail because the statements "were made only in late September" which is too short to be prolonged. Mot. at 13. In fact, as to deception, Defendants' misstatements regarding free and open access date back years to 2010. *E.g.*, SAC ¶¶ 2, 52, 55, 522. As to disparagement, WPE sued in October 2024 after the nuclear war began; it need not have waited until more disparagement occurs so Defendants' "scheme succeeds" and WPE is "driven out of business." *Washington Alder LLC v. Weyerhaeuser Co.*, 2004 WL 1068791, at *2 (D. Or. May 7, ). Defendants' argument about WPE's mirror—which Defendants claimed was ineffective (SAC ¶ 323)—is about **blocking** and therefore has nothing do with the **longevity** of Defendants' **statements**.

The sixth element assesses rivals' abilities to neutralize the deceptive statements. *Harcourt*, 108 F.3d at 1152. Defendants assert the statements "concern WPE's quality and conduct" so WPE could have rebutted them "with its own speech." Mot. at 13–1. But that addresses only Defendants' disparagement of WPE, **not** their deception of the market. Moreover, the disparagement's technical nature (quality of products, community contributions, and use of trademarks), the fact that their speaker (Mullenweg) is an authority in the community, and that the disparagement worked (many customers left WPE) confirm the disparagement was not neutralizable. SAC ¶¶ 48, 108, 112, 133, 265, 503, 525. Defendants' sole citation, *Emulex*, bears no resemblance, as the plaintiff there could simply neutralize the disparagement that the plaintiff was only a "storage connectivity company" by demonstrating that it did, in fact, offer other additional products. 2010 WL 11595718 at *3, *7–*8.

**Interference with WPE's customers and operations.** Defendants recharacterize their interference with WPE's customers and operations as a permissible refusal to deal with WPE. Mot. at 14. But where the defendant's refusal is pretextual (*i.e.*, motivated by anticompetitive intent), the refusal-to-deal doctrine is inapposite. *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 685–86 (D. Del. 2013) (banning plaintiff not protected where done "to create or maintain a monopoly"). Moreover, unlike in Defendants' citations, WPE does not challenge Defendants' **mere** denial of access **to WPE**. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1067, 1074 (10th Cir. 2013) (refusal to share software with independent software vendors); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–10 (2004) (refusal to share network with rival providers); *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13 (N.D. Cal. July 20, 2010) (refusal to allow

scraping); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1150 (N.D. Cal. 2020) (scraping). Instead, WPE challenges Defendants' blocking of WPE, its employees, and its customers, commandeering WPE's ACF plugin (akin to hacking), and using the disruption Defendants fomented to then interfere with WPE's customers. SAC ¶¶ 122, 132, 156, 196. Where the defendant's conduct is meant to induce ***customers*** not to deal with the plaintiff, that is ***not*** a refusal to deal vis-à-vis the defendant and plaintiff. *CoStar*, 150 F.4th at 1072, 1075–76 ("technological barriers" to "limit the abilities of third parties" to work with counter-plaintiff anticompetitive, not proper refusal to deal); *Tekion Corp. v. CDK Glob., LLC*, 2025 WL 1939870, at *4–*5 (N.D. Cal. July 15, 2025) (similar).

    <u>**Solicitation.**</u>  Defendants wrongly assert their "soliciting" WPE's customers and personnel is "competitive." Mot. at 14–15. Their words and timing confirm this was not ordinary competition: they ramped up after declaring "nuclear war" on WPE, disabling WPE's access to wordpress.org, and stating they wanted to go "brick by brick" and turn WPE into a "distressed asset." SAC ¶¶ 132, 149. As to customers, the Court already found Defendants ***improperly*** interfered, requiring enjoinment. Dkt. 64 at 27–31, 36, 41. Defendants fomented chaos among customers and then encouraged them to break their WPE contracts; that states an antitrust claim. *Orwell Nat. Gas Co. v. Dominion Res., Inc.*, 2009 WL 112566, at *1–2 (N.D. Ohio Jan. 16, 2009) (inducing breach of plaintiff's contract anticompetitive); *SC Innovations, Inc. v. Uber Techs., Inc.*, 2020 WL 2097611, at *10–11 (N.D. Cal. May 1, 2020) (creating "delays" for plaintiff's customers to force switch to defendant anticompetitive); *compare Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp. 274, 287–88 (N.D. Cal. 1976) (Defendants' cited case; addressing only "legitimate" conduct).

