Exhibit A

2026 WL 90235
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

MALHEUR FOREST FAIRNESS COALITION, an unincorporated association; Prairie Wood Products, LLC, an Oregon limited liability company; Rude Logging, LLC, an Oregon limited liability company; Brett Morris, an individual; Morris Forestry, LLC, an Oregon limited liability company; Engle Contracting, LLC, an Oregon limited liability company; H Timber Contracting, LLC, an Oregon limited liability company; Doug Emmel, assumed business name dba Emmel Brothers Ranch; Darrell Emmel, assumed business name dba Emmel Brothers Ranch; Pat Voigt, assumed business name dba Ricco Ranch; Hedy Voigt, doing business as Ricco Ranch, Plaintiffs - Appellants,

v.

IRON TRIANGLE, LLC, an Oregon limited liability company; I.T. Logging, Inc., an Oregon corporation; Russell YounG, an individual; Ochoco Lumber Company, an Oregon limited partnership doing business as Malheur Lumber Company, Defendants - Appellees.

No. 24-6366
|
Argued and Submitted November 5, 2025 Portland, Oregon
|
Filed January 13, 2026

**Synopsis**
**Background:** Coalition of loggers, landowners, and sawmill filed antitrust suit, under Sherman Act, against logging company that was awarded in competitive bidding process exclusive contract by United States Forest Service (USFS) to provide stewardship services in national forest market area for ten-year term and right of first refusal on 70% of harvestable federal timberland, and against sawmill with which logging company had purchase agreement, claiming they engaged in anticompetitive tactics to obtain monopoly or monopsony in stewardship services market, harvest rights market, logging services market, and softwood sawlog market, as well as allegedly conspiring to restrain trade through illegal tying agreement, related to acquisition and processing of timber on both federal and private timberland. The United States District Court for the District of Oregon, Marco A. Hernández, C.J., 699 F.Supp.3d 1086 and 2024 WL 4253221, granted defendants' motion to dismiss for failure to state claim. Coalition appealed.

**Holdings:** The Court of Appeals, M. Smith, Circuit Judge, held that:

[1] monopoly claim was not plausibly alleged in stewardship services market;

[2] monopsony claim was not plausibly alleged for harvest rights market;

[3] monopoly claim was not plausibly alleged for logging services market;

[4] monopoly claim was not plausibly alleged for softwood sawlog market;

[5] anticompetitive conduct was not plausibly alleged on theory of false representations;

[6] anticompetitive conduct was not plausibly alleged on theory of predatory bidding for harvest rights;

[7] anticompetitive conduct was not plausibly alleged on theory of hoarding logging opportunities;

[8] antitrust injury was not plausibly alleged; and

[9] illegal tying agreement claim was not plausibly alleged.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (57)

**[1]    Federal Courts** 🔑 Pleading

Court of Appeals reviews a district court's dismissal for failure to state a claim de novo. Fed. R. Civ. P. 12(b)(6).

**[2]    Federal Courts** 🔑 Dismissal for failure to state a claim

On de novo review of district court's dismissal for failure to state a claim, Court of Appeals accepts as true plaintiffs' nonconclusory factual allegations, construes all reasonable inferences in favor of plaintiffs, and asks whether the facts are sufficient to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[3]    Federal Civil Procedure** 🔑 Insufficiency in general

Plausibility of the allegations necessary to state a claim for relief on a motion to dismiss requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief. Fed. R. Civ. P. 12(b)(6).

**[4]    Federal Courts** 🔑 Theory and Grounds of Decision of Lower Court

**Federal Courts** 🔑 Grounds for sustaining decision not relied upon or considered

Court of Appeals may affirm the district court's dismissal on any basis supported by the record, even if the district court relied on different grounds or reasoning.

**[5]    Federal Courts** 🔑 Pleading

Court of Appeals reviews the denial of leave to amend for abuse of discretion, but the question of futility of amendment is reviewed de novo.

**[6]    Antitrust and Trade Regulation** 🔑 Elements in General

To state a plausible monopolization claim, under the Sherman Act, plaintiffs must show: (1) the possession of monopoly power in the relevant market, (2) the willful acquisition or maintenance of that power as distinguished from

growth or development as a consequence of a superior product, business acumen, or historic accident, and (3) causal antitrust injury. Sherman Act § 2, 15 U.S.C.A. § 2.

[7]    **Antitrust and Trade Regulation** 🔑 Market Power;  Market Share

"Monopoly power" is the substantial ability to control prices or exclude competition; it requires something greater than mere market power.

[8]    **Antitrust and Trade Regulation** 🔑 Complaint

Under the Sherman Act, plaintiffs can plead monopoly power by direct evidence by alleging restricted output and supracompetitive prices, that is, direct proof of the injury to competition which a competitor with market power may inflict. Sherman Act § 2, 15 U.S.C.A. § 2.

[9]    **Antitrust and Trade Regulation** 🔑 Complaint

Under the Sherman Act, where plaintiffs plead monopsony power by direct evidence, they must allege restricted input, rather than output, and that the input restriction resulted in subcompetitive, rather than supracompetitive, prices. Sherman Act § 2, 15 U.S.C.A. § 2.

[10]    **Antitrust and Trade Regulation** 🔑 Market Power;  Market Share

A supracompetitive price required for monopoly power is simply a price above competitive levels.

[11]    **Antitrust and Trade Regulation** 🔑 Monopolization or attempt to monopolize

Circumstantial evidence is the more common type of proof of monopoly power and requires plaintiffs to: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.

[12]    **Antitrust and Trade Regulation** 🔑 Market Power;  Market Share

A seller can exercise monopoly power when the government is the only buyer and when federal regulations restrict the government to a reasonable or best-value price. 36 C.F.R. § 223.302; 48 C.F.R. § 15.402(a).

[13]    **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Coalition of loggers, landowners, and sawmill failed to allege with particularity that logging company's misrepresentations to United States Forest Service (USFS) prevented them from bidding on renewals for stewardship contracts in national forest, as would be required to support their claim that company had monopoly in stewardship services market after USFS competitively awarded company exclusive contract to provide stewardship services in national forest area for ten-year term; coalition alleged that company won stewardship contract by falsely assuring USFS that it would administer contract in manner diversifying local economy and promoting public interest, but coalition did not explain specific content of false representations. Sherman Act § 2, 15 U.S.C.A. § 2; Fed. R. Civ. P. 9(b).

**[14]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege that logging company excluded competition in stewardship services market in national forest area, as would be required to support their claim that company had monopoly in that market after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services in national forest area for ten-year term, since coalition's allegation that company weakened competitors by starving them of opportunities was conclusory and not equivalent to excluding competition entirely, coalition did not allege that company prevented competitors from bidding on potential renewed stewardship contract with USFS, and company held 100% market share because stewardship contract was necessarily exclusive contract. Sherman Act § 2, 15 U.S.C.A. § 2.

**[15]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to sufficiently plead restricted output in stewardship services market in national forest area as direct evidence of logging company's alleged monopoly in that market after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services in national forest area for ten-year term; coalition's allegations pertaining to reduced output allegedly due to inability of other companies to compete for stewardship contract were insufficient direct evidence of monopoly because coalition did not allege that company prevented competitors from bidding for existing stewardship contract or that competitors would be unable to do so if USFS pursued renewal bidding process. Sherman Act § 2, 15 U.S.C.A. § 2.

**[16]    Antitrust and Trade Regulation** 🔑 Market Power;  Market Share

**Antitrust and Trade Regulation** 🔑 Entry barriers

A mere showing of substantial or even dominant market share alone does not suffice to establish monopoly power; rather, plaintiffs must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price.

**[17]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to sufficiently plead barriers to entry in stewardship services market as circumstantial evidence of logging company's alleged monopoly in that market after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services in national forest for ten-year term; coalition alleged high barriers to entry due to need to purchase and maintain specialized heavy equipment and develop professional knowledge and experience to perform stewardship services, but did not allege that such costs were not incurred by incumbent firms yet were incurred by new entrants or that those costs deterred entry while permitting company to earn monopoly returns, and coalition did not allege being prevented from entering that market. Sherman Act § 2, 15 U.S.C.A. § 2.

**[18]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to sufficiently plead barriers to expansion in stewardship services market as circumstantial evidence of logging company's alleged monopoly in that market after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services in national forest area for ten-year term; to extent coalition alleged that barrier to expansion in that market was company's 100% market share, that was direct result of exclusive stewardship contract awarded by USFS through competitive bidding process, which

represented actual market realities, given that annual timber supply in national forest market area was almost entirely controlled by USFS. Sherman Act § 2, 15 U.S.C.A. § 2.

**[19]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege logging company's monopsony power in harvest rights market in national forest area, even though United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services in national forest area for ten-year term and right of first refusal to purchase timber harvest rights on 70% of federal timber available for sale from national forest area, and company via additional public bidding acquired nearly 95% share of harvest rights market, since company could not prevent other buyers from bidding for harvest rights for 30% of timber offered in open sales by USFS, so company was not only successful buyer in harvest rights market. Sherman Act § 2, 15 U.S.C.A. § 2.

**[20]    Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Weakened competition is not equivalent to exclusion from competition sufficient to state a monopoly claim in violation of the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[21]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to allege that logging company restricted input in harvest rights market in national forest area as direct evidence of company's alleged monopsony in that market after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services in national forest area for ten-year term and right of first refusal to purchase timber harvest rights on 70% of federal timber available for sale from national forest, even though company through additional public bidding acquired nearly 95% share of harvest rights market, since competitors had access to same harvest rights as company through open bidding process for harvest rights for 30% of timber offered by USFS. Sherman Act § 2, 15 U.S.C.A. § 2.

