# EXHIBIT A

2026 WL 1283922
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

Sezzle, Inc., Plaintiff,
v.
Shopify, Inc., Defendant.

File No. 25-cv-2395 (ECT/SGE)
|
Filed 05/11/2026

**Attorneys and Law Firms**

Michael A. Collyard, Munir R. Meghjee, Stephen P. Safranski, Ryan W. Marth, Peter C. Ihrig, and Maxwell E. Loos, Robins Kaplan LLP, Minneapolis, MN, for Plaintiff Sezzle, Inc.

Rachel S. Brass, Joseph R. Rose, Gibson, Dunn & Crutcher LLP, San Francisco, CA; Harry R.S. Phillips, Gibson, Dunn & Crutcher LLP, Washington, DC; Richard C. Landon, Lathrop GPM LLP, Minneapolis, MN; Michael F. Murray, Paul Hastings LLP, Washington, DC; James M. Pearl, Paul Hastings LLP, Century City, CA; and Thomas P. Brown, Paul Hastings LLP, San Francisco, CA, for Defendant Shopify, Inc.

## OPINION AND ORDER

Eric C. Tostrud United States District Court

 **\*1**  Sezzle operates a transaction service that allows users to buy products in installments, including on websites hosted by Shopify, a company that provides online commerce platforms to merchants. In 2021, Shopify began to offer merchants a similar system called "Shop Pay Installments." Shopify then took several steps to make Sezzle a less attractive option to merchants and consumers, making it difficult to find Sezzle in the purchasing process and charging merchants a fee for each transaction Sezzle facilitated.

Sezzle brought this case alleging violations of federal and state antitrust law. It claims that Shopify attempted to monopolize, and successfully monopolized, the market for "Buy Now Pay Later" services on Shopify platforms, violating § 2 of the Sherman Act, and that Shopify unreasonably restrained trade in violation of § 1 of the Sherman Act. Sezzle also raises parallel antitrust claims under Minnesota law and a claim under the Minnesota Deceptive Trade Practices Act. Shopify moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

That motion will be granted in part and denied in part. Sezzle's § 2 claims will survive, as it has plausibly alleged a relevant market, Shopify's monopoly power, and anticompetitive conduct. Sezzle's § 1 claims are a mixed bag. The unlawful tying claim will be dismissed because there are not plausible allegations that Shopify coerced merchants or consumers into purchasing or using its payment processor. The unlawful restraint claim will survive, however, because the Complaint plausibly shows that the merchants' contracts with Shopify unreasonably restrained trade. The state-law claims mirror the federal ones, so they survive or fall to the same extent.

I [1]

Sezzle offers online payment services to merchants and consumers. Compl. [ECF No. 1] ¶ 23. It allows consumers to purchase goods in up to four interest-free installments, a service called "Buy Now Pay Later" or "BNPL." *Id.* ¶¶ 24–25. Consumers pay the merchant's sticker price, and merchants pay a small per-transaction fee for each purchase made through Sezzle. *Id.* ¶ 27. Whatever financial hit the merchant takes in Sezzle fees, the merchant makes up in increased sales from consumers who are unable to pay a lump sum or qualify for credit cards. *Id.* ¶ 28. Sezzle offers other services too. When consumers choose to "Sezzle Up," Sezzle reports their payments to credit bureaus, and consumers can increase their credit scores. *Id.* ¶ 26. Merchants benefit from Sezzle's real-time inventory-locking feature: When a consumer places an item in their online shopping cart, it is removed from the merchant's inventory, preventing items from overselling. *Id.* ¶ 29.

Shopify provides e-commerce platforms on which merchants can "set up an online store and market their products directly to consumers." *Id.* ¶ 42. Using one of Shopify's "Drag-and-Drop" platforms, a merchant with minimal technological skills can quickly create a template-based website populated with the merchant's images. *Id.* ¶¶ 44–45. Shopify charges merchants a subscription fee to use its services. *Id.* ¶¶ 42, 180 & n.29 (referring to Shopify's pricing webpage); ECF No. 28-1 (showing Shopify's "Plans & Pricing" webpage). If a merchant sets up a Shopify website, it can be technologically difficult and slow to switch to another provider, and the

merchant's online business could be non-operational while it transfers platforms. Compl. ¶¶ 54–55.

**\*2** Shopify has been successful, "host[ing] approximately 4.4 million active merchant websites worldwide," while its competitors serve notably fewer merchants. *Id.* ¶ 52 (noting that Wix hosts about 700,000 active websites, Square about 300,000, and Squarespace about 200,000). In 2023, Shopify "had a 70% market share of the 800 leading direct-to-consumer brands." *Id.* ¶ 162. In the wider e-commerce market, Shopify processed about 10% of national sales volume, but in the narrower drag-and-drop e-commerce platforms category, it exceeds 95% of the market share. *Id.* ¶¶ 161–62.

Merchants using Shopify's e-commerce platforms can choose to enable third-party payment services like those offered by Sezzle (and BNPL competitors like Afterpay and Klarna). *Id.* ¶ 46. Consumers generally like using the BNPL options, and merchants reported substantial increase in average order value and purchase frequency (and decrease in returns) after making Sezzle available on their sites. *Id.* ¶ 48. "[F]rom January 1, 2019 through June 1, 2021, the total value of Sezzle transactions on Shopify stores increased over 1200%, and the number of Shopify stores using Sezzle tripled." *Id.* ¶ 50.

Since 2013, Shopify has offered its own transaction medium called "Shopify Payments," the company's primary profit-driver. *Id.* ¶ 56. When a consumer purchases through Shopify Payments (using, for example, a credit card), Shopify charges the merchant a small fee on that charge, typically about 2.9% plus $0.30. *Id.* ¶ 58; *see* ECF No. 28-1 at 2 (showing Shopify Payment fees at different membership levels). Shopify Payments is set as the default payment processing system on Shopify websites. *Id.* ¶ 57. Additionally, Shopify offers a streamlined version of Shopify Payments called "Shop Pay," which saves the consumer's information (e.g., address, credit card number), and Shop Pay is "automatically installed for merchants that use Shopify Payments." *Id.* ¶¶ 59–60.

