**Pages 1 - 49**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín, Judge

WPENGINE, INC., )
)
Plaintiff, )
)
VS. ) **NO. 4:24-cv-06917-AMO**
)
AUTOMATTIC INC., et al., )
)
Defendants. )
)

Oakland, California
Thursday, June 25, 2026

**TRANSCRIPT OF HYBRID PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
**BY: RACHEL M. KASSABIAN, ATTORNEY AT LAW**
**MARGRET M. CARUSO, ATTORNEY AT LAW**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueora Street, 10th Floor
Los Angeles, CA 90017
**BY: BRANTLEY I. PEPPERMAN, ATTORNEY AT LAW**
**KEVIN Y. TERUYA, ATTORNEY AT LAW**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
**BY: BRIAN E. MACK, ATTORNEY AT LAW**
(appearing via Zoom)

**(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official United States Reporter

**APPEARANCES:** (Continued)

For Defendants:

GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
BY: **JOSEPH R. ROSE, ATTORNEY AT LAW**

GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
BY: **HOWARD S. HOGAN, ATTORNEY AT LAW**

Thursday - June 25, 2026 2:04 p.m.

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:** All rise. The United States District Court for the Northern District of California is now in session, the Honorable Araceli Martínez-Olguín presiding.

**THE COURT:** You may be seated.

**THE COURTROOM DEPUTY:** Now calling Civil Matter 24-6917, WPEngine, Inc. v. Automattic, Inc., et al.

Counsel, if you could please approach the lecturn and state your appearances, beginning with plaintiff's counsel.

**MR. TERUYA:** Good afternoon, Your Honor. Kevin Teruya for plaintiff WPEngine.

**THE COURT:** Good afternoon.

**MS. CARUSO:** Good afternoon, Your Honor. Margret Caruso of Quinn Emanuel Urquhart & Sullivan, LLP, also for plaintiff WPEngine.

**THE COURT:** Thank you. Good afternoon.

**MR. MACK:** And, Your Honor, Brian Mack is appearing remotely, via Zoom, also for WPEngine.

**THE COURT:** Thank you. Good afternoon.

**MR. ROSE:** Good afternoon, Your Honor. Joseph Rose for defendants and counterclaimants.

**THE COURT:** Good afternoon.

**MR. HOGAN:** Good afternoon, Your Honor. Howard Hogan

of Gibson, Dunn & Crutcher also for the counterclaimants.

**THE COURT:** Good afternoon.

All right, folks. We're here on defendants' motion to dismiss WPEngine's third-amended complaint and WPEngine's motion to dismiss counterclaimants' counterclaims.

I'd like to start by talking with you all about the issue of market power, particularly in the foremarket. And I saw some new allegations with regard to that. I would like to hear from you all on the sufficiency of those allegations. So if you could actually start there. And, to some degree, maybe I'll ask defendants to go first, since it's their motion, and I imagine they want the challenge -- or they are challenging the sufficiency of the allegations. If you could please start there, and then I have additional questions for you along the way.

I'm sorry. You're -- forgive me. I'm still new to this courtroom. In my head, defendants are here. But you're not; defendants are there. So I don't know whether that's Mr. Rose or Mr. Hogan, but whoever -- if you could start walking me through. Again, I -- maybe let me say this: And this is built into some of the questions I have written out.

But my sense is you all are spending a lot of time talking about power in the aftermarket. And I understand why. But I still just need -- I don't feel like I actually have enough of an understanding about the foremarket before we get down into

arguing about the aftermarket. So that's why I'm asking you all to start there, if you would, please. And then I'll pepper you with other questions I have.

**MR. ROSE:** I'm happy to do that, Your Honor. Thank you.

WPEngine alleges a foremarket of Web Content Management Systems. For purposes of the motion to dismiss, we're not challenging whether that is a properly pleaded antitrust market, although, of course --

**THE COURT:** I'm sorry, give me one second.

**MR. ROSE:** Of course.

**THE COURT:** Okay. All right. Go ahead.

**MR. ROSE:** As I was saying --

**THE COURT:** For purposes of this motion.

**MR. ROSE:** -- we're not contesting whether it's a properly pleaded antitrust market. For purposes of this motion, of course we reserve those arguments for summary judgment and, you know, going forward, to the extent the claims can continue. But I think the question of market power is very important. And we are continuing to challenge that for several reasons, Your Honor.

As Your Honor's prior order outlined, there are two methods to establish market power. There's direct evidence and indirect evidence. And neither was pleaded in the prior complaint, as Your Honor identified in the prior order. And

rather than addressing the issues that Your Honor identified and adding allegations to address those issues, WPEngine sort of added more of the same kinds of the allegations. And I'll get into why that is inadequate to establish market power here.

So, first, talking about indirect evidence. So Your Honor's prior order -- or I should say WPEngine's prior complaint -- alleged that there was indirect evidence. That is, market share; right? Indirect evidence is market share over some cases say 60 or 65 percent. Some cases say maybe over 50 percent or more. You can establish power through indirect evidence.

WPEngine basically alleged that every website that is built using the WordPress software should be attributed to defendants and to their control over that entirety of websites, and then argued that -- and pled in their prior complaint -- that about 60 percent of websites were built using WordPress software. And ergo, they contend defendants have market power -- or there's indirect evidence of market power.

Your Honor's prior order took issue with that; correctly so, because it doesn't establish that defendants actually control those websites. And, also, that allegation doesn't say anything about the market shares of the other participants in that -- in that alleged market. In fact, a percentage of websites is not related to a company's sales, a company's customers in a particular market. That's just identifying what

technology a website is built with.

And the reason the technology is not a proxy for market power here is that the technology here is free and open for everyone to use, free of charge. No one can control who uses the WordPress software. Defendants can't control it. They can't control the distribution of the software. It is essentially a public good, because it is distributed under the GPL, the General Public License.

And so for that reason, the percentage of websites built using the software is not an appropriate proxy for market power in this case. Because it doesn't say anything about the defendants, directly or indirectly. It doesn't say anything about their ability to restrict output or to control price, because that's the measure of market power. Market power is the ability to restrict output or to control price.

There's no evidence that defendants -- no allegation connecting defendants -- connecting the percentage of websites built using WordPress to defendants' ability to control output or control price. So that's the first point. So there is no indirect evidence that actually connects defendants' power to the relevant standard for market power in an antitrust case.

