# Proposed Redacted Version of Exhibit 18 (Dkt. No. 358-7)

# EXHIBIT 18

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---------------------------------x

WPENGINE, INC.,

     Plaintiff,     C.A. No.

     v.     3:24-cv-06917-AMO(DMR)

AUTOMATTIC, INC., a Delaware

corporation; and MATTHEW

CHARLES MULLENWEG,

an individual

     Defendants.

---------------------------------x

VIDEOTAPED DEPOSITION of

JESSE FRIEDMAN

Boston, Massachusetts

Reporter: Michael D. O'Connor, RMR, CRR, CRC

Job No. J14001192

Page 2

Friday, January 23, 2026

9:07 a.m.

VIDEOTAPED DEPOSITION of JESSE FRIEDMAN, held at Quinn Emanuel Urquhart & Sullivan, LLP, 111 Huntington Avenue, Boston, Massachusetts, pursuant to notice, before Michael D. O'Connor, Registered Merit Reporter, Certified Realtime Reporter, Certified Realtime Captioner.

Page 3

A P P E A R A N C E S:

ATTORNEYS FOR PLAINTIFFS:

     QUINN EMANUEL URQUHART & SULLIVAN LLP

     555 Twin Dolphin Drive, Suite 560

     Redwood Shores, California 94065

     (650) 801-5000

     BY:   MARGARET CARUSO, ESQ.

        margretcaruso@quinnemanuel.com

        – and –

     QUINN EMANUEL URQUHART & SULLIVAN LLP

     295 Fifth Avenue

     New York, New York 10016

     (212) 849-7000

     BY:   KAMYA TRIVEDI, ESQ.

        kamyatrivedi@quinnemanuel.com

Page 4

A P P E A R A N C E S (Cont'd):

ATTORNEYS FOR DEFENDANTS:

     GIBSON, DUNN & CRUTCHER LLP

     One Embarcadero Center, Suite 2600

     San Francisco, California 94111

     (415) 393-8277

     BY:   JOSEPH R. ROSE, ESQ.

        jrose@gibsondunn.com

        – and –

     GIBSON, DUNN & CRUTCHER LLP

     1700 M Street, NW

     Washington, D.C. 20036

     (202) 277-9447

     BY:   JEFFREY WARREN, ESQ.

        jwarren@gibsondunn.com

Also Present:  David Woodford, Videographer



Page 157

says, "July 3: Second terms review Zoom.  Steve Deckert and Jesse Friedman from Automattic, Victor Yuan from WPE."

Do you see that?

A.   Yes.

Q.   So this phone call that you don't remember anything about is one of the phone calls that Automattic has relied on to say we spent time negotiating with WPE, right?

MR. ROSE:  Object to form. Counsel, you keep calling it a phone call.

Q.   Mr. Friedman, is it accurate that the Zoom call that you and Steve Deckert had with Victor Yuan is one of the communications that Automattic has relied on to show the negotiations with WPE?

MR. ROSE:  Object to form.

A.   I don't recall that meeting, and in my cursory glance of the transcript, it seems like I had very little involvement in speaking.  And I think I even showed up late based on what this transcript says.

So again, you know, I'm in meetings all the time.  This is quite a while

Page 158

ago.  I don't recall being on that meeting. And then to answer, you know, whether or not, you know, I think this is obviously a blog post that describes it as one of several meetings that Automattic had had with WP Engine.

Q.   Is it your testimony today that you simply were not paying attention during the Zoom call with Mr. Yuan?

MR. ROSE:  Object to form.

A.   It's my testimony that I don't remember that meeting, and the specific details of it.

Q.   All right.  Do you believe that if you were to read the transcript of that Zoom conversation, that it might refresh your recollection as to what was said?

A.   I don't know what will happen if I read that transcript.

Q.   All right.  I ask that at the next break you do read the transcript, and then we can talk about that.

MR. ROSE:  So, Counsel, are you representing to him that that transcript has been marked as an exhibit -- what transcript are you asking the witness to

Page 159

read?

MS. CARUSO:  The one that was marked as the exhibit -- I believe it was five.

