# EXHIBIT A

*Contains testimony designated "Highly Confidential" and "Attorneys' Eyes Only"*

| Copies of Excerpts of Matthew Charles Mullenweg's Deposition Testimony | |
|---|---|
| **Transcript** | **Testimony** |
| 48:7-53:25 | Q. What does it mean to host a website?<br>A. Oh. What does it mean to host a website?<br>Hosting could mean a number of things. Common usage, I would say is like a -- making it available on the internet. But there's also websites that might be hosted internally.<br>You can run WordPress locally, which some people might call it hosting and some might not. You can also use WordPress embedded to create applications like on a -- your mobile phone. And -- but you can sort of run the code in a really large variety of ways.<br>Q. But if someone wants their website actually to actually be physically -- or not physically, located on the internet, the World Wide Web, they have to have it hosted somewhere; correct?<br>A. Not necessarily.<br>Q. Why not? How would you -- how would it get on the internet if it's -- if it's not being hosted by someone or an entity?<br>A. Well, for example, you could use like a different sort of proxy or a CDN, so it wouldn't be publicly available on the internet. But there would be sort of like a -- a way it was delivered.<br>There's also other ways to have it available, for example, on the core network or deployed like -- like -- like I said, an application.<br>Q. Let me rephrase my question 'cause obviously there was some confusion about it.<br>If someone wants to build a website and have it be visible to the public on the internet, does it need to be hosted somehow?<br>A. I -- I wasn't confused, I don't think. I -- I -- just trying to clarify, but there's a variety of ways a website can be delivered.<br>Q. Right.<br>But then you started getting into private networks where it's not actually visible on the internet. So --<br>A. Well --<br>MR. DORE: Wait. There's no question pending.<br>THE WITNESS: Oh, sorry. Yes.<br>MR. DORE: Wait. So just let -- let him ask a question.<br>THE WITNESS: So...<br>BY MR. WILLIAMS:<br>Q. I want to build a website and have it for my store and put it on the internet. Do I need someone to help me with hosting?<br>MR. DORE: Objection to the form of the question.<br>THE WITNESS: I -- not necessarily. No.<br>BY MR. WILLIAMS:<br>Q. Okay. What is hosting in that context?<br>A. You tell me what you're referring to in the context --<br>Q. No, sir, you're the witness. I'm asking the questions.<br>MR. DORE: You're the one who asked him to --<br>BY MR. WILLIAMS:<br>Q. Are you telling -- are you telling me that you don't understand what "hosting a website" means in your business --<br>MR. DORE: Wait.<br>MR. WILLIAMS: -- is that what you're telling me?<br>MR. DORE: Objection. Counsel, there's no need to raise your voice. You expre- --<br>MR. WILLIAMS: Well, this is ridiculous.<br>MR. DORE: You're arguing -- you expressly asked the witness to confirm with you if there was a misunderstanding so you could clarify it. Now he's doing exactly what you asked him to do at the outset --<br>MR. WILLIAMS: He's not.<br>MR. DORE: -- of the deposition and you're raising your voice unnecessarily.<br>MR. WILLIAMS: He's not.<br>MR. DORE: And you're interrupting me.<br>So I object to the question. If you want to ask the question again, you can do it. But the witness is doing what you asked him to do.<br>THE WITNESS: May I answer the question as he asked it?<br>MR. DORE: If you understand it and if you remember it.<br>THE WITNESS: So, first, I'm -- I'm sorry you seem to get frustrated with that.<br>I -- you know, like you said, it's very important to answer things accurately to the best of my ability. I am trying to be sort of technically specific in the language. |

| | |
|---|---|
| | And so, I think in this instance, sort of preferably understanding like more as an engineer or from a technical level, the words you're using have some ambiguity and could be taken in several ways.<br>So by saying this several ways that I understand it or that it's possible, I'm trying to express that there's a -- a variety of things that -- how WordPress could be delivered. And you're sort of asking me repeatedly about the definition of hosting. Is -- it's a word that can be used in different ways. And I -- not sure about the specificity of how you're using it.<br>BY MR. WILLIAMS:<br>Q. Does your company Automattic offer website hosting services?<br>A. We do, yes.<br>Q. Okay. And -- and what -- what do those services entail?<br>A. Well, it's different things for different sort of ways we offer web hosting. But when you say what does it entail, like, could you be more specific?<br>Q. What does it mean to host a website on the internet?<br>MR. DORE: Object to the form.<br>Go ahead.<br>THE WITNESS: Like I said, it could have a variety of meanings.<br>BY MR. WILLIAMS:<br>Q. How is it used when Automattic offers hosting services for a website?<br>A. Well, for example, on WordPress.com, it could mean that you can sign up for a service on WordPress.com for free or paid and have a website.<br>Q. What does that service provide under WordPress.com?<br>A. Thousands of things.<br>Q. Thousands of things that would fall under the -- the definition of hosting, as that's being used?<br>A. On some. But also things like support or other things that wouldn't be called hosting.<br>Q. Does Automattic have any descriptions on its website as to what hosting services it provides?<br>A. It's possible, yes. I'm not familiar with all of our websites, but it's a possibility.<br>Q. Does hosting a website on the internet involve -- potentially involve having server space somewhere? |
| 65:3-68:11 | Q. Now, as the CEO of the company, are you the ultimate decision-maker?<br>A. Not for all decisions, no.<br>Q. And there's a board; correct?<br>A. Yes. Automattic does have a board.<br>Q. And how many board members are there?<br>A. Four currently.<br>Q. How many board seats are there?<br>A. I don't know. I guess four, at least, but...<br>Q. But I mean are there vacant seats on the board right now?<br>A. Oh, I believe so, yeah.<br>Q. And --<br>A. We also have a sort of advisory board, and we refer to different things as sort of boards.<br>Q. But under the bylaws for Automattic Inc., does it spell out the makeup of the board, board of directors?<br>A. I -- I don't know if it's in the bylaws. I'd want to review them to be certain.<br>Q. Who are your current board members?<br>A. So the -- on sort of the official board/board for Automattic, there's General Ann Dunwoody.<br>Q. I'm sorry, say that again.<br>A. General Ann Dunwoody, retired general. She was actually the U.S. military's first female four-star.<br>Susan Decker, who is also a board member at Berkshire Hathaway and Costco and a few other places. Both Ann and Sue are public directors of a variety of companies.<br>Toni Schneider, and who is also a board member of a number of companies. And myself. I'm also a board member of other companies as well.<br>Q. Were those the same board members that were on the board of directors in 2024?<br>A. I would need to look to be certain.<br>Q. Can you think of any that were not on the board in 2024?<br>A. These four who were not on the board?<br>Q. Right.<br>A. These four, I believe, had been on the board at least since 2024.<br>Q. Can you think of other people that were on the board that have since left since 2024?<br>A. I would want to confirm the date, but there are prior board members. So, for example, Phil Black. But I would want to check exactly what date he...<br>Q. And Automattic has shareholders; correct?<br>A. Automattic Inc. does have shareholders.<br>Q. And as the CEO, is it your understanding that you owe a fiduciary duty to those shareholders?<br>MR. DORE: Objection to the form.<br>Go ahead. |