    Defendants' arguments as to WPE's personnel fail. Mot. at 14–15. Their focus on predatory ***hiring*** of employees ignores their ***harassing*** WPE's CEO (SAC ¶¶ 93–97, 145–48, 519, 533), which is anticompetitive. *Dooley v. Crab Boat Owners Ass'n*, 2004 WL 902361, at *1–*2, *6, *11 (N.D. Cal. Apr. 26, 2004) (threats and torts to plaintiff's employees anticompetitive). As to hiring, their citation, a post-trial decision, involved hiring one employee and ***confirmed*** predatory hiring is shown with "predatory intent" to "harm the competition without helping the monopolist[.]" *Harcourt*, 108 F.3d at 1152–53. That is the inference that must be drawn: only after their "nuclear war" did Defendants solicit "hundreds of WPE employees" to join "the other side," SAC ¶¶ 136–38; after that,

they then laid off employees.  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109–10 (3d Cir. 2010) ("predatory hiring" of employees to harm plaintiff anticompetitive; that defendant "could not absorb some of the employees and had to let them go" showed anticompetitive intent).

### 5. WPE Plausibly Alleges Defendants Committed Unlawful, Negative Tying

WPE alleges that Defendants engaged in negative tying by conditioning access to WordPress plugin distribution (the "tying" product) on customers ***not*** using WordPress web hosting or custom field plugins (the "tied" products) from WPE. SAC ¶¶ 543–566. Defendants' contrary arguments fail.

***First***, Defendants incorrectly assert WPE does not allege the tying market (plugin distribution) or Defendants' power in that market.  Mot. at 15.  That is wrong.  *See* Sections II.A.1.–2.

***Second***, Defendants wrongly contend that WPE's tying claims fail for lack of any "agreement between Defendants and any WordPress users" to "not use WPE for hosting or plugins."  Mot. at 15. Even assuming such an explicit "agreement" were required (it is not), WPE alleges one: Defendant's "checkbox" required anyone logging into wordpress.org to use Defendants' services to affirm that they were unaffiliated with (*i.e.*, would forego) WPE and WPE's services.  SAC ¶¶ 546, 558.

Moreover, Defendants' citations recognize an ***express*** agreement is not required; an "agreement" may also be shown ***implicitly***.  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1752 (tying exists where "defendant improperly imposes conditions that explicitly ***or practically*** require buyers to take the second product if they want the first one"); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016) ("***tying conditions need not be spelled out in express contractual terms***").  WPE alleges Defendants practically coerced customers into ***not*** using WPE's web hosting or custom field plugins through: (1) effectively blocking access to wordpress.org if they used WPE's hosting; and (2) the checkbox.  SAC ¶¶ 5, 118, 153–54, 170, 230, 545–46, 557–58.  WPE further alleges this coercion was successful: many customers left WPE, causing it to lose sales it could have made.  *Id.* ¶¶ 7, 132–33, 170–82, 231, 299, 547, 559.  *See, e.g.*, *Entri, LLC v. GoDaddy.com, LLC*, 2024 WL 4468488, at *4–*8 & n.5 (E.D. Va. Oct. 10, 2024) (denying dismissal of negative tying claim; defendant used "scare tactic" to coerce customers not to use competitor's product and plaintiff then lost customers); Areeda, *Antitrust Law* ¶ 1752 (tying shown "with the practical effect of preventing *some purchases* from the defendant's rivals that might otherwise have been made").

1

**B.     WPE States A Valid CFAA Claim Under Section 1030(a)(7) (Count 3)**

2

**1.     Defendants Acted With Intent To Extort And Facilitated Extortion**

3

To plead extortion, "a litigant must demonstrate *either* that [a] he had a pre-existing right to

4

be free from the threatened harm, *or* that [b] the defendant had no right to seek payment for the service

5

offered." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133 (9th Cir. 2014).  WPE plausibly pleads both.

6

(a)     WPE Alleges A Pre-Existing Right To Be Free

7

WPE alleges a preexisting right to "the continued normal operation of its own computers

8

running the open source WordPress software" and "continued access to wordpress.org."  SAC ¶ 410.