**[22]    Antitrust and Trade Regulation** 🔑 Injury to business or property

Coalition of loggers, landowners, and sawmill failed to allege any barriers to expansion or to entry in harvest rights market, as circumstantial evidence of logging company's alleged monopsony in that market after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services in national forest for ten-year term and right of first refusal to purchase timber harvest rights on 70% of federal timber available for sale from national forest, even though company through additional public bidding acquired nearly 95% share of harvest rights market, since coalition did not plausibly allege illegal tying agreement or predatory bidding barriers to entry, and stewardship contract was not barrier to entry for remaining 30% of timber sales by USFS through open bidding. Sherman Act § 2, 15 U.S.C.A. § 2.

**[23]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Coalition of loggers, landowners, and sawmill failed to allege with particularity logging company's misrepresentations understating its logging capacity as direct evidence of its alleged monopoly power by restricting output in logging services market in national forest, since coalition only alleged that company exploited its stewardship services contract for ten-year term with United States Forest Service (USFS) in order to hoard enormous volumes of timber in national forest through use of performance extensions to contract obtained from USFS by allegedly misrepresenting its logging capacity, but coalition did not allege sufficient detail from which to infer more than mere possibility of company's

misconduct or plead company's alleged misrepresentations with sufficient specificity. Sherman Act § 2, 15 U.S.C.A. § 2; Fed. R. Civ. P. 9(b).

**[24]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege that logging company restricted output in logging services market as direct evidence of monopoly power, by eliminating pine outlet through alleged tying agreement with saw mill and affecting demand for logging services on private timberland; coalition alleged that United States Forest Service (USFS) determined whether and when to contract for logging services on federal timberland, so coalition established only mere possibility that company conditioned its sale of pine sawlogs to sawmill on sawmill's refusal to purchase logging services from competitors and that, in turn, caused decline in logging opportunities, and also coalition offered only conclusory allegations of supracompetitive prices in logging services market. Sherman Act § 2, 15 U.S.C.A. § 2.

**[25]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege that logging company created barriers to entry and expansion in logging services market as circumstantial evidence of alleged monopoly power, by company consolidating logging opportunities on federal timberland, company's alleged tying agreement with sawmill, substantial costs for mobilizing heavy specialized equipment, and inelastic timber supply, since United States Forest Service (USFS) largely determined logging in national forest market area, tying agreement was not plausibly alleged, high equipment costs and inelastic supply were barriers also incurred by incumbent firms, and company's competitors could bid in future for same type of stewardship services contract with USFS under which company had logging rights. Sherman Act § 2, 15 U.S.C.A. § 2.

**[26]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to allege barriers to entry and expansion in softwood sawlog market, as direct evidence of monopoly power by logging company restricting softwood sawlog output allegedly by hoarding federal timber under stewardship services contract with United States Forest Services (USFS) in national forest and by eliminating sawlog harvests on private timberland due to company's alleged illegal tying agreement with sawmill, as well as stewardship contract allegedly allowing company to obtain sawlogs at artificially low prices and sell at supracompetitive rates, since USFS determined whether and when to contract for logging services on federal timberland, tying agreement was not plausibly alleged, and allegations of supracompetitive prices were conclusory. Sherman Act § 2, 15 U.S.C.A. § 2.

**[27]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to allege barriers to entry and expansion in softwood sawlog market, as circumstantial evidence of monopoly power by highly inelastic timber supply in national forest market area and alleged illegal tying agreement under which sawmill refused to purchase pine sawlogs harvested within national forest market area from any seller other than logging company that substantially reduced level of timber harvest on private lands; inelastic supply was barrier also incurred by incumbent firms, illegal tying agreement was not plausibly alleged, and even assuming their arrangement was not illegal, lack of buyer for sawlogs was not significant market barrier, as coalition did not explain why pine sawlog outlet could not process pine sawlogs at profit. Sherman Act § 2, 15 U.S.C.A. § 2.

**[28]    Federal Civil Procedure** 👉 Fraud, mistake and condition of mind

Coalition of loggers, landowners, and sawmill failed to allege with particularity logging company's purported misrepresentations to United States Forest Service (USFS), by which company allegedly willfully acquired and maintained monopolies in stewardship services market, harvest rights market, and logging services market with respect to national forest market area, since coalition submitted only conclusory allegations that company made misrepresentations to USFS in process of acquiring ten-year stewardship services contract and maintained pattern of understating its logging capacity and financial performance to accumulate timber under that contract and to obtain preferential service rates. Sherman Act § 2, 15 U.S.C.A. § 2; Fed. R. Civ. P. 9(b).

**[29]    Antitrust and Trade Regulation** 👉 Predatory Pricing

In a predatory-bidding scheme, a purchaser of inputs bids up the market price of a critical input to such high levels that rival buyers cannot survive or compete as vigorously and, as a result, the predating buyer acquires or maintains or increases its monopsony power; if all goes as planned, the predatory bidder will reap monopsonistic profits that will offset any losses suffered in bidding up input prices. Sherman Act § 2, 15 U.S.C.A. § 2.

**[30]    Antitrust and Trade Regulation** 👉 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege anticompetitive conduct from predatory bidding scheme by logging company in order to consolidate its hold on harvest rights, logging services, and softwood sawlog markets, even assuming that company incurred loss in bidding for harvest rights in national forest market area, since company would not have dangerous probability of recouping loss incurred in bidding up input prices through exercise of monopsony power, as coalition's allegations relied solely on company's dominant market share, but incumbent firm with substantial market share could recoup losses incurred through meritorious competitive bidding by modestly raising prices elsewhere in its business. Sherman Act § 2, 15 U.S.C.A. § 2.

**[31]    Antitrust and Trade Regulation** 👉 Cost determination;  marginal or average variable cost

In analyzing anticompetitive conduct in form of predatory-bidding scheme, the exclusionary effect of prices above a relevant measure of cost may reflect the lower cost structure of the alleged predator, and thus represents competition on the merits. Sherman Act § 2, 15 U.S.C.A. § 2.

**[32]    Antitrust and Trade Regulation** 👉 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege anticompetitive conduct from logging company purportedly hoarding logging opportunities in national forest area, after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services for ten-year term and right of first refusal to purchase timber harvest rights on 70% of available federal timber; coalition alleged that in first year of contract, company subcontracted logging services to other loggers, but in following year offered contracts to same loggers at reduced rates in order to eliminate them from competition, but coalition failed to plausibly allege that reduced rates were anticompetitive tactic, rather than that rates were reduced and that loggers refused to accept them. Sherman Act § 2, 15 U.S.C.A. § 2.

**[33]    Antitrust and Trade Regulation** 👉 Injury to business or property

The fact of antitrust injury or damage must be alleged at the pleading stage. Sherman Act § 2, 15 U.S.C.A. § 2.

**[34]**   **Antitrust and Trade Regulation** 🔑 Injury to Business or Property

**Antitrust and Trade Regulation** 🔑 Causation

To state antitrust injury, under the Sherman Act, plaintiffs must plead: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, (4) that is of the type the antitrust laws were intended to prevent, and (5) that the injured party be a participant in the same market as the alleged malefactors, either as a consumer or a competitor. Sherman Act § 2, 15 U.S.C.A. § 2.

**[35]**   **Antitrust and Trade Regulation** 🔑 Injury to business or property

Coalition of loggers failed to plausibly plead antitrust injury in stewardship services market for national forest area, by generally alleging that logging company foreclosed contract loggers from stewardship services market and that company foreclosed stewardship opportunities on private forestland in national forest market area, after United States Forest Service (USFS) awarded company exclusive contract to provide stewardship services for ten-year term and right of first refusal to purchase timber harvest rights on 70% of available federal timber, since coalition only alleged harm to competitors, not to consumers, and loggers would have suffered same injury had any other business acquired exclusive right to perform stewardship services on federal land in national forest market area. Sherman Act § 2, 15 U.S.C.A. § 2.

**[36]**   **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Conduct that eliminates rivals reduces competition, but reduction of competition does not invoke the Sherman Act until it harms consumer welfare. Sherman Act § 2, 15 U.S.C.A. § 2.

**[37]**   **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Any exclusive contract has the potential for producing economic readjustments that adversely affect some persons, but that does not necessarily rise to the level of anticompetitive conduct under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[38]**   **Antitrust and Trade Regulation** 🔑 Injury to business or property

Coalition of loggers failed to plausibly plead antitrust injury in harvest rights market for national forest area, by allegations that logging company engaged in predatory bidding scheme to foreclose loggers from access to harvest rights and standing timber, since loggers did not adequately plead their predatory bidding theory of anticompetitive conduct, one logger did not demonstrate injury from unsuccessful bid on three of four allegedly predatorially bid timber sales, as logger did not allege it was second highest bidder who would have won bid if company had not, and logger did not allege facts to support inference that all competition in open-bid sales was injured by company's bidding, given that United States Forest Service (USFS), not company, controlled public bidding for harvest rights. Sherman Act § 2, 15 U.S.C.A. § 2.

**[39]**   **Antitrust and Trade Regulation** 🔑 Protection of competition rather than competitors

The antitrust laws were enacted for the protection of competition, not competitors.

**[40]    Antitrust and Trade Regulation** 🔑 Injury to business or property

Coalition of loggers failed to plausibly plead antitrust injury in logging services and softwood sawlog markets in national forest area, by allegations that they lost profits by being foreclosed from selling logging services and softwood sawlog to private landowners and to sawmill through logging company's alleged tying agreement with sawmill, since loggers alleged that company did offer subcontracts to them, albeit at reduced rates, so they failed to explain how company's reduced rates injured all competition in logging services and softwood sawlog markets. Sherman Act § 2, 15 U.S.C.A. § 2.