Shopify announced in May 2020 that it would offer its own BNPL payment system. *Id.* ¶ 67. In June 2021, Shopify launched "Shop Pay Installments," incorporated it into Shop Pay, and set it as the default payment processor on Shopify-based merchants' websites. *Id.* ¶¶ 69–70.

Shopify then imposed "several artificial roadblocks" that made it difficult for consumers to make purchases using Sezzle on Shopify-based merchants' websites. *Id.* ¶ 75. First,

Shopify "obscur[ed] Sezzle and other BNPL options in the checkout process," *id.*; *see id.* ¶ 76 ("Shopify ... buried Sezzle as a checkout option ...."), and forced Sezzle to lie to its customers, *id.* ¶¶ 77–79. After hiding the option to purchase through Sezzle, Shopify incorrectly told merchants that the problem was caused by a bug in Sezzle's software, and required Sezzle to inform merchants that Sezzle was not removed. *Id.* ¶¶ 76–78. Sezzle took this pressure as a threat; it feared "Shopify would do something to cause more harm to Sezzle on its platform." *Id.* ¶ 78. Shopify then required Sezzle to send another email exonerating Shopify for Sezzle's unavailability. *Id.* ¶ 79. Meanwhile, Shopify "relegated Sezzle's functionality to 'beta' ..., which prevented any Shopify-based merchants from signing up with Sezzle" until the email was sent. *Id.*

Second, Shopify "effectively buried Sezzle deep within its merchants' checkout sequences, behind multiple clicks and confusing prompts." *Id.* ¶ 82. Call this the counterintuitive purchase screen. A consumer clicking through the pages in the payment process may attempt to select the Sezzle BNPL option, but Shopify will route them to Shop Pay Installments instead. *See id.* ¶¶ 84–88. Crucially, at the "Payment" screen, if the consumer clicks a button marked, "Buy Now, Pay Later with Sezzle," the consumer is informed that they "will be redirected to Buy Now, Pay Later with Sezzle," but the consumer is actually sent to a Shop Pay screen to enter their email address and contact information. *Id.* ¶¶ 86–88. To purchase through Sezzle, the consumer must click "Check out as guest," at the bottom of the screen, and the webpage nowhere informs the consumer that this is a necessary step to pay with Sezzle. *Id.* ¶¶ 88–89. Merchants and consumers have complained about this system because they could not find Sezzle at the checkout. *Id.* ¶¶ 90–93. Further, if the consumer chooses to enter their email, Shop Pay remembers the consumer at later visits through cookies, "and the consumer will automatically encounter this same forced Shop Pay/Shop Pay Installments experience." *Id.* ¶ 94. In this way, Shop Pay offers the path of least resistance—to use it, a consumer merely must only enter contact information once and never has to alter the default settings. Using Sezzle, on the other hand, requires clicking more boxes, entering more information, and going down a less intuitive route. Shopify has claimed that Shop Pay's speedy checkout process, tightly integrated with Shopify-based websites, has made Shopify dominant in the BNPL aftermarket. *Id.* ¶ 95.

**\*3** Third, in June 2022, Shopify began charging merchants who use Shopify Payments a 1–2% fee for every Sezzle

(or rival BNPL system) transaction. *Id.* ¶ 99. Call this the third-party payment fee. That change affected about 90% of merchants in the United States who used a Shopify-based website. *Id.* Merchants have stopped using Sezzle because they could not afford to pay the fee, and merchants switched to Shop Pay for "the vast majority, if not all, [of] BNPL purchases on their Shopify-based websites." *Id.* ¶¶ 100–02.

The remaining "artificial roadblocks" require less explanation. Fourth, around June 2022, Shopify told merchants that it would no longer make Sezzle and other BNPL payment processors available—other than Shop Pay Installments, that is. *Id.* ¶ 103. This was false—merchants could keep Sezzle by downloading an updated version—but it effectively drove many merchants away from offering Sezzle on their websites. *Id.* ¶¶ 103–05. Fifth, "Shopify also cut off its merchants' ability to obtain Shopify order identification numbers ... for purchases made through Sezzle and other similar third parties." *Id.* ¶ 106. This made it harder for merchants to reconcile purchase orders with inventory and sales data. *Id.* ¶¶ 106, 108. Sixth, Shopify disabled Sezzle's real-time inventory locking on Shopify-based websites. *Id.* ¶ 110. Seventh, Shopify permitted Sezzle to use only a "grainy, low-resolution image for Sezzle's checkout option," while Shopify uses for itself a high-resolution image. *Id.* ¶ 114.

Shopify's tactics have led to "dominance on the BNPL aftermarket." *Id.* ¶ 95; *see id.* ¶ 14 ("By 2024, Shopify's estimated BNPL market share with its merchants exceeded 75%."); ¶ 197 ("Sezzle conservatively estimates that in 2024, Shop Pay Installments handled approximately 75-85% of all BNPL transactions on the Shopify Platform.").

Sezzle identifies two relevant markets: the United States drag-and-drop e-commerce platforms market, *id.* ¶¶ 119, 151, and the United States aftermarket for BNPL services on Shopify's platform, *id.* ¶¶ 164, 177, 194. Drag-and-drop e-commerce platforms are different from other e-commerce platforms. For example, a "plug-in" service like WooCommerce is not interchangeable with Shopify platforms "because setting up a WooCommerce website with comparable functionality to a Shopify-based store's website requires a complex technical customization process, including choosing a hosting partner, purchasing a domain name, computer programming, PCI compliance, and software." *Id.* ¶¶ 127–28. Similarly, "[c]ustom-built, enterprise-level e-commerce platforms are not reasonably interchangeable with Drag-and-Drop E-Commerce Platforms" because the former "are designed for large-scale retail businesses with complex needs, offering

features like scalability, robust security customization, and strong integration capabilities," and "require significantly more up-front financial and time investment to design and build the bespoke software they run on, and they don't offer the user-friendly attributes that are attractive to small to medium-sized merchants." *Id.* ¶¶ 137–39. Finally, online marketplace services like Amazon.com don't offer the "customizable 'look and feel' " of drag-and-drop e-commerce sites, and they rely on a different business model. *Id.* ¶¶ 143, 145 (noting that Shopify-based platforms charge merchants a subscription fee, while an online marketplace takes a commission from each sale).