Then we move on to the question of direct evidence; okay? WPEngine claimed that there was direct evidence. That is actual evidence of super competitive pricing or restricted output or reduced quality. And their evidence alleged -- the

evidence of that, that was alleged in the prior complaint, was essentially defendants' demands -- alleged demands -- for trademark licenses for the WordPress trademarks and defendants' control over WordPress.org and ability to cut off WPEngine, in this instance, from access to WordPress.org.

The Court's prior order rejected those as proper -- properly pleaded pieces of direct evidence of market power, because the trademark -- a trademark license is not the price for any product in the WCMS foremarket. The product in that market is the WCMS software. Again, the WordPress software that no one disputes is free and available to all to use as they please. No one can charge a price for it. No one can restrict output of that software. No one can limit its distribution.

And so, in reality, all of these allegations about trademark demands and fees charged for trademarks -- whether those fees are charged for trademarks as a proxy for access to WordPress.org or what -- it's all beside the point.

Similarly, the allegations -- and so what I'll say is that, with the third-amended complaint, if you look at the allegations that WPEngine added, it's more detail about defendants' alleged demands for a trademark license. But that just misses the point. That's fighting Your Honor's prior order. Because Your Honor -- Your Honor's prior order basically was asking them to add allegations to explain how the

price of WordPress software, the actual product in this market, was raised above super competitive levels or where -- or evidence that the distribution of that WordPress software was somehow restricted or the output of that software of restricted.

Of course they cannot do that, because it is, again, undisputed. It's free, available to all, no one can restrict its distribution, no one can raise its price. Because the license gives everyone in the world a right to use it free of charge. So --

**THE COURT:** Can I ask you something about that? So if I'm following you -- and -- if I'm following you, your position is the subsequent demand for a license -- maybe I'm misunderstanding what happens at that point. But that the subsequent demand for -- sorry -- trademark -- for the trademark demands, that is no longer -- your contention is that it doesn't limit who's using the software at that point; is that right?

**MR. ROSE:** It never limits who's using the software, because you don't need to use the trademark at all to use the software, first of all. And so it's just decoupled from the trademark demands. It's just not the price of WordPress software. The price of WordPress software is zero. And it can never be raised above zero.

And, you know, Your Honor, I don't think either side has

found any case ever by any court that found monopolization in the context of an open source market. Because just by its very term, it is counterintuitive. Monopolization is the power to raise price and to restrict output. And there is a license that prevents anybody from doing those things with respect to WordPress software. And that's the General Public License.

So the real measure of -- if you want to look at market share in the -- in this context, it -- last time around, I sort of hinted to the Court that this is a remarkable situation where we have a much larger company going after a smaller company with smaller share in almost every relevant actual market.

You know, here, Automattic has about 1 percent of the WordPress web hosting market. WPEngine has several times that. They're one of the largest companies in the WordPress web hosting market. And I alluded to this last time around, Your Honor, but it wasn't alleged in the complaint, so I couldn't really make an argument on that basis.

This time around, for some reason, WPEngine put that allegation into their complaint. They have a footnote citing the W3Techs data that shows the actual sort of percentage of market share of web hosts. And that data, which we've attached to our request for judicial notice, shows that WordPress -- that Automattic, here, has 1 percent or less of the actual web hosting market.

So, again, it's a gross distortion of the antitrust laws. It's a gross distortion in the sense that it's an attempt to argue that one can control price and output of a free public good that's distributed under a General Public License. And it's a distortion in the sense that it's attempting to tag a smaller company with smaller market share in any relevant measure with monopolization and claims brought by a much larger company.

**THE COURT:** Thank you, Mr. Rose.

Mr. Teruya, I'm assuming it's you. Can I hear from you on this point? And then we'll keep moving.

**MR. TERUYA:** Thank you, Your Honor.

On this point of power in the foremarket, we reviewed, carefully, Your Honor's prior ruling. And we have added extensive factual allegations, including ones based on evidence in the case on both of these issues.

So on the first issue, which is direct evidence in the foremarket, I wanted to highlight, initially, that the Supreme Court and Ninth Circuit are clear that we can establish power in the foremarket in either of these two ways: Either through direct or indirect; any one of them is sufficient.

And on direct evidence, there are multiple ways to show direct evidence of power, either through increased prices, reduced output, decreased quality, or excluded competitors. And any one of those is sufficient to show direct evidence of

power.

And, here, we've added nearly 60 paragraphs on these issues, including increased prices, increased costs, reduced quality, and excluded rivals with an explanation about how those effects -- those increases and decreases -- are felt and experienced in the foremarket. And that's at paragraphs, of the third-amended complaint, 205 to 257, as well as 275 to 280.

And in response to the arguments from defendants, I note there's a discussion about the software. But the foremarket is about Web Content Management Systems, which include more than just the software. So it's not just an issue of having the ability to use the software, in terms of the market reality market participants, including customers, need to be able to have an operational system. So that includes more than just the software. It also includes access to plugins, distribution of plugins, and other services. So it's not simply about the software or the trademark. It's more than that.

And any effect on any aspect of the foremarket would establish direct evidence of power. And with respect -- and beyond that, I think the question -- or the questions about, was there impact in terms of the price or an effect on the price or on output, those are fact disputes. But, in addition, we've alleged beyond effects on price. We've alleged effects on cost, quality, and competition or competitors. So any one of those would establish direct evidence of power in the

foremarket.

**THE COURT:** Can I pause you for a moment?

So, Mr. Rose, let's go back -- toward the beginning of your remarks, you said, we're not challenging the market definition. But I think I just heard a distinction between what -- what Mr. Teruya is saying is in the market and what the market definition is and the way you're addressing it; right? You're telling me the software, the software, the software, and then -- which is why I need you all to talk to me about the foremarket.

Because I do get -- I do get that from your papers. But when it comes down to it, you are talking across each other, to some degree. Even if you say to me, I'm not challenging the market definition, then the rest of your argument is just about the distribution or the price of the software and not these other aspects.

So can you say some more to me -- I need you to convince me that you're not challenging the market definition. Because it sounds to me like you are.

**MR. ROSE:** Your Honor, that is a new kind of discussion that I've heard. And I'm not sure that's alleged in the complaint that way that Mr. Teruya just put it in terms of the system including all of these services and all of these plugins and -- in addition to the software.

But I will say that the same argument would still apply,

even if you were to try to expand the definition in that way. Because all that participation, including the plugins -- the plugins here are also distributed under the same license. So every piece of this system -- if you want to call it a "system" instead of just this core software -- every piece of it is subject to the General Public License.