MR. ROSE:  So you're just representing to the witness that this was the July 3rd Zoom call, the transcript of a July 3rd Zoom call, because I don't see a date on that exhibit, and the witness has no memory -- can't authenticate it because he has no recollection of it and has not seen it before.

So can you give the witness a little more direction as to what he's supposed to do at your request?

MS. CARUSO:  I would like him to review this transcript, and then answer questions about the conversation that it reflects.

Q.   Can you do that, Mr. Friedman?

A.   I can read the transcript, yes.

Q.   All right.  So at the next break is fine.

MR. ROSE:  If you want him to read

Page 160

through that entire transcript, we're going to do that on the record.  He can look over it on the break, but we're not going to take an hourlong break so he can study an exhibit in the middle of a deposition.

MS. CARUSO:  You had Mr. Friedman show up for this deposition without reviewing a transcript of one of the meetings that your client has relied upon to say we think that WPE was acting in bad faith.

MR. ROSE:  That's not even from his custodial file, and this witness has no -- nothing to say about that exhibit, as is clear from the testimony.

So I reject the insinuation that, number one, that we had any obligation to prepare him to discuss any particular document for a deposition in his personal capacity, and number two, the idea that this witness has some obligation to familiarize himself with a document he has never seen before, and does not come from his custodial file.



Page 161

MS. CARUSO: I take it you will be prepared to say he will not be offering testimony at trial about the contents of that conversation, given that he remembers none of it?

MR. ROSE: The witness will not be offering testimony about Exhibit 5.

MS. CARUSO: That wasn't my question. Can you represent that he won't be offering testimony about the contents of the conversation that was had with Mr. Yuan and the following conversation with Mr. Deckert?

MR. ROSE: No, but you're free to examine him about anything he remembers about a July conversation, and to make your record and to make whatever appropriate objections you would like to make in the future based on whatever testimony is offered.

Q.    Mr. Friedman, it's your recollection you don't remember what was said on that conversation, right?

A.    I don't remember the details of this meeting, no.

Page 162

Q.    Do you remember anything about the contents of the meeting?

A.    No.

Q.    Have you seen a document called "Pricing Trademarks For Hosting Companies"?

A.    I don't know.

(Document marked as Exhibit 8 for identification)

Q.    You have been handed what's been marked as Exhibit 8. The first page has the Bates number A8C00920900. Do you see that?

A.    Yes.

Q.    This is a document you've seen before?

A.    I'm not familiar with this. I don't recall if I've seen this before.

Q.    You didn't prepare this document?

MR. ROSE: Object to form.

A.    I don't remember if I prepared this document.

Q.    Have you heard the term "land and expand" before?

A.    Yes.

Q.    In what context?

A.    That you, with a partner, who you

Page 163

may want to do -- have multiple aspects of a partnership with, for example, Jetpack and WP Cloud, that sometimes there's not always an opportunity to get them to invest in everything at once.

So the idea would be that you develop a partnership on some aspect, some level, and then you grow the relationship and try to expand that partnership over time.

Q.    Have you heard the phrase "land and expand" used in connection with Automattic's host partnership initiative?

A.    I believe I recall hearing the term "land and expand" in conjunction with HPP.

Q.    From whom did you -- withdrawn. Who did you hear use that term?

A.    I don't have an incredibly clear memory of it, but I have a vague memory of Paul Maiorana using that term.

Q.    What did you understand him to mean by that in the context of the host partnership initiative?

A.    In my memory, the only time that I've heard or I think of the term "land and expand," it means what I described before,

Page 164

which is that you work to try and expand a partnership over time.

Q.    Did you understand the land part of land and expand connection with the host partnership initiative to refer to getting a host to pay for the use of WordPress and WooCommerce trademarks?

A.    My understanding of the term "land and expand" can be used as any part of a partnership that a partner finds intriguing and wants to move forward on.

Q.    Was there any part of the host partnership agreement you thought was most likely to be intriguing by host?

A.    I think from what I remember there's many aspects of that partnership program that could be interesting to different posting companies. I don't think it's fair to lump them all in together and say that they all have the same motivations. So there are different aspects that are intriguing to different hosts.