| | |
|---|---|
| | THE WITNESS: That would be my layperson understanding, yes.<br>BY MR. WILLIAMS:<br>Q. What types of decisions would the board have to approve?<br>A. I would need to look up in the bylaws to be certain. But, you know, one example could be a fundraise, if it required issuing a certain type of stock or something.<br>Q. Would the board have to approve an investment by Automattic in another company?<br>A. No, not necessarily.<br>Q. Are there dollar thresholds that they would need to provide approval for?<br>A. I don't recall off the top of my head. I would defer to one of our lawyers or CFO or something.<br>Q. Would the board need to approve an acquisition of another company?<br>A. Not necessarily. I don't think so.<br>Q. So it -- it's your understanding that as the CEO you could -- you would be the ultimate decision-maker to decide if Automattic should invest in another company?<br>MR. DORE: Objection to the form.<br>Go ahead.<br>THE WITNESS: Not necessarily. |
| 89:4-90:13 | Q. Now, you're a director of the WordPress Foundation; correct?<br>A. I'm on the board of the WordPress Foundation, and I believe a director as -- yeah.<br>Q. And what is the WordPress Foundation?<br>A. The WordPress Foundation is a 513(c) [sic] nonprofit.<br>Q. What is the -- well, when was it created?<br>A. Oh, I would have to look up the exact year. I don't know off the top of my head.<br>Q. Were you involved in its creation?<br>A. I was.<br>Q. And why did you create the WordPress Foundation?<br>A. The -- I don't remember the exact sort of reason at the beginning. But it probably evolved as we went through, like, the IRS process and everything like that. I think the original intention was actually to hold, like, the WordPress code or something like that. But then there was something else that we got -- like the application changed over time.<br>Q. Is there a mission statement for the WordPress Foundation?<br>A. Probably, yes.<br>Q. Do you know what it is?<br>A. I think there's a statement that's like the filing or the reason it exists. And there's probably something on its website, on WordPressFoundation.org, and there's probably things that have been stated publicly. So...<br>Q. Right. But you created this foundation; correct?<br>A. Yes. I was one of the people that helped get it started. |
| 106:4-107:5 | Q. But I get to ask you questions and you can tell me from your best recollection, if you know. And I'll represent to you that Bubblestorm is the name listed on the trademark registrations that are attached to your counterclaims, so for the WooCommerce -- Woo-related registrations.<br>So is it your understanding that there is a separate entity called WooCommerce Inc. that is a subsidiary of Automattic?<br>A. I believe there is a subsidiary called WooCommerce Inc. I don't know if it's a subsidiary of Automattic itself or one of the other subsidiaries.<br>Q. Do you hold a title with WooCommerce Inc.?<br>A. Again, I would need to look up the exact, which subsidiary it was, and everything like that. So I wouldn't want to speculate under oath.<br>Q. How does Automattic generate -- well, how does WooCommerce Inc. generate revenue?<br>MR. DORE: Objection to the form.<br>THE WITNESS: Again, I don't know if WooCommerce Inc. gets revenue or if it goes to a different subsidiary.<br>BY MR. WILLIAMS:<br>Q. What is the business of WooCommerce Inc.?<br>A. I would want to look up the sort of the exact subsidiary. |
| 109:7-115:12 | MR. WILLIAMS: And Exhibit 17, which is an e-mail from -- from Priyah Kaul at Gibson Dunn dated Friday, April 24th, 2026.<br>(Mullenweg Deposition Exhibit 17 was marked for identification.)<br>BY MR. WILLIAMS:<br>Q. And do you --<br>A. Are we referring to all of these? It would take a little while to read through it all.<br>Q. Yeah.<br>A. I know you have a lot to get through so...<br>Q. Well, do you have an understanding of the topics that you have been identified to testify on behalf of Automattic for?<br>A. I did do a lot of reading about the topics I've been asked to testify under. |