9

Unlike in *Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998), Defendants'

10

out-of-circuit case, the General Public License ("GPL") guarantees WPE "the freedom to run

11

[WordPress] for any purpose," "the freedom to redistribute," and "the freedom to distribute

12

copies…to others."  SAC ¶ 410.  The Court, in denying Defendants' motion to dismiss the promissory

13

estoppel claim, also held Defendants' offer of "free hosting to anyone who wishes to develop a plugin

14

in our directory" on the wordpress.org website is an actionable promise.  Dkt. 169, at 24.  Following

15

this promise, Defendants continued stating "[a]ll plugins hosted here have access to … provide

16

support via a free forum."  SAC ¶ 87 n.51.  Defendants' promises of "free hosting" of plugins and

17

their obligations to provide free access under the GPL distinguish this case from *Brokerage Concepts*'

18

"very narrow" holding the plaintiffs there had no right to inclusion in a health network because no

19

Pennsylvania law or other obligation they identified required their inclusion.  *Brokerage Concepts*,

20

140 F.3d at 503.  In any event, "evidence of industry custom"—like the open source industry ones at

21

issue here—are properly assessed on a full record, not at "the pleading stage."  *Cal. Spine &*

22

*Neurosurgery Inst. v. Oxford Health Ins. Inc.,* 2019 WL 6171040, at *3 (N.D. Cal. Nov. 20, 2019).

23

Defendants' expropriation of WPE's ACF plugin further and independently establishes their

24

extortionate conduct.  Defendants do not dispute WPE's allegation that it "has a preexisting right to

25

the security and integrity of" ACF and ACF's "user base."  SAC ¶ 409.  Yet Defendants muddle this

26

issue by arguing WPE cannot claim a right to be free of "Defendants' forking of the ACF plugin on

27

Defendants' own website."  Mot. at 19.  That misses the point: WPE is not alleging that Defendants

28

simply copied the source code for ACF to develop their own independent "fork"; rather, WPE

plausibly alleges that Defendants forcibly and deceptively overwrote the ACF code on the computer systems behind WPE and its customers without their knowing consent, and usurped the download counts and user reviews for ACF. SAC ¶¶ 158–66. As the Court previously held, Defendants' claimed right to overwrite the ACF plugin for purported security reasons is belied by their attempt to "pass off the rating and reviews for the ACF plugin." Dkt. 64 at 30–31; *see also* SAC ¶¶ 162–166. WPE's allegation that ACF's purported security flaw was a disingenuous pretext must be "accept[ed] as true" and Defendants' assertion otherwise be "treat[ed] as false." *Alcazar v. Corp. of Cath. Archbishop of Seattle*, 598 F.3d 668, 671 (9th Cir. 2010) (vacated in part on other grounds).

Defendants' other argument that WPE fails to allege Defendants sought to obtain "any money or other thing of value" (Mot. at 18) apart from the trademark license payment is incorrect and misplaced. Defendants' demand for a pretextual license payment *is* an extortionate demand for "money." *See, e.g.*, SAC ¶ 412. And any contention that Defendants had a valid basis to seek payment does not justify its wrongful threat to hijack WPE's ACF plugin under *Levitt*'s disjunctive test, because "some attempts to obtain property . . . are so inherently wrongful that whether the defendant had a lawful claim to the property demanded is not relevant in determining whether extortion or attempted extortion has been proven." *Levitt*, 765 F.3d at 1131.

(b)  WPE Alleges Defendants Had No Right To Seek Payment For The Purported Trademark License

WPE has made plausible allegations of its preexisting right to be free from Defendants' threatened harm. That aside, WPE also sufficiently alleges that Defendants had no right to seek payment for their purported trademark license because the license would be worthless.

Tellingly, Defendants never moved to dismiss WPE's claims for declaratory judgment of non-infringement and non-dilution of the terms at issue, conceding that WPE has plausibly pled the lack of any valid basis for Defendants' license demand. Dkts. 36, 68, 190. WPE did not simply allege "legal conclusion," as Defendants argue. Mot. at 17. The SAC includes detailed facts about many companies' decade-long usage of the terms within the WordPress industry in manners similar to WPE's challenged use, as well as Defendants' years-long awareness, and even active approval and praise, of WPE's use of the terms. SAC ¶¶ 40–47; 413–415. These factual allegations, which must

be accepted as true, *Alcazar*, 598 F.3d at 671, plausibly establish Defendants' "license" has no objective value. In a similar context, the Eleventh Circuit held that withholding access to source code unless a CFAA plaintiff pays an exorbitant amount for purported service rendered was sufficient to plead a claim under 1030(a)(7), because whether the defendant "did not intend to cause harm or that [it] was, in fact, entitled to the $1.1 million or the 32% stake in [plaintiff]" was a factual issue to be resolved after the pleading stage. *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1225 (11th Cir. 2023).