**[41]    Antitrust and Trade Regulation** 🔑 Injury to business or property

Coalition of landowners failed to plausibly plead antitrust injury in logging services and softwood sawlog markets in national forest area, by allegations that they were foreclosed from buying logging services and softwood sawlog by logging company's alleged tying agreement with sawmill, since landowners alleged that but for alleged tying agreement, they would have retained contract loggers to harvest their timber and that alleged agreement denied them those opportunities, but they also alleged that there was another outlet for pine sawlogs and that sawmill had offered to purchase pine at cost. Sherman Act § 2, 15 U.S.C.A. § 2.

**[42]    Antitrust and Trade Regulation** 🔑 Tying Agreements

A "tying arrangement" is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different, or tied, product, or at least agrees that he will not purchase that product from any other supplier.

**[43]    Antitrust and Trade Regulation** 🔑 Tying Agreements

Not all tying arrangements are illegal.

**[44]    Antitrust and Trade Regulation** 🔑 Tying Agreements

Tying arrangements may be unlawful per se or may be analyzed under the rule of reason.

**[45]    Antitrust and Trade Regulation** 🔑 Complaint

To survive a motion to dismiss for a per se unlawful tying arrangement, a plaintiff must plead: (1) that the defendant tied together the sale of two distinct products or services, (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product, and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.

**[46]    Antitrust and Trade Regulation** 🔑 Horizontal

Typically only horizontal restraints, in other words, restraints imposed by agreement between competitors, qualify as unreasonable per se.

**[47]    Antitrust and Trade Regulation** 🔑 Separate or distinct products

In analyzing whether a tying arrangement is per se unlawful, determining whether one or two products are involved turns on the character of the demand for the two items and therefore depends on whether the products are distinguishable in the eyes of buyers.

**[48]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege per se tying agreement between logging company and sawmill, under which sawmill allegedly refused to purchase pine sawlogs produced in national forest market area from sellers other than logging company, in order to foreclose coalition's ability to sell pine sawlogs locally and undermine their ability to compete with company in logging services and softwood sawlog markets; under purchaser-demand test, from perspective of sawmill, logging services and sawlogs were not two distinct products with distinct markets, as absent its need for sawlogs, sawmill would have no need for logging services, and sawmill was not forced to purchase logging services from company instead of other loggers, as their agreement was voluntary. Sherman Act § 1, 15 U.S.C.A. § 1.

**[49]    Antitrust and Trade Regulation** 🔑 Separate or distinct products

Even where a transaction involves separate products, it is not necessarily an illegal tying arrangement; the seller must also force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. Sherman Act § 1, 15 U.S.C.A. § 1.

**[50]    Antitrust and Trade Regulation** 🔑 Tying Agreements

Coercion is often the touchstone issue in assessing a claim of illegal tying in restraint of trade. Sherman Act § 1, 15 U.S.C.A. § 1.

**[51]    Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Buyers often find package sales attractive, and on the flip side, a seller's decision to offer such packages can merely be an attempt to compete effectively, which is conduct that is entirely consistent with the Sherman Act. Sherman Act § 1, 15 U.S.C.A. § 1.

**[52]    Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Under the rule of reason for determining whether tying arrangements are illegal, the analysis is essentially the same as the anticompetitive-conduct inquiry for a monopolization claim. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

**[53]    Antitrust and Trade Regulation** 🔑 Exclusive dealing arrangements/agreements/distributorships
**Antitrust and Trade Regulation** 🔑 Tying Agreements

Businesses may choose the manner in which they do business absent an injury to competition, including by choosing to contract exclusively; thus, it is not sufficient to determine that a tying arrangement is illegal under the rule of reason by merely alleging that parties have entered into a contract that limits some freedom of action. Sherman Act § 1, 15 U.S.C.A. § 1.

**[54]    Antitrust and Trade Regulation** 🔑 Complaint

Coalition of loggers, landowners, and sawmill failed to plausibly allege illegal tying agreement between logging company and sawmill, under which sawmill allegedly refused to purchase pine sawlogs produced in national forest market area from sellers other than logging company, in order to foreclose coalition's ability to sell pine sawlogs locally and undermine their ability to compete with company in logging services and softwood sawlog markets; under rule of reason test, coalition did not adequately plead anticompetitive conduct or antitrust injury. Sherman Act § 1, 15 U.S.C.A. § 1.

**[55]    Federal Civil Procedure** 🔑 Form and sufficiency of amendment;  futility

A district court may deny leave to amend in its discretion when amendment would be futile. Fed. R. Civ. P. 15(a)(1)-(2).

**[56]    Federal Civil Procedure** 🔑 Pleading over

Under futility analysis, dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a)(1)-(2).

**[57]    Federal Civil Procedure** 🔑 Pleading over

District court did not abuse its discretion in denying coalition of loggers, landowners, and sawmill leave to amend, for third time, their complaint claiming that logging company and sawmill violated Sherman Act by anticompetitive tactics to obtain monopoly or monopsony in national forest market area as well as conspiring to restrain trade through illegal tying agreement, since court explained that coalition had already filed three complaints and that, in dismissing first amended complaint, court had "walked through" each element of their claims and provided guidance on how to cure identified deficiencies, but then court determined that they failed to do so on their third attempt. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2; Fed. R. Civ. P. 15(a)(1)-(2).

Appeal from the United States District Court for the District of Oregon, Marco A. Hernández, District Judge, Presiding, D.C. No. 2:22-cv-01396-HZ

**Attorneys and Law Firms**

Michael E. Haglund (argued), Christopher T. Griffith, Christopher G. Lundberg, and Eric J. Brickenstein, Haglund Kelley LLP, Portland, Oregon, for Plaintiffs-Appellants.

Timothy W. Snider (argued) and Rachel C. Lee, Stoel Rives LLP, Portland, Oregon; Matthew D. Segal, Stoel Rives LLP, Sacramento, California; Lawson E. Fite, Schwabe Williamson & Wyatt PC, Portland, Oregon; Daniel C. Peterson (argued), Shayna M. Rogers, and Julie A. Smith, Cosgrave Vergeer Kester LLP, Portland, Oregon; for Defendants-Appellees.

Steven J. Mintz, Nickolai G. Levin, and Daniel E. Haar, Attorneys; Alice A. Wang, Counsel to the Assistant Attorney General; David B. Lawrence, Policy Director; John W. Elias, Deputy Assistant Attorney General; Doha G. Mekki, Acting Assistant Attorney General; Antitrust Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae the United States of America.

Before: MILAN D. SMITH, JR., JACQUELINE H. NGUYEN, and HOLLY A. THOMAS, Circuit Judges.

**OPINION**

M. SMITH, Circuit Judge:

**\*2**  Since 2013, Defendant Iron Triangle, LLC (Iron Triangle) has substantially expanded its market presence in the Malheur National Forest (MNF). In this litigation, Plaintiffs contend it has done so in violation of federal antitrust laws. Specifically, Plaintiffs allege competitive injuries across four products and services markets related to the acquisition and processing of timber on both federal and private timberland. The alleged catalyst for Plaintiffs' injuries is a lucrative contract obtained by Iron Triangle through a competitive bidding process held by the United States Forest Service (Forest Service) in 2013. That contract awarded Iron Triangle the exclusive ability to provide the Forest Service with stewardship services in the MNF Market Area for a ten-year term, as well as right of first refusal on 70% of harvestable federal timberland. Iron Triangle additionally participates in public bidding, also operated by the Forest Service, on the remaining 30% of federal timberland and usually wins these bids. In 2020, Iron Triangle entered into a purchase agreement with Defendant Malheur Lumber Company (Malheur Lumber) wherein Iron Triangle agreed to provide Malheur Lumber with its requirements for pine sawlogs for over two years. The same agreement provided that Malheur Lumber would purchase contract logging services from Iron Triangle.

The district court dismissed Plaintiffs' action with prejudice, finding that Plaintiffs failed to state claims for monopolization and restraint of trade under the Sherman Antitrust Act, 15 U.S.C. §§ 2, 1. Although we disagree with the district court that federal government contracting regulations preclude a finding of monopoly power as a matter of law, we affirm dismissal because Plaintiffs do not plead facts sufficient to state their antitrust claims. Because Plaintiffs have not demonstrated that they could cure the identified deficiencies in their pleadings, we further hold that the district court did not abuse its discretion by denying Plaintiffs leave to amend their complaint for a third time.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs are a coalition of several groups—including loggers, landowners, and a sawmill [1] —alleging antitrust injury by Iron Triangle and Malheur Lumber (collectively, Defendants). Plaintiffs allege that Iron Triangle has used anticompetitive tactics to obtain a monopoly or monopsony in four interrelated product markets in the MNF Market Area. Plaintiffs also allege that Defendants conspired to restrain trade through an illegal tying agreement.

This appeal concerns four product markets in the MNF Market Area—the "Stewardship Services Market," the "Harvest Rights Market," the "Logging Services Market," and the "Softwood Sawlog Market."

The Stewardship Services Market consists of the purchase and sale of forest stewardship services, including precommercial thinning, road maintenance, fire risk reduction, and related services. Iron Triangle is a seller in this market and holds a 100% market share due to the Stewardship Contract it won from the Forest Service. The Forest Service is the only buyer in this market.

The Harvest Rights Market is the market for timber harvest rights in the MNF Market Area. Iron Triangle is a buyer in this market and, as a result of the Stewardship Contract, has held a dominant share of at least 70% of this market since 2013. Plaintiffs' monopolization claim concerns the remaining 30% of harvest rights, which they argue Iron Triangle has also dominated through anticompetitive practices. The Forest Service is the dominant seller in this market.