Entry barriers to the drag-and-drop e-commerce market include "significant network effects," "[s]ignificant switching costs for merchants," and "[r]eputational barriers." *Id.* ¶¶ 147–49. Shopify has significant market power as well:

> **\*4**   On information and belief, Shopify's share of the Drag and Drop E-Commerce Platform market in the United States exceeds 70%. As of 2023, total U.S. e-commerce sales volume exceeded $1.119 trillion, and Shopify claimed that it processed about 10% of that in sales volume, or approximately $111.9 billion. But over $971 billion of the total U.S. e-commerce volume was accounted for by the 20 largest e-commerce stores, including Amazon and Walmart, 18 of which were utilizing custom-built enterprise e-commerce software. Of the remaining $147.9 billion in e-commerce volume, Shopify's volume of $111.9 billion amounted to 76%.

*Id.* ¶ 161; *see id.* ¶ 163 ("In 2024, Shopify's e-commerce U.S. sales volume increased to approximately $166.6 billion.").

The aftermarket in BNPL services on Shopify-based websites is different from the market in payment alternatives like credit cards and installment loans. *Id.* ¶¶ 170, 174. BNPL payments are interest-free, while installment loans carry interest rates from 6.5% to 9.0%, *id.* ¶ 171, and unlike credit cards, BNPL services are available to consumers with poor credit scores or insufficient credit history, *id.* ¶ 174. And Shopify

has significant market share of the BNPL aftermarket on its platform—"Shop Pay Installments handled approximately 75-85% of all BNPL transactions on the Shopify Platform" in 2024. *Id.* ¶ 197. Shopify has the power to exclude BNPL competitors from its platform. *Id.* ¶ 195.

Sezzle brings six causes of action. Counts I and II are monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2. Compl. ¶¶ 224–43. Counts III and IV are unlawful tying and unlawful contracts in restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1. Compl. ¶¶ 244–64. Counts V and VI are brought under state law; they allege violations of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66, and the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subdiv. 1 (13). Compl. ¶¶ 265–82. [2]

## II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept all the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III

### A

**\*5** The Sherman Act makes it unlawful to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). The plaintiff must nevertheless have suffered an "antitrust injury," which

is "an injury of the type the antitrust laws were intended to prevent that flows from that which makes defendants' acts unlawful." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (citation modified). "A plaintiff suffers a sufficient antitrust injury when it is 'the target of the anticompetitive activity,' rather than 'one who has merely suffered indirect, secondary, or remote injury.' " *Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*, No. 22-cv-1681 (KMM/JFD), 2023 WL 5206884, at \*4 (D. Minn. Aug. 14, 2023) (quoting *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985)).

To state a monopolization claim under § 2 of the Sherman Act, a plaintiff must allege facts plausibly showing that the defendant "(1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.' " *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir. 1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); *Moldex Metric, Inc. v. 3M Co.*, No. 14-cv-1821 (JNE/FLN), 2015 WL 520722, at \*6 (D. Minn. Feb. 9, 2015). And to state an attempted monopolization claim under the Act, a plaintiff must allege facts plausibly showing: "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007) (citation modified); *Moldex, 2015 WL 520722, at \*6.

A relevant market consists of a product market and a geographic market. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018). "A relevant product market is composed of 'commodities reasonably interchangeable by consumers for the same purposes.' " *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1277 (8th Cir. 1981) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). "In determining whether two 'products' are in the same market, it is important to consider the cross-elasticity of demand between the products, i.e., whether consumers will shift from one product to the other in response to changes in their relative costs." *SuperTurf, 660 F.2d at 1278. The Supreme Court has recognized that even where a broad market exists, the relevant market might be a "submarket" as determined by "practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and

uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Defining the market is a "deeply fact-intensive inquiry," and courts "hesitate to grant motions to dismiss for failure to plead a relevant market." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019) (citation modified); *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." (quoting *Grinnell Corp.*, 384 U.S. at 572)). The plaintiff bears the burden to define the relevant market. *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998).

 **\*6**  "In exceptional circumstances, a relevant market can be defined by the defendant's own product or service." *Park Irmat*, 911 F.3d at 517 (citing *Eastman Kodak*, 504 U.S. at 482). "There is one situation in which courts generally agree that single-brand markets can succeed: an aftermarket, which is a type of derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 344 (E.D.N.Y. 2019) (citation modified). *Eastman Kodak* provides a classic example. Kodak adopted a policy to sell replacement parts "only to buyers of Kodak equipment who use Kodak service or repair their own machines." *Eastman Kodak*, 504 U.S. at 458. The Court determined that the relevant market was the "derivative aftermarket" in parts and services for Kodak's photocopiers. *Id.* at 455, 482. It did not matter that Kodak lacked monopoly power in the photocopier market because "the relevant market was properly determined by the choices available to Kodak equipment owners." *Sabre Holdings Corp.*, 938 F.3d at 66. "Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Eastman Kodak*, 504 U.S. at 482.

Two Eighth Circuit cases provide helpful contrast with *Eastman Kodak*. In *Park Irmat*, the defendant pharmacy benefits manager (Express Scripts) created a network of pharmacies of which the plaintiff pharmacy (Irmat) was a member. 911 F.3d at 511. As an independent pharmacy, Irmat's business relied on being in the largest pharmacy benefits managers' networks. *Id.* Express Scripts and CVS Health combined to cover 65% of the pharmacy-benefits-

manager market, *id.*, and the amount controlled by Express Scripts alone is not identified in the Eighth Circuit or district court opinion. Mail-order services made up a substantial portion of Irmat's business. *Id.* at 512. Express Scripts required Irmat to sign a contract under which Irmat could no longer continue mail-order operations, and when Irmat nevertheless provided those services, Express Scripts terminated Irmat from its network. *Id.* Irmat alleged monopolization, defining the relevant market as "the market for mail-order pharmacy services to Express Scripts members." *Id.* at 517. This definition was too narrow, the court found, as "Express Scripts [was] not the only mail-order pharmacy available to consumers." *Id.* Two years later, the court resolved a similar case in the same fashion, though this time on an aftermarket theory. *See Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 856–57 (8th Cir. 2020). Plaintiff pharmacies alleged a relevant market of "maintenance medications paid for by [Express Scripts'] plan sponsors." *Id.* at 857. This definition failed to "include all interchangeable payment options to the Pharmacies." *Id.* The court noted that, "unlike in *Park Irmat*," this proposed market was an aftermarket: "the refilling of prescriptions paid for by [Express Scripts'] members." *Id.* at 857 n.9. But that didn't rescue the pleading, as the aftermarket failed to include all interchangeable payment options. *Id.*