And what I didn't hear Mr. Teruya say is, here's the price of Web Content Management System. It is X. And X is super competitive, because defendants have charged that super competitive price. Instead, we hear a lot of sort of -- a jumble of different comments about costs being increased, or different kinds of content conduct, and interference with customers, and we hear about WordPress.org, and control being cut off to WordPress.org. And I think Your Honor's order already addressed those kinds of allegations.

And if you look at the paragraphs that Mr. Teruya is referring to, it's just more of the same categories of conduct, just with more detail.

**THE COURT:** Mr. Teruya, I stopped you. But if there's more you'd like to say about that, please go ahead. And then I'll start asking you all more questions.

**MR. TERUYA:** Yes, Your Honor.

So in the complaint, we allege that the market -- the foremarket -- is a market for Web Content Management Systems. So it's not limited just to the software. You know, users,

customers need a system. When they're picking a system, they want something that works, not just part of a system where they could have the software but they can't have everything else they need to have a website that helps their business. That's what the complaint's about. It's not about just one aspect of copyright or trademark or software. It's for the system. That's what the market users, customers, consumers need.

So we have added extensive allegations on that into the complaint on each of these dimensions, any one of which is sufficient for direct evidence. But switching to indirect evidence, which the Court also asked about, we reviewed the Court's prior order and understood that the Court said that we had failed to allege how much of a market share defendants maintained vis-à-vis competing Web Content Management Systems.

That's why we included the chart -- the table -- from W3Techs that shows the market share for each of the competing Web Content Management Systems by year and -- or by time -- and shows what their shares are. We listed that out. And we alleged why the share of WordPress is an appropriate proxy or measure for defendants' market share. You know, these are the -- that shows the breadth of their power -- the number --

**THE COURT:** Let me pause you there. Because I think you're starting to -- that's a nice -- you're dovetailing into my next question, which is, I want you to walk me through how you get to your 60 percent -- how the -- how you get to the 60

percent you attribute to defendants in the foremarket.

And I'm going to give you a chance to tell me why -- you started to already say that what they do doesn't work. So I'm going to -- I want to hear --

**MR. ROSE:** Of course.

**THE COURT:** -- how you got there again, and then we'll hear from you, Mr. Rose.

If you would, please, Mr. Teruya.

**MR. TERUYA:** So in paragraph 281 of the complaint, as well as in paragraph 116, there's discussion of the data from W3Techs. And we included that in response to the Court's prior ruling. That lays out, for websites with known content management systems, what are the market shares for WordPress, Shopify, Wix, and others. And it goes from September of 2024 through September of 2025. And it actually goes monthly and shows the shares.

And then in paragraphs -- in the subsequent paragraphs, there's an explanation of why that share for WordPress should be attributed to the defendants as a proxy for their share. And the reason for that is that shows the share of sites that have adopted the defendants' system. And that shows the breadth -- it's indirect evidence of their power. Because that's the extent -- their reach, so to speak. Those are the sites that are impacted if they make a decision that increases costs, reduces quality, or excludes competition.

That's analogous to, you know, looking at what is Microsoft's share of a software market or an operating system market or looking at, in the *Deere* case, the reach of *Deere's* power, where you looked at the number of firms that have adopted or the number of dealers that were using *Deere's* system. So that shows their reach.

If there's a question about is this an appropriate proxy -- you know, so I understand -- if the logic is understood, but the defendants dispute that that's a proper measure, then, in the *CoStar* decision from the Ninth Circuit, the Ninth Circuit said issues about overestimation or underestimation of power are fact-intensive inquiries that should be left for beyond the pleadings.

And we can get to it. But, you know, that relates to the issue that, in this case, it's a unique case, because we have the benefit of a fact record. Fact discovery is closed. And we were days away from an expert report. And we have expert analyses for any -- for the antitrust claims -- which will support the antitrust claims and talk about all of these issues in a fact-intensive way, consistent with the ruling from the Ninth Circuit in *CoStar*.

**THE COURT:** That's a good place for you. Go ahead, Mr. Rose.

**MR. ROSE:** Thank you, Your Honor.

And I said earlier that I had not heard that reference to

the market being a systems -- a set of systems -- rather than software. I hadn't heard that before, and I didn't think it was in the complaint. And, in fact, the complaint says the opposite.

**THE COURT:** Oh.

**MR. ROSE:** Paragraph 262, quote, "The Web Content Management Systems market is the product market consisting of web content management systems, which are software products that allow for creating, maintaining, controlling, and revising content on a website without prior knowledge of web programming or markup languages. Examples of web content management systems include Craft CMS, Drupal, Joomla, TYPO3, and WordPress."

Your Honor, they alleged product market consisting of Web Content Management Systems software. The software in question here is WordPress software. And what Mr. Teruya was saying earlier is an attempt to recast their pleadings to avoid the inevitable problem that they run into, which is the fact that the software is free for everybody and cannot be controlled by anybody.

**MR. TERUYA:** Your Honor --

**MR. ROSE:** A --

**MR. TERUYA:** Oh, I'm sorry.

**THE COURT:** Finish, Mr. Rose.

**MR. ROSE:** Sure. Well, I was going to move on to the

second point that Mr. Teruya was discussing, which is the reference to the *CoStar* decision and the attempt to sort of punt this issue into fact discovery, which, again, has concluded, but we still have a lot of work to do if these claims are to survive tremendous expense completing the expert discovery process and going through summary judgment, not to mention trial.

So I don't think it would be appropriate to say, just because we're this far along in the case, we should avoid deciding the -- you know -- the motion to dismiss. Because if they cannot plead an antitrust claim consistent with the applicable standards, those claims should be dismissed at this juncture, just as much as they should have been dismissed earlier in the case.

On the *CoStar* point that Mr. Teruya was bringing up, that's a question of whether the percentage is the right percentage. We're not saying here that 60 percent is not the right percentage because it should be 75 percent. What we're saying is the very premise of just using websites built on WordPress as a proxy for defendants' power in the Web Content Management Systems market is wrong. It's implausible when the complaint also alleges that no one can control WordPress software, because it's distributed free of charge under the GPL, and anyone can copy and distribute it at will.

So it's not that we're contesting an issue -- *CoStar* --

the *CoStar* decision that Mr. Teruya was talking about just doesn't apply to this point. This point is about whether the allegation that websites -- that all websites built with WordPress are attributable to defendants is plausible on its face. And it's not.