Q.    Did, in fact, different hosts have different reactions to the host partnership proposal?



Page 165

A.    I don't recall being in multiple meetings with multiple hosts. Like I don't recall the context and details of those meetings, so I don't remember if they all had different feedback.

Q.    But you're not aware of any of them who accepted any of the terms of a host partnership agreement, right?

MR. ROSE:  Object to form.

A.    I'm not aware of hosting partners that signed agreements, although that doesn't mean that it didn't happen on the HPP program.

Q.    If you wanted to find out if it did happen, who would you ask?

A.    Paul Maiorana or Beau Lebens or Steve Deckert.

Q.    And if Steve Deckert said no one did it, you wouldn't have any reason to think he was wrong about that, right?

A.    Well, Steve was out on medical leave for a long time, so I would make sure to clarify that he has comprehensive knowledge of the program and its status before I took that to mean that no one has ever signed it.



JESSE FRIEDMAN
WPENGINE, INC. vs AUTOMATTIC, INC.

January 23, 2026

Page 169

what this is referring to.

Q.    Well, irrespective of what's in the document, you said that you had a recollection of a discussion of carrots and sticks?

A.    Mm-hmm.

Q.    What sticks did you understand there to be?

A.    Well, as I said, my focus was primarily on the benefits package. So what I wanted, you know, what I focused on was, what is the value that we can boost and improve across HPP, including Jetpack and Woo and all of that.

I'm having a hard time remembering exactly what sticks would have been referencing to -- in reference to.

Q.    Do you remember thinking of any sticks that could be used in connection with the host partnership agreement initiative?

A.    We keep referring to this metaphorical stick, and I don't -- I'm saying, I don't understand the context or what this is meant to be, and I don't remember exactly what this means. So I don't know how to comment on

Page 170

theoretical sticks when I don't understand the core concept of this.

Q.    You don't understand the core concept of a stick as opposed to a carrot?

A.    I'm saying I don't understand this specific sentence in the way in which it was used. You asked me what I thought the sticks would mean in reference to this.

I don't recall exactly what that would have been.

Q.    Again, my question is not tied to this document that's in front of you. It's thinking back to the host partnership initiative. Are there any sticks that you had suggested to anyone that could be used?

A.    I'm trying to remember a time where I used the word "sticks," and I'm having a hard time remembering specifically using that. So I don't think I have a way to answer that question, because it's not in my memory.

(Document marked as Exhibit 9 for identification)

Q.    So is it your testimony that you were focused more on carrots than on sticks?

MR. ROSE:  Object to form.

Page 171

A.    It's my testimony that I was more focused on the benefits of the hosting partnership program. I do not have a strong recollection of using the terms "carrots" and "sticks." I have a vague memory of it. And so, I can't -- I can't say that I was specifically focused on carrots versus sticks, because I barely have a vague memory of this term being used very often at all.

Q.    Generally speaking, carrot is a benefit or enticement, right?

A.    Yes.

Q.    And stick is a negative, something bad that will happen if you don't do the thing, right?

A.    I don't think that sticks needs to be a negative or a bad thing. I think it can be -- I mean, it may not even be perceived as a bad thing. I don't know. I would have to think of some examples to try and categorize them as that.

Q.    So when you talk about the phrase carrots and sticks, what to you understand "stick" to convey?

A.    Motivation.

Page 172

Q.    And the carrot is a positive motivation, right?

A.    Yeah, I mean, theoretically in this metaphor, if we're referring to carrots and sticks and horses, the carrot would draw the horse, and the stick pushes the horse.

Q.    Right. So the horse can be guided to do what you want it to do by either giving it a carrot, which presumably it would like, or beating it with a stick, which presumably it won't like, right?

A.    I wouldn't classify it as beating it with a stick. I'm saying I think that the idea there is that when you ride a horse, there are jockeys that use sticks to motivate the horse to go faster. I don't know that I would necessarily classify it as beating the horse.

Q.    All right. And that's how you understand the phrase "carrot and stick"?

A.    That's how I understand it, yes.

Q.    It's just you could be motivated with food or you could be motivated with a stick, and they're both equally desirable to the person or horse being motivated?

MR. ROSE:  Object to form.