| | |
|---|---|
| | Q. Okay.<br>A. But I'd want to read, like, the exact numbers and what they refer to.<br>Q. Sure.<br>A. Can you give me a second?<br>Q. Yeah. So let me just kind of --<br>A. Well, can I have a second to read first?<br>Q. Yeah. I just -- I wanted to identify the topics for Automattic. So when you're going through it you can -- or you can just look at the – the letter that identifies the topic and compare that to the topics in the deposition notice.<br>A. Which exhibit?<br>Q. So if you look at Exhibit 16, which is the e-mail from Orin Snyder, it identifies you as talking about Topics 2, 3, 9, 11, 12.<br>I'm going to read these in and then you can look at the topics. 20, 22, 27, 28, 30, 35, 36, 37, 47, 48, 49, 50, 57, 58, 59, 60, 61, 62, 63, where there are two numbered 63s. 64, 66, 67, and 68.<br>So those were the -- those correspond to the topics in Exhibit 14, which is the Automattic 30(b)(6) deposition notice.<br>A. And in 17, there's different numbers. Are those like a different document or --<br>Q. So 17 --<br>A. -- is it in addition to this, or is it -- did it change between them --<br>Q. 17 --<br>A. -- because it's a later e-mail.<br>Q. Exhibit 17 has different topic numbers, but they're -- it's because the numbering of those topics in the WooCommerce deposition notice were different.<br>But my understanding, and you can confirm, is that they -- those topics overlap with topics that you've been designated on behalf of Automattic for.<br>A. Okay. I wouldn't want to confirm that without the chance to read them all.<br>Q. Of course.<br>A. Yeah, but -- let me get -- let me read this e-mail.<br>(Witness reviews.)<br>It's actually getting warmer, not cooler.<br>MR. MISSAN: They said they did the best they could and they're trying again but without any guarantee --<br>THE WITNESS: Wow. Can we open a door or?<br>MR. WILLIAMS: Sure.<br>MR. DORE: It's been about another hour, so if we could take a break when you're ready.<br>MR. WILLIAMS: Well, I was thinking we -- as soon as the lunch gets here, we can break then.<br>MR. DORE: Okay.<br>MR. WILLIAMS: Just to keep it moving.<br>MR. DORE: Can we turn the thermostat down, so -- yeah.<br>MR. WILLIAMS: We're checking with the building on that. So hopefully it can get that done.<br>MR. MISSAN: It will help with the door open.<br>MR. WILLIAMS: Yeah.<br>THE WITNESS: (Witness reviews.)<br>Oh, wow.<br>BY MR. WILLIAMS:<br>Q. Mr. Mullenweg, just so you know the e-mail --<br>A. I'm still reading. Sorry.<br>Q. I understand. I just want to explain. The e-mail contains a lot of other stuff that is related to discovery issues between the parties.<br>I'm only focused on your counsel's identification of the topics and then matching those topics up in the deposition notice.<br>A. That's fine. I just wanted to read the whole document.<br>Q. I -- I understand. But we're also on, you know, limited time with you. So --<br>MR. DORE: You handed him documents.<br>MR. WILLIAMS: I --<br>MR. DORE: You're asking my client to read the documents to the extent he feels necessary and appropriate to answer the question. So I understand your position, but I'm telling him to read the<br>document so he's in a position to answer questions about the context surrounding what you're asking about in the document.<br>MR. WILLIAMS: I'm not asking him about the exchange between the counsel, other than the identification of the topics.<br>MR. DORE: I understand your perspective is that you're asking about a specific aspect of the document that you've handed him. I'm telling him to read the document.<br>THE WITNESS: Do you not want me to read the entire documents that you're giving me?<br>BY MR. WILLIAMS:<br>Q. I want you to focus on the deposition notices, because those have the topics. |

| | |
|---|---|
| | What I was showing you the letters for is to show you your counsel's identification of which topics so there isn't any disagreement when we go through the topics. That was the only part of the letter that I was trying to help streamline things with.<br>A. Okay. So I'll need to read all of this as well and, like, all of 14 and 15?<br>Q. Well, those are the deposition topics. And I would -- let -- let me ask you this, did you --<br>A. Can I finish reading before there's any questions?<br>Q. Well, I'll let you read them, but I want to ask you, did you do anything to prepare for your 30(b)(6) deposition today?<br>A. I was trying to finish the document before the question.<br>So may I do that?<br>Q. You're -- you're reading about the parties' discovery disputes that has nothing to do with the deposition questions I'm asking.<br>So I'm trying to, you know, streamline this process, 'cause we're going to be here for a while. So --<br>A. I'm looking forward to it.<br>MR. DORE: He's -- he's reading the document that you handed to him. So if you – if you want to set it up a different way -- if you're going to hand the guy a document, he's going to read the document, as your witnesses have done at length.<br>So if you want to do it an alternative way, we can do it an alternative way. But if you're going to hand him a document, he's going to look at it.<br>MR. WILLIAMS: Okay.<br>THE WITNESS: I -- I -- I would like to read the document. |
| 133:14-16 | A. Not off the top of my head. And it just -- I apologize, it was a lot of prep. I felt like hundreds of hours, or I don't remember. |
| 135:13-19 | A. I'd probably sort of meditate and, like, try to remember sort of the specific answer to your question. So I'd kind of work backwards through the memory palace and sort of the, you know, context of where we were and what we were talking about and sort of what the words -- the color or smell or taste of them. |
| 143:17-145:16 | Q. Mr. Mullenweg, do you see that in this document, it -- after donating the trademark to the Foundation, the Foundation granted Automattic an "exclusive, fully-paid, royalty-free, perpetual, irrevocable, worldwide sublicensable right and license to use and otherwise exploit the Trademarks, and any and all related or similar names, marks, designs, domain names and other rights, along with all associated applications, registrations, and goodwill, but specifically excluding www.wordpress.org, www.wordcamp.org and www.wordpressfoundation.org." [As read]<br>And that's in Paragraph 2. Do you see that?<br>A. I see those words in the document, yes.<br>Q. And -- and you understood that that was the plan for Automattic to make a donation, and then the Foundation to license back rights to Automattic?<br>A. And is this me answering as sort of which -- is this Automattic or WooCommerce or...<br>Q. Well it's -- do you have personal knowledge of it? You signed it.<br>A. I -- I don't recollect exactly a plan, but I see that listed here in this document.<br>Q. And --<br>A. I don't know if that was a plan or not or the original plan, or if it was modified subsequently from when this was done.<br>Q. Okay. But you understood that the Foundation was granting Automattic back exclusive rights to the trademarks as part of this arrangement?<br>A. I'm not a lawyer. So my understanding would be sort of as a -- not as a legal or accounting position.<br>Q. And I -- I'll agree and stipulate that none of my questions are asking you for legal opinions in this deposition. So I -- I recognize you're not a lawyer, and -- and I'm not asking you in that regard.<br>But -- but you had an understanding after signing this document that Automattic was getting exclusive license, as defined here, to use and exploit the WordPress trademarks?<br>A. I --<br>MR. DORE: Object to form.<br>Go ahead.<br>THE WITNESS: I -- I don't recollect my understanding on, you know, the date of this document, June 7, 2010. |
| 147:12-150:24 | Q. And you wrote this blog post titled "The New Home for the WordPress"; correct?<br>A. Yeah, I might have had some help on it.<br>Q. And this is on your personal blog?<br>A. This screenshot looks like a screenshot of my MA.TT personal blog, yes. I have other personal blogs.<br>Q. Do you know -- recall how many -- well, the -- the -- the date on this is September 9th, 2010.<br>Do you see that?<br>A. I do. I don't know what time zone that's in.<br>Q. You said you might have had help on it.<br>Do you remember someone helping you with drafting this? |