Defendants' argument their assertion of trademark rights "establishes that they were not extorting WPE" is baseless. Mot. at 18. WPE's claim is based on Defendants' threat to damage (and actually damaging) computer systems protected by the CFAA, not their infringement threat. All their cases are inapt as none involved assertion of rights coupled with "wrongful use of force or fear." *Levitt*, 765 F.3d at 1132; *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006) (alleged threat to sue not extortionate); *SmileDirectClub, LLC v. Berkely*, 2019 WL 1091339, at *5(C.D. Cal. Jan. 22, 2019) (threat of trademark litigation not extortionate); *Jockey Int'l, Inc. v. Burkard*, 1975 WL 21128, at *10 (S.D. Cal. Feb. 21, 1975) (assertion of trademark rights not economic coercion).

### 2. WPE Plausibly Alleges The Causal Link Between Defendants' Extortion And The Damage They Threatened To Cause and Actually Caused

Subsections (A) and (C) of Section 1030(a)(7) require a defendant act "with intent to extort." Conditions of a person's mind like "intent" "may be alleged generally." *Jiaxing Super Lighting Elec. Appliance Co. v. Bruggeman,* 2022 WL 2068220, at *9 (N.D. Cal. June 8, 2022). In CFAA cases, allegations a defendant threatened to withhold access to software unless it is paid plead an extortionate threat. *SkyHop*, 58 F.4th at 1225; *cf. Bernegger v. Banks*, 2008 WL 3539777, at *2 (E.D. Wis. Aug. 12, 2008) (accepting "allegations that [statements] were made with the intent to extort" as true). Defendants made multiple threats to "ban" WPE from the WordPress community and wordpress.org, seize WPE's ACF plugin, and obliterate WPE's goodwill, and withhold from WPE access to its ACF unless WPE pays for a pretextual license. SAC ¶¶ 167, 401–404. That suffices.

In addition to "intent to extort," subsection (C) requires that damage to a protected computer "was caused to facilitate the extortion." WPE alleges this. Defendants' intent to extort (discussed *supra*) demonstrates their follow-through acts were done "to facilitate the extortion." After they

deployed the blocking and took over ACF, they confirmed WPE could reclaim their access and plugin

listing if "[WPE] could fix their trademark . . . issue today" and "dropped its lawsuits, apologized,

and got in good standing with its trademark use." SAC ¶¶ 119, 167.  WPE thus alleges Defendants

instituted "ongoing threats to ban WPE and damage its ACF plugin and actual carrying out of these

threats where instituted to pressure WPE to consent to Defendants' demand for payment." *Id.* ¶ 405.

No case supports Defendants' arbitrary position "the threatened or actual harm" ***must*** be

"contemporaneous with a demand for payment."  Mot. at 20.  To the contrary, courts recognize that

steps taken to damage a computer after the demand for ransom was rejected are part of the scheme to

facilitate extortion and thus violate the statute.  *GCM Partners, LLC v. Hipaaline Ltd.*, 2020 WL

6867207, at *12 (N.D. Ill. Nov. 23, 2020) ("When [defendant] did not receive the desired response,

[it] took steps to cut off [plaintiff's] access to the [] platform, which could support a violation under

§ 1030(a)(7)(C)."); *Wit Walchi Innovation Techs., GMBH v. Westrick*, 2012 WL 33164, at *1-2 (S.D.

Fla. Jan. 6, 2012) (granting injunction where Section 1030(a)(7) claim premised on defendant's

alleged "threat to cause and ***continue*** to cause damage" when plaintiff did not pay the ransom).

### 3.    WPE Plausibly Alleges Damage To A Protected Computer

WPE plausibly alleges "damage to a protected computer" under the CFAA based on

Defendants': (1) blocking its access to wordpress.org; and (2) overwriting the ACF plugin code.