The Logging Services Market includes the purchase and sale of contract logging services performed by loggers who are paid to harvest sawlogs from areas of the MNF where timber harvest rights have been awarded or from private forest land. Iron Triangle is a seller in this market. Plaintiffs assert that Iron Triangle holds over 90% market share as a provider of logging services in the MNF Market Area.

Finally, the Softwood Sawlog Market is a commodity market for the purchase and sale of sawlogs of pine, fir, and larch species harvested in the MNF Market Area. Iron Triangle is a seller in this market, while Malheur Lumber and Plaintiff Prairie Wood are buyers in this market. Plaintiffs allege that Iron Triangle holds over 90% market share in this market.

 **\*3**  In 2013, Iron Triangle participated in a competitive bidding process for, and won, a ten-year, $69 million stewardship services contract (Stewardship Contract) for the MNF from the Forest Service. The Stewardship Contract also provided Iron Triangle with the right of first refusal to purchase timber harvest rights on 70% of the federal timber available for sale from the MNF. Iron Triangle initially subcontracted logging services under the Stewardship Contract to other companies, including two of the Logger Plaintiffs. The next year, Iron Triangle offered subcontracts to the same logging companies but at reduced rates. While one Logger Plaintiff declined to accept the reduced rates, the other continued to perform logging services at the reduced rates for two more years before stopping, citing slim profits. Plaintiffs allege that during this time, Iron Triangle overcharged the Forest Service for the work of removing, harvesting, and delivering logs to manufacturers, thereby tripling the original $69 million "not-to-exceed" cost of the ten-year Stewardship Contract. According to Plaintiffs, Iron Triangle then used those profits to engage in predatory bidding in open market sales, and it ultimately outbid competitors on most of the remaining 30% of annual timber harvest. By the end of 2021, Iron Triangle had increased the volume of its contracted timber harvest rights to over 90% of the offered volume in the MNF.

Malheur Lumber is a wood product manufacturer that owns a sawmill and sources pine sawlogs in the MNF Market Area. Plaintiff Prairie Wood Products, LLC (Prairie Wood) also owns a sawmill but mills mostly fir logs. When Prairie Wood reopened in 2022,[2] it sought to purchase fir sawlogs from Iron Triangle and to sell pine logs to Malheur Lumber. However, in 2020, Iron Triangle and Malheur Lumber entered into a two-year contract wherein Iron Triangle agreed to sell to Malheur Lumber its requirements for pine sawlogs from the timber Iron Triangle controlled in the MNF. Plaintiffs allege this was an unlawful tying agreement that included a commitment by Malheur Lumber not to purchase pine sawlogs or contract logging services from any other logging company. When Malheur Lumber did offer to buy sawlogs from the Logger Plaintiffs, Plaintiffs allege that it quoted prices below the cost of production, which Plaintiffs argue was done for the purpose of inducing rejection and providing cover for the tying agreement. Defendants maintain that the agreement was a standard requirements contract and that it did not contain any exclusivity provision.

Plaintiffs brought an action under the Sherman Antitrust Act, 15 U.S.C. § 2, alleging monopolization pursuant to Section 2 against Iron Triangle. Plaintiffs sought, *inter alia*, injunctive relief "to reestablish competitive conditions" in all four alleged markets in the MNF Market Area, $117 million in treble damages under the Sherman Act and the Clayton Act, and attorneys' fees and costs.

In January 2023, Plaintiffs filed their First Amended Complaint (FAC), adding Malheur Lumber as a defendant and a claim for conspiracy in restraint of trade pursuant to 15 U.S.C. § 1. Defendants moved to dismiss that complaint, and the district court granted the motion without prejudice, concluding that Plaintiffs failed to adequately allege market power, anticompetitive behavior, and antitrust injury in each of the four product markets, as well as conspiracy in restraint of trade. In November 2023, Plaintiffs filed their Second Amended Complaint (SAC), focusing on just two of the four relevant product markets. Defendants again moved to dismiss, this time with prejudice, and the district court granted those motions. As for Plaintiffs' Section 2 claim, the district court found that Plaintiffs failed to allege monopoly power in the two product markets discussed in the SAC and therefore did not address the remaining elements of the monopolization claim. As for Plaintiffs' Section 1 claim, the court held that Plaintiffs failed to allege a conspiracy because the products at the core of the alleged tying arrangement were not distinct and, separately, because the agreement could reasonably represent legitimate business behavior. The district court dismissed the SAC with prejudice and without leave to amend.

Plaintiffs timely appealed, seeking reversal of the district court's dismissal and a reinstatement of their claims, or, in the alternative, reversal of the district court's denial of leave to amend and remand with instructions permitting Plaintiffs to replead.

The United States filed an amicus brief in support of neither party solely on the issue of whether relevant government contracting regulations bar any allegation of monopoly or monopsony power in the Stewardship Services and Harvest Rights Markets.

## JURISDICTION AND STANDARD OF REVIEW

 **\*4** **[1]** **[2]** **[3]** **[4]** **[5]** We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) *de novo. Bodenburg v. Apple Inc.*, 146 F.4th 761, 767 (9th Cir. 2025). In so reviewing, we "accept as true Plaintiffs' nonconclusory factual allegations, construe all reasonable inference[s] in favor of Plaintiffs, and ask whether the facts are sufficient to state a claim to relief that is plausible on its face." *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 969 (9th Cir. 2017); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." *Somers v. Apple, Inc.*, 729 F.3d 953, 959–60 (9th Cir. 2013) (citation modified). We may affirm the district court's dismissal "on any basis supported by the record, even if the district court relied on different grounds or reasoning." *Maldonado v. Harris*, 370 F.3d 945, 949 (9th Cir. 2004). We review the denial of leave to amend for abuse of discretion, but the question of futility of amendment is reviewed *de novo. United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1172 (9th Cir. 2016).

## ANALYSIS

We start with Plaintiffs' monopolization claim before turning to conspiracy in restraint of trade. For the reasons discussed below, we conclude that Plaintiffs have not stated either claim, though we disagree with the district court that federal government contracting regulations preclude a finding of monopoly power as a matter of law. We nevertheless affirm dismissal because Plaintiffs do not plead sufficient facts to make out any element of their monopolization claim in any of the four Markets, nor the factual matter required to plead a tying agreement.

### I. Monopolization

 **[6]** Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire ... to monopolize" a market. 15 U.S.C. § 2. To state a plausible monopolization claim, Plaintiffs must show (1) "the possession of monopoly power in the relevant market"; (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident"; and (3) "causal antitrust injury." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)); *Somers*, 729 F.3d at 963. Plaintiffs do not successfully plead any element in any of the four Markets. *See United States v. Syufy Enters.*, 903 F.2d 659, 672 n.22 (9th Cir. 1990) ("Antitrust violations must be judged on a market-by-market basis.").

### A. Monopoly Power

 **[7]** **[8]** **[9]** **[10]** **[11]** Monopoly power is "the substantial ability 'to control prices or exclude competition.' " *Epic Games*, 67 F.4th at 998 (quoting *Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698). It requires "something greater" than mere market power. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Monopoly power may be demonstrated through direct or circumstantial evidence. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Plaintiffs can plead monopoly power by direct evidence by alleging "restricted output and supracompetitive prices,"[3] that is, "direct proof of the injury to competition which a competitor with market power may inflict[.]" *Id.* "A supracompetitive price is simply a price above competitive levels." *CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*, 150 F.4th 1056, 1068 (9th

Cir. 2025) (citation modified). Circumstantial evidence is the "more common type of proof" and requires Plaintiffs to "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434.

### 1. Stewardship Services Market

**\*5** In its order granting Defendants' motions to dismiss the FAC, the district court held that Plaintiffs failed to plausibly allege a monopoly in the Stewardship Services Market. The court reasoned that the federal government is "the only buyer" in the Stewardship Services Market, so the alleged "monopoly seller cannot exercise monopoly power to set prices because the government can simply walk away from the transaction." Moreover, the court concluded that Iron Triangle lacks the ability to charge the government a supracompetitive price because the Forest Service is bound by regulation not to pay an unreasonable price. Finally, the district court agreed with Iron Triangle that Plaintiffs cannot plead monopoly power in this market because Iron Triangle cannot exclude other market players from bidding on the renewal of the Stewardship Contract.

We disagree with the district court that federal government contracting regulations preclude a finding of monopoly power as a matter of law. As relevant here, 36 C.F.R. § 223.302 requires that stewardship agreements "be selected on a best-value basis." As the Government points out, though, the regulation itself says nothing about what the "best-value" price must be. And it is possible that, due to market factors and a supplier's anticompetitive practices, the best-value price for a given stewardship contract may also be supracompetitive.[4]

The other federal regulation relevant here, 48 C.F.R. § 15.402(a), similarly requires the Government to pay "reasonable prices" for contracted "supplies and services." But again, the regulation itself does not define "reasonable" pricing.[5] It also could not prevent a supplier from charging a supracompetitive price nor eliminate the possibility that the "reasonable" price in a particular circumstance is also supracompetitive. And though the Government may be able to "walk away" from a transaction based on a supracompetitive price, that does not mean the government necessarily would do so or could do so without cost. Indeed, the district court's rule makes no exceptions for circumstances where the Government-buyer might not "walk away" from a supracompetitive price because it unknowingly relied on misrepresentations.

**[12]** We therefore conclude that the district court erred in holding that a seller cannot exercise monopoly power when the Government is the only buyer and when federal regulations restrict the Government to a reasonable or best-value price.[6] However, this conclusion does not save Plaintiffs' Section 2 claim.