Shopify cites persuasive case law synthesizing requirements for a single-brand aftermarket to be viable in a Rule 12 posture, relying heavily on *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023). *See* ECF No. 27 at 16–18; ECF No. 33 at 11–12. In *Epic Games*, the court read Supreme Court and Ninth Circuit precedent to create the following test for a plaintiff to establish a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." 67 F.4th at 977. The district court, after a sixteen-day bench trial, rejected the proposed single-brand aftermarkets in Apple's iOS app distribution and iOS in-app payment solutions, and the Ninth Circuit affirmed. *Id.* at 966, 970. The *Epic Games* factors have been considered in a Rule 12 posture, *see Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023), but they are limited to cases where it's necessary to determine "whether competition in the foremarket would be able to 'discipline' a defendant's conduct

in the aftermarket," *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 840–41 (N.D. Cal. 2024).

**\*7** To the previous material add one more wrinkle: Generally, courts must consider a two-sided transaction platform as a single market. *Ohio v. Am. Express Co.* (*Amex*), 585 U.S. 529, 545–47 (2018). "[A] two-sided platform offers different products or service to two different groups who both depend on the platform to intermediate between them." *Id.* at 534. In *Amex*, the credit-card network at issue was a two-sided platform, mediating exchanges between merchants and cardholders. *Id.* at 535. The key consideration is the "indirect network effect"—"the value of the two-sided platform to one group of participants depends on how many members of a different group participate." *Id.* For example, consumers will value an Amex credit card more highly when a greater number of merchants accept it for payment. *Id.* This matters for the second prong of a § 2 monopolization or attempted claim, which requires demonstrating anticompetitive effects. *See id.* at 547 ("To demonstrate anticompetitive effects on the two-sided credit-card market as a whole, the plaintiffs must prove that Amex's antisteering provisions increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market.").

Because Sezzle has plausibly alleged all the elements of a § 2 monopolization claim, Count I will not be dismissed. Sezzle has plausibly alleged an antitrust injury. It has pleaded facts that, taken as true, show it was the target of anticompetitive activity. Sezzle and Shopify are competitors in the aftermarket for BNPL services on Shopify drag-and-drop e-commerce platforms. Compl. ¶¶ 191–93. Shopify reduced Sezzle's visibility on Shopify-based websites and raised the price for Sezzle to continue operations on those platforms. *Id.* ¶¶ 84–89, 99. Sezzle has suffered significant loss of profits because of Shopify's conduct. *Id.* ¶¶ 222–23. This is enough to show an antitrust injury at the pleading stage. *See Toyota Motor Sales,* 2023 WL 5206884, at *4–5.

Sezzle has plausibly alleged that the relevant market is the United States aftermarket in BNPL services on Shopify-based websites.[3] *See* Compl. ¶ 177. It has alleged a distinct foremarket—drag-and-drop e-commerce platforms are distinct from "plug-in" based software, enterprise software, and online marketplace services like Amazon.com. *Id.* ¶ 120. A merchant must be technologically sophisticated to run an online shop on a plug-in service, but not on a drag-and-drop e-commerce platform. *Id.* ¶¶ 127–28. Enterprise

software works well for large-scale businesses, but requires too much capital to make financial sense for small- and medium-sized merchants. *Id.* ¶¶ 137–39. Online marketplaces lack the customization offerings that these merchants want, and they rely on a different business model. *Id.* ¶¶ 143, 145. While all these options offer means for a merchant to host an online storefront, Sezzle plausibly alleges that they are not reasonably interchangeable.

Sezzle has also plausibly alleged a distinct aftermarket in BNPL services on Shopify-based websites. BNPL services are unlike credit cards, which are unavailable to consumers with poor or insufficient credit history. *Id.* ¶ 174. Personal loans charge high interest rates, while BNPL providers charge none. *Id.* ¶¶ 25, 171. Sezzle has alleged sufficient facts to conclude BNPL services offer an alternative and not reasonably interchangeable payment processing system—after adopting Sezzle, merchants reported "a 20% uplift in average order value, 10% increase in purchase frequency, and a 50% decrease in returns." *Id.* ¶ 48. "[F]rom January 1, 2019 through June 1, 2021, the total value of Sezzle transactions on Shopify stores increased over 1200%, and the number of Shopify stores using Sezzle tripled." *Id.* ¶ 50. This is enough to make it plausible that BNPL services allow merchants to sell their goods to new consumers—those who would be unable or unwilling to make the same purchases with credit cards or by taking out personal loans. These allegations establish that BNPL services are not interchangeable with other forms of payments, so Sezzle avoids the problem in *Park Irmat* and *Trone.*

**\*8** The *Epic Games* factors do not change the analysis. *Epic Games* and its predecessor, *Newcal Industries, Inc. v. IKON Office Solution,* 513 F.3d 1038 (9th Cir. 2008), attempted to resolve a tension between *Eastman Kodak* and a Ninth Circuit case, *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997). *Eastman Kodak* explained that an entity could have monopoly power in a single-brand aftermarket even though it did not have monopoly power in the foremarket. *See* 504 U.S. at 481–82. *Forsyth* rejected a proposed aftermarket where the monopoly was the result of contractual obligations. 114 F.3d at 1476. *Newcal* and *Epic Games* reasoned that the "critical distinction" between the two cases was the plaintiffs' knowledge whether they would be locked into a narrow aftermarket. *Newcal,* 513 F.3d at 1048; *Epic Games,* 67 F.4th at 977. Recounting this background, the *Lambrix* court concluded that

> [f]rom a practical perspective, the relevance of information costs, switching costs, and general knowledge of

restrictions is reduced where a defendant has market power in the foremarket. Market power is defined as the power to "force a purchaser to do something he would not do in a competitive market." *Eastman Kodak*, 504 U.S. at 464. Consumers in a foremarket within which a company has market power have minimal ability to discipline the company's conduct in aftermarkets, regardless of information costs, switching costs, and general awareness of restrictions.