**THE COURT:** Do you want to add anything else, Mr. Teruya, or --

**MR. TERUYA:** I --

**THE COURT:** Oh, go ahead.

**MR. TERUYA:** Yes, Your Honor.

With respect to the definition of Web Content Management System, which is -- which are discussed throughout the complaint -- in the part that -- in the section that Mr. Rose referenced, which starts at paragraph 262 and goes through 274, at paragraph 264, there's a discussion of the features of Web Content Management Systems, which include access control, personalized editing tools, plugins, software updates, work flow, and document management.

So it's not just I need the initial WordPress software. You need, as part of the system, the ability to get updates, the ability to get plugins, the ability to get those plugins distributed to you. So it's much more than just the initial software. It's -- and that's explicitly in the complaint. This is not something new.

And in the complaint, the things that we're talking about

in terms of conduct that adversely affect the WPE -- all of that is about blocking access to or interfering with these aspects of the system. You know, we can talk about that in the aftermarket, where it breaks out particular parts of it, but that's all part of the overall system and what customers are looking for when they select the system.

They're not looking for, oh, I just want the software and that's it. They want all of these features that are explicitly talked about in the complaint.

**THE COURT:** Mr. Teruya, can I -- are you -- are you alleging anticompetitive conduct in the foremarket or only in the aftermarkets?

**MR. TERUYA:** We're alleging anticompetitive conduct in both the foremarket and in the aftermarkets. So -- so if -- depending on how the Court looks at the aftermarkets, all of the conduct alleged in the aftermarkets is also occurring in the foremarket. If the Court says that let's just focus on the foremarket -- that's where everything is happening -- the conduct is happening and the effects are happening -- and we've alleged that.

But, in addition, in the foremarket, there is this deception that we allege were initially -- there are statements made to the market that there would be free and open access for everyone forever. And those statements caused a distortion in the foremarket, where market participants made decisions based

on the statements of defendants. And that affected competition in the foremarket. And that led market participants to make a choice and then be stuck with whatever happens next in WordPress, in terms of conduct and effects of the defendant.

**THE COURT:** I have a separate question for you that is -- that relates to the Computer Fraud and Abuse Act claim. So I'm going to pocket that and give Mr. Rose a chance before I shift gears a little bit here.

**MR. ROSE:** I was just going to say, Your Honor, that honestly does not make sense to me. Because the foremarket is Web Content Management Systems. The paragraph that he was referring to -- 264 -- is a description of features -- of software features. But, again, even if you were to broaden it to include distribution of plugins and all of that, the point is, anybody can start doing that. Anybody can distribute, anybody can copy, anybody can set up a different plugin distribution process without permission from defendants, without paying defendants anything, because it's all -- all of the technology here is under the General Public License.

On the point about the foremarkets, the foremarket here -- the competitors in the foremarket are companies like Adobe and Shopify and Joomla and other alternatives to WordPress. I don't see -- I didn't see any discussion there of how competitors in that market, the other alternative Web Content Management Systems providers, are somehow being excluded or

being prevented from competing.

Everything that Mr. Teruya described is about conduct within the WordPress ecosystem that relates to the aftermarket allegation. So that explanation just did not make sense, because there isn't -- this complaint does not allege that those alternatives to WordPress are somehow excluded from that Web Content Management Systems market.

**THE COURT:** All right. Let me shift gears a little bit here.

Mr. Teruya, can you tell me a little bit, please, about the extortion aspect of your Computer Fraud and Abuse Act claim. I understand that WPEngine built the business banking on access to WordPress, and the defendants have cut off that access. But I'm having trouble understanding how that rises to the level of extortion. So if you could please speak to that a little bit.

**MR. TERUYA:** So Mr. Mack is addressing this --

**THE COURT:** Ah, thank you.

**MR. TERUYA:** -- claim. Your Honor, might I have the opportunity later to turn to antitrust?

**THE COURT:** We're going to hold Mr. Mack for just a moment. And why don't you go ahead and take your opportunity now, if there's something else you want to respond to Mr. Rose.

I'm sorry, is that what you asked?

**MR. TERUYA:** So on the topic of power, I had a little

more, but also wanted to talk about some of the other parts of the Court's ruling -- prior ruling. But I'm happy to take that up later today.

**THE COURT:** That would be great. Let's skip through -- yes, please. I'd like to get through the questions I still have for you all, and then I'll give you a chance to add more then, Mr. Teruya.

All right. Mr. Mack, let me hear from you about the Computer Fraud and Abuse Act claim. And, as I said, I'm particularly interested in hearing how it rises -- how what you have at this point -- or the facts that are alleged at this point rise to the level of extortion.

**MR. MACK:** Certainly, Your Honor.

If Your Honor recalls, the Court previously dismissed this claim because it wasn't -- the Court -- in the Court's opinion, we didn't adequately plead an intent to extort under the *Levitt* standard. And that was in docket 169 at pages 13 through 14 of your prior order.

So WPEngine really heeded the Court's guidance in the prior order and significantly expanded the factual allegations in the third-amended complaint from just a few paragraphs to several pages, including 30 new paragraphs. I think, in the Court's prior order, the Court indicated that the Court wasn't going to be considering the ACF highjacking. And that was in footnote 4 of the prior order. And, now, we've clearly alleged

that the ACF highjacking is also relevant to these claims.

But, more specifically, we now plausibly alleged in the third-amended complaint that both prongs of the *Levitt* test are met. And if Your Honor remembers, in connection with the attempted extortion claim that was at issue in this case, you can satisfy either of those two prongs of the *Levitt* test in order to establish extortion or an intent to extort. So to properly plead that, all you need to do is demonstrate either you have a preexisting right to be free from the threatened harm, or that the defendant had no right to seek payment for the services offered. And that's that the *Levitt* case. And that's 765 F.3d 1123. That's the Ninth Circuit *Levitt* case.

And we -- we have plausibly pled both now under *Levitt*. So with respect to the first prong, the preexisting right to be free from the threatened harm, we plead numerous preexisting rights in the 30 new paragraphs in the third-amended complaint. It's paragraphs 398 to 428. We say, in paragraph 410, for example, that WPEngine had a preexisting right to the continued normal operation of its own computers running the open source software.

You just heard Mr. Rose talk about the GPL. So they're saying that the GPL guarantees certain rights in connection with the antitrust claims. But now they're trying to distance themselves from the GPL in connection with this claim. But the GPL actually guarantees a -- the freedom to run the open source

software for any purpose, the freedom to redistribute, and the freedom to distribute copies to others. So by intentionally banning WPEngine from the community and blocking it, we have plausibly pled a preexisting right under the GPL.