Page 173

A.    I'm sorry, just to be fair, like I just have a hard time processing the questions when there's these long pauses between the sentences.  So like it's hard for me to process exactly what you just asked me.

Q.    Let's just look at the next exhibit, which is Exhibit 9.  The first page of Exhibit 9 is Bates numbered A8C013358 -- 1335384.

Do you see that?

A.    Yes.

Q.    Do you recognize Exhibit 9?

A.    It appears to be a P2 post that has me as the author.

Q.    Did you, in fact, author this P2 post?

A.    I'd have to read it.  And also, just so we're all clear here, just because my name is on the P2 does not mean that I authored the entire thing.

A lot of times at Automattic there are times when we collaborate, and then it has to choose a single person to be defined as the author.  So there could have been multiple people who worked on this.

Page 174

Q.    You don't recall who you might have collaborated with?

A.    Well, I haven't even had a chance to read it, so I'm not sure.

Q.    Let me ask you this question.  Right under your name it says, "TL; DR."

Do you see that?

A.    Yes.

Q.    Do you understand that to be shorthand for too long, didn't read?

A.    Yes.

Q.    So what follows "TL;DR" is a summary of the post; is that fair to say?

A.    Well, I would say that a TL DR is you don't have time to read the whole thing, here's the part that's probably most relevant.

[REDACTED]

Did I read that correctly?

A.    Yes, I see that there.

Page 175

Q.    Did you write this three-sentence TL DR?

A.    I honestly don't remember.

Q.    Did you collaborate with anyone in writing this TL DR?

A.    It's possible.

Q.    Who are the most likely people you would have collaborated with in preparing this if you did collaborate with anyone?

A.    It's tough to say accurately without having seen the revisions of this.

Q.    Are the revisions to this, do they exist somewhere at Automattic?

A.    I believe so.

Q.    If you wanted to see the revisions to this, could you log into your computer and do that?

A.    I don't recall exactly if I'm able to do that with the permissions I have or not.  I'd have to look.

Q.    Is there any other way that you could find out if you collaborated with anyone about this?

A.    I don't know.  It's hard out of context when I see this in a printed document,

Page 176

and not having a chance to read it, I don't know where else I might have worked on it with someone else.

Q.    This isn't a P2 post that you reviewed in connection with preparing for your deposition today?

MR. ROSE:  Object to form.

MS. CARUSO:  I'll rephrase the question.

Q.    When is the last time that you looked at this P2 post?

A.    I don't remember the last time.  I haven't seen it in quite a while.

Q.    Is there a practice at Automattic that if someone's name appears as the author of a P2 post, that they have reviewed that post at a minimum?

A.    Oh, yes.

Q.    So do you believe that you reviewed this post before it was published on September 12, 2024?

A.    Yes.

Q.    Do you believe that you agreed with everything that was in this post?

A.    I would need to read it to be able



Page 237

where someone was discussing that it was happening. It could have been P2.

Q.   Did you think that was a good idea?

A.   I thought that it was an exercising of the way in which open source code works, but I didn't really have an opinion on it.

Q.   Did you ever go to the SCF page, the plug-in page?

A.   Yeah, I actually had used that plug-in in the past myself. So I had been to that page at some point.

Q.   When you say "in the past," what do you mean by that?

A.   I'm sorry, did you say ACF or SCF?

Q.   SCF.

A.   I think I probably would have reviewed that page after I learned about it, yeah.

Q.   Do you recall that page, the SCF page, had reviews posted on it that were actually reviews of ACF?

A.   I guess then -- yeah, so then if it overtook that page, it would have had the

Page 238

reviews from the previous plug-in. I don't recall seeing that for myself, though.

Q.   Are there any other actions that Automattic took against WPE after the September 2024 Word Camp?

A.   I don't recall anything other than what we've spoken about.

Q.   Are there any other actions that Automattic contemplated taking against WPE after the September 2024 Word Camp?

A.   I don't know, and I don't remember if I was a part of those discussions.

Q.   Were you a part of a -- let me withdraw that.

Page 239

Page 240

Q.   What do you mean by "a formal team"?

A.   Well, in Automattic we have something called matic space, and it defines what team you're on. Earlier I mentioned I'm on the WP Cloud team. In the past I was on the Firefly team. Those are much more -- those are set teams. So I don't have a memory of us creating a team like that.