| | |
|---|---|
| | A. No, I -- I don't remember a specific name. But, you know, for something like this, I might ask for like a -- an editor, a typo check, or this might have included someone else, yeah.<br>Q. Right. But the -- the substance of it, you wrote; correct?<br>A. I don't recall exactly 16 years ago.<br>Q. Why did you write a post about the fact that you had -- Automattic had transferred the WordPress trademark to the WordPress Foundation?<br>A. I -- I don't recall exactly why at that time.<br>Q. Did you think it was a big deal?<br>MR. DORE: Objection to the form.<br>THE WITNESS: Well, it looks like the second paragraph said, "This is a really big deal," so I imagine I did think that at the time, yeah.<br>BY MR. WILLIAMS:<br>Q. And why would this have been a big deal at the time?<br>MR. DORE: Objection to form.<br>THE WITNESS: Oh, why was this a big deal?<br>Well, I remember it being a -- tricky to navigate. You know, Automattic had or has, and had at the time, you know -- this time there would have been a minority of the board. And I think I had to get, like, sign-off from the board, and the investors, and you know, all the sort of folks involved to be able to transfer -- do a transfer of the trademark, which is unusual for sort of for-profit to divest something that's like a -- that's like a trademark.<br>BY MR. WILLIAMS:<br>Q. So you say in the first paragraph, starting with "Today," which is the fourth line down of the first paragraph, you say "Today we're growing in another way." And then it's bolded. "Automattic has transferred the WordPress trademark to the WordPress Foundation, the nonprofit dedicated to promoting and ensuring access to WordPress and related open source projects in perpetuity."<br>Do you see that?<br>A. Yes, I do.<br>Q. Okay. And then you write "This means that the most central piece of WordPress's identity, its name, is now fully independent from any company."<br>Do you see that?<br>A. I do see that in the document. But, again, I don't remember if I wrote that. But it is on my blog, yeah.<br>Q. You're not denying that you wrote it, are you?<br>A. I am neither confirming nor denying my recollection at the time of the exact providence of every sentence.<br>Q. Well, but this was on your personal – one of your personal blogs?<br>A. Yes.<br>Q. Is it still there?<br>A. I would want to check, but I believe that this is, you know, the capture date and everything like that. And it looks like just a few days ago -- or a month ago.<br>Q. Okay. And --<br>A. I have no reason to think it's not there anymore.<br>Q. The statement "This means that the most central piece of WordPress's identity, its name, is now fully independent from any company," that's -- that was a false statement at the time, wasn't it?<br>A. I don't recall. And the post also could have been updated since 2010. |
| 286:19-291:6 | Q. Are you just spewing off names, or do you actually know that any those signed an agreement that you would consider to be a trademark license?<br>A. I don't recall all of the agreements signed by all the hosts.<br>Q. Have you seen an agreement signed by [redacted] where a trademark license signed by them?<br>A. I don't recall. Possibly.<br>Q. Have you seen a signed trademark license with [redacted]?<br>A. It is possible, yes.<br>Q. I'm -- I'm not asking if it's possible.<br>Have you seen one?<br>A. I would want to refresh my memory with a -- a document or --<br>Q. But --<br>A. -- a review.<br>Q. -- surely if you had one, if Automattic had one in its possession, that would have been produced in the litigation; correct?<br>A. If it was relevant or requested or --<br>Q. Wouldn't it be relevant?<br>MR. DORE: Object to the form of the question.<br>THE WITNESS: I don't -- I don't know.<br>BY MR. WILLIAMS:<br>Q. But you -- Automattic did produce an agreement with [redacted]; correct? |