The CFAA defines "damage" to mean "any impairment to the integrity or availability of data,

a program, a system, or information."  18 U.S.C. § 1030(e)(8).  Due to the block, WPE alleges that it

was deprived of "the integrity and availability of data, programs, systems and information" previously

available to it on wordpress.org.  SAC ¶ 407.  In addition, because access to wordpress.org is "baked

into" the WordPress core code and WordPress plugins, all "these hardcoded references, callbacks,

and plugin updates that were intentionally designed to access wordpress.org" on WPE's computers

were broken.  *Id.*  Even Defendants themselves admitted ███████████████████████

██████████████████████████████████████  *Id.* ¶ 419.  Courts are in accord that

withholding access to a website or other computer systems constitutes damage to a protected

computer under the statute.  *Inplant Enviro-Sys. 2000 Atlanta*, 2015 WL 12746702, at *2–*4 (refusal

to give access to a domain likely violated Section 1030(a)(7)); *SkyHop Techs.*, 58 F.4th at 1226

("withholding of the passwords and [plaintiff's] other digital property" had "diminished [plaintiff's] ability to use its computer system or the associated data" and constituted "damage[s]"); *Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015) (locking victim out of her social media accounts "impaired the integrity" of them). Defendants' comparison of its block to a road closure that inflicts no harm on cars cannot be squared with the statutory definition and the case law.

WPE also alleges that Defendants' overwriting of ACF "impaired the utility, availability, and integrity of WPE's ACF plugin" by "deleting millions of instances of [the plugin] and replacing it with Defendants' own SCF plugin." SAC ¶¶ 408, 419. It also allegedly "prevented WPE from making security updates to it." *Id.* Defendants' assertion (Mot. at 22) that WPE failed to allege any "actual harm to computers" or any "impair[ment of] the functionality of users' computers" completely ignores these well-pled allegations, any one of which suffices to defeat a motion to dismiss.

## C.    Defendants' *Noerr-Pennington* Defense Is Baseless

Defendants assert that the *Noerr-Pennington* doctrine bars WPE's antitrust and Section 1030(a)(7) claims. Mot. at 22–25. Defendants' arguments are baseless and should be rejected.[7]

***First***, *Noerr-Pennington* does not shield Defendants' extrajudicial attempt to seek a bogus trademark "license" from WPE. It protects only: (1) "petitions sent directly to the court" (*e.g.*, filing suit via a complaint); and (2) conduct "incidental to the prosecution of the suit[.]" *Sosa*, 437 F.3d at 933–35. WPE's claims do not arise out of Defendants petitioning a court; rather, Defendants assert their conduct was incidental to litigation. This requires an "intimate relationship" between the "prelitigation communications" and "the actual litigation process." *Id.* at 936. Defendants rely on *Sosa*, but that case bears no resemblance to the facts here: it involved a formal pre-litigation demand letter alleging violations of law and a threat to sue if the matter was not settled. *Id.* at 925–26 & n.1.

In contrast, the communications here do not formally threaten trademark litigation if WPE did not pay the ransom. Rather, Defendants rely on September 2024 phone calls and text messages (Mot. at 23) from Automattic's CEO and CFO (business people) who made threats of a "scorched earth

---

[7]    Defendants raise this "defense" for the first time, after WPE brought antitrust and CFAA claims more than a year ago, and after the parties, this Court, and Judge Ryu have spent time and resources on this case. Defendants could have, but did not, raise it vis-a-vis WPE's FAC and Defendants' prior motion to dismiss. Defendants' failure to do so suffices to disregard their arguments. *United Bhd. of Carpenters & Joiners of Am. v. Shapiro*, 2022 WL 3597443, at *2 (W.D. Wash. Aug. 23, 2022).

nuclear approach"—warning they would publicly attack WPE, ban it, and cripple its business unless it paid. SAC ¶¶ 91–98. Courts have declined to apply *Noerr-Pennington* to similar threats. *Perez v. DirecTV Group Holdings LLC*, 2019 WL 6362471, at *7 (C.D. Cal. July 23, 2019) (defendants "called [plaintiff] repeatedly and threatened" to "ruin her" if "she did not pay"); *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 WL 6247594, at *17 (N.D. Cal. Dec. 3, 2013) (similar vis-à-vis antitrust claims based on license demands; communications suggest "ulterior motivations" aside from settlement). *Gamble v. Kaiser Foundation Health Plan* does not help Defendants. Mot. at 24. There, *after* employees asserted claims against their employer, it "demanded certain settlement terms in response," so the challenged communications were tied to litigation (they were the terms to settle the claims). 348 F. Supp. 3d 1003, 1024–27 (N.D. Cal. 2018). That is not true here, where Defendants made extortionate threats outside the litigation context.[8] That Defendants never sued WPE for trademark infringement for a year after these threats highlights they were not incidental to litigation.