**\*6** The district court next held that Plaintiffs could not plead monopoly power in the Stewardship Services Market because Iron Triangle does not have the ability to exclude others from bidding on the renewal of the Stewardship Contract. Plaintiffs argue that Iron Triangle won the Stewardship Contract through misrepresentations to the Government that it would subcontract logging services but instead consolidated those opportunities for itself. That, Plaintiffs theorize, then prevented the Logger Plaintiffs and Prairie Wood from bidding on a renewed stewardship contract. Plaintiffs further contend that the potential for future competitive bidding processes for future stewardship contracts does not negate the monopoly power Iron Triangle held during this Stewardship Contract's ten-year term.

**[13]** Plaintiffs' arguments do not persuade. First, Plaintiffs do not plead their allegations concerning Iron Triangle's misrepresentations to the Government with the particularity required by Federal Rule of Civil Procedure 9(b). Plaintiffs alleged that Iron Triangle won the Stewardship Contract "by assuring the Forest Service in its written proposal that it would administer the contract in a manner that diversified the local economy and promoted the public interest." But Plaintiffs did not explain the "specific content of the false representations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). Absent additional detail, Plaintiffs' theory that Iron Triangle's

misrepresentations to the Forest Service prevented them from bidding on contract renewals is insufficient to satisfy Rule 9(b)'s heightened pleading standard. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009); *cf. Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964–65 (9th Cir. 2018) (holding that a plaintiff adequately pleaded fraud where she alleged "flushable" wipes were not actually flushable and explained why the representation that they were "flushable" was plausibly fraudulent using "multiple allegations in the FAC, including dictionary definitions and Kimberly-Clark's own statement on its website").

 **[14]**   Second, "weakening Iron Triangle's competitors by starving them of ... opportunities" is conclusory and otherwise not equivalent to excluding competition entirely. Plaintiffs do not plead, for example, that Iron Triangle prevented competitors from bidding on a potential renewed stewardship contract with the Forest Service. And to the extent Plaintiffs' argument flows from the Stewardship Contract itself, it is unavailing. The uncontested fact that Iron Triangle held 100% market share in the Stewardship Services Market is insufficient for Plaintiffs to state a claim because the Stewardship Contract is necessarily an exclusive contract. Plaintiffs cite no authority to the contrary. Thus, Plaintiffs have failed to properly plead that Iron Triangle "exclude[d] competition" in the Stewardship Services Market. *Epic Games*, 67 F.4th at 998 (quoting *Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698).

 **[15]**   Plaintiffs fare no better by either direct or circumstantial evidence. As for direct evidence, Plaintiffs do not sufficiently plead restricted output in the Stewardship Services Market. *See Rebel Oil*, 51 F.3d at 1434. Plaintiffs' allegations pertaining to reduced output—that other companies could not compete for the Stewardship Contract—fail because Plaintiffs do not allege that Iron Triangle prevented competitors from bidding for the existing Stewardship Contract, nor that competitors would be unable to do so if the Forest Service pursues a renewal bidding process.

 **[16]**   **[17]**   Considering circumstantial evidence, Plaintiffs do not sufficiently plead barriers to entry and to expansion.[7] *See id.* "A mere showing of substantial or even dominant market share alone" does not suffice. *Id.* at 1439. Rather, Plaintiffs "must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Id.* Plaintiffs allege "high barriers to entry" in this Market "due to the need to purchase and maintain specialized heavy equipment and develop the professional knowledge and experience to perform such services." But Plaintiffs do not allege either that these costs "were not incurred by incumbent firms but [were] incurred by new entrants" or that these costs "deter entry while permitting [Iron Triangle] to earn monopoly returns." *Id.* (citation modified). Nor do Plaintiffs allege that they were "prevented from" entering the Stewardship Services Market as a result. *Id.* (quoting *Syufy*, 903 F.2d at 672 n.21). Indeed, the cost of specialized machinery and professional knowledge more accurately represent the start-up costs that any player in the Stewardship Services Market would encounter. *See Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993) ("The mere fact that entry requires a large absolute expenditure of funds does not constitute a barrier to entry; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." (citation modified)).

 **\*7**   **[18]**   Plaintiffs also do not allege barriers to expansion. To the extent that Plaintiffs argue that the barrier to expansion in this market is Iron Triangle's 100% market share, that is a direct result of the exclusive Stewardship Contract that was awarded by the Forest Service through a competitive bidding process. That process may not be preferred by all Market participants, but it represents "actual market realities," *Eastman Kodak*, 504 U.S. at 466, 112 S.Ct. 2072, given that, as Plaintiffs admit, annual timber supply in the MNF Market Area is almost entirely controlled by the Forest Service.

For these reasons, we conclude that Plaintiffs have not plausibly pleaded a monopoly in the Stewardship Services Market.

## 2. Harvest Rights Market

The district court next held that Plaintiffs failed to plead a monopsony in the Harvest Rights Market, and we agree. This Market functions as the inverse of the Stewardship Services Market: here, the Government is the only seller, while Iron Triangle is an alleged monopsony buyer. But Plaintiffs' pleadings suffer the same flaws as in the Stewardship Services Market.

The district court's reasoning is also flawed to the extent it relies on the preclusive effect of federal regulations on antitrust liability. The district court again held that regulations relevant to this market—governing the Forest Service's ability to sell timber at certain rate values—prevent a finding of monopoly because "the government can simply walk away from the transaction." We disagree with that conclusion, but we affirm on the alternative ground that Plaintiffs did not plausibly plead monopoly power in this Market.

The relevant regulation, 36 C.F.R. § 223.61, requires the Forest Service to sell timber "for appraised value or minimum stumpage rates, whichever is higher" and, barring narrow exceptions for diseased or distressed timber, prevents the Forest Service from selling timber at rates below the "minimum stumpage rates." Like the term "best-value" in the contracting regulation discussed above, *see* 36 C.F.R. § 223.302, "appraised value" is not a fixed term and may well depend on market input. In turn, market input may be influenced by a buyer offering artificially subcompetitive prices. Indeed, Plaintiffs here allege that the "Forest Service considers Malheur Lumber's published log prices in appraising the value of its stewardship-based timber sales" and that those published prices are "uneconomical to contract loggers and private landowners" (by contrast, Malheur Lumber allegedly "privately pay[s] Iron Triangle much higher prices" for harvested sawlogs). It is therefore possible that, as Plaintiffs assert, a monopsony buyer may exercise substantial control over factors that influence the price of timber sales consistent with the regulation. In such circumstances, the Forest Service may unknowingly accept subcompetitive prices. The regulations therefore cannot preclude antitrust liability as a matter of law.

 [19]    We do agree, however, with the district court's conclusion that Plaintiffs did not plead monopoly power because Iron Triangle cannot prevent other buyers from bidding for harvest rights. As a result of the Stewardship Contract, Iron Triangle earned right of first refusal on 70% of available timber in the MNF Market Area and, through additional public bidding, has acquired a nearly 95% share of the Harvest Rights Market. Plaintiffs argue that Iron Triangle's power in the Harvest Rights Market flows from its dominance in the Stewardship Services Market, and Iron Triangle does not contest that it possesses the overwhelmingly dominant share in both markets.

 *8    However, Plaintiffs also do not deny that Iron Triangle cannot prevent other buyers from bidding in open timber sales. Indeed, they plead contrary allegations that demonstrate Iron Triangle is not the only successful buyer in the Harvest Rights Market. Two of those successful buyers—Prairie Wood and Rude Logging, LLC (Rude Logging)—are Plaintiffs in this action. So, by Plaintiffs' own allegations, it is not the case that competitors' ability to bid on the 30% of timber volume offered for sale by the Forest Service is only nominal.

 [20]    [21]    Further, market share alone, though significant, is insufficient to plead market power in the Harvest Rights Market. In *Eastman Kodak*, the Supreme Court held that monopoly power existed where Kodak "control[led] nearly 100% of the parts market and 80% to 95% of the service market." 504 U.S. at 481, 112 S.Ct. 2072. Because there were "no readily available substitutes" for both Kodak's service and parts, that significant market share was "sufficient to survive summary judgment." *Id.* There, market share was critical to finding monopoly power because there were no "readily available substitutes" for consumers of Kodak's services and parts. *Id.* Here, however, competitors have access to the same harvest rights as Iron Triangle through the open bidding process. As we explained above, weakened competition is not equivalent to exclusion from competition sufficient to state a Section 2 claim. And because Plaintiffs have not alleged that Iron Triangle restricts input in the Harvest Rights Market, Plaintiffs do not plead monopsony power by direct evidence either.

 [22]    Finally, Plaintiffs' circumstantial-evidence argument fails because they do not plead any barriers to expansion, and they do not sufficiently allege barriers to entry.[8] *Rebel Oil*, 51 F.3d at 1434, 1439. The alleged barriers to entry are: the Stewardship Contract; Iron Triangle's alleged predatory bidding; and Defendants' alleged tying arrangement. As discussed below, Plaintiffs do not plausibly plead a tying arrangement or a predatory bidding theory. And the Stewardship Contract itself is not a barrier

to entry for the remaining 30% of timber sales, which are conducted through open bidding and are not subject to the rights awarded to Iron Triangle by the Stewardship Contract.

In sum, Plaintiffs have not pleaded monopsony power in the Harvest Rights Market.

### 3. Logging Services Market

The district court held that Plaintiffs failed to plead monopoly power in the Logging Services Market by either direct or circumstantial evidence. Plaintiffs attempt to argue by direct evidence that Iron Triangle restricts output in this Market through (1) hoarding federal timber acquired through its right of first refusal under the Stewardship Contract, and (2) eliminating a pine outlet through its alleged tying agreement with Malheur Lumber, which affects demand for logging services on private timberland. The district court rejected both arguments—as do we.