737 F. Supp. 3d at 841. Here, Sezzle alleges that Shopify has monopoly power in the foremarket—at least 70% market share. Compl. ¶ 161. That's presumptively not a competitive market. *See SuperTurf*, 660 F.2d at 1280 n.8 (finding allegations of 75% to 80% market share raised presumption of monopoly power); *Grinnell Corp.*, 384 U.S. at 571 (stating that controlling "over two-thirds" of a market "constituted a substantial monopoly" (citation modified)). Therefore, the *Epic Games* factors are less important here.

Even so, Sezzle has done enough to meet them. (1) The relevant consumers are not the end customers but the merchants, many of whom did not know about the third-party payment fee until Shopify introduced it in June 2022. Compl. ¶¶ 99, 179. "A change in policy is of course" a way to show lack of consumer awareness, as "a consumer cannot knowingly agree to a restriction that did not exist at the time of the foremarket transaction." *Epic Games*, 67 F.4th at 979. (2) The most reasonable inference in this motion-to-dismiss posture is that there are significant information costs preventing merchants from assessing life-cycle pricing. *See* Compl. ¶ 185 ("[M]erchants cannot reasonably estimate the total aggregate cost of all BNPL transaction fees that would be charged to them over the lifetime of their Shopify subscription. That amount, which is dependent upon consumer behavior, the merchant's business growth, macroeconomic trends, and myriad other factors, is impossible to estimate."). (3) Merchants who want "to transition away from Shopify essentially need to re-build their websites from scratch on another platform," so there are significant switching costs. *Id.* ¶ 188. (4) As explained above, Sezzle's proposed market accords with general market-definition principles of demand cross-elasticity—when Shopify raised the fees on Sezzle payments, merchants and consumers shifted to using Shop Pay Installments and not alternative payment methods like credit cards. *See* Compl. ¶ 97 ("Not long after its launch, approximately 200,000 Shopify-based merchants began offering Shop Pay Installments. This success also coincided with a commensurate, if not more drastic, reduction

in the number and amount of transactions processed through Sezzle by Shopify-based merchants." (footnote omitted)).

**\*9**   *Amex* is not a barrier to Sezzle's claims. Whether the relevant market behaves more like a typical two-sided market than a one-sided market cannot be determined on the facts alleged. *See Batton v. Nat'l Ass'n of Realtors*, No. 21-cv-00430, 2024 WL 689989, at \*5 (N.D. Ill. Feb. 20, 2024) ("Whether this Court should apply a two-sided analysis requires more factual development than is possible at the motion to dismiss stage."); *cf. Amex*, 585 U.S. at 544 (finding that newspaper advertisement markets behave like one-sided markets though they are in the abstract two-sided). And there is precedent for treating "digital payment gateways from companies like ... Shopify" as distinct from "the two-sided credit-card network market because they are not reasonably interchangeable with credit-card networks." *United States v. Google LLC*, 778 F. Supp. 3d 797, 847 (E.D. Va. 2025).

Sezzle has plausibly alleged that Shopify has monopoly power in both the United States drag-and-drop e-commerce platform market and the BNPL services aftermarket on Shopify-based platforms. "Monopoly power is defined as the power to control prices or exclude competition." *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1024 (8th Cir. 2020) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060) (8th Cir. 2000)). "To establish that a defendant possesses the requisite market power required for monopolization liability, a plaintiff must establish that the defendant has a dominant market share in a well-defined relevant market." *HDC Med.*, 474 F.3d at 547. As mentioned earlier, control of about 70% of the market is presumptively monopolistic. *See SuperTurf*, 660 F.2d at 1280 n.8; *Grinnell Corp.*, 384 U.S. at 571. In the national market for drag-and-drop e-commerce platforms, Shopify controls somewhere between 70% and 95% of the market share, depending on whether plug-in based services and custom-built, enterprise-level platforms are excluded. Compl. ¶¶ 161–62. In the aftermarket for BNPL services on Shopify platforms, Shopify controls 75–85% of the market share. *Id.* ¶¶ 14, 197. Sezzle has pleaded enough facts to make it plausible that Shopify has monopoly power in the relevant market.

Sezzle has also plausibly alleged that Shopify acquired monopoly power in the BNPL market on Shopify-based websites "willfully" rather than "as a result of a superior product, business acumen, or historical accident." *Amerinet*, 972 F.2d at 1490 (citation modified). This "second element is

often referred to as anticompetitive conduct or exclusionary conduct." *Toyota Motor Sales*, 2023 WL 5206884, at *6 (quoting *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1067 (S.D. Iowa 2017)). The focus is on harm to competition, not just to competitors. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).

Sezzle identifies at least two anticompetitive tactics that led to Shopify's monopoly power in the BNPL market on its own platform. The counterintuitive purchase screen made it difficult for consumers to understand how to use Sezzle on Shopify-based websites, and caused well-meaning but unaware users to believe they were purchasing through Sezzle when they were actually purchasing through Shop Pay Installments. *See* Compl. ¶¶ 84–89. At least one merchant understood the counterintuitive purchase screen to be "blocking other checkout options." *Id.* ¶ 91. This conduct is plausibly anticompetitive and harms all non–Shop Pay Installments BNPL service providers, not just Sezzle. As one consumer complained, "What if I want to pay with Klarna? What if I decide on Paypal [sic]? Or other payment options that are available?" *Id.* ¶ 93. The third-party payment fee is plausibly anticompetitive as well. Merchants must "either swallow or pass on to their customers" the 1–2% fee. *Id.* ¶¶ 99–100. Charging merchants to offer Sezzle caused Sezzle to lose business; merchants deactivated their Sezzle accounts to avoid paying fees. *Id.* ¶ 102. Shopify's argument that its purchase screen layout and fees have "legitimate business purposes" cannot be accepted in this posture. ECF No. 27 at 27–29; *cf. Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 267–68 (8th Cir. 1984) (reversing jury verdict after finding insufficient evidence that defendant's conduct was anticompetitive rather than an ordinary business practice).