All of the text messages -- if Your Honor recalls, there were a series of text messages that were sent to the board -- the board of WPEngine -- demanding an 8 percent payment. That was completely untethered to any trademark usage. Or that if we didn't pay the 8 percent, that we would be banned from the community. So that banning from the community is the same blocking or banning that was actually carried out. So that's where we had a preexisting right just to be free from that interference. So that's where the extortion comes in.

There's also other preexisting rights now with the ACF highjacking. You've already found that the ACF highjacking was sufficient for the other CFAA claim. So we've now added the ACF highjacking into this CFAA claim.

In paragraph 411 of the third-amended complaint, we say that WPEngine also had a preexisting right to the security and integrity of the software and plugins running on its own computers. And WPEngine had a preexisting right to control its own software and plugins without interference from defendants.

So the -- if -- so we've adequately pled the first prong under the *Levitt* standard to establish extortion. We've also pled under the second prong, which is the no right to seek

payment for the services offered. That that trademark license was effectively a sham and it was objectively worthless. So that's -- that's new allegations in paragraph 413 of the third-amended complaint.

We state, quote, "The purported trademark license that defendants demanded that WPEngine sign under the threat of nuclear war was worthless." And then we go on to explain why defendants, themselves, acknowledged, internally, that no one would really agree to pay for this trademark license, because they get the same thing today for free. And that's allegated -- that's alleged -- excuse me -- in paragraph 413 of our complaint.

And we know that that -- that -- that trademark demand was a sham, because it was just pegged at 8 percent of our revenue. It wasn't tied to the use of the trademark in any way. Defendants settled on that number just because they thought it's what we could afford. And it was a completely arbitrary value. So that's not how you value a legitimate request for a trademark. So, again, these allegations must be accepted as true for the purposes of this motion.

So if you look at third-amended complaint, paragraphs 26 through 28, and paragraph 217, we also allege -- we also adequately plead the second prong under the *Levitt* standard. So that's how we established the intent to extort. It's by meeting -- both -- pleading both of the prongs under *Levitt*,

even though we only had to satisfy one of the prongs.

**THE COURT:** Thank you, Mr. Mack.

Mr. Rose, do you want to address that?

**MR. ROSE:** Yes. A few points, Your Honor. Thank you.

So the first thing that Mr. Mack talked about was sort of an allusion to defendants interfering with WPEngine's use of the WordPress software and that -- Mr. Mack said that they had a preexisting legal right to use that software under the GPL.

Well, there's no violation of the GPL alleged in this complaint. There's no breach. There's no claim for breach of the GPL, because there was no breach of the GPL. That argument is just beside the point. What he's talking about is their allegations of access to WordPress.org, a website owned by Mr. Mullenweg.

The complaint acknowledges that that's a website owned by Mr. Mullenweg. It is not coextensive. It is not that same thing as WordPress itself. The website is not subject to the GPL. The website is the property of Mr. Mullenweg. It does not -- it is not -- access to the website is not given under the GPL. So that whole discussion of there being a preexisting legal right under the GPL is essentially nonresponsive and beside the point here.

The next thing that Mr. Mack talked about was that the trademarks, the trademark negotiations, the demands for a trademark license were a sham and that therefore -- I think he

was -- if we connect the dots, he's saying that WPEngine had a preexisting legal right to be free from sham trademark licensing demands. That's just not the case.

That is not a legal right. You don't have a legal right to be free of a sham licensing demand. And the Court's prior order already recognized that defendants seeking payment for services that have some objective value -- here, a trademark license -- means that this is not extortion. Those requests for a trademark license are just not extortionate threats. Because no one disputes that defendants own these trademarks. And requesting a license for an item that you own is consistent with the exercise of your rights under that trademark.

And WPEngine has no preexisting legal right to be free from those kinds of trademark demands, even if they consider them to be unreasonable. Even if they consider them to be untethered from the value of the trademark, that's hard bargaining. As the *Levitt* case talks about, that's not an extortionate threat.

**MR. MACK:** Your Honor, if I may just respond briefly?

**THE COURT:** You may. And then I have some questions for Mr. Rose. Go ahead. Go ahead, Mr. Mack.

**MR. MACK:** If you look at paragraph 410 of our new allegations, the GPL's clearly referenced. We say WordPress is open source software governed by the GPL. This license grants these freedoms. The fact that we don't have a separate cause

of action for a breach of the GPL is irrelevant. All we're trying to establish here is a preexisting right under the CFAA claim, which we have pled.

I think it's important to note, Your Honor, too, Mr. Rose mentioned free access to WordPress.org. WordPress.org is a website. Yes. I think we talked about this at the PI hearing. The open source software is hard coated to pull data from the interface, the API. It's not just about accessing WordPress.org and the website. The software is intentionally designed by defendants to require data from API.WordPress.org, the interface -- the API -- in order to function properly.

When they blocked us, when they banned us, there were error messages. There were timeout errors. It disrupted the normal functioning of the open source software. That right is guaranteed by the GPL. We do have a preexisting right to normally run the open source software.

This isn't just software that's completely untethered from WordPress.org. It's intentionally designed to hook to API.WordPress.org, the actual interface that's required to run the software. So it just defies -- it just really defies logic how they could argue that we didn't have a preexisting right to run this open source software.

So that's all alleged, Your Honor, if you look in the third-amended complaint of paragraphs 407, 411. There's numerous preexisting rights, even some that I haven't had a

chance to talk about today, that are plausibly alleged in the complaint. And at this stage -- at the Rule 12 stage -- all of these allegations have to be accepted as true.

**THE COURT:** All right. Let's shift gears here.

Mr. Rose, can I ask you to address for me why defense statements that they have absolute power in the WPEngine system or are, and I quote, "in control of everything on WordPress.org," and can, quote, "destroy all competition," and, quote, "get the market moving." Why aren't those enough to establish market power?

**MR. ROSE:** Your Honor, the standard for market power is the actual ability to control price or to restrict output. And I would refer the Court to the numerous cases that talk about how bad intentions or acts of malice and statements of destroying your competition are simply irrelevant to the question of an antitrust violation.

The U.S. Supreme Court's decision in *Brooke Group v. Brown & Williamson* is on point for that. The Ninth Circuit's summary of this concept in the *Aerotec* case, quote, "Competitors are not required to engage in a lovefest; indeed, even an act of pure malice by" --

**THE COURT REPORTER:** I'm sorry. I'm sorry. If you could slow down. Could you start that quote over?

**THE COURT:** That's our court reporter from the heavens.

Thank you, Kendra.