Page 241

Q. Were you part of that team?

A. I think I probably had some level of involvement. I probably had some discussions around it. I don't remember being -- feeling like that was part of my core responsibilities.

Q. What is a daily stand-up?

A. It's a meeting where we get together. Usually it's a very short meeting. In the past we have done daily stand-ups around like sales initiatives so that we can do like a quick ten- to 15-minute check-in on how things are going.

Q. Did you have daily stand ups with any other team that you worked on while you were at Automattic?

A. I don't remember having a daily stand-up around this or anything since I worked on the Firefly team.

(Document marked as Exhibit 11 for identification)

Q. You've been handed what's been marked as Exhibit 11, beginning Bates number A8C01338043.

Do you see that?

Page 242

A. Yes.

Q. And do you recognize this to be a P2 thread or P2 post?

A. Yeah, this appears to be a P2 post.

Q. If you return to the page ending 8101.

A. 8101. Okay.

Q. The first image that appears on that page is the picture of Lance Willett.

Do you see that?

A. Yes.

Do you see that?

A. Yes.

Q. And after that it says, "We'll invite you to the daily stand-up."

Do you see that?

A. Yes.

Q. Who do you understand Mr. Willett to have been inviting to the daily stand-up?

A. It looks like Lance was saying to

Page 243

Mark to please add me to the stand-up.

(Document marked as Exhibit 12 for identification)

Q. Exhibit 12 begins Bates number

Page 244

A8C01401821.

Do you have that in front of you?

A. Yes.

Q. Do you recognize Exhibit 12?

A. It appears to be a DM between myself and Ronald Gijsel.

Q. Do you see the date on the second page of July 1, 2024?

A. Yes.

Q. Why were you having this communication with Mr. Gijsel on July 1, 2024?

A. Just give me a second to review it. I want to know what we were talking about.

Q. This was a couple of days before the meeting that you had with Mr. Yuan; is that correct?

A. I don't remember that meeting. I think based on the transcript you provided, that was July 3rd, and this is July 1st, so that would make sense.



Page 245

Page 247

Page 246

Page 248



Page 249

Page 250

Page 251

Page 252



Page 253

Page 255

Page 254

Page 256



JESSE FRIEDMAN
WPENGINE, INC. vs AUTOMATTIC, INC.

January 23, 2026

Page 277

will reserve our rights to recall the witness, and hold the deposition open.

MR. ROSE:  I think the witness has testified left, right, and sideways in every possible way that he has no memory of this conversation, and that reviewing the transcript will only insert memories into his head of the transcript and not of the conversation.  So I will end the deposition today.

I understand you're going to make some kind of record.  Obviously we don't consent to hold the deposition open, since we've now used over seven hours of time on the record.

The witness will read and sign, and Automatic reserves its right to provide confidentiality designations under the protective order according to the usual schedule.

MS. CARUSO:  And WPE disagrees, and reserves all of its rights, because this witness' preparation and forthcoming have raised issues that lead us to likely seek more time.  With that

Page 278

we can go off the record.

THE VIDEOGRAPHER:  This is the end of media seven.  This concludes the videotaped deposition of Jesse Friedman.  Off the record at 6:10 p.m.

COURT REPORTER:  Counsel, the three business day expedited transcript?

MS. CARUSO:  Yes.

MR. ROSE:  We do not need an expedited transcript.  There's been some confusion of that with the reporters.  We are not ordering an expedited transcript, but we will take a rough.

(Whereupon the deposition concluded at 6:10 p.m.)

Page 279

E R R A T A

I, JESSE FRIEDMAN, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

Page    Line                    Correction

—

Signed under the pains and penalties of perjury this        day of              , 2026.


                    JESSE FRIEDMAN

Page 280

C E R T I F I C A T E

I, Michael O'Connor, Registered Merit Reporter/Certified Realtime Reporter, do hereby certify:

That JESSE FRIEDMAN, the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this 23rd day of January 2026.


                    Michael O'Connor

                    MICHAEL O'CONNOR, RMR, CRR, CRC
                         Notary Public


My Commission expires:
November 9, 2029