| | |
|---|---|
| | MR. DORE: Object to the form of the question.<br>THE WITNESS: I would want to review what was produced if there's an exhibit.<br>BY MR. WILLIAMS:<br>Q. Are you --<br>A. I think Automattic's produced over a million documents.<br>Q. Right. But I'm asking -- you mentioned [redacted]. Are you aware that there is an agreement between Automattic and [redacted]?<br>A. Yeah, I think there's been several agreements over the years.<br>Q. And that deals with a license agreement to the trademarks?<br>MR. DORE: Object to the form.<br>THE WITNESS: Can deal with trademark use or trademark use in advertising or -- yeah, various things.<br>BY MR. WILLIAMS:<br>Q. Yeah. [redacted] was reselling Automattic products and services; correct?<br>A. Not exclusively or, you know, for the entirety of our partnership with them.<br>Q. But that was one of the things they were doing?<br>A. They do have some offerings, which can resell.<br>Q. And then under the terms of that agreement, they only had the right to use the WordPress trademarks when reselling Automattic products; are you aware of that?<br>MR. DORE: Object to the form.<br>THE WITNESS: I don't think that is inclusive of all the times because I think also we've had an agreement prior to the resell, of say, [redacted] which is probably a specific carveouts [verbatim].<br>BY MR. WILLIAMS:<br>Q. Is it your testimony that [redacted] had an agreement by which they could -- a signed license agreement by which they could use the WordPress trademarks to commercially exploit their products and services as opposed to Automattic's?<br>A. I think our agreements also predate [redacted], which previously called [redacted], and previous to that might have been a different entity name.<br>Q. Whether -- whether it was under [redacted] or [redacted], are you aware that --<br>A. Or [redacted] or there might have been different entity names over the years.<br>Q. Okay. Is [redacted] the same company as [redacted]?<br>A. I'm not aware of [redacted]'s cor- -- current corporate structure. And [redacted] also has renamed a number of times.<br>Q. Okay. Are you aware of a signed license agreement with [redacted] to allow them to use the WordPress trademarks?<br>A. I'm not aware of 100 percent of our agreements, no.<br>Q. I'm not asking 100 percent. I'm asking you are you aware with -- of a signed license agreement with [redacted] to allow them to use the WordPress trademarks?<br>A. I don't recall one, no.<br>Q. Do you recall discussions internally at Automattic that hosts were not going to be willing to pay to use the trademark that they've been using for free this whole time for years?<br>MR. DORE: Object- -- objection to the form.<br>Go ahead.<br>THE WITNESS: No.<br>BY MR. WILLIAMS:<br>Q. You're not aware of any conversations that -- to that effect?<br>A. That wasn't your question.<br>Q. Well, are you aware of any conversations internally at Automattic in which Automattic employees said that they were having difficulty convincing hosts to pay a trademark license for something that they have been using for years?<br>A. I don't recall. |
| 340:3-345:16 | Q. So let me make sure I understand your testimony.<br>Is sponsoring a WordCamp in your view a contribution to the WordPress community; yes or no?<br>MR. DORE: Objection to the form.<br>Go ahead.<br>THE WITNESS: In the "Five for the Future" definition that I spoke about, it is not considered a contribution.<br>BY MR. WILLIAMS:<br>Q. My question wasn't limited to "Five for the Future."<br>Do you consider sponsoring a WordCamp a contribution to the WordPress community --<br>MR. DORE: Object- --<br>BY MR. WILLIAMS:<br>Q. -- yes or no?<br>MR. DORE: Objection to the form of the question.<br>Go ahead.<br>THE WITNESS: In my consideration as a contribution in the context I spoke about it, in the open-source altruistic sense, I wouldn't define it as a contribution. |

I could say and maybe even have said that it supports WordCamps, and it's part of what allows us to charge an inexpensive ticket price.

WordCamps are typically -- you know, a professional conference of the same manner probably be hundreds of dollars for a ticket price, and our ticket prices are usually 20 to 50 dollars. That's underwritten and sort of subsidized by sponsors.

However, you know, as a sponsor of WordCamps ourselves since they started, we definitely see a commercial benefit. So a great place to meet new customers. Companies have booths, and they typically get promotion on the website and e-mails and...

BY MR. WILLIAMS:
Q. Have you ever publicly stated anywhere in -- verbally or in writing that you do not consider sponsorships of WordCamps to be a contribution to the WordPress community?
A. I just said this right now. I don't know if this counts as public. I --
Q. We can make it public, but I'm asking if you've ever written it or -- before today. Have you ever told the world that in your view sponsoring a WordCamp is not a contribution to the WordPress community?
A. I believe I have spoken about this at WordCamps or in Q-and-A sessions at WordCamps. I would need to look up which specific one there is. I don't recall just off the dome, as they say.
Q. You don't think that would come as a great surprise to members of the WordPress community to hear you say that their sponsorship money for a WordCamp is not considered a contribution to the WordPress community by you?
A. Not if they've seen any of the talks I mentioned or read WordPress.org, a documentation about this.
Q. Okay.
A. But I can't speak to any person's knowledge or surprise besides my own.
Q. So you're saying there's documentation on WordPress.org that specifically says sponsoring a WordCamp is not considered a contribution to the WordPress community?
MR. DORE: Objection to the form.
THE WITNESS: In the sense of a "Five for the Future" contribution --
BY MR. WILLIAMS:
Q. I'm not limiting it to "Five-" --
MR. DORE: You're interrupting him. Let him finish his que- -- his answer.
BY MR. WILLIAMS:
Q. I apologize. I'm sorry, did you finish?
A. Mm-hmm.
Q. Okay. I wasn't limiting my question to "Five for the Future," 'cause you would agree there are ways to contribute to the WordPress community that do not -- or that are not limited to the "Five for the Future" program; correct?
A. My personal definition is the "Five for the Future" definition. That's why I keep referring to it. Other people might use the word "contribute" differently.

And, like I said, I believe there is some -- you know, when people provide a sort of sense of -- I'll say open source, I'm generally supportive of that in a more broad general sense.

Sponsorship in particular is a -- we always have more sponsors than we have slots for. So if one particular company were to not sponsor, it'd be quickly filled by others.

Q. So is it your testimony that the only contribution you considered to the WordPress community is the "Five for the Future" program?
MR. DORE: Objection to the form.
THE WITNESS: No, that wasn't what I said.
BY MR. WILLIAMS:
Q. In fact, you have said there are numerous ways co- -- peo- -- members of the WordPress community can contribute back to the WordPress project; correct?
A. I don't recall a specific instance.
Q. So would it surpri- -- are you denying that you've said that?
MR. DORE: Objection to the form. Misstates the testimony.

Go ahead.

Testimony WITNESS: That's not what I said.