**Second**, even assuming *Noerr-Pennington* applied to Defendants' license demands (it does not), WPE meets the "sham" exception. Under that exception, petitioning is not protected if: (1) objectively baseless; and (2) brought subjectively as an "anticompetitive weapon" to interfere with a competitor. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993). The Court "must accept as true" sham allegations, and sham is a "question of fact," such that "courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage[.]" *Sonus Networks, Inc. v. Inventergy, Inc.*, 2015 WL 4539814, at *2 (N.D. Cal. July 27, 2015). WPE's SAC meets both prongs.

**Objective Prong**. WPE alleges Defendants' license demand was objectively baseless since WPE never needed a license; its use of the challenged terms was nominative fair use and only to describe its services. SAC ¶¶ 40, 90–92, 444. Further, Defendants' threat was economically irrational, demanding an 8% royalty as that is what Mullenweg believed WPE "could afford." *Id.* ¶¶ 27, 217. Defendants also knowingly acquiesced to WPE's use for 15 years, barring any claim via laches and estoppel, *id.* ¶¶ 43, 46,444–48, 453–58; and they lack standing to enforce any supposed trademark rights, which belong to the WordPress Foundation, *id.* ¶¶ 446, 457. Confirming their demands'

---

[8] Defendants do not rely on their later September 23, 2024 cease-and-desist letter as "petitioning activity," nor does WPE seek to impose liability based on that letter.

1    baselessness, ***Defendants*** recognized they would ██████████████████████

2    ████████████████████████████████████████████████ SAC ¶ 208.

3    Defendants' arguments fail.  Mot. at 24–25.  That Defendants filed "counterclaims for

4    trademark infringement" a year later does not change this analysis, particularly when WPE has moved

5    to dismiss them. Dkt. 207.  That WPE "regularly uses" the trademarks is irrelevant—what matters is

6    whether that use was proper, which WPE alleges it was.  SAC ¶¶ 92, 105, 447.  Defendants' claim

7    that WPE does not allege Defendants "used government processes" to harm WPE is a red herring:

8    ***Defendants*** are the ones equating their threats with government petitioning, and even assuming it

9    was, WPE alleges that petitioning was baseless, since it is unsupported by trademark law and was a

10   ruse to interfere with WPE.  Defendants' citation to *Empress LLC v. City & Cnty. of San Francisco*

11   is misplaced, as the plaintiffs there did no allege any sham (*i.e.*, baseless) conduct.  419 F.3d 1052,

12   1057 (9th Cir. 2005) (claiming exception based on conspiracy with government).

13   Moreover, that WPE "initiated litigation" and sought declaratory relief regarding Defendants'

14   supposed trademark rights does not legitimize Defendants' threats.  WPE sued to obtain a court order

15   validating its position and stopping the harm Defendants were causing to its business.  SAC ¶ 24.

16   **Subjective Prong.**  The SAC also plausibly establishes the second prong.  Defendants

17   recognized their trademark scheme's goal was to obtain exorbitant payments from WPE and ████

18   ████████ else ████████████████ SAC ¶ 135.  They openly discussed their potential

19   and plan to ████████████████ *Id.* ¶ 200.  After making the demands, Mullenweg boasted

20   about: (1) turning WPE into a "distressed asset"; (2) going to "war" with WPE; and (3) "go[ing] brick

21   by brick" to take WPE's customers.  *Id.* ¶¶ 7, 132, 149.  That confirms their desire to harm WPE, not

22   any legitimate interest in hypothetical trademark proceedings, which Mullenweg disclaimed when he

23   stated trademark was simply "the law that we're using to try to" achieve his other goals.  *Id.* ¶ 106.