 [23]   First, Plaintiffs' allegations with respect to the hoarding of federal timber are conclusory. Plaintiffs allege only that "Iron Triangle has exploited the stewardship contract to hoard enormous volumes of forestland timber under contract ... through the use of performance extensions obtained from the Forest Service based on blatant misrepresentations understa[t]ing its logging capacity[.]" Plaintiffs do not offer sufficient detail from which to infer "more than the mere possibility of misconduct." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. And Plaintiffs fail to plead Iron Triangle's alleged misrepresentations to the Forest Service with the specificity required by Federal Rule of Civil Procedure 9(b).

 *9   [24]   Plaintiffs' second direct-evidence argument fails both because it is not direct evidence of restricted output and because it is belied by the record. Plaintiffs themselves allege that, on federal timberland, the Forest Service determines whether, and when, to engage a contractor for logging services. Plaintiffs' assertion that Iron Triangle artificially suppressed demand by denying a pine outlet for private timberland is also conclusory. Plaintiffs do not establish beyond a "mere possibility" that Iron Triangle conditioned its sale of pine sawlogs to Malheur Lumber on the latter's refusal to purchase logging services from competitors and that this, in turn, caused a decline in logging opportunities. *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937.

Plaintiffs also do not plead supracompetitive prices in the Logging Services Market beyond conclusory allegations. Alleging a mere "*ability to* charge supra-competitive prices" and "to secure excessively high stewardship and logging services rates" is not sufficient. Thus, Plaintiffs fail to plead monopoly power by direct evidence.

 [25]   Plaintiffs fail on circumstantial evidence, too.[9] They allege the following barriers to entry and expansion: (1) Iron Triangle consolidated logging opportunities on federal timberland, thereby eliminating competitors' access to such opportunities; (2) Defendants' alleged tying agreement forecloses contract logging opportunities on private timberland; (3) there are substantial costs for mobilization of heavy, specialized equipment; and (4) timber supply is inelastic. None of these allegations is plausibly pleaded.

With respect to logging opportunities on federal timberland, Plaintiffs acknowledge in the same paragraph of the SAC that "90% of the annual [timber] supply [is] controlled by the Forest Service and subject to legally required sustained yield, endangered species and other supply constraints annually." Accordingly, the Forest Service largely determines logging opportunities in the MNF Market Area. Because Plaintiffs fail to properly plead a tying arrangement, that argument fails as a barrier to entry, too.[10] Finally, Plaintiffs do not allege that either high equipment costs or inelastic supply are barriers that "were not incurred by incumbent firms." *Los Angeles Land Co.*, 6 F.3d at 1427. Plaintiffs argue on appeal that already limited timber supply has been further limited by Iron Triangle's ten-year Stewardship Contract and predatory bidding. But Plaintiffs did not allege that Iron Triangle's competitors would be unable to obtain the same kind of contract with the Forest Service in future bidding cycles and did not properly allege predatory bidding, as discussed below.[11]

### 4. Softwood Sawlog Market

 [26]   Plaintiffs' allegations of monopoly power in the Softwood Sawlog Market largely mirror their allegations in the Logging Services Market and therefore suffer the same fate. Plaintiffs attempt to argue by direct evidence that Iron Triangle restricts softwood sawlog output by "hoarding" federal timber under contract and by eliminating sawlog harvests on private timberland as a result of the alleged tying agreement with Malheur Lumber. Plaintiffs also contend that the Stewardship Contract allows Iron Triangle to obtain sawlogs at artificially low prices and to sell them at supracompetitive rates. These arguments fail for the same reasons discussed in the upstream Markets.

 **\*10**   [27]   Plaintiffs' alleged barriers to entry and expansion do not suffice to state monopoly power by circumstantial evidence, either.[12] Plaintiffs again point to allegations that timber supply in the MNF Market Area is "highly inelastic" and that Defendants' alleged tying agreement, "under which Malheur Lumber ... refuses to purchase pine sawlogs harvested within the MNF Market Area from a seller other than Iron Triangle[,] substantially reduces the level of timber harvest on private lands[.]" These allegations all fail for the reasons previously discussed.

Plaintiffs next argue that even if Defendants' arrangement is not an illegal tying agreement, it has had substantial, monopolistic effects on the Logging Services and Softwood Sawlog Markets. Plaintiffs assert that timber sales in the MNF Market Area include a mix of fir and pine species. Thus, "a local outlet for both species is generally necessary," and "the lack of a buyer for pine sawlogs"—due to the alleged tying agreement—"is a significant barrier to landowners and loggers who would otherwise enter the Softwood Sawlog Market." But Plaintiffs also alleged that Prairie Wood is an outlet for pine sawlogs and did not allege any facts that would explain why Prairie Wood does not or cannot process pine harvests at a profit. Thus, we conclude that Plaintiffs do not plead facts to state monopoly power in the Softwood Sawlog Market.

### B. Anticompetitive Conduct

At step two of the monopolization inquiry, Plaintiffs must show anticompetitive conduct. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004); *Epic Games*, 67 F.4th at 998. Throughout this litigation, Plaintiffs have raised some combination of the following theories of anticompetitive conduct: (1) false representations to the Forest Service; (2) predatory bidding for harvest rights; (3) hoarding logging opportunities; (4) restraint of trade by way of the alleged tying agreement; and (5) refusal to deal. Of these, we address only the theories Plaintiffs appear to maintain on appeal: false representations, predatory bidding, and hoarding logging opportunities. For the reasons discussed below regarding Plaintiffs' Section 1 claim, Defendants' alleged tying arrangement also fails as a theory for anticompetitive conduct.

### 1. Misrepresentations to the Forest Service

 [28]   Plaintiffs argue that Iron Triangle willfully acquired and maintained its monopolies through false representations to the Forest Service in the process of acquiring the Stewardship Contract in 2013 and through "maintain[ing] a pattern of understating its logging capacity and financial performance to accumulate timber under contract and obtain preferential service rates[.]" These allegations seemingly apply to the Stewardship Services Market, the Harvest Rights Market, and the Logging Services Market. *See Syufy*, 903 F.2d at 672 n.22.

Plaintiffs do not meet their heightened pleading obligations under Federal Rule of Civil Procedure 9(b), which applies to their allegations concerning "*fraudulent* representations to the Forest Service." *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) (explaining that Rule 9(b) applies to any "allegations of fraud" in a complaint alleging "some fraudulent and some non-fraudulent conduct"). Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud or

mistake." Fed. R. Civ. P. 9(b). However, Plaintiffs adduce no nonconclusory detail on the nature of the alleged misrepresentations "that systematically understated" Iron Triangle's logging capacity and "financial performance"—only that Iron Triangle made these allegedly false statements.[13]

## 2. Predatory Bidding

**\*11  [29]**  Plaintiffs next argue that Iron Triangle engaged in predatory bidding to consolidate its hold on the Harvest Rights, Logging Services, and Softwood Sawlog Markets. "In a predatory-bidding scheme, a purchaser of inputs bids up the market price of a critical input to such high levels that rival buyers cannot survive (or compete as vigorously) and, as a result, the predating buyer acquires (or maintains or increases its) monopsony power." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320, 127 S.Ct. 1069, 166 L.Ed.2d 911 (2007) (citation modified). "If all goes as planned, the predatory bidder will reap monopsonistic profits that will offset any losses suffered in bidding up input prices." *Id.* at 321, 127 S.Ct. 1069. Predatory bidding schemes " 'are rarely tried, and even more rarely successful.' " *Id.* at 323, 127 S.Ct. 1069 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)). To succeed on this theory, Plaintiffs must plausibly allege that (1) Iron Triangle bid for harvest rights at a loss, and (2) Iron Triangle would have a "dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power." *Id.* at 325, 127 S.Ct. 1069.

**[30]**  Regarding the first element, Plaintiffs argue that they specifically pleaded facts related to Iron Triangle's bidding. The SAC includes allegations related to several timber sales: the Conroy sale, the Coxie sale, the R & R sale, and the Ruby sale. According to Plaintiffs, each resulted in a loss for Iron Triangle. For each sale, Plaintiffs determined the alleged loss based on the difference between the value of the timber at purchase and Iron Triangle's costs of performing that sale. Iron Triangle argues that Plaintiffs were required to allege facts demonstrating that Iron Triangle ultimately sold at a loss, rather than the value of the timber sales at the time of purchase. Plaintiffs respond that at the pleading stage, it is reasonable to infer that the value of the commodities purchased is a fair proxy for sales revenue.

In theory, Plaintiffs make a reasonable argument. On their face, Plaintiffs' allegations demonstrating the values of several timber sales represent estimates that approximate the cost differential between Iron Triangle's acquisition of timber and costs for "stumpage, logging and truck hauling." For each timber sale, Plaintiffs thus allege specific figures suggesting that Iron Triangle incurred a loss. *Cf. Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at \*8 (S.D.N.Y. Feb. 21, 2019) (finding that "evidence of below-cost pricing related to a single bid for a single contract is not sufficient to support a predatory bidding claim" (citation modified)).

**[31]**  On the other hand, however, "the exclusionary effect of prices above a relevant measure of cost [may] reflect[ ] the lower cost structure of the alleged predator, and so represents competition on the merits." *Weyerhaeuser*, 549 U.S. at 319, 127 S.Ct. 1069 (citation modified). The Supreme Court has therefore cautioned that courts must be "particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, chill legitimate price cutting, which directly benefits consumers." *Id.* (citation modified).