**\*10**  Even if the market should be analyzed as two-sided, Sezzle has plausibly alleged a § 2 monopolization claim. If the market is two-sided, then the more merchants offering Sezzle, the more Sezzle's services become valuable to consumers; and the more consumers get Sezzle accounts, the more Sezzle's services become valuable to merchants. *See Amex*, 585 U.S. at 535. In *Amex*—a case decided after a bench trial—the Court concluded that the plaintiffs had to "prove that Amex's antisteering provisions increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market." *Id.* at 547. Sezzle has done the analogous work of demonstrating, at a motion to dismiss, that Shopify's conduct "stifled competition" in the

two-sided market by preventing merchants and consumers from using Shop Pay Installments' BNPL competitors. *See* Compl. ¶¶ 100–01.

For similar reasons, Sezzle's § 2 attempted monopolization claim survives as well. Recall that to prevail on such a claim a plaintiff must show "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *HDC Med.*, 474 F.3d at 549. "[S]pecific intent refers not to the defendant's general intent to do a particular act, but to an overall anticompetitive intent expressed through its actions to destroy competition or build monopoly." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 802 (8th Cir. 1987). "The acts from which one can infer specific intent must be essentially predatory in nature." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986) (quoting *Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp. 274, 286 (N.D. Cal. 1976)).

Sezzle has plausibly alleged this intent. The anticompetitive measures described above—the counterintuitive purchase screen and the third-party payment fee—were "designed to steer business away from Sezzle and other BNPL providers, and to Shop Pay Installments." Compl. ¶ 75. Other measures show specific intent as well. Informing merchants that Sezzle would be unavailable on Shopify platforms, while knowing that merchants could use an updated version of Sezzle, provides further evidence. *See id.* ¶ 103. These taken-as-true facts support the first and second elements of an attempted monopolization claim. Sezzle has plausibly alleged that Shopify's anticompetitive measures had a dangerous probability of success—Shopify has been successful in monopolizing the BNPL aftermarket on its platform. *Id.* ¶¶ 14, 197.

### B

Sezzle alleges Shopify violated § 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "To demonstrate a violation of section 1 of the Sherman Act, a plaintiff must provide proof of an illegal contract, combination, or

conspiracy which results in an unreasonable restraint of trade." *Double D Spotting*, 136 F.3d at 558.

There are two types of restraints for purposes of § 1. A restraint may be horizontal—a classic example is direct competitors agreeing to fix prices—or it may be vertical, between actors in different levels of a market. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.").

"Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' this Court has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Some restraints "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit," as to be per se unreasonable. *Id.* Most are not so obviously unlawful, and these restraints are subjected to the rule of reason, "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.*

 **\*11**  Sezzle raises two causes of action over alleged vertical restraints: unlawful tying and unlawful restraint of trade. Compl. ¶¶ 244–64. Start with the unlawful tying claim. "A tying arrangement is 'the sale or lease of one item (the tying product) on the condition that the buyer or lessee purchase a second item (the tied product) from the same source.' " *Marts v. Xerox*, 77 F.3d 1109, 1112 (8th Cir. 1996) (quoting *Amerinet*, 972 F.2d at 1498). Unlawful tying is per se unreasonable, though tying may be analyzed in a way that requires a more fact-intensive review, akin to the rule of reason. [4]  *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984) ("[W]hile the Court has spoken of a 'per se' rule against tying arrangements, it has also recognized that tying may have procompetitive justifications that make it inappropriate to condemn without considerable market analysis."); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 34 (1984) (O'Connor, J., concurring) ("[T]ying doctrine incurs the costs of a rule of reason approach without achieving its benefits: the doctrine calls for the extensive and time-consuming economic

analysis characteristic of the rule of reason, but then may be interpreted to prohibit arrangements that economic analysis would show to be beneficial."), *abrogated on other grounds by, Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). To prevail on an unlawful tying claim, the plaintiff must show "that (1) 'two distinct products' or services are involved, (2) the defendant's power in the tying product's market is capable of restraining competition 'in the tied product's market,' and (3) 'the amount of interstate commerce in the tied product's market [is] not insubstantial.' " *Amerinet*, 972 F.2d at 1499 (quoting *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1140–41 (8th Cir. 1981)); *see Double D Spotting*, 136 F.3d at 559 (requiring plaintiffs to plead a "valid relevant market").

Crucially, this test requires the plaintiff to show coercion—that the seller of the tied product "has some special ability ... to force a purchaser to do something that he would not do in a competitive market." *Jefferson Par. Hosp.*, 466 U.S. at 13–14; *see Amerinet*, 972 F.2d at 1499; *Double D Spotting*, 136 F.3d at 559. Coercion is "[t]ypically" shown by an "express refusal to sell." *Amerinet*, 972 F.2d at 1500. If there is no express refusal, coercion may still exist "if the defendant's policy makes the purchasing of the tying and tied products together 'the only viable economic option.' " *Id.* (quoting *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1324 (D. Md. 1986)). However, "[a] tying condition is presumptively absent when buyers request or choose a bundle of products that a defendant makes available separately." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 1756 (5th ed. & 2025 update).

The unlawful tying claim fails because Sezzle has not plausibly alleged Shopify coerced merchants or consumers into purchasing the tied product. Sezzle argues the tying product is the drag-and-drop e-commerce platform, the tied product is Shop Pay Installments, and the relevant market is the BNPL aftermarket on Shopify-hosted websites. ECF No. 31 at 58–59; *see* Compl. ¶ 247. In Sezzle's view, the buyer appears to be both the merchant and the consumer. *See* Compl. ¶ 248 ("Shopify uses its market power in the Drag-and-Drop E-Commerce Platform market to compel *merchants and end consumers* to also use Shop Pay Installments, its offering in the BNPL Market on the Shopify Platform." (emphasis added)). This collapses two distinct processes, and neither one involves plausible coercion. First, the merchant chooses which payment processing systems are available on her Shopify-hosted platform. *See id.* ¶ 46 ("[A] merchant might

incorporate a service that expands consumers' options for payment, such as Sezzle, Afterpay, or Klarna"); *id.* ¶ 57 ("Shopify sets Shopify Payments as the default payment processor when merchants enroll with Shopify, and Shopify Payments has incredibly high adoption rates (about 88% to 90% or more) by Shopify merchants in the United States."); *id.* ¶ 63 (noting that merchants can choose to install Sezzle on their Shopify-based platform). Second, the consumer decides how to pay for the product—whether through Shop Pay, Sezzle, PayPal, a credit card, or any other option a merchant has made available. *See id.* ¶¶ 85–86. In other words, Shopify does not expressly condition the purchase or use of its platforms with purchase or use of Shop Pay or Shop Pay Installments. Merchants may opt against hosting Shopify's payment-processing system in their checkout system, and consumers may buy merchants' goods through whatever methods merchants choose to provide. Sezzle does not cite cases showing that other anticompetitive conduct —*e.g.*, the counterintuitive purchase screen, disablement of inventory locking—amount to a tying arrangement. Typically, a "condition" is a contractual exclusivity agreement, and nothing like that is alleged here. *See Marts*, 77 F.3d at 1112.