**MR. ROSE:** My apologies.

Quote, "Competitors are not required to engage in a lovefest; indeed, even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."

"As the Tenth Circuit" -- I'm continuing here from the *Aerotec* case quoting another case. "As the Tenth Circuit noted in rejecting a claim similar to the one here, 'were intent to harm a competitor alone the marker of antitrust liability, the law would'" --

**THE COURT REPORTER:** Sorry.

**THE COURT:** You sped back up.

**MR. ROSE:** All right. Yes.

**THE COURT:** Thank you, Kendra.

**MR. ROSE:** "As the Tenth Circuit noted in rejecting a claim similar to the one here, 'were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition.'"

The fact of the matter is, Your Honor, talk cannot violate the antitrust laws. It has to be actual conduct. And it has to be conduct -- it has to be the exercise of market power to exclude competition to the detriment of consumers. And Mr. Mullenweg or others tweeting about destroying competition

or controlling things is not dispositive. And it's not enough to plausibly allege those actual indicia of an antitrust claim, market power, exercise of power, actual raising of price, or restricting of output.

**THE COURT:** Mr. Rose, could you address, more squarely than I think I have from you so far, WPEngine's point that *Novell v. Microsoft* from the Tenth Circuit has nothing to do with market power, but instead dealt with anticompetitive effects?

**MR. ROSE:** I think you're referring to the *Novell* case.

**THE COURT:** I am.

**MR. ROSE:** Yes. So the *Novell* case is a refusal to deal or duty to deal case, which talks about how *Microsoft* was under no obligation to continue providing access to its technology to *Novell*, even though it had provided that access before. So the case does focus on anticompetitive effects.

Here, I think it's very helpful, because we have almost identical allegations of WPEngine that defendants providing access to the WordPress.org website somehow created an ongoing obligation to continue providing that access.

I think the Court's question relates to a particular argument that WPEngine had made. And I'm not sure I fully understood exactly what Your Honor was asking about.

**THE COURT:** Certainly. I understand WPEngine to have

raised the point that *Novell* -- and thank you, Mr. -- thank you for coming forward, Mr. Teruya. Maybe you can help put a finer -- a better point on it. That *Novell* is more about market power than anticompetitive effects. Do you want to -- if you have --

**MR. TERUYA:** Yes, Your Honor.

**THE COURT:** You make your argument -- you make your point. And then, really, that's what I'm asking Mr. Rose to --

**MR. TERUYA:** Okay.

**THE COURT:** -- respond to.

**MR. TERUYA:** Thank you.

**THE COURT:** Go ahead.

**MR. TERUYA:** Yeah. So on -- backing up a step, we're talking about power, as the Court correctly noted, where we're not talking about intention or malice. That -- those kinds of issues go to, is conduct anticompetitive? What are the effects of that conduct? This is a question about power. Do you have the power to do something anticompetitive? And those are distinct elements: Power versus, once we're past power, is there anticompetitive conduct and effects?

So the law being discussed in terms of hate words or, you know, fighting with competitors, fighting words, not being anticompetitive conduct or malice towards competitors not being by itself, sufficient to give rise to a claim for anticompetitive conduct? That's a distinct inquiry. We don't

agree with all of those statements. But that's a distinct inquiry from whether there's power.

And *Novell* is a particular example of that, where the case is analyzing, is a refusal to deal -- a mere refusal to deal -- actionable as anticompetitive conduct? So it's talking about anticompetitive conduct, not anticompetitive effects. But, regardless, it's not talking about power. And so on the inquiry of power, is there direct evidence or indirect evidence of power, these kinds of cases have no bearing on that. It's a distinct inquiry.

And with respect to the statements that the Court asked about by Mr. Mullenweg and others, again, those are admissions of power in the WordPress ecosystem. And in this -- you know -- this is a unique case where we have allegations based on evidence, not on information and belief. Because we had the benefit of some discovery at the time. So we have strong fact-based, evidence-based allegations in the third-amended complaint, which support the claims. And those include the examples the Court mentioned, which are talking about power -- absolute power -- in the WordPress ecosystem, getting the market moving, destroying all competition.

It's not a question of what was in their heart; it's a question about, do they have power? And we're entitled to all inferences at this phase. And the inference from these statements is that they have power to destroy competition and

get the market moving. And there was just an admission that Mr. Mullenweg has absolute power in the WordPress system at a minimum.

So we think those meet the pleadings standards by far. And to the extent that defendants want to argue about the meaning of those admissions, that's a fact question for the jury, saying that those words don't mean what they flatly say. And we do have copies of the documents, if the Court wanted to --

**THE COURT:** No, thank you.

**MR. TERUYA:** Okay.

**THE COURT:** No. No more. We have plenty. We have plenty from all of you.

All right. Is there anything you -- thank you, Mr. Teruya.

Is there anything you want to add, Mr. Rose, with regard to *Novell*?

**MR. ROSE:** Yes. I agree with Mr. Teruya that *Novell* is focused on anticompetitive conduct. So I don't think we have a disagreement on our reading of *Novell*. In *Novell*, market power was not an issue in question.

I think just in terms of the rest of the response, Your Honor, I still didn't hear anything connecting the straight remarks on Twitter to the actual standard for market power. Those are sound bites. There's no case saying that if a

defendant, you know, makes a remark about having power, therefore, the element of market power is satisfied under the Sherman Act. The way to satisfy the element of market power under the Sherman Act is to adequately allege a relevant product market, power in that market, barriers to entry -- which we haven't discussed today, but are missing from the complaint when it comes to the foremarket question -- and then, you know, anticompetitive conduct within that market that results in the detriment to consumers.

**THE COURT:** All right. Let me ask you a handful of -- more questions. I do have a three o'clock case management conference in a different case, and we'll probably go just a few -- cut just a few minutes into that, but not much over. So I'm going to ask you all -- I think I have two more questions, and then I'll give you all a little bit more time.

But my questions that remain at least are drafted for Mr. Rose. And, Mr. Teruya, you're welcome to address them. But I want to hear from you, Mr. Rose, why the alleged highjacking of the ACF plugin doesn't constitute a violation of the Computer Fraud and Abuse Act.

**MR. ROSE:** Your Honor, the claim that's at issue right now is the extortion claim. The portion of the CFAA that prohibits engaging in extortion of threats in connection with damage to a protected computer.