BY MR. WILLIAMS:
Q. Okay. Didn't you recently publicly state that you think the "Five for the Future" program is essentially worthless?
A. Oh, I did have a conversation that was referring to the measurements of inputs versus outputs. It's not a FFT [verbatim] statement of the program as much of the sort of discovered sort of failings, particularly when companies would overstate or people would overstate their contributions.
Q. Would you agree that companies should be able to rely on your past statements about what is considered a contribution to the WordPress community?
MR. DORE: Objection to the form.
THE WITNESS: That is up to them.
BY MR. WILLIAMS:
Q. What do you mean by that?

| | |
|---|---|
| | A. I don't agree or disagree with your statement as it is framed.<br>Q. Are you the sole arbiter of what is a contribution to the WordPress community?<br>A. I am for my opinion of it, yes. |
| 394:10-396:22 | Q. You directed your employees to set up a web tracker website to track all of the websites that were leaving WP Engine; correct?<br>A. No, I wouldn't agree with that characterization.<br>Q. What -- what don't you agree with, what part of it?<br>A. Your sentence or your question.<br>Q. Did you -- were you aware that a web tracker website was set up in order to monitor the websites that left WP Engine?<br>MR. DORE: Objection to the form.<br>THE WITNESS: Not specifically as you phrase it.<br>BY MR. WILLIAMS:<br>Q. You -- okay.<br>What is it about my phrasing that you don't agree with?<br>A. The words you're using have some specific technical connotations. So perhaps if you could explain by, like, tracker, which typically means like a -- in web development, like a -- a pixel on a web page, like a Google Analytics or something.<br>You know, I think you said leaving WP Engine. And, you know, whether a customer is leaving or staying, again, could have like -- not be represented in, say, the domain name or even the sort of who is information [verbatim] or how that site appears to be hosted.<br>Q. So tell me what you did set up in that regard.<br>MR. DORE: Objection to the form.<br>Go ahead.<br>THE WITNESS: Yeah, I don't know – could you be more specific when you mean "that regard"?<br>BY MR. WILLIAMS:<br>Q. Sir, you're under oath.<br>You understand that; right?<br>A. I do understand that.<br>Q. Are you saying you're unaware of a website that you authorized to be set up to monitor how many websites WP Engine was losing as a result of your conduct? Is it your testimony you're completely unaware of that fact?<br>MR. DORE: Objection to the form of the question.<br>THE WITNESS: I think to fully track that you would also need to look at the websites that were going in to WP Engine and track it differently.<br>BY MR. WILLIAMS:<br>Q. The --<br>A. I think you're referring to a different website, which I'm happy to speak to. But I'd need to know you are specifically citing it.<br>Q. Which website are you thinking of?<br>A. I wouldn't want to speculate your intention on it.<br>Q. You just said you -- I [verbatim] think I'm referring to a different website.<br>I'm asking, which website are you thinking of?<br>A. I could guess, but I don't want to speculate. |
| 409:11-410:20 | Q. Okay. You recall stating in August of 2024 that "it's feeling like we're about to go full nuclear with WPE, with a possibility of a partnerships/merger/M&A as an exit, but in general there will be a realignment"? [As written]<br>A. No, I don't recall that specifically.<br>MR. WILLIAMS: Okay. Let's mark as Exhibit 45.<br>(Mullenweg Deposition Exhibit 45 was marked for identification.)<br>BY MR. WILLIAMS:<br>Q. And it's a Slack conversation with a date of August 15, 2024, between Mr. Mullenweg and Jessie Friedman with a Bates Stamp A8C0070639.<br>A. All right.<br>Q. And do you see where you wrote that to Mr. Friedman?<br>A. I don't see Mr. Friedman's response, but, yeah, I do see that, and this looks like a DM Slack between us.<br>Q. Okay. But what I read is what you wrote; correct?<br>A. Can you repeat what you read? I didn't --<br>Q. Sure. The second entry at 8:24 p.m. you wrote, "It's feeling like we're about to go full nuclear with WPE, with a possibility of a partnerships/merger/M&A as an exit, but in general there will be a realignment."<br>You wrote that?<br>A. I don't recollect, but I see that in the document, yes.<br>Q. And what did you mean by "about to go full nuclear with WPE"?<br>A. I don't know. I'd want to read the full context. |

| | |
|---|---|
| 446:16-447:6 | Q. Right.<br>But focusing on Audrey Capital and any affiliated entities with Audrey Capital, who would be most knowledgeable about the corporate structure of it?<br>A. Oh, Franklin could speak to that.<br>Q. And would he be aware of how many board members there are or who the officers are, anything like that?<br>A. He could definitely get that information quickly.<br>Q. Are you aware of any officers -- well, do you know if you are an officer of Audrey Capital?<br>A. Again, I -- I know -- I think I'm a sole member of the LLC. I don't know my exact title or role with all of the previously listed entities. |
| 572:20-575:18 | Q. Mr. Mullenweg, you understand that the Court entered a preliminary injunction in this case; right?<br>A. Yes.<br>Q. How did that make you feel?<br>MR. DORE: Objection to the form.<br>THE WITNESS: Oh. I don't recall. It was a while ago.<br>BY MR. MACK:<br>Q. Do you recall part of the preliminary injunction was a requirement to remove a check box that required users logging in to WordPress.org to check that they were not affiliated with WP Engine, in any way, financially or otherwise?<br>A. There was an editorial check box on one of the login systems. It was not inclusive or required to be used to log in to all parts of WordPress.org.<br>And, in fact, if you were to submit the form without the check box, I believe it would still work. So you could submit the form without the check box being checked.<br>Q. At some point you directed Automattic employees to change the label on that check box to read --<br>A. This is --<br>Q. -- "Pineapple is delicious on pizza;" right? [As read]<br>A. I'm glad we had lunch already. This is going to get me hungry again.<br>I don't recall if an Automattic employee, or an Audrey employee, or a volunteer. But I do recall the check box being changed at some point. And I believe the, you know, the important world issue of pineapple on pizza or not is currently there.<br>We also had a discussion about other things that we could put on the check box. But I don't think it's been implemented yet. I've been a little busy with this, what I consider, unnecessary legal action and subsequent security and core development issues.<br>Q. And it was your idea to change the label on the check box to read "Pineapple is delicious on pizza;" right?<br>A. I'll take credit for it now. I don't remember if it was my sole idea. But I do think it's funny.<br>Q. Okay.<br>A. Or an important question, actually.<br>Q. Okay. Well, prior to WP Engine filing this lawsuit, there was no requirement to select a check box on the login on the WordPress.org web page; right?<br>A. Oh, there might have been check boxes in the past. I don't remember the whole history.<br>Q. Okay.<br>A. And there's also other places where you can log in on other sites that are either or might be affiliated with WordPress.org. And some of them have different check boxes.<br>So, for example, when you do a plug-in, there's a set of check boxes that say that you are aware of and comply with all the plug-in submission guidelines.<br>Or when you register for a WordCamp, that, I believe, also has some different check boxes. So different parts of the sites. There's different things there.<br>Q. Okay. But the Court required you to remove the check box, and you changed the label; right?<br>MR. DORE: Object to the form.<br>THE WITNESS: We removed the check box, and then we added a different check box. |
| 685:7-689:5 | Q. In this article you write, "WP Engine is free to offer their hacked up, bastardized simulacra of WordPress's GPL code to their customers." [As read]<br>Do you see that?<br>MR. DORE: Objection to the form.<br>THE WITNESS: You said did I write this?<br>BY MR. MACK:<br>Q. Yes.<br>A. I did. I must have been using a thesaurus.<br>Q. What was the basis for your statement "WP Engine is free to offer their hacked up, bastardized simulacra of WordPress's GPL code to their customers"? [As read]<br>A. It's my editorial opinion. It's my – you know, as the co-founder of WordPress.org, it's been my life for 22 years. I have a WordPress ring (indicating). I'm kind of married to WordPress. And I really consider it my life's work.<br>And so I -- you know, there's lot of -- you put your baby out into the world. You don't always control like how it's used or what is done. And particularly WordPress being open-source software, It's sort of part of the game. |