24   Defendants' arguments fail. Mot. at 25.  That they registered for additional trademarks in ***July***

25   ***2024*** does not mean they were "taking the trademark enforcement process seriously."  Instead, having

26   planned their scheme since ***March 2024*** (SAC ¶ 135), it shows they were trying to add more weapons

27   to (baselessly) extort WPE.  Similarly, WPE ***disputes*** its use of Defendants' "trademarks" was "likely

28   to cause confusion."  Dkt. 207 at 22.  Defendants baselessly argue WPE's defenses to Defendants'

trademark assertions being based on fair use, laches, and the like, rather than "non-confusion," makes the sham exception unavailable.  Their sole citation, *St Andrews Links Ltd. v. Gilfin Int'l Ltd.*, does not help them.  It held that where a party invokes the sham exception based on defenses an underlying lawsuit was "time-barred" and the suing party "sat on its rights" but fails to support those defenses, the "sham allegations" are not "well-pleaded or adequately supported."  2019 WL 4221725, at *3 (N.D. Cal. Sept. 5, 2019).  That is not the case here, where WPE details the factual and legal reasons that Defendants' trademark claims are baseless.  SAC ¶¶ 40–47, 90–92, 444, 446, 453–58; Dkt. 207.

*Third*, Defendants' license demand and related conduct is still actionable as part of a larger "anticompetitive scheme."  *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007).  To meet this standard, WPE must allege: (1) "other aspects of the scheme independently produce anticompetitive harms"; and (2) the protected conduct is "causally connected to these anticompetitive harms."  *Id.*  Both are met here.  As to the first prong, Defendants engaged in conduct that is indisputably ***not*** protected and untethered to Defendants' license demand (it occurred years before), like deceiving the market about free and open access.  SAC ¶ 196.  As to prong two, the potentially protected conduct (the trademark demands) is "causally connected" to the deception and its harms: Defendants tricked market participants into selecting WordPress over other WCMS, and now Defendants seek to use those demands to extract a ransom.  *Hynix*, 527 F. Supp. 2d at 1098 (test met; defendant deceived as to patent rights, then brought litigation to "extract royalties").

Beyond deception, WPE also challenges other non-petitioning conduct: blocking of access, hijacking ACF, the checkbox, disparagement, and interference with personnel and customers.  SAC ¶ 196.  As non-petitioning, these theories (and WPE's claims based on them) are ***not*** subject to *Noerr-Pennington*.  Since they are non-petitioning part of Defendants' larger anticompetitive scheme, even assuming the license demand was otherwise protected (it is not), it is still actionable.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1146–47 (N.D. Cal. 2020) (plaintiff challenged blocking; since blocking not protected, protected "cease-and-desist letters" actionable as part of scheme).

## III.    CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.  To the extent that the Court determines any claims are subject to dismissal, WPE respectfully requests leave to amend.

1    DATED: December 19, 2025                    Respectfully submitted,

2                                                QUINN EMANUEL URQUHART & SULLIVAN LLP

3                                                By */s/ Rachel Herrick Kassabian*
4                                                    Rachel Herrick Kassabian (SBN 191060)
                                                       rachelkassabian@quinnemanuel.com
5                                                    Yury Kapgan (SBN 218366)
                                                       yurykapgan@quinnemanuel.com
6                                                    Margret M. Caruso (SBN 243473)
                                                       margretcaruso@quinnemanuel.com
7                                                    555 Twin Dolphin Dr., 5th Floor
                                                    Redwood Shores, CA 94065
8                                                    Telephone: (650) 801-5000
                                                    Facsimile: (650) 801-5100
9
                                                    Brian Mack (SBN 275086)
10                                                     brianmack@quinnemanuel.com
                                                    50 California Street, 22nd Floor
11                                                   San Francisco, CA 94111
                                                    Telephone: (415) 875-6400
12                                                   Facsimile: (415) 875-6700

13                                                   Michael E. Williams (SBN 181299)
                                                       michaelwilliams@quinnemanuel.com
14                                                   Kevin Y. Teruya (SBN 235916)
                                                       kevinteruya@quinnemanuel.com
15                                                   865 South Figueroa Street, 10th Floor
                                                    Los Angeles, CA 90017
16                                                   Telephone: (213) 443-3000
                                                    Facsimile: (213) 443-3100

17                                                   *Attorneys for Plaintiff WPEngine, Inc.*

18

19

20

21

22

23

24

25

26

27

28

WPE'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS WPE'S SAC [REDACTED]