Ultimately, we need not determine if Plaintiffs have plausibly alleged that Iron Triangle bid at a loss because the dangerous-probability element dooms their predatory bidding theory. Plaintiffs point to Iron Triangle's 90% or greater market shares in the Logging Services and Softwood Sawlog Markets to argue that "there has been and will be *abundant opportunity to* recoup the costs of the predatory bidding," even through "modest[ly]" "increased prices for logging services and increased softwood sawlog prices." First, an "abundant opportunity to recoup" Iron Triangle's losses is conclusory, so these allegations do not suffice. More critically, however, Plaintiffs' allegations rely solely on Iron Triangle's dominant market share in the Logging Services and Softwood Sawlog Markets. But it follows logically that an incumbent firm with a substantial market share could recoup losses incurred through meritorious competitive bidding by modestly raising prices elsewhere in its business. Without

more, this cannot be sufficient to plead predatory bidding—the result would effectively reduce the question to a mere market share inquiry. Plaintiffs therefore do not clear the high bar required to state a predatory bidding scheme.

### 3. Hoarding Logging Opportunities

**\*12** **[32]** Plaintiffs similarly do not plead that Iron Triangle hoarded logging opportunities. Plaintiffs allege that in the first year of the Stewardship Contract, Iron Triangle subcontracted logging services to other loggers, including Plaintiffs Rude Logging and Engle Contracting, LLC (Engle). However, the following year, Iron Triangle offered contracts to the same group of loggers but at reduced rates. While Rude Logging accepted the reduced contract rate in 2014, Engle declined the new rates. Plaintiffs allege that "[i]n presenting uneconomic logging service contracts to contract loggers in 2014 through 2016, Iron Triangle was pursuing a deliberate anticompetitive strategy to eliminate these loggers from competing with Iron Triangle in the MNF Market Area and to acquire those contract logging opportunities for itself through vertical integration." Even taking as true the allegations that Iron Triangle reduced its logging subcontract rates, "facts that are merely consistent with a defendant's liability ... stop[ ] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citation modified). Plaintiffs do not allege specific facts to support the theory that reduced rates were utilized as an anticompetitive tactic—just that the rates were reduced and that the Logger Plaintiffs refused to accept them. Asserting that doing so was "a deliberate anticompetitive strategy" merely repeats an element of the cause of action and thus does not suffice. *See id.* at 679, 129 S.Ct. 1937.

### C. Antitrust Injury

**[33]** **[34]** The final element of Plaintiffs' monopolization claim is causal antitrust injury. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010). "[T]he fact of injury or damage must be alleged at the pleading stage." *Somers*, 729 F.3d at 963. To state antitrust injury, Plaintiffs must plead: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, ... (4) that is of the type the antitrust laws were intended to prevent[,]" and (5) "that the injured party be a participant in the same market as the alleged malefactors," either as a consumer or a competitor. *Id.* (citation modified). With respect to the fourth element, our court has held that "the antitrust laws are only intended to preserve competition for the benefit of consumers." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). We conclude that Plaintiffs do not state antitrust injury in any of the four Markets.

### 1. Stewardship Services Market

**[35]** **[36]** **[37]** Neither the Landowner Plaintiffs nor Prairie Wood are participants in the Stewardship Services Market, so we assess antitrust injury in this Market only as to the Logger Plaintiffs. Plaintiffs allege generally that Iron Triangle foreclosed contract loggers from the Stewardship Services Market and that Iron Triangle foreclosed stewardship opportunities on private forestland in the MNF Market Area. "[C]onduct that eliminates rivals reduces competition," but "reduction of competition does not invoke the Sherman Act until it harms consumer welfare." *Rebel Oil*, 51 F.3d at 1433. Plaintiffs have not alleged harm to consumers, rather than to individual competitors, and these allegations are otherwise conclusory. Moreover, the Stewardship Contract itself is not a proper source of antitrust injury here. To the extent Plaintiffs allege that injury flows from Iron Triangle winning the Stewardship Contract, Plaintiffs "would have suffered the same injury had [any other business] acquired the exclusive right" to perform stewardship services on federal land in the MNF Market Area. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998).[14] Any exclusive contract "has the potential for producing economic readjustments that adversely affect some persons," but that does not necessarily rise to the level of unlawful conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, Plaintiffs have not pleaded antitrust injury in the Stewardship Services Market.

## 2. Harvest Rights Market

 **[38]**   Plaintiffs do not allege antitrust injury in the Harvest Rights Market with respect to the Landowner Plaintiffs, so we assess injury in this Market as to the Logger Plaintiffs and Prairie Wood only. On appeal, Plaintiffs assert that the Logger Plaintiffs were foreclosed from access to harvest rights and standing timber by Iron Triangle's predatory bidding. Of the Logger Plaintiffs, however, Plaintiffs allege only that Rude Logging and Engle are "engaged in the business of purchasing public timber sales." And Plaintiffs allege facts related only to Rude Logging's injury in the Harvest Rights Market.

 **\*13**   As discussed above, Plaintiffs do not adequately plead their predatory bidding theory. And, for purposes of the injury analysis, Plaintiffs must allege more than the mere fact that Rude Logging lost several bids. For example, Plaintiffs allege that "Rude Logging was one of the top unsuccessful bidders on three of ... four predatorially bid timber sales"—but absent allegations that Rude Logging was the second highest bidder, and therefore would have won the bid if Iron Triangle had not, Plaintiffs have not demonstrated causal injury.

 **[39]**   With respect to Prairie Wood, Plaintiffs assert that the denial of a pine outlet through Iron Triangle's agreement with Malheur Lumber forecloses a substantial portion of the Softwood Sawlog Market, which in turn drives up Prairie Wood's costs and reduces its ability to bid for harvest rights. But the antitrust laws "were enacted for the protection of competition, not competitors." *Brunswick*, 429 U.S. at 488, 97 S.Ct. 690 (citation modified). Plaintiffs do not allege facts to support the inference that all competition in open-bid sales was injured by Iron Triangle's bidding. Additionally, and as discussed, Iron Triangle does not control public bidding for harvest rights; the Forest Service does. Thus, Plaintiffs do not plausibly state that Prairie Wood's injuries in the Harvest Rights Market flowed from Iron Triangle's unlawful conduct.

## 3. Logging Services and Softwood Sawlog Markets

 **[40]**   In the Logging Services Market, Plaintiffs allege antitrust injury with respect to the Logger Plaintiffs and the Landowner Plaintiffs. The Logger Plaintiffs argue that they were foreclosed from selling logging services to private landowners and to Malheur Lumber through Defendants' alleged tying agreement and therefore suffered lost profits. However, Plaintiffs also alleged that Iron Triangle *did* offer logging subcontracts to the Logger Plaintiffs, albeit at reduced rates. Plaintiffs do not explain how Iron Triangle's reduced rates injured all competition in the Logging Services Market. Moreover, as the district court explained, "[s]eeking the lowest possible price for subcontracts is pro-competitive behavior, which in the end, should lower the costs of the product for consumers." And with respect to the alleged tying agreement, the district court correctly concluded that Malheur Lumber's decision to purchase logging services from Iron Triangle is not antitrust injury because the antitrust laws' prohibitions "focus on protecting the competitive process and not on the success or failure of individual competitors."

 **[41]**   The Landowner Plaintiffs, who are buyers in the Logging Services Market, argue that but for the alleged tying agreement, they would have retained contract loggers to harvest their timber and that the alleged agreement denied them these opportunities. But they also alleged that Prairie Wood is an outlet for pine sawlogs and that Malheur Lumber has offered to purchase pine at cost. Thus, Plaintiffs do not state anticompetitive injury in the Logging Services Market.

Finally, Plaintiffs contend that the Logger Plaintiffs, Landowner Plaintiffs, and Prairie Wood all incurred the same injury in the Softwood Sawlog Market. The alleged injury, and Plaintiffs' related allegations, all mirror the allegations made regarding the Logging Services Market because all concern Iron Triangle's alleged foreclosure of a pine outlet. Accordingly, we reject Plaintiffs' arguments for the same reasons and conclude that Plaintiffs fail to state anticompetitive injury in this Market, too.

\*\*\*

In sum, Plaintiffs do not properly plead a monopolization claim under Section 2 of the Sherman Act for any of the four Markets in the MNF Market Area, and we affirm the district court's grant of Defendants' motions to dismiss.

## II. Conspiracy in Restraint of Trade

**\*14** Plaintiffs allege that Defendants have entered into an illegal tying arrangement "under which Malheur Lumber refuses to purchase pine sawlogs produced in the MNF Market Area from sellers other than Iron Triangle, in order to foreclose their ability to sell pine sawlogs locally and thereby undermine their ability to compete with Iron Triangle" in the Logging Services and Softwood Sawlog Markets. Plaintiffs' allegations cannot survive a motion to dismiss.

**[42]    [43]    [44]** "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak*, 504 U.S. at 461, 112 S.Ct. 2072 (citation modified). "Not all tying arrangements are illegal." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008). Tying arrangements may be unlawful *per se* or may be analyzed under the rule of reason. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 564–65 (9th Cir. 2024).

**[45]    [46]** To survive a motion to dismiss for a *per se* unlawful tying arrangement, a plaintiff must plead: "(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (citation modified). "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'— qualify as unreasonable *per se*." *Teradata Corp.*, 124 F.4th at 564 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41, 138 S.Ct. 2274, 201 L.Ed.2d 678 (2018)).

**[47]** The first element of the *per se* test is the sale of two distinct products. Plaintiffs here allege that Iron Triangle "tied its willingness to supply all of Malheur Lumber's pine sawlog requirements to Malheur Lumber's agreement not to purchase logging services from any party other than Iron Triangle." Determining "whether one or two products are involved turns ... on the character of the demand for the two items" and therefore depends on whether the products are "distinguishable in the eyes of buyers." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), *abrogated in part on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006). The district court here held that "logging services and sawlogs are not two distinct products with distinct markets" because, from Malheur Lumber's perspective, both "provide it with the sole product it needs for its mill – sawlogs."