**\*12** Taking as true the allegation that "in 2024, Shop Pay Installments handled approximately 75-85% of all BNPL transactions on the Shopify Platform," *id.* ¶ 197, Sezzle has not shown that merchants or consumers lack other "viable economic option[s]," *Amerinet*, 972 F.2d at 1500. Persuasive precedent strongly suggests it is not enough to establish economic coercion. "[C]oercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914 (9th Cir. 2008) (quoting *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977)). Courts have determined the viability of purchasing non-tied or separate products by looking at the products' sales numbers. *See, e.g.*, *Ways & Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 702–03 (N.D. Cal. 1979) (finding no unlawful tying where 25% of all purchases in the relevant market were separate sales); *Yelp Inc. v. Google LLC*, No. 24-cv-06101-SVK, 2025 WL 2978394, at \*5 (N.D. Cal. Oct. 22, 2025) (same but with 29% separate sales); *Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys, Inc.*, 920 F. Supp. 455, 472 (S.D.N.Y. 1996) (finding viable alternative existed when separate sales composed 17% market share). Acknowledging there is no bright line, a leading treatise "tentatively suggest[s] that separate sales below 10 percent presumptively indicate a de facto tie." Areeda & Hovenkamp, *supra*, § 1758; *see id.* ¶ 1756 ("While any line is arbitrary, we would require 90

percent bundling to make persuasive otherwise insufficient evidence of a tying condition or more than 10 percent unbundling to rebut an otherwise established or presumed inference of a tying condition." (footnote omitted)). Courts have reached different conclusions on similar facts: The Ninth Circuit allowed a tying claim to go forward where the plaintiff produced evidence of 14% market share of separate purchases, *Cascade Health Sols.*, 515 F.3d at 915, whereas the Fourth Circuit rejected a claim where consumers chose the tied product's competitor 14% of the time, *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016). Sezzle's allegation that "approximately" 15–25% of BNPL sales on Shopify platforms are separate sales is too large a figure, under this case law, to establish coercion. *See* Compl. ¶ 197.

Sezzle's other § 1 claim will survive the motion to dismiss. "To prove a violation of section one of the Sherman Act, a plaintiff must show [1] an agreement in the form of a contract, combination, or conspiracy that [2] imposes an unreasonable restraint on trade." *Willman v. Heartland Hosp. E.*, 34 F.3d 605, 610 (8th Cir. 1994) (citation omitted). Claims for unlawful restraint of trade are analyzed under the rule of reason, and plaintiffs must take the "threshold step" of defining a relevant market. *Epic Games*, 67 F.4th at 974.

Section 1's "contract, combination, or conspiracy" element is met by demonstrating concerted rather than independent action. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1032 (8th Cir. 2000) (en banc). Concerted action may be shown by "a unity of purpose or a common design and understanding, or a meeting of the minds." *Insulate SB*, 797 F.3d at 544 (citation modified). The Supreme Court noted in *Perma Life Mufflers* that a plaintiff "can clearly charge a combination between [the defendant] and himself, as of the day he unwillingly complied with the restrictive franchise agreements." 392 U.S. at 142. Though the Court later overruled portions of *Perma Life Mufflers*, it approvingly cited that part of the opinion. *Copperweld Corp.*, 467 U.S. at 766. And other courts have persuasively explained that "a non-negotiated contract of adhesion" is within the scope of § 1, which governs "every contract in restraint of trade." *Epic Games*, 67 F.4th at 981–82 (citation modified); *see Systemcare, Inc. v. Wang Lab'ys Corp.*, 117 F.3d 1137, 1143 (10th Cir. 1997) ("From a buyer's perspective, tying most frequently constitutes a reluctant combination and not an eager conspiracy. This fact does not diminish the adherence

of our holding to the core purposes of the concerted action requirement of section 1.").

Sezzle has plausibly alleged concerted action. It has, as explained above, defined the relevant market: BNPL services on Shopify-based websites. The contracts it identifies are between merchants and Shopify "to pay penalties on non-Shopify transactions and inhibiting [merchants] from installing Sezzle as a payment method on equal terms with Shop Pay Installments." Compl. ¶ 258. This provision is described with enough particularity to avoid being conclusory. *See id.* ¶ 99 ("On June 16, 2022, one year after launching Shop Pay Installments, Shopify changed the terms of its merchant agreements and started charging merchants who use Shopify Payments ... a 1%-2% penalty for every transaction processed through Sezzle or other third-party payment platforms ...."); ECF No. 28-1 (showing Shopify's pricing webpage); *cf. Insulate SB*, 797 F.3d at 544 ("Even though the complaint contains several conclusory references to a contract, the alleged facts do not suggest Graco entered into explicit exclusivity agreements with any of the Distributors."). Sezzle explained at oral argument that the counterintuitive purchase screen, disparagement of rivals, and inventory-locking disablement are not governed by contract, so this anticompetitive conduct cannot be used to support the unlawful restraint claim.[5] Though Shopify argues the third-party payment fee was a "unilateral" action, there is ample precedent that contracts that one party grudgingly or reluctantly agreed to may ground a § 1 claim. *See Perma Life Mufflers*, 392 U.S. at 142; *Epic Games*, 67 F.4th at 982; *Systemcare, Inc.*, 117 F.3d at 1143. Sezzle has plausibly alleged that here: Merchants were frustrated with the third-party payment fee but nevertheless maintained a contractual relationship with Shopify. Compl. ¶¶ 100–01.

**\*13** The parties agree that a showing of a § 1 unreasonable restraint on trade tracks the showing of § 2 anticompetitive conduct, ECF No. 27 at 33; ECF No. 31 at 62, and while the tests are slightly different, here they lead to the same place. "To determine the legality of a restraint of trade under the rule of reason, one must focus on the detrimental effects to competition, often by defining the relevant market and considering evidence of the defendant's power within that market." *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993).