Your Honor did deny our motion to dismiss the other CFAA

claim, which is still at issue -- which is, you know, still in -- at issue. And we have not moved -- again -- moved to dismiss that.

**THE COURT:** Great. Then we can move quickly on to the next thing. Thank you.

With respect to the false advertising portion of counterclaimants' Count 2, I've got two questions there.

**MR. ROSE:** And my colleague is going to address that.

**THE COURT:** I see him rising.

**MR. ROSE:** I will concede the podium. Thank you.

**THE COURT:** Come on over.

Thank you.

Because -- this feels rude. But because we're a little -- I feel like we're a little short on time, Mr. Hogan, I'm going to start my question as you make your way up to the lecturn.

So I see that the counterclaimants point to two statements in the briefing. One statement is about the pledge, which -- well, one statement's about the pledge and the second is about WPEngine's contributions to WordPress. I just want to confirm that those are the only two statements that comprise the claim. Because I read WPEngine's motion as challenging other statements, but I don't read counterclaimants' briefing as defending those other statements.

**MR. HOGAN:** Our apologies, Your Honor. We were sort of, you know, limited in how much we could get into the

briefing. But the counterclaims do have -- do allege more statements than just those.

As Your Honor suggested, there are allegations that the overall statements of support -- and, specifically, the 5 percent of revenues would be devoted to the open source project -- are false. But there are very specific allegations, such as, at paragraph 233, that WPEngine would maintain a golden ratio of contributors to users. At paragraph 234 to 235, that's the -- that they would -- the pledge that they would contribute 5 percent of their resources. And then at paragraphs 236 to 243, there is a full and lengthy list of specific commitments of numbers of staff that would be devoted to the WordPress project that we believe were false when made.

**THE COURT:** Okay. My other question is whether counterclaimants want to make any clarification about the nature of Count 2. I saw the citation to *Lloyds Plumbing* for the proposition that Rule 9(b) doesn't apply to this count. But in *Lloyds Plumbing*, the plaintiff clarified its Lanham Act claim -- I'm sorry -- plaintiff clarified that its Lanham Act claim was not rooted in false advertising. And I didn't read counterclaimants' briefing as making a similar concession. So I'm curious if that's something you want to clarify for me now.

**MR. HOGAN:** Certainly, Your Honor. Our position is that we pled under both standards. We pled a broad claim for false -- advertising false representations -- and false

designation of origin under Section 43(a) of the Lanham Act. But it has two pieces to it.

The overall false association that WPEngine created that they are somehow affiliated with the source of WordPress software -- one element of how they convinced the marketplace that they were associated with the creators of WordPress software was to make these false specific statements about support for the WordPress community that they never intended to honor.

**THE COURT:** Understood. All right.

Do plaintiffs want to address any of the questions I just had about those counterclaims?

**MS. CARUSO:** Yes, Your Honor. Very briefly. Thank you.

**THE COURT:** Mm-hm.

**MS. CARUSO:** Just on those, as to the portions of Count 2 that allege false statements, that's what 9(b) applies to. That's what isn't satisfied here. There's no allegation that either of those statements is material. And, certainly, nothing beyond those two statements has that "who, what, where, when" that 9(b) requires.

And I'd also just point out, with respect to the pledge, as we argued in our briefing, the fact that we made the pledge is something they did not allege is false. And that's all that statement does. In any event, that statement was made in 2020.

The statute of limitations for false advertising and the analogous one for the Lanham Act portion of it is three years. As you know, we have other laches and time-barred issues. But, certainly, for that one, I just wanted to draw that to the Court's attention, Your Honor.

**THE COURT:** Thank you.

Folks, those are -- we have run through my questions. I do -- I know that Mr. Teruya wanted to, at least, make a few more points. I'll give each side about five more minutes, if there are any other additional points you wish to make before we close today.

Mr. Hogan, because you're still standing there, is there anything you want to add at this point?

**MR. HOGAN:** I would be prepared to respond if Ms. Caruso has any more arguments on the counterclaims.

**THE COURT:** I leave it to you all. It's five minutes total, so, yeah, I'm just -- I'm just going to watch the clock and you all --

**MS. CARUSO:** Okay.

**THE COURT:** -- you all tell me how we're doing.

**MS. CARUSO:** I will -- I'll try and keep this short so that my colleague can continue his remarks.

But just very briefly, Your Honor, we think that this is one of the cases where, with respect to both the laches issues and nominative use, that the issues are clear on the face of

the complaint and the judicially noticeable documents.

If you look at the cases that we cited in support of the RJN, laches is exactly the kind of situation in which documents are recognized and judicial notice is granted. This is not a complicated scientific study or anything like that, that needs to be carefully parsed. This is, are the words on the page how they're used. And when you look at how they're used, it's very clear under *Applied Underwriters* that those are nominative fair uses.

So I will, having said that, let Mr. Teruya have the rest of the time.

**THE COURT:** Thank you, Ms. Caruso.

**MR. HOGAN:** And I will be equally brief in responding, Your Honor.

I believe that WPEngine fundamentally mischaracterizes the nature of the counterclaimants' position on these trademark arguments. Counterclaimants have never said that the trademark is required to use the software. It's an entirely different right in an entirely different, you know, mechanism.

The software is about using the copyright that allows you to generate the operating system. The trademark is about communicating to the public who you are. And so earlier statements from years ago that WPEngine was offering WordPress-related web hosting services did not infringe and did not create an obligation to sue. It was when they

fundamentally transformed their market positioning to confuse the public into believing that they were WordPress or were endorsed or sponsored by WordPress. And that did not start to happen until much more recently.

And, you know, this is all very well laid out. You know, the question of when those uses went from nominative fair use to infringing use is an intensely factual question that requires a thorough review of all the facts and circumstances. And we believe our papers fully lay out how we have alleged each of the elements of the nominative fair use test and all other elements of the claims.

And so I will allow my colleagues to take up the rest of your time, Your Honor.

**THE COURT:** Thank you, Mr. Hogan.

Go ahead, Mr. Teruya.

**MR. TERUYA:** Thank you, Your Honor. I just wanted to quickly provide a few cites and then a few final remarks.

In terms of the -- where we allege that there's harm to rival content management system providers, that's in the foremarket. That's in paragraph 371. And we talk about the deception in the market as affecting competition in the foremarket throughout the complaint. But 371 talks about impact on rival content management system providers. We allege at paragraph 284 that Mr. Mullenweg controls the software code. So he does control some part of the software itself, beyond the

fact that the software is just one part of the system.