| | |
|---|---|
| | And, you know, people use WordPress for things that I think are beautiful. You know, like Microsoft Word, you can't control what people print with it. So, you know, it's used for things that I think are morally odious or terrible. It's used on Nazi websites.<br>With open source, you ultimately don't have control of that. But I do feel like, you know, in America, as a free country, freedom of speech, I should be able to express my opinion on things like this.<br>Q. What is the complete basis for your statement that the code WP Engine offers is hacked up?<br>MR. DORE: Objection to the form.<br>THE WITNESS: Hacked up to mean -- yeah, hacked up -- well, the context is "hacked up, bastardized simulacra," so...<br>You said what is my basis. I -- I guess my basis is as the, you know, creator of WordPress, working on it for 22 years, you know, sort of an expert in content management systems, and also, you know, getting -- I hear from a lot of users of WordPress, customers. I see complaints. I go to WordCamps.<br>You know, I've even heard from WP Engine employees, like -- almost like whistleblowers, saying that some of the, you know, cost-saving measures or other things pushed on by the private equity owners have caused them to sort of start to operate in a way that felt, you know, unethical or out of line with the WordPress community guidelines. More of just sort of the social mores of like what's right in the world.<br>BY MR. MACK:<br>Q. Okay. But as of September 25th, 2024, when you made this statement, you hadn't personally reviewed the WordPress GPL code that WP Engine provides to its customers, had you?<br>MR. DORE: Object to the form.<br>THE WITNESS: I have lots of colleagues that have reviewed or have WP Engine accounts. I've heard from many WP Engine customers.<br>And I also, you know, did a review of WP Engine's own website where they talk about how the code is run, what they're doing.<br>And, of course, the bigger context of this is the abuse of the trademark. And so, you know, WP Engine's use of the WordPress and WooCommerce trademarks was creating confusion in the marketplace.<br>My own mother thought WP Engine was an official company. Barry Abrahamson, our CTO, his mother did as well. And when we refer to our "mothers," it's not in the nontechnical sense. These are extremely smart, capable women.<br>And, you know, they're -- my mom's been following WordPress since day one. The fact that she was -- literally thought WP Engine was like an official WordPress was really shocking to me.<br>So that's part of the sort of, you know, bastardized simulacra. You know -- are you familiar with the term "simulacra"?<br>BY MR. MACK:<br>Q. I'm familiar with an essay "Simulacra and Simulation" by Jean -- a French philos- -- philosophical essay.<br>A. Yeah, I -- can you pronounce his last name? I have trouble with it, too. Jean Baudrillard or --<br>Q. Baudrillard, I believe.<br>A. Baudrillard, yeah.<br>Q. Jean Baudrillard, yes.<br>A. Right. |
| 824:12-830:25 | Q. Okay. And then further down in this exhibit, Exhibit 71, on the second page at 11:44 a.m., you respond to the posts from Paul Maiorana and say, "What's our stick?"<br>Is that right?<br>A. It could be what's our "schtick."<br>Q. I mean, the word on the pa- -- the words on the page are, "What's our stick?"<br>Right?<br>A. Yeah, but it could be schtick. I don't know if that's a typo or not.<br>Q. Okay. But the -- as a starting point, the words on the page are, "What's our stick?"<br>Correct?<br>A. That's how you can pronounce it, one way you can pronounce it.<br>Q. Okay. And have you used the term "stick" in the context of negotiations with web hosts?<br>A. Probably use bitg "schtick" and "stick," yes.<br>Q. Okay. And with respect to "stick," have you also used the term "carrot" as the opposite of a stick in the context of negotiations with web hosts?<br>A. It's possible. I do love carrots --<br>Q. So --<br>A. -- almost as much as pineapple on pizza.<br>Q. In the context of negotiations with other web hosts, a stick would be some kind of negative inducement to take action; is that right?<br>A. Not necessarily a -- a negative one, but one which maybe could help move things along or is more at arm's length.<br>Q. So like in the context of a nego- --<br>A. Like a stick is generally longer than a -- a carrot.<br>Q. So in the context of negotiating with other web hosts, a threat of a lawsuit, for example, would be a stick?<br>MR. DORE: Objection to the form. |