**[48]** The district court was correct. Applying the purchaser-demand test from *Jefferson Parish*, the relevant inquiry is whether the market for logging services is separate from the market for sawlogs from Malheur Lumber's perspective. *See Rick-Mik Enters.*, 532 F.3d at 975. Here, the service that generates the product is necessarily linked to that product. Though Malheur Lumber could theoretically purchase sawlogs and the services required to cut trees into sawlogs from different sources, in the end, Malheur Lumber has still obtained a single product—sawlogs. Put another way, absent its need for sawlogs, Malheur Lumber, a sawmill, would have no need for logging services. *See Epic Games*, 67 F.4th at 995 (noting that "the existence of separate products is inferred from 'more readily observed facts' " and circumstantial evidence (quoting Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* ¶ 1745c (4th ed. 2017))).

**\*15** Plaintiffs rest their argument on our decision in *Reid Brothers Logging Company v. Ketchikan Pulp Company*, 699 F.2d 1292 (9th Cir. 1983). There, we affirmed the district court's finding of an antitrust conspiracy in violation of Section 1, and we observed that there were several separate product markets: the sale of standing timber, the sale of logs by independent loggers, the sale of logging services by contract loggers, and the processing of logs by pulp plants and sawmills. *Id.* at 1295. However, that case did not concern a tying arrangement and so did not analyze the elements of a tying claim, including the requirement for distinct products. *Reid Brothers* also preceded *Jefferson Parish* so, in any event, we had no occasion to apply the purchaser-demand test there.

[49]    [50]    [51]    Additionally, "even where a transaction involves separate products, it is not necessarily a tie; the seller must also '*force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.' " *Epic Games*, 67 F.4th at 995 (quoting *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. 1551). Thus, "coercion is often the touchstone issue in assessing a claim of illegal tying." *Cascade Health*, 515 F.3d at 914. Here, Plaintiffs have not pleaded facts to suggest that Malheur Lumber was forced to purchase logging services from Iron Triangle rather than from other loggers. On the contrary, both Defendants contend their agreement was a voluntary contract entered into because Iron Triangle had enough lumber to fulfill all of Malheur Lumber's pine sawlog requirements for over two years. Moreover, it is unsurprising that a buyer of sawlogs might wish to purchase logging services from the same supplier. After all, "[b]uyers often find package sales attractive." *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. 1551. And on the flip side, "a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act." *Id.* Plaintiffs therefore do not plead a *per se* tying agreement.

[52]    [53]    [54]    Turning to the rule of reason, the analysis is "essentially the same" as the anticompetitive-conduct inquiry for a monopolization claim under Section 2. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020); *accord Epic Games*, 67 F.4th at 998; *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). The district court concluded that Plaintiffs' allegations of unlawful behavior could equally suggest legitimate business behavior. On appeal, Plaintiffs argue that Defendants' tying arrangement is anticompetitive because "in an open market, a rational sawmill would welcome additional logging service and sawlog output from multiple sellers to stimulate price competition and reduce its costs"; likewise, a rational seller of sawlogs and logging services "would welcome the entry of a new sawmill like Prairie Wood ... as a significant new customer." However, "[b]usinesses may choose the manner in which they do business absent an injury to competition," *Brantley*, 675 F.3d at 1202, including by choosing to contract exclusively. Thus, it is not sufficient under the rule of reason to allege merely that "parties have entered into a contract that limits some freedom of action." *Id.*; *see also Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence."). For the reasons discussed pertaining to Plaintiffs' Section 2 claim, Plaintiffs have not properly pleaded anticompetitive conduct or antitrust injury, so their Section 1 claim also fails under the rule of reason.

### III. Leave to Amend

**\*16** [55]    [56]    Lastly, we address the district court's denial of leave to amend Plaintiffs' complaint for a third time. A party may amend its pleading once as a matter of course and then "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1)–(2). A district court may deny leave to amend in its discretion when amendment would be futile. *Parents for Priv. v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020). "Under futility analysis, dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011) (citation modified).

[57]    The district court concluded that future amendments would be futile and therefore denied leave to amend. Plaintiffs contend that the court offered almost no reasoning to explain why Plaintiffs could not cure the pleading deficiencies, but the court explained that Plaintiffs had already filed three complaints and that, in dismissing the FAC, the court "walked through each element of Plaintiffs' claims and provided guidance to Plaintiffs on how to cure the identified deficiencies." The district court determined that, on their third attempt, Plaintiffs failed to do so. Plaintiffs have not demonstrated "how they could amend their complaint to remedy the ... deficiencies in their claims"; instead, they argue "that their complaint, as currently alleged, is sufficient to state their claims." *Parents for Priv.*, 949 F.3d at 1239; *see also Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1099–1100 (9th Cir. 2024) (affirming denial of leave to amend where plaintiff failed to identify "any factual allegation or legal theory it would advance in a fourth complaint that would cure the deficiencies found by the district court" and did not explain "why any such allegations or theories would have been previously unavailable to it"). Thus, the district court did not abuse its discretion by denying Plaintiffs leave to amend their complaint for a third time.

**CONCLUSION**

For the foregoing reasons, we conclude that Plaintiffs do not state either of their federal antitrust claims and that further amendments to the complaint would be futile.

**AFFIRMED.**

**All Citations**

--- F.4th ----, 2026 WL 90235

Footnotes

1       We refer to the various groups as the Logger Plaintiffs, Landowner Plaintiffs, and Prairie Wood, respectively.

2       Prairie Wood shut down in 2009 due to the Great Recession and remained closed until 2022.

3       Where Plaintiffs plead monopsony power by direct evidence, they must allege restricted input, rather than output, and that the input restriction resulted in subcompetitive, rather than supracompetitive, prices. *See Rebel Oil*, 51 F.3d at 1434.

4       For example, the Government argues as amicus that lack of competition in a given market "may make it difficult for the [government] contracting officer to find other rates to which to compare a monopolist's proposed rates. Or the monopolist's past supra-competitive prices may be the baseline to which the contracting officer compares the offeror's proposed rates." And "because contracting officers do not have the tools of antitrust enforcement agencies to investigate and uncover anticompetitive activity[,]" they simply "may be unaware of anticompetitive activity that has affected price offers."

5       The regulation does describe the factors the contracting officer must consider "[i]n establishing the reasonableness of the offered prices," including the types of cost and pricing data the contracting officer must obtain and consider. 48 C.F.R. § 15.402(a). But the contracting officer must still consider this data "as necessary to establish a fair and reasonable price." *Id.* § 15.402(a)(1), (a)(2); *see also id.* § 15.402(a)(2)(ii)(A)–(B), (a)(3). The regulation also requires the contracting officer to obtain only "the type and quantity of data necessary to establish a fair and reasonable price, but not more data than is necessary." *Id.* § 15.402(a)(3). Thus, if supracompetitive pricing is not evident on the face of the data, the contracting officer might rely on the limited data before them showing such inflated pricing and ultimately accept the contract.

6       The district court and Iron Triangle relied on *GMA Cover Corp. v. Saab Barracuda LLC*, 2012 WL 642739 (E.D. Mich. Feb. 8, 2012), *report and recommendation adopted*, 2012 WL 639528 (E.D. Mich. Feb. 28, 2012), but that case is distinguishable. *Saab Barracuda* dealt with a potential bilateral monopoly, and the selling price was a "ceiling price" that had been submitted by the seller to the government buyer, the Army, in a competitive bidding process. *Id.* at *7–8. The "ceiling price" bid was then accepted by the Army. *Id.* at *8. Thus, there were no allegations that the ceiling price was supracompetitive. *Id.* The regulations at issue in this case, however, do not set a predetermined ceiling price but rather use subjective terms like "best-value" and "reasonable"—terms which necessarily depend on market conditions, including potential inflation by dishonest business partners, as Plaintiffs suggest happened here.

7       The parties do not contest the definition of the Stewardship Services Market nor Iron Triangle's 100% dominant market share.

8       As with the Stewardship Services Market, the parties do not contest the Harvest Rights Market's definition, nor that Iron Triangle holds the dominant market share.

9       The district court previously held, and the parties do not contest, that Plaintiffs properly alleged that the Logging Services Market is an antitrust market and that Iron Triangle holds a dominant share.

10      Moreover, because the alleged tying agreement began in 2020, it could not have been a barrier to entry in the Logging Services Market in the years prior.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiffs relatedly challenge the district court's finding that "Plaintiffs cannot bootstrap market power in downstream markets to allegations regarding upstream market power or control of a resource Defendant Iron Triangle does not have." Plaintiffs assert that the district court failed to "appreciate that access to harvestable timber is a necessary predicate to the performance of logging services." That may be, but Plaintiffs did not properly plead market power in the upstream Harvest Rights Market, either. Their bootstrapped allegations thus also fail in the Logging Services Market.

As with the prior Markets, the district court held that Plaintiffs sufficiently pleaded the existence of the Softwood Sawlog Market and that Iron Triangle holds a dominant share, and Iron Triangle does not dispute these findings.

For example, Plaintiffs make an attempt at detail by alleging that, "with respect to the service rates charged to the Forest Service under Task Order 2, Iron Triangle falsely represented that it had lost substantial sums during the first year of performance under the 10-year stewardship contract and used those false representations to secure an excessive aggregate service rate of approximately $63 per ton to harvest, remove and truck logs to sawmill purchasers." But Plaintiffs do not plead other "factual matter" to explain why these statements were false or that they were the reason Iron Triangle secured the $63-per-ton service rate. *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 970 (9th Cir. 2008).

At oral argument on Defendants' motion to dismiss the FAC, Plaintiffs acknowledged that "it wasn't a violation of the antitrust laws for Iron Triangle to have won the stewardship contract in 2012, and ... nowhere do we contend in the complaint that that was a violation of the antitrust laws."

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.