Since the purpose of the inquiries into market definition and market power is

to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (citation modified). Often, in a Rule 12 posture, plaintiffs survive by alleging reduced output or raised prices. *See* Areeda & Hovenkamp, *supra*, § 1502 ("To avoid dismissal, the plaintiff must allege that competition in a specified market has been 'restrained.' The most general and useful meaning of that term is an anticompetitive reduction in output, which is one that is capable of producing a price increase."); *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 884 (D. Minn. 2017) ("Detrimental effects can include an increase in price, a decrease in output, or a decline in the quality of good or services.").

Sezzle has plausibly alleged that the third-party payment fee imposed an unreasonable restraint on trade on the market power theory. As noted above, Shopify controls between 70% and 95% of the market share of the national market for drag-and-drop e-commerce platforms, Compl. ¶¶ 161–62, and it controls 75–85% of the market share of the relevant market, the aftermarket for BNPL services on Shopify platforms, *id.* ¶¶ 14, 197. That market power was caused, at least in part, by the contracts between merchants and Shopify. *See id.* ¶¶ 100–02. The relative impact of the third-party payment fee on Shopify's market power—compared to other anticompetitive conduct, like the counterintuitive purchase screen, and the disablement of inventory locking—is best left for discovery. Sezzle has pleaded enough facts to plausibly allege an unlawful restraint in violation of § 1.

C

Sezzle asserts a state-law antitrust claim that parallels the Sherman Act counts. *See* Compl. ¶¶ 265–75; *see* Minn. Stat. § 325D.52 (Sherman Act § 2 counterpart); Minn. Stat. § 325D.51 (Sherman Act § 1 counterpart). "Minnesota antitrust law is generally interpreted consistently with federal antitrust law ...." *Insulate SB*, 797 F.3d at 547 (quoting *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007)); *see Sherr*, 262 F. Supp. 3d at 886 ("[W]here the federal antitrust

claims fail, the Minnesota antitrust claims must fail as well."). The parties agree that the Minnesota antitrust claims rise or fall with the federal claims. ECF No. 27 at 33–34; ECF No. 31 at 19 n.13. Of the federal causes of action, only the unlawful tying claim will be dismissed, so to the extent the state-law antitrust claim asserts the same, it will also be dismissed, and the motion to dismiss will be in all other respects denied.

The Minnesota Deceptive Trade Practices Act (MDTPA) prohibits "unfair methods of competition" and "unfair or unconscionable acts or practices." Minn. Stat. § 325D.44, subdiv. (1)13. "[A]n unfair method of competition or an unfair or unconscionable act or practice is any method of competition, act, or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." Minn. Stat. § 325F.69, subdiv. 8; *see* Minn. Stat. § 325D.44, subdiv. 2(b) (incorporating section 325F.69, subdivision 8). The only available remedy under the MDTPA is injunctive relief, which courts may grant "under the principles of equity." Minn. Stat. § 325D.45, subdiv. 1; *Watkins Inc. v. Lewis*, 346 F.3d 841, 846 (8th Cir. 2003). "Generally, injunctive relief is afforded when other legal remedies are inadequate, but the legislature has allowed such relief against deceptive trade practices regardless of damages or other remedies available at law." *Simmons v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. 1999) (citation omitted); Minn. Stat. § 325D.45, subdivs. 1,

3. Sezzle has plausibly alleged that Shopify's actions offend public policy because there is a plausibly alleged violation of Minnesota antitrust laws, as explained above. *See* Minn. Stat. § 325F.69, subdiv. 8; Minn. Stat. § 325D.44, subdiv. (1)13. Shopify argues injunctive relief is inappropriate, ECF No. 27 at 35, but its sole supporting case explained that a *preliminary* injunction was not warranted where legal remedies were adequate under the MDTPA, *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Sezzle has not sought preliminary injunctive relief. Count VI will survive Shopify's motion to dismiss.

## ORDER

**\*14**  Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Shopify's Motion to Dismiss [ECF No. 25] is **GRANTED WITHOUT PREJUDICE** as to Count III and Count V to the extent that is coextensive with Count III.

2. Shopify's Motion to Dismiss [ECF No. 25] is **DENIED** in all other respects.

**All Citations**

Slip Copy, 2026 WL 1283922

---

### Footnotes

1    In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn entirely from the complaint and materials it necessarily embraces. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

2    There is subject-matter jurisdiction on both federal-question and diversity grounds. Counts I through IV are brought under federal law. Compl. ¶¶ 224–64; 28 U.S.C. § 1331. The state-law counts are part of the same case or controversy, so those claims fall under the Court's supplemental jurisdiction. 28 U.S.C. § 1367. Additionally, there is federal jurisdiction under the diversity statute. *See* 28 U.S.C. § 1332(a)(2). Sezzle is a Delaware corporation with its principal place of business in Minnesota. Compl. ¶ 15. Shopify is a Canadian Corporation with its principal place of business in Canada. *Id.* ¶ 16. Sezzle has plausibly alleged that the amount in controversy, exclusive of interest and costs, exceeds $75,000. *See id.* ¶ 58 (alleging Shopify's anticompetitive alternative to Sezzle—Shopify Payments—produced several billion dollars in revenue in 2024).

3    Shopify does not dispute that the relevant geographic market is the United States.

4       Shopify argues that the rule of reason and not the per se rule applies to "software that serves as a platform for third-party applications." ECF No. 27 at 31 (quoting *Microsoft*, 253 F.3d at 89) (citing *Epic Games*, 67 F.4th at 997). The parties have not provided Eighth Circuit precedent on this question, and the Court's independent research has identified none. Here, under either standard, Sezzle has not plausibly alleged an unlawful tying arrangement.

5       Sezzle does allege that the contracts prevent merchants "from installing Sezzle as a payment method on equal terms with Shop Pay Installments," but this assertion is too vague to be accepted in this posture. Compl. ¶ 258. It appears to be a reference to the counterintuitive purchase screen, but without more direct contractual language, it is impossible to accept it as an allegation that Sezzle and Shopify agreed to restrain trade. *See C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 634 (8th Cir. 2010). That's especially so after Sezzle's in-court admission that technological barriers that disadvantaged rival BNPL providers were not covered by any contract.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---