And with respect to barriers to entry, at paragraphs 359 through 369, we allege high barriers to entry, including network effects and switching costs. So I wanted to provide those cites, because I think there was some discussion that we didn't include that in the complaint, but we did.

With respect to the Court's prior order, I know we focused on the foremarket. And I agree with Your Honor, that's important, because we could have a claim that could stand alone with just the foremarket. But putting that aside, with respect to the aftermarket, we did include allegations to address the first point that the Court made in its prior order, which is that we did not adequately allege the first element under *Epic*. And assuming market definition is required and *Epic* applies, we allege that.

We added allegations clarifying what are the aftermarket restrictions. We challenged that their defendants' conduct, not interoperability among WordPress and Drupal and Joomla and the like. And that matches all of the cases discussed in the briefs. And we also added allegations why those specific challenged aftermarket restrictions were not generally known by customers. And that's all at paragraphs 343 through 352 of the third-amended complaint. And that was to address the Court's comments about that.

More broadly, I did want to note that the documents that

are referenced and explicitly discussed in the complaint -- they're not just tweets. I mean, these are internal documents and emails. And they're among others that have come out in discovery. So there's really extraordinary documents in this case. And I don't think, at that pleading stage, they could be discounted as that's just, you know, an offhand remark. I mean, these are important documents.

And we submit, respectfully, the Court to -- these issues should be evaluated on their merits, with the benefit of a full record which exists now. It sounds like there's fact disputes about how to measure, share, or what's the right proxy, and what is the meaning of these statements that, as the Court noted from our briefing, are very important issues? These are not small statements or offhand remarks.

And we also have expert reports, including, on our side, an expert economist -- we have a team of experts who are submitting reports in six weeks. But we -- among them, we have a well-known antitrust economist who is one of the experts in the *Epic v. Apple* case and is familiar with the issues there. That's Dr. Michael Cragg. So that's one of the reports the fact finder would have the benefit of.

And we submit that the vast, most efficient and practical and fundamentally fair outcome, at this point, is to not dismiss the claims on the pleadings, but instead to have them evaluated on their merits, based on a full record, which

largely already exists -- entirely exists in terms of facts -- and is substantially on their way in terms of experts. And we think that that is the fairest and best outcome here.

**THE COURT:** Thank you, Mr. Teruya.

Go ahead, Mr. Rose.

**MR. ROSE:** Thank you, Your Honor. Just a few final comments.

First, as I said before, I don't think that Rule 12 is satisfied by promising further discovery will prove up the claims. You still have to plead them and meet the standard for pleading an antitrust claim. And, here, they've failed to meet that standard.

A few points in response to Mr. Teruya's comments. So paragraph 371, where Mr. Teruya says they alleged harm to Web Content Management Systems, is a wholly conclusory sentence. It just repeats what he said. It repeats the legal standard. So that's not -- that doesn't meet the standard for plausibly alleging harm in that -- in the WCMS market.

I want to talk more about the question of the aftermarket restrictions. Because we didn't discuss this earlier, and I think it's a good place to end. Because the Court's prior order really focused on that as the sort of lead issue, which is this question of what constitutes an aftermarket restriction under the Ninth Circuit's decision in *Epic*? And the Court correctly noted and applied the standard, which is an

aftermarket restriction isn't just any anticompetitive conduct that is alleged by the plaintiff. An aftermarket restriction is the mechanism by which consumers are locked into the single brand aftermarket that is alleged.

Here, it would be the mechanism that limits consumers or users of WordPress to WordPress-only plugins, WordPress-only hostings, WordPress-only custom field plugins once they make their selection foremarket. *Epic* is crystal clear on that. *Coronavirus Reporter* is crystal clear on that. Even the *Lambrix* case that -- what WPEngine focuses on so much -- identifies the aftermarket restrictions as different things from the alleged anticompetitive conduct.

Because the fact of the matter is, when we're talking about market definition and whether aftermarket -- a single brand aftermarket -- is going to be considered a separate relevant antitrust product market, the question there is the way that consumers make their purchasing decision and whether they know that they're going to be locked into that single brand aftermarket when they make their initial purchase in the foremarket.

That's all clear from Your Honor's prior order. That's the right way to look at it. And, yet, that's exactly what WPEngine fights against in their amended pleading and also in their opposition to the motion to dismiss. What they say over and over again is we've got all sorts of allegations about how

defendants concealed their licensing demands, they concealed their promises about access to WordPress.org, they concealed that they would threaten people. All these allegations are not the mechanism by which people are limited when they make their foremarket decision. And that's so key here. And that's the key to understanding why the amended pleading doesn't solve any of the flaws that the Court already addressed in its prior order. And the Court should do the same here in dismissing it.

**MR. TERUYA:** Your Honor, could I address this point --

**THE COURT:** No, Mr. Teruya. Well --

**MR. TERUYA:** Just this legal point.

**THE COURT:** Here's the problem, Mr. Teruya. There's a reason I told you all to take five minutes. And the only reason I'm going to give you about 45 seconds is because I think Mr. Rose left time on the table.

Sorry, but I appreciate your brevity.

You get 30 seconds, because your time was used. Go.

**MR. TERUYA:** Your Honor, we -- the Ninth Circuit decision in *Epic* is crystal clear. It says what needs to be unknown -- generally unknown -- is the challenged restriction. The challenged restriction does not need to be interoperability among technical platforms. It's what is the conduct of the defendant that is impairing the choices available to consumers. So we clarified that the challenged restriction here is their conduct, not technological interoperability.

All of the cases cited by both sides, including the *Sezzle* decision that we submitted as supplemental authority, all don't involve the customers not knowing they can't choose between iOS and Android or Tesla and some other kind of card or Kodak and some other kind of copier. They're all about limitations within a particular ecosystem. And that's exactly what we've alleged here.

**THE COURT:** Thank you.

**MR. TERUYA:** Thank you, Your Honor.

**THE COURT:** All right. Counsel, I will take the motions under submission, and you will get a written order. Thank you.

**MR. ROSE:** Thank you, Your Honor.

**THE COURT:** Have a good rest of your day.

**MR. TERUYA:** Thank you.

**MR. MACK:** Thank you.

**THE COURTROOM DEPUTY:** This matter is concluded.

(Proceedings adjourned at 3:10 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Saturday, June 27, 2026

Kendra Steppler

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court