| | |
|---|---|
| | THE WITNESS: Ooh. I don't know if I'd use stick for that. I generally don't believe in making threats even if things could be interpreted that way.<br>BY MR. TERUYA:<br>Q. Is legal enforcement a stick in the context of negotiations with other web hosts?<br>A. No. In fact, sometimes legal enforcement is actually just what you have to do to exam- -- for example, protect a trademark. I'm not a lawyer, but my understanding is if you don't enforce a trademark, you could lose -- it could become generic, right, is the term, or you could lose that trademark. So that also could just be a necessary action because of community rules or other things.<br>Q. Mm-hmm.<br>A. So...<br>Q. So what's an example of a stick in the context of negotiating with other web hosts?<br>A. Oh. It would depend a lot on I guess the context of what was being negotiated, your relationship with that, and maybe what's been tried before or sort of history together.<br>Q. Mm-hmm.<br>A. A stick could be, you know, you have to pay for dinner next time. So it -- there's a range. I'm sure it could also be like we'll say bad things about you on the internet or -- I don't know. It could be any number of things.<br>Q. And what's a -- what are carrots in the context of negotiations with other web hosts?<br>A. Oh. It'd probably depend on the web host. But I would say one would be anything that helps them grow their business. You know, web hosts I would say is a secular trend, not even just the WordPress ones.<br>You know, have had headwinds to the business, and many are growing -- I would say almost all are growing much slower than they used to.<br>Q. Okay.<br>A. I think that helps them accelerate growth or serves their customers better.<br>Q. Mm-hmm.<br>A. So reducing churn, but also like a -- a -- great carrots. Public recognition or sort of compliments. Partnerships, you know, where you, like, do a press release together. Partnerships where you provide technology they might not be able to develop themselves or -- or take them a long time. Those are some carrots.<br>Q. So in terms of --<br>A. I obviously think a lot more about carrots.<br>Q. Did -- do you think you've ever referred to legal enforcement or litigation conduct as a stick in the context of negotiations with other web hosts?<br>A. We're generally on the receiving end of legal things. But perhaps like a cease and desist I'd say is a pretty low -- what would you call that, low cost, low -- you know, pretty common. Even among partners you might do a cease and desist. But, no, I wouldn't say that that's typically something I would think about or maybe even think of like the top ten things you want to do.<br>I would say particularly now having been in some legal entanglements, I would do anything to, you know, try to head this off ever happening again in the future.<br>Q. Mm-hmm.<br>And when you asked, "What's our stick," that was in response to Paul Mai- -- Maiorana's message which ended, "You've spent a lot of times with the -- lot of time with the hosts, what other incentives come to mind for you Matt Mullenweg?" [as read]; is that right?<br>A. Where are you seeing that?<br>Q. Sorry. In Paul Maiorana's 9:03 a.m. message right above your message he ended by saying, "You've spent a lot of time with the hosts, what other incentives come to mind for you Matt Mullenweg?"<br>Is that right?<br>A. Oh, it does say that, yes.<br>Q. And then you responded, "What's our stick"?<br>A. Yeah, my reading actually of the context of this, sort of before and after, is also like what's proprietary? So what's something that we -- we own completely that is valuable or useful?<br>And that's, I think, indicated by Paul's subsequent message where he says the trademark and "compete with us on SEM" would be reference to, for example, you know, when you search on Google, Google Ad words, Ad words at the time, at least, would not allow the use of registered trademarks without permission for other people to use that trademark in their particular ad.<br>So even while they might say, buy an ad on WordPress, they couldn't use the trademark in a non-very-use [verbatim] way or in a way that sort of was confusing because, you know, especially lay people don't even realize those top results are ads. And over the years they've become more and more blended.<br>So most people, like, just kind click on whatever the first thing is and don't realize that that's now an auction. So it's whoever's paying the most. And particularly if, as we found, WP Engine was doing, that ad is confusing the marketplace. I think that's actually one of the real reasons why people were confusing WP Engine being an official WordPress thing.<br>I find it very -- you know, I -- I'm very aware of the differences. Unless I misspeak and say WordPress Engine, you know, I'm pretty good about, you know, knowing the search results and everything like that. |

| | |
|---|---|
| | But when I think about why there's so much confusion or why my own mom, she might have just Googled "WordPress" or typed in "WordPress," saw the results and clicked on the top one, and that was going to a WP Engine, which then, you know, was using the logo in lots of ways. So I think that's obviously really, really important. |
| 922:10-16 | A. Oh. Value? No. We do have a -- WordPress engine tracker sites which sort of looks at some -- sort of a set of -- finite set of domains from a date and that change in that finite set. But you also -- it does not include all of the possible domains. And I think as I previously clarified, isn't necessarily indicative of -- of customers. |
| 966:5-967:6 | Q. Okay. But is the top post on the second page of Exhibit 82 a post from you on the X platform?<br>A. It is a partial post.<br>Q. Okay. In the post -- partial post from you on the second page of Exhibit 82, you said, "I don't think they're worth a fraction of that now. Customers are leaving in droves. People are waking up to their bad behavior since 2018. It's a distressed asset."<br>Is that right?<br>A. It does say that. And part of the reason the context is interesting is 'cause it's replying to something that says "WordPress Acquires WPEngine for 2.5 billion in Cash and Stock" [as read] [as written], which is a nonsensical sentence for a variety of reasons, including WordPress is not a company that could acquire anything.<br>Q. Did you post the top -- the -- the -- did you make the post at the top of this page?<br>A. The part we read earlier, the I don't think it's a distressed asset, yes.<br>Q. Okay. And did -- were you referring by a "distressed asset" to WP Engine?<br>A. Well, I would want to see the full thing it's referring to. The "they" could also be like -- you know, like Jason Cohen or something like that. |